UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

COMMODITY FUTURES TRADING COMMISSION,

Plaintiff,

v.

STERLING TRADING GROUP, INC., UNIVERSAL FX, INC., STG GLOBAL TRADING, INC., QIX, INC., GRAYSTONE BROWNE FINANCIAL INC., JOSEPH ARSENAULT, AND ANDREW STERN

Defendants.

04-21346

CIVIL ACTION NO:

CIV-LENARD

MAGISTRATE JUDGE SIMONTON

**COMPLAINT FOR A PERMANENT INJUNCTION, OTHER EQUITABLE RELIEF AND CIVIL MONETARY PENALTIES**

**I.**

**SUMMARY**

1. Since July 2002 and continuing through the present (the "relevant time"), defendants Sterling Trading Group, Inc. ("Sterling"), STG Global Trading, Inc. ("STG"), and Graystone Browne Financial, Inc. ("Graystone") also doing business as ("a/d/b/a") Graystone Browne Management, Inc., and formerly doing business as ("f/d/b/a") Global Forex Trading, Inc., acting as agents of, and introducing entities for, defendants Universal FX, Inc. ("Universal") and/or QIX, Inc. ("QIX"), have solicited and are soliciting members of the retail public throughout the United States to engage in the speculative trading of illegal foreign currency futures and options contracts with Universal and QIX.

2. The defendants have operated their scheme in two phases, through a complex maze of interrelated firms. During each phase, Joseph Arsenault ("Arsenault"), an officer and controlling person of at least two of the three introducing entities, has solicited and introduced foreign currency business for Universal and QIX, which are commonly owned and controlled by Andrew Stern ("Stern").

3. From at least July 2002 through August 2003 ("Phase I"), Sterling, acting as an agent of and introducing entity for Universal and under the control of Arsenault, used misleading radio advertisements and aggressive, high-pressured, misleading telemarketing sales tactics to fraudulently solicit retail customers to engage in illegal foreign currency futures transactions with Universal. Sterling maintained an exclusive principal-agent relationship with Universal at all times during this period.

4. In addition, Universal provided Sterling with misleading and deceptive account opening documents that Sterling then provided to prospective customers. The account opening documents contained numerous materially misleading statements and material omissions regarding the total fees charged to customers, the nature of the transactions entered into by customers, and the nature of Universal's role as the counterparty to the customer transactions.

5. Furthermore, while making material misrepresentations about the likelihood of realizing profits and down playing the risks, Sterling and Universal defrauded customers by trading in a manner so that their customers would be cheated out of their investment funds.

6. Since August 2003 through present ("Phase II"), STG and Graystone have been soliciting retail customers to engage in illegal foreign currency options transactions with QIX. QIX has accepted funds from STG and Graystone customers and executed orders for the illegal foreign currency options transactions.

7. By virtue of their conduct, the defendants have engaged, are engaging, or are about to engage in acts and practices which violate Sections 4b(a)(2)(i) and (iii), 4(a), 4h, 4c(b) of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 6b(a)(2)(i) and (iii), 6(a), 6h, 6c(b) (2001) and Commission Regulations ("Regulation(s)") 1.1(b)(1) and (3) and 32.11(a) thereunder, 17 C.F.R. §§1.1(b)(1) and (3) and 32.11(a) (2003).

8. Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the Commodity Futures Trading Commission ("Commission") brings this action to enjoin Sterling, STG, and Graystone from soliciting new customers and customer funds and to enjoin all of the defendants from any other unlawful acts and practices, and to compel their compliance with the Act. In addition, the Commission seeks from each of the defendants an accounting, disgorgement of defendants' ill-gotten gains, restitution to investors, civil monetary penalties, and such other relief as this Court may deem necessary or appropriate.

9. Unless enjoined by this Court, defendants are likely to continue to engage in the acts and practices alleged in this Complaint, as more fully described below.

## II.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), which authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

11. Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because the defendants are found in, inhabit, or transact business, among other

places, in this District, or the acts, practices and omissions in violation of the Act have occurred, are occurring, or are about to occur, within this District, among other places.

## III.

## THE PARTIES

**THE PLAINTIFF**

12. The Commodity Futures Trading Commission is an independent federal regulatory agency that is charged with the responsibility for administering and enforcing the provisions of the Act, as amended, 7 U.S.C. §§ 1 *et seq.*, and the regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.*

**THE DEFENDANTS**

13. **Joseph S. Arsenault,** age 45, resides at various times in Beverly Hills, California and Miami Beach, Florida. He is currently listed as the managing director of Sterling, the vice-president of Graystone Browne Financial, Inc., and the president of Graystone Browne Management, Inc. In the 1980's, Arsenault was registered with the Commission at various times as an associated person of five south Florida firms, four of which were the subject of Commission enforcement actions for fraud.

14. **Andrew Stern**, age 43, resides in North Miami Beach, Florida. He is listed as president of Universal FX, QIX, Inc., and Universal Financial Holding Corporation, Inc. He is a registered Associated Person with the National Futures Association ("NFA"), and an approved NFA associate member and principal. He was a respondent in three NFA regulatory and four NFA arbitration actions.

15. **Sterling Trading Group, Inc**. is a Florida corporation organized on May 9, 2002. Its principal place of business is 2999 NE 191 St., Suite 804, Aventura, Florida 33180. From at

least July 2002 through July 2003, Sterling has solicited retail customers to engage in foreign currency futures transactions with Universal FX, Inc. Sterling has never been registered with the Commission.

16. **STG Global Trading, Inc**. is a California corporation organized on July 14, 2003. Its principal place of business is 1901 Avenue of the Stars, Suite 1458, Los Angeles, California 90067. Since approximately August 2003, STG has been soliciting retail customers to engage in foreign currency options transactions with QIX. STG is not registered with the Commission in any capacity.

