**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

COMMODITY FUTURES TRADING )
COMMISSION, )
              )
          Plaintiff, )
              )
vs. )
              )
STERLING TRADING GROUP, INC., )
UNIVERSAL FX INC., STG GLOBAL )
TRADING, INC., QIX, INC., )
GRAYSTONE BROWNE FINANCIAL )
INC., JOSEPH ARSENAULT, AND )
ANDREW STERN )
              )
        Defendants. )

**NIGHT BOX FILED**
JUN 2 3 2004 JC

Case No.: 04-21346-CIV

Judge Joan A. Lenard
CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

Magistrate Andrea M. Simonton

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' JOINT MOTION TO DISMISS**

Pursuant to Rules 12(b)(1), (b)(6), Fed. R. Civ. P., and Local Rule 7.1, S.D. Fla. L.R.,

Defendants Sterling Trading Group, Inc. ("Sterling"), Universal FX, Inc. ("Universal"), STG

Global Trading, Inc. ("STG"), QIX, Inc. ("QIX"), Graystone Browne Financial Inc.

("Graystone"), Joseph Arsenault ("Arsenault"), and Andrew Stern ("Stern") (collectively

"Defendants") respectfully submit this Memorandum of Law in support of Defendants' Joint

Motion to Dismiss the Complaint of the Commodity Futures Trading Commission ("CFTC" or

"Commission") for lack of subject matter jurisdiction and failure to state a claim upon which

relief may be granted, or alternatively for a more definite statement under Rule 12(e), Fed. R.

Civ. P. As discussed below, this Court should dismiss the Complaint with prejudice. In the

alternative, the Court should order the CFTC to restate the supposed claims.

**NATURE OF THE DISPUTE**

This Complaint is another flawed attempt by the CFTC to assert jurisdiction over

participants in the foreign currency markets. Despite decisions from several courts holding that

1

the CFTC does not have jurisdiction over spot foreign currency transactions such as those underpinning Counts I and II and part of Count III, the CFTC erroneously tries to extend its powers to cover these transactions by simply mischaracterizing them as "futures contracts." Further, the sections of the Commodity Exchange Act 7 U.S.C. 1, et seq., ("CEA" or "Act") upon which the CFTC predicates Count II, Count III and its claims of Principal/Agent liability and Control Person liability are not included within the Act's narrow grant of jurisdiction to the CFTC. This lack of jurisdiction is particularly evident where, as here, Defendants are affiliates of Futures Commission Merchants (FCM). Finally, the CFTC's allegations in Count IV (and part of Count III) that the Defendants engaged in illegal options on foreign currencies is premised upon the CFTC's misguided notion that the regulations under the Act proscribe such transactions. Accordingly, the Complaint should be dismissed in its entirety.

## SUMMARY OF THE COMPLAINT

The Complaint asserts four Counts arising from two supposed "phases" of alleged activity. The allegations of "Phase I" are directed to defendants Universal, Sterling, Arsenault and Stern and form the predicate for Counts I, II and part of Count III. Universal, the alleged "counterparty" that executed the foreign currency transactions, is identified in the Complaint as "a principal of UTS World Incorporated, a registered futures commission merchant ("FCM")." (Compl. ¶18.)

The allegations of "Phase II" are directed against defendants STG, Graystone, QIX, Arsenault and Stern and form the predicate for part of Count III and Count IV. QIX, the alleged "counterparty" that executed the foreign currency transactions, is identified in the Complaint as being "a principal of QIX Futures, Inc., a registered FCM." (See id. at ¶ 19.)

The Complaint alleges that, during Phase I, Sterling used misleading advertisements and sales tactics to solicit customers to open accounts for trading foreign currency futures contracts at Universal. (Compl. ¶¶ 1, 3). The Commission alleges that Universal provided Sterling with fraudulent, misleading and deceptive account opening documents that Sterling in turn provided to prospective customers, (Compl. ¶ 4), and that these documents misled prospective customers regarding the true nature of the investment and Universal's role in the investment. (Compl. ¶ 29.) The Complaint further alleges that Universal, Sterling, Arsenault and Stern fraudulently traded customers' accounts, charged undisclosed mark-ups, unlawfully failed to provide customers with access to account information, and avoided customer efforts to close accounts. (Compl. ¶ 37, 38, 39, 44.)

The CFTC alleges this Court has jurisdiction over this action pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), but fails to allege the particular statutory source of its own authority to regulate the foreign currency transactions in Phase I. (Compl. ¶ 10.) Rather, the CFTC attempts to establish jurisdiction implicitly by characterizing the Phase I transactions as "Illegal *Futures* Transactions." (Compl. ¶ 48.) (emphasis added). In supposed support, the Complaint sets forth conclusory (and factually wrong) allegations regarding Universal's spot foreign currency transactions in an attempt to characterize these transactions as "futures contracts." (Compl. ¶¶ 49-55.)

The Complaint asserts three Counts against defendants Sterling, Universal, Arsenault and Stern based upon the allegations in Phase I. Count I alleges that Sterling, Universal, Arsenault and Stern offered and sold futures contracts in violation of the Act and corresponding Regulations.[1] (Compl. ¶¶ 97-104). Count I also conflates claims of Principal/Agent and Control

---

[1] Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(i) and (iii) and Regulation 1.1(b)(1) and (3), 17 C.F.R. §1.1(b)(1) and (3).

Person liability, asserting Principal/Agent liability[2] against Universal for the acts of Sterling, (Compl. ¶ 101), and against both Universal and Sterling for alleged violations by their officers and employees. (Compl. ¶ 103.)   Count I asserts claims of Control Person liability[3] against Arsenault for his alleged control of Sterling, (Compl. ¶¶ 64, 100), and against Stern for his alleged control of Universal. (Compl. ¶¶ 59, 102.)

Count II alleges that Universal, Sterling, Arsenault and Stern unlawfully offered and sold futures contracts that were not subject to a board of trade, or similar regulatory controls, in violation of the Act.[4]   (Compl. ¶¶ 105-110.)  Count II also conflates claims of Principal/Agent and Control Person liability, asserting Principal/Agent liability against Universal for the acts of Sterling, (Compl. ¶ 109),  Control Person liability against Arsenault for his alleged control of Sterling, (Compl. ¶ 108), and Control Person liability against Stern for his alleged control of Universal. (Compl. ¶ 110.)

Count III alleges that Universal [and QIX] made false statements that they "were members of a registered entity" and/or "were registrants under the Act."[5]  (Compl. ¶ 111.)  The Complaint alleges that these statements were false despite allegations that Universal was a principal of UTS World Incorporated, a registered futures commission merchant ("FCM"), (Compl. ¶ 18), and that QIX was listed as a principal of QIX Futures, Inc., a registered FCM. (Compl. ¶ 19.)  Count III also conflates a claim of Control Person liability against Stern for his alleged control of Universal.  (Compl. ¶ 113.)

---

[2] All of the CFTC's claims of Principal/Agent liability are brought pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

[3] All of the CFTC's claims of Control Person liability are brought pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

[4]       Section 4(a) of the Act, 7 U.S.C. §6(a).

[5]       Section 4(h) of the Act, 7 U.S.C. §6h.

4

The Complaint alleges that, during Phase II, STG and Graystone solicited retail customers to engage in illegal foreign currency options transactions with QIX, (Compl. ¶¶ 77, 84), and that QIX accepted funds for these foreign currency options transactions. (Compl. ¶¶ 78, 85.) Specifically, the Complaint alleges that these options transactions "have not been conducted or executed on or subject to the rules of any contract market, or foreign board of trade," (Compl. ¶¶ 78, 86), and that QIX is not a proper counterparty to these options transactions under the Act. (Compl. ¶¶ 80, 88.)

Count III, as stated supra, alleges that QIX [and Universal] made false statements that they "were members of a registered entity" and/or "were registrants under the Act," (Compl. ¶ 111,) and conflates a claim of Control Person liability against Stern for his alleged control of QIX. (Compl. ¶ 113.)

Count IV alleges that STG, Graystone, QIX, Arsenault, and Stern unlawfully offered and sold commodity options that were not subject to the rules of a contract market or foreign board of trade, in violation of the Act.[6]  (Compl. ¶ 115.)  Count IV also conflates claims of Control Person liability against Arsenault for his alleged control of Graystone and STG, (Compl. ¶ 117), and against Stern for his alleged control of QIX. (Compl. ¶ 118.)

## ARGUMENT

### 1.    Standard For Motion To Dismiss.

The CFTC bears the burden of demonstrating that subject matter jurisdiction exists here. Taylor v. Appleton, 30 F.3d 1365, 1367 (11th Cir. 1994)(the party invoking jurisdiction bears the burden of producing the necessary facts to establish subject matter jurisdiction). A federal court must dismiss a case upon determining that it lacks subject matter jurisdiction, regardless of the

---

[6]      Section 4c(b) of the Act, 7 U.S.C. § 6c(b) and Regulation 32.11(a),17 C.F.R. § 32.11(a).

5

stage of the proceedings. Smith v. GTE Corp., 236 F.3d 1292, 1299 (11th Cir. 2001) ("[B]ecause a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case, and should itself raise the question of subject matter jurisdiction at any point in the litigation where a doubt about jurisdiction arises."). Furthermore, while the Court may accept as true the Complaint's well-pleaded factual allegations regarding subject matter jurisdiction, the court may consider matters outside the pleadings in ruling on a motion under Rule 12(b)(1). Colonial Pipeline Co. v. Collins, 921 F.2d 1237, 1243 (11th Cir. 1991). Once defendants contest the allegations concerning subject matter jurisdiction through affidavit or similar proof, the burden shifts back to the CFTC to prove that subject matter jurisdiction exists. United Phosphorus, Ltd. v. Angus Chemical Co., 322 F.3d 942, 946 (7th Cir. 2003); Maton v. IRS, 2003 U.S.Dist.LEXIS 5928 at pp. 5-6 (N.D. Ill).

The CFTC cannot establish that this Court has subject matter jurisdiction here. As discussed infra, the evidence before this Court refutes the allegations of the Complaint and belies the CFTC's assertion of jurisdiction over the transactions at issue. This evidence includes numerous documents attached to the CFTC's motion for preliminary injunction in this matter[7] and the Affidavit of Andrew Stern ("Stern Aff."), attached hereto as Exhibit A.

---

[7]   These documents, attached hereto, were submitted as exhibits to the Memorandum of Points and Authorities to Plaintiff Commodity Futures Trading Commission's Motion for Ex Parte Statutory Restraining Order and Motion for Preliminary Injunction and Other Equitable Relief (Memorandum") and include:  Declaration of Richard K. Lyons ("Lyons Dec.") (Exhibit 1), Declaration of Kyong J. Koh ("Koh Dec.") (Exhibit 2), Universal Account Opening Documents (Version 1) (Exhibit 2A); Universal Account Opening Documents (Version 2) (Exhibit 2B); Universal Account Opening Documents (Version 3) (Exhibit 2C); Investigative Testimony of Andrew Stern (Exhibit 2E); Investigative Testimony of Steven Michael (Exhibit 2F).  (Only Version 1 of the Universal Account Opening Documents is attached hereto, since all three versions contain similar language unless otherwise noted herein.)  Defendants rely upon these documents submitted by the CFTC for purposes of this Motion only, and do not waive any objections to these documents on the basis of foundation, relevance or other grounds.

**2.     Counts I, II and III Must Be Dismissed For Lack Of Subject Matter Jurisdiction Because The Transactions At Issue Here Involved "Spot Foreign Currency Transactions," Not "Futures Contracts."[8]**

Counts I through III of the Complaint invoke federal question jurisdiction over this matter, claiming that the foreign currency transactions at issue implicate the CFTC's limited statutory jurisdiction over "contract[s] of sale of a commodity for future delivery" under the Act. However, the CFTC fails to demonstrate – because it cannot – the basis of this alleged jurisdiction. Instead, the CFTC merely alleges that "[t]his Court has jurisdiction over this action pursuant to Section 6c(a) of the Act . . . which authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act . . . ," (Compl. ¶ 10).

The CFTC attempts to buttress subject matter jurisdiction with conclusory allegations regarding the transactions at issue (Compl. ¶¶ 50-58), and undoubtedly will rely upon the Declaration of CFTC employee Richard K. Lyons ("Lyons Dec."), attached hereto as Exhibit B, to establish that subject matter jurisdiction exists here. Neither these conclusory allegations nor the Declaration of Mr. Lyons support the CFTC's position. Indeed, the analysis and conclusions in the Lyons Declaration that the CFTC submits here is virtually identical to the declaration that was submitted to, and rejected by, the court in CFTC v. Zelener, 2003 WL 22284295 (N.D.Ill. October 3, 2003) aff'd 2004 WL 1462670 (7th Cir. June 30, 2004). Accordingly, the CFTC fails to establish its threshold burden of establishing subject matter jurisdiction.

---

[8]  With regard to Count III of the Complaint, the argument that this Court lacks subject matter jurisdiction over spot foreign currency transactions relates only to the portion of Count III concerning foreign currency transactions (as opposed to options).

### a.     The CFTC's Limited Jurisdiction Under The Statutory Scheme.

The CFTC's jurisdiction is limited:

> The Commission shall have exclusive jurisdiction ... with respect to accounts, agreements . . . and transactions involving <u>contracts of sale of a commodity for future delivery</u> . . .

7 U.S.C. § 2(a)(l)(A) (emphasis added).  When Congress created the CFTC in 1974 and expanded the statute's coverage to include non-agricultural commodities, it also enacted an exemption referred to as the "Treasury Amendment," which exempted any transaction in foreign currency from the jurisdiction of the CFTC. 7 U.S.C. § 2(cX1)(A) ("nothing in this chapter . . . governs or applies to an agreement, contract, or transaction in foreign currency . . . .").

In <u>Dunn</u> <u>v.</u> <u>CFTC</u>, 519 U.S. 465, 469 (1997), the Supreme Court held that this statute exempted from CFTC regulation transactions in options to buy or sell foreign currency, concluding that the Treasury Amendment amounted to "a complete exclusion of [foreign currency transactions] from the regulatory scheme," except to the extent they were conducted on a board of trade.  <u>Id.</u> at 476.  Following <u>Dunn</u>, the Treasury Amendment itself was amended to give the CFTC authority only to regulate any agreement, contract, and transaction in foreign currency "that is a contract of sale of a commodity for future delivery (or an option on such a contract) . . . ." 7 U.S.C. § 2(c)(2)(B)(i).  Accordingly, the CFTC was left with jurisdiction only over foreign currency transactions "for future delivery" – that is, futures contracts or options. See <u>CFTC v. Mass Media Marketing, Inc.</u>, 297 F.3d 1321, 1325-26 (11th Cir. 2002) (holding that because the Commodity Exchange Act is unambiguously limited to commodity transactions, the CFTC could not impose its anti-fraud regulations on advertisers).  As discussed infra, the foreign currency transactions underlying Counts I through III do <u>not</u> involve futures contracts or options and the CFTC is, thus, without jurisdiction over those claims.

8

b.     The Transactions At Issue Here Involved "Spot Foreign
       Currency Transactions," Not "Futures Contracts."

The foreign currency transactions underlying the CFTC's claims in Counts I through III

involved "spot foreign currency transactions," not "futures contracts."  A "futures contract" is a

fungible promise to buy or sell a particular commodity at a fixed date in the future."  CFTC v.

Zelener, 2004 WL 1462670 (7th Cir. June 30, 2004) at *2.  A characteristic feature of a futures

contract is that its terms are standardized:

> Standard terms and an absence of counterparty-specific risk are what make the
> futures contract fungible, which in turn makes it possible to close a position by
> buying an offsetting contract.  Additionally, all contracts that expire in a given
> month are identical and each calls for delivery of the same commodity in the same
> place at the same time.

Id. at *4.  The central distinguishing characteristic between a spot transaction and a futures

contract is that "in organized futures markets, people buy and sell contracts, not commodities"

and trading in a futures contract occurs "in the contract" whereas trading in a spot transaction

occurs "in the commodity."  Id.

The evidence here demonstrates that the transactions at issue were spot foreign currency

transactions that involved the purchase of currency.   As an initial matter, the customer

agreements here identify these transactions as involving "accounts to speculate and/or purchase

and/or sell cash or spot foreign currency."  See example of Customer Agreement, Exhibit C

hereto.  Customers established positions by purchasing (going long) or selling (short)  foreign

currency.  In a typical transaction, a customer opened an account and traded foreign currency

such as the British Pound. (Testimony of Steven Michael ("Michael"), attached hereto as Exhibit

D, at 133:21-134:2.)  Once a customer established a position in the foreign currency market, the

customer agreement provided that all trades would be settled within 48 hours.  (Michael at

135:16; Agreement at Bates No. 101 00037.)  On the settlement date, if a customer wanted to

take actual delivery, the customer agreement provided for it. (Agreement at Bates No. 101 00037.) However, absent timely instruction from the customer regarding settlement, Universal, in its sole discretion, was authorized to deliver, rollover, or offset all or any portion of the customer's currency position (e.g., liquidation of the Pound position at the market price that day). Id.

In the currency transactions, each customer transaction was different from any other foreign currency transaction due to the timing of the purchase, the purchase size and the purchase price. For example, each transaction's settlement date varied depending on the transaction's purchase date. (Michael at 135:3-4.) Since currency could be purchased 365 days a year, and settlement date was set for 48 hours after the purchase of the currency, settlement varied from transaction to transaction depending on the day and hour of purchase. Additionally, contrary to the allegations of the Complaint and the Lyons Declaration that the transactions at issue were standardized in terms of amount (Compl. ¶ 52; Lyons Dec. at ¶ 14), a customer calling to the trade desk could choose the individual size of a transaction. (Michael Dep. at 134: 3-13; see also Agreement at Bates No. 101 00045.) Only if the customer chose to trade on-line would he be required, due solely to software limitations, to choose a minimum size transaction in rounded amounts. The ultimate size of the transaction would still be set by the customer. Finally, constant value fluctuations in the foreign currency market varied the price paid in each transaction.

Further, the spot transactions at issue here were backed by actual physical currency holdings, which were held at various banks and counterparties throughout the world. Actual spot currency inventory was maintained every day to cover every foreign currency spot transaction by

each customer.  See Michael Dep. at 29:17 - 35:5., Exhibit D hereto.  Delivery of the actual physical currency could thus be easily accomplished upon request by any customer.

In considering virtually identical transactions in the foreign currency market, several federal courts – including the Seventh Circuit Court of Appeals recently affirming a decision by the Northern District of Illinois – have held that such transactions do not involve "futures contracts" subject to the jurisdiction of the CFTC.  See CFTC v. Zelener, 2004 WL 1462670 (7th Cir. June 30, 2004); CFTC v. Frankwell Bullion Ltd., 1994 WL 449071 (N.D.Cal. Aug. 12, 1994); Bank Brussels Lambert v. Intermetals Corp., 779 F.Supp. 741 (S.D.N.Y. 1991)("BBL").

In Zelener, a case strikingly similar to the case here, the CFTC alleged that defendants fraudulently engaged in speculative trading of foreign currency.  Zelener, 2004 WL 1462670 at *1.  Defendants moved to dismiss based on lack of subject matter jurisdiction on the grounds that the transactions at issue were spot contracts that called for settlement within 48 hours, not futures contracts.  Id. at *2.  The district court granted the defendants' motion to dismiss and the Seventh Circuit affirmed on appeal, holding that the transactions in foreign currency offered by the defendant were spot contracts and not futures contracts, despite the fact that the 48-hour customer positions were automatically and indefinitely "rolled over" and that the customers never took delivery.  The Court stated that the transactions at issue in Zelener could not be futures contracts because "the deals lack standard terms [and the] transactions differ in size, price, and settlement date."  Id. at *3.  The Court concluded that:

> Customers of foreign exchange at Alaron did not purchase identical contracts: each was unique in amount of currency (while normal futures contracts are for fixed quantities, such as 1,000 bushels of wheat or 100 times the price of the Standard & Poors 500 Index) and in timing (while normal futures contracts have defined expiration or delivery dates). Thus the trade was "in the commodity" rather than "in the contract . . . ."

Id. at *5.

11

### c. Courts Have Repeatedly Rejected The Arguments Made Here By The CFTC That The Transactions At Issue Are "Futures Contracts."

Despite the striking similarities between this case and numerous other cases where courts have held transactions to be spot transactions, the CFTC nonetheless alleges that "the foreign currency contracts that Sterling and Universal offered and sold to customers were futures contracts." (Compl. ¶ 48; see also Lyons Dec. at 10.) All of the bases upon which this argument rests, however, have been repeatedly rejected by courts.

First, the CFTC claims that the transactions at issue here are futures contracts because customers never were required to take delivery. (Compl. ¶ 55-56; Lyons Dec. at ¶¶ 8, 10.)[9] Such reliance on "delivery" as a dispositive factor in identifying whether a transaction is a futures contract was expressly rejected by the Zelener Court. In Zelener, the Court considered the CFTC's argument (supported by a declaration very similar to that of Mr. Lyons) and concluded that "[t]reating *absence* of 'delivery' (actual or intended) as a defining characteristic of a futures contract is implausible." Id. at *3. The Court explained that:

> [u]sing 'delivery' to differentiate between forward and futures contracts yields indeterminacy, because it treats as the dividing line something the two forms of contract have in common for commodities [futures] and that both forms lack for financial futures.

Id. Furthermore, Mr. Lyons apparently ignores the express language of the Agreement, which provides for delivery of any foreign currency if requested by the customer, or, in the absence of timely instructions, that Universal, in its sole discretion, is authorized to make delivery of all or any portion of a currency position on the settlement date. (Agreement at Bates No. 101 00063.)

---

[9]   Mr. Lyons states: "Whether delivery is immediate or not is crucial because it determines whether possession of the underlying asset is established. Spot transactions create a legal interest in the foreign currencies. Futures contracts, in contrast, are based on the value of currencies without creating a legal interest." (Lyons Dec. at ¶ 9.) Mr. Lyons provides no basis for equating "possession" with the creation of a legal interest.

12

Furthermore, the <u>Zelener</u> Court rejected the CFTC's related argument that, because customer positions were held open indefinitely through rollovers, the contracts constituted "futures contracts." Stressing that "form must be respected," <u>id.</u> at *4, the Court concluded that customers had bought the currency immediately and not at some future date, despite a rollover feature: "Rollover, and the magnification of gain or loss over a longer period, does not turn sales into futures contracts . . . ." <u>Id.</u> at *6.

The <u>BBL</u> Court also examined whether repeated rollovers on the same contract perpetuated **the speculation on a currency for** a period of time greater than that contemplated by a single spot transaction, **such that it should** be deemed a futures contract. <u>BBL</u>, 779 F.Supp. at 748. Recognizing that, unlike a futures contract, "spot transactions ordinarily call for settlement in two days," <u>id.</u> at 743, the court **nonetheless** rejected this argument, noting that:

> [t]he [Act] does not purport to cover all speculation in foreign currencies that is extended over a substantial period of time. It covers futures contracts. <u>One can . . .</u> <u>speculate in a foreign currency over a lengthy period simply by establishing a position in that currency and maintaining that position for as long as one wishes to speculate before converting it back to U.S. dollars</u> . . . .Such transactions would not fall within the regulation of the [Act], notwithstanding that they involved long-term speculation in a foreign currency, because they would not involve contracts for futures.

<u>Id.</u> at 749 (emphasis added). The <u>Frankwell Bullion</u> Court reached a similar conclusion that contracts are not "futures" on account of a daily "roll over" feature:

> [t]his last characteristic – the daily roll-over  has the effect of sufficiently undercutting the possibility that [the CFTC] will ultimately prevail on the merits of their complaint. Because there is a closing daily on each position held by customers . . . the contracts at issue may well be determined by this Court upon a full adjudication to be spot transactions within the meaning of [BBL].

Frankwell Bullion Ltd., 1994 WL 449071.

Finally, the CFTC contends that the transactions at issue here are "futures contracts" because customers' motivations for entering into these contracts was "to make a profit on price

moves in the foreign currency market and [they] did not intend to take delivery of foreign currency." (Compl. ¶ 24)   The   Zelener Court rejected this argument also, explaining that "[n]othing is worse than an approach that asks what the parties 'intended' or that scrutinizes the percentage of contracts that led to delivery *ex post*." Zelener, 2004 WL 1462670 at *4. See also BBL., 779 F.Supp. at 749 (rejecting the argument that the contracts were "futures" merely for speculation, with no intention to take delivery of any foreign, and noting that the CFTC's jurisdiction is limited to futures and "does not cover the spot market, regardless of the motivation of the transactions.").

**3.     The CFTC's Limited Jurisdiction Over Foreign Currency Transactions Does Not Include Claims Alleged In The Complaint.**

**a.     The CFTC's Limited Jurisdiction Is Further Circumscribed Under Section (c)(2)(C).**

As the CFTC concedes in the Complaint, its jurisdiction over foreign currency transactions is limited to those sections of the Act listed in "paragraph (2)" of Section 2(c) of the Act:  "Except as provided in paragraph (2), nothing in this chapter . . . governs or applies to an agreement, contract, or transaction in . . . foreign currency."  7 U.S.C. § 2(c)(1)(emphasis added). Paragraph (2) — entitled "Commission jurisdiction" — provides that the CFTC has jurisdiction only over "an agreement, contract or transaction in foreign currency" that is a futures contract or an option, and only "so long as the contract is 'offered to, or entered into with, a person that is not an eligible contract participant,' and the counterparty . . . is not one of [certain enumerated] regulated entities . . . ." (Compl. ¶ 92, citing 7 U.S.C. § 2(c)(2)(B)).

While the CFTC acknowledges this, the CFTC neglects the rest of "paragraph (2)," which provides that the CFTC's jurisdiction over these futures contracts and options is,

> [n]otwithstanding subclauses (II) and (III) of subparagraph (B)(ii) . . . subject to sections 6b, 6c(b), 9, 15, and 13b (to the extent that sections 9, 15, and 13b of this

14

title prohibit manipulation of the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any market), 13a-1, 13a-2, and 12(a) of this title if [the foreign currency transactions] are entered into by a futures commission merchant or an affiliate of a futures commission merchant that is not also an entity described in sub-paragraph (B)(ii) of this paragraph."

7 U.S.C. § 2(c)(2)(C) (emphasis added).

**b.    The CFTC Has No Jurisdiction Over Affiliated Persons Of FCMs.**

According to the language of the statute, then, to the extent Universal and QIX are entities described under (B)(ii) (which they are, as affiliated persons of FCMs, see infra), the CFTC lacks jurisdiction to enforce any of the alleged claims in the Complaint against them. On this basis alone, the alleged claims, and the Complaint, can be dismissed completely.

**c.    The CFTC Has No Jurisdiction To Enforce Sections Not Specifically Identified In Section 2(c)(2)(C), Including Claims Alleged In Counts II And III, And The Principal/Agent And Control Person Claims.**

Moreover, regardless of whether Universal or QIX are affiliated persons of FCMs, the CFTC can in no event exercise jurisdiction over sections that are omitted from the exclusive list of sections identified Section 2(c)(2)(C). The "subject to" clause lists certain sections representing the only sections over which the CFTC can exercise jurisdiction with respect to foreign currency transactions.[10] This exclusive list does not include Sections 6(a) or 6(h) of the Act, upon which the CFTC bases Counts II and III, respectively. Nor does Section 2(c)(2)(C)'s exclusive list include Section 2(a)(1)(B) of the Act, under which the CFTC asserts Principal/Agent liability against Sterling (Compl. ¶ 101) and Universal (Compl. ¶¶ 103, 104, 109). Further, Section 2(c)(2)(C)'s exclusive list omits Section 13c(b) of the Act, under which

---

[10] Of course, this exclusion of jurisdiction over sections omitted from section (c)(2)(C) applies by an even greater weight of authority to those entities "described in subparagraph (B)(ii)," such as affiliated persons of FCMs

the CFTC asserts Control Person liability against Arsenault (Compl. ¶¶ 64-66, 81, 100, 108, 117) and Stern (Compl. ¶¶ 59-63, 83, 102, 110, 113, 118).[11]

The Act's omission of these sections can hardly be deemed unimportant.  Indeed, if Congress wanted to grant the CFTC authority to assert claims under these sections, Congress knew how to do it.  The CFTC's jurisdiction cannot be implied or extrapolated.  Rather, the statute must be applied as written.  See Dunn, 519 U.S. 465, 470 ( "[A]bsent any indication that doing so would frustrate Congress's clear intention or yield patent absurdity, our obligation is to apply the statute as Congress wrote it") (citations omitted).  Since omitted Sections 6(a), 6(h), 2(a)(1)(B) and 13c(b) are the only sections upon which the CFTC predicates Counts II and III and its claims of Principal/Agent liability and Control Person liability, these claims must be dismissed **as a matter of law on the grounds** that the CFTC lacks jurisdiction over such claims with regard to **foreign currency transactions.**

### d.    Universal And QIX Are Affiliated Persons of FCMs.

An "affiliated person" is defined as any entity "directly or indirectly controlling, controlled by, or under common control with an FCM."  See 7 U.S.C. §6f(c)(1).  An FCM is, in turn, required to keep records on affiliated persons "whose business activities are reasonably likely to have a material impact on the financial or operational condition of the FCM, including its adjusted net capital, its liquidity, or its ability to conduct or finance its operations."  See 7 U.S.C. § 6f(c)(2)(B).  Thus, where an FCM keeps records of a counterparty in compliance with CFTC regulations (in particular, **regulations 1.14 and 1.15**), that counterparty is considered a affiliated person, and therefore is generally exempt from CFTC jurisdiction.

---

[11]  The narrow list also excludes 7 U.S.C. §12(a)(5), which grants the CFTC authority to promulgate rules and regulations.  Accordingly, it is dubious whether the supposed regulatory violations the CFTC incorporates in Counts I and IV, including §§ 1.1(b)(1) and (3), and § 32.11(a), are even enforceable as to FCMs or affiliated persons of FCMs.  Compare Mass Media, 297 F.3d at 1325-26 (finding the CFTC had no authority to impose its anti-fraud regulations on advertisers where the statute did not apply to advertisers)

Both Universal and QIX qualify as affiliated persons of FCMs in the Complaint. The CFTC alleges, "On May 13, 2003, Universal was granted approval by the [National Futures Association] to be a principal of UTS World Incorporated, a registered futures commission merchant ("FCM")." (Compl. ¶ 18.) The CFTC further alleges, "On November 20, 2003, QIX was listed as a principal of QIX Futures, Inc., a registered FCM." (Compl. ¶ 19. In fact, Universal and QIX were 100 % owners of their FCMs, and the FCMs were wholly dependant on Universal and QIX. (See Stern Aff., Exhibit A hereto.) The FCMs further kept records of Universl and QIX in accordance with CFTC regulations 1.14 and 1.15. See id. Universal and QIX were therefore affiliated persons.

The CFTC does make the conclusory (and factually wrong) allegation that Universal and QIX "were neither FCM's nor affiliates of FCM's." (Compl. ¶ 93.) But that allegation is internally at odds with the CFTC's earlier admission that in fact Universal and QIX are principals of FCMs – an admission that is wholly supported by the facts. In the context of a Rule 12(b)(6) motion, the court is only required to treat as true assertions of fact, and mere conclusions are not entitled to the presumption of truth. See In re Livent, Inc. Noteholders Securities Litigation, 151 F.Supp.2d 371, 405 (S.D.N.Y. 2001). The unsupported conclusion that Universal and QIX are somehow not affiliates of FCMs does not undermine the CFTC's earlier admission that Universal and QIX are, in fact, principals of FCMs. And, in any event, under Rule 12(b)(1), the Court can consider the outside proof that Universal and QIX do in fact qualify as affiliate persons of FCMs.

Where conflicting assertions are alleged, the court may deem the fact assertions a judicial admission. See National Western Life Ins. Co. v. Merrill Lynch, 175 F.Supp.2d 489 (S.D.N.Y. 2000) ("there is no authority for the proposition that within a statement of a given claim a party

may assert as fact two assertions that directly contradict each other. Such clashing factual assertions, stated in the context of the same claim rather than as conceptually distinct alternative theories of liability, may be deemed judicial admissions") (citations omitted). Notably, the CFTC has incorporated the conflicting assertions in each and every alleged Count. (Compl. ¶¶ 97, 105, 111 and 114.) Where the fact allegations are asserted in every count, rather than in alternative claims, the plaintiff loses the right to plead inconsistent facts. See Schott Motorcycle Supply, Inc. v. American Honda Motor Co., Inc., 976 F.2d 58, 61-62 (3rd Cir. 1992) (where an assertion is made as to the entire claim, the judicial admission rule applies and the right to plead inconsistent facts in alternative claims gives no relief) (citation omitted); In re Livent, 151 F.Supp.2d at 407 (Rule 8(e) does not grant plaintiffs "license to plead inconsistent *assertions of facts* within the allegations that serve as the factual predicates for an independent, unitary claim"); see also Allied Vision Group, Inc. v. RLI Professional Technologies, Inc., 916 F.Supp. 778, 782 (N.D. Ill. 1996) (granting motion to dismiss for failure to state a claim where inconsistent assertions were made within a single contract claim). Accordingly, the CFTC is bound by its judicial admission that Universal and QIX are principals of FCMs, and the CFTC cannot rely on its pat, conclusory allegation to the contrary to negate the admission.

Universal and QIX thus qualify as affiliated persons under 7 U.S.C. § 2(c)(B)(ii)(III), and the CFTC has no jurisdiction to bring any claims alleged in Counts II and III, including claims under 7 U.S.C. § 6(a) or 7 U.S.C. § 6h; no jurisdiction to bring supposed principal-agent claims under 7 U.S.C. § 2(a)(1)(B) as alleged in Counts I and II; and no jurisdiction to maintain the alleged Control Person claims under 7 U.S.C. §13c(b) as alleged in all Counts. Those claims therefore should be dismissed as a matter of law.

4.     **Count IV Fails As A Matter Of Law Because CFTC Regulation § 32.11(a) Does Not Apply To Foreign Currency Transactions.**

In Count IV, the CFTC alleges under 7 U.S.C. § 6c(b) a purported violation of CFTC Regulation § 32.11(a) against defendants STG, Graystone, and QIX for allegedly soliciting or accepting orders that were not "conducted or executed on or subject to the rules of the contract market, or foreign board of trade." (Compl. ¶ 115.) Because § 32.11(a) has never been, and is not now, applicable to foreign currency transactions, Count IV should be dismissed as a matter of law.

Section 6c(b) is an enabling section of the Act that prohibits transactions in regulated commodities that violate CFTC regulations. The section provides in pertinent part:

> No person shall offer to enter into, enter into or confirm the execution of, any transactions involving any commodity regulated under this Chapter which is of the character of, or is commonly known to the trade as, an "option" ... contrary to any rule, regulation, or order of the Commission prohibiting any such transaction .
> . . .

7 U.S.C. §6c(b). The statute also provides a procedure for promulgating enforceable regulations: "[a]ny such order, rule, or regulation may be made only after notice and opportunity for hearing . . . ." Id. (emphasis added). Thus, to state a claim under § 6c(b), there must be a predicate violation of an order, rule, or regulation that the CFTC properly promulgated "after notice and opportunity for hearing."

The 2000 Modernization Act incorporated § 6c(b) into Section 2(c)(2)(C)'s exclusive list of sections over which the CFTC may exercise jurisdiction with respect to foreign currency transactions (as least as to entities not identified in subsection (2)(B)(ii)). 7 U.S.C. § 2(c)(2)(C). However, § 6c(b) itself was last amended in 1983, long before the Modernization Act. Id. Congress gave the CFTC no authority to use previously-existing regulations which clearly did

not apply to foreign currency transactions – as part of its new, but limited, jurisdiction over foreign currency transactions.

The operative regulation that the CFTC relies upon here for its § 6c(b) claim, CFTC Regulation § 32.11(a), was last amended in 1988 and predates the Modernization Act by years. CFTC Regulation § 32.11(a) provides in pertinent part that

[I]t shall be unlawful . . . for any person to solicit or accept orders for, or to accept money, securities or property in connection with, the purchase or sale of any commodity option, or to supervise any person or persons so engaged.

CFTC Regulation § 32.11(a).

Similarly, the CFTC defines a "commodity option" as "any transaction or agreement in interstate commerce which is or is held out to be of the character of, or is commonly known to the trade as, an 'option' ... involving any commodity regulated under the ACT . . . ." CFTC Regulation § 32.1(b)(1).   This section was last amended in 1994.  Thus, at the time that § 32.11(a) went into effect, and at all times through its most recent amendment, that section, as well the regulation defining "commodity option," did not regulate and could not have regulated foreign currency transactions.  Such transactions were exempt from CFTC regulation under the Treasury Amendment.  The United States Supreme Court underscored this point in no uncertain terms: "It seems quite natural in this context to read the Treasury Amendment's exemption of transactions in foreign currencies as a complete exclusion of that commodity from the regulatory scheme ... ." See Dunn, 519 U.S. at 475-76.  Since § 32.11(a) did not include foreign currency transactions in its proscriptions prior to Dunn, and it has not been amended after Dunn, it cannot now be read to encompass foreign currency transactions.

In passing the Modernization Act, Congress clearly had the ability, and knew how, to make old regulations applicable to the Modernization Act and enforceable under 7 U.S.C. §

6c(b).  For example, in Section 2(h), Congress exempted certain transactions between eligible commercial entities from the Modernization Act, but specifically made the exemption "subject to . . . the regulations of the Commission pursuant to section 6c(b) proscribing fraud in connection with commodity option transactions to the extent the . . . transactions would otherwise be subject to such sections and regulations."  7 U.S.C. § 2(h)(4)(B) (emphasis supplied).  There is no comparable provision relating to foreign currency transactions.  Lacking this specific grant of statutory authority, the CFTC cannot enforce its old regulations on Defendants here.  See Mass Media, 297 F.3d at 1325-26 (holding that the CFTC cannot enforce anti-fraud rules except pursuant to a specific grant of authority by statute).

Congress left it to the CFTC to amend or promulgate new regulations applicable to foreign currency transactions in accordance with Section 6c(b)'s notice and hearing requirements.  It became the CFTC's prerogative, and obligation, to do so.  See Chevron v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44 (1984) (holding that where "Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation"); U.S. v. Trident Seafoods Corp., 60 F. 3d 556, 559 (9th Cir. 1995) (finding that an agency has the responsibility and obligation "to promulgate clear and unambiguous standards," and that where a regulation's language is unclear, the agency is obligated to amend).  The CFTC chose not to amend or promulgate such regulations, and it cannot now simply enforce the old regulations in their place.

Count IV is an effort to circumvent not only the CFTC's duty to pass new regulations, but Section 6c(b)'s notice and hearing requirement as well.  The notice and hearing language is a due process provision designed to give traders fair notice of what activities are proscribed.  See,

e.g., Cleveland Bd. Educ. v. Laudermill, 470 U.S. 532, 542 (1985) (finding it an "essential principle of due process . . . that a deprivation of property "be preceded by notice and an opportunity for hearing"). Far from giving that fair notice, the CFTC gave every indication through numerous interpretive notices that off-exchange trading in foreign currency options by affiliate persons was perfectly permissible. (See CFTC Notices, Exhibit E hereto.) To allow the CFTC to make a sudden about-face and enforce old regulations against affiliates of FCMs that had never previously applied to foreign currency transactions (and cannot now apply) would contravene the basic protections Section 6c(b) ensures. See Trident Seafood, 60 F.3d at 559 (refusing to enforce a penalty for conduct that was not "clearly applicable either by statute or by regulation to [the defendant's] conduct").

Because § 32.11(a), CFTC Reg., does not and cannot apply to foreign currency transactions, the CFTC cannot maintain its claim under 7 U.S.C. § 6c(b), and Count IV therefore fails as a matter of law.

## 5.      The Complaint Improperly Co-mingles Alleged Control Person And Principal-Agent Claims With Separate Claims.

While the Complaint purports to allege four Counts against Defendants, the CFTC attempts to incorporate many more alleged claims within the Counts. In Count I alone, which purports to be a claim under 7 U.S.C. §6b, the CFTC tries to cram in at least five other causes of action, including a Control Person claim against Arsenault for Sterling's alleged violations (Compl. ¶ 100); a claim against Sterling as the principal of Arsenault and Sterling's employees (Id. at ¶ 101); a Control Person claim against Stern for Universal's alleged violations of the Act (Id.at ¶ 102); a claim against Universal as the supposed principal of "its officers and employees" (Id. at ¶ 103); and another claim against Universal as the supposed principal of Sterling (Id. at ¶ 104).

Likewise, Count II purports to bring an action for alleged violations of 7 U.S.C. §6a, but then tacks on Control Person claims against Arsenault (Id. at ¶ 108) and Stern (Id. at ¶ 110), and a principal-agent claim under 7 U.S.C. §2(a)(1)(B) against Universal as the alleged principal of Sterling (Id. at ¶109). Counts III and IV similarly incorporate separate Control Person claims against Stern (Id. at ¶¶ 113, 118) and Arsenault (Id. at ¶117).

Combining a multitude of claims in a single Count is forbidden under the rules of civil procedure. Rule 10(b), Fed. R. Civ. P., provides that "[e]ach claim founded upon a separate transaction or occurrence . . . [shall] be stated in a separate count . . . whenever a separation facilitates the clear presentation of the matters set forth." The CFTC's commingling of various Counts not only is confusing and improper, but it has allowed the CFTC to omit critical elements of the alleged claims (elements the CFTC cannot prove), such as factual allegations establishing any meaningful agency relationship between the parties, or establishing Defendants Stern or Arsenault as controlling persons..

Because the CFTC has failed to comply with Rule 10(b), the principal-agent and Control Person claims should be dismissed as improperly pled and for failure to state a claim. In the alternative, the CFTC should be required to re-state the alleged claims in separate Counts to comply with Rule 10(b). See, e.g., Anderson v. District Board of Trustees of Central Florida Community College, 77 F.3d 364, 366 (11th Cir. 1996) (requiring a more definite statement where the plaintiff asserted multiple claims for relief); Fikes v. City of Daphne, 77 F.3d 1079, 1082 (11th Cir. 1996) (by combining several claims for relief in each Count, the plaintiff disregarded Rule 10(b), making a motion for a more definite statement appropriate).

WHEREFORE, for the reasons discussed herein and in Defendants' motion to dismiss, Defendants respectfully request that this Court dismiss the CFTC's Complaint in its entirety with

prejudice, including all claims alleged therein, as a matter of law.  In the alternative, to the extent

any claim survives the substantive grounds for dismissal (which they do not), this Court should

enter an order requiring the CFTC to restate its claims.

Respectfully submitted:

HOMER & BONNER, P.A.
Attorneys for Defendant Andrew Stern
The Four Seasons Tower
1441 Brickell Avenue
Suite 1200
Miami, Florida 33131
Telephone: (305) 350-5100
Telecopier: (305) 982-0060
E-mail: lbonner@homerbonner.com

By: _____

R. Lawrence Bonner
Florida Bar No. 304328
Christopher King
Florida Bar No. 0123919

and as local counsel for

By: _____

Ted S. Helwig, Esq.
Michael J. Tiffany, Esq.
David J. Stagman, Esq.
KMZ Rosenman
Attorneys for Defendants: QIX, Inc. and
Universal FX, Inc.
525 West Monroe Street, Suite 1600
Chicago, Illinois 60661
Telephone: (312)902-5537
Fax: (312)577-8976

By: _____

Jeffrey S. Rosen, Esq.
Dilworth Paxson, LLP
Attorney for Defendants: Joseph Arsenault,
Sterling Trading Group, Inc., STG Global
Trading, Inc., and Graystone, Browne
Financial, Inc.
1818 N Street NW, Suite 400
Washington, DC 20036

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent via facsimile and U.S. mail this 23rd day of July, 2004, to: Peter M. Haas, Esq., Eugene Smith, Esq., Ghassan Hitti, Esq., Counsel for Plaintiff, Commodity Futures Trading Commission, 1155 21st Street, NW, Washington, DC 20581, Fax (202) 418-5523.

Christopher King

G:\Clients\41167\001\Pleadings\Memorandum on mot to dismiss 7-24-04.doc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

COMMODITY FUTURES TRADING
COMMISSION,

Plaintiff,

v.                                        CASE NO:  04-21346-CIV-LENARD

STERLING TRADING GROUP, INC.,
UNIVERSAL FX, INC., STG GLOBAL
TRADING, INC., QIX, INC., GRAYSTONE
BROWNE FINANCIAL INC., JOSEPH
ARSENAULT, AND ANDREW STERN

Defendants.

_____/

## DECLARATION OF ANDREW STERN

1.      My name is Andrew Stern.  I have been involved in the commodities

industry for over twenty years and have owned various Futures Commission Merchants

(FCMs) since 1997.

2.      I am the President and a Director of Defendant Universal FX, Inc.

(Universal FX), and the President, a Director, and sole Shareholder of Defendant QIX,

Inc. (QIX).

3.      I am also an officer and Director of UTS World Incorporated (UTS

World) and an officer and Director of QIX Futures, Inc. (QIX Furtures).

4.      UTS World is a FCM registered with the CFTC pursuant to § 4d of the

Commodities Exchange Act, and with the NFA.

5.      Universal FX owns 100% of the stock in UTS World.

6.      Universal FX is the parent company of UTS World Incorporated, its

subsidiary.



7.    UTS World was incorporated with the intention that it would act as an FCM to Universal FX, and that Universal FX would be the affiliated person of UTS World consistent with the statutory requirements for being an affiliated person under the Commodities Exchange Act and the CFTC Regulations.

8.    Since the inception of UTS World, and during the relevant period of this case, UTS World was financially dependent on Universal FX.

9.    Since the inception of UTS World, and during the relevant period of this case, the business activities of Universal FX had a material impact on the financial and operational conditions of UTS World, including UTS World's adjusted net capital, UTS World's liquidity, and UTS World's ability to conduct and finance its operations.

10.    UTS World has obtained such information and has made and kept such records of Universal FX as required under the CFTC's rules and regulations, including under §§ 1.14 and 1.15, CFTC Reg.

11.    The records kept by UTS World describe, in the aggregate, financial activities conducted by, and the customary sources of capital and funding of, Universal FX.

12.    Since the inception of UTS World, and during the relevant period of this case, UTS World relied on Universal FX for operational support and services in connection with UTS World's business.

13.    Since the inception of UTS World, and during the relevant period of this case, Universal FX had the authority and the ability to cause or withdraw as capital from UTS World.

14.     QIX Futures is a FCM registered with the CFTC pursuant to § 4d of the Commodities Exchange Act and the NFA.

15.     QIX owns 100% of the stock in QIX Futures.

16.     QIX is the parent company of QIX Futures, its subsidiary.

17.     QIX Futures was incorporated with the intention that it would act as an FCM to QIX, and that QIX would be an affiliated person of QIX Futures consistent with the statutory requirements for being an affiliated person under the Commodities Exchange Act and the CFTC Regulations.

18.     Since the inception of QIX Futures, and during the relevant period of this case, QIX Futures was financially dependent on QIX.

19.     Since the inception of QIX Futures, and during the relevant period of this case, the business activities of QIX had a direct and material impact on the financial and operational conditions of QIX Futures, including QIX Futures' adjusted net capital, QIX Futures' liquidity, and QIX Futures' ability to conduct and finance its operations.

20.     QIX Futures has obtained such information and has made and kept such records of QIX as required under the CFTC's rules and regulations, including under §§ 1.14 and 1.15, CFTC Reg.

21.     The records kept by QIX Futures describe, in the aggregate, financial activities conducted by, and the customary sources of capital and funding of, QIX.

22.     During the relevant period of this case, QIX Futures relied on QIX for operational support and services in connection with QIX Futures' business.

23.     During the relevant period of this case, QIX had the authority and the ability to cause or withdraw as capital from QIX Futures.

**I DECLARE** under penalty of perjury that the foregoing is true and correct this 23rd day of July 2004.

Andrew Stern

G:\Clients\41167\001\Pleadings\Declaration of Andrew Stern.doc

## DECLARATION OF RICHARD K. LYONS

I, Richard K. Lyons, hereby declare as follows. I am making this Declaration in the matter of Certain Persons Engaging in Retail Foreign Currency Transactions Universal FX, Inc. I have personal knowledge of the facts stated herein, and, if called as a witness, I could and would testify to those facts.

## I. INTRODUCTION

1. My name is Richard Lyons and I am employed as Professor, University of California (UC) Berkeley, Haas School of Business, Berkeley, California, 94720-1900. I have been asked to render an opinion as to whether transactions offered and entered into by Universal FX, Inc. (UFX) are futures contracts. The following declaration is made in my individual capacity as expert witness for the Commodity Futures Trading Commission. I am receiving compensation for providing this testimony.

## II. BACKGROUND AND QUALIFICATIONS

2. I have been employed by UC Berkeley since July 1993. For the previous 6 years, I was a professor at Columbia University, Graduate School of Business (Assistant Professor 1987-1991, Associate Professor 1991-1993). My current duties at UC Berkeley include teaching an MBA course in International Finance, a PhD course in Microstructure Finance, and an MFE course (Masters in Financial Engineering) in Currency Markets. I am a member of both the Finance Group and the Economics and Policy Group at the Haas Business School. I have been appointed to the Sylvan C. Coleman Chaired Professorship in Finance and Accounting at the Haas School, and will begin in that position as of July 1, 2004.

3. My research expertise is in a field called Foreign Exchange Market Microstructure. My work in this area includes many articles published in peer-reviewed journals as well as a


**EXHIBIT**
B

book, "The Microstructure Approach to Exchange Rates," published in 2001 by MIT Press. A definition of this field and a clearinghouse for recent research are available at http://faculty.haas.berkeley.edu/lyons/NewField.html.

4. I also serve as a Director/Trustee for three investment trusts: iShares Inc./Trust (managed by Barclays Global Investors), Barclays Global Investors Funds (managed by Barclays Global Investors), and Matthews Asian Funds (managed by Matthews International Capital Management). iShares is a family of exchange traded funds, whereas the other two trusts have more traditional, open-ended mutual fund structures.

5. I attended UC Berkeley from 1979 to 1982, receiving a B.S. degree in Business Administration (finance concentration). I received my PhD from the Massachusetts Institute of Technology (MIT) in 1987. My fields of emphasis were International Economics and Macroeconomics.

III. DOCUMENTS REVIEWED

6. I have reviewed the following documents with regard to this case:

A. Investigative Testimony of Andrew Stern

B. Investigative Testimony of Steven Michael

C. UFX Trading Agreement, Version 1 (bates range 101 00002 to 101 00026)

D. UFX Trading Agreement, Version 2 (101 00054 to 101 00079)

E. UFX Trading Agreement, Version 3 (101 00027 to 101 00053)

F. Dealer's Blotter by All Instruments (ActForex 510-121 to 510-126)

G. Confirmations/Statements of Account: Customers of Universal FX

--Acct ID 219 (bates range 101 12512 to 101 12559)

--Acct ID 618 (101 10978 to 101 11026)

--Acct ID 670 (101 12253 to 101 12273)

2

--Acct ID 861 (101 10869 to 101 10870)

--Acct ID 698 (101 11446 and 101 11467)

--Acct ID 1070 (101 00971 to 101 00984)

--Acct ID 270 (no bates range, from 1/23/03 to 3/21/03)

--Acct ID 823 (no bates range, from 3/27/03 to 6/27/03)

--Acct ID 843 (no bates range, from 4/3/03 to 7/18/03)

H.  Order tickets

--Bates ranges 102 00508 to 102 00532, 102 00541, 102 00556, 102

00563, 102 00577, and 102 01657.

Marked as Exhibits 10, 15, and 17 (no bates ranges)

I.  IFX Statements for Universal Financial Holding (102-124 to 102-160)

J.  Dresdner Statements for Universal Financial Holding (102-08 to 102-13)

K.  Swiss Finance Statement for Universal Financial Holding (102-123)

L.  Trading Screen Prints from IFX, Dresdner, and ACT Forex (102-06, 102-07)

M.  Compelled Testimony Explanation

N.  Printouts from Universal FX's web site (www.ufxc.com)

O.  *Bank Brussels Lambert, S.A. v. Intermetals Corp.*

P.  *CFTC v. Frankwell Bullion Ltd.*

Q.  *Chicago Mercantile Exchange v. Securities and Exchange Commission*

R.  *CFTC v. Esfand Baragosh*

S.  *CFTC v. International Financial Services*


IV. DISTINGUISHING FUTURES CONTRACTS FROM SPOT TRANSACTIONS

7. Futures contracts can be characterized as agreements that establish a price (or pricing

formula) today for delivery of an asset in the future (e.g., commodity, security, currency, etc.), in

3

return for future payment. Spot transactions are agreements that establish a price today for immediate delivery, in return for immediate payment (where "immediate" depends on settlement features specific to a given market; in spot foreign exchange, typically two business days). In addition, unlike spot transactions, futures involve some mechanism   expressly designed into the contract   that allows the contract holder to avoid the delivery process altogether. These mechanisms include cash settlement and the ability to offset through resale/repurchase.

8. The two key elements, then, that distinguish spot transactions from futures contracts are the immediacy of delivery and the immediacy of payments (corresponding to the two sides of the transaction). The remainder of my declaration focuses on these two distinguishing elements.

IV.A   IMMEDIACY OF DELIVERY

9. Whether delivery is immediate or not is crucial because it determines whether possession of the underlying asset is established. Spot transactions create a legal interest in foreign currencies. Futures contracts, in contrast, are based on the value of currencies without creating a legal interest in currencies.

10. Regarding the immediacy of delivery, the UFX contracts with its customers are futures contracts, not spot transactions. UFX customers never took or made delivery of foreign (non-dollar) currencies. (On page 157 of his investigative testimony, Andrew Stern states that, "no retail customers ever desired for us to deliver them a currency other than the dollar"; on page 155 of his investigative testimony, Steven Michael notes that he had no knowledge of any UFX customer taking or making delivery, and on page 157 he states that UFX "didn't have a set procedure" for doing so.) Transactions between UFX and its customer counterparties were accomplished solely through paper entries, not through customers actually possessing the foreign currency, or accounts denominated in foreign currency. Though the UFX Customer Agreement provides for a delivery option, it was not intended for use. (For example, delivery was elective, requiring a separate, distinct request on the part of the customer; moreover, advance notice of

4

two days was required, and delivery could be on a delivery-versus-payment basis only.) Customers generally did not have the foreign-currency accounts necessary to take delivery of foreign currency. Moreover, given that customer margins were only two percent (see page 140 of Stern's investigative testimony), customers would generally not have anywhere near the necessary dollar balances to make payment on the dollar side.

11. The lack of delivery immediacy in the UFX contracts is related to their leverage. Leverage is a distinctive attribute of a futures transaction, but not of a spot transaction. (This is not to imply that one cannot use spot trading, bundled with other transactions, as a means of establishing a leveraged position.) At two percent, the margin basis of the UFX contracts this translates into a leverage ratio of 50-to-1 (ratio of notional value to capital), which is quite high, even for institutional traders. Moreover, UFX allowed this leverage ratio to go to 100-to-1 before it responded (in this case, by liquidating positions automatically, which itself generated still higher transaction fees for UFX).

IV.B  IMMEDIACY OF PAYMENTS

12. The second fundamental distinction between spot transactions and futures contracts is the immediacy versus futurity of payments. In a spot transaction, all payments are settled immediately (within two business days). Once settled through offsetting deliveries (exchanging currencies), the spot contract is fulfilled — no subsequent payments or obligations are involved. Though profit or loss from a position established from a spot transaction may occur in the future, those cash flows are not part of the initial spot contract, hence the lack of futurity. In a futures contract, unless extinguished, payment obligations do extend beyond the two-day spot window. Typically, these payments will occur over the life of the contract due to marking to market (i.e., settling interim capital gains and losses on the contract). But an important feature of futures contracts is that the life of the payment obligations extends beyond that for spot transactions.

13. In this second fundamental distinction, too, UFX contracts with customers are futures

5

contracts, not spot transactions. Regardless of how UFX was actually hedging in the background via its trades with IFX, Dresdner, and Swiss Finance, what matters here is the nature of the contract between UFX and its retail customers. Those contracts were not designed to be completed within two days (per descriptions in the UFX Customer Trading Agreement and elsewhere), and in many instances were not completed within two days. In those instances, customer cash flows from the position continued until the position was closed. In this respect too, they correspond closely to futures: the holder of a currency futures contract can simply go to the market and trade out of it; the price necessarily tracks current value.

IV.C  OTHER ATTRIBUTES AND COMMENTS

14. There are many other attributes of the UFX contracts with customers that indicate that they are futures contracts. These attributes include: (1) the contracts were standardized amounts that typically matched standard exchange-traded futures contracts, which were an order of magnitude smaller than standard sizes in the interbank spot market; (2) the contracts required the UFX customer to post initial margin; (3) the contracts did not require performance at a specific time  recall that futures can be offset; (4) the contracts permitted the purchaser to avoid his delivery obligation through offset; (5) the contracts were settled by the exchange of dollar cash payments; (6) contract participants were not limited to those with the capacity to take or make delivery of the underlying currency; and (7) the Risk Disclosure Statement on the second page of the Customer Agreement (e.g., base range 101 00003 in Version 1) makes reference in line 1 to "trading in futures and options".

15. We live in a world of financial engineering. That is a reality. It is now possible to synthetically create a futures contract for sale to customers  a financial contract that has every cash-flow feature of a futures contract  but never trade a futures contract in the background in the process of creating that synthetic contract (e.g., by combining currency swaps, borrowing/lending, and spot trades, and adjusting these positions over time) As a financial

economist, all my training tells me to call the synthetic contract that I just described what it is—economically, it is a futures contract. In my judgment, this is the central issue at hand in the UFX case: whether the contracts between UFX and its retail customers, as described in the Customer Trading Agreement and as implemented in practice, constitute trading in futures. This is distinct from the nature of the hedging trades placed by UFX with IFX, Dresdner, and Swiss Finance. I have provided arguments above for why those retail customer contracts do in fact have the fundamental attributes of futures contracts.

16. The customers of UFX would have been better off trading actual currency futures than the synthetic currency futures offered to them by UFX (better off in the sense that their transaction costs would have been much lower, given the markups, commissions, and premiums that UFX netted from their cash flows). There is no lack of irony in the fact that UFX was able to collect these transaction costs only because they deliberately designed a synthetic retail futures contract that might not be considered the real thing in a regulatory sense.

17. In summary, after reviewing the investigative testimonies of Stern and Michael, the UFX contract with its customers, and the other documents outlined in section III above, I conclude that the contractual arrangement between UFX and its customers clearly had the fundamental attributes of a futures contract because (1) delivery of foreign currencies never occurred and (2) payment obligations exhibited futurity.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Berkeley, California, on May 14, 2004

Richard K. Lyons

| Notice To Traders |
|---|

### This Agreement Is a Legal Contract, Please Read It Carefully.

**This is a legal contract between Universal FX, (hereinafter referred to as UFX) a limited liability corporation organized under the laws of the state of Florida, its successors and assigns, and the party (or parties) executing this document.**

In connection with opening an account to speculate and/or purchase and/or sell cash or spot foreign currency (hereinafter referred to as "Currency") through the OTC foreign exchange markets (hereinafter referred to as "OTCFX") with UFX, Customer (hereinafter referred to as Trader) acknowledges that Trader has been advised and understands the following factors concerning trading in leveraged OTCFX, in addition to those contained in the Risk Disclosure Statement which has been provided to Trader.

1. OTCFX is not traded on a regulated exchange. There are no guarantees to the credit worthiness of the counter party of your Currency position. Every attempt has been made to deal with reputable credit worthy banks/clearing houses. Also, there may be certain cases in which trading liquidity decreases causing trading in a certain Currency to cease, thereby preventing the liquidation of an adverse position that may result in a substantial financial loss.

2. Trading in OTCFX is suitable only for those sophisticated institutions or sophisticated participants financially able to withstand losses that may substantially exceed the value of margins or deposits. OTCFX accounts are not available through UFX to non-sophisticated participants.

3. Trader acknowledges that the purchase or sale of a Currency always anticipates the accepting or making of delivery.

4. UFX's margin policies and/or the policies of those banks/clearing houses through which trades are executed may require that additional funds be provided to properly margin Trader's account and that Trader is obligated to immediately meet such margin requirements. Failure to meet margin calls may result in the liquidation of any open positions with a resultant loss. UFX also reserves the right to refuse to accept any order.

5. OTCFX business is not traded on a regulated market and therefore does not require open-outcry. Even though quotations or prices are afforded by many computer-based component systems, the quotations and prices may vary due to market liquidity. Many electronic trading facilities are supported by computer-based component systems for the order-routing, execution or matching of trades. As with all facilities and systems, they are vulnerable to temporary disruption or failure. Your ability to recover certain losses may be subject to limits on liability imposed by the system provider, the market, the bank and/or financial institution. Such limits may vary, you should ask the firm with which you deal for details in this respect.

6. Trading on an electronic trading system may differ not only from trading in the interbank market but also from trading on other electronic trading systems. If you undertake transactions on an electronic trading system, you will be exposed to risks associated with the system including the failure of hardware and software. The result of any system failure may be that your order is either not executed according to your instructions or is not executed at all.

Disclaimers
    a)    Internet failures
Since UFX does not control signal power, its reception or routing via Internet, configuration of your equipment or reliability of its connection, we cannot be responsible for communication failures, distortions or delays when trading on-line (via Internet).

**101 00006**

| EXHIBIT |
|---|
| C |

b)      Market risks and on-line trading:

Trading currencies involves substantial risk that is not suitable for everyone. See Trader Agreement for more detailed description of risks. Trading on-line, no matter how convenient or efficient, does not necessarily reduce risks associated with currency trading.

c)      Password protection:

The Trader is obligated to keep passwords secret and ensure that third parties do not obtain access to the trading facilities. The Trader will be liable to UFX for trades executed by means of the Trader's password even if such use may be wrongful.

d)      Quoting errors:

Should quoting errors occur due to a dealer's mistype of a quote or an erroneous price quote from a Trader, such as but not limited to a wrong big figure quote, UFX will not be liable for the resulting errors in account balances. UFX reserves the right to make the necessary corrections or adjustments on the account involved. Any dispute arising from such quoting errors will be resolved on a basis of a fair market value of a currency at the time such an error occurred.

7. In OTCFX, firms are not restricted to effect off-exchange transactions. The firm with which you deal may be acting as your counter party to the transaction. It may be difficult or impossible to liquidate an existing position, to assess the value, to determine a fair price or to assess the exposure to risk. For these reasons, these transactions may involve increased risks. Off-exchange transactions may be less regulated or subject to a separate regulatory regime. Before you undertake such transactions, you should familiarize yourself with applicable rules and attendant risks.

8. In the event that Trader grants trading authority or control over Trader's account to a third party (Trading Agent), whether on a discretionary or non-discretionary basis, UFX shall in no way be responsible for reviewing Trader's choice of such Trading Agent or for making any recommendations with respect thereto. UFX makes no representations or warranties concerning any Trading Agent; UFX shall not be responsible for any loss to Trader occasioned by the actions of the Trading Agent; and UFX does not, by implication or otherwise endorse or approve of the operating methods of the Trading Agent. If Trader gives the Trading Agent authority to exercise any of its rights over it account, Trader does so at his own risk.

## TRADER AGREEMENT

In consideration of UFX agreeing to carry one or more accounts of the undersigned ("Trader") and providing services to Trader in connection with the purchase and sale of cash currencies (including financial instruments) and any similar instruments (collectively referred to as "OTCFX"), which may be purchased or sold by or through UFX for Trader's accounts(s), Trader agrees as follows:

1. AUTHORIZATION TO TRADE. UFX is authorized to purchase and sell OTCFX for Trader's account(s) with a counter party bank or sophisticated institutions or participants in accordance with Trader's oral or written or computer instructions. Unless instructed by Trader to the contrary in writing, UFX is authorized to execute all orders with such banking institutions, counter party, bank, or sophisticated institutional participants as UFX deems appropriate.

2. GOVERNMENTAL, COUNTER PARTY INSTITUTION AND INTERBANKING SYSTEM RULES. All transactions under this Agreement shall be subject to the constitution, by-laws, rules, regulations, customs, usage, rulings and interpretations of the counter party institution or other interbank market (and its clearing organization, if any) where executed and to all applicable Federal and State laws and regulations. If any statute shall hereafter be enacted or any rule or regulation shall hereafter be adopted by any governmental authority, the United States Federal Reserve, Commodity Futures Trading Commission ("CFTC"), the National Futures Association ("NFA"), a contract market or clearing organization which shall be binding upon UFX and shall affect in any manner or be inconsistent with any of the provisions hereof, the affected provisions of this Agreement shall be deemed modified or superseded, as the case may be by the applicable provisions of such statute, rule or regulation, and all other provisions of this Agreement and provisions so modified shall in all respects continue in full force and effect. Trader acknowledges that all transactions under this Agreement are subject to the aforementioned regulatory requirements and Trader shall not thereby be given any independent legal or contractual rights with respect to such requirements.

3. MARGINS AND DEPOSIT REQUIREMENTS. Trader shall provide to and maintain with UFX margin in such amounts and in such forms as UFX, in its sole discretion, may require. Such margin requirements may be greater or less than margins required by a counter party bank. UFX may change margin requirements at any time. Trader agrees to deposit by immediate wire transfer such additional margin when and as required by UFX and will promptly meet all margin calls in such mode of transmission as UFX in its sole discretion designates. UFX may at any time proceed to liquidate Trader's account in accordance with paragraph 7 below and any failure by UFX to enforce its rights hereunder shall not be deemed a waiver by UFX to enforce its rights thereafter. No previous margin requirement by UFX shall preclude UFX from increasing that requirement without prior notice. UFX retains the right to limit the amount and/or total number of open positions that Trader may acquire or maintain at UFX. UFX will attempt to execute all orders, which it may, in its sole discretion, choose to accept in accordance with the oral or written, or computer instructions of Trader's. UFX reserves the right to refuse to accept any order. However, UFX shall not be responsible for any loss or damage caused, directly or indirectly, by any events, actions or omissions beyond the control of UFX including, without limitation, loss or damage resulting, directly or indirectly, from any delays or inaccuracies in the transmission of orders and/or information due to a breakdown in or failure of any transmission or communication facilities.

4. CLIENT MONEY NOTICE. Some banks and/or carrying brokers, counter parties to OTCFX are required to provide the following statement pursuant to rule 2.02(3) of the Securities and Investments Board's Financial Services (Client Money) regulations 1991 to draw attention to the following: "Your money will not be subject to the protections conferred by the Financial Services (Client Money) Regulations 1991 as amended from time to time."

5. SETTLEMENT DATE AND ROLLOVERS. With respect to purchases or sales of Currencies through an OTCFX account, Trader agrees to instruct UFX as to the offset or rollover of a Currency position. Except as provided herein, during the term of the Currency position, Trader shall give UFX instructions for rolling the Currency position no later than two hours prior to the settlement of trading in the Currency contract on the day Trader intends to rollover a Currency position. In addition, Trader, by noon of the business day before the settlement date of the contract of the Currency contract, shall instruct UFX whether to deliver, offset or rollover the Currency position. In the absence of timely instructions from Trader, UFX is authorized, at UFX's absolute discretion, to deliver, rollover or offset all or any portion of the Currency positions in the OTCFX account(s) for Trader's Account(s) and at Trader's risk. Trader's account(s) shall be charged commissions, at broker's rates, upon the rollover or offset of a Currency position.

6. COLLATERAL AND LENDING AGREEMENT. All funds, securities, currencies, and other property of Trader which UFX or its affiliates may at any time be carrying for Trader (either individually, jointly with other, or as a guarantor of the account of any other person,) or which may at any time be in its possession or control or carried on its books for any purpose, including safekeeping, are to be held by UFX as security and subject to a general lien and right of set off for liabilities of Trader to UFX whether or not UFX has made advances in connection with such securities, commodities, currencies or other property, and irrespective of the number of accounts Trader may have with UFX. UFX may in its discretion, at any time and from time to time, without notice to Trader, apply and/or transfer any or all funds or other property of Trader between any of Trader's accounts

Trader hereby also grants to UFX the right to pledge, re-pledge, hypothecate, invest or loan, either separately or with the property of other Traders, to itself as broker or to others, any securities or other property of Trader held by UFX as margin or security. UFX shall at no time be required to deliver to Trader the identical property delivered to or purchased by UFX for any account of Trader. The rights of UFX are subject to the applicable requirements for the segregation of Trader funds and property under the Commodity Exchange Act, as amended (the "Act"). The purpose of the Lending Agreement is to allow UFX to use depository receipts (representing collateral) as collateral. Should Trader take delivery of Currencies through settlement of trades, UFX is obliged to make full payment for the delivery on 24 hours notice. If the balance in the Trader's account is not adequate to pay for the delivery, the depository receipts become property carried on margin in the Trader's account, since they are not fully paid for by Trader. The Lending Agreement allows UFX to use the depository receipt as collateral for a bank loan, the proceeds of which are used to pay for the depository receipts until rollover of the Currency and/or payment in full by Trader. Should Trader intend to take delivery of the Currency covered by any other obligation, UFX requires the Trader to sign the Lending Agreement so it may use the Currencies, property, depository receipts or evidence of ownership thereof, as collateral for a bank loan, the proceeds of which may be used to pay for the Currencies or evidence of ownership thereof, until payment in full, including interest, by the Trader. This authorization shall apply to all accounts carried by UFX for Trader and shall remain in full force until all accounts are fully paid for by Trader or notice of revocation is sent by UFX from its home office.

7.  LIQUIDATION OF ACCOUNTS AND PAYMENT OF DEFICIT BALANCES.  In the event of (a) the death or judicial declaration of incompetence of Trader, (b) the filing of a petition in bankruptcy, or a petition for the appointment of a receiver, or the institution of any insolvency or similar proceeding by or against Trader; (c) the filing of an attachment against any of Trader's accounts carried by UFX, (d) insufficient margin, or UFX's determination that any collateral deposited to protect one or more accounts of Trader is inadequate, regardless of current market quotations, to secure the account; (e) Trader's failure to provide UFX any information requested pursuant to this agreement, or (f) any other circumstances or developments that UFX deems appropriate for its protection, and in UFX's sole discretion, it may take one or more, or any portion of, the following actions: (1) satisfy any obligation Trader may have to UFX, either directly or by way of guaranty of suretyship, out of any of Trader's funds or property in its custody or control, (2) sell any or purchase any or all Currency contracts, securities held or carried for Trader; and (3) cancel any or all outstanding orders or contracts, or any other commitments made on behalf of Trader. Any of the above actions may be taken without demand for margin or additional margin, without prior notice of sale or purchase or other notice to Trader, Trader's personal representatives, heirs, executors, administrators, trustees, legatees or assigns and regardless of whether the ownership interest shall be solely Trader's or held jointly with others. In liquidation of Trader's long or short positions, UFX may, in its sole discretion, offset in the same settlement or it may initiate new long or short positions in order to establish a spread or straddle which in UFX's sole judgment may be advisable to protect or reduce existing positions in Trader's account. Any sales or purchases hereunder may be made according to UFX's judgment and at its discretion with any interbank or other exchange market where such business is then usually transacted or at a public auction or private sale, and UFX may purchase the whole or any part thereof free from any right of redemption. Trader shall at all times be liable for the payment of any deficit balance of Trader upon demand by UFX and in all cases, Trader shall be liable for any deficiency remaining in Trader's account(s) in the event of the liquidation thereof in whole or in part by UFX or by Trader. In the event the proceeds realized pursuant to this authorization are insufficient for the payment of all liabilities of Trader due to UFX, trader shall promptly pay upon demand, the deficit and all unpaid liabilities, together with interest thereon equal to three (3) percentage points above the then prevailing prime rate at UFX's principal bank or the maximum interest rate allowed by law, whichever is lower, and all costs of collection, including attorney's fees, witness fees, travel expenses and the like. In the event UFX incurs expenses other than for the collection of deficits, with respect to any of the account(s) of Trader, Trader agrees to pay such expenses.

8.  SETTLEMENT DATE OFFSET INSTRUCTIONS.  Offset instructions on Currency positions open prior to settlement arriving at settlement date must be given to UFX at least one (1) business day prior to the settlement or value day. Alternatively, sufficient funds to take delivery or the necessary delivery documents must be in the possession of UFX within the same period described above. If neither instructions, funds nor documents are received, UFX may without notice, either offset Trader's position or roll Trader's positions into the next settlement time period or make or receive delivery on behalf of Trader upon such terms and by such methods deemed reasonable by UFX in its sole discretion.

9.  CHARGES.  Trader shall pay such brokerage, commission and special service and all other charges (including, without limitation, markups and markdowns, statement charges, idle account charges, order cancellation charges, account transfer charges or other charges), fees (including, without limitation, fees imposed by any interbank agency, bank, contract markets or other regulatory or self regulatory organizations) arising out of UFX providing services hereunder. UFX may change its commission, charges, and/or fees without notice. Trader agrees to be liable to UFX for interest on amounts due from Trader to UFX at an interest rate equal to three (3) percentage points above the then prevailing prime rate at UFX principal bank or the maximum interest rate allowed by law, whichever is lower. All such charges shall be paid by Trader as they are incurred, or as UFX in its sole and absolute discretion, may determine, and Trader hereby authorizes UFX to withdraw the amount of any such charges from Trader's account(s). Trader agrees to pay a transfer fee, to be designated by UFX in the event Trader instructs UFX to transfer open positions, moneys, and/or property of Trader's account to another institution. UFX confirms all prices quoted to Trader are not inclusive of markups and markdowns.

**101 00009**

10. STATEMENTS AND CONFIRMATION. Reports of the confirmation of orders and statements of accounts for Trader shall be deemed correct and shall be conclusive and binding upon Trader if not objected to immediately upon receipt and confirmed in writing within (1) day after transmittal to Trader by mail or otherwise. Margin calls shall be conclusive and binding unless objected to immediately in writing  Written objections on Trader's part shall be directed to UFX Capital Markets, LLC at its home office located at: 3467 NE 163rd ST NMB, FL 33160, USA, or the most recent address as indicated on the UFX website, and shall be deemed received only if actually delivered or mailed by registered mail, return receipt requested. Failure to object shall be deemed ratification of all actions taken by UFX or UFX's agents prior to Trader's receipt of said reports. Trader's failure to receive a trade confirmation shall not relieve Trader of the obligation to object as set out herein.

11. COMMUNICATIONS. Reports, statements, notices and any other communications may be transmitted to Trader via email, address on Trader's application, or to such other address as Trader may from time to time designate in writing to UFX. All communications so sent, whether by mail, telegraph messenger or otherwise, shall be deemed transmitted by UFX when deposited in the United States mail, or when received by a transmitting agent, and deemed delivered to Trader personally, whether actually received by Trader or not.

12. UFX RESPONSIBILITIES. UFX will not be responsible for delays in the transmission of orders due to a breakdown or failure of transmission or communication facilities, electrical power outage or for any other cause beyond UFX's control or anticipation. UFX shall only be liable for its actions directly attributable to negligence, willful default or fraud on the part of UFX. UFX shall not be liable for losses arising from the default of any agent or any other party used by UFX under this agreement.

13. CURRENCY FLUCTUATION RISK  If Trader directs UFX to enter into any currency transaction: (a) any profit or loss arising as a result of a fluctuation in the exchange rate affecting such currency will be entirely for Trader's account and risk; (b) all initial and subsequent deposits for margin purposes shall be made in U.S. dollars, in such amounts as UFX may in its sole discretion require, and (c) UFX is authorized to convert funds in Trader's account for margin into and from such foreign currency at a rate of exchange determined by UFX in its sole discretion on the basis of the then prevailing money market rates.

14. RISK ACKNOWLEDGMENT. Trader acknowledges that investments in leveraged and non-leveraged transactions are speculative, involves a high degree of risk, and is appropriate only for persons who can assume risk of loss in excess of their margin deposit. Trader understands that because of the low margin normally required in OTCFX trading, price changes in OTCFX may result in significant losses that may substantially exceed Trader's investment and margin deposit. Trader warrants that Trader is willing and able, financially and otherwise, to assume the risk of OTCFX trading, and in consideration of UFX's carrying his/her account(s), Trader agrees not to hold UFX responsible for losses incurred through following its trading recommendations or suggestions or those of its employees, agents or representatives. Trader recognizes that guarantees of profit or freedom from loss are impossible of performance in OTCFX trading  Trader acknowledges that Trader has received no such guarantees from UFX or from any of its representatives or any introducing agent or other entity with whom Trader is conducting his/her UFX account and has not entered into this agreement in consideration of or in reliance upon any such guarantees or similar representations

15  TRADING RECOMMENDATIONS   (a) Trader acknowledges that (i) any market recommendations and information communicated to Trader by UFX or by any person within the company, does not constitute an offer to sell or the solicitation of an offer to buy any OTCFX contract, (ii) such recommendation and information, although based upon information obtained form sources believed by UFX to be reliable, may be based solely on a broker's opinion and that such information may be incomplete and may be unverified, and (iii) UFX makes no representation, warranty or guarantee as to, and shall not be responsible for, the accuracy or completeness of any information or trading recommendation furnished to Trader  Trader acknowledges that UFX and/or its officers, directors, affiliates, associates, stockholders or representatives may have a position in or may intend to buy or sell currencies, which are the subject of market recommendations furnished to Trader, and that the market position of UFX or any such officer, director, affiliate, associate, stockholder or representative may not be consistent with the recommendations furnished to Trader by UFX   Trader acknowledges that UFX makes no representations concerning the tax implications or treatment of contracts, and, (b) Trader acknowledges that should Trader grant trading authority or control over Trader's account to a third party ("Trading Agent"), whether on a discretionary or non-discretionary basis, UFX shall in no way be responsible for reviewing Trader's choice of such Trading Agent nor making any recommendations with respect thereto  Trader understands that UFX makes no warranties nor representations concerning the Trading Agent, that UFX shall not be responsible for any loss to Trader occasioned by the actions of the Trading Agent and that UFX does not, by implication or otherwise, endorse or approve of the operating methods of the Trading Agent  If Trader gives Trading Agent authority to exercise any of its rights over Trader's account(s), Trader understands that Trader does so at Trader's own risk

16  TRADER REPRESENTATIONS AND WARRANTIES  Trader represents and warrants that  (a) Trader is of sound mind, legal age and legal competence, and, (b) No person other than Trader has or will have an interest in Trader's account(s), and, (c)

Trader hereby warrants that regardless of any subsequent determination to the contrary, Trader is suitable to trade OTCFX and is a sophisticated institution and/or institutional participant; and, (d) Trader is not now an employee of any exchange, any corporation in which any exchange owns a majority of the capital stock, any member of any exchange and/or firm registered on any exchange, or any bank, trust, or insurance company, and in the event that Trader becomes so employed, Trader will promptly notify UFX at its home office in writing of such employment; and, (e) All the information provided in the information portion of this booklet is true, correct and complete as of the date hereof and Trader will notify UFX promptly of any changes in such information.

17.  DISCLOSURE OF FINANCIAL INFORMATION.  The Trader represents and warrants that the financial information disclosed to UFX in this document is an accurate representation of the Trader's current financial condition.  The Trader represents and warrants that in determining the Trader's Net Worth, Assets and Liabilities were carefully calculated then Liabilities were subtracted from Assets to determine the value that the Trader has included in the financial information as Net Worth.  The Trader represents and warrants that in determining the value of Assets, the Trader included cash and/or cash equivalents, U.S. Government and Marketable securities, real estate owned (excluding primary residence), the cash value of life insurance and other valuable Assets.  The Trader represents and warrants that in determining the value of Liabilities, the Trader included notes payable to banks (secured and unsecured), notes payable to relatives, real estate mortgages payable (excluding primary residence) and other debts  The Trader represents and warrants that in determining the Trader's Liquid Assets the Trader included only those Assets that can be quickly (within one day's time) converted to Cash.  The Trader represents and warrants that the Trader has very carefully considered the portion of the Trader's assets which the Trader considers to be Risk Capital  The Trader recognizes that Risk Capital is the amount of money the Trader is willing to put at risk and if lost would not, in any way, change the Trader's lifestyle  The Trader agrees to immediately notify UFX if the Trader's financial condition changes in such a way to reduce the Trader's Net Worth, Liquid Assets and/or Risk Capital.

18.  NO GUARANTEES.  Trader acknowledges that Trader has no separate agreement with Trader's broker or any UFX employee or agent regarding the trading in Trader's UFX account, including any agreement to guarantee profits or limit losses in Trader's account.  Trader understands that Trader is under an obligation to notify UFX's Compliance Officer immediately in writing as to any agreement of this type.  Further, Trader understands that any representations made by anyone concerning Trader's account that differ from any statements Trader receives from UFX must be brought to the attention of UFX's Compliance Officer immediately in writing  Trader understands that Trader must authorize every transaction prior to its execution unless Trader has delegated discretion to another party by signing UFX's limited trading authorization, and any disputed transactions must be brought to the attention of UFX's Compliance Officer pursuant to the notice requirements of this Trader Agreement  Trader agrees to indemnify and hold UFX harmless form all damages or liability resulting form Trader's failure to immediately notify UFX's Compliance Officer of any of the occurrences referred to herein.  All notices required under this section shall be sent to UFX at its home office

19.  CREDIT.  Trader authorizes UFX or agents acting on behalf of UFX to investigate Trader's credit standing and in connection therewith to contact such banks, financial institutions and credit agencies as UFX shall deem appropriate to verify information regarding Trader  Trader further authorizes UFX to investigate Trader's current and past investment activity, and in connection therewith, to contact such futures commission merchants, exchanges, broker/dealers, banks, and compliance data centers as UFX shall deem appropriate  Upon reasonable request made in writing by Trader to UFX, Trader shall be allowed to review any records maintained by UFX relating to Trader's credit standing  Trader shall also be allowed, at Trader's sole cost and expense, to copy such records

20  JOINT ACCOUNTS  All transactions correspond to the "Trader Account Letter" and "Trader Agreement"  Each tenant has authority  a) To trade for the account with restraint to the agreements of the account, b) To receive all correspondence and documents in respect to the account, c) To receive or withdraw money from the account, d) To execute agreements relating to the account, and e) To deal with UFX fully  UFX has the authority to require joint action by the parties of the account in matters of the account  UFX has possession over the security of the account individually or jointly  If a death occurs to one or more of the tenants, UFX shall be notified in writing and shown proof of a death certificate  All expenses due at the date of notification shall be charged to the account  Unless Joint Account Allocation Addendum is completed, then each tenant is presumed to have equal share

21  NO WAIVER OR AMENDMENT  No provision of this Agreement may be waived or amended unless the waiver or amendment is in writing and signed by both Trader and an authorized officer of UFX  No waiver or amendment of this Agreement may be implied from any course of dealing between the parties or from any failure by UFX or its agents to assert its rights under this Agreement on any occasion or series of occasions  No oral agreements or instructions to the contrary shall be recognized or enforceable  This instrument and the attachments hereto embody the entire agreement of the parties, superseding any and all prior written and oral agreements and there are no other terms, conditions or obligations other than those contained herein

**101 00011**

22   GOVERNING LAW AND JURISDICTION.  This Agreement, and the rights and obligations of the parties hereto, shall be governed by, construed and enforced in all respects by the laws of the State of Florida, where UFX's principal order execution facilities are located.

23.  BINDING EFFECT.  This Agreement shall be continuous and shall cover, individually and collectively, all accounts of Trader at any time opened or reopened with UFX irrespective of any change or changes at any time in the personnel of UFX or its successors, assigns, or affiliates.  This Agreement including all authorizations, shall inure to the benefit of UFX and its successors and assigns, whether by merger, consolidation or otherwise, and shall be binding upon Trader and/or the estate, executor, trustees, administrators, legal representatives, successors and assigns of Trader.  Trader hereby ratifies all transactions with UFX effected prior to the date of this Agreement, and agrees that the rights and obligations of Trader in respect thereto shall be governed by the terms of this Agreement.

24.  TERMINATION.  This Agreement shall continue in effect until termination, and may be terminated by Trader at any time when Trader has no open Currency position(s) and no liabilities held by or owed to UFX upon the actual receipt by UFX at its home office of written notice of termination, or at any time whatsoever by UFX upon the transmittal of written notice of termination to Trader, provided, that such termination shall not affect any transactions previously entered into and shall not relieve either party of any obligations set out in this agreement nor shall it relieve Trader of any obligations arising out of any deficit balance.

25.  INDEMNIFICATION   Trader agrees to indemnify and hold UFX, its affiliates, employees, agents, successors and assigns harmless from and against any and all liabilities, losses, damages, costs and expenses, including attorney's fees, incurred by UFX arising out of Trader's failure to fully and timely perform Trader's agreements herein or should any of the representations and warranties fail to be true and correct.  Trader also agrees to pay promptly to UFX all damages, costs and expenses, including attorney's fees, incurred by UFX in the enforcement of any of the provisions of this Agreement and any other agreements between UFX and Trader.

26.  CROSS TRADE CONSENT   The undersigned hereby acknowledges and agrees that a situation may arise whereby an officer, director, affiliate, associate, employee, bank, bank employee or dealer associated with UFX may be the opposing broker for a trade entered for the undersigned's account.  The undersigned hereby consents to any such transaction, subject to the limitations and conditions, if any, contained in the Rules or Regulations of any bank, institution, exchange or board of trade upon which such buy or sell orders are executed, and subject to the limitations and conditions, if any, contained in any applicable Regulations of the Commodity Futures Trading Commission, National Futures Association, United States Federal Reserve or other regulatory agency

27.  TERMS AND HEADINGS.  The term "UFX" shall be deemed to include UFX, its divisions, its successors and assigns, the term "home office" is Universal FX, Inc., 3467 NE 163ʳᵈ ST, NMB, FL 33160 USA, the term "Trader" shall mean the party (or parties) executing the Agreement, and the term "Agreement" shall include all other agreements and authorizations executed by Trader in connection with the maintenance of Trader's account with UFX regardless of when executed.  The paragraph headings in this Agreement are inserted for convenience of reference only and are not deemed to limit the applicability or affect the meaning of any of its provisions

28   ACCEPTANCE   This Agreement shall not be deemed to be accepted by UFX nor become a binding contract between Trader and UFX until approved at UFX home office and signed by its authorized representative(s)

29.  CONSENT TO JURISDICTION AND VENUE   Except as provided in the Arbitration Agreement, if applicable, Trader, in order to induce UFX to accept this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby agrees to the following   (a) Any judicial or administrative action or proceeding arising directly or indirectly hereunder or in connection with the transactions contemplated hereby, whether brought by Trader or UFX, shall be held, at the sole discretion of UFX within Dade County, State of Florida  Trader consents and submits to, and waives any and all objections Trader may have to such venue, and further agrees to waive and forego any right Trader may have to transfer or change the venue of any action or proceeding encompassed hereby, and, (b) Trader consents and submits to the jurisdiction of any local, state or federal court located within Dade County, State of Florida in any action or proceeding arising directly or indirectly hereunder or in connection with the transaction hereby, whether brought by Trader or UFX

30  RECORDINGS   Trader agrees and acknowledges that all conversations regarding Trader's account(s) between Trader and UFX personnel may be electronically recorded with or without the use of an automatic tone warning device   Trader further agrees to the use of such recordings and transcripts thereof as evidence by either party in connection with any dispute or proceeding that may arise involving Trader or UFX  Trader understands that UFX destroys such recordings at regular intervals in accordance with UFX's established business procedures and Trader hereby consents to such destruction

## Lending Agreement

By signing this agreement Trader authorizes UFX and its associates to use the currencies, or the ownership thereof, as collateral for a loan, the proceeds of which are used to pay for the currencies until rollover of the currency or commodity to a new settlement date and/or payment in full is made by Trader. This authorization shall apply to all accounts carried by UFX and associates for Trader. This shall remain in effect until the account is closed and all financial responsibilities are completed. See Paragraph 6 of Trader Agreement for additional information about this Lending Agreement.

## Disclosure Statement for Non-Cash Margin

This statement is furnished to you because regulatory agencies of leverage transactions such as the Commodity Futures Trading Commission require such statements. Rule 190 10(c) of the Commodity Futures Trading Commission requires it for reasons of fair notice unrelated to UFX's current financial condition.

1. In the unlikely event of UFX's bankruptcy, all property, including property specifically traceable to you, will be returned, transferred or distributed to you, or in your behalf, only to the extent of your pro rata share of all property available for distribution to Traders.

2. Notice concerning the terms for the returning of specifically identifiable property will be by publication in a newspaper of general circulation

3. The Commission's regulations concerning bankruptcies of commodity brokers can be found at 17 Code of Federal Regulations Part 190

## Social Security or Tax ID Certification & Backup Withholding Statement

Under penalties of perjury, I certify (1) the number shown on this agreement is the correct Social Security or Taxpayer Identification number and (2) the ownership, or beneficiary, of this account is not subject to backup withholding under Section #3406 (a)(1)(C) of the Internal Revenue Code

## Authorization to Transfer Funds

Trader agrees hereby that UFX may at any time, in the judgment of UFX and its associates, apply and transfer from Trader's Security or Commodity escrow account to any of Trader's other accounts held with UFX or other approved financial institution or its associates any of the moneys, currencies, commodities, securities, or other property of Trader held either individually or jointly with others to another regulated account of the same said Trader

## Off Exchange Transaction Disclosure

UFX may from time to time execute transactions as Trader's agent on the foreign exchange market to trade currencies, pursuant to an agreement between the agent and UFX, and that a trade executed between one bank executes a trade onset by another banking agent  Traders who trade through the this market may not be afforded certainty of the protective measures provided by the Commodity Exchange Act, CFTC regulations, and the rules of the NFA, and any domestic futures exchange, including the right to use reparation proceedings before the CFTC and arbitration proceedings provided by the NFA or any domestic futures exchange

Trader understands that Trader may be giving up the right to have arbitration through the above paragraph on foreign exchanges

## Consent To Electronic Transmission Of Account Statements

Trader hereby consents to have Trader's account information and trade confirmations available on the Internet in lieu of having such information delivered to Trader via mail or email  Trader will be able to access account information via the UFX website using Trader's account login information to access the account  UFX will post all of Trader's account activity and Trader will be able to generate daily, monthly and yearly reports of account activity as well as a report of each executed trade  Updated account information will be available no more than twenty-four hours after any activity takes place on Trader's account  Posting of account information on Trader's online account will be deemed delivery of confirmation and account statements  At all times, account information will include trade confirmations with ticket numbers, purchase and sale rates, used margin, amount available for margin trading, statements of profits and losses, as well as current open or pending positions as required by the CFTC  Trader may revoke this consent at any time upon written notice to UFX

## Arbitration Agreement

Any controversy between Trader and UFX, arising out of or relating to Trader's account shall be, except as provided below, resolved by arbitration in accordance with Part 180 of the Commodity Exchange Act as amended. Any award rendered in such arbitration shall be final and binding on and enforceable in accordance with the laws of any court having jurisdiction.

At such time that Trader notifies UFX that s/he intends to submit a claim to arbitration or at such time that UFX notifies Trader of its intent to submit a claim to arbitration, Trader will have the opportunity to elect a qualified forum for conducting the proceeding. Within ten (10) business days of notice by either party of intent to file a claim, UFX will provide Trader with a list of organizations whose procedures qualify them to conduct arbitration in accordance with Part 180 of the Commodity Exchange Act together with the rules of each forum listed. Failure to select an organization gives UFX the right to select an organization

UFX will pay any incremental fees, which may be assessed by a qualified forum for provision of a mixed panel, unless the arbitrators determine that the Trader has acted in bad faith in initiating or conducting that proceeding.

Three forums exist for the resolution of commodity disputes: Civil Court litigation, reparations at the Commodity Futures Trading Commission (CFTC), and arbitration conducted by a self-regulatory or other private organization

The CFTC recognizes that the opportunity to settle disputes by arbitration may in some cases provide many benefits to customers, including the ability to obtain an expeditious and final resolution of disputes without incurring substantial costs. The CFTC requires, however, that each customer individually examine the relative merits of arbitration and that you consent to the arbitration agreement by voluntary

By signing this agreement, you (1) may be waiving your right to sue in a court of law; and (2) are agreeing to be bound by arbitration of any claims or counterclaims that you or UFX may submit to arbitration under this agreement. You are not, however, waiving you right to elect instead to petition the CFTC to institute reparations proceedings under Section 14 of the Commodity Exchange Act with respect to any dispute, which may be arbitraged pursuant to this Agreement   In the event a dispute arises, you will be notified if UFX intends to submit the dispute to arbitration  If you believe a violation of the Commodity Exchange Act is involved and if you prefer to request a Section 14 "Reparations" proceeding before the CFTC, you have 45 days from the date of such notice in which to make that election

Traders are not required to sign this agreement to open an account with UFX  See 17 CFR 180 1-180 5

**101 00014**

| Notice To Foreign Traders | | |

## NOTICE TO FOREIGN TRADERS
*(Only if applicable)*

### Designation of UFX as Agent for Trader

The Commodity Futures Trading Commission ("CFTC") has issued regulations which require the designation of Futures Commission Merchants ("FCM") as the agents of foreign brokers and foreign traders. UFX is required to notify all foreign brokers and foreign traders of the requirements of these regulations.

CFTC Regulation 15.05 provides that upon execution by an FCM of commodity interest transactions on a United States contract market for the account of a foreign trader or foreign broker, the FCM will be considered to be the agent of the foreign trader or foreign broker, as well as of Customers of the foreign brokers who have positions in the foreign broker's accounts carried by the FCM, for purposes of accepting delivery and service of communication and legal process issued by or on behalf of the CFTC. UFX is required under such regulation to retransmit any such communications or process to the foreign broker or trader that is its Customer. A foreign broker or trader should be aware that this regulation also permits the foreign broker or trader to designate an agent other than UFX. Such alternate designation of agency must be evidenced by written agreement that the foreign broker or trader must provide to UFX and which UFX must forward to the CFTC. If the foreign broker or trader wishes to designate an agent other than UFX, you must notify UFX in writing. In the event another agent is not so designated, UFX will be the foreign broker's or foreign trader's designated agent for CFTC communications. CFTC Regulation 15.05 is available upon request from UFX.

In addition, the CFTC has issued Regulation 21.03 requiring FCMs, foreign brokers and foreign traders to respond to special calls made by the CFTC for information regarding their futures and options trading. UFX is also required by this regulation to notify all foreign brokers and foreign traders of the requirements of this regulation.

CFTC Regulation 21.03 provides for the issuance of a special call by the CFTC for information from foreign brokers or traders for whom an FCM makes or causes to be made a futures or option on futures transaction, including any foreign futures and foreign options. These special calls are generally limited to instances where the CFTC requires information and where the books and records of the FCM, trader or broker upon whom the special call is made are not open at all times to inspection in the United States by any representative of the CFTC. For the purposes of this regulation, UFX will be considered the agent of the Customer and may be required to submit such special call by telex or a similarly expeditious means of communication, unless the Customer has made an alternative designation as above for CFTC Regulation 15.05. Foreign brokers and traders are required to provide the CFTC with the information requested in such special call. The regulation permits the CFTC to prohibit the foreign broker or trader from further trading in the contract market and in the delivery months or option expiration dates specified in the call, except for liquidation if the special call is not responded to at the place and within the time required by the CFTC. The special call shall be limited to information relating to futures or options positions of the foreign broker or trader in the United States.

# In The Matter Of:

*Certain Foreign Currency Trading Companies (Universal FX)*

---

*Deposition of Steven Michael*
*March 1, 2004*

---

*Miller Reporting Company, Inc.*
*735 Eighth Street, S.E.*
*Washington, DC 20003*
*(202) 546-6666*

*Original File O301MICH.TXT, 205 Pages*
*Min-U-Script® File ID: 0709742470*

# Word Index included with this Min-U-Script®



EXHIBIT
D

**Page 1**

UNITED STATES OF AMERICA
BEFORE THE
COMMODITY FUTURES TRADING COMMISSION
In the Matter of:
CERTAIN FOREIGN CURRENCY TRADING  :
COMPANIES (Universal FX)            :
Washington, D.C.
Monday, March 1, 2004

The deposition of STEVEN MICHAEL, called
for examination by counsel for Commodity Futures
Trading Commission in the above-entitled matter,
pursuant to Notice, in the offices of CFTC, 1155
Twenty-first Street, N.W., Washington, D.C.,
convened at 9:25 a.m., before Cathy Jardim, a
notary public in and for the District of Columbia,
when were present on behalf of the parties:

APPEARANCES:
On behalf of the CFTC:
    PETER M. HAAS, ESQ.
    EUGENE SMITH, ESQ.
    Commodity Futures Trading Commission
    1155 21st Street, N.W.
    Washington, D.C. 20581
    (202)418-5377
On behalf of the Witness:
    TED S. HELWIG, ESQ.
    Katten Muchin Zavis Rosenman
    Suite 1600
    525 West Monroe Street
    Chicago, Illinois 60661
    (312)902-5537
Also Present: (Via teleconference)
    CHARLOTTE OHLMILLER
    Chief Regional Investigator
    Commodity Future Trading Commission

CONTENTS
EXAMINATION BY COUNSEL FOR

| WITNESS | CFTC |
| --- | --- |
| STEVEN MICHAEL | 4 |

EXHIBITS

| MICHAEL DEPOSITION EXHIBITS | MARKED |
| --- | --- |
| No. 1, No 2 | 5 |
| No 3 | 7 |
| No. 4 | 24 |
| No 5 | 94 |
| No. 6 | 97 |
| No. 7 | 102 |
| No 8 | 104 |
| No 9 | 105 |
| No 10 | 120 |
| No 11 | 162 |
| No. 12 | 165 |
| No. 13 | 180 |
| No. 14 | 194 |
| No. 15 | 198 |
| No 16 | 201 |
| No. 17 | 202 |

**Page 4**

[1] **PROCEEDINGS**
[2] Whereupon,
[3] STEVEN MICHAEL
[4] was called for examination by counsel for CFTC and,
[5] having been first duly sworn by the notary public,
[6] was examined and testified as follows:
[7] **EXAMINATION BY COUNSEL FOR CFTC**
[8] **BY MR. HAAS:**
[9] Q: Could you state your full name for the
[10] record?
[11] A: Steven Michael.
[12] Q: Mr. Michael, let me introduce myself. My
[13] name is Peter Haas. I am an attorney with the
[14] Commodity Futures Trading Commission, and also with
[15] me is Eugene Smith, also with the commission.
[16] Attending today attending via teleconference is
[17] Charlotte Ohlmiller.
[18] Are you represented by counsel?
[19] A: Yes.
[20] **MR. HAAS:** Would counsel identify
[21] himself.
[22] **MR. HELWIG:** Ted Helwig.

**Page 5**

[1] **MR. HAAS:** I am going to show you a
[2] document which I will have marked as Exhibit 1.
[3] (Michael Exhibit No. 1 was
[4] marked for identification.)
[5] **BY MR. HAAS:**
[6] Q: I would ask if you can identify that?
[7] A: Yes.
[8] Q: Is that the subpoena that called for your
[9] testimony here today?
[10] A: Yes.
[11] Q: I will note for the record that the
[12] subpoena was issued earlier with another date,
[13] first with the erroneous date and then with the
[14] date of March 2nd, and then after further
[15] discussions with your counsel, we agreed to have
[16] your testimony take place on March 1.
[17] Now, Exhibit 2.
[18] (Michael Exhibit No. 2 was
[19] marked for identification.)
[20] **BY MR. HAAS:**
[21] Q: This is a document entitled "Statement to
[22] registered persons directed to provide information

Page 6

[1] or access to books and records" — you know what,

[2] that is the wrong one.

[3]     Let's go off the record for just a

[4] second.

[5]     (Discussion off the record.)

[6]          BY MR. HAAS:

[7]     Q: We have a correct version of Exhibit 2,

[8] which is a "Statement to persons directed to

[9] provide information pursuant to a Commission

[10] subpoena." Now, Mr. Michael, while we were off the

[11] record, you were looking at a similar document

[12] which was put together for people who were

[13] providing information not pursuant to a subpoena,

[14] but can you look through that and see if you have

[15] any questions about that or whether you have had an

[16] opportunity to go over this before your testimony

[17] with your attorney?

[18]     A: I don't have any questions.

[19]     Q: See on page 1 where it refers to false

[20] statement, the statute under 18 U.S.C. 1001 applies

[21] to your testimony here today?

[22]     A: Yes.

Page 7

[1]     Q: Now, I am going to mark as Exhibit 3 a

[2] letter dated February 27 from KMZ Rosenman to me

[3] regarding a subpoena to Steven Michael. I am going

[4] to give that to you and give a copy to your

[5] attorney and then ask you, have you seen the letter

[6] before? And if you haven't, just let me know and

[7] we can talk about it anyway.

[8]     A: No, I haven't.

[9]     (Michael Exhibit No. 3 was

[10] marked for identification.)

[11]          BY MR. HAAS:

[12]     Q: This letter purports to respond to a

[13] request for certain documents in the subpoena about

[14] your employment, e-mail addresses, phone numbers,

[15] futures accounts and foreign currency accounts.

[16] Can you look over this letter and tell me whether

[17] the information that is in here regarding the

[18] categories that are listed is accurate and

[19] complete?

[20]     A: Yes. Yes, it is accurate.

[21]     Q: It is.

[22] Can you explain to me briefly what Corymb

Page 8

[1] Capital Advisors is?

[2]     A: It is a CTA CPO.

[3]     Q: And is that an active business at the

[4] time?

[5]     A: Today?

[6]     Q: Yes.

[7]     A: No.

[8]     Q: Does it have any employees?

[9]     A: No.

[10]     Q: Does it have any customers?

[11]     A: No.

[12]     Q: Does it have a bank account?

[13]     A: I believe so, yes.

[14]     Q: And how long has it had no employees or

[15] no customers?

[16]     A: I never had employees. I believe the

[17] last customer — customers stopped trading

[18] approximately March of last year, 2003.

[19]     Q: And when you did have — when Corymb

[20] Capital Advisors did have customers, where were the

[21] customers trading?

[22]     A: Swiss finance.

Page 9

[1]     Q: Who were those customers?

[2]     A: There was — we were a customer,

[3] myself — the management — the advisors, I

[4] believe, Corymb Capital Advisors was an investor in

[5] the fund and there were two customers. One person

[6] I don't recall the name. The other one was Mark

[7] Harris and Julie Harris.

[8]     Q: And were these just individual investors?

[9]     A: Yes.

[10]     Q: Did the firm Corymb Capital Advisors have

[11] any businesses as customers — any business

[12] entities as customers?

[13]     A: No.

[14]     Q: And what is the relationship between

[15] Corymb Capital Advisors and Corymb Capital

[16] Management?

[17]     A: It is the same managers, myself and

[18] Edward Agabs. I am not sure about the question.

[19] Relationship?

[20]     Q: Is there a connection between the two

[21] firms?

[22]     A: Yes. It was set up — the attorney

Page 10

[1] set — advised us how to set up the management
[2] company and the advisors. I am not quite sure what
[3] role each had. I was a trader for the most part.
[4] I didn't really handle the management. I am not
[5] quite sure, to be honest with you. I could get
[6] more information for you.
[7]    Q: Is Corymb Capital Management — provides
[8] management administration for Corymb Capital
[9] Advisors?
[10]   A: There was a Corymb Capital Fund — or
[11] Corymb Capital — I forget the name of it. There
[12] was a fund managed by the management company. The
[13] management company was CTA CPO, which I believe was
[14] Corymb Capital Management.
[15]   Q: So both Corymb Capital Management and
[16] Corymb Financial Advisors was a CTA CPO?
[17]   A: No, one was and one wasn't. Sorry, I am
[18] not real clear. This was a while back and I was
[19] not part of managing that. I am not sure if it was
[20] management or advisors, was the manager of the
[21] fund, and was the CTA CPO.
[22]   Q: What is JMS Delray LLC?

Page 11

[1]    A: Just a real estate — a small real estate
[2] business.
[3]    Q: Is that active?
[4]    A: Yes.
[5]    Q: What is the relationship between JMS
[6] Delray LLC and JMS —
[7]    A: JMS Delray owns property in Delray. JMS
[8] owns properties in Chicago.
[9]    Q: What is Steve Michael Trading, Inc.?
[10]   A: That was just a company that never —
[11] that was set up for — it is a Sub S corporation
[12] set up for tax purposes for any income from
[13] trading. Didn't actually have trading accounts.
[14]   Q: Does it have any employees now?
[15]   A: No.
[16]   Q: Does it have any customers?
[17]   A: No. It never had any customers.
[18]   Q: What about Stemic Investment Company
[19] Limited, what is that?
[20]   A: Again, just for stock investments and
[21] real estate investment.
[22]   Q: So of these businesses, are there any

Page 12

[1] that you are now actively working for?
[2]    A: No. I am actively involved with JMS
[3] Delray.
[4]    Q: Which is real estate?
[5]    A: Yes.
[6]    Q: Are you still being paid in connection
[7] with your work for Universal FX?
[8]    A: No. I do have present employment that is
[9] not on here. It is Avidus Trading.
[10]   Q: So you are saying there is an addition to
[11] the content of the letter, which would be current
[12] employment by the name of?
[13]   A: Avidus Capital Trading.
[14]   Q: A-V-I-D-A-S?
[15]   A: A-V-I-D-U-S.
[16]   Q: Where is that located?
[17]   A: 5200 Town Center Circle.
[18]   Q: What city?
[19]   A: In Boca Raton.
[20]   Q: Is that a corporation, partnership?
[21]   A: It is a corporation.
[22]   Q: Do you hold a position as an officer or

Page 13

[1] director?
[2]    A: At the moment — we are just organizing,
[3] I should say, that is what we are doing.
[4]    Q: When you say we, you are referring to
[5] whom?
[6]    A: Well, it is myself and a group of
[7] investors and some of the — also people from some
[8] previous employees from UTS World.
[9]    Q: Any names?
[10]   A: Yes, Russ Dougherty, Sam Borek. I am
[11] trying to think of anybody else. Really that is it
[12] at the moment. We are organizing this.
[13]   Q: You have signed a lease?
[14]   A: No. We are using the space of UTS right
[15] now until the lease is up, paying for the rent.
[16]   Q: And what is your — you list here that
[17] you are president at UTS World. Are there any
[18] other employees or officers at UTS?
[19]   A: No.
[20]   Q: Are there any other shareholders at
[21] UTS — or who are the shareholders?
[22]   A: The UTS — the only shareholder UTS had

**Page 14**

[1] was Universal FX.

[2]   Q: And what is the business of Avidus

[3] Capital Trading?

[4]   A: Avidus is going to be a proprietary

[5] trading firm.

[6]   Q: What will it be trading?

[7]   A: Foreign exchange and possibly some

[8] futures, and we do a little — some education.

[9]   Q: Do you have plans for where the funds are

[10] going to come from for this proprietary trading?

[11]   A: Just my own and another shareholder, Sam

[12] Borek.

[13]   Q: How do you spell that?

[14]   A: B-O-R-E-K.

[15]   Q: What is the nature of the education that

[16] you are planning on providing?

[17]   A: The nature of the education?

[18]   Q: Yes.

[19]   A: I am not sure —

[20]   Q: You said you were — the firm had some

[21] plans to do some education?

[22]   A: Sort of our model is to educate

**Page 15**

[1] prospective traders in a manner that hopefully they

[2] can become a proprietary trader for us, and we

[3] would start them trading a small amount of capital,

[4] sort of incubate them as a trader.

[5]   Q: They would become a proprietary trader

[6] through Avidus?

[7]   A: Through Avidus, correct.

[8]   Q: And these would be individuals?

[9]   A: Individuals, yes, who have some previous

[10] trading experience, or if not, they could go

[11] through our mentoring process, our educational

[12] process.

[13]   Q: And if such an individual were to go

[14] through this mentoring process and become a trader

[15] through Avidus, where would that individual — with

[16] whom would that individual be trading?

[17]   A: They would trade in our location and we

[18] would — if they would trade proprietary for us, we

[19] trade through IFX Markets right now in London.

[20]   Q: This is IFX Markets Limited?

[21]   A: Correct, although they do have a U.S.

[22] branch that is incorporated.

**Page 16**

[1]   Q: Has this happened with respect to any

[2] customer — do you have any active customers?

[3]   A: Not yet. We are just actually putting

[4] together our educational process. We are really

[5] organizing at the moment.

[6]   Q: If an individual were to do this, would

[7] they be filling out account documents with IFX

[8] Markets Limited?

[9]   A: Only if they would trade their own money,

[10] they would fill out IFX Markets' paperwork.

[11] Otherwise, if they would be a PROP trading for us,

[12] we created a proper trading agreement, not an

[13] account application but an agreement which spells

[14] out the terms of what they get paid, the percentage

[15] of the profits they get paid, and their

[16] responsibilities and our responsibilities.

[17]   Q: So customers would go through an

[18] educational process and give Avidus money to trade.

[19] Who would do the trading?

[20]   A: They don't give us money. They would

[21] open their own account with IFX. We have nothing

[22] to do with holding client funds. If they trade our

**Page 17**

[1] money, then we would allocate a loss limit or some

[2] parameters for them to trade our own capital, and

[3] in that case they would fill out our agreement as a

[4] PROP trader. We would pay them 50 percent of our

[5] profits on an ongoing basis.

[6]   Q: Why would Avidus be looking to have other

[7] people, other retail clients trading the firm's

[8] money —

[9]   A: They are not retail clients. They are

[10] guys — we are incubating as traders and we are

[11] looking to find and incubate traders to make money

[12] for us. That is our goal. Our profit model is to

[13] make profit from traders who can trade profitably

[14] and we do help them along and give them our risk

[15] management guidance, our money management guidance,

[16] but we are looking ultimately for traders to be

[17] profitable. And the next step would be, if they

[18] are profitable and create a track record with our

[19] money to turn them into a CTA, CPO, and we would

[20] then be partners in that — in the general

[21] partnership.

[22]   Q: These individuals who wanted to

Page 18

[1] participate in this proprietary model you are
[2] describing would pay Avidus money to do this?
[3]     A: They pay for the class, we have a class
[4] for $500, it is a week long. This is what we plan,
[5] a week-long class, which is the beginning of the
[6] education. If they want to continue to possibly
[7] trade through us, they can come to our location, we
[8] do have space for about 50 traders.
[9]     They either can demo trade in our
[10] location. We set them up with a computer, a couple
[11] of screens and access to the Internet with a demo
[12] account of IFX's, and they would pay a $1,250 seat
[13] lease per month. They have to be there for three
[14] months. We analyze the risk management, sort of
[15] their discipline as a trader, and at the end of
[16] three months, we either will back them or tell them
[17] they — we will or we won't.
[18]     They also can trade their own account
[19] through IFX and we can analyze their trading that
[20] way and watch them for three months. If we find
[21] that their risk management is what we are looking
[22] for, they are disciplined, we can choose then to

Page 19

[1] back them as a proprietary trader.
[2]     Q: Who is working on putting together the
[3] educational part of this?
[4]     A: That is myself, Russ Dougherty — Art
[5] Buckner is also from UTD. We have Dave Chamides.
[6] C-H-A-M-I-D-B-S, I believe. Larry Freedberg is not
[7] part of the educational process, but that is sort
[8] of back office, and Merick Chaleski. I am not real
[9] good with the last name. I can get the last name
[10] for you.
[11]     Q: Chaleski?
[12]     A: I don't know the exact spelling of the
[13] last name. He was an exemployee from UTS.
[14]     Q: Is Andrew Stern involved with this
[15] adventure?
[16]     A: No.
[17]     Q: Does Avidus have a phone number?
[18]     A: Yes. It is 561-886-2600.
[19]     Q: Does it have an 800 number?
[20]     A: It does. I don't know the 800 number off
[21] the top of my head.
[22]     Q: Does it advertise?

Page 20

[1]     A: We plan to advertise our classes, is what
[2] we are planning to advertise, locally.
[3]     Q: In what media?
[4]     A: Newspaper.
[5]     Q: Looking at these e-mail addresses on this
[6] letter, which of these e-mail addresses are you
[7] still actively using?
[8]     A: Corymb Fund is still active, and UTS
[9] World, Earth Link sometimes.
[10]     Q: Was UTS — I see an address for UTX for
[11] x.com. Was that a separate business?
[12]     A: Avidus, which, again, we sort of brought
[13] some of the people from UTS into Avidus. UTX
[14] foreign was going to be what we called Avidus. We
[15] chose to change the name completely. As with any
[16] past relationships in the retail business, we
[17] wanted to make sure we separated ourselves from
[18] retail. So for a short time we were going to use
[19] UTX for it, but it didn't make sense.
[20]     Q: And the futures accounts that are listed
[21] on page of the letter, do you remember what period
[22] of time that was open?

Page 21

[1]     A: It is still open.
[2]     Q: Is that kept in your name?
[3]     A: Yes.
[4]     Q: Are there any other firms associated with
[5] that account, or do you just have it directly with
[6] Revis?
[7]     A: No, I just have it directly with Revis.
[8]     Q: And the Swiss foreign currency account?
[9]     A: Same thing.
[10]     Q: Still open?
[11]     A: No.
[12]     Q: When did it close?
[13]     A: They asked me to close it about three
[14] months ago because I haven't used it in many, many
[15] months.
[16]     Q: When did that account open?
[17]     A: Probably about two and a half years ago,
[18] approximately. Maybe longer. Could be even
[19] longer.
[20]     Q: And at one time, were you actively
[21] investing or trading?
[22]     A: Yes. I was actually — myself, Edward

Page 22

[1] Agabs and myself were both the owners of Corymb and
[2] we invested in Corymb through the management or the
[3] advisors, I forget which one, and also we both had
[4] our own personal accounts. We also traded as a
[5] model — we had a model we traded — we did the
[6] identical trades for our personal accounts. That
[7] is the only trading it ever did. It was a
[8] long-term model in foreign currencies.
[9]     Q: Could you tell me briefly about your
[10] educational background, high school and college?
[11]     A: I went to Al North High School. I went
[12] to Loyola University.
[13]     Q: In Chicago?
[14]     A: Yes.
[15]     Q: Did you graduate with a degree?
[16]     A: Yes, accounting.
[17]     Q: What year?
[18]     A: I believe 1985 or 1996. I should
[19] probably know that.
[20]     Q: Any postgraduate study?
[21]     A: No.
[22]     Q: Have you taken any courses or studies

Page 23

[1] relating to commodity futures or options?
[2]     A: No, I didn't.
[3]     Q: What about securities or business?
[4]     A: No.
[5]     Q: Do you hold any professional licenses?
[6]     A: I have a Series 3.
[7]     Q: How long have you held a Series 3
[8] license?
[9]     A: Well, I had a broker's license — a floor
[10] broker's license for many years, and I believe — I
[11] am not sure if there was a point where it lapsed
[12] and then I got my Series 3. I think I did have to
[13] take the Series 3 exam again about three years ago,
[14] when we organized Corymb.
[15]     Q: And your Series 3 is current now?
[16]     A: Yes.
[17]     Q: The account you had at Swiss Finance, did
[18] that make or lose money over the life of the
[19] account?
[20]     A: I think it made money.
[21]     Q: What about the Revco account?
[22]     A: I haven't traded the Revco account in

Page 24

[1] about four years, at least. I just never closed
[2] it. I am not quite sure if that made money. It
[3] was a long time ago.
[4]     Q: Did you ever have an account at UFX?
[5]     A: No.
[6]     Q: I am going to show you a document we will
[7] mark as Exhibit 4.
[8]     (Michael Exhibit No. 4 was
[9] marked for identification.)
[10]         BY MR. HAAS:
[11]     Q: Do you have Exhibit 4, which is Bates
[12] stamped 510121 through 126?
[13]     A: Yes.
[14]     Q: Can you identify this document?
[15]     A: Yes.
[16]     Q: Let me step back here. Just a couple of
[17] ground rules which I should have tossed out early
[18] on. Because our testimony is getting transcribed
[19] by a court reporter, although it feels like a
[20] normal conversation, you have to make sure you
[21] answer verbally. No uh-huh or uh-uh. I would
[22] appreciate yes-or-no. If you don't understand a

Page 25

[1] question, please let me know and I will rephrase
[2] it. If you want to take a break, let me know. I
[3] control the record. We can go off the record.
[4]     Other than that, we can move ahead.
[5] You do recognize Exhibit 4?
[6]     A: Yes.
[7]     Q: What is it?
[8]     A: It is a trade blotter from ACTFOREX.
[9]     Q: If you turn to the second page, it has a
[10] number of trades and it has your name listed?
[11]     A: Correct.
[12]     Q: Although, is your name with or without an
[13] S?
[14]     A: It is without.
[15]     Q: So that is a typo. But it is referring
[16] to you?
[17]     A: Is it referring to me?
[18]     Q: Yes.
[19]     A: It puts a name — you have to have a name
[20] on the account. I believe that could be the house
[21] account, the offset account.
[22]     Q: We are jumping ahead a little bit in

Page 26

[1] terms of the area we will be covering, but is this
[2] a document that you saw in connection with your
[3] work at Universal FX?
[4] A: Yes.
[5] Q: And it was a document that Universal FX
[6] obtained from ACTFOREX?
[7] A: Yes. We would log on to ACTFOREX, or
[8] while we are logged on we can go on and archive
[9] trade blotters, or live.
[10] Q: Did you set the time parameters? Because
[11] here it is 24 hours.
[12] A: We were able to set the dates and, I
[13] believe, the times.
[14] Q: Did you do this — do this on-line, or
[15] did you print these out and keep copies?
[16] A: When we printed them out, we printed them
[17] out to check out, basically for the day, to make
[18] sure we were flat, and every trade was in
[19] correctly. That was the purpose of this.
[20] Q: Looking at Exhibit 4 as a sample, how did
[21] you determine that you were flat for that day?
[22] A: We didn't only use this document. We

Page 27

[1] also would write out tickets for trades. So we
[2] would use both and we would compare the tickets
[3] also to the trade blotter, and typically we had —
[4] wherever we covered the trade, counter-party, the
[5] confirmation with the ticket.
[6] So, I am not sure — this may be —
[7] again, I don't recall these account numbers, what
[8] they are, but — 167 — usually what we would have
[9] is — actually, I am sorry — now I remember. With
[10] ACTFOREX, we did not have the counter-party
[11] transactions on them because we didn't punch them
[12] into ACTFOREX. We had no way of having the
[13] counter parties show up on ACTFOREX.
[14] So this would show us what the customers
[15] did and what the house did against the customers,
[16] and then we had our counter-party transactions that
[17] we compared to see that we were flat.
[18] Q: So this list of trades that are listed
[19] beginning on page 2 and going on to page 3 and 4 of
[20] this exhibit, who are those trades — where it says
[21] Steve Michaels?
[22] A: 167 —

Page 28

[1] Q: Who are those trades between?
[2] A: I believe 167 was the house account,
[3] which was against the same trades that you see on
[4] the other page, the other accounts. It will
[5] print — for example, 165 sold, it says, 1 yen at
[6] 121.80. The other side of that was 167, which
[7] would have bought 1 yen at 121.80. I don't know if
[8] it had an accounting for the market or not, and
[9] that is basically how we knew if it was flat or
[10] not — not flat, but we would — the 167 is — it
[11] just printed. But we didn't use it for any
[12] purpose. We were interested in what the clients
[13] did because we knew the other side would show up
[14] against 167, which we knew was the house account.
[15] Q: So the first entry on the second page,
[16] 510-122, where it says Steve Michaels, and it says,
[17] 1, selling U.S. dollar Japanese yen, and the price
[18] that is listed as 121.46, is it your testimony that
[19] that particular trade is going to show up — that
[20] is the Universal FX side of a trade with a customer
[21] that will show up elsewhere on this document?
[22] A: I don't know if it is on this document.

Page 29

[1] Q: Why wouldn't it show up on this document
[2] if it was that day?
[3] A: Because it has been a while since I have
[4] used these. I am not sure when it printed, which
[5] side of the transaction — I am actually trying to
[6] remember. It has been a long time since I used
[7] this. I think I remember that 167 was that offset
[8] account. I believe it should have the other side
[9] of it on this — sometime on this blotter. I am
[10] not 100 percent sure. Really would have to go back
[11] and remember.
[12] Q: Is there a way for you to identify that
[13] particular trade or any particular trade and match
[14] it up with another trade that was done for a
[15] customer on the same day?
[16] A: I am sure — I am not sure what you mean.
[17] Q: Your testimony was that this was, in
[18] conjunction with other documents, was used to make
[19] sure you were flat. I am trying to understand how
[20] you used this document. Whether some particular
[21] trade that is listed here that was put on by a
[22] broker was somehow offset or traded somewhere else

**Page 30**

[1] so that the firm was flat?

[2] A: We didn't do it from this. This was just

[3] really a blotter of what the customers did, and

[4] then we — the way we actually figured out —

[5] whether we were flat or not, besides the fact that

[6] we had a bank confirmation or a counter-party

[7] confirmation with every ticket, we also had another

[8] back office, either an Excel program or we used

[9] Broker Box, which was sort of like a back office —

[10] as a back-office system, and we punched in the

[11] customer trade and then we punched in our

[12] counter-party trade.

[13] All day long we did this and we had

[14] somebody constantly who punched in and was also

[15] responsible to make sure that we were always flat,

[16] and if we weren't flat, they would come to us and

[17] say we are not flat, we are not even, and we used

[18] this blotter just to make sure that the trades went

[19] into ACTFOREX correctly.

[20] Q: If you can turn to page 510-123, and you

[21] see there is a section — an entry where it says

[22] 155 and then Howard Needle, and then below that

**Page 31**

[1] there is a series of entries for 167 Steve

[2] Michaels.

[3] A: Yes.

[4] Q: If you look down the column, first there

[5] is a buy of U.S. dollar Japanese yen at a certain

[6] price at a certain time and then about — actually

[7] it goes all the way down to the bottom of the page

[8] with the same time. Some of these are buys for

[9] U.S. dollar Japanese yen and some are sells. Are

[10] these UFX's side of trades with individual

[11] customers?

[12] A: Well, I believe that is what the 167

[13] account is. It is either — I am pretty sure it is

[14] the house side of the transactions. It has been a

[15] long time. The reason the times are the same,

[16] probably, again — this was — this is a blotter of

[17] anything that went into ACTFOREX. If it went in

[18] electronically, it would time stamp that trade.

[19] If we manually punched a trade because

[20] somebody may have traded on the phone and we wrote

[21] a ticket up and later we punched the ticket in, the

[22] time we did the punching of the trades was time

**Page 32**

[1] stamped — it may not be the time of the trade, but

[2] it was the time that the person who keypunched the

[3] trades keypunched it into the system. A lot of

[4] times they will be punched at the same time because

[5] they are punching the trades at the same time, and

[6] what happens, you punch these trades and then when

[7] you confirm them, they all get confirmed at the

[8] same time.

[9] I don't know if that makes sense to you.

[10] That is why these times seem to be grouped — they

[11] didn't necessarily trade at those times, but that

[12] is when they got punched into the system.

[13] Q: How can you tell whether someone is

[14] opening a position or closing a position?

[15] A: I couldn't tell from here. All I can

[16] tell is whether they bought or sold.

[17] Q: So the sell entries might be somebody

[18] closing out a previous buy or it could be somebody

[19] establishing a sell position?

[20] A: Correct.

[21] Q: Could you turn to the — do you recognize

[22] the individuals that are listed here on the — in

**Page 33**

[1] the owner column?

[2] A: Yes, some of these people I know by name.

[3] This system, you have to put a name, as a name for

[4] the account, or the IB — for example, like the

[5] house account, you have to put a name.

[6] Q: Looking on this document, are there names

[7] here in the owner column that you knew to be

[8] associated with Australia — Sterling Trading

[9] Group?

[10] A: No.

[11] Q: Looking on the last page, first of all,

[12] appears to be cut off where maybe it should have

[13] been printed in landscape, but it is in portrait,

[14] but in the columns that are intact, can you tell me

[15] what those mean and whether you use them in

[16] connection with your work at Universal FX?

[17] A: I couldn't tell you what they mean. I

[18] didn't use this. I used this as a blotter to make

[19] sure trades are entered correctly.

[20] Q: You didn't use this market-to-market

[21] summary at all?

[22] A: No. It wasn't correct.

Page 34

[1] **Q:** Why wasn't it correct?

[2] **A:** Because we only punched one side of the

[3] transaction. We didn't punch the counter-party

[4] side in. I actually tried to, but first of all, it

[5] was impossible because ACT has — you have to punch

[6] an open and then you have to close a particular

[7] trade, which was impossible for us to trade with a

[8] counter-party because it was always netting

[9] accounts.

[10]     Whenever we trade with a bank, it is

[11] always netted. So we were going to try to punch in

[12] every counter-party transaction, and then this

[13] information could be accurate because then we would

[14] have both sides of the transaction and we could

[15] tell what we made or lost with the counter-party

[16] and what we made or lost with clients, and that net

[17] would be accurate, and would also tell us our

[18] position, but it was impossible to punch in the

[19] counter-party side because the **way the ACT system**

[20] forces you to punch in the trades, to manually

[21] punch the trades, is not how we actually traded

[22] with the counter-parties, so we couldn't pick and

Page 35

[1] choose which buys to close and which sells to

[2] close. We tried it for a couple of days. It was

[3] literally impossible. So this information is

[4] just — it would just keep accumulating

[5] incorrectly. It would mean nothing to us.

[6] **Q:** So when you refer to the counter-party

[7] trading that you tried to put into this at a

[8] certain point, you are referring to the trading

[9] that either Universal FX had —

[10] **A:** Right.

[11] **MR. HELWIG:** Let him finish the question.

[12]             **BY MR. HAAS:**

[13] **Q:** What were those other firms?

[14] **A:** We used IFX. We used Dressner Bank and

[15] we used Swiss FS.

[16] **Q:** Were any of those held in the name of

[17] Universal FX, or were they held into another name?

[18] **A:** I think we got it in Universal Holdings

[19] Corporation for Dressner, and I believe IFX — I

[20] think Swiss Finance — maybe all three. I am not

[21] quite sure.

[22] **Q:** Were you involved with the trading at

Page 36

[1] those counter-party accounts?

[2] **A:** Yes.

[3] **Q:** Which accounts — you named three, Swiss

[4] Finance —

[5] **A:** All three. Those were our choices of

[6] counter-parties when we offset a customer

[7] transaction.

[8] **Q:** So you were involved with the trading at

[9] the counter-party accounts at Swiss Finance, IFX

[10] and Dressner Bank?

[11] **A:** Correct.

[12] **Q:** You said one or two of those was in the

[13] name of Universal Financial Holdings?

[14] **A:** Yes, maybe all three. Originally when we

[15] opened the accounts, I know Dressner we often did

[16] in the name of Universal Financial Holding

[17] Corporation because they had more capital. It was

[18] an FCM. I believe IFX as well. I can't be sure.

[19] This was a long time ago. At least two of them,

[20] and we may or may not later down the line have

[21] switched. We didn't switch Dressner. I don't know

[22] if we switched the accounts — I think IFX we did

Page 37

[1] switch into Universal.

[2] **Q:** The funds that were traded in the

[3] accounts that were in the name of Universal

[4] Financial Holding, were they Universal Holding

[5] funds?

[6] **A:** No. It was Universal FX.

[7] **Q:** It was Universal FX money?

[8] **A:** Yes.

[9] **Q:** Were you employed by Universal Financial

[10] Holdings?

[11] **A:** No.

[12] **Q:** Were you paid by Universal Financial

[13] Holdings?

[14] **A:** No.

[15] **Q:** Universal Financial Holding was a

[16] separate entity. Who allowed you to set up the

[17] accounts there?

[18] **A:** Andy Stern.

[19] **Q:** And was he involved in the trading of the

[20] accounts?

[21] **A:** No.

[22] **Q:** Did there come a time when those separate

Page 38

[1] counter-party accounts were no longer in the name
[2] of Universal Financial Holding?
[3]    A: I believe IFX, we eventually changed it
[4] to Universal FX. Swiss Finance may or may not have
[5] started as Universal Financial Holding. It might
[6] have started as Universal. Dressner always
[7] remained in the name of Universal Financial Holding
[8] Corporation.
[9]    Q: And why did you change the account at
[10] IFX?
[11]    A: Well, eventually we were going to —
[12] started to create UTX World, and that was going to
[13] be the entity we traded through, so there would be
[14] an affiliation that we started the change.
[15]    MR. HAAS: Charlotte, do you have any
[16] questions about this document?
[17]            BY MS. OHLMILLER:
[18]    Q: I just want to be sure I understand the
[19] source of this document that we have marked as
[20] Exhibit 4. Is this created through the ACTFOREX
[21] platform?
[22]    A: Correct.

Page 39

[1]    Q: Can we just look at the first line on the
[2] first page? The column that is labeled Account ID,
[3] what is that?
[4]    A: That is the account number.
[5]    Q: And then the next column?
[6]    A: Actually, it may — sorry. ACTFOREX I
[7] remember generated an account ID and an account
[8] number, now that I am sort of recalling this. I
[9] don't know if this was — I am not sure if it
[10] printed the account number for the account in
[11] particular or the other number that they called an
[12] ID, but one of the two. It was a reference to the
[13] customer.
[14]    Q: Well, is it a reference to the customer
[15] or is it a reference to the introducing entity?
[16]    A: It is a reference to the customer, and
[17] then the person who represented — we put a name
[18] to, let's say, an introducing broker. It didn't
[19] have any significance, this owner name. It was
[20] just a name that we — when the introducing broker
[21] was set up in ACTFOREX, you had to put a name. So
[22] whatever name you put in there would print out on

Page 40

[1] this blotter, every time a customer with that
[2] introducing firm traded.
[3]    Q: So the name Vinnie Caputo is not a
[4] customer —
[5]    A: No.
[6]    Q: That is a name that is associated with
[7] some introducing entity?
[8]    A: Correct.
[9]    Q: And which introducing entity is it?
[10]    A: You know, I don't know the name of it. I
[11] don't really know too much about the introducing
[12] brokers. I know Vinnie Caputo's name, but I don't
[13] know what introducing brokerage firm that he was
[14] associated with, but it was one of them.
[15]    Q: Now, this has a column called "Open."
[16] What does that mean?
[17]    A: That is the price that it was — that it
[18] was traded at.
[19]    Q: But now, as I understood what you said
[20] earlier, some closing trades could be on here too;
[21] is that correct?
[22]    A: Correct. It is a bad name for the

Page 41

[1] column. It didn't refer to open or closed. Just
[2] when the trade was opened — not even necessarily
[3] opened. It could have been closed as well. It is
[4] a bad term.
[5]    Q: This column is really a price column?
[6]    A: Correct.
[7]    Q: And then the time column, what time does
[8] this represent?
[9]    A: That is the electronic time stamp, when
[10] the trade went into the back-office system of
[11] ACTFOREX. Whether it was punched manually or done
[12] electronically, it reflects the time that it was
[13] inputted. So if it was an electronic trade, it was
[14] the time of the trade. If it was a manual input
[15] then it was the time that it manually was inputted.
[16]    Q: And how can we tell the difference, what
[17] kind of time this is?
[18]    A: There is no way to tell the difference.
[19] Unfortunately that is how ACT prints out the data.
[20]    Q: In going through here, normally I would
[21] expect that if the house account is on the other
[22] side of a customer trade, that both sides would

Page 42

[1] have the same time on them, and I can't find that
[2] in here. Can you explain what I am missing?
[3]    A: Yes. It has been a while. I need to
[4] look at these. It makes sense what you are saying.
[5] I can't recall why — I know this was something
[6] that was manually punched, and 167 was the offset
[7] account that I remember. I don't remember why the
[8] time — I know when there is a batch of the same
[9] times it is because we punched the trades at that
[10] time, and we may manually punch five tickets and
[11] then when you confirm them, at the same time that
[12] is the electronic time stamp. But you are right,
[13] it makes sense.
[14]    I don't have an answer, but there is an
[15] answer that there would be an offsetting trade. I
[16] don't know if it does punch at the same time. It
[17] would make sense.
[18]    Q: For the trades on this blotter that are
[19] for customers, the time that is shown in this time
[20] column, is that the same time that is shown in the
[21] customer confirmation documents?
[22]    A: What is the customer confirmation

Page 43

[1] documents?
[2]    MR. HAAS: Account statements.
[3]    THE WITNESS: It would definitely be the
[4] same time. It is carried forward to the account
[5] statements. It should correspond. Again, it is
[6] software related. I never really examined that
[7] real closely, but it should.
[8]    BY MR. HAAS:
[9]    Q: How did Sterling enter most of its
[10] customer orders?
[11]    A: A combination of trading on-line and on
[12] the phone. Which one did they do more of? I am
[13] not sure. Probably more on the phone, if I recall.
[14]    MS. OHLMILLER: That is it, Peter.
[15]    BY MR. HAAS:
[16]    Q: So the trades that Sterling did on the
[17] phone may have happened at one point in time and
[18] they may show up on the blotter at a different
[19] time?
[20]    A: They may show up hours later because we
[21] punched trades as we had time to. As things slowed
[22] down, then we would go and punch trades. Usually

Page 44

[1] they would batch them. They would wait until they
[2] had a stack of tickets and then they would go and
[3] punch them, so they could be totally different
[4] times.
[5]    Q: Will the order — were the order tickets
[6] produced simultaneous — when the orders came in
[7] from Sterling on the phone?
[8]    A: Yes, if we would take an order on the
[9] phone, as quickly as we could, we would write a
[10] ticket and we would try to time stamp them.
[11]    Q: And when those order tickets were time
[12] stamped, when there came a time for those to be
[13] entered into the ACTFOREX system, the individual
[14] inputting them couldn't put in the time?
[15]    A: You couldn't — this is all electronic
[16] time stamp. It would print it electronically as it
[17] was confirmed in the back office. There was no
[18] place to put times.
[19]    Q: So in summary, the times that are
[20] indicated here and in the customer account
[21] statements may not correspond at all to the times
[22] the trades were actually done?

Page 45

[1]    A: Correct.
[2]    Q: Do you know whether that was ever
[3] explained to customers?
[4]    A: If they asked, yes.
[5]    Q: Do you know if there is anything in the
[6] Universal FX documents that address that issue?
[7]    A: I don't know, I don't know that it was
[8] addressed in the document.
[9]    Q: Have you ever testified in another CFTC
[10] proceeding?
[11]    A: Yes.
[12]    Q: What was that?
[13]    A: It was Paul Hayeck.
[14]    Q: And that was investigative testimony?
[15]    A: I am sorry.
[16]    Q: That was an investigation — it wasn't
[17] like a trial or a hearing?
[18]    A: No.
[19]    MR. HELWIG: Was it on the record like
[20] this?
[21]    THE WITNESS: Yes.
[22]    BY MR. HAAS:

Page 46

[1]   Q: Have you ever been named as a defendant
[2] or respondent in any action brought by the CFTC,
[3] the SEC or any state or federal agency?
[4]   A: No.
[5]   Q: How about the NFA or NASD?
[6]   A: No.
[7]   Q: How about any self-regulatory entity,
[8] commodity or stock exchange?
[9]   A: No.
[10]   Q: Have you been named any as a defendant in
[11] an action alleging violations of commodity laws or
[12] security laws?
[13]   A: No.
[14]   Q: During what period of time did you work
[15] at Universal FX?
[16]   A: I believe I started approximately August
[17] of 2002, until we stopped doing business.
[18]   Q: And when did you stop doing business?
[19]   A: Last four months.
[20]   Q: Around November or December?
[21]   A: Yes, around December.
[22]   Q: Did you start working at Universal FX at

Page 47

[1] the beginning of when it started doing business?
[2]   A: No.
[3]   Q: Do you know how long it was in business
[4] before you showed up in August?
[5]   A: I don't know. Approximately six months.
[6] I am really guessing. I am not sure.
[7]   Q: Do you have any knowledge as to how UFX
[8] came to be formed?
[9]   A: No.
[10]   Q: Do you know who the owner of Universal FX
[11] was?
[12]   A: Yes, Andy Stern.
[13]   Q: Did Andy Stern hire you?
[14]   A: Yes.
[15]   Q: Did you just meet with him before taking
[16] the job or did you interview with anyone else?
[17]   A: No, just Andy.
[18]   Q: And how did you find out about the job?
[19]   A: Through a friend that said that Andy
[20] was — an FCM was looking to create an FX, a
[21] foreign exchange-making desk.
[22]   Q: And who was it?

Page 48

[1]   A: Larry Freedberg.
[2]   Q: And when you began to work at Universal
[3] FX in August of 2002, how did Andy Stern describe
[4] the prospective job to you?
[5]   A: Just said that he wanted to start his own
[6] market-making desk. They were outsourcing the
[7] market-making desk to another firm in Chicago or
[8] FXCM or both, I am not sure. They didn't really
[9] have the expertise of setting up a trading desk, a
[10] market-making desk.
[11]   Q: Was he looking for someone with
[12] experience in the area?
[13]   A: Yes.
[14]   Q: And you had that experience?
[15]   A: Yes.
[16]   Q: Where did you have that experience from?
[17]   A: From RCG, from GNI, Jordan International
[18] in London.
[19]   Q: You mentioned a couple of firms. Maybe
[20] we are talking about a different time frame than
[21] was in the letter, but can you explain these firms
[22] and when you worked for them?

Page 49

[1]   A: I left Rosenthal Collins in '99 —
[2]   MR. HELWIG: Start with what you did at
[3] Rosenthal Collins.
[4]   THE WITNESS: I set up their foreign
[5] exchange desk and I ran the desk in Chicago and
[6] London. That was from '97 to '99. Prior to that I
[7] was running Jordan International's national —
[8] G E R R A-R-D and National's foreign exchange desk.
[9]   BY MR. HAAS:
[10]   Q: What kind of business is that?
[11]   A: Well, it is an investment bank slash —
[12] sort of a brokerage firm. They have a U.S. FCM
[13] entity called GNI.
[14]   Q: And you worked for both of those?
[15]   A: I answered to Gerrard and National.
[16]   Q: And how long did you work there?
[17]   A: Approximately '95 to '97.
[18]   Q: That was before Rosenthal Collins?
[19]   A: Correct. Prior to that I did — for a
[20] short time I set up a trading desk at Paradigm
[21] National, which is an FCM. That was six months
[22] prior to joining GNI.

Page 50

[1] Q: What did the desk at Paradigm National
[2] trade in?

[3] A: Foreign exchange.

[4] Q: So you said you worked at Rosenthal
[5] Collins up until 1999?

[6] A: Correct.

[7] Q: And then where did you go?

[8] A: Then I started my own fund, Corymb Fund.
[9] That is what I was doing until I started with
[10] Universal.

[11] Q: Now, at the time that you came to
[12] Universal, who were the principals at the firm?

[13] A: I only knew of Andy Stern as the
[14] principal.

[15] Q: And what was his title?

[16] A: I don't know what his official title was
[17] at Universal. Probably president. I don't know
[18] what his official title was.

[19] MR. HAAS: Can we go off the record for
[20] one second?

[21] (Discussion off the record.)

[22] (Brief recess.)

Page 51

[1] BY MR. HAAS:

[2] Q: At the time you began working in August
[3] 2002, what were the job responsibilities that were
[4] given you at Universal FX?

[5] A: To run the trading desk.

[6] Q: Who was working on the trading desk at
[7] the time?

[8] A: It was nobody — nobody was there. I had
[9] to start the trading desk. It was just me.

[10] Q: And how did you start the trading desk?

[11] A: That is a good question. How did I start
[12] it? We just — I guess we told people — actually,
[13] first of all, the electronic — the ACT system, you
[14] can be the dealer from anywhere remotely.

[15] So, for example, prior to me being there,
[16] let's say FXCM was the dealer. They logged on as
[17] the dealer. Now we can log on as the dealer and
[18] now we are able to deal with the client trades, and
[19] we would tell them if they needed to call the
[20] trading desk, we gave them a phone number to call.
[21] That is how we started. We initially get trading
[22] lines with counter-parties to offset; so then we

Page 52

[1] were ready.

[2] Q: So clients called the trading desk
[3] directly?

[4] A: If they wanted to do something and they
[5] didn't want to do it electronically or couldn't,
[6] yes.

[7] Q: What firms was Universal FX doing
[8] business with at the time?

[9] A: You mean who were they outsourcing the
[10] trading desk to?

[11] Q: No.

[12] A: Counter-parties?

[13] Q: No. The firms that had customers.

[14] A: You know, I don't recall, I don't recall
[15] who or what firms.

[16] Q: Did Universal FX have employees that
[17] directly — at the time, that directly solicited
[18] business from the public?

[19] A: No.

[20] Q: But the accounts that Universal FX — the
[21] foreign currency accounts that Universal was
[22] trading was with individual investors?

Page 53

[1] A: I am sorry. I am not —

[2] Q: The foreign currency accounts you were
[3] trading at the trading desk —

[4] A: The ones that traded with us or called us
[5] for a market or electronically.

[6] Q: These were individual retail investors?

[7] A: They were through an IB — every client
[8] was through an IB. I don't believe there were any
[9] clients that had an account with Universal.

[10] Q: Did individual investors ever contact the
[11] trading desk directly?

[12] A: No.

[13] Q: So the calls came from a broker or a
[14] trader at some introducing firm?

[15] A: A trader or whoever had the right to
[16] trade.

[17] Q: And you indicated that these firms had
[18] the right to trade; so these accounts they were
[19] trading were discretionary accounts?

[20] A: Correct.

[21] Q: Where there was a power of attorney to
[22] trade?

---

**Page 54**

[1]   A: Correct.

[2]   Q: Were there any accounts that weren't

[3] discretionary, where the customer had to authorize

[4] all of the trades?

[5]   A: No, not that I know of.

[6]   Q: How did you know that the accounts were

[7] discretionary accounts — was there some sort of

[8] record at Universal FX that confirmed that to you?

[9]   A: Usually we had a list of accounts that

[10] corresponded to an IB — what name of the person

[11] was that had power of attorney that could transact

[12] business.

[13]   Q: There was a list of which —

[14]   A: There was a list of clients that would

[15] correspond to a particular IB or account numbers.

[16] Then an IB — IB firm had a person that had power

[17] of attorney. That person's name we had on the list

[18] on the desk, so we know who the had ability or the

[19] right to put trades on behalf of any clients.

[20]   Q: So for a particular firm, would there be

[21] more than one individual that could trade an

[22] account?

---

**Page 55**

[1]   A: Not that I know of. There may have been.

[2]   Q: At the time you began working at

[3] Universal FX in August of 2002, was Sterling

[4] Trading one of those firms that was doing business

[5] with Universal FX?

[6]   A: I don't recall if he was there or not,

[7] before or after.

[8]   Q: Do you recall at a certain point in time

[9] seeing lists of the kind you just described for

[10] Sterling, for Sterling customers?

[11]   A: I wouldn't remember. I couldn't remember

[12] now. I don't know if — eventual, at some point?

[13]   Q: Yes.

[14]   A: At some point, I thought you meant when

[15] we first started.

[16]   Q: At some point you were doing trades for

[17] Sterling customers?

[18]   A: Yes, yes. Sorry.

[19]   Q: And you routinely had and checked a list

[20] to make sure that the customer's account number was

[21] on that list to be traded?

[22]   A: Well, the accounts — the list of the

---

**Page 56**

[1] accounts were just a list of accounts that

[2] corresponded to Sterling Trading. Every account

[3] Sterling had was a power-of-attorney account.

[4]   The name of the person who had that power

[5] of attorney we would always check, but Joe

[6] Arsenault was the only person that had power of

[7] attorney that I ever recall for any account of

[8] Sterling. So in that respect, yes. We didn't

[9] necessarily go through every client number, but we

[10] had a list of client numbers that corresponded to

[11] Sterling, knowing that every Sterling account had a

[12] power of attorney.

[13]   Q: Was this the situation — was there a

[14] similar situation with the other introducing firms

[15] that Universal was doing business with?

[16]   A: Yes.

[17]   Q: So they all had — all their accounts had

[18] power of attorneys and you had a list?

[19]   A: Correct.

[20]   Q: Who was responsible for creating and

[21] maintaining that list that you just referred to?

[22]   A: Probably, more or less, Ben Dayan. We

---

**Page 57**

[1] can also print a list from FOREX — if the account

[2] was set up into ACT, we can from the trading desk

[3] print that list of account numbers and what

[4] introducing broker it corresponded to, or account

[5] numbers. So we were periodically able to do it

[6] ourselves as well.

[7]   Q: Now, did the ACTFOREX system have away to

[8] input whether the customer had signed a power of

[9] attorney?

[10]   A: No.

[11]   Q: That was just assumed, for the purposes

[12] of the ACTFOREX records, that was —

[13]   A: Correct.

[14]   Q: If a list was printed out from ACTFOREX

[15] of customers and a customer had terminated a power

[16] of attorney, would that have been reflected somehow

[17] in the records?

[18]   A: No, but that — no trades could have gone

[19] into that customer's account because as soon as

[20] they terminated it, somebody would deactivate that

[21] account, so if they tried to trade electronically

[22] for that account, it wouldn't allow it. If we

---

Page 58

[1] manually tried to enter a trade for that account,
[2] it wouldn't allow it.
[3]    Q: And who was responsible for deactivating
[4] that account from the system?
[5]    A: Well, Ben Dayan, and he would also have
[6] somebody working with him, a girl who would help
[7] him, periodically it would change, but somebody who
[8] would help him input accounts, deactivate accounts.
[9] Sometimes Larry Freedberg would help.
[10]    Q: Was there a paper record that was
[11] produced at Universal FX that sort of memorialized
[12] the time when it was deactivated?
[13]    A: No, but I believe ACTFOREX potentially —
[14] if you have access to it, potentially could tell
[15] you what time. It may have some sort of electronic
[16] time stamp — when virtually anything happens to an
[17] account or the setup of an account, such as
[18] deactivating an account. Other than that, we
[19] didn't produce anything.
[20]    Q: Couldn't an account have been deactivated
[21] for other reasons, other than termination of a
[22] power of attorney?

Page 59

[1]    A: Possibly — maybe — possibly they didn't
[2] have enough money to trade. I don't think there
[3] would be any other reason.
[4]    Q: And that account would have been
[5] deactivated in the same manner at ACTFOREX?
[6]    A: Correct.
[7]    Q: So whatever time record ACTFOREX had,
[8] they wouldn't be able to look and distinguish
[9] whether it was done because of termination of a
[10] power of attorney or for some other reason?
[11]    A: No, no, not that I know of.
[12]    Q: Just to be clear, if a customer had ended
[13] a request for terminating a power of attorney,
[14] there was no record kept to memorialize when that
[15] request was complied with?
[16]    A: No, but we did it immediately. It was
[17] something we acted on immediately. We didn't wait.
[18]    Q: So if there is a request in, say, a
[19] customer's files to terminate a power of attorney,
[20] then there wouldn't be any trades in that
[21] customer's account put on after —
[22]    A: After it was eventually — after it was

Page 60

[1] deactivated, sure, unless the customer specifically
[2] asked us — or requested us to reactivate it, would
[3] be the only time.
[4]    Q: How did a customer have to communicate
[5] that to Universal FX to terminate power of
[6] attorney?
[7]    A: Well, they can either fax us a request or
[8] they would fax the IB. The IB would pass along
[9] that fax to us.
[10]    Q: Was there information or instructions in
[11] the account-opening documents that told a customer
[12] how to fax a request to Universal FX to terminate a
[13] power of attorney?
[14]    A: I don't recall.
[15]    Q: Was there information provided on
[16] Universal FX's Web site about that?
[17]    A: I don't recall.
[18]    Q: Were you involved in managing or
[19] implementing these requests?
[20]    A: No, no. If they did call the trading
[21] desk, we would tell them to simply fax us a note,
[22] fax the office a note.

Page 61

[1]    Q: Customers did call — if they ever did,
[2] if they ever called and asked how they would close
[3] an account or periodically, say, maybe deactivate
[4] an account, did customers call the trading desk?
[5]    A: Periodically. Rarely, I would think.
[6]    Q: Did you ever personally deal with
[7] customers who called the trading desk?
[8]    A: At most, maybe once or maybe twice.
[9]    Q: Do you recall anything regarding the
[10] circumstances, why the customer called?
[11]    A: No, no, I don't recall anything in
[12] particular.
[13]    Q: Do you know how customers — do you have
[14] any information as to how customers knew to call?
[15] Was the phone number for the trading desk provided
[16] to them by anyone that you know?
[17]    A: I know the main office number was — the
[18] office number was on the contact. They would be
[19] easily able to reach us by calling the main number.
[20]    Q: When you started up the trading desk, did
[21] you hire other people to work the trading desk with
[22] you?

Page 62

[1]   A: Yes.

[2]   Q: And who did you hire to work for you?

[3]   A: Art Buckner, Russ Dougherty, at the time,

[4] Mike Mansfield, Dexter Choi, Merick Chaleski. I

[5] will have to get you the correct spelling and

[6] pronunciation. David Chamides.

[7]   Q: What was Art Buckner's responsibility and

[8] when did he start working there?

[9]   A: I don't recall exactly when he started.

[10] Probably around September of 2002. His

[11] responsibility was a dealer on the trading desk.

[12]   Q: What about Russ Dougherty?

[13]   A: Same responsibility, and he was hired

[14] probably closer to December, November, December,

[15] 2002.

[16]   Q: Mike Mansfield?

[17]   A: Same responsibility and around the same

[18] time as Art Buckner.

[19]   Q: Did he stop working there?

[20]   A: Yes. He no longer works there. He

[21] stopped working there as a dealer, I believe,

[22] January or February, approximately.

Page 63

[1]   Q: Of 2003?

[2]   A: Right.

[3]   Q: Do you know where he is now?

[4]   A: No, I am not sure where. He manages

[5] money. Started a money management company, but I

[6] don't know where.

[7]   Q: What was Dexter Choi's job?

[8]   A: Same thing, a dealer. The times, I

[9] believe he was probably hired around the beginning

[10] of 2003 and was there for less than three months.

[11]   Q: Do you know where he is working now?

[12]   A: No.

[13]   Q: What about Merick?

[14]   A: He had the same responsibilities. Maybe

[15] later in 2003, and he is with me at Avidus right

[16] now.

[17]   Q: Did you supervise all these individuals?

[18]   A: Yes.

[19]   Q: Were their jobs all interchangeable —

[20] did they have discrete areas of responsibility?

[21]   A: They all were dealers. Their times were

[22] interchangeable, what times of the day, but, no,

Page 64

[1] that was really — that was the same job

[2] description for each one of them.

[3]   Q: Did they all deal with all the currencies

[4] that were being traded?

[5]   A: Yes.

[6]   Q: Do you know what past job experience

[7] Mr. Dougherty had?

[8]   A: Yes. He was a floor trader in New York.

[9]   Q: What about Mr. Mansfield?

[10]   A: He was a CTA previously, and he was

[11] working for a proprietary trading firm in Colorado.

[12]   Q: What was the name of that firm?

[13]   A: It might have been Hanover Trading.

[14]   Q: Hanover?

[15]   A: With an H. I am not 100 percent sure

[16] though.

[17]   Q: And what were they trading?

[18]   A: Equities, and maybe some futures. I am

[19] not sure.

[20]   Q: And what was the prior job experience of

[21] Merick?

[22]   A: He also was managing money and he was

Page 65

[1] working for another brokerage firm, an MCM, MCCI,

[2] and he was running their trading desk. They were

[3] just starting a trading desk.

[4]   Q: A foreign currency trading desk?

[5]   A: Correct, and I think he may have been

[6] managing their order entry desk for futures as

[7] well, and now that I mention that, they for a short

[8] time were a client of ours, maybe a month or two.

[9] That is how I met Merick.

[10]   Q: How was MCCI a unit of UFX?

[11]   A: They were just starting a trading FX

[12] division, a trading division, and used us

[13] basically — similar to how we used FSCM,

[14] outsourcing, until a month or two, when they

[15] started doing it themselves. When you asked me

[16] about business entities, that was one.

[17]   Q: What were your normal working hours at

[18] UFX? Or if they changed — we can go through time

[19] periods.

[20]   A: About 20 hours a day. It was flexible.

[21] I was there, of course, all day and often part of

[22] the night, to watch — because we ran 24 hours, so

Page 66

[1] I was covering the desk from — oftentimes from
[2] eight in the morning until 10 at night.
[3] **Q: And who was covering the night shift?**
[4] **A:** Art Buckner and — initially — when we
[5] first started, Mike Mansfield.
[6] **Q: And so, the trades that came in at night,**
[7] these would be trades like the other trades you
[8] described that would be initiated by someone at a
[9] trading firm pursuant to a power of attorney?
[10] **A:** Correct.
[11] **Q: And they would contact the trading desk**
[12] at 11:00 at night?
[13] **A:** Yes, any time of the night.
[14] **Q: And it was during the week, around the**
[15] clock?
[16] **A:** Yes.
[17] **Q: Who did you report to?**
[18] **A:** Well, I reported what we did to Andy,
[19] basically. That is the only person. There was
[20] nobody else.
[21] **Q: Can you tell me what your role was in**
[22] running the day-to-day operations? Can you

Page 67

[1] describe the day — your work day?
[2] **A:** Most of it was running the trading desk,
[3] which is involved — if there were issues with
[4] trades or errors or trades were missing
[5] counter-parties. Ben was the backup — Ben handled
[6] a lot of the clients or IB issues and sometime —
[7] periodically Andy and I would sit down and meet
[8] regarding the bigger — sort of the — the company
[9] as a whole. My day was pretty much running the
[10] trading desk.
[11] **Q: How often would you meet with Andy Stern?**
[12] **A:** We were located in north Miami. Three
[13] times a week, approximately.
[14] **Q: And when you met, was it just you and**
[15] Mr. Stern?
[16] **A:** Usually Ben Dayan was also there.
[17] **Q: And what topics did those meetings cover?**
[18] **A:** Could cover any number of topics, how the
[19] desk was doing, any number of issues.
[20] **Q: Would you have any role in managing or**
[21] overseeing relations with the introducing firms?
[22] **A:** Well, I really didn't know it — I didn't

Page 68

[1] know any of them, but, yes, I could help in making
[2] decisions.
[3] **Q: Was the business or the nature or the**
[4] volume of the business that Universal FX was doing
[5] with any particular introducing firm a subject that
[6] came up at these meetings with Mr. Stern?
[7] **A:** Yes, sure.
[8] **Q: Was there a list you had at any**
[9] particular time that showed you who those firms
[10] were — a list that told you at the trading desk
[11] who those firms were that were introducing
[12] customers to UFX?
[13] **A:** Yes, we had a list of introducing
[14] brokers. We would keep a current list.
[15] **Q: Did you keep that list or compile that**
[16] list?
[17] **A:** We would just keep it at the desk to
[18] reference during the day. It was good also to have
[19] phone numbers if we needed to call any of them
[20] back.
[21] **Q: Who provided that list to you?**
[22] **A:** One of the girls that was helping Ben

Page 69

[1] type out the list or print it out, and periodically
[2] if one changed, it would be updated.
[3] **Q: Did the list also have the name and phone**
[4] number of the individual who was held — held the
[5] power of attorney?
[6] **A:** Yes. The list had the names of people
[7] who traded and list of phone numbers to contact
[8] them.
[9] **Q: Your testimony earlier was that the only**
[10] individual you knew that was in that — that stood
[11] in that role at Sterling Trading was Joe Arsenault?
[12] **A:** Yes, that is the only one I recall.
[13] **Q: Did you, at the trading desk, did you**
[14] handle both accepting and putting on trades
[15] opposite customers?
[16] **A:** Yes.
[17] **Q: And did you also have a role in doing**
[18] separate trades that UFX did in these hedge
[19] accounts or counter-party accounts?
[20] **A:** Yes. Any dealer that dealt with the
[21] customer, the IB would also be able to cover the
[22] transaction of the counter-party.

Deposition of Steven Michael
March 1, 2004

Certain Foreign Currency Trading
Companies (Universal FX)

---

Page 70

[1] Q: Who was covering the transaction?

[2] A: Usually the person who made the market to

[3] the client, because we covered the transactions

[4] fairly quickly. There was a lot of discretion

[5] around holding positions. If there were positions

[6] being held it was for a short time, but for the

[7] most part, what we did was we covered our

[8] transactions pretty quickly. The same person

[9] normally would do it, or if it was busy, maybe

[10] someone else at the desk — we knew what orders had

[11] to be made and what market was being made and what

[12] position we had, so maybe someone else would help

[13] him cover the transaction.

[14] Q: Was it the responsibility of you or one

[15] of the traders at the UFX desk to cover the

[16] position?

[17] A: It wasn't one person's responsibility.

[18] We all — it was our practice to cover everything.

[19] So whoever handled it, or was most convenient to

[20] cover the transaction, or maybe two people would

[21] call two different counter-parties to try to get a

[22] price for both to see what was the best price to

---

Page 71

[1] cover it. So more than one person would help in

[2] that process.

[3] Q: Was there a period of time when you had

[4] more than one counter-party account referring to

[5] IFX, Swiss Finance and Dressner, there were two

[6] that were open at the same time?

[7] A: All three were opened at the same time,

[8] all the time.

[9] Q: Did you have any responsibility in

[10] preparing financial records?

[11] A: Financial records?

[12] Q: Any records relating to the trade?

[13] A: For internal purposes?

[14] Q: Yes.

[15] A: We didn't really — it was difficult for

[16] us to prepare financial records. We tried to back

[17] into our profitability as a trading desk. We tried

[18] to, with our back office, calculate how much we

[19] made or lost for a particular day and tried to tie

[20] that out to the counter-parties' statements and

[21] where we were against customers. There were no

[22] formal financial records.

---

Page 72

[1] Q: Maybe we can make a list of the documents

[2] that you regularly produced in connection with your

[3] work. Order tickets, was that one of them?

[4] A: Order tickets. We did have somebody that

[5] came on later as a bookkeeper to help us determine

[6] our profitability. His name was Onealio. He

[7] wasn't a trader.

[8] Q: What was the name?

[9] A: Onealio. I can't remember his last name.

[10] He eventually came to help us create some

[11] financials for profitability. He was in charge of

[12] doing that. He probably came in January or

[13] February of 2003.

[14] Q: And how long did he work at Universal FX?

[15] A: Until Universal FX stopped doing

[16] business.

[17] Q: Did you work with him on this project?

[18] A: No. He did it on his own. He would get

[19] statements from the banks, from the

[20] counter-parties, and he would, from our back-office

[21] system, whether ACT or Choice FX, whatever we used,

[22] our client liability for each day so he knew the

---

Page 73

[1] change in client liability, we needed to change the

[2] counter-parties, and created as close as possible

[3] the financials for trading.

[4] Q: He was trying to create a report that

[5] would give a bird's-eye view of the firm's

[6] profitability?

[7] A: Correct.

[8] Q: And was he successful in this endeavor?

[9] A: Not too much — somewhat. It was

[10] difficult because we had counter-party

[11] statements — for example, Dressner, you didn't get

[12] any statements. All you got was one dollar figure

[13] for each day. Because it is a true accounting. It

[14] had a cutoff at the close of Frankfurt. So trades

[15] from Frankfurt close at 5:00 until the New York

[16] date, which is the international time date, were

[17] missing.

[18] He made an attempt to adjust for those

[19] differences. That is difficult. I have facts —

[20] there may have been errors, or facts mispunched in.

[21] He was constantly trying to fix it. It was

[22] difficult, it was.

---

Page 74

[1] **Q: What other documents did you produce**
[2] **other than order tickets?**
[3] A: Documents we generated?
[4] **Q: Yes, in connection with the work you**
[5] **would create or generate.**
[6] A: Really nothing else because Onealio would
[7] take our figure that he could take directly from
[8] the back office, whether it be ACT or Choice FX,
[9] and he would have the statements from the banks,
[10] the counter-parties, and he knew we were always
[11] relatively fluid, and if not, maybe we had residual
[12] positions or small position of our own as a
[13] proprietary position, and we would tell him —
[14] maybe we had a small position in euros. We would
[15] tell him, but as far as generating statements, that
[16] was it.
[17] He would take the data and try to
[18] generate a statement. I would go over it with him.
[19] Maybe Andy would get a chance to go over it as
[20] well. That was our financial reporting.
[21] **Q: Was he using the ACTFOREX platform?**
[22] A: He had the ability to log into it and to

Page 75

[1] get the client liability figures, which is what he
[2] needed, and I believe it also showed the P&L for
[3] that particular period for clients. So the
[4] clients, as a whole, made $10,000 for the day and
[5] he can compare. The house made $10,000 to the
[6] clients, or the change in equity.
[7] He would look to see what the aggregate
[8] of the counter-party account's statement — if the
[9] aggregate made $11,000 over the course of the same
[10] period, given that all of the trades — we have
[11] adjusted for the missing data of a Dressner or
[12] whoever, then that was our profitability in trading
[13] at the desk, that $1,000 difference. That is what
[14] his responsibility was, to try to determine those
[15] numbers.
[16] **Q: And conversely, if the customers lost**
[17] **money collectively during a period of time, as far**
[18] **as UFX was concerned as a counter-party, UFX made**
[19] **money with respect to the customers?**
[20] A: Yes, and we would lose money with the
[21] counter-parties, and the difference in what we lost
[22] with the counter-parties and what we made against

Page 76

[1] customers was our net P&L, trading P&L, and each
[2] day we had figures for both.
[3] **Q: How were the figures for the customers**
[4] **broken out, or were they broken out?**
[5] A: Really they weren't. There was no reason
[6] to.
[7] **Q: So they weren't broken out by the**
[8] **introducing firm?**
[9] A: No. ACT had the ability to show the
[10] individual client segregated amounts for each IB
[11] firm, but it wouldn't do us any good to see
[12] profitability because we couldn't do the same on
[13] the counter-party side. We only have an aggregate.
[14] If anybody would take each ticket and since we
[15] always had a corresponding counter-party — if
[16] somebody manually went through it, they could, but
[17] we never did. We were just trying to gather an
[18] aggregate P&L. We ran that sort of — that end of
[19] it or that part of how we determine P&L just like a
[20] bank would. That is really how I ran it, or I had
[21] us run it, because that is the way I learned from
[22] the inter-bank side.

Page 77

[1] **Q: Did you have any role in paying UFX**
[2] **employees?**
[3] A: Just to determine the salaries of the
[4] dealers, yes, and the bonuses, if we paid bonuses.
[5] **Q: Did UFX have a sales staff?**
[6] A: No.
[7] **Q: And UFX, as you said earlier, had no role**
[8] **in directly soliciting customers?**
[9] A: No.
[10] **Q: Did you have any role in bringing in new**
[11] **introducing firms?**
[12] A: No. It was nobody's role. I did bring
[13] one introducing firm that was somebody I knew from
[14] ING Bank. Now I don't remember his name. It was
[15] never on any of the lists. Just had a few
[16] accounts. It was out of Houston, Texas. I don't
[17] recall the name right now. I can get it for you,
[18] but other than that, I had no role in any IB's.
[19] **Q: Did you have any role in either being**
[20] **liaison with or overseeing the introducing firms?**
[21] A: No — when you say overseeing?
[22] **Q: Did you have any role other than**

**Page 78**

[1] communicating with them and taking customer orders?

[2]    A: No.

[3]    Q: Did you have any role in troubleshooting

[4] any problems that came up with respect to any

[5] introducing firm?

[6]    A: If it had to do with trading, yes. One

[7] of the things that we did was we forced any of

[8] these introducers who traded accounts to trade and

[9] use inter-bank lingo, and even though, for example,

[10] some of this reports were won as lots, we wouldn't

[11] allow them to call lots — like an inter-bank

[12] transaction, I am buying a million euros, or half a

[13] million euros. I did have an input and we tried to

[14] educate them to place orders correctly, to have the

[15] correct lingo, to have the proper etiquette when

[16] they traded. So we did that.

[17]    Q: What was your understanding as to how the

[18] firms were compensated?

[19]    A: They all had their own deals. I don't

[20] know the nature of their deals. We knew how much

[21] they would markup or markdown a transaction. That

[22] is it. I don't really know — we knew on a monthly

**Page 79**

[1] basis.

[2]    Q: When you say you knew how much they

[3] marked up or marked down a transaction, is that

[4] something separate from commissions?

[5]    A: Yes. We knew their commissions as well.

[6] If, for any reason, the commission changed or was

[7] incorrect, we could go back and look at a

[8] statement — we had the ability at the desk to look

[9] through ACT at a customer's account. If the

[10] commission was wrong or if we needed to back out a

[11] trade that was incorrectly input, we would have to

[12] back out commissions and markups. So we were aware

[13] of what they were.

[14]    Q: And you said the firms — you knew how

[15] they marked up or marked down the trades. Can you

[16] elaborate on that?

[17]    A: They negotiated a markup or a markdown of

[18] the transaction. It was a free markup. They would

[19] buy a dollar-yen — it would also do it

[20] electronically on ACT, whatever was sold up on the

[21] system. If they said buy 180 110.50 and we would

[22] mark it up to 110.53 automatically. I believe that

**Page 80**

[1] is what was negotiated, I guess, on the account

[2] documents with the clients, with the IB's.

[3]    Q: Was there a markup that Universal FX put

[4] in place with respect to a particular credit?

[5]    A: No. We just quoted the market.

[6]    Q: And the market that Universal FX quoted

[7] was based on what?

[8]    A: It was based on what we saw the

[9] inter-bank market as. We had different price

[10] reporting mechanisms that we can view. If it was,

[11] again, traded — say, traded electronically, they

[12] have a price for an IPA trade that we used on

[13] markets.

[14]    Q: So one source for the price was a data

[15] feed from IFX markets?

[16]    A: Correct.

[17]    Q: Was there another source of what you

[18] referred to as inter-bank prices?

[19]    A: Yes. We could have at — that data feed

[20] was not always accurate. We could call up directly

[21] to the banks with the counter-parties. We could

[22] quote systems, come in, CQGs or certain vendors,

**Page 81**

[1] that recorded prices, Reuters.

[2]    Q: Were there other ones. You said IFX,

[3] Reuters, and you called the banks directly?

[4]    A: CQG. I don't recall having — there were

[5] sources on the Internet we can call out.

[6]    Q: What was the source of information on

[7] CQG?

[8]    A: The quotes?

[9]    Q: Yes.

[10]    A: They were from the banks, a number of

[11] different banks. Every source had its own price.

[12] So every bank we would call would have their own

[13] price. They may or may not be the same. But they

[14] were always pretty close.

[15]    Q: What was the typical range?

[16]    A: Typical range was within five PIPS.

[17] Sometimes there would be more. Sometimes — it

[18] depended also on the time of day. Asia or early

[19] Asia was the most discrepancy.

[20]    Q: When you say there was a range of five

[21] PIPS, are you referring to the difference in the

[22] bid and the asking price —

Page 82

[1]  A: The difference in the bid prices could be
[2] three, four points, somewhere between zero and
[3] three or four points, somewhere around there.
[4]  Q: And then that would be the same with
[5] respect to the offers?
[6]  A: Yes, and different markets had — some
[7] had more discrepancy because they were more
[8] illiquid markets.
[9]  Q: Was the euro a relatively liquid market?
[10]  A: That was the most liquid, yes.
[11]  Q: So, was the euro the market that you
[12] typically saw the tightest spreads?
[13]  A: Yes, yes.
[14]  Q: Again to be clear, you said you would get
[15] a price from one of these sources and quote that
[16] price to the introducing firm, and they would add
[17] the markup?
[18]  A: No, they wouldn't add the markup. They
[19] would trade on our price. If they had a markup,
[20] when we punch the trade into the system, it would
[21] punch whatever they traded into the system. It
[22] automatically added and subtracted the mark up or

Page 83

[1] mark down. We didn't do it ourselves. It would be
[2] done automatically by the software. When the
[3] account was set up, they agreed to a markup or
[4] markdown based on the paperwork, and that was put
[5] into a system the way that client was set up. So
[6] when any transactions would be put into that client
[7] account, it would automatically adjust the price
[8] for that markup or markdown.
[9]  Q: There was a markup that was negotiated
[10] with the customer —
[11]  A: And the IB.
[12]  Q: And the IB?
[13]  A: Correct.
[14]  Q: How was that added into the trade or
[15] factored into the price of the trade?
[16]  A: How was it factored into the price of the
[17] trade?
[18]  Q: Yes.
[19]  A: Well, the system — the software would do
[20] it automatically. When that client account was set
[21] up, it would set what the markup would be. That
[22] would be input into the system every time that

Page 84

[1] client traded. Every time a trade was implemented,
[2] it would automatically add or subject that markup
[3] or markdown.
[4]  I don't know if that makes sense.
[5]  Q: So are you saying that that markup
[6] came — the input for that markup came from the
[7] introducing firm and was somehow factored into the
[8] ACT FX that was put into the system?
[9]  A: No. Somebody in our back office would
[10] set up the account and in that account paperwork it
[11] would state what the input or output was, and that
[12] is what was submitted in there, and after that it
[13] was done automatically.
[14]  Q: For that particular customer's account,
[15] then the same markup or markdown would occur to all
[16] of the trades?
[17]  A: Right, right.
[18]  Q: Was there a way to change that, change
[19] what the markup was?
[20]  A: Yes, we could do that.
[21]  Q: Yes.
[22]  A: Periodically, not often, but maybe the IB

Page 85

[1] would not want markups charged to the client, and
[2] if they did request that we would allow them not to
[3] charge — or we wouldn't allow them to charge more.
[4]  Q: You said there was paperwork at Universal
[5] FX that told you how much of a markup to put into
[6] the system for that particular client's account?
[7]  A: The account documents had the markup or
[8] markdown and then the client was set up in the
[9] system, and once that was done, we wouldn't have to
[10] monitor it. It would be done electronically. We
[11] didn't manually do it. The software did it for us.
[12]  MR. HELWIG: You mean when the customer
[13] account was set up, it was set up to do that
[14] automatically?
[15]  THE WITNESS: Yes.
[16]  BY MR. HAAS:
[17]  Q: Did you have any role in determining or
[18] calculating payments to introducing firms?
[19]  A: No.
[20]  Q: Did you have any role with respect to
[21] UFX's Web site?
[22]  A: No.

**Page 86**

[1] Q: Did you have signatory authority over any
[2] UFX bank accounts?

[3] A: Later I did, later toward maybe the last
[4] few months of FX's existence, I did have authority
[5] to write checks because the signatures prior was
[6] Andy and Ben, and when we moved to the location in
[7] Boca Raton, if Ben wasn't there, it was, hey Bill.

[8] Q: And when did that move take place in
[9] 2003?

[10] A: May 2003.

[11] Q: Who supervised you?

[12] A: Nobody really supervised me. You mean on
[13] the trading desk?

[14] Q: Yes.

[15] A: Nobody really supervised me.

[16] Q: But your ultimate supervisor was
[17] Mr. Stern?

[18] A: Well, he really didn't get terribly
[19] involved in the training aspect. We would have
[20] meetings and I would tell him where we are and what
[21] we are doing, as far as the trading end, and we
[22] tried to make some decisions together.

**Page 87**

[1] Q: The documents you referenced earlier that
[2] the accountant put together?

[3] A: Yes.

[4] Q: For the profitability. Who received —
[5] or saw those documents?

[6] A: I would see them. He would e-mail them
[7] to both of us. Sometimes I would go to his office
[8] and look, maybe once a week, once every two weeks.

[9] Q: Who were you referring to when you said
[10] "both of us"?

[11] A: Andy and I and maybe Ben.

[12] Q: So Andy got these documents regularly?

[13] A: I don't know when, but I know at some
[14] point he was, but I just don't know when.

[15] Q: Do you recall getting e-mails of these
[16] documents and having him be an e-mail recipient as
[17] well?

[18] A: I don't know if it was copied or not. It
[19] was one time as an e-mail to two people. I don't
[20] recall. It has been, actually, a while.

[21] Q: You said that this accountant was working
[22] there until the firm was closed?

**Page 88**

[1] A: Correct.

[2] Q: Was he not doing this up to the end?

[3] A: He was, but he wasn't e-mailing to us.
[4] There were times when he would be a week behind and
[5] not do it until a week or two weeks accumulated and
[6] then he would do it. Sometimes he had problems
[7] because our statements were so difficult to
[8] figure — to adjust for. We had an ongoing issue
[9] of adjusting for trades that were cut off for
[10] certain periods of time with Dressner or if client
[11] accounts had trades that were punching correctly or
[12] not punching correctly or punching after the value
[13] date.

[14] We wanted it to be in by 5:00. Whatever
[15] was punched after that was automatically put it in
[16] for the next day. Maybe the counter-party
[17] transaction was punched prior to that time or
[18] vice-versa, so it would create issues where you
[19] couldn't determine profitability because you have
[20] one side of the transaction on that day's
[21] accounting and the other side in the next day's
[22] accounting. So it would make it at times

**Page 89**

[1] complicating and he would also have expense
[2] reporting. So he would sometimes get behind. It
[3] was periodic when we would get the management.

[4] Q: When he sent the reports, he would
[5] normally ZIP them to you and Mr. —

[6] A: Yes, that was normal.

[7] Q: Let's take a break.

[8] (Discussion off the record.)

[9] (Brief recess.)

[10] **BY MR. HAAS:**

[11] Q: Mr. Michael, earlier in your testimony
[12] you were describing these documents that the
[13] accountant was doing to try to summarize the
[14] profitability at any particular point in time for
[15] the firm, and you were referring to this process
[16] where he was trying to compare the net of the
[17] trading that was going on with respect to the
[18] customers and the net of the trading that was going
[19] on with respect to the counter-parties, correct?

[20] A: Correct.

[21] Q: And the difference between the two was —

[22] A: Presumably our trading profit at the

Page 90

[1] desk.

[2] Q: What was the difference between — or the

[3] trading desk profit, which I assume was something

[4] you were looking to have happen — correct — yes?

[5] A: Yes.

[6] Q: What was that attributable to?

[7] A: Just our ability to trade — to execute

[8] in and out of our positions with our clients in a

[9] very short time frame, could be seconds, could be

[10] minutes, maybe as long as an hour. Like any

[11] dealing desk or any bank, you make a market to a

[12] client and now you try to trade out of that

[13] position.

[14] Q: Let's take a particular trade, say, a

[15] euro trade. The customer is going — wants to buy

[16] the euro and enters into a transaction with

[17] Universal FX at a particular price, so Universal FX

[18] is acting as the counter-party to the customer and

[19] taking the other side of the transaction, correct?

[20] A: Right.

[21] Q: So Universal in that instance is selling

[22] the euro?

Page 91

[1] A: Correct.

[2] Q: And then you are saying under this

[3] scenario with these counter-party firms, that

[4] Universal would turn around and buy the euro with

[5] one of the counter-party accounts it had?

[6] A: Correct.

[7] Q: And let's say — is the price that

[8] Universal FX is buying the euro at, say, IFX, the

[9] same price that the customer is buying the euro

[10] at —

[11] A: Well, it is changing every second.

[12] Q: Let's say it is done at the same time.

[13] A: We don't do it simultaneously, that

[14] second, because there would be virtually no

[15] profitability there. Unless of the three

[16] counter parties one of them had a price that was

[17] more advantageous enough to take it that second and

[18] lock in a profit. We may cover it at a loss. It

[19] may go against us, and we have our own parameters

[20] of what we are willing to risk. We may take a

[21] quick loss. There was no — it wasn't like every

[22] trade simultaneously was covered that second.

Page 92

[1] Number one, it would take us time to do the order,

[2] write the ticket, enter the trade. By that time it

[3] could have been five points.

[4] Q: Is it your testimony that at any given

[5] time the price you were getting from IFX was the

[6] price you were offering to the customer?

[7] A: We didn't just get it from IFX. We get

[8] it from a number of different sources and we quoted

[9] them based on the — based on the prices, but it

[10] wasn't always exact. Maybe we had a position and

[11] we had a view — we had a view that the euro is

[12] going a little higher and we had a bid, it would

[13] get better — a PIP to the right or any — just

[14] like any bank does to us.

[15] We use it as a reference when we call up,

[16] say, IFX, and maybe they have referenced a 20, 25

[17] market in euro. We may have 21, 26. We don't know

[18] what the customer is going to do, or the trader.

[19] We may have our own view. We may have a position.

[20] That is part of making a market, as IFX would do to

[21] us with their view, and that is why us calling out

[22] to three different places — there was no set

Page 93

[1] price, so maybe IFX would be 20, 24, and maybe

[2] Dressner would be 22, 27. There is always a

[3] different view on the price. We would have to make

[4] a determination what our price is within that

[5] parameter.

[6] Q: You use the prices that were given to you

[7] by IFX and these other various —

[8] A: As a reference point.

[9] Q: And then set a price?

[10] A: Right.

[11] Q: And then quoted that price, whatever that

[12] price was, based on your view, to the dealer at the

[13] introducing firm?

[14] A: Correct.

[15] Q: And that is the price they gave to the

[16] customer?

[17] A: No. They were trading — they had the

[18] power of attorney to trade for the customer. They

[19] would tell us whether they want to trade on that

[20] price or buy or sell. They would ask us for what

[21] is the market in a million Euros and we would

[22] quote, 20, 24. As an example. If they wanted to

Page 94

[1] buy it, they would buy it at 24. If they wanted to
[2] sell it, they would sell it at 20. That was their
[3] determination. They wouldn't go to the client
[4] because they had power of attorney.
[5]    Q: I want to show you a document I will mark
[6] as Exhibit 5.
[7]    (Michael Exhibit No. 5 was
[8] marked for identification.)
[9]        BY MR. HAAS:
[10]    Q: This is a letter that was sent from Mr.
[11] Helwig to me, that is the cover page, dated
[12] November 14, and attached is a one-page document
[13] entitled "Compelled Testimony Explanation." Can
[14] you look at that?
[15]    A: Yes.
[16]    Q: Do you recognize that document?
[17]    A: Yes, it looks familiar.
[18]    Q: This was a document that was prepared in
[19] response to a subpoena asking for written
[20] testimony. Did you have any role in preparing
[21] this — the text that is here on this compelled
[22] testimony?

Page 95

[1]    A: Yes.
[2]    Q: What was your role in preparing this?
[3]    A: I helped in preparing it. I helped in
[4] giving input to this letter.
[5]    Q: And is this accurate?
[6]    A: Yes.
[7]    MR. HELWIG: Why don't you read it? It
[8] has been a while.
[9]    (Pause.)
[10]    THE WITNESS: First, the spread never
[11] exceeds five pesos. Sterling yen, just to clarify.
[12] The reference was Euros, yes.
[13]        BY MR. HAAS:
[14]    Q: This reference to never exceeding five
[15] PIPS, that is the difference between the bid and
[16] the offer?
[17]    A: Right.
[18]    Q: So is it your testimony that — I just
[19] want to clarify. Are you saying that you as the
[20] trader at UFX did not routinely — mechanically add
[21] a certain number of PIPS —
[22]    A: No.

Page 96

[1]    Q: Let me finish my question. Mechanically
[2] add some number of PIPS to the price you got from,
[3] say, IFX, to the price you were offering to the
[4] customer via the trader?
[5]    A: No.
[6]    Q: But the price that you offered the trader
[7] who was trading on behalf of the customer was not
[8] necessarily the exact same price that you got from
[9] any one of these number of sources. You may look
[10] at the three or four sources and decide to give
[11] them a different price?
[12]    A: Not a different price. We may not even
[13] use — we may quote — like I said, different
[14] feeds. CQG, we could quote off of that. These are
[15] all part of our reference of quotes. There were
[16] others. Reuters, CGG — CQG. You know what the
[17] market is. For small amounts we would quote it off
[18] a reference point on the screen. It would be one
[19] of our three or one of our referenced quote
[20] vendors.
[21]    Q: Were there any other documents that were
[22] created to — what documents, if any, were created

Page 97

[1] to memorialize the price that you offered to the
[2] trader at an introducing broker?
[3]    A: There was no documents. If they did
[4] transact — do a transaction, we would typically
[5] write up a ticket, a trade ticket, but when we
[6] quoted a price there were no documents.
[7]    Q: When you wrote up a ticket, was the
[8] writing up of that ticket, did that happen
[9] simultaneously when the order was being put in?
[10]    A: Not every time. If it was busy, we would
[11] take orders — if the phone was ringing, we would
[12] take an order, quote two or three prices, do two or
[13] three phone calls, traders, and then go back, like
[14] any desk, get the order tickets written out as soon
[15] as possible, but normally — under normal
[16] conditions, yes.
[17]    Q: I will show you what I will mark as
[18] Exhibit 6.
[19]    (Michael Exhibit No. 6 was
[20] marked for identification.)
[21]        BY MR. HAAS:
[22]    Q: This is a declaration, two pages. Can

Page 98

[1] you identify the document?

[2] A: Yes, I can.

[3] Q: Is this a declaration that was signed by

[4] you?

[5] A: Yes.

[6] Q: Do you recall, to the best of your

[7] recollection, when you prepared the document?

[8] A: I don't recall specifically when. Four

[9] or five months ago. I am guessing. Approximately.

[10] MR. HELWIG: Paragraph 1 says it is in

[11] response to a December 2, 2003 —

[12] THE WITNESS: Okay. Sometime after

[13] December 2.

[14] BY MR. HAAS:

[15] Q: With respect to number 8, do you see

[16] where it says, "using a price feed from an outside

[17] provider" — "using this price feed," referring to

[18] a price feed from IFX Markets Limited — that

[19] "ACTFOREX software created a bid-asked spread. The

[20] ACTFOREX allowed Universal FX how wide of a spread

[21] to use and Universal FX showed a five-point spread

[22] to its customers."

Page 99

[1] A: Okay.

[2] Q: Is that, again, in connection with the

[3] euro?

[4] A: Yes.

[5] Q: So with other currencies, the spread

[6] might be different?

[7] A: Correct. It could be different.

[8] Typically every currency has its own spread. Euro

[9] is typically the narrowest spread.

[10] Q: Is there any document that Universal FX

[11] has that shows at any given point in time there was

[12] a five-point spread with respect to the bid-asked

[13] prices being quoted in euros?

[14] A: A document?

[15] Q: Yes.

[16] A: No, not that I am aware of — you mean a

[17] document that would go to a client or an IB?

[18] Q: Anyone — internally?

[19] A: No.

[20] Q: Was there any document that the customer

[21] saw that explained this five PIP spread?

[22] A: Not that I am aware of.

Page 100

[1] MR. HELWIG: Could I ask a clarifying

[2] question? With respect to the information in

[3] paragraph 8, is this making — this response that

[4] you provided in your declaration, is that response

[5] making reference to the quote spread — the quoted

[6] spread that was appearing on the platform when a

[7] customer logged on?

[8] THE WITNESS: Yes.

[9] MR. HELWIG: And — so that is — if the

[10] customer logged on to the system, that is the kind

[11] of bid-asked quote that would be there.

[12] THE WITNESS: Yes.

[13] MR. HELWIG: If the customer or — which

[14] I guess never happened, but if the person with

[15] power of attorney called in an order to the desk,

[16] did you or someone else on the desk in addition to

[17] this quote that was based on a live feed also

[18] reference all the other reference sources that you

[19] just testified about, and verbally quote a market.

[20] THE WITNESS: If somebody would call up?

[21] MR. HELWIG: Yes.

[22] THE WITNESS: Yes. The price quoted was

Page 101

[1] always accurate. Sometimes it wasn't accurate, the

[2] electronic price, because it wasn't accurate coming

[3] in, like all electronic feeds, they are not

[4] accurate at all times.

[5] MR. HELWIG: When you say accurate, you

[6] mean one consistent with what inter-bank dealers

[7] were quoting?

[8] THE WITNESS: Right, right.

[9] BY MR. HAAS:

[10] Q: When you are referring to someone logging

[11] on to the system, one of the traders who had power

[12] of attorney would log on to the system?

[13] A: Yes.

[14] Q: Was there a means for the customer to do

[15] that directly — in other words, when an order came

[16] in on the system, on the platform, was there a way

[17] for you to know that it was coming from the trader

[18] and not somebody else?

[19] A: No.

[20] Q: Are you aware of any instances where a

[21] customer logged on to the system directly to try to

[22] input a trade?

---

Page 102

[1]   **A:** I am not aware of any.

[2]      (Michael Exhibit No. 7 was

[3]   marked for identification.)

[4]            **BY MR. HAAS:**

[5]   **Q:** This is Exhibit No. 7, which is a

[6]   document produced to us, represented to be the

[7]   first version of the account opening documents for

[8]   Universal FX. Are you familiar with the general

[9]   format of the account documents?

[10]  **A:** A little bit. I really don't have very

[11]  much experience with them.

[12]  **Q:** You testified earlier that there was a

[13]  markup that was negotiated with the customers and

[14]  introducing firms, and then that was part of the

[15]  account opening documents, and that was — somehow

[16]  made a record so that you knew how to work in the

[17]  markup for the introducing firms?

[18]  **A:** Some of the input from the account

[19]  documents into the back-office system — I didn't

[20]  do it, the trading desk didn't do it, but we would

[21]  become aware of what the market is through the

[22]  system. That would be through somebody's

Page 103

[1]   keypunching or account setup.

[2]   **Q:** Do you know whether that section is in

[3]   this particular document that explains what the

[4]   markup is? Let me refer you to a specific page.

[5]   Go to the page Bates stamped 20. There is a line

[6]   there for commissions, correct?

[7]   **A:** Correct.

[8]   **Q:** That is different than what a markup

[9]   would be, correct?

[10]  **A:** Correct.

[11]  **Q:** And then there are lines here for the

[12]  customer to initial what the lot size is, and then

[13]  there is another line for an unlimited trading

[14]  account for six months with a $15,000 fee —

[15]  **MR. HELWIG:** $1,500.

[16]  **MR. HAAS:** Sorry. Thank you.

[17]           **BY MR. HAAS:**

[18]  **Q:** Was that ever used?

[19]  **A:** Not that I know of. That is the first

[20]  time I ever saw it.

[21]  **Q:** Commission payable to introducer. What

[22]  was that?

Page 104

[1]   **A:** I really don't know. I am really not

[2]   familiar with account statements. I don't know.

[3]   **Q:** If you turn to page 25, there is a

[4]   limited power of attorney.

[5]   **A:** Correct.

[6]   **Q:** These are all documents that were

[7]   prepared by Universal FX, correct?

[8]   **A:** When you say prepared by Universal FX?

[9]   **Q:** The actual form, the contents of these

[10]  documents were —

[11]  **A:** I believe so.

[12]  **Q:** And again, there is a line here on page

[13]  25, where it says "commissions," but it doesn't say

[14]  anything about markup?

[15]  **A:** Okay.

[16]     (Michael Exhibit No. 8 was

[17]  marked for identification.)

[18]           **BY MR. HAAS:**

[19]  **Q:** Here is 8. Now, this is the second

[20]  version of the account documents which was produced

[21]  to us.

[22]  **A:** Okay.

Page 105

[1]   **Q:** I am going to try to find that same page.

[2]   Page 00075, again, has a line for commissions per

[3]   round turn lot. It has the same line for lot size

[4]   and also commission payable to introducer, and

[5]   again, you don't know what that means?

[6]   **A:** No.

[7]   **Q:** Page 00077, there is a line there for

[8]   commissions but nothing about a markup?

[9]   **A:** Right.

[10]  **Q:** Now we are up to 9.

[11]     (Michael Exhibit No. 9 was

[12]  marked for identification.)

[13]           **BY MR. HAAS:**

[14]  **Q:** This is the third version of Universal FX

[15]  documents. If you go to page 00049, similar to the

[16]  second version, correct?

[17]  **A:** Yes.

[18]  **Q:** Go back to the beginning, page 00031.

[19]  **A:** Okay.

[20]  **Q:** This has a line here where it has a

[21]  blank, where it says, spread per currency payer.

[22]  **A:** Correct.

Case 1:04-cv-21346-KMM   Document 36   Entered on FLSD Docket 07/26/2004   Page 75 of 129
Ocean Foreign Currency Trading
Companies (Universal FX)

Deposition of Steven Michael
March 1, 2004

Page 106

[1]   Q: But it is not specifying which currency;
[2] is that right?
[3]   A: That is right.
[4]   Q: And did you — wasn't it your testimony
[5] that the spreads were different in different
[6] currencies?
[7]   A: Yes. Some currencies, like the sterling
[8] and crosses, they were more — I don't want to say
[9] exotic. The mainstream crosses were wider, but
[10] generally they were all the same spread.
[11]   Q: Total markups kept by the introducer and
[12] total markups credited to the counter-party. The
[13] counter-party in this case was Universal FX?
[14]   A: Yes.
[15]   Q: But it doesn't say that, does it?
[16]   A: No.
[17]   Q: Is it your understanding that this —
[18] total markups kept by introducer and total credited
[19] to the counter-party, is it your testimony that
[20] those two added up to the spread on the first line?
[21]   A: The spread per currency pair?
[22]   Q: Yes.

Page 107

[1]   A: No, I think the spread was the market
[2] spread that was quoted, I believe, the bid-offer
[3] spread. I don't think it has anything to do with
[4] the markups. I don't believe it does.
[5]   Q: When it says, markups per currency pair,
[6] blank PIPS on the open, what does that mean?
[7]   A: The number of PIPS on the open of a
[8] transaction.
[9]   Q: Number of PIPS —
[10]   A: Open of a transaction.
[11]   Q: In addition to what?
[12]   A: In addition to what? I am sorry.
[13]   Q: That is what I am trying to understand.
[14] Currency — let's say, the euro. The price on the
[15] currency is quoted in the hundredth of a cent and
[16] the hundredth of a cent is the PIP, right?
[17]   A: Correct.
[18]   Q: So in that particular instance, say the
[19] euro was at a dollar, to use a nice round number.
[20] So that is 1,000 PIPS?
[21]   A: Is it 1,000 PIPS?
[22]   Q: In terms of the total number of PIPS in

Page 108

[1] that price?
[2]   A: I don't know. No one has ever asked me
[3] that. I don't know if it is 1,000 PIPS. If it is
[4] 100 PIPS from — you are saying one-to-one, 1.000
[5] to 1.01 is 100 PIPS. 1.00 —
[6]   Q: A one-penny move would be —
[7]   A: 100 PIPS.
[8]   Q: So the dollar, take out the decimal and
[9] throw in a comma, and it will be 10,000?
[10]   A: Yes.
[11]   Q: So this obviously — is this markups per
[12] currency pair in the second line, is that restating
[13] the information that is on the first line where it
[14] says the spread per currency pair, or is it a
[15] markup?
[16]   A: It is a markup.
[17]   Q: And what is being marked up?
[18]   A: The spread per currency pair is not a
[19] markup. That is the price. There is a bid and
[20] offer to every price. There is not one price.
[21] There is a bid offer, and then the markup would be
[22] in addition to an offer or a bid, subtracted from

Page 109

[1] the bid. If it was a two PIP markup on a spread
[2] where they are buying, they would be paying two
[3] PIPS above the offer.
[4]   Q: Some of that markup was credited to the
[5] introducer and some of it was credited or kept by
[6] Universal FX?
[7]   A: I am not aware of what went to the
[8] introducer. That was really sort of the back
[9] office — negotiating with the IB. That I am not
[10] aware of. I never really saw account statements.
[11] I only know what the markups were and were not. I
[12] believe it all went to some sort of sales
[13] introducer.
[14]   Q: Who was the individual or who were the
[15] individuals who were mainly involved in that
[16] reconciliation of what went to the IB's?
[17]   A: That would be Ben and maybe somebody
[18] helping Ben.
[19]   MR. HAAS: I was going to think this
[20] would be a good time to stop for lunch.
[21]   MS. OHLMILLER: I do have a few questions
[22] on what you asked this morning. Do you want me to

Page 110

[1] hold them?

[2]    MR. HAAS: Let's go off the record.

[3]    (Discussion off the record.)

[4]    (Whereupon, at 1:02 p.m., the deposition

[5] was recessed to reconvene at 1:45 p.m. that same

[6] day.)

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

Page 111

[1]    **AFTERNOON SESSION**

[2]    (1:55 p.m.)

[3] Whereupon,

[4] STEVEN MICHAEL,

[5] having been previously duly sworn, was further

[6] examined and testified as follows:

[7]    **EXAMINATION BY COUNSEL FOR THE CFTC**

[8]    **BY MS. OHLMLLER:**

[9]    Q: Mr. Michael, do you have some

[10] relationship with a firm called Emerald Capital

[11] Management?

[12]    A: Yes, yes, I do.

[13]    Q: What is that firm?

[14]    A: It is CTA CPO — a CTA. I am not sure if

[15] it is a CPO.

[16]    Q: What is your relationship to the firm?

[17]    A: I am one of the general partners. You

[18] are right. I didn't realize that one.

[19]    MR. HELWIG: That should have been on

[20] that list?

[21]    THE WITNESS: Yes. It is a new CTA that

[22] I am one of the general partners in with Merick

Page 112

[1] Chaleski.

[2]    **BY MS. OHLMLLER:**

[3]    Q: What will be your role at Emerald?

[4]    A: Just as a general partner in the

[5] business. We haven't done any business yet.

[6]    Q: Do you have an affiliation with turnkey

[7] hedge funds?

[8]    A: No. Actually that is the attorney that

[9] has created Corymb and Emerald Capital. Also the

[10] administrator.

[11]    Q: When you first started at Universal FX,

[12] where was the dealing desk?

[13]    A: There was no dealing desk. They

[14] outsourced it to FXCM — another firm was called

[15] Direct FX.

[16]    Q: How long did that situation continue, the

[17] outsourcing?

[18]    A: Sometime after — when I came — I came

[19] there to set up the trading desk. When I set up

[20] the trading desk, we stopped outsourcing it.

[21]    Q: When did you set up the trading desk?

[22]    A: Approximately August of 2002.

Page 113

[1]    Q: Is that when customers began dealing

[2] directly with Universal's dealing desk?

[3]    A: Correct.

[4]    Q: You testified earlier that when you were

[5] working on the dealing desk, you had lists of IB's

[6] and customers and traders. What were those lists

[7] called?

[8]    A: Just an IB list. There was no specific

[9] name.

[10]    Q: Could Universal customers access

[11] information about their accounts on-line?

[12]    A: Yes.

[13]    Q: When they accessed their accounts, what

[14] could they see?

[15]    A: The same thing we could see, as far as I

[16] know.

[17]    Q: Could they see orders?

[18]    A: I believe they can see orders pending,

[19] yes.

[20]    Q: Could they enter an order?

[21]    A: I believe they could. I am not 100

[22] percent sure. I believe they have that available.

Page 114

[1] **Q:** Who would know the answer to that?

[2] **A:** Either Andy or Ben.

[3] **Q:** Why did UFX deactivate any client who

[4] revoked his power of attorney?

[5] **A:** Well, because — if he revoked his power

[6] of attorney, then FX would deactivate the account,

[7] which meant it couldn't be trading.

[8] **Q:** Why wouldn't UFX accept a customer

[9] account where the customer was going to make his

[10] own trades?

[11] **A:** It is not that they didn't have a policy

[12] of not. We never marketed to clients that I know

[13] of, individual clients — there was no policy. We

[14] did what the client told us.

[15] **Q:** When did David Chamides become a dealer?

[16] **A:** Best of my knowledge, around June —

[17] approximately around June of 2003 — actually prior

[18] to that. Probably April or May. I am really kind

[19] of guessing. I am not 100 percent sure.

[20] **Q:** And what was his experience before

[21] becoming a dealer for Universal?

[22] **A:** He worked on the trading desk in metals

Page 115

[1] in both Lehman Brothers and Morgan Stanley in New

[2] York.

[3] **Q:** What documents did Universal obtain from

[4] the introducing brokers to show what markups to

[5] charge?

[6] **A:** I really wasn't involved in the documents

[7] between the introducing brokers and the back office

[8] or, for that matter, the client, so I am not sure

[9] what type of document was created. I believe there

[10] was an introducing broker agreement. I can't tell

[11] you for sure what it would look like.

[12] **Q:** If a trader, one of the IB traders,

[13] entered an on-line order — as I understand it, the

[14] system would automatically execute that order at

[15] the system bid or ask price; is that correct?

[16] **A:** A limit order or a market order?

[17] **Q:** Let's talk about a market order first.

[18] **A:** The system had the ability — we had the

[19] ability at the desk to negotiate that price. From

[20] time to time the price that — the electronic price

[21] could have been off, so we may or may not have had

[22] the ability or had negotiated the price, but

Page 116

[1] generally it was done at that price, the bid offer

[2] spread that was on-line, and if it was a limit

[3] order it would be executed when the — if it was a

[4] limit bid, when the offer was the same as the bid.

[5] **Q:** Once the system has automatically

[6] executed one of these orders, what was the

[7] procedure to get that hedged?

[8] **A:** Called up one of the counter-parties or

[9] called on the Reuters or went on one of the

[10] electronic platforms of the counter-parties, and we

[11] just hedged it that way.

[12] **Q:** But how did you find out about it, to

[13] hedge it?

[14] **A:** With ACTFOREX there was some sort of

[15] alert but plus the dealers were constantly on the

[16] desk staring at the screens, but there was some

[17] sort of alert. I don't recall exactly what that

[18] was, but it would alert us that a transaction had

[19] just taken place, and what our position was, so we

[20] would know how to hedge the position.

[21] **Q:** At the time an on-line execution

[22] happened, did the system automatically put on the

Page 117

[1] opposite trade for that account 167?

[2] **A:** They didn't put it on. I am not 100

[3] percent sure how — but it has been a while and I

[4] don't even know how to use it anymore, but I

[5] believe what happens when there is a transaction —

[6] there has to be an offsetting side somewhere. It

[7] should be simultaneously the house side of the

[8] transaction which I believe was 167.

[9] **Q:** So you believe — when the system did it,

[10] that the house trade should have been entered at

[11] the same time as the customer trade?

[12] **A:** Yes, that would make sense. I just don't

[13] know —

[14] **MR. HELWIG:** Does it make sense or do you

[15] know if that is what happened?

[16] **THE WITNESS:** I don't really know how the

[17] software worked that intimately, and it has been a

[18] while since I have looked at blotters and times. I

[19] do recall when we punched trades, I know that

[20] electronic time stamp is when we punched a trade

[21] and I remember that oftentimes we punched bunches

[22] of trades, so a lot of times it was the same time

Deposition of Steven Michael
March 1, 2004

Ce.   in Foreign Currency Trading
Companies (Universal FX)

Page 118

[1] even though the transaction may have occurred

[2] previous to that, maybe hours

[3] BY MS. OHLMILLER:

[4]   Q: Who would know the answer to my earlier

[5] question about whether the trade was automatically

[6] entered in the house account at the time of an

[7] on-line execution?

[8]   A: I don't know that anybody would know.

[9] Potentially ACT. If I went back and researched it,

[10] maybe I could give you an answer. I just don't

[11] know how that process worked. It wouldn't be

[12] difficult to find out.

[13]   MR. HELWIG: Do you remember if trade was

[14] done on-line through someone with a power of

[15] attorney — or from anyone, if the trade is done

[16] on-line, did you have to do a manual ticket and

[17] punch it in?

[18]   THE WITNESS: No, no. Once a date was

[19] done on-line, then that went into the client's

[20] account —

[21]   MR. HELWIG: I don't mean a manual ticket

[22] for the customer order, I mean a manual ticket for

Page 119

[1] the house side.

[2]   THE WITNESS: I believe automatically the

[3] other side of the transaction had to be on some

[4] account, and if it was electronic trade it was

[5] always the house account or the dealer account. I

[6] recall that 167 was the dealer account. I just

[7] don't know how the mechanics of the software works

[8] as far as the reporting of times and this, but it

[9] does — I do know there is a dealer side to a

[10] customer trade every time, and somehow it

[11] electronically did happen. I just don't know how.

[12]   BY MS. OHLMILLER:

[13]   Q: Turning your attention to the customer

[14] tickets you prepared —

[15]   MR. HAAS: Which one are we referring to,

[16] Charlotte? I have this list, a control number

[17] list.

[18]   MS. OHLMILLER: Control number 4.

[19]   MR. HAAS: Let me represent that

[20] Universal FX in response to a subpoena issued by

[21] the Commission produced by Federal Express some

[22] documents on Friday and some others on Saturday,

Page 120

[1] just before the testimony. Certain documents

[2] subpoenaed, among them were order tickets for a

[3] certain period of time, I think it was a week in

[4] February, a week in late April, early May of 2003,

[5] and then a week in June 2003, and these documents

[6] were pulled from that production.

[7]   So you want 4?

[8]   MS. OHLMILLER: Yes, and that will be

[9] Exhibit 10.

[10]   (Michael Exhibit No. 10 was

[11] marked for identification.)

[12]   BY MS. OHLMILLER:

[13]   Q: We have now shown you what has been

[14] marked as Exhibit 10. Can you tell us what these

[15] are?

[16]   A: There are two trades done with —

[17]   MR. HELWIG: What are they, first, not

[18] what do they represent?

[19]   THE WITNESS: Two trade tickets and one

[20] deal confirmation with IFX.

[21]   BY MS. OHLMILLER:

[22]   Q: Turning to the ticket first. Ticket

Page 121

[1] number, what does that represent?

[2]   A: We try to number groups of tickets that

[3] went together as one trade, to get us flat or to

[4] hedge our risk, basically, to hedge our position.

[5] Sometimes we had two trades at the same time or

[6] very close to the same time and covered a net

[7] position. If that happened it was easier for the

[8] keypuncher to punch into our back-office system

[9] that way.

[10]   Q: What is the ticket number?

[11]   A: That is a ticket number — I believe that

[12] is a ticket number that we assigned. I think we

[13] just went down the line — actually, I am confused

[14] a little myself. I believe that is the ticket

[15] numbers we assigned. They weren't preprinted.

[16]   Q: Is that the same ticket number that

[17] appears on customer statements?

[18]   A: No. It is an internal ticket number.

[19]   Q: Now, you know the ticket number I am

[20] talking about on customer statements?

[21]   A: Not really. Which statements are we

[22] talking about? We had ACTFOREX that had one and

Page 122

[1] when we went to Choice — are you referring to ACT.

[2] Q: I am referring to the ACTFOREX time

[3] frame.

[4] A: I think the ACTFOREX , it creates its own

[5] ticket number. I don't believe there was a way we

[6] could enter a ticket number.

[7] Q: So the ticket number handwritten here has

[8] nothing to do with the ticket number that is

[9] besides trades that customers see?

[10] A: I don't believe so, but I can't tell you

[11] for sure. I am not sure what the reference is,

[12] since it has been a while, of putting the ticket

[13] number. It is possible it was taken from ACT,

[14] instead of us generating it. I just don't recall.

[15] Could have been generated taken from ACT.

[16] Q: Do you recognize the handwriting on

[17] either of these order tickets?

[18] A: No, I wouldn't know exactly.

[19] Q: It is not yours?

[20] A: No, it is not mine.

[21] Q: Going to the next box, it says, trader,

[22] looks like I-N-I-T. What does that mean?

Page 123

[1] A: Sometimes — that refers to the dealer.

[2] The dealer that took the order and covered the

[3] trade. Sometimes we would put in our initials so

[4] we know who did what trades, again for internal

[5] purposes.

[6] Q: In this case, we can't see who did it?

[7] A: Whoever did it didn't initial it.

[8] Q: And then next to that, to the right,

[9] there is a series of little boxes, one says

[10] platform or other —

[11] A: Correct.

[12] Q: What does that mean?

[13] A: Platform would indicate that the trade

[14] came right off the electronic platform. Other

[15] would mean that the customer traded on the phone or

[16] the IB traded on the phone.

[17] Q: And the next, under that it says open or

[18] close?

[19] A: That you were to indicate whether it was

[20] an opening position or a closing position, which we

[21] did not always get that information. That would

[22] help in punching in manually to ACT.

Page 124

[1] Q: To the right of that there are some more

[2] little boxes, A-L-L-O-C, and the other says,

[3] posted.

[4] A: That is, internally, that we know that

[5] the trade, if it was manual, was posted, meaning it

[6] was manually put into the system or allocated,

[7] whether it was allocated to — let's say the IB

[8] would do one bulk order and then we would allocate

[9] it, once we allocated it to specific accounts than

[10] we were told to, we should be checking it off for

[11] internal purposes so we know we don't punch it

[12] twice or allocate it twice.

[13] Q: And then to the right of that there is a

[14] little box that says, verified?

[15] A: Right. I believe that referred to when

[16] somebody went to double check our positions and our

[17] trades, how the tickets were punched, against the

[18] blotter, they would check off verified or highlight

[19] some sometimes.

[20] Q: And to the right of that, it says, value

[21] date?

[22] A: It is the value date of the trade.

Page 125

[1] Q: Why wouldn't this be filled in?

[2] A: Same reason the platform or the verify is

[3] not filled in. We didn't — we weren't always —

[4] when it was busy, we were less likely to get

[5] everything filled in, but when it wasn't busy, we

[6] tried to get it filled in. It is all internal.

[7] Q: Still on the right side of the ticket,

[8] trade filled, date and time.

[9] A: Okay.

[10] Q: What does that mean?

[11] A: Well, if somebody left us a working

[12] order, all working orders were good until canceled

[13] unless otherwise stated, so if we had a time stamp

[14] of a limit order two days ago, and it got filled

[15] today, that would be the time and date it was

[16] filled.

[17] Q: There is a time stamp on this document.

[18] What is that?

[19] A: That is a time stamp of the time the

[20] trade was executed, or approximately.

[21] Q: So it is not the time it got posted to

[22] the system?

---

**Page 126**

[1] A: No.

[2] Q: Moving now back to the left, there is a

[3] box that says, working order, date and time. What

[4] is that for?

[5] A: If somebody placed a working order limit

[6] or a stop, that is the date and time. If we didn't

[7] have a time stamp machine at that moment, then we

[8] would write in the times. Otherwise we would stamp

[9] it when it was placed and stamp it when it was

[10] filled, but sometimes we would write it in.

[11] Q: And the box called account numbers or IB?

[12] A: Exactly that, the account numbers for the

[13] IB name — or both, possibly.

[14] Q: If it just said the IB name, how would

[15] you know what accounts to assign the trade to?

[16] A: Then we would get an allocation from the

[17] IB. So if it is a busy market and the IB says to

[18] buy a million euros, we will execute the trade and

[19] write the IB name as a reference and we will get

[20] back to the allocation if we are very busy, and get

[21] it punched in. We will know when we go back and we

[22] have five tickets, we know who did the trade, so we

**Page 127**

[1] can go back and get the allocation, depending on

[2] how busy it was.

[3] Q: In what form did you get the allocation?

[4] A: Could be verbal, on the phone, or

[5] sometimes it was faxed or possibly even e-mailed.

[6] Sometimes it was pre- — sometimes we had

[7] pre-allocations that were always the same until —

[8] Q: If you got — sorry, go ahead.

[9] A: Nothing else.

[10] Q: When you got the allocations in writing,

[11] what did you do with them after you made the

[12] allocation?

[13] A: We generally just checked out and then —

[14] we would oftentimes keep the allocation sheets.

[15] Sometimes we did, sometimes we didn't. We just

[16] made sure they were right and it matched what it

[17] said on the paper. At the end of the day we did a

[18] check out and made sure that the trades that went

[19] through the blotters, the accounts matched all of

[20] the allocations, and then there was no more need

[21] for it, as long as we knew it was punched right.

[22] Q: Under that, on the left side,

**Page 128**

[1] counter-party buy. What information goes there?

[2] A: That is where we — that is who we

[3] covered the trade with, what the confirmation or

[4] ticket number or whatever was generated, and the

[5] price.

[6] Q: And if it was a sale, to the right side

[7] of the order ticket?

[8] A: Yes.

[9] Q: And then down below, on the left side, it

[10] says, buy?

[11] A: Yes.

[12] Q: What does that mean?

[13] A: That means that the customer bought.

[14] Q: What kind of order was this?

[15] A: I don't know from the ticket whether it

[16] was a limit or a market order. I am guessing

[17] probably a market order.

[18] MR. HELWIG: To do what?

[19] THE WITNESS: To buy .1 million Euros at

[20] 118.36.

[21]             BY MS. OHLMILLER:

[22] Q: Moving to the second order ticket on the

**Page 129**

[1] page, what is this for?

[2] A: To sell $.2 million at 118.36.

[3] Q: Can you tell what type order this was?

[4] A: No. That was done on the platform. So I

[5] wouldn't know. We just take trades off the

[6] platform and put them on tickets so we can balance.

[7] Q: So, it appears that the first order on

[8] the page, the top order, did not come off the

[9] platform?

[10] A: I would have no idea because they didn't

[11] check off platform or other.

[12] Q: But the bottom one definitely came off

[13] the platform?

[14] A: I couldn't tell you 100 percent because

[15] they could have checked it incorrectly, but that is

[16] why they should have checked platform. More than

[17] likely, yes.

[18] Q: Turning to the previous page, direct deal

[19] confirmation, explain how to read this first?

[20] A: It is in relationship — in relation to

[21] what we did with IFX. So we sold .1 million Euros

[22] at 113.95 and then time and who the dealer was or

Page 130

[1] if it was automatic.

[2]    Q: What does create a deal 346776 mean?

[3]    A: That would be the reference number for

[4] the trade.

[5]    Q: There is a handwritten number to the

[6] right of the deal confirmation. What is that?

[7]    A: The 5781?

[8]    Q: Yes.

[9]    A: I don't know. I am not quite sure. Some

[10] internal numbers that we can sort of balance our

[11] tickets to. We tried to keep ours flat, so

[12] sometimes when we are punching, we write a

[13] reference number that helps us identify what trade

[14] tickets go with what counter-party transactions so

[15] we know we are hopefully flat.

[16]    Q: Does this deal confirmation go with the

[17] tickets on the second page?

[18]    A: I believe so, unless somebody copied it

[19] incorrectly.

[20]    MR. HAAS: I will represent for the

[21] record that this document was stapled.

[22]    THE WITNESS: Not you copying it

Page 131

[1] incorrectly, us copying it incorrectly. I believe

[2] so, yes, to the best of my knowledge it is.

[3]            BY MS. OHLMLLER:

[4]    Q: The time on the deal confirmation, what

[5] time is that?

[6]    A: 18:22:32.

[7]    MR. HELWIG: Greenwich Mean Time.

[8]    THE WITNESS: Yes, I guess it would be.

[9]            BY MS. OHLMLLER:

[10]    Q: The time systems on the order tickets on

[11] the second page, what times are those?

[12]    A: They would be New York — Eastern time.

[13]    Q: What is the difference between Eastern

[14] time and Greenwich time?

[15]    A: I believe it is four or six hours now.

[16] It depends on daylight savings. I think it is six

[17] hours.

[18]    MR. HELWIG: To the extent it is

[19] relevant, I believe that is my belief — it is

[20] determinable.

[21]            BY MS. OHLMLLER:

[22]    Q: I believe you said earlier that sometimes

Page 132

[1] if you were busy you might not immediately prepare

[2] one of these order tickets —

[3]    A: Correct.

[4]    Q: That you might make two or three or four

[5] deals and then you would go back and write up the

[6] tickets?

[7]    A: That is correct.

[8]    Q: How did you keep track of what you had

[9] done until you got around to writing up the

[10] tickets?

[11]    A: Kept it in our head. That is part of the

[12] talent of being a dealer or not, just like a local

[13] on the floor that makes 10 trades and writes them

[14] on — when I was trading on the floor, you would

[15] write down as soon as you had a chance what trades

[16] you did with whom, but you try to keep track in

[17] your head or maybe you would write it on a piece of

[18] paper somewhere to help you remember.

[19]    I would like to add one thing in

[20] reference to this ticket, if it is traded on the

[21] platform and we would write a ticket from the

[22] platform, that would not necessarily be done that

Page 133

[1] second. Normally if a phone order came in, it was

[2] time stamped as it was traded, but if it was taken

[3] off the platform, because, again, it was just for

[4] reference, when we had time or when it was slower,

[5] we would take and write tickets up so we could

[6] balance later. I don't know if it mattered or not.

[7]    Q: So there is a ticket even for an on-line

[8] trade done on-line?

[9]    A: It may have been done on-line previous to

[10] the time stamp of a ticket because we couldn't

[11] possibly write it simultaneously. Maybe we were

[12] diverted for a minute, but we would eventually

[13] write a ticket.

[14]    Q: What contracts did Universal offer to

[15] clients?

[16]    A: What markets would we allow them to

[17] trade? We really didn't have a list. We didn't

[18] restrict any markets that we could trade with a

[19] counter-party.

[20]    Q: So anything anybody wanted to trade you

[21] would have traded?

[22]    A: Any currency we could have readily

**Deposition of Steven Michael**
**March 1, 2004**

Ce..  .in Foreign Currency Trading
Companies (Universal FX)

---

Page 134

[1] traded, yes. Most people stayed with the majors or

[2] the crosses. We rarely did any exotic markets.

[3]    Q: For the euro/U.S. dollar, what contract

[4] sizes could customers trade?

[5]    A: Any size.

[6]    Q: Was there a minimum?

[7]    A: We generally — it was a written rule,

[8] but we generally liked to keep a limit of 100,000.

[9] We were limited with ACTFOREX to the increments we

[10] could input, but we would let somebody — as far as

[11] we were concerned there was no size or particular

[12] increment or amount other than a minimum and, of

[13] course, a maximum, depending on their margin.

[14]    Q: Same question for U.S. dollar/Japanese

[15] yen?

[16]    A: The same thing, yes.

[17]    Q: 100,000 U.S. dollars?

[18]    A: As a minimum, generally, yes.

[19]    Q: And U.S. dollars with Swiss francs?

[20]    A: Correct.

[21]    Q: Same, $100,000?

[22]    A: Yes.

Page 135

[1]    Q: And the British pound/U.S. dollars?

[2]    A: 100,000 British pounds.

[3]    Q: What value dates were available?

[4]    A: Any value date.

[5]    Q: How did customers know what value date

[6] their transaction was — had to be paid up by?

[7]    A: The IB — the person who had the power of

[8] attorney?

[9]    Q: I mean the ultimate customer. What told

[10] the customer what the value date was for a

[11] particular trade?

[12]    A: What told the customer? Depends, when we

[13] were using ACTFOREX, the ACTFOREX didn't have a way

[14] of representing on the statement the value dates,

[15] but they traded to the spot — whoever traded with

[16] us was always told there was a two day spot, and if

[17] they went past the value date with a position, that

[18] we would have to swap that position.

[19]    ACTFOREX never had a good way of

[20] reporting and representing that time role, but

[21] probably by the date I got to UFX we were

[22] researching other platforms, and we did immediately

Page 136

[1] hire Broker Box and FOREX Manage. We never

[2] implemented it, but we spent six months with that

[3] transition for the sole purpose that they have

[4] representation of the time role, the settlement

[5] dates, it was netted as opposed to open and close

[6] and would allow for any transaction amount. We

[7] eventually used Choice, which showed the settlement

[8] dates, and the time next, which was the way we

[9] always represented it.

[10]    Q: For accounting purposes, when did a

[11] trading day start for Universal?

[12]    A: For accounting purposes, it would start

[13] on the value date change, which is 5:00 Eastern

[14] time — just past five. It was the end of the

[15] trading day.

[16]    Q: When a trader initiated a trade on-line,

[17] what did he have to do to obtain the current

[18] bid-ask quotes?

[19]    A: It would be on the screen.

[20]    Q: If the system is up, the current bid ask

[21] is on the screen?

[22]    A: Correct, and again, there were times

Page 137

[1] where we could negotiate that if it was off.

[2]    Q: And you say there were times when it was

[3] off, the bid ask was off?

[4]    A: Well, not off. There is no — dollar

[5] Swiss, there is no dollar Swiss market from five in

[6] the afternoon until 8:00. It doesn't ask. So a

[7] lot of times, the feeds that come in, our feed or

[8] any feed either reflects a crazy price, an

[9] incorrect price or no price, so at those times we

[10] would have to negotiate.

[11]    Q: Let's assume there is a feed. What was

[12] the formula that the system used to compute the

[13] bid-ask price from the IFX feed?

[14]    A: From the API feed? I believe the API

[15] feed came in as one price, somewhere just — I

[16] believe it was in the middle of the bid ask, and

[17] then we would take that price and create a bid ask

[18] from that — well, the software did it, ACTFOREX.

[19]    Q: That is what I am asking for, what the

[20] formula was.

[21]    A: I don't know. It was really an ACTFOREX

[22] system. I don't know exactly how that was

---

Page 138

[1] calculated, unless I am not understanding the
[2] question.
[3]     Q: The price feed that was coming in to the
[4] ACTFOREX system, I believe earlier you said that
[5] came from IFX, correct?
[6]     A: Yes.
[7]     Q: And that was not bid prices and ask
[8] prices?
[9]     A: No. As far as I recall, that price comes
[10] in as one price, not a bid ask, just one price, and
[11] I think it represents the middle of their bid ask,
[12] and then ACTFOREX, I believe, allowed us to
[13] separate between the bid and the offer. How it
[14] actually created that from that price, I am not
[15] sure.
[16]     Q: Other than entering an order on-line or
[17] picking up the telephone and calling the dealing
[18] desk, is there any other way that a trader for one
[19] of the IB's could obtain a trade execution for a
[20] customer?
[21]     A: No. That would be the only way that I
[22] know of.

Page 139

[1]     Q: I think we went through this earlier, but
[2] I just want to be sure I understand. For
[3] customers, the system has in it the markup. Was
[4] the markup the same — for any one customer, was
[5] the markup on the bid equal to the markdown on the
[6] sale?
[7]     A: I believe that actually they had the
[8] ability to make a different bid — buy markup
[9] rather than a sell markup, but I am not real
[10] familiar with the markups. I believe it had that
[11] ability.
[12]     Q: Within a single introducing firm, did all
[13] customers have the same markups?
[14]     A: As far as I know, yes, but, again, I
[15] can't be 100 percent sure.
[16]     Q: Would the system have allowed different
[17] markups for different customers?
[18]     A: You know, I am not sure — I believe one
[19] system, either ACT or Choice, did allow, and the
[20] other system didn't. I think ACT was created at
[21] the customer level, and Choice, it might have been
[22] created at the IB level, which would be different

Page 140

[1] from one customer to the other, but I am not 100
[2] percent sure.
[3]     Q: To trade FOREX contracts through
[4] Universal FX, what requirements did customers have
[5] to meet?
[6]     A: Again, that I am not sure of, what the
[7] requirements were. That wasn't part of my job,
[8] what the requirements were. I am not sure what
[9] they were.
[10]     Q: Who had the initial responsibility to
[11] send Universal new account papers to prospective
[12] new customers?
[13]     A: I believe that was the IB, but, again, I
[14] am not 100 percent sure. I don't believe we sent
[15] the — contacted the clients. I believe they can
[16] download it from the Internet, if I am not
[17] mistaken.
[18]     Q: If prospective customers had questions
[19] about how to read the account paperwork, the
[20] confirmation statements, the trading documents, who
[21] did they call?
[22]     A: I don't know if they would call the main

Page 141

[1] number, the IB — generally I believe they would
[2] call the IB, they would probably deal with
[3] initially.
[4]     Q: What information did Universal provide to
[5] Sterling regarding how to read the account
[6] documents?
[7]     A: I am not sure.
[8]     Q: Who at Universal had the responsibility
[9] to deal with prospective customers regarding
[10] questions about costs or pricing or any other
[11] aspect of trading?
[12]     A: I am not sure. Generally the customer
[13] talked to the IB. The only time they would call us
[14] is if they couldn't get an answer properly from the
[15] IB or they didn't feel like they did. I never
[16] really encountered much of that. I am not sure
[17] whose job it was or who dealt with it. It could
[18] have been anybody who answered the phone.
[19]     Q: Did you ever receive any calls like that?
[20]     A: Well, reading a statement, it is possible
[21] I may have gotten one or two, a few calls.
[22]     Q: What about how trading worked, the

Page 142

[1] arithmetic?

[2] A: I personally never got a question from a

[3] client how the trading worked or the arithmetic.

[4] Q: How the profits and losses were computed?

[5] A: No, not to my recollection did I ever get

[6] a question like that.

[7] Q: How much money did Universal require

[8] customers to deposit before they could trade?

[9] A: Again, that I am not sure. I couldn't

[10] really tell you exactly.

[11] Q: But you know customers had to put up

[12] money before they could trade?

[13] A: Yes.

[14] Q: And how did you refer to that money?

[15] A: It was all done electronically. The

[16] system wouldn't allow them to trade, or that

[17] account to trade without the proper margin. So at

[18] the trading desk, it wasn't really important what

[19] they deposited or how much they had because the

[20] system kept track of the requirements.

[21] Q: But as I understood it, more than half

[22] the orders didn't go directly into the on-line

Page 143

[1] system. They came by telephone to you or one of

[2] the other dealers?

[3] A: Correct.

[4] Q: So in that instance, what did you do to

[5] check that the account could trade before you

[6] actually confirmed a trade?

[7] A: We did nothing. We went — when we

[8] punched the trades manually, if they didn't have

[9] the proper margin, it wouldn't let us punch the

[10] trade.

[11] Q: Did that happen?

[12] A: It happened from time to time, yes.

[13] Q: What did you do with the trade that the

[14] system wouldn't accept?

[15] A: We would go, first of all, back to the IB

[16] and tell them that this client didn't have the

[17] margin requirements.

[18] Q: And then what happened?

[19] A: Generally we would just cover the trade,

[20] and that would be — most of the time, if it was

[21] small — usually if it was a small amount, we would

[22] just eat it at the desk. It wasn't an ongoing

Page 144

[1] problem. I am sorry.

[2] Q: If it wasn't a small amount, what would

[3] you do?

[4] A: I don't recall having times where we had

[5] a big amount — because we would catch that pretty

[6] quickly. I don't necessarily mean the amount of

[7] the trade, but the amount of the loss, if it was a

[8] loss for us, or a gain or whatever it was.

[9] Q: If you had two customers, one customer

[10] wanted to buy to establish a new position and the

[11] other wanted to close a sell position, did

[12] Universal provide the same price quotation to both

[13] customers if they came in at the same time?

[14] A: It wouldn't be possible to come in at the

[15] same time because there is one person answering —

[16] if it was a phone order, I can only quote one

[17] person at a time, if it is one person. If it came

[18] in to two dealers at the same time, then there

[19] would be a bid offer spread — it would be the same

[20] to both, but the customer that buys is going to buy

[21] the offer, and the customer that sells is going to

[22] sell at the bid.

Page 145

[1] Q: No, you misunderstood. Both are buying.

[2] One is buying to open a new position and the other

[3] is buying to offset a sale, a previous sold

[4] position. So they are both buying. Do they both

[5] get the same bid-ask spread?

[6] A: Yes.

[7] Q: Theoretically, at least?

[8] A: Yes.

[9] Q: And the same would be true if both wanted

[10] to sell?

[11] A: Yes.

[12] Q: Would Universal allow a new sell position

[13] to be established in an account where there was a

[14] previous and still open by position in the same

[15] currency?

[16] A: I don't know — I am not sure what that

[17] means. A new sell position, if there is an

[18] existing long position?

[19] Q: Yes.

[20] A: In the currency.

[21] Q: In the same currency.

[22] A: I am not sure what that means.

**Page 146**

[1] MR. HELWIG: Would you offset it
[2] immediately, or would you let them have two open
[3] positions, one on each side of the market?
[4] THE WITNESS: That is part of the opening
[5] and closing. ACTFOREX had that ability. In the
[6] very beginning these people did have the ability to
[7] do it, and I changed that and didn't allow people
[8] to have a simultaneous sell — a short and a long
[9] position in the same currency, but in the very
[10] beginning, the clients were able to do that
[11] previously on their system with whoever we
[12] outsourced to, and initially because of ACT they
[13] were used to it. There was a period of time in the
[14] very beginning that they could do that, but it was
[15] quickly changed. We called it a hedge
[16] BY MS. OHLMILLER:
[17] Q: That is what ACTFOREX referred to as a
[18] hedge?
[19] A: I believe ACT or in the marketplace, but
[20] that was something we quickly changed and didn't
[21] allow.
[22] Q: Why did you change it?

**Page 147**

[1] A: Because it didn't make any sense to me.
[2] As a dealer, it didn't make any sense.
[3] MR. HAAS: Why didn't it make sense?
[4] THE WITNESS: It didn't make sense to be
[5] long and short the same currency. To me it was
[6] netted out, and I have never seen it before. It
[7] didn't make sense to be long and short. To me they
[8] were flat. So the trade should be closed out. The
[9] fact that they had the ability was a flaw in the
[10] software.
[11] BY MS. OHLMILLER:
[12] Q: Earlier, when we were looking at Exhibit
[13] 10 — in fact, would you bring it back in front of
[14] you.
[15] A: Yes.
[16] Q: That is the order tickets?
[17] A: Yes.
[18] Q: You said that occasionally Universal
[19] netted orders and only did the difference in a
[20] hedge?
[21] A: Correct.
[22] Q: That is what happened here; is that

**Page 148**

[1] correct?
[2] A: Yes.
[3] Q: My question is, in this case, why would
[4] Universal FX have put the two customers opposite
[5] each other at the same price, where one wants to
[6] buy and one wants to sell?
[7] A: We didn't. We didn't put them at the
[8] same price. They just traded the same price. I
[9] don't know when exactly — when they exactly
[10] traded. It wouldn't be possible at the same time
[11] for them to buy and sell at the same price unless
[12] we quoted them a bid-offer spread that is the same.
[13] Q: So what you are saying then is here —
[14] there are two distinct trades with these two
[15] accounts opposite Universal FX, and then after the
[16] fact, the dealer netted them and only did the
[17] difference?
[18] A: Correct. I don't know exact times to the
[19] minute or even, for that matter, if the first one
[20] was traded on the platform or quoted. But when it
[21] is happening fluidly, and the dealer has a position
[22] and all of a sudden another trade comes in, and it

**Page 149**

[1] is easy for him to offset the balance.
[2] Q: What is the premium charge to customers?
[3] A: The premium, what is the premium? What
[4] do you mean by the premium?
[5] Q: A charge that is shown on statements to
[6] customers. When a customer holds a trade more than
[7] two days, or more than a day, actually, there is a
[8] small charge?
[9] A: That is the swap — I am not sure if it
[10] is called the premium on the statement —
[11] Q: It is variously called premiums or
[12] interest.
[13] MR. HAAS: Or I-N-T-R.
[14] THE WITNESS: I am assuming that is the
[15] swap rate, that is the swap that they pay on their
[16] positions overnight.
[17] BY MS. OHLMILLER:
[18] Q: Is that a number that should be the same
[19] every day?
[20] A: Generally it is just about the same every
[21] day. In the inter-bank, it depends on what level
[22] you trade, in the inter-bank. If you are on the

**Page 150**

[1] very top tier of the inter-bank, that may change
[2] very slightly from day to day. If you trade as we
[3] do, more like a margin client on the fringe of the
[4] inter-bank or just outside the inter-bank, that
[5] very generally is pretty constant, until the LIBOR
[6] rate changes, or the difference in the LIBOR rate
[7] in one currency and another.
[8]    Q: Who set the formula used to compute that
[9] rate?
[10]    A: I don't think there is a formula. I
[11] think you would input what the rate is, the premium
[12] rate.
[13]    Q: So, did Universal put in one number that
[14] was charged every time?
[15]    A: Pretty much, yes, until we had a system
[16] where we did swaps — probably that is the only
[17] thing we could do.
[18]    Q: This interest number was always a debit
[19] to customer accounts, at least that is all I have
[20] seen to date, are debits. Were there times when
[21] the interest rates were such that customers should
[22] have received a credit, not a debit?

**Page 151**

[1]    A: I am not real familiar — you are talking
[2] about the ACT system, so it is going back —
[3]    Q: I am talking about if you were doing a
[4] rollover, doing the time next, for example, you are
[5] saying there is some swap amount.
[6]    A: Correct.
[7]    Q: Would that sometimes be positive for
[8] customers and sometimes be negative?
[9]    A: Sometimes it was, yes.
[10]    Q: What is a price shift?
[11]    A: That allows you to add just sort of on
[12] the fly where — so your bid off spread is either
[13] to the right or to the left. It is a quick way to
[14] say — if your price is not correct or it is off,
[15] or you have a view, one of the three, you can
[16] quickly shift — you can shift prices to the right
[17] without having to manually shift the bid and the
[18] offer, or to the left. It was an ability to react
[19] to where the prices should be or where you think
[20] they should be.
[21]    Q: It would either raise or lower both
[22] prices the same amount?

**Page 152**

[1]    A: Correct.
[2]    Q: And who could do that?
[3]    A: The dealers.
[4]    Q: Only dealers?
[5]    A: Yes.
[6]    Q: And you would only use this in a
[7] situation where you either felt the bid and offer
[8] were off or you had a different view of the market?
[9]    A: Or a different view of the — yes,
[10] basically, yes.
[11]    Q: With regard to Sterling customers, who
[12] decided if a customer was going to hold a contract
[13] past the value date?
[14]    A: The trader.
[15]    Q: What did the trader do to alert Universal
[16] that he was going to hold a position past the value
[17] date?
[18]    A: He wouldn't have to do anything.
[19]    Q: And then what happened if he did nothing?
[20]    A: It would automatically be done for him by
[21] the system, the software.
[22]    Q: So if Universal hears nothing from the

**Page 153**

[1] trader, then Universal automatically rolls the
[2] position forward?
[3]    A: Correct. The only time we would not is
[4] if the client said, "I want to take delivery of the
[5] currency." That would be the only time we wouldn't
[6] roll — unless there is something else they could
[7] tell us — they did have the ability to make or
[8] take delivery on a DVP basis, if they chose to.
[9]    Q: You said DVP?
[10]    A: Yes. That means — delivery versus
[11] payment, meaning we must deliver the full amount of
[12] the currency before we make the payment. So if
[13] Sterling, for example, for a client, bought a
[14] million euros and that client wanted to take
[15] delivery of the million euros, he would have to
[16] deliver to us the corresponding full amount before
[17] we would make payment of euros to him.
[18]    Q: Did any customer of Universal ever make
[19] delivery of a foreign currency?
[20]    A: Not that I know of, but I have customers
[21] that were going to. Some accounts were
[22] specifically being set up just for delivery-versus-

Page 154

[1] payment accounts. We did have — made sure that we
[2] had accounts with our bank or our counter-party
[3] that allowed us to do that. I did have some
[4] accounts that we were negotiating with that were
[5] going to do that.
[6] **Q:** What accounts were those?
[7] **A:** It was — we had some customers that we
[8] were negotiating with in Mexico, and they were
[9] going to trade the peso, dollar against the peso,
[10] and also make or take delivery of pesos.
[11] **Q:** And what introducing entity was
[12] representing those customers?
[13] **A:** That customer was a customer that came
[14] directly to us. It wasn't through an introducing
[15] entity that I recall.
[16] **Q:** Did that customer ever open an account?
[17] **A:** No, no, but we sent them documents.
[18] **Q:** That was just one customer?
[19] **A:** There were other clients that asked and
[20] we told them they can't, or IB's asked if they
[21] could take delivery or if their clients can. I
[22] told them they could on a delivery-versus-payment

Page 155

[1] basis only.
[2] **Q:** But no customer actually received
[3] delivery from Universal; is that correct?
[4] **A:** Not to my knowledge, no.
[5] **Q:** So, no Sterling customer took delivery?
[6] **A:** Not to my knowledge.
[7] **Q:** Did any customer make delivery of a
[8] foreign currency to Universal?
[9] **A:** I don't recall if anybody did. I don't
[10] recall if anybody had made delivery of a foreign
[11] currency.
[12] **Q:** As far as you know, no one from Sterling
[13] made delivery of a foreign currency?
[14] **A:** Not that I recall.
[15] **Q:** If the market moved against a customer
[16] position so that the customer account had
[17] insufficient margin, what did Universal do?
[18] **A:** Well, we had — the software had an
[19] alert, that would alert us that they were below
[20] margin requirements.
[21] **Q:** And then what happened after you got the
[22] alert?

Page 156

[1] **A:** I don't recall exactly what our procedure
[2] was. There was also a liquidation level that the
[3] client would be liquid — the positions would be
[4] liquidated. Typically we would try to contact the
[5] IB if clients were below margin.
[6] **Q:** So you contacted the introducing entity,
[7] not the customer?
[8] **A:** Correct.
[9] **Q:** How did most customers meet margin calls?
[10] **A:** I don't know exactly. Assuming they
[11] would send more money.
[12] **Q:** What role did you have in obtaining
[13] information about margin calls and relaying them to
[14] introducing entities?
[15] **A:** I would just notify introducers when
[16] we — because it would pop up on our screen, and it
[17] would pop up on their screen as well, if they had
[18] their screen on.
[19] **Q:** How long did a customer have to meet a
[20] margin call?
[21] **A:** Again, I am not familiar with what our
[22] procedure was for that.

Page 157

[1] **MS. OHLMILLER:** Peter, one of the
[2] documents, 510156.
[3] **MR. HAAS:** I will have to go get it.
[4] Can you skip ahead to the next one?
[5] **BY MS. OHLMLLER:**
[6] **Q:** What was the procedure for a customer who
[7] wanted to receive delivery?
[8] **A:** The procedure, we didn't have a set
[9] procedure. Again, they would have to notify us
[10] either through the IB — generally through the IB,
[11] as to their intention.
[12] **Q:** When and where did the customer pay
[13] dollars — where and when was the customer expected
[14] to pay dollars?
[15] **A:** They may not necessarily pay dollars. It
[16] would depend on what their — what the transaction
[17] was. They may have been selling dollars —
[18] **Q:** I said receive delivery of a foreign
[19] currency.
[20] **A:** When would they be expected to pay
[21] dollars?
[22] **Q:** When and where?

Page 158

[1] A: When would be two days prior to us
[2] sending the currency, depending on the currency,
[3] and where would be our bank account, our U.S.
[4] dollar bank account with either City National Bank
[5] or Wachovia.
[6] Q: Now, if I did a trade today with
[7] Universal, it has a value date two days from now,
[8] are you saying I would have to deposit the money
[9] today in order to get delivery two days from now?
[10] A: Right. If it was Canadian dollar, I
[11] would be able to do it in one day.
[12] Q: I believe you said you had an account, so
[13] if I wanted to get that currency, you could?
[14] A: Yes. As there was a possible need, we
[15] would talk to Wachovia or City National — Wachovia
[16] is where we were going to do our foreign currency
[17] transactions, and they had specific — they did
[18] have the ability for us to transfer in certain
[19] currencies, euros, Sterling, account that is tied
[20] to our account and our counter-party was prepared
[21] to send us currency.
[22] So we had prepared how we would do it,

Page 159

[1] and we had the ability to do it through the bank
[2] and through our counter-party. The reason I need
[3] two days is so I can get the currency from the
[4] party. We were also a DVP account with the
[5] counter-party.
[6] Q: The accounts to hold the currencies, for
[7] instance, British pounds, that was a U.S. account
[8] that would hold British pounds?
[9] A: It would be through our U.S. bank,
[10] Wachovia. I am not 100 percent sure how the
[11] banking system works. I don't believe you can hold
[12] foreign currency in a U.S. bank. You can only hold
[13] it in a bank in the country of the currency, so you
[14] would have to have a corresponding bank account.
[15] Wachovia can't hold euro dollars in a bank in the
[16] U.S., but they can hold it in Wachovia in Europe or
[17] a correspondent bank of theirs for their behalf in
[18] Europe, but they can credit our foreign currency.
[19] To us it would be a U.S. bank account.
[20] Q: And the customer would have to have
[21] something similar to receive the currency; is that
[22] correct?

Page 160

[1] A: Yes, they would have to have — their
[2] bank would have to have a currency account, like
[3] most major banks have the ability for you to
[4] deposit foreign currency, but you have to arrange
[5] it with them prior.
[6] Q: What did Universal do to determine ahead
[7] of time whether prospective customers had the
[8] appropriate accounts in place to make or take
[9] delivery of a foreign currency?
[10] A: We wouldn't do anything. They were
[11] expected to do that on their own if they wanted to
[12] take delivery.
[13] Q: If a customer wanted to deliver a foreign
[14] currency to Universal, the customer would have to
[15] maintain a correspondent account of some sort to
[16] hold the currency in the foreign jurisdiction?
[17] A: No, they wouldn't. We would have that.
[18] If they were making delivery to us, we would have
[19] to do that.
[20] Q: How were they going to get the currency
[21] to deliver to you?
[22] A: They would wire it to us from wherever —

Page 161

[1] if they had a U.S. bank, for example, Citibank, if
[2] the client dealt with Citibank and he had British
[3] pounds in his British pound account, he had
[4] Citibank in New York, even though physically it is
[5] not really in New York, it is in the UK, but it is
[6] being credited it to his U.S. bank account, he
[7] would wire transfer money from his U.S. bank
[8] account which would again technically come from a
[9] British bank but through his U.S. Citibank account
[10] to us, and it would come to our British pound
[11] account.
[12] Q: How would a customer notify Universal
[13] that he planned to make delivery of a foreign
[14] currency?
[15] A: Either through his IB, verbally or in a
[16] fax if he wanted to.
[17] Q: When would you expect the foreign
[18] currency to be delivered?
[19] A: For them to deliver a currency, it
[20] wouldn't make a difference when. We would credit
[21] their account if and when we received it. If we
[22] were going to make delivery, then we would demand

Page 162

[1] the money for the corresponding currency up front
[2] and we would have to verify it was all there before
[3] we could make delivery.
[4]     MS. OHLMILLER: Do you have the document
[5] now, Peter?
[6]     MR. HAAS: Yes. 156.
[7]     MS. OHLMILLER: Can we mark this as
[8] Exhibit 11, please.
[9]     (Michael Exhibit No. 11 was
[10] marked for identification.)
[11]     MR. HAAS: Can I ask one more question
[12] related to what you just finished?
[13]     BY MR. HAAS:
[14]     Q: You referred to ACTFOREX and Choice.
[15] When did Choice come in?
[16]     A: The actual change, I believe it was
[17] right — beginning of September, 2003, but like I
[18] said, we were preparing — we went through two
[19] other platforms that we were planning to implement
[20] together, Broker Box and FOREX Manage. For six
[21] months we were trying to phase into it and we had
[22] actually moved client data to FOREX Manage probably

Page 163

[1] five times in that period but didn't turn it on
[2] live because we didn't feel comfortable enough that
[3] it was ready to go, and then we decided to go with
[4] Choice because the changeover was easy.
[5]     Q: To go to Choice?
[6]     A: Choice FOREX — Choice FX is what it is
[7] called.
[8]     Q: And that was in place from September 2003
[9] until the end?
[10]     A: Yes.
[11]     Q: Did the ACTFOREX system have the ability,
[12] if the customer wanted to make or take delivery of
[13] a currency, for that event to be recorded or
[14] inputted into the ACTFOREX system?
[15]     A: They told me it had that ability. I was
[16] going on what they told me. I believe they told us
[17] it had that ability, and if it didn't, we would
[18] have created our own accounting for that, but I
[19] believe it did have that ability.
[20]     I did have many conversations with
[21] ACTFOREX about how it reported, how the system
[22] reported rolls and, like you said, settlements, and

Page 164

[1] they always said they were changing that. That
[2] kept us on longer than we would have, but it never
[3] really materialized.
[4]     Q: One other point before I let you get to
[5] Exhibit 11, which is with respect to rollovers,
[6] what documents were created at the time — you say
[7] a rollover happened if a client didn't give
[8] instructions on it and the system did it
[9] automatically. What documents were generated to
[10] memorialize that?
[11]     A: There were no documents. It happened
[12] electronically in the back-office system
[13] automatically. We didn't have to manually do it.
[14] If we did, we would have written tickets for each
[15] one, but it did it automatically.
[16]     Q: When the customer's position was closed
[17] out, how were those rollovers reflected in the
[18] account system?
[19]     A: I believe each day it reflected the
[20] rollovers — I am not 100 percent how ACT displayed
[21] it. If it did it one time or each day — I believe
[22] it was each day.

Page 165

[1]     Q: You don't know for sure?
[2]     A: I am really not familiar with the account
[3] statements.
[4]     MR. HAAS: Go ahead, Charlotte.
[5]     (Michael Exhibit No. 12 was
[6] marked for identification.)
[7]     BY MS. OHLMILLER:
[8]     Q: Have you ever seen this before?
[9]     A: Not really — no, not that I recall.
[10]     Q: Can you read through it and let us know
[11] if it accurately reflects your understanding of
[12] what would happen with margin calls?
[13]     A: Okay.
[14]     (Pause.)
[15]     BY MR. HAAS:
[16]     Q: Does it accurately reflect the margin
[17] policy that Universal followed?
[18]     A: No, not even in the least bit. I didn't
[19] even understand this.
[20]     Q: In particular, you have already said you
[21] didn't allow quote hedging?
[22]     A: Correct.

Page 166

[1] Q: What are the other differences?

[2] A: Well, first of all, the times aren't

[3] correct. We did not use 3 p.m. Eastern time. We

[4] used 5 p.m. Eastern time. It didn't do anything 30

[5] minutes — I have never seen any of this take

[6] place, and these amounts, 50 percent, 30 percent

[7] and 10 percent, were variables we could input

[8] customer to customer.

[9] Q: You could put in different percentages

[10] for different customers?

[11] A: We could, if we chose to. It was a

[12] variable on the system. I guess they call these

[13] defaults, but they are variables.

[14] Q: What levels did you customarily use?

[15] A: I think we used a dollar amount, if I

[16] recall.

[17] Q: What were those dollar amounts?

[18] A: You know, I don't recall exactly what the

[19] dollar amounts — I don't recall what they were,

[20] but — I don't remember exactly what the dollar

[21] amounts were, but it was a variable that could be

[22] changed or adjusted depending on what the IB chose

Page 167

[1] to do as long as we agreed, but generally — I know

[2] the liquidation was one-half of the margin level —

[3] actually not one-half — 30 percent of the margin

[4] level, if I remember correctly.

[5] So if the margin level is $1,000, I

[6] believe the maintenance — a margin and a

[7] liquidation, I believe if it went below that

[8] liquidation percentage of the margin, is when it

[9] would liquidate. I don't recall what those amounts

[10] were.

[11] Q: What documents would we look at to find

[12] out what those levels were for Universal?

[13] A: I don't know. I don't know that we have

[14] documented it. I just couldn't tell you.

[15] Q: What obligations did a Universal customer

[16] assume when entering into a FOREX contract with

[17] Universal FX?

[18] A: I am not sure what obligations they would

[19] have. I don't know the exact obligationS. You

[20] mean the technical obligations?

[21] Q: Yes.

[22] A: I don't recall. I believe they would be

Page 168

[1] in the account opening documents.

[2] Q: When entering into a contract, did the

[3] customer have some obligation to staff that

[4] contract in some way?

[5] A: No. The obligation was to meet the

[6] margin requirements to hold that contract. The

[7] only obligation they had was if they were going to

[8] deliver the contract, other than margin

[9] requirements.

[10] Q: So they have no obligation, if they

[11] didn't deliver?

[12] A: They have an obligation if they didn't

[13] deliver, yes, they still had a margin obligation,

[14] if they didn't deliver.

[15] Q: But as long as they kept an adequate

[16] amount of margin, they had no obligation?

[17] A: Correct.

[18] Q: When a customer entered into a FOREX

[19] contract with Universal, what obligations did

[20] Universal take on?

[21] A: To — I don't know the technical

[22] obligations that we had. We have the obligation of

Page 169

[1] making sure that the currency they had, they held

[2] in their account on a margin basis, not settled,

[3] but they had the margin account — they had the

[4] currency on margin, or at least the difference in

[5] the price movement, and the only thing that we

[6] extended was that we allowed them to take delivery.

[7] I don't know that we had any obligations other than

[8] to quote a market.

[9] Q: What is a FOREX contract?

[10] A: I think a FOREX contract is a currency —

[11] amount of currency — a currency pair, say, a

[12] contract between a euro and a dollar, is the

[13] exchange rate between the euro rate and the dollar

[14] rate.

[15] Q: I didn't understand that. Can you

[16] rephrase it?

[17] A: A FOREX contract is a transaction that

[18] occurs between two particular currency pairs and

[19] that stated exchange rate, stated amount, and the

[20] stated value date.

[21] Q: How did Universal FX confirm trades to

[22] customers?

Page 170

[1]   A: We can't confirm trades to customers. It
[2] would be inputted into their account. We would
[3] have a formal confirmation. We generally had a
[4] check-out with IB's who were managing or had power
[5] of attorney over the accounts, and we would have a
[6] check-out process with that. Everything was
[7] on-line.
[8]   Q: So Universal FX never sent paper
[9] statements to customers?
[10]   A: We sent weekly statements that we printed
[11] off of the ACTFOREX system.
[12]   Q: Who physically printed the statements?
[13]   A: Usually one of the girls that worked for
[14] Ben or assisted Ben.
[15]   Q: When you printed the statements, did you
[16] have a way to print them so the customers could see
[17] all the columns?
[18]   A: No, no. We only had the ability that ACT
[19] set up. We couldn't really change the way it was
[20] printed. We printed it right —
[21]   Q: So what was left off?
[22]   A: I don't know. I would have to see a

Page 171

[1] statement possibly.
[2]   Q: In addition to getting paper statements
[3] once a week, you said customers could review their
[4] statements on-line?
[5]   A: Correct.
[6]   Q: How did a customer go about gaining
[7] access to this statements on-line?
[8]   A: He would — he had a user name and a
[9] password, and he could log on.
[10]   Q: And who initialed the user name and the
[11] password?
[12]   A: I am not sure if — I believe the IB's
[13] did, the introducing broker would issue it to the
[14] client.
[15]   Q: What information did Universal FX have
[16] about each user ID and password issued by the IB?
[17]   A: The user word and password was
[18] electronically communicated. We communicated that
[19] to the IB. If we could communicate that to the
[20] customer, we would, but we had no way of
[21] communicating, and they would communicate it to the
[22] client.

Page 172

[1]   Q: If a manager of an account wanted to
[2] access a particular customer's statement, would he
[3] use that customer's ID and password?
[4]   A: I am not sure, actually, if he had his
[5] own — an IB had his own user name and password or
[6] if he would use the client. I am not sure how that
[7] worked.
[8]   Q: Who were your contacts at ACTFOREX?
[9]   A: It has been a while. I think I spoke to
[10] somebody named Alex Melnick, and there was a tech
[11] guy named Bart.
[12]   Q: Anyone else?
[13]   A: Not that I spoke to, no.
[14]   Q: Are you aware of any other ACTFOREX
[15] people that other Universal people talked to?
[16]   A: Certainly there are other ACTFOREX
[17] people. Whether somebody spoke to them or not, I
[18] am not quite sure. There were other people there.
[19]   Q: I would like to talk about the reports
[20] that the ACTFOREX system generated.
[21]     Can you explain for us or give us a list
[22] of the different reports that you could obtain out

Page 173

[1] of the ACTFOREX system?
[2]   A: It has been a long time since I used it.
[3] There were a number of reports. I don't know the
[4] names of them.
[5]   Q: Can you describe the kinds of information
[6] they showed?
[7]   A: There was a blotter, which you actually
[8] showed me, but that really wasn't for the clients.
[9] It was a dealer blotter. Something called a
[10] business report. I don't remember the names.
[11] There were a number of reports. We only used a
[12] few. It has been quite a long time.
[13]   MS. OHLMILLER: Can we mark control
[14] three?
[15]   MR. HAAS: This will be 12.
[16]   (Michael Exhibit No. 12 was
[17] marked for identification.)
[18]           BY MS. OHLMLLER:
[19]   Q: If you look at the first page of this
[20] exhibit?
[21]   A: Yes.
[22]   Q: What is that?

Page 174

[1] A: I have no idea. Where it says, mark to
[2] market?

[3] Q: Yes.

[4] A: I think that is the last page of a
[5] blotter. It has no relevance whatsoever.

[6] Q: Turn to page 2. What is this?

[7] A: This is the very beginning of the
[8] business report by department, and the first — the
[9] beginning is the opening prices — I don't know
[10] what that means actually. The opening prices and
[11] the closing prices — I am sorry. The closing
[12] prices — the prices at 1700 earn time on
[13] 9/29/2002, and then the prices at 1700 GMT on
[14] 10/4/2002, and approximately the time — 1700.

[15] That is what the report would state,
[16] although it looks like the prices were slightly
[17] earlier. That is all that is there. There is a —
[18] beginning of the report that tells you when it was
[19] run, from what day, what time, until what day, what
[20] time.

[21] Q: And then it shows you — so this document
[22] is incomplete, there is something else that is not

Page 175

[1] here?

[2] A: Yes.

[3] MR. HELWIG: Do you recognize this?

[4] THE WITNESS: This is the business
[5] report, I think is the example I gave you. I think
[6] I said business report.

[7] BY MS. OHLMLLER:

[8] Q: Could you request a business report, give
[9] it dates, and then it would print out for you?

[10] A: Yes.

[11] Q: So this is something you could run
[12] yourselves?

[13] A: Correct.

[14] Q: Just going to the very bottom of that
[15] page, it says, department name, and then it says,
[16] main dot company dot trading internal, dot
[17] international for trading group. What does that
[18] mean?

[19] A: That pertained to an IB entitled FOREX
[20] International Trading Group. The rest of it is
[21] programming.

[22] Q: Would you look at the next page, which is

Page 176

[1] 510-137. What is that?

[2] A: That is part of the same report.

[3] Q: Actually, I think it is not. The dates
[4] are different business report.

[5] Same kind of report?

[6] A: Yes.

[7] Q: Is this how the end of the first report
[8] would look, sort of?

[9] A: Yes, that is exactly how it would look.

[10] Q: Can you, in a little more detail, explain
[11] to us how to read this and what it all means?

[12] A: I am not sure what — line 13, I think
[13] that is the aggregate of all of these, all these
[14] IB's, and then it would go through each IB, give
[15] you their start balance, which I believe is
[16] starting equity balance of all of the clients
[17] within that IB, the beginning equity for that
[18] period — all refers to the period, the deposits, and
[19] withdrawals, the net of the deposits and
[20] withdrawals.

[21] Turnover, we never really figured out
[22] from ACT what that meant. I don't know. I don't

Page 177

[1] know what fix means. There are certain things in
[2] reports that we use, some things we never realized
[3] what they meant. Realized P&L is the P&L, I
[4] believe, on closed positions, and then OM and CM,
[5] open markups, close markups, I don't understand
[6] what that means either.

[7] Premium is the premium charges to the
[8] accounts for the rolls, and then total commissions
[9] for the accounts. Ending balance, and ending
[10] equity. I believe the equity reflects the — the
[11] difference is the open trades, if they have them —

[12] Q: The value of the open trades added to the
[13] balance?

[14] A: I believe so, yes.

[15] Q: And this is called a business report by
[16] department?

[17] A: Correct.

[18] Q: Would you turn to the next page. What is
[19] this?

[20] A: This is an account transactions report,
[21] which I rarely used, but what I believe this report
[22] reflects transactions that hit any particular

**Page 178**

[1] account. I think it was anything but trades.

[2] **Q:** Adjustments, deposits and withdrawals?

[3] **A:** Yes, I believe that is what it is.

[4] **Q:** This is something that you could print for any

[5] days you picked?

[6] **A:** Yes.

[7] **Q:** Is this a report that someone printed and

[8] kept every day?

[9] **A:** No, no.

[10] **Q:** What about the previous — the

[11] transactions by department?

[12] **A:** No.

[13] **Q:** Is that —

[14] **A:** No, that possibly could be a report that

[15] Oneilio would print to get a client balance, to

[16] help us to reconcile our trading P&L, but — that

[17] might be the report that he would take to get the

[18] client balance, client equity balance, but we

[19] didn't routinely print that.

[20] **Q:** Skip the next document and go on to the

[21] next, looks like report, statement of department.

[22] It is document 510-182 at the top. What is this?

**Page 179**

[1] **A:** I don't know that I have ever seen this

[2] report. It doesn't look familiar. There are

[3] several reports I have never run. This could be

[4] one of them.

[5] **Q:** Do you want to go on to the next page?

[6] **A:** Sure.

[7] **Q:** What is this?

[8] **A:** I am not familiar with this either. I

[9] have never seen this report.

[10] **Q:** Document 510-260, almost to the end.

[11] What is this?

[12] **A:** Looks like it might be a client report,

[13] giving the account number and the name of the

[14] client.

[15] **Q:** Have you ever seen a number like this

[16] before?

[17] **A:** I have seen a client list. I am not sure

[18] if this is it. There are a number of different

[19] client list reports.

[20] **Q:** Would you look at the next page?

[21] **A:** Sure.

[22] **Q:** This is 510-271.

**Page 180**

[1] **A:** Yes.

[2] **Q:** What is this?

[3] **A:** It looks like it just puts — that is a

[4] report, FOREX puts a name to an IB, which in turn

[5] puts a name to the client, it is attached to the

[6] client. That is what I believe it is.

[7] **Q:** And the next document?

[8] **A:** I have never seen this.

[9] **Q:** 510-301?

[10] **A:** Right. I have never seen this. Looks

[11] like client name and Social Security and date of

[12] birth.

[13] **Q:** 510-326. What is this?

[14] **A:** Never seen it before. It is another

[15] report.

[16] **MS. OHLMILLER:** Peter, would you mark

[17] control 2?

[18] (Michael Exhibit No. 13 was

[19] marked for identification.)

[20]      **BY MS. OHLMILLER:**

[21] **Q:** This is Exhibit 13. Mr. Michael, have

[22] you ever seen documents like these before?

**Page 181**

[1] **A:** No.

[2] **MR. HELWIG:** Are they all the same?

[3] Looks like they are all the same.

[4] **THE WITNESS:** I have never seen this

[5] report.

[6]      **BY MS. OHLMILLER:**

[7] **Q:** So you have no idea how Universal used

[8] it?

[9] **A:** I don't know if we ever used it, if we

[10] did. I have never personally seen it.

[11] **MS. OHLMILLER:** Pete, do you want to take

[12] a break?

[13] **MR. HAAS:** Sure.

[14] (Discussion off the record.)

[15] (Brief recess.)

[16]      **BY MS. OHLMILLER:**

[17] **Q:** Going back to Exhibit No. 12. If you

[18] would go to the page marked 510-193. It is about

[19] halfway in. Could you please read that.

[20] **A:** Dear —

[21] **MR. HELWIG:** To himself?

[22]      **BY MS. OHLMILLER:**

Page 182

[1] **Q:** To yourself.

[2] (Pause.)

[3] **THE WITNESS:** Okay.

[4] **BY MR. EDGAR:**

[5] **Q:** Turning your attention to 510-194. Does

[6] reading the e-mail refresh your recollection about

[7] what this document is on 510-194?

[8] **A:** No, I don't recall ever seeing it. I may

[9] not have even read the e-mail ever before.

[10] Oftentimes we tried to get ACT to explain how

[11] numbers and columns were calculated, and it never

[12] made sense to us. I would imagine there was

[13] definitely more than one e-mail from Bart trying to

[14] explain what different columns represented. I

[15] still don't remember ever seeing this report.

[16] **BY MR. HAAS:**

[17] **Q:** Do the definitions on 193 make sense to

[18] you in connection with your normal business

[19] operations at Universal FX, opening markups?

[20] **A:** You know, we were never able — not from

[21] this report, because I don't remember ever seeing

[22] this, but the business report, which has the OM and

Page 183

[1] CM that I never was able to make heads or tails of.

[2] I oftentimes asked them to explain how it was

[3] calculated because it didn't seem to tie up, it

[4] didn't make sense to us, and also when the people

[5] who calculated the markups for the month — it

[6] didn't seem to tie out either.

[7] So I oftentimes asked Bart or someone at

[8] ACT to explain how it is calculated, and he would

[9] send periodically things like this which still

[10] didn't explain to me how the number was calculated

[11] because it didn't seem to make sense.

[12] **Q:** Weren't the markups set by Universal or

[13] in conjunction with the introducing firms?

[14] **A:** Yes. The reports — how it spit out —

[15] **Q:** Isn't this report basically summarizing

[16] information that you firms — either you and the

[17] firms you were dealing with were setting?

[18] **A:** This is taking — theoretically would

[19] take what we set as the markup and apply it to the

[20] amount of the trades and giving you totals. But it

[21] didn't tie out, when we did it manually. We would

[22] manually go through the whole month of statement

Page 184

[1] for, let's say, a client and manually count up,

[2] let's say, markups, and it wouldn't tie out to the

[3] numbers on the report.

[4] **Q:** How did you manually go through and count

[5] up what the markups were for each trade?

[6] **A:** We would print out — you can print out a

[7] statement for a period. Let's say we printed out a

[8] statement for an account —

[9] **Q:** Like an account statement?

[10] **A:** Yes, yes, and it would — you can print

[11] out a statement —

[12] **Q:** Like the same kind of account statement

[13] that a customer would get?

[14] **A:** Yes, exactly.

[15] **Q:** And where did that show what the markup

[16] was?

[17] **A:** It would show — it did show it in the

[18] statements at times. It showed in the statements.

[19] **Q:** It did?

[20] **A:** Yes.

[21] **Q:** So if we had some statements here, you

[22] could show us where the markup was?

Page 185

[1] **A:** I don't know that it always had, but at

[2] some point you were able to do it or you were able

[3] to tell it to print with a markup, all of the

[4] columns. I am not quite sure — I know there was

[5] an ability at some point to go and print the

[6] statements.

[7] **Q:** This was an internal statement that you

[8] could produce that would show the markup, but the

[9] customers wouldn't see that?

[10] **A:** I believe at some point we did send

[11] the — the statements reflected markups.

[12] **Q:** And if Universal produced all of the

[13] account statements to us, then we will have

[14] statements where we can go look and see what the

[15] markup is?

[16] **A:** No. If we wanted to — we would do this

[17] to calculate to see if these numbers were right.

[18] We would do a spot-check, take an account, print up

[19] a statement — we can also just look at the —

[20] let's say we print up a statement and it shows

[21] lots, numbers of lots, five lots, and multiply, we

[22] know what the markup is for that account, multiply

Page 186

[1] by 10 or whatever it was, we can create a total and
[2] go and compare it to the report total —

[3] Q: Is the markup the same on the open and
[4] the close?

[5] A: Some are, some aren't. When we would
[6] spot-check, we would go and we would find out what
[7] the markup is on the open, what it is on the close.
[8] The trades on the statement did show you whether it
[9] was an open or a close. I know it stated that.

[10] This report that you see here, we can
[11] break out into clients as well. It could be by
[12] department, it could be by account, and we can take
[13] a total of, let's say, a period of one month, and
[14] find the markups for that account and then go to
[15] the statements and actually do the math and try and
[16] tie it out —

[17] Q: The statements that you had internally?

[18] A: We would print it just to — just to
[19] calculate — it is not something we kept. We would
[20] create a statement — we periodically can print a
[21] statement. We didn't keep those statements —

[22] Q: I want to get this clear. Universal has

Page 187

[1] the ability to print a statement that reflected
[2] what the markup was?

[3] A: I believe it had — at some point it did
[4] have that ability. I know —

[5] Q: When did it not have the ability and why
[6] did it not have the ability?

[7] A: Why, I don't know, because I really
[8] didn't print statements — the only reason we at
[9] the desk would want to do that is to look and see
[10] if these reports were right, because we were
[11] relying on other numbers on the report, for
[12] example, equity numbers. So we did have a question
[13] whether these numbers were correct in fact. So we
[14] could go back and manually determine what the
[15] markups were, either by looking to see what the
[16] markup amounts were on the statements or by the
[17] number of contracts.

[18] Q: You are saying at some point in time, and
[19] you are not sure when, Universal had the ability to
[20] create an account statement that reflected — that
[21] broke out and stated what the markups were for
[22] individual trades on customer accounts?

Page 188

[1] A: Correct.

[2] Q: Both opened and closed?

[3] A: I don't know if it was opened. It had a
[4] markup column.

[5] Q: Did it have a way of summarizing those
[6] for a period of time?

[7] A: I believe, just like the statements, it
[8] would summarize whatever was on the statement,
[9] period.

[10] Q: And you were also involved, were you not,
[11] in coordinating Universal's request to certain
[12] commission subpoenas for documents, right?

[13] A: Commission subpoena?

[14] Q: CFTC subpoenas?

[15] A: Yes.

[16] Q: One of those subpoenas was for all
[17] account statements relating to Universal customers,
[18] correct?

[19] A: Correct.

[20] Q: And those have been produced to us,
[21] right?

[22] A: Everything that we have.

Page 189

[1] Q: So if you are saying — you know that
[2] some of those account statements with the markups
[3] broken out were created because you have seen them,
[4] right?

[5] A: Yes.

[6] Q: So you have produced everything and they
[7] were kept and we have them?

[8] A: We didn't keep them. We did produce —
[9] we would produce statements periodically — on a —
[10] if we had a discrepancy with an account, we will go
[11] and print a statement for that account and —
[12] sometimes it is easier to look at it visually on a
[13] piece of paper than on a screen, and we would go
[14] through and look for whether something was punched
[15] in correctly or the wrong price, that is how we
[16] would verify it, and we would print the statement
[17] for the account, but we wouldn't keep it. After we
[18] corrected it — there would be no reason to keep
[19] the statement that we printed.

[20] Q: Was this a feature — you said earlier
[21] customers can go on-line —

[22] A: They can print it on-line.

Page 190

[1] Q: Customers can view what the markups
[2] were —

[3] A: I don't know when and if they had that
[4] ability.

[5] Q: Who turned on that feature, who
[6] controlled that?

[7] A: I don't know if that was an ACTFOREX
[8] thing that eventually was available or if we had
[9] that ability. At some point there was an ability.

[10] Q: Looking at page 510-194, which is this
[11] table —

[12] A: Right.

[13] Q: Can you explain what appears to be the
[14] considerable discrepancy in the amounts of what
[15] appear to be the markups on the open and the
[16] markups on the close for these various entries?

[17] A: You mean OMO and —

[18] Q: OMC.

[19] A: No. I couldn't tell you why they are
[20] different. I am not quite sure what OMO — I take
[21] it that means for opening markups during that
[22] period.

Page 191

[1] Q: And OMC is for opening markups in all
[2] positions closed?

[3] A: There must have been more closed trades
[4] during that period than there were open.

[5] Q: Or in the alternative, were there more
[6] markups on trades closed —

[7] A: That is possible. I don't know what the
[8] markups are for each. I couldn't tell you why one
[9] is more or less. Some of them it looks like —

[10] Q: For each one?

[11] A: For one of them. For one of them — I
[12] couldn't tell you. Apparently — either the
[13] closing markup is higher than the opening markup or
[14] there were more closing trades during that period
[15] that we ran the report.

[16] MR. HELWIG: Or both.

[17] THE WITNESS: Or both.

[18] MR. HAAS: Back to you, Charlotte.

[19] BY MS. OHLMLLER:

[20] Q: What Universal employees had
[21] administrative access to the ACTFOREX system?

[22] A: When you say administrative, I think the

Page 192

[1] dealers had administrative access, and back office.

[2] Q: Who would that have been?

[3] A: That would have been either keypunch
[4] people, which is Vicki or Ben Dayan. I guess that
[5] is it. Them or the dealers or another keypunch guy
[6] named Linton that worked for a brief time.

[7] Q: Who had customer service access to
[8] ACTFOREX?

[9] A: Customer service access. I think it is
[10] the same as the administrative access.

[11] Q: What type of access did the traders have
[12] to the ACTFOREX system?

[13] A: I don't think — I don't know there was
[14] any distinction. I think the dealer, when you log
[15] on as a dealer, you had administrative authority or
[16] access to the system.

[17] Q: Now, what about the introducing entities,
[18] what sort of access did they have to the ACTFOREX
[19] system?

[20] A: They, I believe they had access to view
[21] the client accounts. I don't know if they had
[22] the — I never logged in as an IB, but I am sure

Page 193

[1] they had the ability to access the client balances
[2] and see the client trades. They had no
[3] administrative access, I know that.

[4] Q: Did they have the ability to pull reports
[5] for their IB?

[6] A: I believe they did, yes.

[7] Q: Did they have the ability to see open and
[8] close markups?

[9] A: That I am not sure. I believe so. I
[10] believe they would. I just couldn't tell you for
[11] sure. I have never logged in.

[12] Q: Who would know?

[13] A: Other than ACT, Andy would know, possibly
[14] Ben would know, Ben Dayan.

[15] Q: How did Universal pay for the ACTFOREX
[16] platform?

[17] A: It was billed — we paid by check or wire
[18] transfer possibly.

[19] Q: Did Universal make the payments?

[20] A: Yes.

[21] Q: And you directed the payments to
[22] ACTFOREX?

**Page 194**

[1] **A:** As far as I know.

[2] **MS. OHLMILLER:** Peter, the document

[3] beginning 37.

[4] **MR. HAAS:** We are up to 14.

[5] (Michael Exhibit No. 14 was

[6] marked for identification.)

[7]         **BY MS. OHLMILLER:**

[8] **Q:** Do you know what these are?

[9] **A:** It looks likes a confirmation of a wire

[10] transfer.

[11] **Q:** And in particular, they are wire

[12] transfers to ACTFOREX. And who is the wiring

[13] party?

[14] **MR. HAAS:** It looks like what I gave

[15] Mr. Michael as 14 is multiple copies of the same

[16] page. We have additional ones here. I think we

[17] ended up breaking it apart.

[18] **MS. OHLMILLER:** Could you do that —

[19] could you put it all together?

[20]         **BY MS. OHLMILLER:**

[21] **Q:** Who paid the ACTFOREX bills?

[22] **A:** As far as I know, Universal FX.

**Page 195**

[1] Apparently these came from Universal Financial

[2] Holding Corporation.

[3] **Q:** Can you explain why that happened?

[4] **A:** No, I really can't. I can't explain that

[5] at all. I didn't have any wire transfer ability.

[6] I am under the assumption that it came from

[7] Universal FX. I couldn't tell you.

[8] **Q:** At some point in time, did you become

[9] aware of disagreements between Universal FX and

[10] ACTFOREX over money?

[11] **A:** Yes.

[12] **Q:** What was the problem?

[13] **A:** I was confused. I am sorry. Can you

[14] repeat the question?

[15] **MS. OHLMILLER:** Can you read it back?

[16] (The reporter read the requested portion

[17] of the record.)

[18] **THE WITNESS:** The problem was that they

[19] were charging an exorbitant amount per trade, and

[20] we were — we had — they had originally negotiated

[21] a deal with Andy that was impossible to survive as

[22] a business because our model was considerably

**Page 196**

[1] different than ACTFOREX's typical clients, which I

[2] tried to explain.

[3] We don't take the other side of trades,

[4] so our profit margin was not like a typical

[5] ACTFOREX client, and we couldn't pay the amount per

[6] transaction they demanded and we negotiated back

[7] and forth and they constantly wanted to charge more

[8] for things that made no sense. It was a business

[9] decision. We tried to input counter-party

[10] transactions to the system so that it would help us

[11] balance, and then they were charging us for

[12] inputting counter-party transactions which were

[13] transactions we didn't even do on the system. It

[14] was business-related issues about their billing and

[15] that is what it amounted to. It never got

[16] resolved.

[17] **Q:** What documents did Universal FX have with

[18] regard to the disputes over billing?

[19] **A:** What documents did we have?

[20] **Q:** Yes.

[21] **A:** I don't know of any documents. We had

[22] e-mails back and forth.

**Page 197**

[1] **Q:** And where were the e-mails kept?

[2] **A:** They were kept in the in-box of my e-mail

[3] or Andy's e-mail or whoever they corresponded with.

[4] We didn't continuously keep — I didn't personally

[5] keep those e-mails, but we did correspond by

[6] e-mail, by telephone. We had numerous

[7] conversations over billing.

[8] **Q:** So, today you have no way to retrieve

[9] those e-mails?

[10] **A:** No, I don't have the e-mails.

[11] **Q:** Did you print them?

[12] **A:** Yes, I am sure I printed some of them or

[13] most of them possibly. I just didn't save them.

[14] **Q:** You didn't save the printed copies

[15] either; is that what you said?

[16] **A:** Correct. I never expected I would need

[17] them.

[18] **MS. OHLMILLER:** Okay, Peter, do you have

[19] any questions?

[20] **MR. HELWIG:** Can I ask one follow-up? I

[21] think when you described the dispute, you told

[22] ACTFOREX you didn't have the same business model

**Deposition of Steven Michael**
**March 1, 2004**

C...ain Foreign Currency Trading
Companies (Universal FX)

Page 198

[1] that other of their clients had. You said, "We
[2] don't take the other side of the trade." I think
[3] you collapsed two thoughts there.
[4]    You did take the immediate other side of
[5] the customer, but then you laid off?
[6]    THE WITNESS: Yes. Good to clarify that.
[7]    MR. HAAS: We are up to 15.
[8]    (Michael Exhibit No. 15 was
[9] marked for identification.)
[10]           BY MR. HAAS:
[11]    Q: This is another order ticket.
[12]    A: Yes.
[13]    Q: Do you recognize whose initials those
[14] are?
[15]    A: AB, Art Buckner.
[16]    Q: Does this indicate which introducing firm
[17] the trade is being done for?
[18]    A: No.
[19]    Q: With respect to the count numbers or IB
[20] numbers, are those broker IB numbers or is there a
[21] way to figure out what the firm is from those?
[22]    A: These are client account numbers.

Page 199

[1]    Q: So if you could find that client account
[2] numbers in the account statements, that would tell
[3] you what the firm is?
[4]    A: Yes.
[5]    Q: Under the buy column, they are buying
[6] three, and there is one each at three different
[7] prices?
[8]    A: Yes.
[9]    Q: Is there a way to tell which client got
[10] which price?
[11]    A: It was done electronic, on the platform.
[12] It went into the — the trade that corresponded to
[13] 573 went into — that price went into that client
[14] account. We had no intervention. He probably was
[15] busy, wrote all three trades down, but it
[16] electronically went to that client because it was
[17] electronically done on the phone.
[18]    Q: You are saying electronically these were
[19] done individually?
[20]    A: Yes.
[21]    Q: But that was for the sake of convenience,
[22] somebody wrote the three trades on one order

Page 200

[1] ticket?
[2]    A: Yes.
[3]    Q: And there is a date and time indicated on
[4] here, but no time stamp?
[5]    A: No, because he probably didn't have a
[6] time stamp, so he manually wrote something which is
[7] not going to be exact because there were three
[8] separate trades.
[9]    Q: And here it indicates there was a
[10] counter-party buy, and it shows what the price is?
[11]    A: Yes.
[12]    Q: One was five PIPS different, one was six
[13] PIPS different and one was seven PIPS different?
[14]    A: Yes.
[15]    Q: But there is no way to tell if these were
[16] done at the same time or near the same time?
[17]    A: They couldn't have been done exactly the
[18] same time, but they probably were near the same
[19] time, and he just covered all three. At some point
[20] he bought 31 from IFX.
[21]    Q: Was there a sequence followed routinely
[22] in terms of whether the customer trades were done

Page 201

[1] first and then covered or whether a customer order
[2] came in and then you covered it and then placed the
[3] trade?
[4]    A: No. We always first did — traded with
[5] the customer.
[6]    Q: This will be 16.
[7]    (Michael Exhibit No. 16 was
[8] marked for identification.)
[9]           BY MR. HAAS:
[10]    Q: As this was produced to us, it was
[11] several pages. Is there anything here that tells
[12] you what the introducing firm was that was putting
[13] in these orders?
[14]    A: Actually CT, which is the currency
[15] trader.
[16]    Q: When it says, other, is that telephone?
[17]    A: Yes.
[18]    Q: And here, it looks like eight accounts
[19] where there are orders being put in for?
[20]    A: Correct.
[21]    Q: And is there anything that tells us
[22] whether these came in at the same time or different

Page 202

[1] times?

[2] A: No. They bought 1.4 million euros and

[3] give us the break down.

[4] (Michael Exhibit No. 17 was

[5] marked for identification.)

[6] BY MR. HAAS:

[7] Q: This is, again, an order ticket — pair

[8] of order tickets that were stapled and given to us

[9] in the production. It has the notation MC 3 on it.

[10] What is that?

[11] A: It was a liquidation. The system

[12] automatically, when it hits liquidation, it

[13] liquidates the account or whatever positions they

[14] have, and we oftentimes don't know until —

[15] sometimes hours later. It is one of the flaws of

[16] ACTFOREX. A lot of times we didn't catch these

[17] margin calls for a long time.

[18] Q: And this does have a time stamp on it?

[19] A: Yes, but it is not the time of the margin

[20] call. It is done electronically. Automatically in

[21] the system it is done.

[22] Q: And can you explain why there would be

Page 203

[1] the discrepancy between the two prices, between

[2] what it was bought at for the customer and what the

[3] IFX trade was?

[4] A: I would like to say the dealer was a good

[5] trader, but more likely this margin call — it

[6] happens electronically and there is no warning —

[7] there is like a buzzer, but you don't hear it, you

[8] don't know about the margin calls sometimes for

[9] hours later. So a lot of times we lost a lot of

[10] money in these margin calls because they always

[11] happen when the market is in a crazy mode, and it

[12] is a guess whether you are right or wrong. I am

[13] anticipating that margin call took place

[14] considerably earlier than —

[15] Q: Than when it was covered?

[16] A: Yes. That was normally what happened.

[17] We had no intervention on the margin calls. They

[18] happened as soon as they hit a percentage.

[19] MR. HAAS: I will mark this as 18.

[20] MS. OHLMILLER: Which document is it?

[21] MR. HAAS: Set of account statements for

[22] a FOREX change corporation customer — know what,

Page 204

[1] we will skip this. I am going to change my mind

[2] because it was for another question that you

[3] covered earlier and we don't need to do that.

[4] That is it. Do you have anything else,

[5] Charlotte?

[6] MS. OHLMILLER: No.

[7] MR. HAAS: Mr. Helwig, anything you want

[8] to clarify?

[9] MR. HELWIG: I don't believe so.

[10] MR. HAAS: Okay. Mr. Michael. We will

[11] adjourn your testimony. I will tell you that the

[12] standard disclosure is that we reserve the right to

[13] request additional testimony from you if at some

[14] point it becomes necessary for us to do so, but we

[15] have no further questions for you at this time, and

[16] I understand you have a plane to catch, so we will

[17] close the record here.

[18] (Whereupon, at 4:54 p.m., the taking of

[19] the deposition was concluded.)

[20] (Signature not waived.)

[21]

[22]

Page 205

CERTIFICATE OF DEPONENT

I have read the foregoing 204 pages,
which contain the correct transcript of the answers
made by me to the questions therein recorded.

STEVEN MICHAEL

Subscribed and sworn to before me this
day of _____, 2001.
Notary Public in and for
My commission expires:

**Lawyer's Notes**

## $

**$.2 million** 129:2
**$1,000** 75:13; 167:5
**$1,250** 18:12
**$1,500** 103:19
**$10,000** 75:4, 5
**$100,000** 134:21
**$11,000** 75:9
**$15,000** 103:14
**$500** 18:4

## 0

**00031** 105:18
**00049** 105:15
**00075** 105:2
**00077** 105:7

## 1

**1** 5:2, 3, 16; 6:19; 28:5, 7, 17; 98:10; 128:19; 129:21
**1,000** 107:20, 21; 108:3
**1.00** 108:5
**1.000** 108:4
**1.01** 108:5
**1.4** 202:2
**10** 66:2; 120:9, 10, 14; 132:13; 147:13, 166:7; 186:1
**10,000** 108:9
**10/4/2002** 174:14
**100** 29:10; 64:15; 108:4, 5, 7; 113:21; 114:19; 117:2; 129:14; 139:15; 140:1, 14; 159:10; 164:20
**100,000** 134:8, 17; 135:2
**1001** 6:20
**11** 162:8, 9; 164:5
**110.50** 79:21
**110.53** 79:22
**113.95** 129:22
**118.36** 128:20; 129:2
**11:00** 66:12
**12** 165:5; 173:15, 16; 181:17
**121.46** 28:18
**121.80** 28:6, 7
**126** 24:12
**13** 176:12; 180:18, 21
**14** 94:12, 194:4, 5, 15
**15** 198:7, 8
**155** 30:22
**156** 162:6
**16** 201:6, 7
**185** 28:5
**167** 27:8, 22; 28:2, 6, 10, 14; 29:7; 31:1, 12, 42:6; 117:1, 8; 119:6

**17** 202:4
**1700** 174:12, 13, 14
**18** 6:20; 203:19
**180** 79:21
**18:22:32** 131:6
**193** 182:17
**1985** 22:18
**1996** 22:18
**1999** 50:5
**1:02** 110:4
**1:45** 110:5
**1:55** 111:2

## 2

**2** 5:17, 18; 6:7; 27:19; 98:11, 13; 174:6; 180:17
**20** 65:20; 92:16; 93:1, 22; 94:2; 103:5
**2002** 46:17; 48:3; 51:3; 55:3; 62:10, 15; 112:22
**2003** 8:18; 63:1, 10, 15; 72:13; 86:9, 10; 98:11; 114:17; 120:4, 5; 162:17; 163:8
**21** 92:17
**22** 93:2
**24** 26:11; 65:22; 93:1, 22; 94:1
**25** 92:16; 104:3, 13
**26** 92:17
**27** 7:2; 93:2
**2nd** 5:14

## 3

**3** 7:1, 9; 23:6, 7, 12, 13, 15; 27:19; 166:3; 202:9
**30** 166:4, 6; 167:3
**31** 200:20
**348778** 130:2
**37** 194:3

## 4

**4** 24:7, 8, 11; 25:5; 26:20; 27:19; 38:20; 119:18; 120:7
**4:54** 204:18

## 5

**5** 94:6, 7; 166:4
**50** 17:4; 18:8; 166:6
**510-122** 28:16
**510-123** 30:20
**510-137** 176:1
**510-182** 178:22
**510-193** 181:18
**510-194** 182:5, 7; 190:10
**510-260** 179:10

**510-271** 179:22
**510-301** 180:9
**510-326** 180:13
**510121** 24:12
**510156** 157:2
**5200** 12:17
**561-886-2600** 19:18
**573** 199:13
**5781** 130:7
**5:00** 73:15; 88:14; 136:13

## 6

**6** 97:18, 19

## 7

**7** 102:2, 5

## 8

**8** 98:15; 100:3; 104:16, 19
**800** 19:19, 20
**8:00** 137:6

## 9

**9** 105:10, 11
**9/29/2002** 174:13
**95** 49:17
**97** 49:6, 17
**99** 49:1, 6

## A

**A-L-L-O-C** 124:2
**A-V-I-D-A-S** 12:14
**A-V-I-D-U-S** 12:15
**AB** 198:15
**ability** 54:18; 74:22; 76:9; 79:8; 90:7; 115:18, 19, 22; 139:8, 11; 146:5, 6; 147:9; 151:18; 153:7; 158:18; 159:1; 160:3; 163:11, 15, 17, 19; 170:18; 185:5; 187:1, 4, 5, 6, 19; 190:4, 9, 9; 193:1, 4, 7; 195:5
**able** 26:12; 51:18; 57:5; 59:8; 61:19, 69:21; 146:10; 158:11; 182:20; 183:1; 185:2, 2
**above** 109:3
**accept** 114:8; 143:14
**accepting** 69:14
**access** 6:1; 18:11; 58:14; 113:10; 171:7; 172:2; 191:21; 192:1, 7, 9, 10, 11, 16, 18, 20; 193:1, 3
**accessed** 113:13
**account** 8:12; 16:7, 13, 18; 21:8; 21:5, 8, 16;

**23:17, 19, 21, 22; 24:4; 25:20, 21, 21; 27:7; 28:2, 14; 29:8; 31:13; 33:4, 5; 38:9; 39:2, 4, 7, 7, 10, 10; 41:21; 42:7; 43:2, 4; 44:20; 53:9; 54:15, 22; 55:20; 56:2, 3, 7, 11; 57:1, 3, 4, 19, 21, 22; 58:1, 4, 17, 17, 18, 20; 59:4, 21; 61:3, 4; 71:4; 79:9; 80:1; 83:3, 7, 20; 84:10, 10, 14; 85:6, 7, 13; 102:7, 9, 15, 18; 103:1, 14; 104:2, 20; 109:10; 114:6, 9; 117:1; 118:6, 20; 119:4, 5, 5, 6; 126:11, 12; 140:11, 19; 141:5; 142:17; 143:5; 145:13; 154:16; 155:16; 158:3, 4, 12, 19, 20; 159:4, 7, 14, 19; 160:2, 15; 161:3, 6, 8, 9, 11, 21; 164:18; 165:2; 168:1; 169:2, 3; 170:2; 172:1; 177:20; 178:1; 179:13; 184:8, 9, 12; 185:13, 18, 22; 186:12, 14; 187:20; 188:17; 189:2, 10, 11, 17; 198:22; 199:1, 2, 14; 202:13; 203:21**
**account** 75:8
**account-opening** 60:11
**accountant** 87:2, 21; 89:13
**accounting** 22:16; 28:8; 73:13; 88:21, 22; 136:10, 12; 163:18
**accounts** 7:15, 15; 11:13; 20:20; 22:4, 6; 28:4; 34:9; 36:1, 3, 9, 15, 22; 37:3, 17, 20; 38:1; 52:20, 21; 53:2, 18, 19; 54:2, 6, 7, 9; 55:22; 56:1, 1, 17; 58:8, 8; 69:19, 19; 77:16; 78:8; 86:2; 88:11; 91:5; 113:11, 13; 124:9; 126:15; 127:19; 148:15; 150:19; 153:21; 154:1, 2, 4, 6; 159:6; 160:8; 170:5; 177:8, 9; 187:22; 192:21; 201:18
**accumulated** 88:5
**accumulating** 35:4
**accurate** 7:18, 20; 34:13, 17; 80:20; 95:5; 101:1, 1, 2, 4, 5
**accurately** 165:11, 16
**ACT** 34:5, 19; 41:19; 51:13; 57:2; 72:21; 74:8; 76:9; 79:9, 20; 84:8; 118:9; 122:1, 14, 15; 124:22; 139:19, 20; 146:12, 19; 151:2; 164:20; 170:18; 176:22, 182:10; 183:8; 193:13
**acted** 59:17
**ACTFOREX** 25:8, 26:6, 7, 27:10, 12, 13, 30:19; 31:17, 38:20; 39:6, 21, 41:11; 44:13; 57:7, 12, 14; 58:13; 59:5, 7; 74:21; 98:19, 20; 116:14; 121:22;

**122:2, 4; 134:9; 135:13, 13, 19; 137:18, 21; 138:4, 12; 146:5, 17; 162:14; 163:11, 14, 21; 170:11; 172:8, 14, 16, 20; 173:1; 190:7; 191:21; 192:8, 12, 18; 193:15, 22; 194:12, 21; 195:10; 196:5; 197:22; 202:16**
**ACTFOREX's** 196:1
**acting** 90:18
**action** 46:2, 11
**active** 8:3; 11:3; 16:2; 20:8
**actively** 12:1, 2; 20:7; 21:20
**actual** 104:9; 162:16
**actually** 11:13; 16:3; 21:22; 27:9; 29:5; 30:4; 31:6; 34:4, 21; 39:6; 44:22; 51:12; 87:20; 112:8; 114:17; 121:13; 138:14; 139:7; 143:6; 149:7; 155:2; 162:22; 167:3; 172:4; 173:7; 174:10; 176:3; 186:15; 201:14
**add** 82:16, 18; 84:2; 95:20; 96:2; 132:19; 151:11
**added** 82:22; 83:14; 106:20; 177:12
**addition** 12:10; 100:16; 107:11, 12; 108:22; 171:2
**additional** 194:16; 204:13
**address** 20:10; 45:6
**addressed** 45:8
**addresses** 7:14; 20:5, 6
**adequate** 168:15
**adjourn** 204:11
**adjust** 73:18; 83:7; 88:8
**adjusted** 75:11; 166:22
**adjusting** 88:9
**Adjustments** 178:2
**administration** 10:8
**administrative** 191:21, 22; 192:1, 10, 15; 193:3
**administrator** 112:10
**advantageous** 91:17
**adventure** 19:15
**advertise** 19:22; 20:1, 2
**advised** 10:1
**Advisors** 8:1, 20; 9:3, 4, 10, 15; 10:2, 9, 16, 20; 22:3
**affiliation** 38:14; 112:6
**AFTERNOON** 111:1, 137:6
**Agabs** 9:18; 22:1
**Again** 11:20; 20:12; 23:13, 27:7; 31:16; 43:5, 80:11; 82:14; 99:2; 104:12; 105:2, 5; 123:4; 133:3; 136:22; 139:14; 140:6, 13; 142:9; 156:21;

**Deposition of Steven Michael**
**March 1, 2004**

Certain Foreign Currency Trading
Companies (Universal FX)

157:9; 161:8; 202:7

**against** 27:15; 28:3, 14;
71:21; 75:22; 91:19;
124:17; 154:9; 155:15
**agency** 46:3
**aggregate** 75:7, 9; 76:13,
18; 176:13
**ago** 21:14, 17; 23:13;
24:3; 36:19; 98:9; 125:14
**agreed** 5:15; 83:3; 167:1
**agreement** 16:12, 13;
17:3; 115:10
**ahead** 25:4, 22; 127:8;
146:2; 160:6; 165:4
**AI** 22:11
**alert** 116:15, 17, 18;
152:15; 155:19, 19, 22
**Alex** 172:10
**alleging** 46:11
**allocate** 17:1; 124:8, 12
**allocated** 124:6, 7, 9
**allocation** 126:16, 20;
127:1, 3, 12, 14
**allocations** 127:10, 20
**allow** 57:22; 58:2; 78:11;
85:2, 3; 133:16; 136:6;
139:19; 142:16; 145:12;
146:7, 21; 165:21
**allowed** 37:16; 98:20;
138:12; 139:16; 154:3;
169:6
**allows** 151:11
**almost** 179:10
**along** 17:14; 60:8
**alternative** 191:5
**although** 15:21; 24:19;
25:12; 174:16
**always** 30:15; 34:8, 11;
38:6; 56:5; 74:10; 76:15;
80:20; 81:14; 92:10; 93:2;
101:1; 119:5; 123:21;
125:3; 127:7; 135:16;
136:9; 150:18; 164:1;
185:1; 201:4; 203:10
**among** 120:2
**amount** 15:3; 134:12;
136:6; 143:21; 144:2, 5, 6,
7; 151:5, 22; 153:11, 16;
166:15; 168:16; 169:11,
19; 183:20; 195:19; 196:5
**amounted** 196:15
**amounts** 76:10; 96:17;
166:6, 17, 19, 21; 167:9;
187:16; 190:14
**analyze** 18:14, 19
**Andrew** 19:14
**Andy** 37:18; 47:12, 13,
17, 19; 48:3; 50:13; 66:18;
67:7, 11; 74:19; 86:6;
87:11, 12; 114:2; 193:13;
195:21
**Andy's** 197:3
**answered** 49:15; 141:18
**anticipating** 203:13
**anymore** 117:4

**apart** 194:17
**API** 137:14, 14
**Apparently** 191:12;
195:1
**appear** 190:15
**appearing** 100:6
**appears** 33:12; 121:17;
129:7; 190:13
**application** 16:13
**applies** 6:20
**apply** 183:19
**appreciate** 24:22
**appropriate** 160:8
**approximately** 8:18;
21:18; 46:16; 47:5; 49:17;
62:22; 67:13; 98:9;
112:22; 114:17; 125:20;
174:14
**April** 114:18; 120:4
**archive** 26:8
**area** 26:1; 48:12
**areas** 63:20
**arithmetic** 142:1, 3
**Around** 46:20, 21; 62:10,
17; 63:9; 66:14; 70:5; 82:3;
91:4; 114:16, 17; 132:9
**arrange** 160:4
**Arsenault** 56:6; 69:11
**Art** 19:4; 62:3, 7, 18; 66:4;
198:15
**Asia** 81:18, 19
**aspect** 86:19; 141:11
**assign** 126:15
**assigned** 121:12, 15
**assisted** 170:14
**associated** 21:4; 33:8;
40:6, 14
**assume** 90:3; 137:11;
167:16
**assumed** 57:11
**assuming** 149:14;
156:10
**assumption** 195:6
**attached** 94:12; 180:5
**attempt** 73:18
**Attending** 4:16, 16
**attention** 119:13; 182:5
**attorney** 4:13; 6:17; 7:5;
9:22; 53:21; 54:11, 17;
56:5, 7, 12; 57:9, 16;
58:22; 59:10, 13, 19; 60:6,
13; 66:9; 69:5; 93:18; 94:4;
100:15; 101:12; 104:4;
112:8; 114:4, 6; 118:15;
135:8; 170:5
**attorneys** 56:18
**attributable** 90:6
**August** 46:16; 47:4; 48:3;
51:2; 55:3; 112:22
**Australia** 33:8
**authority** 86:1, 4; 192:15
**authorize** 54:3
**automatic** 130:1

**automatically** 79:22;
82:22; 83:2, 7, 20; 84:2,
13; 85:14; 88:15; 115:14;
116:5, 22; 118:5; 119:2;
152:20; 153:1; 164:9, 13,
15; 202:12, 20
**available** 113:22; 135:3;
190:8
**Avidus** 12:9, 13; 14:2, 4;
15:6, 7, 15; 16:18; 17:6;
18:2; 19:17; 20:12, 13, 14;
63:15
**aware** 79:12; 99:16, 22;
101:20; 102:1, 21; 109:7,
10; 172:14; 195:9
**away** 57:7

## B

**B-O-R-E-K** 14:14
**back** 10:18; 18:16; 19:1,
8; 24:16; 29:10; 30:8, 9;
44:17; 68:20; 71:16, 18;
74:8; 79:7, 10, 12; 84:9;
97:13; 105:18; 109:8;
115:7; 118:9; 126:2, 20,
21; 127:1; 132:5; 143:15;
147:13; 151:2; 181:17;
187:14; 191:18; 192:1;
195:15; 196:6, 22
**back-office** 30:10; 41:10;
72:20; 102:19; 121:8;
164:12
**background** 22:10
**backup** 67:5
**bad** 40:22; 41:4
**balance** 129:6; 130:10;
133:6; 149:1; 176:15, 16;
177:9, 13; 178:15, 18, 18;
196:11
**balances** 193:1
**bank** 8:12; 30:6; 34:10;
35:14; 36:10; 49:11;
76:20; 77:14; 81:12; 86:2;
90:11; 92:14; 154:2;
158:3, 4, 4; 159:1, 9, 12,
13, 14, 15, 17, 19; 160:2;
161:1, 6, 7, 9
**banking** 159:11
**banks** 72:19; 74:9; 80:21;
81:3, 10, 11; 160:3
**Bart** 172:11; 182:13;
183:7
**based** 80:7, 8; 83:4; 92:9,
9; 93:12; 100:17
**basically** 26:17; 28:9;
65:13; 66:19; 121:4;
152:10; 183:15
**basis** 17:5; 79:1; 153:8;
155:1; 169:2
**batch** 42:8; 44:1
**Bates** 24:11; 103:5
**become** 15:2, 5, 14;
102:21; 114:15; 195:8
**becomes** 204:14
**becoming** 114:21

**began** 48:2; 51:2; 55:2;
113:1
**beginning** 18:5; 27:19;
47:1; 63:9; 105:18; 146:6,
10, 14; 162:17; 174:7, 9,
18; 176:17; 194:3
**behalf** 54:19; 96:7;
159:17
**behind** 88:4; 89:2
**belief** 131:19
**below** 30:22; 128:9;
155:19; 156:5; 167:7
**Ben** 56:22; 58:5; 67:5, 5,
16; 68:22; 86:6, 7; 87:11;
109:17, 18; 114:2; 170:14,
14; 192:4; 193:14, 14
**besides** 30:5; 122:9
**best** 70:22; 98:6; 114:16;
131:2
**better** 92:13
**bid** 81:22; 82:1; 92:12;
95:15; 108:19, 21, 22;
109:1; 115:15; 116:1, 4, 4;
136:20; 137:3, 16, 17;
138:7, 10, 11, 13; 139:5, 8;
144:19, 22; 151:17; 152:7
**bid-ask** 136:18; 137:13;
145:5
**bid-asked** 98:19; 99:12;
100:11
**bid-off** 151:12
**bid-offer** 107:2; 148:12
**big** 144:5
**bigger** 67:8
**Bill** 86:7
**billed** 193:17
**billing** 196:14, 18; 197:7
**bills** 194:21
**bird's-eye** 73:5
**birth** 180:12
**bit** 25:22; 102:10; 165:18
**blank** 105:21; 107:6
**blotter** 25:8; 27:3; 29:9;
30:3, 18; 31:16; 33:18;
40:1; 42:18; 43:18;
124:18; 173:7, 9; 174:5
**blotters** 26:9; 117:18;
127:19
**Boca** 12:19; 86:7
**bonuses** 77:4, 4
**bookkeeper** 72:5
**books** 6:1
**Borek** 13:10, 14:12
**both** 10:15; 22:1, 3; 27:2;
34:14; 41:22; 48:8; 49:14;
69:14; 70:22; 76:2; 87:7,
10; 115:11; 126:13; 144:12,
20; 145:1, 4, 4, 9; 151:21;
188:2; 191:16, 17
**bottom** 31:7; 129:12,
175:14
**bought** 28:7; 32:16;
128:13; 153:13; 200:20;
202:2; 203:2
**Box** 30:9; 122:21; 124:14;

126:3, 11; 136:1; 162:20
**boxes** 123:9; 124:2
**branch** 15:12
**break** 25:2; 89:7; 181:12;
186:11; 202:3
**breaking** 194:17
**Brief** 50:22; 89:9; 181:15;
192:6
**briefly** 7:22; 22:9
**bring** 77:12; 147:13
**bringing** 77:10
**British** 13:1, 2; 159:7, 8;
161:2, 3, 9, 10
**broke** 187:21
**broken** 76:4, 4, 7; 189:3
**broker** 29:22; 30:9;
39:18, 20; 53:13; 57:4;
97:2; 115:10; 136:1;
162:20; 171:13; 198:20
**broker's** 23:9, 10
**brokerage** 40:13; 49:12;
65:1
**brokers** 40:12; 68:14;
115:4, 7
**Brothers** 115:1
**brought** 20:12; 46:2
**Buckner** 19:5; 62:3, 18;
66:4; 198:15
**Buckner's** 62:7
**bulk** 124:8
**bunches** 117:21
**business** 8:3; 9:11; 11:2;
14:2; 20:11, 16; 23:3;
46:17, 18; 47:1, 3; 49:10;
52:8, 18; 54:12; 55:4;
56:15; 65:16; 68:3, 4;
72:16; 112:5, 5; 173:10;
174:8; 175:4, 6, 8; 176:4;
177:15; 182:18, 22;
195:22; 196:8; 197:22
**business-related**
196:14
**businesses** 9:11; 11:22
**busy** 70:9; 97:10; 125:4,
5; 126:17, 20; 127:2;
132:1; 199:15
**buy** 31:5; 32:18; 79:19,
21; 90:15; 91:4; 93:20;
94:1, 1; 126:18; 128:1, 10,
19; 159:8; 144:10, 20;
148:6, 11; 199:5; 200:10
**buying** 78:12; 91:8, 9;
109:2; 145:1, 2, 3, 4; 199:5
**buys** 31:8; 35:1; 144:20
**buzzer** 203:7

## C

**C-H-A-M-I-D-E-S** 19:6
**calculate** 71:18; 185:17;
186:19
**calculated** 138:1;
182:11; 183:3, 5, 8, 10
**calculating** 85:18



Certain Foreign Currency Trading
Companies (Universal FX)

Deposition of Steven Michael
March 1, 2004

**call** 51:19, 20; 60:20;
61:1, 4, 14; 68:19; 70:21;
78:11; 80:20; 81:5, 12;
92:15; 100:20; 140:21, 22;
141:2, 13; 156:20; 166:12;
202:20; 203:5, 13

**called** 4:4; 5:8; 20:14;
39:11; 40:15; 49:13; 52:2;
53:4; 61:2, 7, 10; 81:3;
100:15; 111:10; 112:14;
113:7; 116:8, 9; 126:11;
146:15; 149:10, 11; 163:7;
173:9; 177:15

**calling** 61:19; 92:21;
138:17

**calls** 53:13; 97:13;
141:19, 21; 156:9, 13;
165:12; 202:17; 203:8, 10,
17

**came** 44:6, 12; 47:8;
50:11; 53:13; 66:6; 68:6;
72:5, 10, 12; 78:4; 84:6, 6;
101:15; 112:18, 18;
123:14; 129:12; 133:1;
137:15; 138:5; 143:1;
144:13, 17; 154:15; 195:1,
6; 201:2, 22

**can** 5:6; 6:14; 7:7, 16, 22;
15:2; 17:13; 18:7, 9, 18,
19, 22; 19:9; 24:14; 25:3,
4; 26:8; 30:20; 32:13, 15;
33:14; 39:1; 41:16; 42:2;
48:21; 50:19; 51:14, 17;
57:1, 2; 60:7; 65:18; 66:21,
22; 72:1; 75:5; 77:17;
79:15; 80:10; 81:5; 94:13;
97:22; 98:2; 113:18;
120:14; 127:1; 129:3, 6;
130:10; 140:15; 144:16;
151:15, 16; 154:21; 157:4;
159:3, 11, 12, 16, 18;
162:7, 11; 165:10; 169:15;
172:21; 173:5, 13; 176:10;
184:6, 10; 185:14, 19;
186:1, 10, 12, 20; 189:21,
22; 190:1, 13; 195:3, 13,
15; 197:20; 202:22

**Canadian** 158:10

**canceled** 125:12

**Capital** 8:1, 20; 9:4, 10,
15, 15; 10:7, 8, 10, 11, 14,
15; 12:13; 14:3; 15:3; 17:2;
36:17; 111:10; 112:9

**Caputo** 40:3

**Caputo's** 40:12

**carried** 44:4

**case** 17:3; 106:13; 123:6;
148:3

**catch** 144:5; 202:16;
204:16

**categories** 7:18

**cent** 107:15, 16

**Center** 12:17

**certain** 7:13; 31:5, 6;
35:8; 55:8; 80:22; 88:10;
95:21; 120:1, 3; 158:18;
177:1; 188:11

**Certainly** 172:16

**CFTC** 4:4, 7; 45:9; 46:2;
111:7; 188:14

**CGG** 96:16

**Chaleski** 19:8, 11; 62:4;
112:1

**Chamides** 19:5; 62:6;
114:15

**chance** 74:19; 132:15

**change** 20:15; 38:9, 14;
58:7; 73:1, 1; 75:6; 84:18,
18; 136:13; 146:22; 150:1;
162:16; 170:19; 203:22;
204:1

**changed** 38:3; 65:18;
69:2; 79:6; 146:7, 15, 20;
166:22

**changeover** 163:4

**changes** 150:6

**changing** 91:11; 164:1

**charge** 72:11; 85:3, 3;
115:5; 149:2, 5, 8; 196:7

**charged** 85:1; 150:14

**charges** 177:7

**charging** 195:19; 196:11

**Charlotte** 4:17; 38:15;
119:16; 165:4; 191:18;
204:5

**check** 26:17; 56:5;
124:16, 18; 127:18;
129:11; 143:5; 193:17

**check-out** 170:4, 6

**checked** 55:19; 127:13;
129:15, 16

**checking** 124:10

**checks** 86:5

**Chicago** 11:8; 22:13;
48:7; 49:5

**Choi** 62:4

**Choi's** 63:7

**Choice** 72:21; 74:8;
122:1; 136:7; 139:19, 21;
162:14, 15; 163:4, 5, 6, 6

**choices** 36:5

**choose** 18:22; 35:1

**chose** 20:15; 153:8;
166:11, 22

**Circle** 12:17

**circumstances** 61:10

**Citibank** 161:1, 2, 4, 9

**city** 12:18; 158:4, 15

**clarify** 95:11, 19; 198:6;
204:8

**clarifying** 100:1

**class** 18:3, 3, 5

**classes** 20:1

**clear** 10:18, 59:12; 82:14;
186:22

**client** 16:22; 51:18; 53:7;
56:9, 10, 65:8; 70:3; 72:22;
73:1; 75:1; 76:10; 83:5, 6,
20, 84:1; 85:1, 8; 88:10;
90:12; 94:3; 99:17; 114:3,
14; 115:8, 142:3; 143:16;
150:3; 153:4, 13, 14;
156:3; 161:2; 162:22;

164:7; 171:14, 22; 172:6;
178:15, 18, 18; 179:12, 14,
17, 19; 180:5, 6, 11; 184:1;
192:21; 193:1, 2; 196:5;
198:22; 199:1, 9, 13, 16

**client's** 85:6; 118:19

**clients** 17:7, 9; 28:12;
34:16; 52:2; 53:9; 54:14,
19; 67:6; 75:3, 4, 6; 80:2;
90:8; 114:12, 13; 133:15;
140:15; 146:10; 154:19,
21; 156:5; 173:8; 176:16;
186:11; 196:1; 198:1

**clock** 66:15

**close** 21:12, 13; 34:6;
35:1, 2; 61:2; 73:2, 14, 15;
81:14; 121:6; 123:18;
136:5; 144:11; 177:5;
186:4, 7, 9; 190:16; 193:8;
204:17

**closed** 24:1; 41:1, 3;
87:22; 147:8; 164:16;
177:4; 188:2; 191:2, 3, 6

**closely** 43:7

**closer** 62:14

**closing** 32:14, 18; 40:20;
123:20; 146:5; 174:11, 11;
191:13, 14

**CM** 177:4; 183:1

**collapsed** 198:3

**collectively** 75:17

**college** 22:10

**Collins** 49:1, 3, 18; 50:5

**Colorado** 64:11

**column** 31:4; 33:1, 7;
39:2, 5; 40:15; 41:1, 5, 5,
7; 42:20; 188:4; 199:5

**columns** 33:14; 170:17;
182:11, 14; 185:4

**combination** 43:11

**comfortable** 163:2

**coming** 101:2, 17; 138:3

**comma** 108:9

**Commission** 4:14, 15;
6:9; 79:6, 10; 103:21;
105:4; 119:21; 188:12, 13

**commissions** 79:4, 5,
12; 105:6; 104:13; 105:2,
8; 177:8

**Commodity** 4:14; 23:1;
46:8, 11

**communicate** 60:4;
171:19, 21

**communicated** 171:18,
18

**communicating** 78:1;
171:21

**company** 10:2, 12, 13;
11:10, 18; 63:5; 67:8;
175:16

**compare** 27:2, 75:5;
89:16; 186:2

**compared** 27:17

**Compelled** 94:13, 21

**compensated** 78:18

**compile** 68:15

**complete** 7:19

**completely** 20:15

**complicating** 89:1

**complied** 59:15

**compute** 137:12; 150:8

**computed** 142:4

**computer** 18:10

**concerned** 75:18;
134:11

**concluded** 204:19

**conditions** 97:16

**confirm** 32:7; 42:11;
169:21; 170:1

**confirmation** 27:5; 30:6,
7; 42:21, 22; 120:20;
128:3; 129:19; 130:6, 16;
131:4; 140:20; 170:3;
194:9

**confirmed** 32:7; 44:17;
54:8; 143:6

**confused** 121:13; 195:13

**conjunction** 29:18;
183:13

**connection** 9:20; 12:6;
26:2; 33:16; 72:2; 74:4;
99:2; 182:18

**considerable** 190:14

**considerably** 195:22;
203:14

**consistent** 101:6

**constant** 150:5

**constantly** 30:14; 73:21;
116:15; 196:7

**contact** 53:10; 61:18;
66:11; 69:7; 156:4

**contacted** 140:15; 156:6

**contacts** 172:8

**content** 12:11

**contents** 104:9

**continue** 18:6; 112:16

**continuously** 197:4

**contract** 134:3; 152:12;
167:16; 168:2, 4, 6, 8, 19;
169:9, 10, 12, 17

**contracts** 133:14; 140:3;
187:17

**control** 25:3; 119:16, 18;
173:13; 180:17

**controlled** 190:6

**convenience** 199:21

**convenient** 70:19

**conversation** 24:20

**conversations** 165:20,
197:7

**conversely** 75:16

**coordinating** 188:11

**copied** 87:18; 130:18

**copies** 26:15; 194:15;
197:14

**copy** 7:4

**copying** 130:22; 131:1

**corporation** 11:11;

12:20, 21; 35:19; 36:17;
38:8; 195:2; 203:22

**corrected** 189:18

**correctly** 26:19; 30:19;
33:19; 78:14; 88:11, 12;
167:4; 189:15

**correspond** 43:5; 44:21;
54:15; 197:5

**corresponded** 54:10;
56:2, 10; 57:4; 197:3;
199:12

**correspondent** 159:17;
160:15

**corresponding** 76:15;
153:16; 159:14; 162:1

**Corymb** 7:22; 8:19; 9:4,
10, 15, 15; 10:7, 8, 10, 11,
14, 15, 16; 20:8; 22:1, 2;
23:14; 50:8; 112:9

**costs** 141:10

**counsel** 4:4, 7, 18, 20;
5:15; 111:7

**count** 184:1, 4; 198:19

**counter-parties** 27:13;
34:22; 36:6; 51:22; 52:12;
67:5; 70:21; 71:20; 72:20;
73:2; 74:10; 75:21, 22;
80:21; 89:19; 91:16;
116:8, 10

**counter-party** 27:4, 10,
16; 30:6, 12; 34:8, 12,
15, 19; 35:6; 36:1, 9; 38:1;
69:19, 22; 71:4; 73:10;
75:8, 18; 76:13, 15; 88:16;
90:18; 91:3, 5; 106:12, 13,
19; 128:1; 130:14; 133:19;
154:2; 158:20; 159:2, 5;
196:9, 12; 200:10

**country** 159:13

**couple** 18:10; 24:16;
35:2; 48:19

**course** 65:21; 75:9;
134:13

**courses** 22:22

**court** 24:19

**cover** 67:17, 18; 69:21;
70:13, 15, 18, 20; 71:1;
91:18; 94:11; 143:19

**covered** 27:4; 70:3, 7;
91:22; 121:6; 123:2;
128:3; 200:19; 201:1, 2;
201:15; 204:3

**covering** 26:1; 66:1, 3;
70:1

**CPO** 8:2; 10:13, 16, 21;
17:19; 111:14, 15

**CQG** 81:4, 7; 96:14, 16

**CQGs** 80:22

**crazy** 137:8; 203:11

**create** 17:18; 38:12;
47:20; 72:10; 73:4; 74:5;
88:18; 130:2; 137:17;
186:1, 20; 187:20

**created** 16:12; 38:20;
73:2; 96:22, 22; 98:9;
112:9; 115:9; 138:14;
139:20, 22; 163:18; 164:6;

**Deposition of Steven Michael**
**March 1, 2004**

Ce... n Foreign Currency Trading
Companies (Universal FX)

189:3
creates 122:4
creating 56:20
credit 80:4; 150:22;
159:18; 161:20
credited 106:12, 18;
109:4, 5; 161:6
crosses 106:8, 9; 134:2
CT 201:14
CTA 8:2; 10:13, 16, 21;
17:19; 64:10; 111:14, 14,
21
currencies 22:8; 64:3;
99:5; 106:6, 7; 158:19;
159:6
currency 7:15; 21:8;
52:21; 53:2; 65:4; 99:8;
105:21; 106:1, 21; 107:5,
14, 15; 108:12, 14, 18;
133:22; 145:15, 20, 21;
146:9; 147:5; 150:7;
153:5, 12, 19, 155:8, 11,
13; 157:19; 158:2, 2, 13,
16, 21; 159:3, 12, 13, 18,
21; 160:2, 4, 9, 14, 16, 20;
161:14, 18, 19; 162:1;
163:13; 169:1, 4, 10, 11,
11, 18; 201:14
current 12:11; 23:15;
68:14; 136:17, 20
customarily 166:14
customer 8:17; 9:2; 16:
28:20; 29:15; 30:11; 36:6;
39:13, 14, 16; 40:1, 4;
41:22; 42:21, 22; 43:10;
44:20; 54:3; 57:8, 15;
59:12; 60:1, 4, 11; 61:10;
69:21; 78:1; 83:10; 85:12;
90:15, 18; 91:9; 92:6, 18;
93:16, 18; 96:4, 7; 99:20;
100:7, 10, 13; 101:14, 21;
103:12; 114:8, 9; 117:11;
118:22; 119:10, 13;
121:17, 20; 123:15;
128:13; 135:9, 10, 12;
138:20; 139:4, 21; 140:1;
141:12; 144:9, 20, 21;
149:6; 150:19; 152:12;
153:18; 154:13, 13, 16, 18;
155:2, 5, 7, 15, 16; 156:7,
19; 157:6, 12, 13; 159:20;
160:13, 14; 161:12;
163:12; 166:8, 8; 167:15;
168:3, 18; 171:6, 20;
184:13; 187:22; 192:7, 9;
198:5; 200:22; 201:1, 5;
203:2, 22
customer's 55:20; 57:19;
59:19, 21; 79:9; 84:14;
164:16; 172:2, 3
customers 8:10, 15, 17,
20, 21; 9:1, 5, 11, 12;
11:16, 17; 16:2, 17; 27:14,
15; 30:3; 31:11; 42:19;
45:3; 52:13; 55:10, 17;
57:15; 61:1, 4, 7, 13, 14;
68:12; 69:15; 71:21;
75:16, 19; 76:1, 3; 77:8;
89:18; 98:22; 102:13;

113:1, 6, 10; 122:9; 134:4;
135:5; 139:3, 13, 17;
140:4, 12, 18; 141:9;
142:8, 11; 144:9, 13;
148:4; 149:2, 6; 150:21;
151:8; 152:11; 153:20;
154:7, 12; 156:9; 160:7;
166:10; 169:22; 170:1, 9,
16; 171:3; 185:9; 188:17;
189:21; 190:1
cut 33:12; 88:9
cutoff 73:14

**D**

data 41:19; 74:17; 75:11;
80:14, 19; 162:22
date 5:12, 13, 14; 73:16,
16; 88:13; 118:18; 124:21,
22; 125:8, 15; 126:3, 6;
135:4, 5, 10, 17, 21;
136:13; 150:20; 152:13,
17; 158:7; 169:20; 180:11;
200:3
dated 7:2; 94:11
dates 26:12; 135:3, 14;
136:5, 8; 175:9; 176:3
Dave 19:5
David 62:6; 114:15
day 26:17, 21; 29:2, 15;
30:13; 63:22; 65:20, 21;
67:1, 1, 9; 68:18; 71:19;
72:22; 73:13; 75:4; 76:2;
81:18; 88:16; 110:6;
127:17; 136:11, 15; 149:7,
19, 21; 150:2, 2; 158:11;
164:19, 21, 22; 174:19, 19;
178:8
day's 88:20, 21
day-to-day 66:22
Dayan 56:22; 58:5; 67:16;
192:4; 193:14
daylight 131:16
days 35:2; 125:14; 149:7;
158:1, 7, 9; 159:5; 178:5
deactivate 57:20; 58:8;
61:3; 114:3, 6
deactivated 58:13, 20;
59:5; 60:1
deactivating 58:3, 18
deal 51:18; 61:6; 64:3;
120:20; 129:18; 130:2, 6,
16, 131:4, 141:2, 9, 195:21
dealer 51:14, 16, 17, 17;
62:11, 21; 63:8; 69:20;
93:12; 114:15, 21; 119:5,
6, 9; 123:1, 2; 129:22;
132:12; 147:2; 148:16, 21;
173:9; 192:14, 15; 203:4
dealers 63:21; 77:4;
101:6; 116:15; 143:2;
144:18; 152:3, 4; 192:1, 5
dealing 90:11; 112:12,
13; 113:1, 2, 5; 138:17;
183:17
deals 78:19, 20; 132:5

dealt 69:20; 141:17;
161:2
Dear 181:20
debit 150:18, 22
debits 150:20
December 46:20, 21;
62:14, 14; 98:11, 13
decide 96:10
decided 152:12; 163:3
decimal 108:8
decision 196:9
decisions 68:2; 86:22
declaration 97:22; 98:3;
100:4
defaults 166:13
defendant 46:1, 10
definitely 43:3; 129:12;
182:13
definitions 182:17
degree 22:15
deliver 153:11, 16;
160:13, 21; 161:19; 168:8,
11, 13, 14
delivered 161:18
delivery 153:4, 8, 10, 15,
19; 154:10, 21; 155:3, 5, 7,
10, 13; 157:7, 18; 158:9;
160:9, 12, 18; 161:13, 22;
162:3; 163:12; 169:6
delivery-versus 153:22
delivery-versus-
payment 154:22
Delray 10:22; 11:6, 7, 7;
12:3
demand 161:22
demanded 196:6
demo 18:9, 11
department 174:8;
175:15; 177:16; 178:11,
21; 186:12
depend 157:16
depended 81:18
depending 127:1;
134:13; 158:2; 166:22
depends 131:16; 135:12;
149:21
deposit 142:8; 158:8;
160:4
deposited 142:19
deposition 110:4; 204:19
deposits 176:18, 19,
178:2
describe 48:3; 67:1;
173:5
described 55:9; 66:8;
197:21
describing 18:2; 89:12
description 64:2
desk 47:21; 48:6, 7, 9, 10;
49:5, 5, 8, 20; 50:1; 51:5,
6, 9, 10, 20; 52:2, 10; 53:3,
11; 54:18; 57:2; 60:21;
61:4, 7, 15, 20, 22; 62:11;
65:2, 3, 4, 6; 66:1, 11;

67:2, 10, 19; 68:10, 17;
69:13; 70:10, 15; 71:17;
75:13; 79:8; 86:13; 90:1, 3,
11; 97:14; 100:15, 16;
102:20; 112:12, 13, 19, 20,
21; 113:2, 5; 114:22;
115:19; 116:16; 138:18;
142:18; 143:22; 187:9
detail 176:10
determinable 131:20
determination 93:4; 94:3
determine 26:21; 72:5;
75:14; 76:19; 77:3; 88:19;
160:6; 187:14
determining 85:17
Dexter 62:4; 63:7
difference 41:16, 18;
75:13, 21; 81:21; 82:1;
89:21; 90:2; 95:15;
131:13; 147:19; 148:17;
150:6; 161:20; 169:4;
177:11
differences 73:19; 166:1
different 43:18; 44:3;
48:20; 70:21; 80:9; 81:11;
82:6; 92:8, 22; 93:3; 96:11,
12, 13; 99:6, 7; 103:8;
106:5, 5; 139:8, 16, 17, 22;
152:8, 9; 166:9, 10;
172:22; 176:4; 179:18;
182:14; 190:20; 196:1;
199:6; 200:12, 13, 13;
201:22
difficult 71:15; 73:10, 19,
22; 88:7; 118:12
Direct 112:15; 129:18
directed 5:22; 6:8;
193:21
directly 21:5, 7; 52:3, 17,
17; 53:11; 74:7; 77:8;
80:20; 81:3; 101:15, 21;
113:2; 142:22; 154:14
director 13:1
disagreements 195:9
discipline 18:15
disciplined 18:22
disclosure 204:12
discrepancy 81:19;
82:7; 189:10; 190:14;
203:1
discrete 63:20
discretion 70:4
discretionary 53:19;
54:3, 7
Discussion 6:5; 50:21;
89:8; 110:3; 181:14
discussions 5:15
displayed 164:20
dispute 197:21
disputes 196:18
distinct 148:14
distinction 192:14
distinguish 59:8
diverted 133:12
division 65:12, 12

document 5:2, 21; 6:11;
24:6, 14; 26:2, 5, 22;
28:21, 22; 29:11, 20; 33:6;
38:16, 19; 45:8; 94:5, 12,
16, 18; 98:1, 7; 99:10, 14,
17, 20; 102:6; 103:3;
115:9; 125:17; 130:21;
162:4; 174:21; 178:20, 22;
179:10; 180:7; 182:7;
194:2; 203:20
documented 167:14
documents 7:13; 16:7;
29:18; 42:21; 43:1; 45:6;
60:11; 72:1; 74:1, 3; 80:2;
85:7; 87:1, 5, 12, 16;
89:12; 96:21, 22; 97:3, 6;
102:7, 9, 15, 19; 104:6, 10,
20; 105:15; 115:3, 6;
119:22; 120:1, 5; 140:20;
141:6; 154:17; 157:2;
164:6, 9, 11; 167:11;
168:1; 180:22; 188:12;
196:17, 19, 21
dollar 28:17; 31:5, 9;
73:12; 107:19; 108:8;
134:3; 137:4, 5; 154:9;
158:4, 10; 166:15, 17, 19,
20; 169:12, 13
dollar-yen 79:19
dollar/Japanese 134:14
dollars 134:17, 19; 135:1;
157:13, 14, 15, 17, 21;
159:15
done 29:14; 41:11; 44:22;
59:9; 83:2; 84:13; 85:9, 10;
91:12; 112:5; 116:1;
118:14, 15, 19; 120:16;
129:4; 132:9, 22; 133:8, 9;
142:15; 152:20; 198:17;
199:11, 17, 19; 200:16, 17,
22; 202:20, 21
dot 175:16, 16, 16
double 124:16
Dougherty 13:10; 19:4;
62:3, 12; 64:7
down 31:4, 7; 36:20;
43:22; 67:7; 79:3, 15; 83:1;
121:13; 128:9; 132:15;
199:15; 202:3
download 140:16
Dressner 35:14, 19;
36:10, 15, 21; 38:6; 71:5;
73:11, 75:11, 88:10, 93:2
duly 4:5; 111:5
During 46:14; 66:14;
68:18; 75:17; 190:21;
191:4, 14
DVP 153:8, 9; 159:4

**E**

e-mail 7:14, 20:5, 6; 87:6,
16, 19; 182:6, 9, 13; 197:2,
3, 6
e-mailed 127:5
e-mailing 88:3
e-mails 87:15; 196:22

197:1, 5, 9, 10
**earlier** 5:12; 40:20; 69:9;
77:7; 87:1; 89:11; 102:12;
113:4; 118:4; 131:22;
138:4; 139:1; 147:12;
174:17; 189:20; 203:14;
204:3
**early** 24:17; 81:18; 120:4
**earn** 174:12
**Earth** 20:9
**easier** 121:7; 189:12
**easily** 61:19
**Eastern** 131:12, 13;
136:13; 166:3, 4
**easy** 149:1; 163:4
**eat** 143:22
**EDGAR** 182:4
**educate** 14:22; 78:14
**education** 14:8, 15, 17,
21; 18:6
**educational** 15:11; 16:4,
18; 19:3, 7; 22:10
**Edward** 9:18; 21:22
**eight** 66:2; 201:18
**either** 18:9, 16; 30:8;
31:13; 35:9; 60:7; 77:19;
114:2; 122:17; 137:8;
139:19; 151:12, 21; 152:7;
157:10; 158:4; 161:15;
177:6; 179:8; 183:6, 16;
187:15; 191:12; 192:3;
197:15
**elaborate** 79:16
**electronic** 41:9, 13;
42:12; 44:15; 51:13;
58:15; 101:2, 3; 115:20;
116:10; 117:20; 119:4;
123:14; 199:11
**electronically** 31:18;
41:12; 44:16; 52:5; 53:5;
57:21; 79:20; 80:11;
85:10; 119:11; 142:15;
164:12; 171:18; 199:16,
17, 18; 202:20; 203:6
**else** 13:11; 29:22; 47:16;
66:20; 70:10, 12; 74:6;
100:16; 101:18; 127:9;
153:6; 172:12; 174:22;
204:4
**elsewhere** 28:21
**Emerald** 111:10; 112:3, 9
**employed** 37:9
**employees** 8:8, 14, 16;
11:14; 13:8, 18; 52:16;
77:2; 191:20
**employment** 7:14; 12:8,
12
**encountered** 141:16
**end** 18:15; 76:18; 86:21;
88:2; 127:17; 136:14;
163:9; 176:7; 179:10
**endeavor** 73:8
**ended** 9:12; 194:17
**Ending** 177:9, 9
**enough** 59:2; 91:17;
163:2

**enter** 43:9; 58:1; 92:2;
113:20; 122:6
**entered** 33:19; 44:13;
115:13; 117:10; 118:6;
168:18
**entering** 138:16; 167:16;
168:2
**enters** 90:16
**entities** 9:12; 65:16;
156:14; 192:17
**entitled** 5:21; 94:13;
175:19
**entity** 37:16; 38:13;
39:15; 40:7, 9; 46:7; 49:13;
154:11, 15; 156:6
**entries** 31:1; 32:17;
190:16
**entry** 28:15; 30:21; 65:6
**equal** 139:5
**Equities** 64:18
**equity** 75:6; 176:16, 17;
177:10, 10; 178:18;
187:12
**erroneous** 5:13
**errors** 67:4; 73:20
**establish** 144:10
**established** 145:13
**establishing** 32:19
**estate** 11:1, 1, 21; 12:4
**etiquette** 78:15
**Eugene** 4:15
**euro** 82:9, 11; 90:15, 16,
22; 91:4, 8, 9; 92:11, 17;
99:3, 8; 107:14, 19;
159:15; 169:12, 13
**euro/U.S** 134:3
**Europe** 159:16, 18
**euros** 74:14; 78:12, 13;
93:21; 95:12; 99:13;
126:18; 128:19; 129:21;
153:14, 15, 17; 158:19;
202:2
**even** 21:18; 30:17; 41:2;
78:9; 96:12; 117:4; 118:1;
127:5; 133:7; 148:19;
161:4; 165:18, 19; 182:9;
196:13
**event** 163:13
**eventual** 55:12
**eventually** 38:3, 11;
59:22; 72:10; 133:12;
136:7; 190:8
**exact** 19:12; 92:10; 96:8;
148:18; 167:19; 200:7
**exactly** 62:9; 116:17;
122:18; 126:12; 137:22;
142:10; 148:9, 9; 156:1,
10; 166:18, 20; 176:9;
184:14; 200:17
**exam** 23:13
**examination** 4:4, 7;
111:7
**examined** 4:6; 43:6;
111:6
**example** 28:5; 33:4;

51:15; 73:11; 78:9; 93:22;
151:4; 153:13; 161:1;
175:5; 187:12
**exceeding** 95:14
**exceeds** 95:11
**Excel** 30:8
**exchange** 14:7; 46:8;
49:5, 8; 50:3; 169:13, 19
**exchange-making**
47:21
**execute** 90:7; 115:14;
126:18
**executed** 116:3, 6;
125:20
**execution** 116:21; 118:7;
138:19
**exemployee** 19:13
**Exhibit** 5:2, 3, 17, 18; 6:7;
7:1, 9; 24:7, 8, 11; 25:5;
26:20; 27:20; 38:20; 94:6,
7; 97:18, 19; 102:2, 5;
104:16; 105:11; 120:9, 10,
14; 147:12; 162:8, 9;
164:5; 165:5; 173:16, 20;
180:18, 21; 181:17; 194:5;
198:8; 201:7; 202:4
**existence** 86:4
**existing** 145:18
**exorbitant** 195:19
**exotic** 106:9; 134:2
**expect** 41:21; 161:17
**expected** 157:13, 20;
160:11; 197:16
**expense** 89:1
**experience** 15:10; 48:12,
14, 16; 64:6, 20; 102:11;
114:20
**expertise** 48:9
**explain** 7:22; 42:2; 48:21;
129:19; 172:21; 176:10;
182:10, 14; 183:2, 8, 10;
190:13; 195:3, 4; 196:2;
202:22
**explained** 45:3; 99:21
**explains** 103:2
**Explanation** 94:13
**Express** 119:21
**extended** 169:6
**extent** 131:18

# F

**fact** 30:5; 147:9, 13;
148:16; 187:13
**factored** 83:15, 16; 84:7
**facts** 73:19, 20
**fairly** 70:4
**false** 6:19
**familiar** 94:17; 102:8;
104:2; 139:10; 151:1;
156:21; 165:2; 179:2, 8
**far** 74:15; 75:17; 86:21;
113:15; 119:8; 134:10;
138:9; 139:14; 155:12;

194:1, 22
**fax** 67:7, 8, 9, 12, 21, 22;
161:16
**faxed** 127:5
**FCM** 36:18; 47:20; 49:12,
21
**feature** 189:20; 190:5
**February** 7:2; 62:22;
72:13; 120:4
**federal** 46:3; 119:21
**fee** 103:14
**feed** 80:15, 19; 98:16, 17,
18; 100:17; 137:7, 8, 11,
13, 14, 15; 138:3
**feeds** 96:14; 101:3; 137:7
**feel** 141:15; 163:2
**feels** 24:19
**felt** 152:7
**few** 77:15; 86:4; 109:21;
141:21; 173:12
**figure** 73:12; 74:7; 88:8;
198:21
**figured** 30:4; 176:21
**figures** 75:1; 76:2, 3
**files** 59:19
**fill** 16:10; 17:3
**filled** 125:1, 3, 5, 6, 8, 14,
16; 126:10
**filling** 16:7
**finance** 8:22; 23:17;
35:20; 36:4, 9; 38:4; 71:5
**Financial** 10:16; 36:13,
16; 37:4, 9, 12, 15; 38:2, 5,
7; 71:10, 11, 16, 22; 74:20;
195:1
**financials** 72:11; 73:3
**find** 17:11; 18:20; 42:1;
47:18; 105:1; 116:12;
118:12; 167:11; 186:6, 14;
199:1
**finish** 35:11; 96:1
**finished** 162:12
**firm** 9:10; 14:5, 20; 30:1;
40:2, 13; 48:7; 49:12;
50:12; 53:14; 54:16, 20;
64:11, 12; 65:1; 66:9; 68:5;
76:8, 11; 77:13; 78:5;
82:16; 84:7; 87:22; 89:15;
93:13; 111:10, 13, 16;
112:14; 149:12; 198:16,
21; 199:5; 201:12
**firm's** 17:7; 73:5
**firms** 9:21; 21:4, 35:13;
48:19, 21; 52:7, 13, 15;
53:17; 55:4; 56:14; 67:21;
68:9, 11; 77:11, 20; 78:18,
79:14; 85:18; 91:3,
102:14, 17; 183:13, 16, 17
**first** 4:5; 5:13; 28:15;
31:4; 33:11; 34:4; 39:1, 2;
51:13; 55:15; 66:5; 95:10;
102:7; 103:19; 106:20;
108:13; 112:11; 115:17;
120:17, 22; 129:7, 19;
143:15; 148:19; 166:2;
173:19; 174:8; 176:7;

201:1, 4
**five** 42:10; 81:16, 20;
92:3; 95:11, 14; 98:9;
99:21; 126:22; 136:14;
137:5; 163:1; 185:21;
200:12
**five-point** 98:21; 99:12
**fix** 73:21; 177:1
**flat** 26:18, 21; 27:17; 28:9,
10; 29:19; 30:1, 5, 15, 16,
17; 121:3; 130:11, 15;
147:8
**flaw** 147:9
**flaws** 202:15
**flexible** 65:20
**floor** 23:9; 64:8; 132:13,
14
**fluid** 74:11
**fluidly** 148:21
**fly** 151:12
**follow-up** 197:20
**followed** 165:17; 200:21
**follows** 4:6; 111:6
**forced** 78:7
**forces** 34:20
**foreign** 7:15; 14:7; 20:14;
21:8; 22:8; 47:21; 49:4, 8;
50:3; 52:21; 53:2; 65:4;
153:19; 155:8, 10, 13;
157:18; 158:16; 159:12,
18; 160:4, 9, 13, 16;
161:13, 17
**FOREX** 57:1; 136:1;
140:3; 162:20, 22; 163:6;
167:16; 168:18; 169:9, 10,
17; 175:19; 180:4; 203:22
**forget** 10:11; 22:3
**form** 104:9; 127:3
**formal** 71:22; 170:3
**format** 102:9
**formed** 47:8
**formula** 137:12, 20;
150:8, 10
**forth** 196:7, 22
**forward** 43:4; 153:2
**four** 24:1; 46:19; 82:2, 3;
96:10; 98:8; 131:15; 132:4
**frame** 48:20; 90:9; 122:3
**francs** 134:19
**Frankfurt** 73:14, 15
**free** 79:18
**Freedberg** 19:6; 48:1;
58:9
**Friday** 119:22
**friend** 47:19
**fringe** 150:3
**front** 147:13, 162:1
**FS** 45:15
**FSCM** 65:13
**full** 4:9; 153:11, 16
**fund** 9:5; 10:10, 12, 21,
20:8; 50:8, 8
**funds** 14:9; 16:22; 37:2,
5; 112:7

Deposition of Steven Michael
March 1, 2004

Certain Foreign Currency Trading
Companies (Universal FX)

further 5:14; 111:5;
204:15
Futures 4:14; 7:15; 14:8;
20:20; 23:1; 64:18; 65:6
FX 12:7; 14:1; 26:3, 5;
28:20; 33:16; 35:9, 17;
37:6, 7; 38:4; 45:6; 46:15,
22; 47:10, 20; 48:3; 51:4;
52:7, 16, 20; 54:8; 55:3, 5;
58:11; 60:5, 12; 65:11;
68:4; 72:14, 15, 21; 74:8;
80:3, 6; 84:8; 85:5; 90:17,
17; 91:8; 98:20, 21; 99:10;
102:8; 104:7, 8; 105:14;
106:13; 109:6; 112:11, 15;
114:6; 119:20; 140:4;
148:4, 15; 163:6; 167:17;
169:21; 170:8; 171:15;
182:19; 194:22; 195:7, 9,
196:17
FX's 60:16; 86:4
FXCM 48:8; 51:16;
112:14

G

G-E-R-R-A-R-D 49:8
gain 144:8
gaining 171:6
gather 76:17
gave 51:20; 93:15; 175:5;
194:14
general 17:20; 102:8;
111:17, 22; 112:4
generally 106:10; 116:1;
127:13; 134:7, 8, 18;
141:1, 12; 143:19; 149:20;
150:5; 157:10; 167:1;
170:3
generate 74:5, 18
generated 39:7; 74:3;
122:15; 128:4; 164:9;
172:20
generating 74:15;
122:14
Gerrard 49:15
girl 58:6
girls 68:22; 170:13
given 51:4; 75:10; 92:4;
93:6; 99:11; 202:8
giving 95:4; 179:13;
183:20
GMT 174:13
GNI 48:17; 49:13, 22
goal 17:12
goes 31:7; 128:1
good 19:9; 51:11; 68:18;
76:11; 109:20; 125:12;
135:19; 198:6; 203:4
graduate 22:15
Greenwich 131:7, 14
ground 24:17
group 13:6; 33:9; 175:17,
20
grouped 32:10

groups 121:2
guess 51:12; 80:1;
100:14; 131:8; 166:12;
192:4; 203:12
guessing 67:6; 98:9;
114:19; 128:16
guidance 17:15, 15
guy 172:11; 192:5
guys 17:10

H

H 64:15
HAAS 4:8, 13, 20; 5:1, 5,
20; 6:6; 7:11; 24:10; 35:12;
38:15; 43:2, 8, 15; 45:22;
49:9; 50:19; 51:1; 85:16;
89:10; 94:9; 95:13; 97:21;
98:14; 101:9; 102:4;
103:16, 17; 104:18;
105:13; 109:19; 110:2;
119:15, 19; 130:20; 147:3;
149:13; 157:3; 162:6, 11,
13; 165:4, 15; 173:15;
181:13; 182:16; 191:18;
194:4, 14; 198:7, 10;
201:9; 202:6; 203:19, 21;
204:7, 10
half 21:17; 78:12; 142:21
halfway 181:19
handle 10:4; 69:14
handled 67:5; 70:19
handwriting 122:16;
130:5
Hanover 64:13, 14
happen 90:4; 97:8;
119:11; 143:11; 165:12;
203:11
happened 16:1; 43:17;
100:14; 116:22; 117:15;
121:7; 143:12, 18; 147:22;
152:19; 155:21; 164:7, 11;
195:3; 203:16, 18
happening 148:21
happens 32:6; 58:16;
117:5; 203:6
Harris 9:7, 7
Hayeck 45:13
head 19:21; 132:11, 17
heads 183:1
hear 203:7
hearing 45:17
hears 152:22
hedge 69:18; 112:7;
116:13, 20; 121:4, 4;
146:15, 18; 147:20
hedged 116:7, 11
hedging 165:21
held 23:7; 35:16, 17; 69:4,
4; 70:6; 169:1
help 17:14; 58:6, 8, 9;
68:1; 70:12; 71:1; 72:5, 10;
123:22; 132:18; 178:16;
196:10

helped 95:3, 3
helping 68:22; 109:18
helps 130:13
HELWIG 4:22, 22; 35:11;
45:19; 49:2; 85:12; 94:11;
95:7; 98:10; 100:1, 9, 13,
21; 101:5; 103:15; 111:19;
117:14; 118:13, 21;
120:17; 128:18; 131:7, 18;
146:1; 175:3; 181:2, 21;
191:16; 197:20; 204:7, 9
hey 86:7
high 22:10, 11
higher 92:12; 191:13
highlight 124:18
himself 4:21; 181:21
hire 47:13; 61:21; 62:2;
136:1
hired 62:13; 63:9
hit 177:22; 203:18
hits 202:12
hold 12:22; 23:5; 110:1;
152:12, 16; 159:6, 8, 11,
12, 15, 16; 160:16; 168:6
holding 16:22; 36:16;
37:4, 4, 15; 38:2, 7; 70:5;
195:2
Holdings 35:18; 36:13;
37:10, 13; 38:5
holds 149:6
honest 10:5
hopefully 15:1; 130:15
hour 90:10
hours 26:11; 43:20;
65:17, 20, 22; 118:2;
131:15, 17; 202:15; 203:9
house 25:20; 27:15; 28:2,
14; 31:14, 33:5; 41:21;
75:5; 117:7, 10; 118:6;
119:1, 5
Houston 77:16
Howard 30:22
hundredth 107:15, 16

I

I-N-T 122:22
I-N-T-R 149:13
IB 33:4; 53:7, 8; 54:10, 15,
16, 16; 60:8, 8; 67:6;
69:21; 76:10; 83:11, 12;
84:22; 99:17; 109:9;
113:8; 115:12; 123:16;
124:7; 126:11, 13, 14, 17,
17, 19; 135:7; 139:22;
140:13; 141:4, 2, 13, 15;
143:15; 156:5; 157:10, 10;
161:15; 166:22; 171:16,
19; 172:5; 175:19; 176:14,
17; 180:4; 192:22; 193:5;
198:19, 20
IB's 77:18; 80:2; 109:16;
113:5; 138:19; 154:20;
170:4; 171:12; 176:14
ID 39:2, 7, 12; 171:16;

172:3
idea 129:10; 174:1; 181:7
identical 22:6
identification 5:4, 19;
7:10; 24:9; 94:8; 97:20;
102:3; 104:17; 105:12;
120:11; 162:10; 165:6;
173:17; 180:19; 194:6;
198:9; 201:8; 202:5
identify 4:20; 5:6; 24:14;
29:12; 98:1; 130:13
IFX 15:19, 20; 16:7, 10,
21; 18:19; 35:14, 19; 36:9,
18, 22; 38:3, 10; 71:5;
80:15; 81:2; 91:8; 92:5, 7,
16, 20; 93:1, 7; 96:3;
98:18; 120:20; 129:21;
137:13; 138:5; 200:20;
203:3
IFX's 18:12
illiquid 82:8
imagine 182:12
immediate 198:4
immediately 59:16, 17;
132:1; 135:22; 146:2
implement 162:19
implemented 84:1;
136:2
implementing 60:19
important 142:18
impossible 34:5, 7, 18;
35:3; 195:21
in-box 197:2
Inc 11:9
income 11:12
incomplete 174:22
incorporated 15:22
incorrect 79:7; 137:9
incorrectly 35:5; 79:11;
129:15; 130:19; 131:1, 1
increment 134:12
increments 134:9
incubate 15:4; 17:11
incubating 17:10
indicate 123:13, 19;
198:16
indicated 44:20; 53:17;
200:3
indicates 200:9
individual 9:8; 15:13, 15,
16; 16:6; 31:10, 44:13;
52:22; 53:6, 14; 68:6;
69:4, 10; 76:10; 109:14;
114:13; 187:22
individually 199:19
individuals 15:8, 9;
17:22; 32:22; 63:17;
109:15
information 5:22; 6:9,
13; 7:17; 10:6; 34:13; 35:3;
60:10, 15; 61:14; 81:6;
100:2; 108:13; 113:11;
123:21; 128:1; 141:4;
156:13; 171:15; 173:5;
183:16

ING 77:14
initial 103:12; 123:7;
140:10
initialed 171:10
initially 51:21; 66:4;
141:3; 146:12
initials 123:3; 198:13
initiated 66:8; 136:16
input 41:14; 57:8; 58:8;
78:13; 79:11; 83:22; 84:6,
11; 95:4; 101:22; 102:18;
134:10; 150:11; 166:7;
196:9
inputted 41:13, 15;
163:14; 170:2
inputting 44:14; 196:12
instance 90:21; 107:18;
143:4; 159:7
instances 101:20
instead 122:14
instructions 60:10;
164:8
insufficient 155:17
intact 33:14
intention 157:11
inter-bank 76:22; 78:9,
11; 80:9, 18; 101:6;
149:21, 22; 150:1, 4, 4
interchangeable 63:19,
22
interest 149:12; 150:18,
21
interested 28:12
internal 71:13; 121:18;
123:4; 124:11; 125:6;
130:10; 175:16; 185:7
internally 99:18; 124:4;
186:17
international 48:17;
73:16; 175:17, 20
international's 49:7
internet 18:11; 81:5;
140:16
intervention 199:14;
203:17
interview 47:16
intimately 117:17
into 17:19; 20:13; 27:12;
30:19; 31:17; 32:3, 12;
35:7, 17; 37:1; 41:10;
44:13; 57:2, 19; 71:17;
74:22; 82:20, 21; 83:5, 6,
14, 15, 16, 22; 84:7, 8,
85:5; 90:16; 102:19;
118:19; 121:8; 124:6;
142:22; 162:21; 163:14;
167:16; 168:2, 18; 170:2,
186:11; 199:12, 13, 13
introduce 4:12
introducer 103:21;
105:4; 106:11, 18; 109:5,
8, 13
introducers 78:8; 156:15
introducing 39:15, 18,
20; 40:2, 7, 9, 11, 13;

Case 1:04-cv-21346-KMM    Document 36    Entered on FLSD Docket 07/26/2004    Page 107 of
129
Certain Foreign Currency Trading
Companies (Universal FX)

Deposition of Steven Michael
March 1, 2004

53:14; 56:14; 57:4; 67:21;
68:5, 11, 13; 76:8; 77:11,
13, 20; 78:5; 82:16; 84:7;
85:18; 93:13; 97:2;
102:14, 17; 115:4, 7, 10;
139:12; 154:11, 14; 156:6,
14; 171:13; 183:13;
192:17; 198:16; 201:12
**invested** 22:2
**investigation** 45:16
**investigative** 45:14
**investing** 21:21
**investment** 11:18, 21;
49:11
**investments** 11:20
**investor** 9:4
**investors** 9:8; 13:7;
52:22; 53:6, 10
**involved** 12:2; 19:14;
35:22; 36:8; 37:19; 60:18;
67:3; 86:19; 109:15;
115:6; 188:10
**IPA** 80:12
**issue** 45:6; 88:8; 171:13
**issued** 5:12; 119:20;
171:16
**issues** 67:3, 6, 19; 88:18;
196:14

**J**

**January** 62:22; 72:12
**Japanese** 28:17; 31:5, 9
**JMS** 10:22; 11:5, 6, 7, 7;
12:2
**job** 47:16, 18; 48:4; 51:3;
63:7; 64:1, 6, 20; 140:7;
141:17
**jobs** 63:19
**Joe** 56:5; 69:11
**joining** 49:22
**Jordan** 48:17; 49:7
**Julie** 9:7
**jumping** 25:22
**June** 114:16, 17; 120:5
**jurisdiction** 160:16

**K**

**keep** 26:15; 35:4; 68:14,
15, 17; 127:14; 130:11;
142:8, 16; 144:8; 186:21;
189:8, 17, 18; 197:4, 5
**kept** 2:12; 59:14; 106:11,
18; 109:5; 132:11; 142:20;
164:2; 168:15; 178:8;
186:19; 189:7; 197:1, 2
**keypunch** 192:3, 5
**keypunched** 32:2, 3
**keypuncher** 121:8
**keypunching** 103:1
**kind** 41:17; 49:10, 55:9;
100:10; 114:18; 128:14;
176:5; 184:12

**kinds** 173:5
**KMZ** 7:2
**knew** 28:9, 13, 14; 33:7;
50:13; 61:14; 69:10;
70:10; 72:22; 74:10;
77:13; 78:20, 22; 79:2, 5,
14; 102:16; 127:21
**knowing** 56:11
**knowledge** 47:7; 114:16;
131:2; 155:4, 6

**L**

**labeled** 39:2
**laid** 198:5
**landscape** 33:13
**lapsed** 23:11
**Larry** 19:6; 48:1; 58:9
**last** 8:17, 18; 19:9, 9, 13;
33:11; 46:19; 72:9; 86:3;
174:4
**late** 120:4
**later** 31:21; 36:20; 43:20;
63:15; 72:5; 86:3, 3; 133:6;
202:15; 203:9
**laws** 46:11, 12
**learned** 76:21
**lease** 13:13, 15; 18:13
**least** 24:1; 36:19; 145:7;
150:19; 165:18; 169:4
**left** 49:1; 125:11; 126:2;
127:22; 128:9; 151:13, 18;
170:21
**Lehman** 115:1
**less** 56:22; 63:10; 125:4;
191:9
**letter** 7:2, 5, 12, 16; 12:11;
20:6, 21; 48:21; 94:10;
95:4
**level** 139:21, 22; 149:21;
156:2; 167:2, 4, 5
**levels** 166:14; 167:12
**liability** 72:22; 73:1; 75:1
**liaison** 77:20
**LIBOR** 150:5, 6
**license** 23:8, 9, 10
**licenses** 23:5
**life** 23:18
**liked** 134:8
**likely** 125:4; 129:17;
203:5
**likes** 194:9
**limit** 17:1; 115:16; 116:2,
4; 125:14; 126:5; 128:16;
134:8
**Limited** 11:19; 15:20;
16:8; 98:18; 104:4; 134:9
**line** 36:20; 39:1; 103:5,
13; 104:12; 105:2, 3, 7, 20;
106:20; 108:12, 13;
121:13, 176:12
**lines** 51:22; 103:11
**lingo** 78:9, 15
**Link** 20:9

**Linton** 192:6
**liquid** 82:9, 10; 156:3
**liquidate** 167:9
**liquidated** 156:4
**liquidates** 202:13
**liquidation** 156:2; 167:2,
7, 8; 202:11, 12
**list** 13:16; 27:18; 54:9, 13,
14, 17; 55:19, 21, 22; 56:1,
10, 18, 21; 57:1, 3, 14;
68:8, 10, 13, 14, 15, 16,
21; 69:1, 3, 6, 7; 72:1;
111:20; 113:8; 119:16, 17;
133:17; 172:21; 179:17,
19
**listed** 7:18; 20:20; 25:10;
27:18; 28:18; 29:21; 32:22
**lists** 55:9; 77:15; 113:5, 6
**literally** 35:3
**little** 14:8; 25:22; 92:12;
102:10; 121:14; 123:9;
124:2, 14; 176:10
**live** 26:9; 100:17; 163:2
**LLC** 10:22; 11:6
**local** 132:12
**locally** 20:2
**located** 12:16; 67:12
**location** 15:17; 18:7, 10;
86:6
**lock** 91:18
**log** 26:7; 51:17; 74:22;
101:12; 171:9; 192:14
**logged** 26:8; 51:16;
100:7, 10; 101:21; 192:22;
193:11
**logging** 101:10
**London** 15:19; 48:18;
49:6
**long** 8:14; 18:4; 23:7;
24:3; 29:6; 30:13; 31:15;
36:19; 47:3; 49:16; 72:14;
90:10; 112:16; 127:21;
145:18; 146:8; 147:5, 7;
156:19; 167:1; 168:15;
173:2, 12; 202:17
**long-term** 22:8
**longer** 21:18, 19; 38:1;
62:20; 164:2
**look** 6:14; 7:16; 31:4;
39:1; 42:4; 59:8; 75:7;
79:7, 8; 87:8; 94:14; 96:9;
115:11; 167:11; 173:19;
175:22; 176:8, 9; 179:2,
20; 185:14, 19; 187:9;
189:12, 14
**looked** 117:18
**looking** 6:11; 17:6, 11,
16; 18:21; 20:5; 26:20;
33:6, 11; 47:20; 48:11;
90:4; 147:12; 187:15;
190:10
**looks** 94:17; 122:22;
174:16; 178:21; 179:12;
180:3, 10; 181:3; 191:9;
194:9, 14; 201:18
**lose** 23:18; 75:20

**loss** 17:1; 91:18, 21;
144:7, 8
**losses** 142:4
**lost** 34:15, 16; 71:19;
75:5, 16, 21; 203:9
**lot** 32:3; 67:6; 70:4;
103:12; 105:3, 3; 117:22;
137:7; 202:16; 203:9, 9
**lots** 78:10, 11; 185:21, 21,
21
**lower** 151:21
**Loyola** 22:12
**lunch** 109:20

**M**

**machine** 126:7
**main** 61:17, 19; 140:22;
175:16
**mainly** 109:15
**mainstream** 106:9
**maintain** 160:15
**maintaining** 56:21
**maintenance** 167:6
**major** 160:3
**majors** 134:1
**makes** 32:9; 42:4, 13;
84:4; 132:13
**making** 68:1; 92:20;
100:3, 5; 160:18; 169:1
**Manage** 136:1; 162:20,
22
**managed** 10:12
**management** 9:3, 16;
10:1, 4, 7, 8, 12, 13, 14, 15,
20; 17:15, 15; 18:14, 21;
22:2; 63:5; 89:3; 111:11
**manager** 10:20; 172:1
**managers** 9:17
**manages** 63:4
**managing** 10:19; 60:18;
64:22; 65:6; 67:20; 170:4
**manner** 15:1; 59:5
**Mansfield** 62:4, 16; 64:9;
66:5
**manual** 41:14; 118:16,
21, 22; 124:5
**manually** 31:19; 34:20;
41:11, 15; 42:6, 10; 58:1;
76:16, 85:11; 123:22;
124:6; 143:8; 151:17;
164:13; 183:21, 22; 184:1,
4; 187:14; 200:6
**many** 21:14, 14; 23:10;
163:20
**March** 5:14, 16; 8:18
**margin** 14:13; 142:17;
143:9, 17; 150:3; 155:17,
20; 156:5, 9, 13, 20;
165:12, 16; 167:2, 3, 5, 6,
8; 168:6, 8, 13, 16; 169:2,
3, 4; 196:4; 202:17, 19;
203:5, 8, 10, 13, 17
**mark** 7:1; 9:6; 24:7;

79:22; 82:22; 83:1; 94:5;
97:17; 162:7; 173:13;
174:1; 180:16; 203:19
**markdown** 78:21; 79:17;
83:4, 8; 84:3, 15; 85:8;
139:5
**marked** 5:2, 4, 19; 7:10;
24:9; 38:19; 79:3, 3, 15,
15; 94:8; 97:20; 102:3;
104:17; 105:12; 108:17;
120:11, 14; 162:10; 165:6;
173:17; 180:19; 181:18;
194:6; 198:9; 201:8; 202:5
**market** 28:8; 53:5; 70:2,
11; 80:5, 6, 9; 82:9, 11;
90:11; 92:17, 20; 93:21;
96:17; 100:19; 102:21;
107:1; 115:16, 17; 126:17;
128:16, 17; 137:5; 146:3;
152:8; 155:15; 169:8;
174:2; 203:11
**market-making** 48:6, 7,
10
**market-to-market** 33:20
**marketed** 114:12
**marketplace** 146:19
**Markets** 15:19, 20; 16:8,
10; 80:13, 15; 82:6, 8;
98:18; 133:16, 18; 134:2
**markup** 78:21; 79:17, 18;
80:3; 82:17, 18, 19; 83:3,
8, 9, 21; 84:2, 5, 6, 15, 19;
85:5, 7; 102:13, 17; 103:4,
8; 104:14; 105:8; 108:15,
16, 19, 21; 109:1, 4; 139:3,
4, 5, 8, 9; 183:19; 184:15,
22; 185:3, 8, 15, 22; 186:3,
7; 187:2, 16; 188:4;
191:13, 13
**markups** 79:12; 85:1;
106:11, 12, 18; 107:4, 5;
108:11; 109:11; 115:4;
139:10, 13, 17; 177:5, 5;
182:19; 183:5, 12; 184:2,
5; 185:11; 186:14; 187:15,
21; 189:2; 190:1, 15, 16,
21; 191:1, 6, 8; 193:8
**match** 29:13
**matched** 127:16, 19
**materialized** 164:3
**math** 186:15
**matter** 115:8; 148:19
**mattered** 133:6
**maximum** 134:13
**may** 27:6; 51:20; 42:1;
36:20, 20; 38:4, 4; 39:6;
42:10, 43:17, 18, 20;
44:21; 55:1; 58:15; 65:5;
73:20; 81:13, 13; 86:10;
91:18, 19, 20; 92:17, 19,
19; 96:9, 12, 13; 114:18;
115:21, 21; 118:1; 120:4;
133:9; 141:21; 150:1;
157:15, 17; 182:8
**Maybe** 21:18; 33:12;
35:20; 36:14; 48:19; 59:1;
61:3, 8, 8; 63:14; 64:18;
65:8; 70:9, 12, 20; 72:1;

**Deposition of Steven Michael**
**March 1, 2004**

74:11, 14, 19; 84:22; 86:3; 87:8, 11; 88:16; 90:10; 92:10, 16; 93:1, 1; 109:17; 118:2, 10; 132:17; 133:11
MC 202:9
MCCI 65:1, 10
MCM 65:1
mean 29:16; 33:15, 17; 35:5; 40:16; 52:9; 85:12; 86:12; 99:16; 101:6; 107:6; 118:21, 22; 122:22; 123:12, 15; 125:10; 128:12; 130:2; 131:7; 135:9; 144:6; 149:4; 167:20; 175:18; 190:17
meaning 124:5; 153:11
means 101:14; 105:5; 128:13; 145:17, 22; 153:10; 174:10; 176:11; 177:1, 6; 190:21
meant 55:14; 114:7; 176:22; 177:3
mechanically 95:20; 96:1
mechanics 119:7
mechanisms 80:10
media 20:3
meet 47:15; 67:7, 11; 140:5; 156:9, 19; 168:5
meetings 67:17; 68:6; 86:20
Meinick 172:10
memorialize 59:14; 97:1; 164:10
memorialized 58:11
mention 65:7
mentioned 48:19
mentoring 15:11, 14
Merick 19:8; 62:4; 63:13; 64:21; 65:9; 111:22
met 65:9; 67:14
metals 114:22
Mexico 154:8
Miami 67:12
MICHAEL 4:3, 11, 12; 5:3, 18; 6:10; 7:3, 9; 11:9; 24:8; 89:11; 94:7; 97:19; 102:2; 104:16; 105:11; 111:4, 9; 120:10; 162:9; 165:5; 173:16; 180:18, 21; 194:5, 15; 198:8; 201:7; 202:4, 204:10
Michaela 27:21; 28:16; 31:2
middle 137:16; 138:11
might 32:17; 38:5; 64:13; 99:6; 132:1, 4; 139:21; 178:17; 179:12
Mike 62:4, 16; 66:5
million 78:12, 13; 93:21; 126:18; 128:19; 129:21; 153:14, 15; 202:2
mind 204:1
mine 122:20
minimum 134:6, 12, 18

minute 133:12; 148:19
minutes 90:10; 166:5
mispunched 73:20
missing 42:2; 67:4; 73:17; 75:11
mistaken 140:17
misunderstood 145:1
mode 203:11
model 14:22; 17:12; 18:1; 22:5, 5, 8; 195:22; 197:22
moment 13:2, 12; 16:5; 126:7
money 16:9, 18, 20; 17:1, 8, 11, 15, 19; 18:2; 23:18, 20; 24:2; 37:7; 59:2; 63:5, 5; 64:22; 75:17, 19, 20; 142:7, 12, 14; 156:11; 158:8; 161:7; 162:1; 195:10; 203:10
monitor 85:10
month 18:13; 65:8, 14; 183:5, 22; 186:13
monthly 78:22
months 18:14, 16, 20; 21:14, 15; 46:19; 47:5; 49:21; 63:10; 86:4; 98:9; 103:14; 136:2; 162:21
more 10:6; 36:17; 43:12, 13; 54:21; 56:22; 71:1, 4; 81:17; 82:7, 7; 85:3; 91:17; 106:8; 124:1; 127:20; 129:16; 142:21; 149:6, 7; 150:3; 156:11; 162:11; 176:10; 182:13; 191:3, 5, 9, 14; 196:7; 203:5
Morgan 115:1
morning 66:2; 109:22
most 10:3; 43:9; 61:8; 67:2; 70:7, 19; 81:19; 82:10; 134:1; 143:20; 156:9; 160:3; 197:13
move 25:4; 86:8; 108:6
moved 86:6; 155:15; 162:22
movement 169:5
Moving 126:2; 128:22
much 40:11; 67:9; 71:18; 73:9; 78:20; 79:2; 85:5; 102:11; 141:16; 142:7, 19; 150:15
multiple 194:15
multiply 185:21, 22
must 153:11; 191:3
myself 4:12; 9:3, 17; 13:6; 19:4; 21:22; 22:1; 121:14

**N**

name 4:9, 13; 9:6; 10:11; 12:12; 19:9, 9, 13; 20:15; 21:2; 25:10, 12, 19, 19; 33:2, 3, 3, 5; 35:16, 17; 36:13, 16; 37:3; 38:1, 7; 39:17, 19, 20, 21, 22; 40:3,

6, 10, 12, 22; 54:10, 17; 56:4; 64:12; 69:3; 72:6, 8, 9; 77:14, 17; 113:9; 126:13, 14, 19; 171:8, 10; 172:5; 175:15; 179:13; 180:4, 5, 11
named 36:3; 46:1, 10; 172:10, 11; 192:6
names 13:9; 33:6; 69:6; 173:4, 10
narrowest 99:9
NASD 46:5
national 49:7, 15, 21; 50:1; 158:4, 15
National's 49:8
nature 14:15, 17; 68:3; 78:20
near 200:16, 18
necessarily 32:11; 41:2; 56:9; 96:8; 132:22; 144:6; 157:15
necessary 204:14
need 42:3; 127:20; 158:14; 159:2; 197:16; 204:3
needed 51:19; 68:19; 73:1; 75:2; 79:10
Needle 30:22
negative 151:8
negotiate 115:19; 137:1, 10
negotiated 79:17; 80:1; 83:9; 102:13; 115:22; 195:20; 196:6
negotiating 109:9; 154:4, 8
net 34:16; 76:1; 89:16, 18; 121:6; 176:19
netted 34:11; 136:5; 147:6, 19; 148:16
netting 34:8
New 64:8; 73:15; 77:10; 111:21; 115:1; 131:12; 140:11, 12; 144:10; 145:2, 12, 17; 161:4, 5
Newspaper 20:4
next 17:17; 39:5; 88:16, 21; 122:21; 123:8, 17; 136:8; 151:4; 157:4; 175:22; 177:18; 178:20, 21; 179:5, 20; 180:7
NFA 46:5
nice 107:19
night 65:22; 66:2, 3, 6, 12, 13
nobody 51:8, 8; 66:20; 86:12, 15
nobody's 77:12
normal 24:20; 65:17; 89:6; 97:15; 182:18
normally 41:20; 70:9; 89:5; 97:15; 133:1; 203:16
North 22:11; 67:12
notary 4:5
notation 202:9

note 5:11; 60:21, 22
notify 156:15; 157:9; 161:12
November 46:20; 62:14; 94:12
number 19:17, 19, 20; 25:10; 39:4, 8, 10, 11; 51:20; 55:20; 56:9; 61:15, 17, 18, 19; 67:18, 19; 69:4; 81:10; 92:1, 8; 95:21; 96:2, 9; 98:15; 107:7, 9, 19, 22; 119:16, 18; 121:1, 2, 10, 11, 12, 16, 18, 19; 122:5, 6, 7, 8, 13; 128:4; 130:3, 5, 13; 141:1; 149:18; 150:13, 18; 173:3, 11; 179:13, 15, 18; 183:10; 187:17
numbers 7:14; 27:7; 54:15; 56:10; 57:3, 5; 68:19; 69:7; 75:15; 121:15; 126:11, 12; 130:10; 182:11; 184:3; 185:17, 21; 187:11, 12, 13; 198:19, 20, 20, 22; 199:2
numerous 197:6

**O**

obligation 168:3, 5, 7, 10, 12, 13, 16, 22
obligations 167:15, 18, 19, 20; 168:19, 22; 169:7
obtain 115:3; 136:17; 138:19; 172:22
obtained 26:6
obtaining 156:12
obviously 108:11
occasionally 147:18
occur 84:15
occurred 118:1
occurs 169:18
off 6:3, 5, 10; 19:20; 25:3; 33:12; 50:19, 21; 88:9; 89:8; 96:14, 17; 110:2, 3; 115:21; 123:14; 124:10, 18; 129:5, 8, 11, 12; 133:3; 137:1, 3, 3, 4; 151:14; 152:8; 170:11, 21; 181:14; 198:5
offer 95:16; 108:20, 21, 22; 109:3; 116:1, 4; 133:14; 138:13; 144:19, 21; 151:18; 152:7
offered 96:6; 97:1
offering 92:6; 96:3
offers 82:5
office 19:8; 30:8, 9; 44:17; 60:22; 61:17, 18; 71:18; 74:8; 84:9; 87:7; 109:9; 115:7; 192:1
officer 12:22
officers 13:18
official 50:16, 18
offset 25:21; 29:7, 22; 36:6; 42:6; 51:22; 145:3; 146:1; 149:1

offsetting 42:15; 117:6
often 36:15; 65:21; 67:11; 84:22
oftentimes 66:1; 117:21; 127:14; 182:10; 183:2, 7; 202:14
Ohlmiller 4:17; 38:17; 43:14; 109:21; 118:3; 119:18; 120:8; 146:16; 157:1; 162:4, 7; 173:13; 180:16; 181:11, 22; 194:2, 18; 195:15; 197:18; 203:20; 204:6
OHLMLLER 111:8; 112:2; 119:12; 120:12, 21; 128:21; 131:3, 9, 21; 147:11; 149:17; 157:5; 165:7; 173:18; 175:7; 180:20; 181:6, 16; 191:19; 194:7, 20
OM 177:4; 182:22
OMC 190:18; 191:1
OMO 190:17, 20
on-line 26:14; 43:11; 113:11; 115:13; 116:2, 21; 118:7, 14, 16, 19; 133:7, 8, 9; 136:16; 138:16; 142:22; 170:7; 171:4, 7; 189:21, 22
once 61:8; 85:9; 87:8, 8; 116:5; 118:18; 124:9; 171:3
one 6:2; 9:5, 6; 10:17, 17; 21:20; 22:3; 34:2; 36:12; 39:12; 40:14; 43:12, 17; 50:20; 54:21; 55:4; 64:2; 65:16; 68:22; 69:2, 12; 70:14, 17; 71:1, 4; 72:3; 73:12; 77:13; 78:6; 80:14; 82:15; 87:19; 88:20; 91:5, 16; 92:1; 96:9, 18, 19; 101:6, 11; 108:2, 20; 111:17, 18, 22; 115:12; 116:6, 8, 9; 119:15; 120:19; 121:3, 22; 123:9; 124:8; 129:12; 132:2, 19; 137:15; 138:10, 10, 18; 139:4, 18; 140:1; 141:21; 143:1; 144:9, 15, 16, 17; 145:2; 146:3; 148:5, 6, 19; 150:7, 13; 151:15; 154:18; 155:12; 157:1, 4; 158:11; 162:11; 164:4, 15, 21; 170:13; 179:4; 182:13; 186:13; 188:16; 191:8, 10, 11, 11; 197:20; 199:6, 22; 200:12, 12, 13; 202:15
one-half 167:2, 3
one-page 94:12
one-penny 108:6
one-to-one 108:4
Oneallo 72:6, 9; 74:6
Onellio 178:15
ones 53:4; 81:2; 194:16
ongoing 17:5; 88:8; 143:22
only 13:22; 16:9; 22:7; 26:22; 34:2; 50:13; 56:6; 60:3; 66:19; 69:9, 12;

76:13; 109:11; 138:21;
141:13; 144:16; 147:19;
148:16; 150:16; 152:4, 6;
153:3, 5; 155:1; 159:12;
168:7; 169:5; 170:18;
173:11; 187:8

open 16:21; 20:22; 21:1,
10, 16; 34:6; 40:15; 41:1;
71:6; 107:6, 7, 10; 123:17;
136:5; 145:2, 14; 146:2;
154:16; 177:5, 11, 12;
186:3, 7, 9; 190:15; 191:4;
193:7

opened 36:15; 41:2, 3;
71:7; 188:2, 3

opening 32:14; 102:7,
15; 123:20; 146:4; 168:1;
174:9, 10; 182:19; 190:21;
191:1, 13

operations 66:22;
182:19

opportunity 6:16

opposed 136:5

opposite 69:15; 117:1;
148:4, 15

options 23:1

order 44:5, 5, 8, 11; 65:6;
72:3, 4; 74:2; 92:1; 97:9,
12, 14; 100:15; 101:15;
113:20; 115:13, 14, 16, 16,
17; 116:3; 118:22; 120:2;
122:17; 123:2; 124:8;
125:12, 14; 126:3, 5;
128:7, 14, 16, 17, 22;
129:3, 7, 8; 131:10, 132:2;
133:1; 138:16; 144:16;
147:16; 158:9; 198:11;
199:22; 201:1; 202:7, 8

orders 43:10; 44:6;
70:10; 78:1, 14; 97:11;
113:17, 18; 116:6; 125:12;
142:22; 147:19; 201:13,
19

organized 23:14

organizing 13:2, 12; 16:5

Originally 36:14; 195:20

others 96:16; 119:22

Otherwise 16:11;
125:13; 126:8

ours 65:8; 130:11

ourselves 20:17; 57:6;
83:1

out 16:7, 10, 14; 17:3;
24:17; 26:15, 16, 17, 17;
27:1; 30:4; 32:18; 39:22;
41:19; 47:18; 57:14, 69:1,
1; 71:20; 76:4, 4, 7; 77:16;
79:10, 12, 81:5; 90:8, 12;
92:21; 97:14; 108:8;
116:12; 118:12; 127:13,
18, 147:6, 8; 164:17;
167:12; 172:22; 175:9;
176:21; 183:6, 14, 21;
184:2, 6, 6, 7, 11; 186:6,
11, 16; 187:21; 189:3;
198:21

output 84:11

outside 98:16; 150:4

outsourced 112:14;
146:12

outsourcing 48:6; 52:9;
65:14; 112:17, 20

over 6:16; 7:16; 23:18;
74:18, 19; 75:9; 86:1;
170:5; 195:10; 196:18;
197:7

overnight 149:16

overseeing 67:21; 77:20,
21

own 14:11; 16:9, 21; 17:2;
18:18; 22:4; 48:5; 50:8;
72:18; 74:12; 78:19;
81:11, 12; 91:19; 92:19;
99:8; 114:10; 122:4;
160:11; 163:18; 172:5, 5

owner 33:1, 7; 39:19;
47:10

owners 22:1

owns 11:7, 8

**P**

P&L 75:2; 76:1, 1, 18, 19;
177:3, 3; 178:16

p.m 110:4, 5; 111:2;
166:3, 4; 204:18

page 6:19; 20:21; 25:9;
27:19, 19; 28:4, 15; 30:20;
31:7; 33:11; 39:2; 94:11;
103:4, 5; 104:3, 12; 105:1,
2, 7, 15, 18; 129:1, 8, 18;
130:17; 131:11; 173:19;
174:4, 6; 175:15, 22;
177:18; 179:5, 20; 181:18;
190:10; 194:16

pages 97:22; 201:11

paid 12:6; 16:14, 15;
37:12; 77:4; 135:6;
193:17; 194:21

pair 106:21; 107:5;
108:12, 14, 18; 169:11;
202:7

pairs 169:18

paper 58:10; 127:17;
132:18; 170:8; 171:2;
189:13

papers 140:11

paperwork 16:10; 83:4;
84:10; 85:4; 140:19

Paradigm 49:20; 50:1

Paragraph 98:10; 100:3

parameter 93:5

parameters 17:2; 26:10;
91:19

part 10:3, 19; 19:3, 7;
65:21; 70:7, 76:19, 92:20,
96:15; 102:14; 132:11;
140:7; 146:4; 176:2

participate 18:1

particular 28:19; 29:13,
13, 20; 34:6; 39:11; 54:15,
20; 61:12; 68:5, 9; 71:19;
75:3; 80:4; 84:14; 85:6;
89:14; 90:14, 17; 103:3;

107:18; 134:11; 135:11;
165:20; 169:18; 172:2;
177:22; 194:11

partner 112:4

partners 17:20; 111:17,
22

partnership 12:20; 17:21

party 159:4; 194:13

pass 60:8

password 171:9, 11, 16,
17; 172:3, 5

past 20:16; 64:6; 135:17;
136:14; 152:13, 16

Paul 45:13

Pause 95:9; 165:14;
182:2

pay 17:4; 18:2, 3, 12;
149:15; 157:12, 14, 15, 20;
193:15; 196:5

payable 103:21; 105:4

payer 105:21

paying 13:15; 77:1; 109:2

payment 153:11, 12, 17;
154:1

payments 85:18; 193:19,
21

pending 113:18

people 6:12; 13:7; 17:7;
20:13; 33:2; 51:12; 61:21;
69:6; 70:20; 87:19; 134:1;
146:6, 7; 172:15, 15, 17,
18; 183:4; 192:4

per 18:13; 105:2, 21;
106:21; 107:5; 108:11, 14,
18; 195:19; 196:5

percent 17:4; 29:10;
64:15; 113:22; 114:19;
117:3; 129:14; 139:15;
140:2, 14; 159:10; 164:20;
166:6, 6, 7; 167:3

percentage 16:14;
167:8; 203:18

percentages 166:9

period 20:21; 46:14;
71:3; 75:3, 10, 17; 120:3;
146:13; 163:1; 176:18, 18;
184:7; 186:13; 188:6, 9;
190:22; 191:4, 14

periodic 89:3

periodically 57:5; 58:7;
61:3, 5; 67:7; 69:1; 84:22;
183:9; 186:20; 189:9

periods 65:19; 88:10

person 9:5; 32:2; 39:17;
54:10, 16; 56:4, 6; 66:19;
70:2, 8; 71:1; 100:14;
135:7; 144:15, 17, 17

person's 54:17; 70:17

personal 22:4, 6

personally 61:6; 142:2;
181:10; 197:4

persons 5:22; 6:8

pertained 175:19

peso 154:9, 9

pesos 95:11; 154:10

Pete 181:11

Peter 4:13; 43:14; 157:1;
162:5; 180:16; 194:2;
197:18

phase 162:21

phone 7:14; 19:17; 31:20;
43:12, 13, 17; 44:7, 9;
51:20; 61:15; 68:19; 69:3,
9; 97:11, 13; 123:15, 16;
127:4; 133:1; 141:18;
144:16; 199:17

physically 161:4; 170:12

pick 34:22

picked 178:5

picking 138:17

piece 132:17; 189:13

PIP 92:13; 99:21; 107:16;
109:1

PIPS 81:16, 21; 95:15, 21;
96:2; 107:6, 7, 9, 20, 21,
22; 108:3, 4, 5, 7; 109:3;
200:12, 13, 13

place 5:16; 44:18; 78:14;
80:4; 86:8; 116:19; 160:8;
163:8; 166:6; 203:13

placed 126:5, 9; 201:2

places 92:22

plan 18:4; 20:1

plane 204:16

planned 161:13

planning 14:16; 20:2;
162:19

plans 14:9, 21

platform 38:21; 74:21;
100:6; 101:16; 123:10, 13,
14; 125:2; 129:4, 6, 9, 11,
13, 16; 132:21, 22; 133:3;
148:20; 193:16; 199:11

platforms 116:10;
135:22; 162:19

please 25:1; 162:8;
181:19

plus 116:15

point 23:11; 35:8; 43:17;
55:8, 12, 14, 16; 87:14;
89:14; 93:8; 96:18; 99:11;
164:4; 185:2, 5, 10; 187:3,
18; 190:9; 195:8; 200:19;
204:14

points 82:2, 3; 92:3

policy 114:11, 13; 165:17

pop 156:16, 17

portion 195:16

portrait 33:13

position 12:22; 32:14,
14, 19; 34:18; 70:12, 16;
74:12, 13, 14; 90:13;
92:10, 19; 116:19, 20;
121:4, 7; 123:20, 20;
135:17, 18; 144:10, 11,
145:2, 4, 12, 14, 17, 18;
146:9; 148:21; 152:16;
153:2; 155:16; 164:16

positions 70:5, 5; 74:12;
90:8; 124:16; 146:3;
149:16; 156:3; 177:4;

191:2; 202:13

positive 151:7

possible 73:2; 97:15;
122:13; 141:20; 144:14;
148:10; 158:14; 191:7

possibly 14:7; 18:6; 59:1,
1; 126:13; 127:5; 133:11;
171:1; 178:14; 193:13, 18;
197:13

posted 124:3, 5; 125:21

postgraduate 22:20

potentially 58:13, 14;
118:9

pound 161:3, 10

pound/U.S 135:1

pounds 135:2; 159:7, 8;
161:3

power 53:21; 54:11, 16;
56:4, 6, 12, 18; 57:8, 15;
58:22; 59:10, 13, 19; 60:5,
13; 66:9; 69:5; 93:18; 94:4;
100:15; 101:11; 104:4;
114:4, 5; 118:14; 135:7;
170:4

power-of-attorney 56:3

practice 70:18

pre 127:6

pre-allocations 127:7

premium 149:2, 3, 3, 4,
10; 150:11; 177:7, 7

premiums 149:11

prepare 71:16; 132:1

prepared 94:18; 98:7;
104:7, 8; 119:14; 158:20,
22

preparing 71:10; 94:20;
95:2, 3; 162:18

preprinted 121:15

present 12:8

president 13:17; 50:17

Presumably 89:22

pretty 31:13; 67:9; 70:8;
81:14; 144:5; 150:5, 15

previous 13:8; 15:9;
32:18; 118:2; 129:18;
133:9; 145:3, 14; 178:10

previously 64:10; 111:5;
146:11

price 28:17; 31:6; 40:17;
41:5; 70:22, 22; 80:9, 12,
14; 81:11, 13, 22; 82:15,
16, 19; 83:7, 15, 16; 90:17;
91:7, 9, 16; 92:5, 6; 93:1,
3, 4, 9, 11, 12, 15, 20; 96:2,
3, 6, 8, 11, 12; 97:1, 6;
98:16, 17, 18; 100:22;
101:2, 107:14; 108:1, 19,
20, 20, 115:15, 19, 20, 20,
22, 116:11; 128:5; 137:8, 9,
9, 13, 15, 17; 138:3, 9, 10,
10, 14; 144:12; 148:5, 8, 8,
11; 151:10, 14; 169:5;
189:15; 199:10, 13;
200:10

prices 80:18; 81:1; 82:1;
92:9, 93:6; 97:12, 99:13;

**Deposition of Steven Michael**
**March 1, 2004**

Ce... in Foreign Currency Trading
Companies (Universal FX)

138:7, 8; 151:16, 19, 22;
174:9, 10, 11, 12, 12, 13,
16; 199:7; 203:1
**pricing** 141:10
**principal** 50:14
**principals** 50:12
**print** 26:15; 28:5; 39:22;
44:16; 57:1, 3; 69:1;
170:16; 175:9; 178:4, 15,
19; 184:6, 6, 10; 185:3, 5,
18, 20; 186:18, 20; 187:1,
8; 189:11, 16, 22; 197:11
**printed** 26:16, 16; 28:11;
29:4; 33:13; 39:10; 57:14;
170:10, 12, 15, 20, 20;
178:7; 184:7; 189:19;
197:12, 14
**prints** 41:19
**Prior** 49:6, 19, 22; 51:15;
64:20; 86:5; 88:17;
114:17; 158:1; 160:5
**Probably** 21:17; 22:19;
31:16; 43:13; 50:17;
56:22; 62:10, 14; 63:9;
72:12; 114:18; 128:17;
135:21; 141:2; 150:16;
162:22; 199:14; 200:5, 18
**problem** 144:1; 195:12,
18
**problems** 78:4; 88:6
**procedure** 156:7; 156:1,
22; 157:6, 8, 9
**proceeding** 45:10
**PROCEEDINGS** 4:1
**process** 15:11, 12, 14;
16:4, 18; 19:7; 71:2; 89:15;
118:11; 170:6
**produce** 58:19; 74:1;
185:8; 189:8, 9
**produced** 44:6; 58:11;
72:2; 102:6; 104:20;
119:21; 185:12; 188:20;
189:6; 201:10
**production** 120:6; 202:9
**professional** 23:5
**profit** 17:12, 13; 89:22;
90:3; 91:18; 196:4
**profitability** 71:17; 72:6,
11; 73:6; 75:12; 76:12;
87:4; 88:19; 89:14; 91:15
**profitable** 17:17, 18
**profitably** 17:13
**profits** 16:15, 17, 5; 142:4
**program** 30:8
**programming** 175:21
**project** 72:17
**pronunciation** 62:6
**PROP** 16:11; 17:4
**proper** 16:12; 78:15;
142:17; 143:9
**properly** 141:14
**properties** 11:8
**property** 11:7
**proprietary** 14:4, 10;
15:2, 5, 18; 18:1; 19:1;

64:11; 74:13
**prospective** 15:1; 48:4;
140:11, 18; 141:9; 160:7
**provide** 5:22; 6:9; 141:4;
144:12
**provided** 60:15; 61:15;
68:21; 100:4
**provider** 98:17
**provides** 10:7
**providing** 6:13; 14:16
**public** 4:5; 52:18
**pull** 193:4
**pulled** 120:6
**punch** 27:11; 32:6; 34:3,
5, 11, 18, 20, 21; 42:10,
16; 43:22; 44:3; 82:20, 21;
118:17; 121:8; 124:11;
143:9
**punched** 30:10, 11, 14;
31:19, 21; 32:4, 12; 34:2;
41:11; 42:6, 9; 43:21;
88:15, 17; 117:19, 20, 21;
124:17; 126:21; 127:21;
143:8; 189:14
**punching** 31:22; 32:5;
88:11, 12, 12; 123:22;
130:12
**purports** 7:12
**purpose** 26:19; 28:12;
136:3
**purposes** 11:12; 57:11;
71:13; 123:5; 124:11;
136:10, 12
**pursuant** 6:9, 13; 66:9
**put** 6:12; 29:21; 33:3, 5;
35:7; 39:17, 21, 22; 44:14,
18; 54:19; 59:21; 80:3;
83:4, 6; 84:8; 85:5; 87:2;
88:15; 97:9; 116:22;
117:2; 123:3; 124:6;
129:6; 142:11; 148:4, 7;
150:13; 166:9; 194:19;
201:19
**puts** 25:19; 180:3, 4, 5
**putting** 16:3; 9:2; 69:14;
122:12; 201:12

**quoting** 101:7

# R

**raise** 151:21
**ran** 49:5; 65:22; 76:18,
20; 191:15
**range** 81:15, 16, 20
**Rarely** 61:5; 134:2;
177:21
**rate** 149:15; 150:6, 6, 9,
11, 12; 169:13, 13, 14, 19
**rates** 150:21
**rather** 139:9
**Raton** 12:19; 86:7
**RCG** 48:17
**reach** 61:19
**react** 151:18
**reactivate** 60:2
**read** 95:7; 129:19;
140:19; 141:5; 165:10;
176:11; 181:19; 182:9;
195:15, 16
**readily** 133:22
**reading** 141:20; 182:6
**ready** 52:1; 163:3
**real** 10:18; 11:1, 1, 21;
12:4; 19:8; 43:7; 139:9;
151:1
**realize** 111:18
**realized** 177:2, 3
**really** 10:4; 13:11; 16:4;
29:10; 30:3; 40:11; 41:5;
43:6; 47:6; 48:8; 64:1;
67:22; 71:15; 74:6; 76:5,
20; 78:22; 86:12, 15, 18;
102:10; 104:1, 1; 109:8,
10; 114:18; 115:6; 117:16;
121:21; 133:17; 137:21;
141:16; 142:10, 18; 161:5;
164:3; 165:2, 9; 170:19;
173:8; 176:21; 187:7;
195:4
**reason** 31:15; 59:3, 10;
76:5; 79:6; 125:2; 159:2;
187:8; 189:18
**reasons** 58:21
**recall** 9:6; 27:7; 42:5;
43:13; 52:14, 14; 55:6, 8;
56:7; 60:14, 17; 61:9, 11;
62:9; 69:12; 77:17; 81:4;
87:15, 20; 98:6, 8; 116:17;
117:19; 119:6; 122:14;
148:9; 144:4; 154:15;
155:9, 10, 14; 156:1;
165:9; 166:16, 18, 19;
167:9, 22; 182:8
**recalling** 39:8
**receive** 141:19; 157:7,
18, 159:21
**received** 87:4; 150:22,
155:2; 161:21
**recess** 50:22; 89:9;
181:15
**recessed** 110:5

**recipient** 87:16
**recognize** 25:5; 32:21;
94:16; 122:16; 175:3;
198:13
**recollection** 98:7; 142:5;
182:6
**reconcile** 178:16
**reconciliation** 109:16
**reconvene** 110:5
**record** 4:10; 5:11; 6:3, 5,
11; 17:18; 25:3, 3; 45:19;
50:19, 21; 54:8; 58:10;
59:7, 14; 89:8; 102:16;
110:2, 3; 130:21; 181:14;
195:17; 204:17
**recorded** 81:1; 163:13
**records** 6:1; 57:12, 17;
71:10, 11, 12, 16, 22
**refer** 35:6; 41:1; 103:4;
142:14
**reference** 39:12, 14, 15,
16; 68:18; 92:15; 93:8;
95:12, 14; 96:15, 18;
100:5, 18, 18; 122:11;
126:19; 130:3, 13; 132:20;
133:4
**referenced** 87:1; 92:16;
96:19
**referred** 56:21; 80:18;
124:15; 146:17; 162:14
**referring** 13:4; 25:15, 17;
35:8; 71:4; 81:21; 87:9;
89:15; 98:17; 101:10;
119:15; 122:1, 2
**refers** 6:19; 123:1;
176:18
**reflect** 165:16
**reflected** 57:16; 164:17,
19; 185:11; 187:1, 20
**reflects** 41:12; 137:8;
165:11; 177:10, 22
**refresh** 182:6
**regard** 152:11; 196:18
**regarding** 7:3, 17; 61:9;
67:8; 141:5, 9
**registered** 5:22
**regularly** 72:2; 87:12
**related** 43:6; 162:12
**relating** 23:1; 71:12;
188:17
**relation** 129:20
**relations** 67:21
**relationship** 9:14, 19;
11:5; 111:10, 16; 129:20
**relationships** 20:16
**relatively** 74:11; 82:9
**relaying** 156:13
**relevance** 174:5
**relevant** 131:19
**relying** 187:11
**remained** 38:7
**remember** 20:21; 27:9;
29:6, 7, 11; 39:7; 42:7, 7;
55:11, 11; 72:9; 77:14;
117:21; 118:13; 132:18,

166:20; 167:4; 173:10;
182:15, 21
**remotely** 51:14
**rent** 13:15
**repeat** 195:14
**rephrase** 25:1; 169:16
**report** 66:17; 73:4;
173:10; 174:8, 15, 18;
175:5, 6, 8; 176:2, 4, 5, 7;
177:15, 20, 21; 178:7, 14,
17, 21; 179:2, 9, 12; 180:4,
15; 181:5; 182:15, 21, 22;
183:15; 184:3; 186:2, 10;
187:11; 191:15
**reported** 66:18; 163:21,
22
**reporter** 24:19; 195:16
**reporting** 74:20; 80:10;
89:2; 119:8; 135:20
**reports** 78:10; 89:4;
172:19, 22; 173:3, 11;
177:2; 179:3, 19; 183:14;
187:10; 193:4
**represent** 41:8; 119:19;
120:18; 121:1; 130:20
**representation** 136:4
**represented** 4:18; 39:17;
102:6; 136:9; 182:14
**representing** 135:14, 20;
154:12
**represents** 138:11
**request** 7:13; 59:13, 15,
18; 60:7, 12; 85:2; 175:8;
188:11; 204:13
**requested** 60:2; 195:16
**requests** 60:19
**require** 142:7
**requirements** 140:4, 7,
8; 142:20; 143:17; 155:20;
168:6, 9
**researched** 118:9
**researching** 135:22
**reserve** 204:12
**residual** 74:11
**resolved** 196:16
**respect** 16:1; 56:8;
75:19; 78:4; 80:4; 82:5;
85:20; 89:17, 19; 98:15;
99:12; 100:2; 164:5;
198:19
**respond** 7:12
**respondent** 46:2
**response** 94:19, 98:11;
100:3, 4; 119:20
**responsibilities** 16 16,
16, 5:1, 3; 63:14
**responsibility** 62:7, 11,
13, 17; 63:20; 70:14, 17;
71:9; 75:14; 140:10; 141:8
**responsible** 30:15;
56:20; 58:3
**rest** 175:20
**restating** 108:12
**restrict** 133:18
**retail** 17:7, 9; 20:16, 18;

**quick** 91:21; 151:13
**quickly** 44:9; 70:4, 8;
144:6, 146:15, 20; 151:16
**quite** 10:2, 5; 24:2; 35:21;
130:9; 172:18; 173:12;
185:4; 190:20
**quotation** 144:12
**quote** 80:22; 82:15;
93:22; 96:13, 14, 17, 19;
97:12; 100:5, 11, 17, 19;
144:16; 165:21; 169:8
**quoted** 80:5, 6; 92:8;
93:11; 97:6; 99:13; 100:5,
22; 107:2, 15; 148:12, 20
**quotes** 81:8; 96:15;
136:18

Case 1:04-cv-21346-KMM  Document 36  Entered on FLSD Docket 07/26/2004  Page 111 of
129

Certain Foreign Currency Tr  ng
Companies (Universal FX)

Deposition of Steven Michael
March 1, 2004

53:6
**retrieve** 197:8
**Reuters** 81:1, 3; 96:16;
116:9
**Revco** 23:21, 22
**review** 171:3
**Revis** 21:6, 7
**revoked** 114:4, 5
**right** 13:14; 15:19; 35:10;
42:12; 53:15, 18; 54:19;
63:2, 15; 77:17; 84:17, 17;
90:20; 92:13; 93:10;
95:17; 101:8, 8; 105:9;
106:2, 3; 107:16; 111:18;
123:8, 14; 124:1, 13, 15,
20; 125:7; 127:16, 21;
128:6; 130:6; 151:13, 16;
158:10; 162:17; 170:20;
180:10; 185:17; 187:10;
188:12, 21; 189:4; 190:12;
203:12; 204:12
**ringing** 97:11
**risk** 17:14; 18:14, 21;
91:20; 121:4
**role** 10:3; 66:21; 67:20;
69:11, 17; 77:1, 7, 10, 12,
18, 19, 22; 78:3; 85:17, 20;
94:20; 95:2; 112:3;
135:20; 136:4; 156:12
**roll** 153:6
**rollover** 151:4; 164:7
**rollovers** 164:5, 17, 20
**rolls** 153:1; 163:22; 177:8
**Rosenman** 7:2
**Rosenthal** 49:1, 3, 18;
50:4
**round** 105:3; 107:19
**routinely** 55:19; 95:20;
178:19; 200:21
**rule** 134:7
**rules** 24:17
**run** 51:5; 76:21; 174:19;
175:11; 179:3
**running** 49:7; 65:2;
66:22; 67:2, 9
**Russ** 13:10; 19:4; 62:3,
12

# S

**S** 11:11; 25:13
**sake** 199:21
**salaries** 77:4
**sale** 128:6; 139:6; 145:3
**sales** 77:5, 109:12
**Sam** 13:10, 14:11
**same** 9:17; 21:9; 28:5;
29:15; 31:8, 15; 32:4, 5, 8;
42:1, 8, 11, 16, 20; 43:4;
59:5; 62:13, 17; 63:8,
14; 64:1; 70:8; 71:6, 7;
75:9; 76:12; 81:13; 82:4;
84:15; 91:9, 12; 96:8;
105:1, 3; 106:10; 110:5;
113:15; 116:4; 117:11, 22;

121:5, 6, 16; 125:2; 127:7;
134:14, 16, 21; 139:4, 13;
144:12, 13, 15, 18, 19;
145:5, 9, 14, 21; 146:9;
147:5; 148:5, 8, 8, 10, 11,
12; 149:18, 20; 151:22;
176:2, 5; 181:2, 3; 184:12;
186:3; 192:10; 194:15;
197:22; 200:16, 16, 18, 18;
201:22
**sample** 26:20
**Saturday** 119:22
**save** 197:13, 14
**savings** 131:16
**saw** 26:2; 80:8; 82:12;
87:5; 99:21; 103:20;
109:10
**saying** 12:10; 42:4; 84:5;
91:2; 95:19; 108:4;
148:13; 151:5; 158:8;
187:18; 189:1; 199:18
**scenario** 91:3
**school** 22:10, 11
**screen** 96:18; 116:19, 21;
156:16, 17, 18; 189:13
**screens** 18:11; 116:16
**seat** 18:12
**SEC** 46:3
**second** 6:4; 25:9; 28:15;
50:20; 91:11, 14, 17, 22;
104:19; 105:16; 108:12;
128:22; 130:17; 131:11;
133:1
**seconds** 90:9
**section** 30:21; 103:2
**securities** 23:3
**security** 46:12; 180:11
**seeing** 55:9; 182:8, 15,
21
**seem** 32:10; 183:3, 6, 11
**segregated** 76:10
**self-regulatory** 46:7
**sell** 32:17, 19; 93:20;
94:2, 2; 129:2; 139:9;
144:11, 22; 145:10, 12, 17;
146:8; 148:6, 11
**selling** 28:17; 90:21;
157:17
**sells** 31:9; 35:1; 144:21
**send** 140:11; 156:11;
158:21; 183:9; 185:10
**sending** 158:2
**sense** 20:19; 52:9; 42:4,
13, 17; 84:4; 117:12, 14;
147:1, 2, 3, 4, 7; 182:12,
17; 183:4, 11; 196:8
**sent** 89:4; 94:10; 140:14;
154:17; 170:8, 10
**separate** 20:11; 37:16,
22; 69:18; 79:4; 138:13;
200:8
**separated** 20:17
**September** 62:10;
162:17; 163:8
**sequence** 200:21

**Series** 23:6, 7, 12, 13, 15;
31:1; 123:9
**service** 192:7, 9
**SESSION** 111:1
**set** 9:22; 10:1, 1; 11:11,
12; 18:10; 26:10, 12;
37:16; 39:21; 49:4, 20;
57:2; 83:3, 5, 20, 21;
84:10; 85:8, 13, 13; 92:22;
93:9; 112:19, 19, 21;
150:8; 153:22; 157:8;
170:19; 183:12, 19;
203:21
**setting** 48:9; 183:17
**settled** 169:2
**settlement** 136:4, 7
**settlements** 163:22
**setup** 58:17; 103:1
**seven** 200:13
**several** 179:3; 201:11
**shareholder** 13:22;
14:11
**shareholders** 13:20, 21
**sheets** 127:14
**shift** 66:3; 151:10, 16, 16,
17
**short** 26:18; 49:20; 65:7;
70:6; 90:9; 146:8; 147:5, 7
**show** 5:1; 24:6; 27:13, 14;
28:13, 19, 21; 29:1; 43:18,
20; 76:9; 94:5; 97:17;
115:4; 184:15, 17, 17, 22;
185:8; 186:8
**showed** 47:4; 68:9; 75:2;
98:21; 136:7; 173:6, 8;
184:18
**shown** 42:19, 20; 120:13;
149:5
**shows** 99:11; 174:21;
185:20; 200:10
**side** 28:6, 13, 20; 29:5, 8;
31:10, 14; 34:2, 4, 19;
41:22; 76:13, 22; 88:20,
21; 90:19; 117:6, 7; 119:1,
3, 9; 125:7; 127:22; 128:6,
9; 146:3; 196:3; 198:2, 4
**sides** 34:14; 41:22
**signatory** 86:1
**Signature** 204:20
**signatures** 86:5
**signed** 13:13; 57:8; 98:3
**significance** 39:19
**similar** 6:11; 56:14;
65:13; 105:15; 159:21
**simply** 60:21
**simultaneous** 44:6;
146:8
**simultaneously** 91:13,
22; 97:9; 117:7; 133:11
**single** 139:12
**sit** 67:7
**site** 60:16, 85:21
**situation** 56:13, 14;
112:16; 152:7
**six** 47:5; 49:21; 103:14;

131:15, 16; 136:2; 162:20;
200:12
**size** 103:12; 105:3; 134:5,
11
**sizes** 134:4
**skip** 157:4; 178:20; 204:1
**slash** 49:11
**slightly** 150:2; 174:16
**slowed** 43:21
**slower** 133:4
**small** 11:1; 15:3; 74:12,
14; 96:17; 143:21, 21;
144:2; 149:8
**Smith** 4:15
**Social** 180:11
**software** 43:6; 83:2, 19;
85:11; 98:19; 117:17;
119:7; 137:18; 147:10;
152:21; 155:18
**sold** 28:5; 32:16; 79:20;
129:21; 145:3
**sole** 136:3
**solicited** 52:17
**soliciting** 77:8
**somebody** 30:14; 31:20;
32:17, 18; 57:20; 58:6, 7;
72:4; 76:16; 77:13; 84:9;
100:20; 101:18; 109:17;
124:16; 125:11; 126:5;
130:18; 134:10; 172:10,
17; 199:22
**somebody's** 102:22
**somehow** 29:22; 57:16;
84:7; 102:15; 119:10
**someone** 32:13; 48:11;
66:8; 70:10, 12; 100:16;
101:10; 118:14; 178:7;
183:7
**sometime** 29:9; 67:6;
98:12; 112:18
**sometimes** 20:9; 58:9;
81:17, 17; 87:7; 88:6; 89:2;
101:1; 121:5; 123:1, 3;
124:19; 126:10; 127:5, 6,
6, 15, 15; 130:12; 131:22;
151:7, 8, 9; 189:12;
202:15; 203:8
**somewhat** 73:9
**somewhere** 29:22; 82:2,
3; 117:6; 132:18; 137:15
**soon** 57:19, 97:14;
132:15; 203:18
**Sorry** 10:17; 27:9; 39:6;
45:15; 54:1; 55:18;
103:16; 107:12; 127:8;
144:1; 174:11; 195:13
**Sort** 14:22; 15:4; 18:14;
19:7; 20:12; 30:9; 39:8;
49:12; 54:7; 58:11, 15;
67:8; 76:18, 109:8, 12;
116:14, 17; 130:10;
151:11; 160:15; 176:8;
192:18
**source** 38:19; 80:14, 17;
81:6, 11
**sources** 81:5; 82:15;

92:8; 96:9, 10; 100:18
**space** 13:14; 18:8
**specific** 103:4; 113:8;
124:9; 158:17
**specifically** 60:1; 98:8;
153:22
**specifying** 106:1
**spell** 14:13
**spelling** 19:12; 62:5
**spells** 16:13
**spent** 136:2
**spit** 183:14
**spoke** 172:9, 13, 17
**spot** 135:15, 16
**spot-check** 185:18;
186:6
**spread** 95:10; 98:19, 20,
21; 99:5, 8, 9, 12, 21;
100:5, 6; 105:21; 106:10,
20, 21; 107:1, 2, 3; 108:14,
18; 109:1; 116:2; 144:19;
145:5; 148:12; 151:12
**spreads** 82:12; 106:5
**stack** 44:2
**staff** 77:5; 168:3
**stamp** 31:18; 41:9; 42:12;
44:10, 16; 58:16; 117:20;
125:13, 17, 19; 126:7, 8, 9;
133:10; 200:4, 6; 202:18
**stamped** 24:12; 32:1;
44:12; 103:5; 133:2
**standard** 204:12
**Stanley** 11:5
**stapled** 130:21; 202:8
**staring** 116:16
**start** 15:3; 46:22; 48:5;
49:2; 51:9, 10, 11; 62:8;
136:11, 12; 176:15
**started** 38:5, 6, 12, 14;
46:16; 47:1; 50:8, 9; 51:21;
55:15; 61:20; 62:9; 63:5;
65:15; 66:5; 112:11
**starting** 65:3, 11; 176:16
**state** 4:9; 46:3; 84:11;
174:15
**stated** 125:13; 169:19,
19, 20; 186:9; 187:21
**Statement** 5:21; 6:8, 20;
74:18; 75:8; 79:8; 135:14;
141:20; 149:10; 171:1;
172:2; 178:21; 183:22;
184:7, 8, 9, 11, 12; 185:7,
19, 20; 186:8, 20, 21;
187:1, 20; 188:8; 189:11,
16, 19
**statements** 43:2, 5;
44:21; 71:20, 72:19;
73:11, 12; 74:9, 15; 88:7,
104:2; 109:10; 121:17, 20,
21; 140:20; 149:5; 165:3;
170:9, 10, 12, 15; 171:2, 4,
7; 184:18, 18, 21; 185:6,
11, 13, 14; 186:15, 17, 21;
187:8, 16; 188:7, 17;
189:2, 9; 199:2; 203:21
**statute** 6:20

Deposition of Steven Michael
March 1, 2004

Cer...an Foreign Currency Trading
Companies (Universal FX)

stayed 134:1
Stemic 11:18
step 17:17; 24:16
Sterling 33:8; 43:9, 16; 44:7; 55:3, 10, 10, 17; 56:2, 3, 8, 11, 11; 69:11; 95:11; 106:7; 141:5; 152:11; 153:13; 155:5, 12; 158:19
Stern 19:14; 37:18; 47:12, 13; 48:3; 50:13; 67:11, 15; 68:6; 86:17
Steve 11:9; 27:21; 28:16; 31:1
STEVEN 4:3, 11; 7:3; 111:4
still 12:6; 20:7, 8; 21:1, 10; 125:7; 145:14; 168:13; 182:15; 183:9
stock 11:20; 46:8
stood 69:10
stop 46:18; 62:19; 109:20; 126:6
stopped 8:17; 46:17; 62:21; 72:15; 112:20
studies 22:22
study 22:20
Sub 11:11
subject 68:5; 84:2
submitted 84:12
subpoena 5:8, 12; 6:10, 13; 7:3, 13; 94:19; 119:20; 188:13
subpoenaed 120:2
subpoenas 188:12, 14, 16
subtracted 82:22; 108:22
successful 73:8
sudden 148:22
summarize 89:13; 188.8
summarizing 183:15; 188:5
summary 33:21; 44:19
supervise 63:17
supervised 86:11, 12, 15
supervisor 86:16
sure 9:18; 10:2, 5, 19; 14:19; 20:17; 23:11; 24:2, 20; 26:18; 27:6; 29:4, 10, 16, 16, 19; 30:15, 18; 31:13; 33:19; 35:21; 36:18; 38:18; 39:9; 43:13; 47:6; 48:8, 55:20; 60:1; 63:4; 64:15, 19; 68:7; 111:14; 113:22; 114:19; 115:8, 11; 117:3; 122:11, 11; 127:16, 18; 130:9; 138:15; 139:2, 15, 18; 140:2, 6, 8, 14; 141:7, 12, 16; 142:9; 145:16, 22; 149:9; 154:1; 159:10; 165:1; 167:18; 169:1; 171:12; 172:4, 6, 18; 176:12; 179:6, 17, 21; 181:13; 185:4; 187:19;

190:20; 192:22; 193:9, 11; 197:12
survive 195:21
swap 135:18; 149:9, 15, 15; 151:5
swaps 150:16
Swiss 8:22; 21:8; 23:17; 35:15, 20; 36:3, 9; 38:4; 71:5; 134:19; 137:5, 5
switch 36:21; 37:1
switched 36:21, 22
sworn 4:5; 111:5
system 30:10; 32:3, 12; 33:3; 34:19; 41:10; 44:13; 51:13; 57:7; 58:4; 72:21; 79:21; 82:20, 21; 83:5, 19, 22; 84:8; 85:6, 9; 100:10; 101:11, 12, 16, 21; 102:19, 22; 115:14, 15, 18; 116:5, 22; 117:9; 121:8; 124:6; 125:22; 136:20; 137:12, 22; 138:4; 139:3, 16, 19, 20; 142:16, 20; 143:1, 14; 146:11; 150:15; 151:2; 152:21; 159:11; 163:11, 14, 21; 164:8, 12, 18; 166:12; 170:11; 172:20; 173:1; 191:21; 192:12, 16, 19; 196:10, 13; 202:11, 21
systems 80:22; 131:10

T

table 190:11
tails 183:1
talent 132:12
talk 7:7; 115:17; 158:15; 172:19
talked 141:13; 172:15
talking 48:20; 121:20, 22; 151:1, 3
tax 11:12
tech 172:10
technical 167:20; 168:21
technically 161:8
Ted 4:22
teleconference 4:16
telephone 138:17; 143:1; 197:6; 201:16
tells 174:18; 201:11, 21
term 41:4
terminate 59:19; 60:5, 12
terminated 57:15, 20
terminating 59:13
termination 58:21; 59:9
terms 16:14; 26:1; 107:22; 200:22
terribly 86:18
testified 4:6; 45:9; 100:19; 102:12; 111:6; 113:4
testimony 5:9, 16; 6:16, 21; 24:18; 28:18, 29:17; 45:14; 69:9; 89:11; 92:4; 94:13, 20, 22; 95:18;

106:4, 19; 120:1; 204:11, 13
Texas 77:16
theirs 159:17
Theoretically 145:7; 183:18
third 105:14
though 64:16; 78:9; 118:1; 161:4
thought 55:14
thoughts 198:3
three 18:13, 16, 20; 21:13; 23:13; 35:20; 36:3, 5, 14; 63:10; 67:12; 71:7; 82:2, 3; 91:15; 92:22; 96:10, 19; 97:12, 13; 132:4; 151:15; 173:14; 199:6, 6, 15, 22; 200:7, 19
throw 108:9
ticket 27:5; 30:7; 31:21, 21; 44:10; 76:14; 92:2; 97:5, 5, 7, 8; 118:16, 21, 22; 120:22, 22; 121:10, 11, 12, 14, 16, 18, 19; 122:5, 6, 7, 8, 12; 125:7; 128:4, 7, 15, 22; 132:20, 21; 133:7, 10, 13; 198:11; 200:1; 202:7
tickets 27:1, 2; 42:10; 44:2, 5, 11; 72:3, 4; 74:2; 97:14; 119:14; 120:2, 19; 121:2; 122:17; 124:17; 126:22; 129:6; 130:11, 14, 17; 131:10; 132:2, 6, 10; 133:5; 147:16; 164:14; 202:8
tie 71:19; 183:3, 6, 21; 184:2; 186:16
tied 158:19
tier 150:1
tightest 82:12
times 26:13; 31:15; 32:4, 10, 11; 42:9; 44:4, 18, 19, 21; 63:8, 21, 22; 67:13; 88:4, 22; 101:4; 117:18, 22; 119:8; 126:8; 131:11; 136:22; 137:2, 7, 9; 144:4; 148:18; 150:20; 163:1; 166:2; 184:18; 202:1, 16; 203:9
title 50:15, 16, 18
today 4:16; 5:9, 6:21; 8:5; 125:15; 158:6, 9; 197:8
together 6:12, 16:4; 19:2; 86:22; 87:2; 121:3; 162:20; 194:19
told 51:12; 60:11; 68:10; 85:5; 114:14; 124:10; 135:9, 12, 16; 154:20, 22; 163:15, 16, 16; 197:21
took 123:2; 155:5; 203:13
top 19:21; 129:8, 150:1; 178:22
topics 67:17, 18
tossed 24:17
Total 106:11, 12, 18, 18; 107:22; 177:8; 186:1, 2, 13

totally 44:3
totals 183:20
toward 86:3
Town 12:17
track 17:18; 132:8, 16; 142:20
trade 15:17, 18, 19; 16:9, 18, 22; 17:2, 13; 18:7, 9, 18; 25:8; 26:9, 18; 27:3, 4; 28:19, 20; 29:13, 13, 14, 21; 30:11, 12; 31:18, 19; 32:1, 11; 34:7, 7, 10; 41:2, 10, 13, 14, 22; 42:15; 50:2; 53:16, 18, 22; 54:21; 57:21; 58:1; 59:2; 71:12; 78:8; 79:11; 80:12; 82:19, 20; 83:14, 15, 17; 84:1; 90:7, 12, 14, 15; 91:22; 92:2; 93:18, 19; 97:5; 101:22; 117:1, 10, 11, 20; 118:5, 13, 15; 119:4, 10; 120:19; 121:3; 123:3, 13; 124:5, 22; 125:8, 20; 126:15, 18, 22; 128:3; 130:4, 13; 133:8, 17, 18, 20; 134:4; 135:11; 136:16, 18; 138:19; 140:3; 142:8, 12, 16, 17; 143:5, 6, 10, 13, 19; 144:7; 147:8; 148:22; 149:6, 22; 150:2; 154:9; 158:6; 184:5; 195:19; 198:2, 17; 199:12; 201:3; 203:3
traded 22:4, 5; 23:22; 29:22; 31:20; 34:21; 37:2; 38:13; 40:2, 18; 53:4; 55:21; 64:4; 69:7; 78:8, 16; 80:11, 11; 82:21; 84:1; 123:15, 16; 132:20; 133:2, 21; 134:1; 135:15, 15; 148:8, 10, 20; 201:4
trader 10:3; 15:2, 4, 5, 14; 17:4; 18:15; 19:1; 53:14, 15; 64:8; 72:7; 92:18; 95:20; 96:4, 6; 97:2; 101:17; 115:12; 122:21; 136:16; 138:18; 152:14, 15; 153:1; 201:15; 203:5
traders 15:1; 17:10, 11, 13, 16; 18:8; 70:15; 97:13; 101:11; 113:6; 115:12; 192:11
trades 22:6; 25:10; 27:1, 18, 20; 28:1, 3; 30:18; 41:10, 22; 32:3, 5, 6; 33:19; 34:20, 21; 40:20; 42:9, 18; 43:16, 21, 22; 44:22; 51:18; 54:4, 19; 55:16; 57:18; 59:20; 66:6, 7, 7; 67:4, 4; 69:14, 18; 73:14; 75:10; 79:15; 84:16; 88:9, 11; 114:10; 117:19, 22; 120:16; 121:5; 122:9; 123:4; 124:17; 127:18; 129:5; 132:13, 15; 143:8; 148:14; 169:21; 170:1; 177:11, 12; 178:1; 183:20; 186:8; 187:22; 191:3, 6, 14; 193:2; 196:3; 199:15, 22; 200:8, 22

Trading 4:14; 8:17, 21; 11:9, 13, 13; 12:9, 13; 14:3, 5, 6, 10; 15:3, 10, 16; 16:11, 12, 19; 17:7; 18:19; 21:21; 22:7; 33:8; 35:7, 8, 22; 36:8; 37:19; 43:11; 48:9; 49:20; 51:5, 6, 9, 10, 20, 21; 52:2, 10, 22; 53:3, 3, 11, 19; 55:4; 56:2; 57:2; 60:20; 61:4, 7, 15, 20, 21; 62:11; 64:11, 13, 17; 65:2, 3, 4, 11, 12; 66:9, 11; 67:2, 10; 68:10; 69:11, 13; 71:17; 73:3; 75:12; 76:1; 78:6; 86:13, 21; 89:17, 18, 22; 90:3; 93:17; 96:7; 102:20; 103:13; 112:19, 20, 21; 114:7, 22; 132:14; 136:11, 15; 140:20; 141:11, 22; 142:3, 18; 175:16, 17, 20; 178:16
training 86:19
transact 54:11; 97:4
transaction 29:5; 34:3, 12, 14; 36:7; 69:22; 70:1, 13, 20; 78:12, 21; 79:3, 18; 88:17, 20; 90:16, 19; 97:4; 107:8, 10; 116:18; 117:5, 8; 118:1; 119:3; 135:6; 136:6; 157:16; 169:17; 196:6
transactions 27:11, 16; 31:14; 70:3, 8; 83:6; 130:14; 158:17; 177:20, 22; 178:11; 196:10, 12, 13
transcribed 24:18
transfer 158:18; 161:7; 193:18; 194:10; 195:5
transfers 194:12
transition 136:3
trial 45:17
tried 34:4; 35:2, 7; 57:21; 58:1; 71:16, 17, 19; 78:13; 86:22; 125:6; 130:11; 182:10; 196:2, 9
troubleshooting 78:3
true 73:13; 145:9
try 34:11; 44:10; 70:21; 74:17; 75:14; 89:13; 90:12; 101:21; 105:1; 121:2; 132:16; 156:4; 186:15
trying 14:11; 29:5, 19; 73:4, 21; 76:17; 89:16, 107:13; 162:21; 182:13
turn 17:19; 25:9; 30:20; 32:21; 91:4; 104:3; 105:3; 163:1; 174:6; 177:18; 180:4
turned 190:5
Turning 119:13; 120:22; 129:18; 182:5
turnkey 112:6
Turnover 176:21
twice 61:8; 124:12, 12
two 9:5, 20, 21:17; 36:12, 19; 39:12; 65:8, 14; 70:20,

21; 71:5; 87:8, 19; 88:5;
89:21; 97:12, 12, 22;
106:20; 109:1, 2; 120:16,
19; 121:5; 125:14; 132:4;
141:21; 144:9, 18; 146:2;
148:4, 14, 14; 149:7;
158:1, 7, 9; 159:3; 162:18;
169:18; 198:3; 203:1
**two-day** 135:16
**type** 69:1; 115:9; 129:3;
192:11
**typical** 81:15, 16; 196:1,
4
**typically** 27:3; 82:12;
97:4; 99:8, 9; 156:4
**typo** 25:15

# U

**U.S** 15:21; 28:17; 31:5, 9;
49:12; 134:14, 17, 19;
158:3; 159:7, 9, 12, 16, 19;
161:1, 6, 7, 9
**U.S.C** 6:20
**UFX** 24:4; 47:7; 65:10, 18;
68:12; 69:18; 70:15;
75:18, 18; 77:1, 5, 7, 86:2;
95:20; 114:3, 8; 135:21
**UFX's** 31:10; 85:21
**uh-uh** 24:21
**UK** 161:5
**ultimate** 86:16; 135:9
**ultimately** 17:16
**under** 6:20; 91:2; 97:15;
123:17; 127:22; 195:6;
199:5
**understood** 40:19;
142:21
**Unfortunately** 41:19
**unit** 65:10
**Universal** 12:7; 14:1;
26:3, 5; 28:20; 33:16; 35:9,
17, 18; 36:13, 16; 37:1, 3,
4, 6, 7, 9, 12, 15; 38:2, 4, 5,
6, 7; 45:6; 46:15, 22;
47:10; 48:2; 50:10, 12, 17;
51:4; 52:7, 16, 20, 21;
53:9; 54:8; 55:3, 5; 56:15;
58:11; 60:5, 12, 16; 68:4;
72:14, 15; 80:3, 6; 85:4;
90:17, 17, 21; 91:4, 8;
98:21; 99:10; 102:8;
104:7, 8; 105:14; 106:13;
109:6; 112:11; 113:10;
114:21; 115:3; 119:20;
133:14; 136:11; 140:4, 11;
141:4, 8; 142:7; 144:12;
145:12; 147:18; 148:4, 15;
150:13; 152:15, 22; 153:1,
18; 155:3, 8, 17; 158:7;
160:6, 14; 161:12; 165:17;
167:12, 15, 17; 168:19, 20;
169:21; 170:8; 171:15;
172:15; 181:7; 182:19;
183:12; 185:12; 186:22;
187:19; 188:17; 191:20;
193:15, 19; 194:22; 195:1,

7, 9; 196:17
**Universal's** 113:2;
188:11
**Universial** 98:20
**University** 22:12
**unless** 60:1; 91:15;
125:13; 130:18; 138:1;
148:11; 153:6
**unlimited** 103:13
**up** 9:22; 10:1; 11:11, 12;
13:15; 18:10; 27:13;
28:13, 19, 21; 29:1, 14;
31:21; 37:16; 39:21;
43:18, 20; 47:4; 48:9; 49:4,
20; 50:5; 57:2; 61:20; 68:6;
78:4; 79:3, 15, 20, 22;
80:20; 82:22; 83:3, 5, 21;
84:10; 85:8, 13, 13; 88:2;
92:15; 97:5, 7, 8; 100:20;
105:10; 106:20; 108:17;
112:19, 19, 21; 116:8;
132:5, 9; 133:5; 135:6;
136:20; 138:17; 142:11;
153:22; 156:16, 17; 162:1;
170:19; 183:3; 184:1, 5;
185:18, 20; 194:4, 17;
198:7
**updated** 69:2
**use** 20:18; 26:22; 27:2;
28:11; 33:15, 18, 20; 78:9;
92:15; 93:6; 96:13; 98:21;
107:19; 117:4; 152:6;
166:3, 14; 172:3, 6; 177:2
**used** 21:14; 29:4, 6, 18,
20; 30:8, 17; 33:18; 35:14,
14, 15; 65:12, 13; 72:21;
80:12; 103:18; 136:7;
137:12; 146:13; 150:8;
166:4, 15; 173:2, 11;
177:21; 181:7, 9
**user** 171:8, 10, 16, 17;
172:5
**using** 13:14; 20:7; 74:21;
98:16, 17; 135:13
**usually** 27:8; 43:22; 54:9;
67:16; 70:2; 143:21;
170:13
**UTD** 19:5
**UTS** 13:8, 14, 17, 18, 21,
22, 22; 19:13; 20:8, 10, 13
**UTX** 20:10, 13, 19; 38:12

# V

**value** 88:12; 124:20, 22,
135:3, 4, 5, 10, 14, 17;
136:13; 152:13, 16; 158:7;
169:20; 177:12
**variable** 166:12, 21
**variables** 166:7, 13
**various** 93:7; 190:16
**variously** 149:11
**vendors** 80:22; 96:20
**verbal** 127:4
**verbally** 24:21; 100:19;
161:15

**verified** 124:14, 18
**verify** 125:2; 162:2;
189:16
**version** 6:7; 102:7;
104:20; 105:14, 16
**versus** 153:10
**via** 4:16; 96:4
**vice-versa** 88:18
**Vicki** 192:4
**view** 73:5; 80:10; 92:11,
11, 19, 21; 93:3, 12;
151:15; 152:8, 9; 190:1;
192:20
**Vinnie** 40:3, 12
**violations** 46:11
**virtually** 58:16; 91:14
**visually** 189:12
**volume** 68:4

# W

**Wachovia** 158:5, 15, 15;
159:10, 15, 16
**wait** 44:1; 59:17
**waived** 204:20
**wants** 90:15; 148:5, 6
**warning** 203:6
**watch** 18:20; 65:22
**way** 18:20; 27:12; 29:12;
30:4; 31:7; 34:19; 41:18;
76:21; 83:5; 84:18;
101:16; 116:11; 121:9;
122:5; 135:13, 19; 136:8;
138:18, 21; 151:13; 168:4;
170:16, 19; 171:20; 188:5;
197:8; 198:21; 199:9;
200:15
**Web** 60:16; 85:21
**week** 18:4; 66:14; 67:13;
87:8; 88:4, 5; 120:3, 4, 5;
171:3
**week-long** 18:5
**weekly** 170:10
**weeks** 87:8; 88:5
**weren't** 30:16; 54:2; 76:5,
7; 121:15; 125:3; 183:12
**whatsoever** 174:5
**Whenever** 34:10
**Whereupon** 4:2; 110:4;
111:3; 204:18
**wherever** 27:4; 160:22
**whole** 67:9; 75:4; 183:22
**whose** 141:17; 198:13
**wide** 98:20
**wider** 106:9
**willing** 91:20
**wire** 160:22; 161:7;
193:17; 194:9, 11; 195:5
**wiring** 194:12
**withdrawals** 176:19, 20;
178:2
**within** 81:16; 93:4;
132:12; 176:17

**without** 25:12, 14;
142:17; 151:17
**WITNESS** 43:3; 45:21;
49:4; 85:15; 95:10; 98:12;
100:8, 12, 20, 22; 101:8;
111:21; 117:16; 118:18;
119:2; 120:19; 128:19;
130:22; 131:8; 146:4;
147:4; 149:14; 175:4;
181:4; 182:3; 191:17;
195:18; 198:6
**won** 78:10
**word** 171:17
**words** 101:15
**work** 12:7; 26:3; 33:16;
46:14; 48:2; 49:16; 61:21;
62:2; 67:1; 72:3, 14, 17;
74:4; 102:16
**worked** 48:22; 49:14;
50:4; 114:22; 117:17;
118:11; 141:22; 142:3;
170:13; 172:7; 192:6
**working** 12:1; 19:2;
46:22; 51:2, 6; 55:2; 58:6;
62:8, 19, 21; 63:11; 64:11;
65:1, 17; 87:21; 113:5;
125:11, 12; 126:3, 5
**works** 62:20; 119:7;
159:11
**World** 13:8, 17; 20:9;
38:12
**write** 27:1; 44:9; 86:5;
92:2; 97:5; 126:8, 10, 19;
130:12; 132:5, 15, 17, 21;
133:5, 11, 13
**writes** 132:13
**writing** 97:8; 127:10;
132:9
**written** 94:19; 97:14;
134:7; 164:14
**wrong** 6:2; 79:10; 189:15;
203:12
**wrote** 31:20; 97:7;
199:15, 22; 200:6

# X

**x.com** 20:11

# Y

**year** 8:18, 22; 22:17
**years** 21:17; 23:10, 13;
24:1
**yen** 28:5, 7, 17; 31:5, 9;
95:11; 134:15
**yes-or-no** 24:22
**York** 64:8; 73:15; 115:2,
131:12; 161:4, 5

# Z

**zero** 82:2
**ZIP** 89:5



**CFTC Letter No. 01-91**
**December 12, 2001**
**Interpretation**
**Division of Trading and Markets**

Dear:

This is in response to your e-mail dated October 23, 2001, which has been forwarded to the Division of Trading and Markets (the "Division") for response, as supplemented by telephone conversations with Division Staff. Section 2(c)(2)(B) of the Commodity Exchange Act (the "Act"), makes clear that offering foreign currency futures and options contracts, other than those that are executed or traded on an organized exchange ("off-exchange"), to retail customers is unlawful unless the counterparty is a regulated entity enumerated in the Act. (A copy of the Act is available on the Commission's web site at: www.cftc.gov/files/ogc/comex060601.pdf ). The counterparties enumerated include persons that are registered with the Commission as futures commission merchants ("FCMs") and certain affiliated persons of FCMs. The other enumerated counterparties are: (1) financial institutions; (2) registered broker-dealers; (3) associated persons of registered broker-dealers; (4) insurance companies or affiliates thereof; (5) financial holding companies; and (6) investment bank holding companies. (See Section 2(c)(2)(B)(ii)). A "retail customer" is a person that does not fall within the definition of an "eligible contract participant" as defined in Section 1a(12) of the Act. If the off-exchange foreign currency transaction is being entered into with an "eligible contract participant," then the Act is not applicable to, and the Commission does not have jurisdiction over, the transaction.

In your e-mail, you indicated that your firm is a "fund management company." Generally, a firm that, for compensation or profit, advises others as to the value of or advisability of trading in futures or options contracts, or issues analyses or reports concerning the foregoing, is a commodity trading advisor ("CTA") and must register as such. (See 7 U.S.C. 1a(6)). Advising others includes exercising discretionary trading authority over a customer's account. Generally, a person employed by a CTA to solicit discretionary accounts must register as an associated person ("AP") of the CTA. However, it is the opinion of the Division that, with respect to a firm that manages the funds of retail customers that are held by a registered FCM acting as a counterparty under Section 2(c)(2)(B)(ii) of the Act for the purposes of off-exchange foreign currency trading, the firm is not required to register with the Commission as a CTA, and its employees are not required to register as APs, but may voluntarily do so. This opinion is solely that of the Division and does not necessarily represent the opinion of the Commission or any other division or office of the Commission and is not binding on the Commission. (To the extent that your inquiry pertains to managing the funds of retail customers that are held by one of the enumerated counterparties other than an FCM, you will have to contact the appropriate regulatory body for a response, e.g., a broker-dealer is registered with the Securities and Exchange Commission).

Although your firm and the person soliciting discretionary accounts in the U.S. may not be required to register with the Commission, you both may remain subject to all relevant antifraud provisions of the Act, including Section 4b, and CFTC Rules 4.30 (prohibiting CTAs from handling client funds) and 4.41 (prohibiting deceptive advertising and requiring representations concerning hypothetical performance results). Additionally, if the counterparty to the retail customer is not one of those enumerated under the Act, then the transaction is unlawful and, in addition to the counterparty being liable for violating the Act, persons involved with the intermediation of the transaction, such as managing the funds of the customers or soliciting for such transactions, may be held liable for aiding and abetting a violation of the Act.

I hope you find this e-mail responsive to your inquiry. If you have any questions concerning this correspondence, please contact Michael A. Piracci, an attorney on my staff, at (202) 418-5430.

Lawrence B. Patent,
Associate Chief Counsel,
Division of Trading and Markets,
U.S. Commodity Futures Trading Commission



CFTC Letter No. 01-91

Updated December 27, 2001

**Advisory:**        **06-01**

**For Release:**    **February 05, 2001**

## COMMODITY FUTURES TRADING COMMISSION (CFTC)

### ADVISORY ON FOREIGN CURRENCY

The Commodity Exchange Act (the Act) was recently amended to make clear that it is unlawful to offer foreign currency futures and option contracts to retail customers unless the offeror is a regulated financial entity as enumerated in the Act,[1] including futures commission merchants (FCM) and their affiliates. Off-exchange trading of foreign currency futures or options with retail customers by counterparties that are not within one of the enumerated categories is a violation of Section 4(a) of the Act.[2]

Thus, to the extent there was confusion as to the applicability of the Act and the jurisdiction of the CFTC in this area, Congress has made clear that the Act is applicable to, and the CFTC has jurisdiction over, foreign currency futures and options trading involving retail customers where the counterparty does not fall within one of the enumerated categories.[3] Trading of foreign currency futures and options on organized exchanges continues to be permitted. Therefore, trading of foreign currency futures contracts, or options thereon, is lawful if it occurs on designated contract markets or derivatives transaction execution facilities. Trading of options on foreign currency also is lawful if conducted on national securities exchanges registered pursuant to Section 6(a) of the Securities Exchange Act of 1934.

Generally, retail customers are: (1) individuals with less than $10 million in total assets, or less than $5 million in total assets if entering into the transaction to manage risk, and who are not registered as futures or securities professionals; (2) companies, other than financial institutions and investment companies, with less than $10 million in total assets, or a net worth less than $1 million if entering into the transaction in connection with the conduct of their businesses; and (3) commodity pools that have less than $5 million in total assets.[4] The enumerated counterparties who may lawfully conduct off-exchange foreign currency trading with retail customers are regulated financial entities. These include, among others, FCMs and affiliates of FCMs.[5] FCMs and their affiliates that are not also regulated as one of the other enumerated financial entities, remain subject to the Commission's anti-fraud jurisdiction with respect to foreign currency transactions.

[1] 7 U.S.C. § 1 et seq. (1994), as amended by the Commodity Futures Modernization Act of 2000 ("CFMA"), Appendix E of Pub. L. No. 106-554, 114 Stat. 2763 (to be codified as amended in scattered sections of 7 U.S.C.). Relevant portions of the CFMA are attached.

[2] 7 U.S.C. § 6 (a).

[3] As a result of this legislative clarification, the issue of whether trading occurs on a "board of trade," as that term was used in the former so called "Treasury Amendment," no longer exists. See CFTC v. Frankwell, Ltd., 99 F.3d 299 (9th Cir. 1996).

[4] See Section 1a(12) of the newly amended Act (CFMA Section 101(3)) for the definition of "Eligible Contract Participant." Any Person not falling within this definition is a retail customer.

[5] The other enumerated counterparties are: (1) financial institutions; (2) registered broker-dealers; (3) associated persons of registered broker-dealers; (4) insurance companies or affiliates thereof; (5) financial holding companies; and (6) investment bank holding companies. See section 2(c)(2)(B)(ii) of the newly-amended Act (CFMA Section 102). Note that introducing brokers are not one of the

permitted counterparties and therefore cannot be lawfully involved in off-exchange foreign currency transactions with retail customers.

Investors can obtain information about any firm or individual registered with the CFTC, including any actions taken against a registrant, through the National Futures Association (NFA) Background Affiliation Status Information Center (BASIC), available on the NFA website at: www.nfa.futures.org/basicnet/. Similarly, information on firms or individuals registered with the Securities and Exchange Commission may be found through the National Association of Securities Dealers (NASD) public disclosure program, available on the NASD regulation website at: www.nasdr.com/2000.htm. Information on affiliates of FCMs and BDs, however, is confidential under the respective risk assessment provisions.6 As such, it will not be available on the NFA or NASD websites. Potential customers that are approached by firms claiming to be permitted counterparties as affiliates of an FCM or BD are strongly advised to inquire about the name of the affiliated FCM or BD and to obtain the name of a contact person at the FCM or BD who can verify the affiliation.

Attachment: Sections 101(3) and 102 of the CFMA.

6 See 7 U.S.C. § 6f(c)(10) and 17 C.F.R. §§ 1.14(f) and 1.15(f); 15 U.S.C. §§ 78o-5(b)(2)(C)(v) and 78q(h)(3)(E) and 17 C.F.R. §§ 240.17h-1t(f) and 240.17h-2T(e).

Updated March 9, 2001

**CFTC Letter No. 01-89**
**September 28, 2001**
**Interpretation**
**Division of Trading and Markets**

Dear:

This is in response to your e-mail message to the Division of Trading and Markets (the "Division") of the Commodity Futures Trading Commission (the "Commission") dated September 3, 2001 regarding a proposed Internet web site to provide trading advice concerning foreign currency. You ask if such a web site, for which customers would pay a monthly fee in return for trading tips, information and signals, would be subject to Commission regulation and, if so, where you could find information regarding applicable requirements and obligations. We will review first the matter of jurisdiction over foreign currency trading in general, and next, regulation of the proposed web site activity.

The recently enacted Commodity Futures Modernization Act of 2000 ("CFMA") makes clear that the Commodity Exchange Act and the Commission's jurisdiction apply in the area of foreign currency trading, including off-exchange trading. (A copy of the CFMA is available on the Commission's website (http://www.cftc.gov) at (http://www.cftc.gov/files/ogc/ogchr5660.pdf). Generally, the Commission has jurisdiction over foreign currency futures and option contracts offered to retail customers, and the only counterparties that can lawfully enter into these contracts with retail customers are persons that are registered with the Commission as futures commission merchants ("FCMs"), or that are affiliates of an FCM, or that are otherwise regulated entities, e.g., a securities broker-dealer, a bank or an insurance company. You will find an advisory explaining the implications of the CFMA, as it relates to the trading of foreign currency, on the Commission's website at: www.cftc.gov/opa/press01/opaadv06-01.htm.

In your inquiry, you refer to trading tips and signals regarding "spot currencies." The Commission's staff has observed many firms that claim to be engaged in "spot" or forward transactions in an attempt to avoid Commission jurisdiction. The reference by a vendor to a contract as being a spot or forward contract does not necessarily mean that the contract being offered is not, in fact, a futures or option contract. Of course, we cannot definitively determine the appropriate characterization of any particular instrument without reviewing documentation concerning the instrument and the manner in which it is being offered and sold. The Commission looks to the characteristics of a contract and the circumstances under which it is being traded to determine whether or not it is a futures contract. A forward contract contemplates physical delivery of the underlying commodity, in this case foreign currency, whereas a futures contract rarely results in actual delivery of the commodity. A person entering into a futures contract may satisfy his obligation under the contract by entering into an offsetting position. Additionally, those entering into forward contracts do so because they have some business purpose for obtaining foreign currency, while futures contracts are usually entered into for speculation and hedging purposes. Retail customers would not normally contemplate delivery of foreign currency or have a business purpose to do so. A transaction involving a futures or option contract on foreign currency that is not traded on a futures or securities exchange and is offered to a retail customer by a person that is not an appropriate counterparty would be unlawful.

Assuming for discussion that the subject matter of the proposed website is subject to Commission regulation, whether you, as its operator, would be subject to more requirements than the prohibition against fraudulent statements or activity and the restrictions upon advertising depends upon the manner in which advice is provided to customers. As a general rule, a person who, for compensation, provides trading advice that is subject to the Commission's regulatory jurisdiction must be registered as a commodity trading advisor ("CTA"). In March, 2000, the Commission adopted Rule 4.14(a)(9), providing an exemption from the requirement to register as a CTA for persons who provide standardized advice by means of newsletters, prerecorded telephone newslines, Internet web sites and non-customized computer software. The *Federal Register* release announcing adoption of the rule (including the text of the rule) is available at: http://www.cftc.gov/foia/fedreg00/foi000310a.htm. The release contains an extensive explanation including illustrative examples that should help you determine if the exemption provided by Rule 4.14(a)(9) is applicable to the activities in which you plan to engage by means of the proposed web site.

Please remember that whether or not your activities require you to register as a CTA, the Commission would almost certainly have antifraud jurisdiction over those activities. Because this area is highly regulated and because the factors that determine the applicability of various regulatory requirements are not always easily determined, you would be well advised to consult an attorney with experience in this area. Further information, including information CTA registration and the consequent regulatory requirements, about can be obtained from the Commission's web site and from the web site of the National Futures Association (http://www.nfa.futures.org/).

> Christopher W. Cummings
> Attorney Advisor
> Division of Trading and Markets
> Commodity Futures Trading Commission

Updated December 13, 2001

**CFTC Letter No. 01-82**
**November 2, 2001**
**Interpretation**
**Division of Trading and Markets**

Re: "X"

Dear:

This is in response to your letter dated February 20, 2001, to "A", an attorney in the Commission's Division of Enforcement, on behalf of "X". "A" has asked that the Division of Trading and Markets (the "Division") respond to your inquiry.

As you are aware, Section 102 of the Commodity Futures Modernization Act of 2000 ("CFMA")[1] amended the Commodity Exchange Act (the "Act")[2] to make clear the application of the Act and the Commission's jurisdiction in the area of foreign currency trading. Generally, it is unlawful to offer off-exchange foreign currency futures or option contracts to retail customers[3] unless the counterparty is a regulated entity enumerated in the Act. The counterparties enumerated include registered futures commission merchants ("FCMs") and certain affiliated persons of registered FCMs.[4]

In your letter, you state that "X" is "purely an educational company" offering "affordable training courses that teach students to trade in the spot market." You claim that "X" does not advise as to trading foreign currency futures or option contracts. Please be aware that the reference to a contract as being a "spot" or "forward" contract does not necessarily mean that the contract being offered is not, in fact, a futures or option contract, which would make it subject to the jurisdiction of the Commission. The Commission views the transaction as a whole, including the characteristics of the contract and the circumstances under which it is being traded, to determine whether or not it is a futures or options contract. A spot or forward contract contemplates physical delivery, either immediately or on a deferred basis, respectively, of the underlying commodity, in this case foreign currency, whereas a futures contract rarely results in actual delivery of the commodity. While futures contracts may provide for the parties to make or take delivery, delivery can be avoided by offset, cancellation, cash payment, or similar mechanisms. Additionally, those entering into forward contracts do so because they have some business purpose for obtaining foreign currency, while futures contracts are usually entered into for speculation or hedging purposes.

Generally, a person who, for compensation or profit, advises others as to the value of or advisability of trading in futures or options contracts, or issues analyses or reports concerning the foregoing, is a commodity trading advisor ("CTA").[5] Absent an exemption, a CTA is required to register with the Commission.[6] In March 2000, the Commission adopted Rule 4.14(a)(9), exempting from mandatory registration under the Act CTAs whose business is limited to distributing standardized commodity trading advice.[7] Rule 4.14(a)(9) is meant to exempt from registration CTAs who do not provide trading advice based on, or tailored to, the commodity interest or cash market positions or other circumstances or characteristics of particular clients.

Based upon the limited facts presented in your letter, it would appear that your activities might bring you within the definition of a CTA. Additionally, it would appear from your brief description of "X's" activities that Rule 4.14(a)(9) might be applicable to your situation, and, accordingly, you would be exempt from registering as a CTA. However, please be aware that, in order to qualify for the exemption under Rule 4.14(a)(9), you may not tailor to a client's particular circumstances any opinion you give as to what commodity interests to buy or sell. Additionally, you may not direct client accounts, meaning that you may not be authorized to cause transactions to be effected for any client's commodity interest account. Additionally, CTAs that meet the requirements for exemption under Rule 4.14(a)(9) remain subject to all the relevant antifraud provisions of the Act and the Commission's regulations thereunder (including Section 4o of the Act),[8] as well as Commission Rules 4.30 (prohibiting CTAs from handling client funds) and 4.41 (prohibiting deceptive advertising and requiring representations concerning hypothetical performance results).

I hope you find this letter responsive to your inquiry. If you have any questions concerning this correspondence, please contact Michael A. Piracci, an attorney on my staff, at (202) 418-5430.

Very truly yours,

Lawrence B. Patent
Associate Chief Counsel

[1] The Commodity Futures Modernization Act of 2000, Pub. L. 106-554, 114 Stat. 2763 (to be codified as amended in scattered sections of 7 U.S.C.).

[2] 7 U.S.C. § 1, *et seq.* (1994), as amended by Pub. L. 106-554, 114 Stat. 2763.

[3] As used in this letter, the term "retail customer" refers to any person other than a person that comes within the definition of an "eligible contract participant" pursuant to Section 1a(12) of the Act.

[4] The other enumerated counterparties are: (1) financial institutions; (2) registered broker-dealers; (3) associated persons of registered broker-dealers; (4) insurance companies or affiliates thereof; (5) financial holding companies; and (6) investment bank holding companies. *See* 7 U.S.C. § 2(c)(2)(B)(ii), as amended by Section 102 of the CFMA.

[5] *See* 7 U.S.C. § 1a(6).

[6] *See* Section 4m(1) of the Act, *see also* Commission Rule 4.14. Commission rules referred to herein are found at 17 C.F.R. Ch. 1 (2001).

[7] A copy of the *Federal Register* release for this rule is available on the CFTC web site at: www.cftc.gov/foia/fedreg00/foi000310a.htm.

[8] 7 U.S.C. § 6o.

Updated November 15, 2001

**CFTC Letter No. 01-83**
**November 2, 2001**
**Interpretation**
**Division of Trading and Markets**

Re: Foreign Exchange Activities

Dear:

This is in response to your letter received by the Commodity Futures Trading Commission ("Commission") on April 9, 2001. By your correspondence, you request information about the regulation of the foreign currency market. Section 102 of the Commodity Futures Modernization Act of 2000 ("CFMA") amended the Commodity Exchange Act (the "Act") to make clear that offering off-exchange foreign currency futures and option contracts to retail customers is unlawful unless the counterparty is a regulated entity enumerated in the Act.[1] The counterparties enumerated include registered futures commission merchants ("FCMs") and certain affiliated persons of registered FCMs.[2] Accordingly, if a firm is offering such contracts and is not one of the regulated entities enumerated in the Act, it is operating unlawfully. You may find information about any firm or individual registered with the Commission, including any actions taken against a registrant, in the National Futures Association ("NFA") Background Affiliation Status Information Center ("BASIC"), on the NFA website at: www.nfa.futures.org/basicnet/.

In your letter, you asked about the regulation of persons introducing clients to the firm offering foreign currency trading. Generally, a person employed by an FCM to solicit customers must register as an associated person ("AP") of the FCM.[3] Also, generally speaking, a separate entity that introduces customers to an FCM must register as an introducing broker ("IB)".[4]

You also asked about advertising by persons introducing clients. While there is no prohibition against advertising by IBs, the antifraud provisions of the Act and regulations thereunder are applicable to all of the IB's activities, including advertising. Finally, you asked about state regulation of foreign currency trading. The Act and the regulations promulgated thereunder are applicable throughout the United States. Additionally, each state may also have specific statutes and regulations applicable to firms doing business in those states. You must contact the appropriate agency in each state to find out what the applicable laws and regulations might be.

I hope you find this letter responsive to your inquiry. Should you have additional questions on this matter, contact Michael A. Piracci, an attorney on my staff, at (202) 418-5430.

Very truly yours,

Lawrence B. Patent
Associate Chief Counsel

[1] See 7 U.S.C. § 2 (1994), as amended by the Commodity Futures Modernization Act of 2000 ("CFMA"), Pub. L. No. 106-554, 114 Stat. 2763 (to be codified as amended in scattered sections of 7 U.S.C.). As used in this letter, the term "retail customer" refers to any person other than a person that comes within the definition of an eligible contract participant under Section 101 of the CFMA, to be codified in Section 1a(12) of the Act.

[2] The other enumerated counterparties are: (1) financial institutions; (2) registered broker-dealers; (3) associated persons of registered broker-dealers; (4) insurance companies or affiliates thereof; (5) financial holding companies; and (6) investment bank holding companies. See 7 U.S.C. § 2(c)(2)(B)(ii),

as amended by CFMA Section 102.

[3] As stated in note 2, an FCM is only one of the enumerated counterparties that may lawfully offer this type of retail foreign currency trading. To the extent that your inquiry pertains to introducing clients to firms that are one of the enumerated counterparties other than an FCM, you will have to contact the appropriate regulatory body for a response, e.g., a broker-dealer is registered with the Securities and Exchange Commission.

[4] 7 U.S.C. § 1a(23); *see also* Commission rule 1.3(mm). Commission rules referred to herein are found at 17 C.F.R. Ch. 1 (2001). With respect to entities that introduce retail customers to registered FCMs acting as counterparties under Section 2(c)(2)(B)(ii) of the Act, as amended by Section 102 of the CFMA, however, it is the opinion of the Division of Trading and Markets that such entities may not be required to register with the Commission as an IB, but may voluntarily do so. This opinion is solely that of the Division of Trading and Markets and does not necessarily represent the opinion of the Commission or any other division or office of the Commission and is not binding on the Commission.

Updated November 15, 2001

**CFTC Letter No. 02-05**
**January 8, 2002**
**Interpretation**
**Division of Trading and Markets**

Re: "X" & "Y" Licensees

Dear:

    This is in response to your letter dated April 16, 2001, to "A" of the Division of Enforcement of the Commodity Futures Trading Commission ("Commission"), which was forwarded to the Division of Trading and Markets (the "Division") for reply, as supplemented by your letter dated November 26, 2001, and telephone conversations with Commission staff. By your correspondence, you request, on behalf of "X" and its "Y" licensees, that the Commission interpret the "Y" licensees to be affiliates of "X" or, in the alternative, permit the "Y" licensees to register as introducing brokers ("IBs").

*The Commodity Futures Modernization Act of 2000*

    As you are aware, the Commodity Futures Modernization Act of 2000 ("CFMA")[1] amended the Commodity Exchange Act (the "Act")[2] to clarify the application of the Act and the Commission's jurisdiction in the area of foreign currency trading.[3] Generally, offering foreign currency futures and options contracts, other than those that are executed or traded on an organized exchange[4] ("off-exchange"), to retail customers[5] is unlawful unless the counterparty is a regulated entity enumerated in the Act. The counterparties enumerated include registered futures commission merchants ("FCMs") and certain affiliated persons of registered FCMs.[6]

*The Activities of "X"*

    "X" offers trading in foreign currency, primarily over the Internet, and you have indicated that most of "X's" customers would be retail customers under the Act. You represented that "X" acts as a counterparty to retail customers "in almost all of its trading activities."[7] Effective October 14, 2001, "X" became registered as an FCM, and thus qualifies as one of the enumerated counterparties under the Act.

    "X's" trading platform, for foreign currency trading over the Internet, is a software program called "Y". "X", in addition to utilizing "Y" on its own website, licenses its "Y" software to licensees. These licensees market the platform under their own brand names and set up their own structure for charging customer commissions. According to your representations, as part of the licensing agreement, licensees must agree that customer funds traded over the "X" "Y" system be "placed in accounts with "X" . . . so that "X" has control over the disbursal of these customer funds on the customer's instructions." Additionally, you have represented that "X" monitors the web sites of licensees "to assure compliance with [the] contractual requirements" of the licensing agreements.

*Affiliated Persons*

    One of the enumerated counterparties under Section 2(c)(2)(B)(ii)(III) of the Act is "an affiliated person of a [registered FCM], concerning the financial or securities activities of which the registered [FCM] makes and keeps records under . . . section 4f(c)(2)(B) of this Act."[8] Section 4f(c)(2)(B) of the Act requires FCMs to keep records that describe the futures and financial activities, including the sources of capital and funding, of its affiliated persons whose business activities "are reasonably likely to have a material impact on the financial or operational condition of the" FCM.[9] Section 4f(c)(1)(i) of the Act defines the term "affiliated person" as "any person directly or indirectly controlling, controlled by, or under common control with a[n FCM], as the Commission, by rule or regulation, may determine will effectuate the purposes of this subsection."[10]

You ask that "Y" licensees be viewed as affiliates of "X", so as to qualify as one of the enumerated counterparties for retail foreign currency trading under the Act. You argue that, although "X" has no ownership interest in any of the "Y" licensees, it sufficiently controls their activities through the licensing agreement so that the "Y" licensees should be considered to be affiliates of "X".

You state in your letter that Section 4f(c) of the Act does not explicitly require that the affiliated person be owned by, or under common ownership with, an FCM. You also note that the Act confers on the Commission the authority to determine what denotes someone as an affiliated person of an FCM. The release adopting Commission Rules 1.14 and 1.15 refers to a holding company system and, in fact, the release is entitled "Risk Assessment for Holding Company Systems."[11] In the release, the Commission referred to "holding company structures" and a system involving "parent" companies.[12] Black's Law Dictionary states that a "holding company usually owns a controlling interest in the companies whose stock it holds."[13]

Although "X" may have influence over the activities of "Y" licensees with respect to their use of "X's" "Y" trading platform, "X" does not have any ownership interest in the "Y" licensees. The licensing arrangement is certainly not comparable to a holding company system. Therefore, the Division does not agree with your assertion that the "Y" licensees are affiliated persons of "X". Accordingly, "Y" licensees would not constitute enumerated counterparties for retail foreign currency transactions under the Act.

*"Y" Licensees as Introducing Brokers*

In your letter, you requested that the Commission recognize "Y" licensees as affiliates of "X" or, in the alternative, permit them to register as IBs. You indicated that the "Y" licensees would be unable to meet the minimum financial requirements for registering as an FCM, but could meet the lower requirements for registering as an IB.[14]

The "Y" licensees operate under their own names, offering the currency trading services to customers as their own, through web sites on the Internet.[15] Additionally, the Customer Agreement with the "Y" licensee does not make clear the role of "X" in customer trades, and does not even contain a reference to "X".[16] In fact, the agreement indicates that the "Y" licensee may be the counterparty to a trade.[17] Further, while "X" maintains control over customer funds once they are deposited into "X's" customer account, when the customer opens an account, or adds funds to an existing account, through a "Y" licensee, the funds are made payable to the "Y" licensee which then forwards the money to "X's" customer account. When "X" receives the funds, it then credits the customer's individual account. Requests for withdrawals from a customer's account are made to the "Y" licensee.

The terms of the customer agreement between the ""Y licensees and the customers and the manner in which the "Y" licensees are operated, in particular the fact that the "Y" licensees operate under their own names without any reference to "X's" role in the transactions and receive customer monies in the name of the "Y" licensees, have the indicia of the "Y" licensees being the counterparties to these retail customers. Accordingly, the "Y" licensees, to continue operating as they are currently, must be one of the enumerated counterparties under Section 2(c)(2)(B)(ii) of the Act. A registered IB is not one of the enumerated counterparties that may lawfully offer this type of off exchange foreign currency trading to retail customers and, therefore, registration as an IB would not permit the "Y" licensees to continue operating as they are now.

If the "Y" licensees wish to continue any role with "X" in connection with off exchange foreign currency futures or options transactions, without becoming registered, they must: (1) never act as a counterparty to the retail customers; (2) amend the "Y" licensee customer agreements and their web sites to reflect "X's" role in the retail foreign currency transactions; and (3) not receive funds from customers in their own name, nor act as a conduit for funds due to customers from "X".[18]

Although "Y" licensees, if they comply with the conditions listed above, may not be required to register, "X" and the "Y" licensees would remain subject to all of the relevant antifraud provisions of the

Act and the Commission's regulations issued thereunder. Moreover, if a "Y" licensee violates the antifraud provisions of the Act or the rules thereunder, "X", as well as the "Y" licensee, may be liable for such violations.

*The "Z"*

"X", through the "Z", provides a platform through which customers may trade directly with one another. You indicated your belief that "X" is the counterparty to these "Z" transactions "since it guarantees the integrity of the trades and allows the trading customers to liquidate their positions as they wish with "X" as their direct counterparty." Although "X" may be acting as the counterparty to some of these transactions, there are some transactions in which "X" is not acting as the counterparty. Under Section 2(c)(2)(B) of the Act, one of the regulated financial entities enumerated under the Act must act as the counterparty in the subject off-exchange foreign currency transactions with retail customers. To the extent that retail customers, trading through "Z", become counterparties to one another, that would fail to meet the requirement that the counterparty to a retail customer must be one of the entities enumerated under Section 2(c)(2)(B)(ii) of the Act and, therefore, be a violation of Section 4(a) of the Act. With regard to "X's" operation of the "Z", its registration as an FCM is not sufficient to meet the requirement under the Act that the counterparty to a retail customer be one of the regulated financial entities listed under Section 2(c)(2)(B) of the Act. To the extent that "X" is continuing to operate the "Z", it should cease doing so immediately, and permit only those transactions necessary to liquidate any open positions being held by customers on the "Z".[19]

The positions taken herein are based upon the representations that have been made to us. Any different, changed, or omitted facts or conditions might require us to reach a different conclusion. Further, this letter represents the position of the Division only and does not necessarily represent the views of the Commission or any other division or office of the Commission.

If you have any questions concerning this correspondence, please contact Michael A. Piracci, an attorney on my staff, at (202) 418-5430.

Very truly yours,
Lawrence B. Patent
Associate Chief Counsel

[1] Appendix E of Pub. l. No. 106-554, 114 Stat. 2763 (2000).

[2] 7 U.S.C. § 1, *et seq.* (2000).

[3] *See* 7 U.S.C. § 2(c)(2)(B)(ii).

[4] 7 U.S.C. § 1a(27).

[5] As used in this letter, the term "retail customer" refers to any person other than a person that comes within the definition of an "eligible contract participant" pursuant to Section 1a(12) of the Act. 7 U.S.C. § 1a(12).

[6] The other enumerated counterparties are: (1) financial institutions; (2) registered broker-dealers; (3) associated persons of registered broker-dealers; (4) insurance companies or affiliates thereof; (5) financial holding companies; and (6) investment bank holding companies. 7 U.S.C. § 2(c)(2)(B)(ii).

[7] You represent that less than one percent of "X" customers trade directly with one another through the "Z". The "Z" is further discussed below.

[8] 7 U.S.C. § 2(c)(2)(B)(ii)(III).

[9] 7 U.S.C. § 6f(c)(2)(B).

[10] 7 U.S.C. § 6f(c)(1)(i). The Commission implemented Section 4f(c) of the Act in Commission Rules 1.14 and 1.15. Commission rules referred to herein are found at 17 C.F.R. Ch. 1 (2001).

[11] *See* 59 Fed. Reg. 66674 (December 28, 1994). Section 4f(c) of the Act was added by Section 229 of the Futures Trading Practices Act of 1992, which is also entitled "Risk Assessment for Holding Company Systems." Pub. L. No. 102-546, 106 Stat. 3590 (1992); *see also* H.R. Rep. No. 102-978 at 32-34, 73-75 (1992).

[12] *Id.* at 66678.

[13] *Black's Law Dictionary* 504 (Abridged 6th Edition 1991).

[14] *See* 17 C.F.R. § 1.17.

[15] "Y" License Agreement ¶ 1.1.

[16] The Customer Agreement with the "Y" licensee is actually the same agreement "X" uses with its direct customers, except all references to "X" have been changed to the name of the "Y" licensee.

[17] Customer Agreement ¶ 25.

[18] *See* CFTC Staff Interpretative Letter No. 01-83, (November 2, 2001) http://www.cftc.gov/tm/letters/01letters/tm01-83.htm.

[19] In your letter dated April 16, 2001, and in conversations with Commission staff, you indicated that if operating the "Z" is perceived to be "inappropriate for the activities of a[n FCM], "X" is prepared to discontinue [its operation of the "Z"] immediately, upon reasonable notice to its customers."

Updated January 17, 2002

**CFTC Letter No. 02-04**
**January 8, 2002**
**Interpretation**
**Division of Trading and Markets**

     Re: "X"

Dear:

    This is in response to your letter dated May 20, 2001, to Barbara Gold, Assistant Chief Counsel in the Division of Trading and Markets (the "Division"), as supplemented by conversations with Division staff. By your correspondence, you inquired about possible exemptions from registration as a commodity pool operator ("CPO") regarding the operation of an "investment club."

    Section 2(c)(2)(B) of the Commodity Exchange Act (the "Act")[1] makes clear that offering foreign currency futures and options contracts, other than those that are executed or traded on an organized exchange[2] ("off-exchange"), to retail customers[3] is unlawful unless the counterparty is a regulated entity enumerated in the Act. The counterparties enumerated include registered futures commission merchants ("FCMs") and certain affiliated persons of registered FCMs.[4] However, if the off-exchange foreign currency transaction is offered to, or entered into with, an eligible contract participant, then the Act is not applicable to, and the Commission does not have jurisdiction over, the transaction.[5]

    Based upon your representations, we understand the facts to be as follows. The investment club will combine the funds of its participants. An account will be opened in the name of the investment club with 'Y', a registered FCM, for the purpose of trading in off-exchange foreign currency. The investment club will limit its activities to the trading of off-exchange foreign currency and will not conduct any trading on or subject to the rules of an organized exchange.

    Commission Rule 4.10(d)(1) defines the term commodity "pool" as "any investment trust, syndicate or similar form of enterprise operated for the purpose of trading commodity interests."[6] Generally, a person who, in connection with a "pool," "solicits, accepts, or receives from others, funds, securities, or property . . . for the purpose of trading in" commodity futures contracts is a CPO.[7] Absent an exemption, a CPO is required to register with the Commission.[8] However, it is the opinion of the Division that, with respect to a person operating a "pool" that limits its trading activities to off-exchange foreign currency with a registered FCM acting as a counterparty under Section 2(c)(2)(B)(ii) of the Act, the person is not required to register as a CPO, but may voluntarily do so.[9]

    Although you, or any other person who operates the investment club, may not be required to register as a CPO, please be aware that, if the investment club enters into off-exchange foreign currency futures or options transactions with an entity that is not one of the counterparties enumerated in Section 2(c)(2)(B)(ii) of the Act, the transaction is unlawful and the operator of the investment club may be liable for aiding and abetting a violation of the Act.[10] Even if the investment club enters into off-exchange foreign currency futures or options transactions with an enumerated counterparty, such as a registered FCM, the operator of the investment club may still be subject to the relevant antifraud provisions of the Act and rules thereunder.

    I hope you find this letter responsive to your inquiry. If you have any questions concerning this correspondence, please contact Michael A. Piracci, an attorney on my staff, at (202) 418-5430.

                      Very truly yours,
                      Lawrence B. Patent
                      Associate Chief Counsel

Case 1:04-cv-21346-KMM    Document 36    Entered on FLSD Docket 07/26/2004    Page 129 of 129

[1] 7 U.S.C. § 2 (2000).

[2] 7 U.S.C. § 1a(27).

[3] As used in this letter, the term "retail customer" refers to any person other than a person that comes within the definition of an "eligible contract participant" under Section 1a(12) of the Act, 7 U.S.C. § 1a (12).

[4] The other enumerated counterparties are: (1) financial institutions; (2) registered broker-dealers; (3) associated persons of registered broker-dealers; (4) insurance companies or affiliates thereof; (5) financial holding companies; and (6) investment bank holding companies. *See* Section 2(c)(2)(B)(ii) of the Act, 7 U.S.C. § 2(c)(2)(B)(ii).

[5] A commodity pool that has total assets exceeding $5 million and is formed and operated by a registered CPO, or a foreign person performing a similar function subject as such to foreign regulation, is an "eligible contract participant." Section 1a(12)(A)(iv) of the Act, 7 U.S.C. § 1a(12)(A)(iv).

[6] Commission rules referred to herein are found at 17 C.F.R. Ch. 1 (2001).

[7] 7 U.S.C. § 1a(5).

[8] Section 4m(1) of the Act, 7 U.S.C. § 6m(1); *see also* Commission Rule 4.13.

[9] This opinion is solely that of the Division of Trading and Markets and does not necessarily represent the opinion of the Commission or any other division or office of the Commission and is not binding on the Commission. Moreover, the Division does not express any opinions as to the status of the investment club under applicable state or federal laws that are not within the jurisdiction of the Commission, e.g., federal securities laws which fall under the jurisdiction of the Securities and Exchange Commission.

[10] *See* Section 4(a) of the Act, 7 U.S.C. § 6(a); *see also* Section 13(a) of the Act, 7 U.S.C. § 13c(a).

Updated January 17, 2002