17. **Graystone Browne Financial, Inc.** a/d/b/a Graystone Browne Management, Inc. and f/d/b/a Global Forex Trading, Inc. is a Florida corporation organized on November 5, 2003. Its principal place of business is 18305 Biscayne Boulevard, Suite 303, Miami, Florida 33160. From at least November 5, 2003 to the present, Graystone has been soliciting retail customers to engage in foreign currency options transactions with QIX. Graystone is not registered with the Commission in any capacity. Graystone has a pending application for registration as an introducing broker ("IB").

(i.) Global Forex Trading, Inc. was a Florida corporation organized on August 1, 2003. Its principal place of business was 12864 Biscayne Boulevard, Suite 113, North Miami, Florida 33181. From at least July 24, 2003 through November 5, 2003, Global Forex Trading, Inc. solicited retail customers to engage in foreign currency options transactions with QIX, Inc. During this period, its president was listed as Andre Stepsky of 600 Parkview Drive, 922, Hallandale, Florida 33009. Andre Stepsky is a former employee of Sterling and is currently employed at Graystone. On November 5, 2003, Global Forex Trading, Inc. changed its name Graystone Browne Management Inc.

(ii.) Graystone Browne Management, Inc. a/d/b/a Graystone Browne Financial, Inc. is a Florida corporation organized on November 5, 2003. Its principal place of business is 18305 Biscayne Boulevard, Suite 303, Miami, Florida 33160.

18. **Universal FX, Inc.** is a Florida corporation organized on February 2, 2002. Its principal place of business is 3467 N.E. 163rd St., North Miami Beach, FL 33160. From at least February 2, 2002 to the present, Universal has used various introducing entities to solicit retail customers to enter into foreign currency futures transactions with it. Universal is not registered in any capacity with the Commission. On May 13, 2003, Universal was granted approval by the NFA to be a principal of UTS World Incorporated, a registered futures commission merchant ("FCM").

19. **QIX, Inc.** is a Florida corporation organized on October 17, 2002. Its principal place of business is 3471 NE 163rd St., North Miami Beach, FL 33160. From at least October 17, 2002 to the present, QIX has used various introducing entities to solicit retail customers to engage in foreign currency options transactions with QIX. QIX is not registered in any capacity with the Commission. On November 20, 2003, QIX was listed as a principal of QIX Futures, Inc, a registered FCM.

## IV.

## FACTS

### A. PHASE I

#### (1) STERLING/UNIVERSAL OPERATIONS

20. During Phase I, Sterling, by and through its sales representatives and Arsenault, fraudulently solicited retail customers to open accounts to trade foreign currency futures contracts at Universal. At all times relevant, Universal was the counterparty to the foreign

currency futures transactions. Sterling customers authorized Sterling to trade on their behalf by completing limited power-of-attorney forms identifying Sterling as the trading agent. Arsenault was the sole trader who placed trades on behalf of Sterling customers. At all times relevant, Sterling's relationship with Universal was exclusive in that Sterling solicited customers exclusively for Universal.

21. After the initial solicitation, Sterling sales representatives sent prospective customers, usually by fax, Federal Express, or Airborne Express, a customer account application and agreement generated by Universal and additional promotional information concerning the foreign currency market ("account-opening packet"). Once customers decided to invest, they were instructed to send their money directly to Universal.

22. At least 250 retail customers invested funds with Sterling ranging in amounts from $5,000 to over $100,000. The vast majority of Sterling's customers closed their accounts at a loss.

23. Most if not all of the Sterling customers were unsophisticated investors with little investment experience and were unfamiliar with foreign currency transactions. None of the Sterling customers qualified as eligible contract participants. *See* 7 U.S.C. § 1a(12)(A)(xi).

24. Sterling customers made speculative investments to make a profit on price moves in the foreign currency market and did not intend to take delivery of foreign currency, did not have the capacity to make or take delivery of foreign currency, and did not, in fact, take delivery of foreign currency.

## (2) STERLING/UNIVERSAL FRAUDULENT CONDUCT

### (a) Radio Advertisements

25. Sterling sponsored radio advertisements nationwide in which it claimed to offer customers opportunities to gain huge profits in the foreign currency market, which was described as a lucrative market that had previously been off-limits to retail customers. Typically, Sterling used fictitious sales representatives to convince listeners that because of the war in Iraq, a weakening U.S. dollar, or other publicly known market news, the value of the Euro would increase versus the dollar. These radio advertisements falsely claimed or implied that investors could also make huge profits with little to no risk, when in fact most Sterling customers lost most or substantially all of their investment. Some of the false and misleading claims and material omissions included the following:

(i.) Claiming that a $.01 move in the price of the Euro equals $1,000 profits without explaining the commissions and other hidden charges that would make it significantly more difficult for the customer to profit;

(ii.) Telling listeners that the profit potential is unlimited, while downplaying the potential risk of loss;

(iii.) Providing misleading and false examples of profit potential such as: if an investor had invested $12,000 in the Euro 60 days ago, they would have profited as much as $60,000. The ad, however, fails to mention that during this alleged time period, most of Sterling's customers lost money;

(iv.) Sterling representatives deliberately discussed recent and past price moves in the Euro in a manner that falsely implied that Sterling customers had reaped

significant profits from trading with Sterling during that time, when in fact virtually all Sterling customers were losing money;

(v.) Representing that Sterling utilizes stop-losses that will limit a customer's loss. A review of customer accounts and interviews revealed that Sterling did not use stop-losses and often provided customers with excuses as to why stop-losses were not utilized in the customer's account;

(vi.) Suggesting that the maximum loss from a $12,000 investment would be $3,000. This is false and misleading because Sterling representatives knew that customers typically lost most or substantially all of their investment; and

(vii.) Representing that Sterling traders watched the market 24 hours a day. This statement is false because Arsenault was the only trader who placed orders for Sterling customers.

26. The radio advertisements provided listeners with an 800 number to call to get more information and receive a free account-opening packet. The fictitious sales representatives urged listeners to call immediately so they would not miss out on the opportunity. Some representatives from the radio advertisements even suggested that listeners pull off the road to call the number.

**(b) Account-Opening Packet**

27. The account-opening packet generated by Universal typically contained: (1) a risk disclosure statement, disclosing the risk of investing in futures and options; (2) a customer information page in which prospective customers could provide information about their net-worth and trading experience; (3) a notice to traders (i.e., prospective customers), which discussed the risk of trading in the OTC (over the counter) foreign exchange market; (4) a trader agreement; (5) a disclosure statement and commission acknowledgement form; (6) a limited power of attorney form, which would allow Sterling to trade on the customer's behalf; and (7) wiring instructions to a bank account held in the name of Universal.

28. The account-opening packet provided to customers contained false and misleading statements and material omissions regarding the total charges assessed against customers. For nearly all Sterling customers, the account-opening packet contained a written disclosure about a per-transaction commission, and provided a space for the customer to sign that they had received a disclosure statement "relating to... the compensation received therefore by Introducer from UFX." Both Universal and Sterling, however, omitted and concealed any reference in the account-opening packets to additional mark-ups that Universal and/or Sterling charged on each transaction. These concealed mark-ups were at least two-thirds (66%) as large as the disclosed commissions, and Universal and Sterling charged some customers concealed mark-ups that were greater than or as large as the commissions that were disclosed. Universal tracked the total amounts of these concealed mark-ups assessed against virtually all Sterling customers in internal company documents, and it further tracked how these concealed mark-ups were significantly increasing the amount of trading losses incurred by its customers.

29. The account-opening packet provided to customers contained false and misleading statements and material omissions, which served to confuse and mislead a reasonable prospective customer regarding the true nature of the investment and the nature of Universal's role in the investment. Some of the misleading representations and material omissions include the following:

(i.) On the first two pages of the account-opening packet, Universal provides a risk disclosure statement using verbatim language from Appendix A to Commission Regulation 1.55(c), 17 C.F.R. § 155(c). This Regulation, however, applies only to futures commission merchants and introducing brokers who solicit or accept orders for the purchase or sale of any commodity for future delivery on or subject to the rules of a contract market or derivatives transaction execution facility. Furthermore, futures commission merchants and introducing brokers who solicit or accept such orders for the purchase or sale of any commodity for future delivery are required to be registered with the Commission. Nevertheless, Universal provided this risk disclosure statement, which falsely implied to prospective customers that either the customer would be trading on-exchange, regulated instruments, or that Universal traded these on-exchange, regulated instruments with other customers, or both. In fact, Universal has never been registered with the Commission, and it has never traded any commodity for future delivery on any contract market or derivatives transaction execution facility;

(ii.) An arbitration agreement on page twelve of the account-opening packet indicated that that any disputes between the customer and Universal "shall be, except as provided below, resolved by arbitration in accordance with Part 180 of the

Commodity Exchange Act." This statement referred to arbitration regulations that were set forth in Part 180 of the Commission Regulations, 17 C.F.R. § 180 *et seq.*, until October 9, 2001, at which time the Regulations were modified and recodified in Part 166 of the Commission Regulations, 17 C.F.R. § 166.5. The Commission Regulations found in Part 180 governed "any dispute which arises out of any transaction on or subject to the rules of a contract market executed by or effected through a member of that contract market" and governed "any person for or on behalf of whom a member of a contract market effects a transaction on such contract market." Universal's statement that disputes shall be resolved by arbitration in accordance "with Part 180" falsely implied either that the customer's trades with Universal FX would be traded on a contract market by a member of that contract market, or that Universal had other customers who made trades on a contract market by a member of that contract market, or both. In fact, Universal was not a member of any contract market, and none of Universal's trades with any customers were conducted on a contract market;

(iii.) Universal also represented in the same disclosure statement and commission acknowledgment form that Universal was a member of the National Futures Association. This statement was false since Universal has never been a member of the NFA; and

(iv.) The trader agreement on page six of the customer packet stated that: "UFX is authorized to purchase and sell OTCFX [over the counter foreign currency] for Trader's account(s) with a counterparty bank or sophisticated institutions or participants in accordance with Trader's oral or written or computer instructions.

Unless instructed by Trader to the contrary in writing, UFX is authorized to execute orders with such banking institutions, counterparty, bank, or sophisticated institutional participants as UFX deems appropriate." The notice to traders also stated "the firm with which you deal may be acting as your counter party to the transaction." These statements were deceptive and misleading because they falsely implied that the customers would be entering into transactions with third parties other than Universal, when Universal knew, through its representatives and agents, that it would be acting as the counterparty to the customers' trades.

**(c) False and Misleading Telephone Solicitations**

30. During telephone solicitations, Sterling sales representatives, including Arsenault, made numerous false and misleading representations to prospective customers and even NFA employees. Some of those false and misleading representations and material omissions included the following:

(i.) If the customer invested $50,000, the sales representative [Arsenault] would quadruple the investment within two to eight weeks and the customer would be thanking him for the rest of his life because the customer would be a millionaire, while failing to disclose that, as a result of the trading Sterling conducted on behalf of their customers, the vast majority of customers closed their accounts at a loss;

(ii.) 100% of the sales representative's customers are profitable, while failing to disclose that, as a result of the trading Sterling conducted on behalf of their customers, the vast majority of customers closed their accounts at a loss;.

(iii.) The Sterling sales representative made a client $180,000, earning $30,000 in commissions. This claim, which was made in or about February 2003, is misleading because most of Sterling's customers had lost money up to that point in time, and Sterling representatives failed to disclose that fact;

(iv.) Sterling utilizes a stop-loss system that would limit any possible loss. Sterling, however, either failed to use stop-losses or routinely traded customer accounts in such a manner that customers lost nearly all of their funds invested;

(v.) The Sterling sales representative promised that he would not trade more than 15% to 20% of the customer's investment. This falsely conveyed that the customer's losses would be limited to 15% to 20%. In reality, the customer ultimately lost most of his investment; and

(vi.) The Sterling representative stated that the Euro would go from $1.07 to $1.40 in five to six months, which would translate into six figure profits, when the representative had no reasonable basis for such statement and the representative knew that Sterling customers were routinely losing money, even when the value of the Euro was generally rising.

**(d) High-Pressure and Deceptive Sales Tactics**

31. Sterling sales representatives typically rushed prospective customers through the details of the customer packet, often telling prospective customers not to worry about the information because it was "boilerplate" language used to satisfy the government.

32. Sterling representatives sent a letter to prospective customers that misrepresented the scope and nature of Universal's business. This letter told prospective customers to disregard

as irrelevant much of the language in the account opening documents that Sterling and Universal used.

33. Once customers decided to invest, Sterling sales representatives pressured them to wire or send their funds to Universal and return their signed account opening documents almost immediately, insisting that the customer did not want to miss out on the huge profits that could be made. Sometimes, Sterling representatives even dispatched couriers within hours to retrieve checks and account documents.

34. Sterling sales representatives typically requested additional funds from customers to continue trading, shortly after the customer opened their account. If the sales representative was unsuccessful in convincing a customer to provide additional funds, the customers were typically referred to another sales representative (the "new representative"), usually Arsenault, who was falsely touted as Sterling's most successful and experienced trader.

35. The new sales representative, including Arsenault, usually made false claims about their success, track record, experience, and/or life style to convince the customer to send in additional funds.

36. Typically, the new sales representatives, including Arsenault, promised to make back the money lost in the customer's account plus additional profits. The new representatives, including Arsenault, would even agree to provide customers with commission-free trades. This tactic of switching sales representatives and making promises usually continued until the customer's account was depleted and/or the customer refused to send in additional funds.

**(e) Deceptive Practices**

**Fraudulent Trading Practices**

37. Contrary to Sterling's repeated claims of huge profit potential and limited risks, Sterling customers typically lost most if not all of their investment, due to combined effect of commissions, undisclosed mark-ups and interest charges. For example, Sterling, along with Universal, defrauded customers by engaging in transactions that were financial nullities (and thereby provided customers with no opportunity to profit) while charging commissions and mark-ups. In short, Sterling placed its customers in trades where they never had an opportunity to profit and only sustained losses caused by the commissions and mark-ups. Sterling also "rolled" customer accounts. "Rolling" is a trading practice where trades are closed out with the same transaction being repurchased immediately thereafter.

**Commissions and Mark-ups**

38. Sterling and Universal collaborated in a scheme whereby they charged virtually all customers with material undisclosed mark-ups. Both Universal and Sterling failed to disclose these material mark-ups to customers in the account opening documents, disclosure forms and weekly account statements until in or about July 2003. Sterling and Universal further materially misled certain customers by reducing the disclosed commissions that they charged to such customers, while at the same time raising the amount of undisclosed mark-ups that they charged the same customers.

**Failure To Provide Access To Account Information**

39. Sterling did not provide customers with regular account statements. Sterling and Universal claimed to provide customers with the ability to monitor their accounts on-line.

However, in most cases, Sterling customers could not access their accounts on-line. Sterling and Universal also failed to provide some customers with passwords to access their accounts on-line.

40. Universal at times sent customer account statements via U.S. mail, but customers typically received these statements well after a significant portion of their funds had been lost. Moreover, the statements were usually incomplete, confusing to read, and important information was typically missing, rendering the statements materially defective.

41. The on-line accounts, controlled and maintained by Universal, were so confusing that customers able to access their accounts could not decipher the status of their accounts or how their accounts were being traded.

42. Furthermore, Universal failed to maintain complete sets of customer account statements.

43. The Universal account statements were also misleading in that they did not contain true and accurate information regarding the time of execution of trades.

**Customers Could Not Close Their Accounts**

44. Once Sterling customers lost a large portion of their investment, Sterling sales representatives became evasive by avoiding customer calls.

45. Customers also found it difficult to contact sales representatives at Sterling when they wanted to ask questions about their account or to close out their account. Some customers even contacted Universal when Arsenault and/or other Sterling employees refused to accept or to answer the customers' telephone calls.

46. Universal employees usually ignored customer complaints telling customers that Universal was not responsible for the conduct of Sterling employees or that the customer needed to contact Sterling in writing to close out their account.

47. When customers threatened to take action, some Sterling sales representatives, including Arsenault, convinced the customers to enter into settlement agreements to clear Sterling and/or Universal of any wrongdoing in exchange for commission free trades or a return of a portion of their funds. Sterling and/or Universal representatives prepared and forwarded to customers settlement agreements on behalf of Sterling and Universal.

**(3) ILLEGAL FUTURES TRANSACTIONS**

48. Sterling and Universal purported to offer contracts in "spot" foreign currency to retail customers. However, the foreign currency contracts that Sterling and Universal offered and sold to customers were futures contracts.

49. Sterling and Universal marketed these contracts to the general public. The customers who purchased these futures contracts had no commercial need for the foreign currency. Instead, the customers entered into these transactions to speculate and profit from anticipated price fluctuations in the foreign currency markets.

50. Customers were only required to deposit a percentage of the value of a contract in order to enter into a trade.

51. Customers did not negotiate individual purchase agreements with Defendants Sterling and Universal. The rules for margin calls, and other terms and conditions of Defendants' contracts, as set by Defendants, were standardized. The contracts offered by Sterling and Universal required customers to pay a predetermined portion of the total contract price as a "margin" payment when the contract was purchased, and required customers to make an additional "margin" payment if adverse changes in the market price of the commodities caused the equity in their respective accounts to fall below a specified percentage.

52. The contracts were purchased in standard lots sizes of 100,000 units per contract.

53. On a given trade date, Sterling, through Arsenault, would place a trade in a foreign currency contract at a stated price. At a date subsequent to the trade date, the position in the foreign currency contract was offset by entering into an equal but opposite position. The value of the transaction was based on the opening and closing prices indicated on the account statements.

54. The positions were not marked to market each day based on changes in currency rates, nor were the customers charged rollover fees. Instead, customer statements indicated that customers were charged a flat premium fee when their trades were held open beyond 5:00 P.M. each day.

55. The contracts were cash settled in U.S. dollars. The prices or pricing formulas were established at the time the contracts were initiated, and were settled through offset, cancellation, cash settlement or other means to avoid delivery.

56. Customers did not anticipate taking, and never took, delivery of the foreign currencies they purchased.

57. Sterling and Universal did not conduct these transactions on or subject to the rules of a board of trade which has been designated or registered by the Commission as a contract market or derivatives transaction execution facility for such commodity.

58. Furthermore, Universal and Sterling did not execute or consummate the futures contracts by or through any contract market.

**(4) <u>STERN IS THE CONTROLLING PERSON OF UNIVERSAL</u>**

59. At all relevant times, Stern was the president, director and controlling person of Universal. He controlled and was responsible for Universal's overall operations. He hired and fired employees, and exercised ultimate control over all of the daily functions of the office.

60. Stern exercised control over and approved the form and content of Universal's account opening documents, and he exercised control over and approved the form and content of Universal's account statements.

61. Stern controlled Universal's bank account and signed most if not all of the checks for the company. Stern routinely signed checks drawn on Universal's bank account that paid customers a minor portion of their investment after Universal and Sterling had lost most of the customer's investment.

62. One or more Sterling customers complained to Stern and informed him that their accounts had been mismanaged. Sterling customers also complained to other Universal employees, who were supervised and controlled by Stern, about how their accounts had been mismanaged. Stern either deliberately or recklessly ignored such customer complaints, and he failed to establish and to maintain a good faith system of supervision to detect and to correct fraudulent conduct by Sterling and/or Universal employees.

63. Stern exercised ultimate control over, and approved the format of internal Universal spreadsheets and other internal reports. These documents, among other things, provided Stern and other Universal employees with extensive actual notice about the significant adverse impact of the undisclosed mark-ups that Universal and Sterling charged customers.

**(5) ARSENAULT IS THE CONTROLLING PERSON OF STERLING**

64. At all relevant times, Arsenault was the managing director and controlling person of Sterling. He controlled and was responsible for Sterling's overall operations. He ran and maintained the daily functions of the office, and hired and fired employees.

65. Arsenault personally placed trades at Universal on behalf of all Sterling customers. Arsenault used the power of attorney that customers executed to trade their accounts

excessively for the purpose of generating commissions and without regard for the clients' interests, and by placing individual trades or series of trades in customer accounts that had no legitimate purpose except to generate commissions, fees and mark-ups. Arsenault also collaborated with Universal to conceal from Sterling customers significant mark-ups that were charged to virtually all such customers.

66. Arsenault controlled Sterling's bank account and signed all of the checks for the company.

67. One or more Sterling customers complained to Arsenault and informed him that their accounts had been mismanaged. Sterling customers also complained to Arsenault and other Sterling employees about how their accounts had been mismanaged. Arsenault deliberately or recklessly ignored such customer complaints, and he failed to establish and to maintain a good faith system of supervision to detect and to correct fraudulent conduct by Sterling employees.

**(6) <u>STERLING ACTED AS AN AGENT OF UNIVERSAL</u>**

68. At all relevant times, Sterling operated as Universal's agent.

69. Universal's standard introducing agreement contained language that explicitly indicated the existence of an exclusive relationship between Universal's introducing entities and Universal. Upon information and belief, Sterling and Universal executed such an agreement. Some of the provisions in Universal's standard introducing agreement include the following:

(i.) The introducing entity agrees to introduce counterparties (i.e., retail customers) exclusively to Universal;

(ii.) The introducing entity agrees to assess the qualifications of prospective counterparties (i.e. retain customers); and

(iii.) The introducing entity agrees that for so long as Universal maintains a foreign exchange relationship with any introduced customer counterparty, the introducing entity shall not introduce or refer prospective customer counterparties to any other person or entity; and

(iv.) The introducing entity agrees to notify Universal of any complaints from customer counterparties.

70. A form draft of the introducing agreement is provided on Universal's website.

71. Sterling directed its customers to send funds directly to Universal.

72. Universal, not Sterling, generated the account statements.

73. Sterling used only account opening forms, including, customer agreements, risk disclosures, and power-of-attorney forms, provided by Universal.

74. During this period, Sterling and Universal shared fees charged to customers. Universal even maintained extensive internal records tracking the total amounts of such fees, including largely undisclosed mark-ups.

75. Universal and Sterling both received customer complaints. Universal and Sterling established a common legal fund to finance settlements with Sterling customers. Some customer settlement forms even covered both Universal and Sterling.

76. Universal recruited Sterling and other similar firms to solicit retail customers who were not eligible contract participants to trade foreign currency futures contracts at Universal.

**B. PHASE II**

**(1) GRAYSTONE/ QIX OPERATION**

77. Since on or about August 2003 through present, Graystone, through its sales representative, under the control and direction of Arsenault, has solicited retail customers nationwide to enter into foreign currency options transactions with QIX.

77. During this period, QIX has been accepting funds from Graystone customers and executing customer orders to purchase and sell foreign currency options contracts.

78. These options transactions have not been conducted or executed on or subject to the rules of any contract market, or foreign board of trade.

79. Graystone markets these options contracts to the general public

80. QIX is not a proper counterparty to these options transactions under the Act.

81. Arsenault is the vice-president of Graystone. He controls and is responsible for Graystone's overall operations. He runs and maintains the daily functions of the office and hires and fires employees. Graystone also employs some of the former employees of Sterling and some of the current employees of STG.

83. Stern is the president of QIX. He controls and is responsible for QIX's overall operations. He runs and maintains the daily functions of the office and hires and fires employees.

**(2) STG/QIX OPERATION**

84. Since on or about August 2003 through present, STG, through its sales representatives, has solicited retail customers nationwide to enter into foreign currency options transactions with QIX.

85. During this period, QIX has been accepting funds from STG customers and executing customer orders to purchase and sell foreign currency options contracts.

86. These options transactions have not been conducted or executed on or subject to the rules of any contract market, or foreign board of trade.

87. STG markets these options contracts to the general public.

88. QIX is not a proper counterparty to these options transactions under the Act.

89. Upon information and belief, Arsenault is also behind the operation of STG. STG is owned and operated by an apparent relative and friend of Arsenault, who is also a former employee of Sterling.

90. Stern is the president of QIX. He controls and is responsible for QIX's overall operations. He runs and maintains the daily functions of the office and hires and fires employees.

**(3) QIX ACCOUNT-OPENING DOCUMENT**

91. The account-opening document that QIX provides to STG and Graystone to distribute to customers is identical in content and form to the account-opening document that Universal provided to Sterling to distribute to its customers with the only apparent change being the substitution of QIX's name for Universal's name. Among other things, the QIX account-opening document also makes the false statement that QIX is a member of the NFA.

## C. STATUTORY BACKGROUND

92. Section 2(c)(2)(B)(i) and (ii) of the Act provides that the Commission shall have jurisdiction over an agreement, contract or transaction in foreign currency that is a sale of a commodity for future delivery or an option, so long as

- the contract is "offered to, or entered into with, a person that is not an eligible contract participant", and
- the counterparty, or the person offering to be the counterparty, is not one of the regulated entities enumerated in Section 2(c)(2)(B)(ii)(I-VI).

7 U.S.C. § 2(c)(2)(B)(i) and (ii). FCM's and certain statutorily defined affiliates are regulated entities enumerated in Section 2(c)(2)(B)(ii)(II) and (III). 7 U.S.C. § 2(c)(2)(B)(ii)(II) and (III). However, notwithstanding subclauses (II) and (III) of subparagraph (B)(ii), Section 2(c)(2)(C) of the Act, agreements, contracts, or transactions in retail foreign currency described in subparagraph (B) are subject to Sections 4b (antifraud provision) and 4c(b) of the Act if they are entered into by a futures commission merchant or an affiliate of a futures commission merchant that is not also an entity described elsewhere in subparagraph (B)(ii). 7 U.S.C. § 2(c)(2)(C).

93. During the relevant time, neither defendants Universal nor QIX were proper counterparties for the retail foreign currency transactions described in the Complaint because they were neither FCM's nor affiliates of FCM's as described in Section 2(c)(2)(B)(ii)(III) of the Act.

94. Section 1a(12)(A)(xi) of the Act, 7 U.S.C. § 1, defines an eligible contract participant as an individual who has total assets in excess of: a) $10 million; or b) $5 million and who enters the transaction to manage the risk associated with an asset owned or a liability incurred, or reasonably likely to be owned or incurred.

95. Most, if not all, of the foreign currency futures and/or options transactions alleged herein were offered to or entered into with persons who did not qualify as eligible contract participants.

96. Since this Complaint alleges that Universal and QIX were not proper counterparties, the customers were not eligible contract participants, and that defendants violated either Section 4(a) of the Act or Sections 4b(a) and 4c(b) of the Act, the Commission has jurisdiction over this action.

V.

## COUNT ONE

**VIOLATION OF SECTION 4b(a)(2)(i) and (iii) OF THE ACT, 7 U.S.C. § 6b(a)(i) and (iii) AND REGULATION 1.1(b)(1) and (3), 17 C.F.R. §1.1(b)(1) and (3): FRAUD AND DECEIT IN THE OFFER AND SALE OF FUTURES CONTRACTS**
**(Against Defendants Sterling, Universal, Arsenault, and Stern)**

97. Paragraphs 1 through 96 are re-alleged and incorporated herein.

98. By engaging in the foregoing fraudulent acts and practices alleged in this Complaint, defendants Sterling and Universal, by and through their agents and employees, and Arsenault, in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made or to be made, for or on behalf of any other persons, where such contracts for future delivery were or could be used for the purposes set forth in Section 4b(a) of the Act, 7 U.S.C. § 6b(a), have: (a) cheated or defrauded or attempted to cheat or defraud other persons; and (b) willfully deceived or attempted to deceive other persons, all in violation of Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii) and Regulation 1.1(b)(1) and (3), 17 C.F.R. § 1.1(b)(1) and (3).

99. Each misrepresentation, omission, actual or attempted act to cheat or defraud, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii) and Regulation 1.1(b)(1) and (3), 17 C.F.R. § 1.1(b)(1) and (3).

100. Arsenault directly or indirectly controlled Sterling and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Sterling's violations alleged in this Complaint. Arsenault is therefore liable for each of Sterling's violations of the Act and Regulations pursuant to Section 13(b) of the Act, 7 U.S.C. §13c(b).

101. The actions and omissions of Arsenault and the other Sterling representatives described in paragraphs 3, 4, 5, 25, 26, 28 – 44 of this Complaint were done within the scope of their employment with Sterling. Therefore, Sterling is liable as a principal for each of the violations of Arsenault and the Sterling sales associates pursuant to 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) and Regulation 1.2, 17 C.F.R. § 1.2.

102. Stern directly or indirectly controlled Universal and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Universal's violations alleged in the Complaint. Stern is therefore liable for each of Universal's violations the Act and Regulations pursuant to Section 13(b) of the Act, 7 U.S.C. §13c(b).

103. The actions and omissions of Universal's officers and employees described in paragraphs 3, 4, 5, 28, 29, 37 43 of this Complaint were done within the scope of their employment with Universal. Therefore, Universal is liable as a principal for each of the violations of its officers and employees pursuant to 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) and Regulation 1.2, 17 C.F.R. § 1.2.

104. The actions and omissions of Sterling described in paragraphs 3, 4, 5, 25, 26, 28 44 of this Complaint were done as agents of Universal. Therefore, Universal is liable as a principal for each of the Sterling's violations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

## COUNT TWO

**VIOLATION OF SECTION 4(a) OF THE ACT, 7 U.S.C. § 6(a): OFFER AND SALE OF COMMODITY FUTURES CONTRACTS NOT CONDUCTED ON A BOARD OF TRADE WHICH HAS BEEN DESIGNATED AS A CONTRACT MARKET**

**(Against Defendants Sterling, Universal, Arsenault, and Stern)**

105. Plaintiff re-alleges paragraphs 1 through 96 above and incorporates these allegations herein by reference.

106. From on or about July 2002 through August 2003, defendants Sterling and Universal have offered to enter into, entered into, executed, confirmed the execution of, or conducted an office or business in the United States for the purpose of soliciting, accepting any order for, or otherwise dealing in transactions in, or in connection with, a contract for the purchase or sale of a commodity for future delivery when: (a) such transactions have not been conducted on or subject to the rules of a board of trade which has been designated by the Commission as a contract market or derivatives transaction execution facility for such commodity, and (b) such contracts have not been executed or consummated by or through a contract market, in violation of Section 4(a) of the Act, 7 U.S.C. § 6(a).

107. Each foreign currency futures transaction not conducted on a designated contract market or derivatives transaction execution facility for such commodity made during the relevant time period, including but not limited to those conducted by the defendants Sterling and Universal as specifically alleged herein, is alleged as a separate and distinct violation of Section 4(a) of the Act, 7 U.S.C. § 6(a).

108. Arsenault directly or indirectly controlled Sterling and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Sterling's violations alleged in

this Complaint. Arsenault is therefore liable for each of Sterling's violations of Section 4(a) of the Act pursuant to Section 13(b) of the Act, 7 U.S.C. §13c(b).

109. The unlawful futures transactions offered, entered into, executed, or confirmed by Sterling described in this Complaint were done while Sterling acted as an agent of Universal. Therefore, Universal is liable as a principal for each of the Sterling's Section 4(a) violations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

110. Stern directly or indirectly controlled Universal and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Universal's violation of Section 4(a) of the Act. Stern is therefore liable for each of Universal's violations of Section 4(a) of the Act, 7 U.S.C. § 6(a) pursuant to Section 13(b) of the Act, 7 U.S.C. §13c(b).

## COUNT THREE

### VIOLATION OF SECTION 4h OF THE ACT, 7 U.S.C. § 6h: FALSE REPRESENTATION THAT SUCH PERSON IS A MEMBER OF A REGISTERED ENTITY OR A REGISTRANT UNDER THE ACT

**(Against Defendants Universal, QIX, and Stern)**

111. Plaintiff re-alleges paragraphs 1 through 96 above and incorporates these allegations herein by reference.

112. During the relevant period, defendants Universal and QIX generated account opening documents that Sterling, STG, and Graystone provided to retail customers, which contained false and misleading claims that stated and/or implied that Universal and QIX were members of a registered entity and/or that Universal and QIX were registrants under the Act in violation of Section 4h of the Act, 7 U.S.C. § 6h.

113. Stern directly or indirectly controlled Universal and QIX and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Universal's and QIX's

violations of Section 4(h) alleged in the Complaint. Stern is therefore liable for each of Universal's and QIX's violations of Section 4(h) of the Act pursuant to Section 13(b) of the Act, 7 U.S.C. §13c(b).

## COUNT FOUR

**VIOLATIONS OF SECTION 4c(b) OF THE ACT, 7 U.S.C. § 6c(b) AND REGULATION 32.11(a), 17 C.F.R. §32.11(a): OFFER AND SALE OF COMMODITY OPTIONS NOT CONDUCTED OR EXECUTED ON OR SUBJECT TO THE RULES OF A CONTRACT MARKET, OR A FOREIGN BOARD OF TRADE**
**(Against Defendants STG, Graystone, QIX, Arsenault, and Stern)**

114. Plaintiff re-alleges paragraphs 1 through 96 above and incorporates these allegations herein by reference.

115. Since approximately August 2003, STG, Graystone and QIX have solicited and/or accepted orders for, and/or accepted money, securities or property in connection with, the purchase and sale of commodity options when: (a) such transactions have not been conducted or executed on or subject to the rules of a contract market, or a foreign board of trade in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.11(a), 17 C.F.R. § 32.11(a).

116. Each foreign exchange commodity option transaction solicited and/or executed since August 2003, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.11(a), 17 C.F.R. § 32.11(a).

117. Arsenault directly or indirectly controlled Graystone and/or STG and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Graystone's and/or STG's violations of Section 4c(b) of the Act and Regulation 32.11(a) alleged in this Complaint. Arsenault is therefore liable for each of these violations of the Act and Regulations pursuant to Section 13(b) of the Act, 7 U.S.C. §13c(b).

118. Stern directly or indirectly controlled QIX and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting QIX's violations of Section 4c(b) of the Act and Regulation 32.11(a) alleged in this Complaint. Stern is therefore liable for each of QIX's violations of Section 4c(b) of the Act and Regulation 32.11(a) pursuant to Section 13(b) of the Act, 7 U.S.C. §13c(b).

## VI.

## RELIEF REQUESTED

Wherefore, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

a. a permanent injunction prohibiting the defendants and any other person or entity associated with them, or any successor thereof, from engaging in conduct violative of the provisions of the Act as alleged in this Complaint, and from engaging in any activity relating to commodity interest trading, including but not limited to, soliciting, accepting or receiving funds, revenue or other property from any person, giving advice for compensation, or soliciting prospective customers, related to the purchase and sale of any commodity futures or options on commodity futures contracts;

b. an order directing the defendants and any successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constituted violations of the Act, as described herein, and interest thereon from the date of such violations;

c. an order directing the defendants to make full restitution to every customer whose funds were received by them as a result of acts and practices which constituted

violations of the Act, as described herein, and interest thereon from the date of such violations;

d. an order directing the defendants to pay a civil monetary penalty in the amount of not more than the higher of $120,000 or triple the monetary gain to each defendant for each violation of the Act or Regulations; and

e. such other and further remedial ancillary relief as the Court may deem appropriate.

Dated: 6/7/04

Respectfully submitted,

Peter M. Haas

Peter M. Haas
Eugene Smith
Ghassan Hitti
Attorneys for Plaintiff Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone: (202) 418-5377 (Haas
(202) 418-5371 (Smith)
(202 418-5339 (Hitti)
Facsimile: (202) 418-5523

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

Commodity Futures Trading Commission

04-21346

**DEFENDANTS**

Sterling Trading Group, Inc., Universal FX, Inc., STG Global Trading, Inc., QIX, Inc., Graystone Browne Financial, I[illegible] Joseph Arsenault & Andrew Stern

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

CIV-LENARD

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT DADE
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) 202 4185320
Peter M. Haas, Eugene Smith & Ghassan Hitti, 1155 21st St, N.W. Wash. DC 20581

ATTORNEYS (IF KNOWN)

MAGISTRATE JUDGE SIMONTON

(d) CIRCLE COUNTY WHERE ACTION AROSE: (DADE) MONROE, BROWARD, PALM BEACH, MARTIN, ST LUCIE, INDIAN RIVER, OKEECHOBEE HIGHLANDS

**II. BASIS OF JURISDICTION** (PLACE AN X IN ONE BOX ONLY)

- X 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

1:04CV21346 C[illegible]-Simonton

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

X 1 Original Proceeding; ☐ 2 Removed from State Court; ☐ 3 Remanded from Appellate Court; ☐ 4 Reinstated or Reopened; ☐ 5 Transferred from another district (specify); ☐ 6 Multidistrict Litigation; ☐ 7 Appeal to District Judge from Magistrate Judgment

**V. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

**A CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- B☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- B☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability

**A REAL PROPERTY**
- ☐ 210 Land Condemnation
- B☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**A TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury Med Malpractice
- ☐ 365 Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**A CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- B☐ 510 Motions to Vacate Sentence

HABEAS CORPUS:
- B☐ 530 General
- A☐ 535 Death Penalty
- B☐ 540 Mandamus & Other
- B☐ 550 Civil Rights
- B☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- B☐ 610 Agriculture
- B☐ 620 Other Food & Drug
- B☐ 625 Drug Related Seizure of Property 21 USC 881
- B☐ 630 Liquor Laws
- B☐ 640 R.R. & Truck
- B☐ 650 Airline Regs
- B☐ 660 Occupational Safety/Health
- B☐ 690 Other

**A LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- A☐ 791 Empl. Ret. Inc. Security Act

**A BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**A PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**B SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- A☐ 870 Taxes (U.S. Plaintiff or Defendant)
- A☐ 871 IRS — Third Party 26 USC 7609

**A OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- B☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- X 850 Securities/Commodities/Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions A OR B

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Complaint for Permanent Injunction, Other Equitable Relief and Civil Monetary Penalties. 7 USC 6a, 6b, 6c(b), 6(h) and 17 CFR 1.1, 32.11.

LENGTH OF TRIAL via ___ days estimated (for both sides to try entire case)

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 — **DEMAND $** ___ — CHECK YES only if demanded in complaint: **JURY DEMAND:** ☐ YES X NO

**VIII. RELATED CASE(S) (See instructions) IF ANY** JUDGE ___ DOCKET NUMBER ___

DATE 6/7/04 — SIGNATURE OF ATTORNEY OF RECORD [signature]

FOR OFFICE USE ONLY

RECEIPT # ___ AMOUNT [handwritten] ___ APPLYING IFP ___ JUDGE ___ MAG. JUDGE ___