**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  04-21346-CIV-LENARD/SIMONTON**

**COMMODITY FUTURES TRADING**
**COMMISSION,**

       **Plaintiff,**

**v.**

**STERLING TRADING GROUP, INC.,**
**UNIVERSAL FX, INC., QIX, INC., STG**
**GLOBAL TRADING, INC., GRAYSTONE**
**BROWNE FINANCIAL, INC., JOSEPH**
**ARSENAULT, AND ANDREW STERN,**

       **Defendants.**
_____/

**<u>REPORT AND RECOMMENDATION</u>**

Presently pending before the Court is Plaintiff's Motion for a Preliminary Injunction (DE # 3).  This motion is referred to the undersigned Magistrate Judge to take all necessary and proper action as required by law (DE # 14).  The motion is fully briefed, and an evidentiary hearing was held.  For the reasons stated below, it is respectfully recommended that the Motion be denied.

Transcripts of the evidentiary hearing have been filed as follows: September 30, 2004 (DE # 107); October 1, 2004 (DE # 101); November 17, 2004 (DE # 109); November 18, 2004 (DE # 111); December 16, 2004 (DE # 128).

The following documents have been filed by the parties in connection with this motion:

DE # 4: CFTC's Memorandum in Support of its Motion for Preliminary Injunction[1]
DE # 30: CFTC's List of Witnesses, Affidavits, and Exhibits

_____

[1] The Declaration of Robert Chilton, (DE # 4, Ex. 9, and DE # 30) was withdrawn since he was not available for cross-examination at the hearing (DE # 111 at 31-32).

DE # 48: Response of Defendants Universal, QIX, and Andrew Stern

DE # 49: Defendants' Joint List of Witnesses, Affidavits and Exhibits[2]

DE # 50: Response of Defendants Sterling Trading Group, Inc., STG Global Trading, Inc., Graystone Browne Financial, Inc.  and Joseph Arsenault

DE # 59: CFTC's Notice of Filing Supplemental Declaration of Kyong J.  Koh

DE # 60: CFTC's Reply to Defendants' Opposition

DE # 61: CFTC's Rebuttal List of Affidavits and Exhibits[3]

DE # 62: CFTC's Notice of Filing Attachments and Exhibits to Plaintiff's Rebuttal List

DE # 65: Defendants' (Stern, Universal FX and QIX) Notice of Filing Supplemental Exhibits

DE # 72: Joint Statement of Stipulated Facts

DE # 74: CFTC's Proposed Findings of Fact and Conclusions of Law

DE # 76: Defendants' (Sterling Trading, STG Global, Graystone Browne, Arsenault) Proposed Findings of Fact and Conclusions of Law

DE # 77: Defendants' (Stern, Universal and QIX) Proposed Findings of Fact and Conclusions of Law

DE # 78: Defendant Stern's Supplemental Memorandum in Opposition to Motion for Preliminary Injunction

DE # 95: CFTC's Notice of Filing Exhibit A to Declaration of Robert Firebaugh

DE # 97: CFTC's Notice of Filing Transcript of Broker Solicitation Tape (included as Exhibit 8 to DE # 30)

DE # 112: Defendants' Notice of Filing List of Exhibits

DE # 132: CFTC's Notice of Filing transcripts of Sterling radio advertisements previously filed in electronic form in DE # 4, Ex.  2, Attachment Z

DE # 134: CFTC Post-Hearing Brief

DE # 136: CFTC's Proposed Findings of Fact and Conclusions of Law

DE # 137: CFTC's Reply to Defendant Stern's Supplemental Memorandum in Opposition to Motion for Preliminary Injunction

DE # 139: Defendants' Notice of Filing Additional Authority (*CFTC v.  Next Financial Services, et al.,* 04-80562-CIV-KLR (S.D. Fla.  Jan.  27, 2005).

DE # 144: Defendants' Joint Post-Hearing Brief

DE # 145: Defendants' (Stern, Universal, and QIX) Post Hearing Proposed Findings of Fact and Conclusions of Law

DE # 146: Defendants' (Sterling Trading Group, STG Global Trading, Graystone Browne, and Arsenault) Post-Hearing Proposed Findings of Fact and Conclusions of Law

---

[2]  The Declarations of Rose Judy, Andre Stepsky, Thomas Keesee, and Michael Mesa were withdrawn since those witnesses were not available for cross-examination; although the exhibits to these Declarations were admitted in connection with other testimony at the hearing (DE # 128 at 103).

[3]  Attachment E to DE # 61 was not admitted since it was not properly authenticated, and its contents appear inconsistent with that portion of the Declaration which refers to this exhibit (DE # 111 at 53).

DE # 147: Defendants' (Sterling Trading Group, STG Global Trading, Graystone Browne, and Arsenault) Notice of Filing Compliance Transcripts

DE # 149: (Defendants' (Stern, Universal and QIX) Notice of Filing Declaration of Ronald B. Hobson

DE # 155: CFTC's Reply to Defendants' Joint Post-Hearing Brief and Proposed Findings and Conclusions of Law, and Notice of Errata (DE # 156)

DE # 168: Defendants' Notice of Filing Supplemental Authority in Further Opposition to Plaintiff's Motion for Preliminary Injunction (re: legislative proposals)

DE # 171: CFTC's Notice of Filing Supplemental Authority and of Order Vacating Authority Cited by Defendants (re: *CFTC v. Next Financial Services Unltd.*, Case No. 04-80562 (S.D. Fla. June 7, 2005)

DE # 173: CFTC's Motion to Strike Notice of Filing Supplemental Authority re: legislative proposals (deemed a response to the supplemental authority)

DE # 175: Defendants' Response to Motion to Strike

DE # 176: CFTC's Notice of Filing Supplemental Authority re: asset freeze (*CFTC v. United Investor Group*, Case. No. 05-80002-CIV-Hurley (S.D. Fla. June 9, 2005)

DE # 177: CFTC's Reply in Support of Motion to Strike

DE # 179: CFTC's Notice of Filing Supplemental Authority (*CFTC v. National Investment Consultants*, Case No. C05-02641-JSW (N.D. Cal. Aug. 26, 2005))

DE # 198: CFTC's Notice of Filing Supplemental Authority Relating to Plaintiff's Motion for Preliminary Injunction (*CFTC v. G7 Advisory Services, LLC*, Case. No. 05-80313-CIV-WPD (S.D. Fla. Dec. 6, 2005)

DE # 200: Defendants' Notice of Filing Supplemental Authority in Further Support (*CFTC v. American Derivatives Corp.*, Case. No. 05-2492-STORY (N.D. Ga. Nov. 23, 2005))

DE # 223: Defendants' Notice of Filing Supplemental Authority (article entitled, "The Retail FX Conundrum" by Philip McBride Johnson)

DE # 234: CFTC's Motion to Strike Supplemental Authority contained in DE # 223 (which is deemed a response to the supplemental authority)

DE # 235: Notice of Filing Supplemental Authority re: restitution issue (*CFTC v. Next Financial Services*, Case. No. 04-80562-CIV-Ryskamp (S.D. Fla. Mar. 17, 2006))

DE # 241: Defendants' Response in Opposition to Motion to Strike

DE # 243: CFTC's Reply to Response in Opposition to Motion to Strike

DE # 244: Defendants' Notice of Filing Additional Supplemental Authority (*CFTC v. Erskine*, Case No. 04-CV-0016 (N.D. Ohio Apr. 19, 2006)

DE # 250: Defendants' Notice of Filing Additional Supplemental Authority (*CFTC v. Madison Forex, Int'l*, Case No. 05-61672-CIV-Altonaga (S.D. Fla. July 19, 2006).

DE # 263: Plaintiff's Notice of Filing of Supplemental Authority (*CFTC v. First Int'l Group, Inc.*, Case No. 06-20979-CIV-JORDAN (S.D. Fla. Jan. 5, 2007).

I. <u>BACKGROUND</u>

The Commodity Futures Trading Commission ("CFTC") initially filed a four-count

Complaint alleging violations of the Commodities Exchange Act ("the Act"), as amended

by the  Commodities Futures Modernization Act of 2000 ("the Modernization Act"),

against Defendants Sterling Trading Group, Inc. ("Sterling"), Universal FX, Inc. ("UFX"), STG Global Trading, Inc. ("STG"), QIX, Inc., Graystone Browne Financial, Inc. ("Graystone"), Joseph Arsenault and Andrew Stern. In the pending motions, the CFTC seeks a preliminary injunction which (1) prohibits future violations of the Commodity Exchange Act, as amended by the Commodity Futures Modernization Act of 2000; (2) continues the temporary restraining order which prohibited the destruction or alteration of books, records and documents of the Defendants;[4] and (3) which freezes the assets of the Defendants, requires an accounting of such assets, requires repatriation to the United States of foreign-held assets, and requires Defendants to sign consents to the release of financial records and to waive the protections of foreign bank secrecy laws.

More specifically, the Complaint alleges in Count One that Defendants Sterling, Universal, Arsenault, and Stern committed fraud and deceit in the offer and sale of foreign exchange futures contracts, in violation of 7 U.S.C. § 6b(a)(i) and (iii) (Section 4b(a)(2)(i) and (iii) of the Act) and 17 C.F.R. § 1.1(b)(1) and (3).

In Count Two, the Complaint alleges that Defendants Sterling, Universal, Arsenault and Stern violated 7 U.S.C. § 6(a) (Section 4(a) of the Act) through the offer and sale of commodity futures contracts which were not conducted on a board of trade designated as a contract market.

In Count Three, the Complaint alleges that Defendants Universal, QIX and Stern

---

[4] Plaintiff did not seek an asset freeze in connection with the temporary restraining order, and there has been no objection to the continuing duration of the prohibition on the destruction of books, records and documents, or to the retention by the CFTC of the records seized in connection with these proceedings. All of the defendant business entities ceased doing business prior to the commencement of hearings on the preliminary injunction. As stated by counsel for defendants at the outset of the proceedings, they were willing to enter into an agreed order regarding preliminary injunctive relief, other than with respect to the requested asset freeze (DE # 107 at 52-55). Since the CFTC did not agree to this proposal, it was withdrawn.

4

violated 7 U.S.C. § 6h (Section 4h of the Act) by falsely representing that Universal and QIX were a member of a registered entity or that Universal and QIX were registrants under the Act.

In Count Four, the Complaint alleges that Defendants STG, Graystone, QIX, Arsenault, and Stern violated 7 U.S.C. § 6c(b) (Section 4c(b) of the Act) and 17 C.F.R. § 32.11(a) through the offer and sale of commodity options not conducted or executed on, or subject to the rules of a contract market or a foreign board of trade.

The Complaint concerns transactions that occurred during two different phases of operations involving overlapping defendants.  The CFTC alleges that during Phase I of the operations, which occurred between July 2002 and August 2003, Sterling, acting under the control of Arsenault as an agent and introducing entity for Universal, used misleading radio advertisements and high-pressured, misleading telemarketing sales tactics to fraudulently solicit retail customers to engage in illegal foreign currency futures transactions with Universal, which was controlled by Stern (Complaint ¶¶ 20-76).

The Complaint alleges that during Phase II of the operations, which occurred between August 2003 and June 7, 2004, Graystone and STG, under the control of Arsenault, solicited retail customers to enter into foreign currency options transactions with QIX, which was controlled by Stern.  The Complaint alleges that these transactions were illegal since QIX was not a proper counterparty to the transactions (Complaint ¶¶ 77-91).[5]

---

[5]  In an Amended Complaint (DE # 151), the CFTC added a fraud claim with respect to the Phase II transactions (between August 2003 and June 7, 2004) in which STG and Graystone acted as agents of and introducing entities for QIX.  Specifically the CFTC alleges that Defendants Graystone, STG, Arsenault and QIX engaged in fraudulent and deceptive conduct to induce retail customers to engage in illegal foreign currency option transactions with QIX.  This claim is contained in Count Two of the Amended Complaint, and the original Counts Two, Three and Four have been renumbered, respectively as

Defendants argue that the transactions which occurred during Phase I were "spot transactions" rather than futures contracts, and thus the CFTC does not have jurisdiction over those transactions.  The parties agree that if the transactions at issue were spot transactions the CFTC does not have jurisdiction.  Based upon this argument, Defendants contend that the CFTC lacks jurisdiction over Counts One, Two and that part of Count Three alleging transactions during Phase I.  Defendants also contend that, even assuming the transactions could be characterized as futures contracts, the CFTC has failed to establish fraud.

Relying on 7 U.S.C. § 2(c)(2)(B)(ii)(III),  the Defendants contend that Defendants Universal and QIX are affiliated persons of a Futures Commission Merchant ("FCM"); that Congress exempted such affiliated persons from the CFTC's jurisdiction; and, thus, the CFTC does not have jurisdiction over any of the claims asserted.

In the alternative, Defendants contend that the CFTC's jurisdiction over foreign currency transactions was limited to specified subsections which do not include the claims alleged in Counts Two, Three, and Four; the control person claims alleged in all four counts, or the principal/agent claims alleged in Counts One and Two.  More specifically, Defendants Stern and Arsenault assert that they cannot be held liable for the actions of the corporate defendants as controlling persons since the Modernization Act did not make either Section 2(a)(1)(B) or Section 13(b) of the Commodity Exchange Act applicable to off-exchange retail foreign currency transactions, and because they acted in good faith and did not knowingly induce violations by any of the corporate defendants.

Counts Three, Four and Five.  Although the Amended Complaint is not the basis for the request for preliminary injunctive relief, the undersigned notes that the same jurisdictional arguments apply to both the original Complaint and the Amended Complaint.

6

With respect to Count Three, Defendants contend that Section 4h of the Act, 7 U.S.C. § 6h, was omitted from the list of sections over which Congress conferred jurisdiction with respect to foreign exchange transactions, and therefore, there is no jurisdiction to enforce this provision; and, even if jurisdiction existed, the CFTC has failed to establish that either Universal or QIX falsely represented its registration status. Defendants also contend that there was no fraud or misrepresentation in the account opening documents. Similarly, Defendants contend that the CFTC does not have jurisdiction over the claim alleged in Count Four since the underlying predicate regulation, § 32.11(a), was not incorporated by the CFMA, and therefore does not apply to foreign currency transactions.

## II. FINDINGS OF FACT

### A.  The Parties and Other Relevant Entities

The CFTC filed this action in June 2004 (DE # 72, ¶ 63).[6]   The CFTC is an independent federal regulatory agency that is charged with the responsibility for administering and enforcing the provisions of the Commodity Exchange Act (DE # 72, ¶ 64).

Defendant Universal FX, Inc.  ("Universal" or "UFX")[7] was incorporated in the State of Florida by Defendant Andrew Stern ("Stern") on or about February 22, 2002 (DE # 72, ¶ 2).  At the time of Universal's incorporation, Stern was Universal's President, Director and sole shareholder (DE # 72, ¶ 3).  Universal was a trading firm that engaged in transactions in foreign currency (DE # 72, ¶ 4), and was formed with the intention of

---

[6]  Docket Entry # 72 is the parties' Joint Statement of Stipulated Facts.

[7]  In the parties' memoranda and this Report and Recommendation, Universal FX, Inc.  is referred to as "Universal."  However, in various underlying documents regarding the accounts at issue in the case at bar, Universal FX is referred to as "UFX."

conducting retail foreign currency business (DE # 111, Stern Test. at 61).  Universal used the facilities, personnel, and machinery of Universal Financial Holding Corporation ("UFHC"), and was initially capitalized by UFHC (DE # 111, Stern Test. at 141).  Thereafter, in approximately May 2002, Universal funded its own Futures Commission Merchant ("FCM"), which was UTS World (DE # 111, Stern Test. at 142).

Prior to September 2002, Universal, while acting as the counterparty for retail transactions in foreign currency, redirected its customers' orders to FXCM[8] for execution (DE # 72, ¶ 11).   In September 2002, Universal opened its own trading desk (DE # 72, ¶ 12).  From approximately August 2002 until approximately December 2003, Universal acted as a counterparty to retail off-exchange transactions in foreign currency (DE # 72, ¶¶ 9, 14).  In its role as counterparty, Universal executed customer trades, accepted customer money, and took the opposite side of customer trades (DE # 72, ¶ 10).  All of Universal's clients came from introducing brokers; except on rare occasions, the individual investors did not directly contact the trading desk (DE # 4, Ex.  2, Att.  F (Michael's Test.  at 52-53, 60-61).[9]  To minimize its risk, Universal engaged in offset or hedge trading with several European financial institutions, including Dresdner Bank,

---

[8]  At all relevant times, FXCM was a company which engaged in foreign currency transactions.  The parties have not provided the full name of this entity.  However, it appears that FXCM is Forex Capital Markets, LLC, which, according to the opinion of the Court in *CFTC v. Gibraltar Monetary Corp.*, 2006 WL 1789018, No. 04-80132-CIV-WPD (S.D. Fla. 2006), was the world's largest non-bank FCM dealing exclusively in retail foreign exchange.

[9]  The first Declaration of Investigator Koh sets forth an analysis of the activity of eleven introducing brokers during selected periods of time (DE # 4, Ex. 2 at ¶¶ 9 and 10).  During the two-week period from May 1, 2003 through May 14, 2003, Sterling was responsible for $575,101.91, which is approximately 51% of the customer funds deposited at Universal, with the remainder divided among eight additional introducing brokers (*Id.* at ¶ 9).  During the month of January 2003, Sterling was responsible for $717,430.00, which is approximately 67% of the customer funds deposited at Universal (*Id.* at ¶ 10).

Swiss Finance and IFX Markets Ltd. (DE # 109 Koh Test. at 69, 106-08; DE # 4, Ex. 2, Att. F (Michael's Test.) at 35- 38, 70-77).[10]  The accounts at these institutions were initially in the name of Universal Financial Holding Corp. although the money belonged to Universal FX (DE # 4, Ex. 2, Att. F (Michael's Test. at 36-38)).

Universal wholly owns UTS World, Inc., which is also a Florida corporation organized by Stern (DE # 72, ¶ 6).  On May 13, 2003, UTS World first became registered as a futures commission merchant ("FCM") (DE # 72, ¶ 7).  Stern incorporated UTS World with the intention that it would act as an FCM to Universal such that Universal would be considered an "affiliated person" within the meaning of the Commodities Exchange Act and CFTC regulations (DE # 49, Stern Decl., Ex. A at ¶ 7).  At all relevant times, UTS World was financially dependent on Universal (DE # 49, Stern Decl., Ex. A at ¶ 8).  UTS World has never held any customer-segregated funds reportable to the National Futures Association on a Form 1-FR (DE # 72, ¶ 8).

Universal Financial Holding Corporation, Inc. ("UFHC") is a Florida corporation organized by Stern in 1994 to conduct business as a registered FCM (DE # 30, Stern Invest. Test., Ex. 1 at 13; DE 65 (NFA Detail Report and 1996 Annual Report)).  UFHC deals with commodity futures and options that are traded on recognized exchanges (DE # 111, Stern Test. at 57).  During the period for which Universal operated, Universal Financial Holding Corporation never held customer segregated funds of $6,250,000 or more, and had less than $5,000,000 in adjusted net capital at the end of each fiscal year during this period.

---

[10]The CFTC takes the position that the activities of Universal with respect to what it did with the customers' money after receiving it are irrelevant to the analysis of whether the transactions between the customer and Universal were spot transactions or futures transactions (DE # 107 at 15-16).

Although Universal remains in active status as a Florida corporation, it is not currently doing business (DE # 72, ¶ 5).

Defendant Sterling Trading Group, Inc. ("Sterling") was among several other introducing entities that introduced customers to Universal (DE # 72, ¶¶ 27, 28).  Sterling was incorporated as a Florida corporation by Joseph Arsenault on or about May 9, 2002 (DE # 72, ¶ 15).  Sterling has never been registered with the CFTC in any capacity (DE # 72, ¶ 16).  At the time of Sterling's incorporation, Arsenault was Sterling's chief executive officer and sole shareholder (DE # 72, ¶ 17).  At all times since Sterling's incorporation, Arsenault has owned either all shares of Sterling, or a controlling interest of the shares of Sterling (DE # 72, ¶ 19).  Arsenault had the authority to hire, and in fact hired, employees at Sterling (DE # 72, ¶¶ 20, 21).  Arsenault had authority to fire employees at Sterling (DE # 72, ¶ 22).  Arsenault had signatory authority over Sterling's operating bank account, and signed most, if not all, of the checks on behalf of Sterling (DE # 72, ¶¶ 23, 24).

Sterling was active as a business from approximately August 2002 through July 2003, and solicited customers to engage in transactions in foreign currency with Universal as the counterparty (DE # 72, ¶ 25).  Sterling solicited certain customers by sponsoring radio ads (DE # 72, ¶ 26).  All or almost all of Sterling's Universal accounts were discretionary, meaning that the customer authorized Sterling to trade in the customer's account by executing a limited power of attorney (DE # 72, ¶¶ 13, 32).  Arsenault personally placed most of the trades on behalf of the Sterling customers (DE # 72, ¶ 33).  Sterling customers who opened an account with Universal did so by completing account opening documents provided by Universal, and transmitting funds to Universal (DE # 72, ¶¶ 29, 30).  All customer funds were made payable to Universal.

Universal would not accept money from Sterling or any other introducing entity, and would not accept checks made out to any introducing entity (DE # 72, ¶ 31).  Universal was a party to some settlement agreements entered into with Sterling customers (DE # 72, ¶ 34).

A review of the account statements submitted as exhibits to the first Declaration of CFTC Investigator Koh reflects transactions in Euros (EUR), Swiss Francs (CHF), Japanese Yen (JPY) and British Pounds Sterling (GBP) (DE # 4, Ex. 2 attachments N through Y).  Customer files obtained by the CFTC indicated that Sterling had approximately 298 retail customer accounts at Universal, and that those customers invested approximately $5.6 million from January 2003 through July 2003.  During that same time period, Sterling customers had trading losses (including commissions and other fees) of over $4.9 million, and customers received back approximately $734,000 (DE # 4, Ex. 2, Koh Decl. at ¶ 6).

Defendant QIX, Inc.  ("QIX") is a Florida corporation that was organized on October 17, 2002 (DE # 72, ¶ 36).  At all material times, Defendant Andrew Stern has been President, Director, and sole shareholder of QIX (DE # 72, ¶ 38, DE # 111, Stern Test. at 118).  QIX engaged in off-exchange foreign currency options transactions (DE # 72, ¶ 37).  QIX has acted as a counterparty for retail foreign currency options transactions from at least August 2003 (DE # 72, ¶ 39).  The account opening documents used by QIX were put together by Daniel Perini, but ultimately approved by Stern (DE # 111, Stern Test. at 118).

QIX wholly owns QIX Futures, Inc., an Illinois corporation which has been a registered futures commission merchant ("FCM") since November 20, 2003 (DE # 72, ¶¶ 40, 43).  From the time QIX Futures first became registered as an FCM, its approved

principals have been Scott Pettersen and QIX, Inc.  (DE # 72, ¶ 42).  Stern incorporated QIX Futures with the intention that it would act as an FCM to QIX, and that QIX would be an "affiliated person" of QIX Futures within the meaning of the Commodities Exchange Act and the CFTC regulations (DE # 49, Stern Decl., Ex.  A at ¶ 17).  QIX Futures was financially dependent on QIX at all relevant times (DE # 49, Stern Decl., Ex.  A at ¶ 18).  Prior to June 2004, QIX Futures did not conduct any business on recognized commodities exchanges (DE # 111, Stern Test. at 59).  QIX Futures has never held any customer-segregated funds reportable to the NFA on a form 1-FR (DE # 72, ¶ 44).

QIX terminated its relationship with its introducing brokers and customers and closed its business when this action was filed, and transferred all of its assets to QIX Futures (DE # 49, Stern Decl. at ¶¶ 21, 52).

Defendant STG Global Trading, Inc.  ("STG") was incorporated in California on July 14, 2003 by Defendant Joseph Arsenault, who is the principal and controlling person of STG (DE # 72, ¶ 45).  STG introduced customers to QIX (DE # 72, ¶ 47).  From at least August 2003 to June 2004, STG solicited retail customers to engage in foreign currency options transactions with QIX as the counterparty (DE # 72, ¶ 46).  STG has never been registered with the CFTC in any capacity, but was in the process of applying for registration when this case was filed (DE # 72, ¶ 48).  STG ceased doing business when this action was filed (DE # 49, Arsenault Dec.  at ¶ 10).

Defendant Graystone Browne Financial, Inc.  ("Graystone") was incorporated in Florida by Defendant Arsenault on November 5, 2003 (DE # 72, ¶ 49).  Graystone was formerly known as Global Forex Trading, Inc.  ("Global" or "GFT").[11]  In November 2003,

_____

[11]  Global had been incorporated in Florida on July 24, 2003.

Global changed its name to Graystone Browne Financial when it received a threatening letter from an attorney who represented a company with a similar name (DE # 72, ¶ 50). Graystone's principal place of business at all relevant times was 18305 Biscayne Boulevard, Suite 303, Miami, Florida (DE # 72, ¶ 51).

From at least November 5, 2003, to June 2004, Graystone solicited retail customers to engage in foreign currency options transactions with QIX as the counterparty (DE # 72, ¶ 52). Graystone has never been registered with the CFTC in any capacity (DE # 72, ¶ 53). Graystone ceased doing business when this action was filed (DE # 49, Arsenault Dec. at ¶ 10).

Graystone and STG both solicited customers by sponsoring radio ads (DE # 72, ¶ 59). QIX provided the account opening documents to Graystone and QIX, which, in turn, provided the documents to the customers (DE # 72, ¶ 60). The account opening documents specified how customers should transfer funds to QIX (DE # 72, ¶ 61). Customers who opened an account at QIX did so by completing the QIX account opening documents and transmitting the funds to QIX (DE # 72, ¶ 58). QIX did not accept any checks or other forms of payment that were not made out to QIX (DE # 72, ¶ 62).

Defendant Joseph S. Arsenault ("Arsenault") organized Sterling, Graystone, and STG (DE # 72, ¶ 15, 17, 19, 49). He was responsible for their overall management and the hiring and firing of employees (DE # 72, ¶¶ 20-24, 54-57). Arsenault was registered with the CFTC as an Associated Person or Principal of five South Florida Commission registrants at various times from 1984 through 1996 (DE # 49 Arsenault Decl. at ¶ 4; DE # 4, Ex. 2, Koh Decl. at ¶ 46). Four of these firms which were the subject of Commission enforcement actions for fraud. (DE # 4, Ex. 2, Koh Decl. at ¶46). However, aside from the present case, Joseph Arsenault has never been a defendant or respondent in any

other actions brought by the CFTC or the NFA (DE # 72, ¶ 18). He was previously licensed as a securities broker by the Securities and Exchange Commission and the National Association of Securities Dealers (DE # 49, Arsenault Decl. at ¶ 4).

At all relevant times, Defendant Andrew N. Stern resided in North Miami Beach, Florida (DE # 30, Ex. 1, Stern Invest. Test. at 11). He is president and a director of Universal FX; president, a director and sole shareholder of QIX, Inc.; and an officer and director of UTS World, and QIX Futures (DE # 49, Stern Decl., Ex. A at ¶¶ 2, 3). He is a registered Associated Person with the NFA, and an approved NFA associated member and sole owner of UFHC . (DE # 111, Stern Test. at 57; DE # 62, Att. B, Pendleton Decl. at ¶4; DE # 4, Ex. 2, Koh Decl. at ¶ 46). Stern has been the respondent in three NFA regulatory and four NFA arbitration actions (DE # 4, Ex. 2, Koh Decl. at ¶ 46).

Shortly before the hearing on the preliminary injunction, Stern entered into a settlement agreement with the National Futures Association in which he agreed that he would terminate his membership with the NFA, and would not supervise any firms that were members, but he was permitted to continue his ownership interest and to have input into financial matters concerning the firms (DE # 111, Stern Test. at 182). The settlement was based upon the vicarious liability of one of his FCMs, Universal Commodity Corporation, for the actions of an introducing broker in making misleading, deceptive and high-pressured sales solicitations, in violation of NFA rules (DE # 111, Stern Test. at 182).

Prior to this lawsuit, Andrew Stern, both directly and through counsel, had numerous conversations with Sharon Pendleton, regarding the rules and regulations applicable to foreign exchange transactions(DE # 49, Stern Decl. ¶ 17; DE #62, Att. B, Pendleton Decl. ¶¶ 5-6). Sharon Pendleton has worked at the National Futures

Association ("NFA") since 1986, and has been an Associate Director of Compliance since 2002 (DE # 62, Att. B., Pendleton Decl. at ¶ 1; DE # 101, Pendleton Test. at 15).  She testified in this case as a witness on behalf of the CFTC.  The NFA is a congressionally authorized self-regulatory organization of the U.S. futures industry, and Pendleton's responsibilities there include oversight of staff who conduct audits and investigations; working on enforcement actions; advising Members on compliance issues; developing and monitoring Compliance Department goals; and serving as a primary liaison between NFA and the CFTC in development of rules for Futures Commission Merchants and Introducing Brokers (*Id.*).  She testified that she advised Defendant Stern and his counsel that she did not know whether the requirement of being a material affiliated person applied to the exemption from CFTC regulation (although she believed it did), and that she had been trying unsuccessfully to obtain written guidance from the CFTC for some time (DE # 101 at 26-34, 42-45).  She also testified that it was the NFA's position that FCMs and affiliates of FCMs were permitted to offer off-exchange options on foreign currency contracts, and that the NFA had audited members who offered such options, and did not find them to be prohibited by Regulation 32.11 (DE # 101, Pendleton Test. at 81-97).  In addition, the NFA has published an interpretive notice and a retail foreign currency transactions regulatory guide which advised its members that they were permitted to conduct transactions regarding options on foreign exchange contracts (DE # 101, Pendleton Test. at 81-83).  The standard procedure for issuing such guidance involves a review by the CFTC for approval (DE # 101, Pendleton Test. at 84).  The NFA rules apply only to members, and the NFA rules relating to retail foreign currency transactions ("Forex") became effective on December 1, 2003 (DE # 62, Att. B. Pendleton Decl. ¶ 5).  To date, the CFTC has not promulgated rules specifically regarding Forex.

15

B. **Phase I Operations**

As stated above, Phase I Operations occurred between the summer of 2002 and July 2003; and involved Forex transactions in which Sterling acted as an introducing broker, and Universal accepted the trades and acted as a counterparty.

Prior to entering the Forex market by establishing Universal, Andrew Stern met with people from two FCMs that were already engaged in this business–FXCM and Alaron (DE # 111, Stern Test. at 134). Initially, Stern entered into an arrangement with FXCM that permitted him to use their Actforex software platform to process the transactions between Universal and its customers (DE # 111, Stern Test. at 135). In addition, FXCM provided Stern with its account opening documents to use in developing Universal's account opening documents. Universal also used parts of Alaron's documents, including their introducing broker agreement and parts of their website (DE # 111, Stern Test. at 136). It was Stern's intention to set up a business identical to what Alaron and FXCM were doing (DE # 111, Stern Test. at 136).

Sterling used customer account documents that were provided by Universal. There were three versions of account opening documents (DE # 4, Ex. 2, Koh Decl. at ¶ 11, and attachments A, B and C). The first version (Ex. A) was used during June, July, and August of 2002. The second version (Ex. B) was used from approximately September 2002 through early July 2003. The third version was used from on or about July 7, 2003, until Sterling ceased doing business.

Stern testified that the account opening documents for Universal were derived from the account opening documents of two existing foreign exchange firms-- AlaronFX and FXCM; and that he made enhancements to them so that they would be as complete as possible (DE # 111, Stern Test. at 64-66).

16

Universal used the Actforex computerized trading platform, which was the same software trading platform that was used by AlaronFX and FXCM (DE # 111, Stern Test. at 152-53).

Stern testified that Universal FX offered spot cash foreign currency transactions (DE # 111, Stern Test. at 76). The account opening documents state, "trader acknowledges that the purchase or sale of currency always anticipates the accepting or making of delivery," but no retail customers every actually took delivery of a foreign currency (DE # 111, Stern Test. at 76-77). The customers of Universal always provided Universal with U.S. dollars; and the Canadian customers were told to exchange their Canadian dollars into U.S. dollars before doing business with Universal (DE # 111, Stern Test. at 77, 82). Stern testified that Universal had made arrangements to accept foreign currency from several foreign customers who contemplated large accounts, but those accounts never came to fruition (DE # 111, Stern Test. at 78).

Stern testified that customers entered into bilateral agreements with Universal under which the customer agreed to buy a particular currency at a specified price, and Universal agreed to sell the currency to the customer at that price (DE # 111, Stern Test. at 83). The customer was not required to deposit the full value of the contract, but was permitted to deposit a margin amount, which was generally two percent (DE # 111, Stern Test. at 83). Stern testified that this was a down payment (DE # 111, Stern Test. at 83-84). The customer was required to notify Universal a day in advance if they wanted delivery, and provide sufficient funds (DE # 111, Stern Test. at 85). When a customer placed an order, Universal went to one of Universal's foreign counter parties and obtained the currency needed to make delivery (DE # 111, Stern Test. at 86). Stern testified that the value of most of the transactions was $100,000.00 (DE # 111, Stern Test.

at 88).  Customers were not required to show that they had liquid assets sufficient to take delivery prior to engaging in transactions with Universal (DE # 111, Stern Test. at 89).  Stern further testified that Universal had the right to increase the margin required or to liquidate or close out a customer's position without notice at any time (DE # 111, Stern Test. at 90).

With respect to the length of time between the opening of the transaction and the settlement date, Stern testified that the account opening documents do not set a specific time, but refer to current industry customs (DE # 111, Stern Test. at 92).  Stern testified that Universal used the industry custom of 48 hours, but that there was nothing in the account documents that specified this time frame (DE # 111, Stern Test. at 93).  Stern testified that customers could have chosen a shorter period of time, but that, based on industry custom, Universal would not have entered into an agreement for a longer period of time (DE # 111, Stern Test. at 95).

Stern's testimony regarding the mechanics of the transactions that actually occurred was somewhat confusing.  As stated above, he initially testified that all contracts called for a two-day settlement date (DE # 111, Stern Test. at 93).  He testified that the actual rollover transactions were not reflected on account statements because of limitations in the software trading platform they were using (DE # 111, Stern Test. at 96).  Stern agreed that a "rollover involves offsetting the transaction at the current market price," and testified, "That is, in fact, what happened on the 48-hour period."  (DE # 111, Stern Test. at 96).  He testified that "[w]hat happened during the rollover was the customer's initial contract was closed out and a new contract was established."  (DE # 111, Stern Test. at 96).  The price was not reported to the customer on the account statement because of the above-mentioned software limitations (DE # 111, Stern Test. at

18

96-97).  He then testified that the amount of interest charged in the "premium column" of the account statement "was what we approximated that gain or loss to be" (DE # 111, Stern Test. at 98).  He then acknowledged that the amount shown in the interest or premium column was a daily charge that was the same for every day (DE # 111, Stern Test. at 98).  Stern attempted to explain this by stating, "If we were able to show the detail of the rollover, the amount of difference between the exiting of the one two-day position and the opening of the next two-day position [it] would have been an amount approximately in the nine- or ten-dollar range.  Certainly no less than six dollars and certainly no more than 12 dollars.  So by picking nine, I think we did our best to approximate what was actually happening with the physical currency." (DE # 111, Stern Test. at 99).  Stern then acknowledged, however, that for a typical transaction, the gain or a loss could easily be in the hundreds of dollars (DE # 111, Stern Test. at 99).  Stern then explained, "What would happen is whether the position showed the detail of the rollover or was simply mark[ed] to market, the ultimate effect on the liquidation of the account was ultimately the same.  What the rollover or the interest, the interest charge was meant to approximate, was the actual cost of getting out and getting back in.  And that was never more than, as I said, you know, maybe 12 or 15 dollars."  (DE # 111, Stern Test. at 100).  Stern then testified that the interest or premium charge occurred every day that a transaction remained open past 5:00 p.m. because Universal closed out every position every day (DE # 111, Stern Test. at 103-04).  He then explained the significance of the two-day period as the maximum that people would go out in the industry, "but on a daily basis positions are rolled, and the value date keeps moving out for two days." (DE # 111, Stern Test. at 105).  Stern further testified that the commission was charged, in accordance with the industry customs, at the time the initial position was established,

but was not charged every time there was a rollover (DE 3 111, Stern Test. at 106).  Stern acknowledged that there was nothing on the account statements that would permit a customer to deduce what was actually happening if the introducing broker did not explain what was happening (DE # 111, Stern Test. at 106).

Stern acknowledged that in addition to the commissions, customers were also charged varying amounts of markups that were negotiated between the customer and the introducing broker (DE # 111, Stern Test. at 106-07).  The markups were part of the pricing and were reflected in the customer's profit and loss, but were not put on the account statement the same way that a commission or interest fee was (DE # 111, Stern Test. at 108-10).  Sterling included markups on both the opening and closing of transactions, generally in the amount of five pips[12], which is the equivalent of $50.00 on a one hundred thousand dollar transaction (DE # 111, Stern Test. at 111).  Other introducing brokers charged different markups; some only charged on opening transactions and others only on closing transactions (DE # 111, Stern Test. at 111).  The markups were part of the internal pricing, but did not appear on customer statements until July 2003, when the software and account opening documents were revised (DE #111, Stern Test. at 112).

Customers had the ability to sign onto the trade platform and see the current prices for various currencies; however, these prices did not include markups that would be included within any price for any transaction completed for their account (DE # 111, Stern Test. at 113).  If the transaction was completed, the price shown on the account would include the markup charged by Sterling (DE # 111, Stern Test. at 114).

---

[12]  A "pip" is equal to $10 on a $100,000.00 contract; *i.e.*, 1 pip = .01%.

If a Sterling trader placed the trade online, the account statement would reflect the date and time the trade was actually made, but if the trader placed the trade by calling the phone-up desk, there would be a delay from the time called until the person who received the call processed the trade and keypunched it into the system (DE # 111, Stern Test. at 114).  The time reflected on the account statement would be the time that the trade was keypunched into the system rather than the time the trade was actually placed (DE # 111, Stern Test. at 115).

Stern testified that the Actforex trading platform that Universal used only permitted foreign currency transactions in increments of a hundred thousand (DE # 111, Stern Test. at 116-17).[13]  If trades were placed by telephone rather than online, however, trades could be done for any amount since they were not restricted by the computer software limitations (DE # 111, Stern Test. at 117).  Sterling chose to trade its customers with a hundred thousand increment, but other introducing brokers chose different amounts (DE #111, Stern Test. at 118).

Stern was aware of the CFTC action filed against AlaronFX, which is known as the *Zelener* case (DE # 111, Stern Test. at 153).  That action was filed on June 23, 2003. When he first learned of the case, he reviewed the problems that the CFTC had alleged with respect to AlaronFX, and tried to obviate the problems to the extent that they existed in Universal (DE # 111, Stern Test. at 154).  As a result of the *Zelener* case,

---

[13]  At times during the hearing, and in the exhibits, the one hundred thousand increment appears to refer to dollars, which would yield varying amounts of the commodity purchased per transaction; at other times, such as in this part of the testimony, it appears to refer to the units of foreign currency purchased per transaction. Compare Ticket 82051 for the account of customer Firebaugh (DE # 4, Ex. 2 (Koh Decl) at Att. P), where it appears that Swiss francs (CHF) were sold in lots of 100,000 CHF; with Ticket 63448 for the account of customer Bozzella (DE # 4, Ex. 2 (Koh Decl) at Att. N), where it appears that Swiss francs were sold based upon lots equivalent to $100,000, *i.e.*, 72,014.979 CHF.

Universal modified its account opening documents to provide details regarding the markups that would occur and how it would affect the customer's ability to make or lose money on a trade (DE # 111, Stern Test. at 167, 169).

At any given time, the difference between the sales price and purchase price of a currency was five points or "pips," *i.e.* .05%. That is, the price for a customer to buy currency was five points higher than the price at which the customer could sell it (DE # 111, Stern Test. at 177). The Actforex software required that all customers receive the same point spread, although the spread could be set to any amount (DE # 111, Stern Test. at 177).

Defendant Joseph Arsenault first met Defendant Andrew Stern in the early 1980's when they both worked in the same brokerage firm (DE # 111, Arsenault Test. at 186-87). Arsenault subsequently moved to California and retired (DE # 111, Arsenault Test. at 188). In approximately 2001 or 2002, when Arsenault was on vacation in Florida, he had dinner with Stern and another individual named Joe Prager. Stern and Prager explained foreign currency trading to Arsenault. Arsenault decided to look into it, and he downloaded a practice trading platform to learn how the business worked (DE # 111, Arsenault Test. at 190-91). Prior to 2002, Arsenault had never traded off-exchange Forex, and never had a personal Forex account (DE #111, Arsenault Test. at 191). Arsenault founded Sterling in June or July 2002, and discussed with Stern using Sterling to introduce business to Universal (DE # 111, Arsenault Test. at 191-92). The officers of Sterling were Defendant Joseph Arsenault and his father (DE # 111, Arsenault Test. at 192). Arsenault's father did not work at the office, however (DE # 111, Arsenault Test. at 192). At its peak, Sterling had 30 or 40 employees (DE # 111, Arsenault Test. at 192). The brokers contacted the clients, but did not do any trading. Arsenault did all the trading at

Sterling (DE # 111, Arsenault Test. at 194-95).  Universal conducted all the trades for Sterling (DE # 111, Arsenault Test. at 198).  Sterling made its money through commissions and markups (DE # 111, Arsenault Test. at 204-05).  Arsenault testified that without the markups the business could not have survived (DE # 111, Arsenault Test. at 205-06).

Arsenault testified that to protect his clients, he put a stop order in at the same time that he placed his initial order for currency (DE # 128, Arsenault Test. at 50).  It is not clear from the record how this "stop order" was implemented.

Arsenault was the direct supervisor of all sales representatives for Sterling, and approved various radio advertisements that were used to solicit customers (DE # 128, Arsenault Test. at 7).  Although Arsenault constantly kept track of how his customers were doing (DE # 128, Arsenault Test. at 57), none of the radio ads mentioned how Sterling customers were actually doing (DE # 128, Arsenault Test. at 60).

Compact disc recordings of certain radio advertisements, as well as transcripts of these advertisements are included in the record (DE # 4, Ex. 2, Koh Decl. at Att. Z(cd's); DE # 132 (transcripts).   For example, on September 25, 2002, a person identified as Guy Davis welcomed Mr. Robert Marshall to a program called, "Business Weekly."  (DE # 132, Att. A transcript).  Mr. Marshall was identified as a senior account executive with Sterling Trading Group.  Mr. Marshall stated that Sterling followed currencies such as the Japanese yen, British pound, Swiss franc and Euro, and that they tried "to target the one currency that could bring us back the greatest gain potential, the greatest profit potential over the shortest period of time while always keeping your risks pre-determined."  (*Id.* at 10/25/02 Tr. p. 4).  Mr. Marshall explained that they recommended a $10,000.00 investment, which would allow the customer to leverage a purchase of approximately

500,000 Euros.  If the Euro moved up 7 cents, the customer could see a return of as much as $35,000.  (*Id.* Tr. at 7).  In responding to a question regarding the risk of becoming involved in the currency market, Mr. Marshall stated that, "We never want to sweep that under the rug.  Our traders place stop-loss orders on every trade in order to reduce the inherent risk of trading in the currency market place."  (*Id.* at Tr. p. 10).  Mr. Marshall then stated that the loss was therefore pre-determined when the trade was placed (*Id.*).  Mr. Marshall urged listeners to "stop whatever it is you're doing now, put down your pen, put down your notebook, pull your car over to the side of the road.  Call this number." He then provided the toll free number for Sterling (*Id.* at 16).  Mr. Marshall also explained that customers could leverage other currencies such as the Japanese yen and purchase 100,000 yen per contract (*Id.* at 18).  Mr. Marshall then confirmed that, "if the Euro currency went from 95 [cents] to 100, moved up 5 cents, on five contracts, and [you] caught that whole move, you would make $25,000" (*Id.* at 25).  However, if the Euro went down five cents, Mr. Marshall explained that the investor would not lose $25,000 because of the stop-loss orders.  As an example, he stated that if you purchased 100,000 Euros at 95, a stop-loss order placed at 94.60 would mean that you would lose only $400.00 per contract, for a total of $2,000.00 on five contracts (*Id.* at 26-27).

Based upon a review of the radio advertisements, the undersigned finds that Sterling was marketing speculative investments in foreign currency in which there was great potential for gains and the ability to pre-determine and limit the potential loss.[14]

_____

[14]  The undersigned notes that the 11/15/02 ad also discussed stop loss orders (Att. C at 25-26), as did the undated transcript in DE # 132, Att. D at 8-10 and 29-30, but that radio ads on 3/20/03 and 3/31/03, unlike the others, did not mention stop losses.  The undated transcript necessarily predated March 20, 2003 since it discusses the potential invasion of Iraq, and President Bush announced the invasion on March 19, 2003 (*Id.* at 24).  The undated radio ad necessarily occurred after February 2, 2003, since it refers to the price of the Euro on that date (DE # 132, Att. D at 29).

The earlier advertisements discussed the purchase and sales of contracts by customers; the later advertisements referred to the purchase and sale of "pure" currency (DE # 132, Att. F. (3/31/03 Tr.) at 19), but none of the advertisements contemplated that the customer would take delivery of the currency, particularly within 48 hours.  For example, one radio ad discussed the increase in the value of the Euro over a one month period, claiming that the Euro had increased from 102 to 109 during the preceding 30 days, and that if the investor had opened an account with $12,000.00 and purchased 6 contracts 30 days ago, he could have made $42,000.00 in one month (DE # 132, Att. D at 22-23).  That same advertisement explains that an investor who puts $2,000.00 in the market controls $100,000.00 in leverage, but that the customer doesn't "physically own that" (DE # 132, Att. D at 27).  Similarly, the radio ad on March 20, 2003, discussed the concept of leverage and controlling a $100,000.00 contract with a "margin or a good-faith deposit" of $2,000.00," and stated that the investor didn't "actually own that $100,000" but was "just using it" (DE # 132, Att. E (3/20/03 Tr.) at 3).  In discussing risk, the ad states that they would "risk somewhere in the neighborhood of one third to 40 percent of that on any given trade" (DE # 132, Att. E (3/20/03 Tr.) at 4-5).  The ad then explained that the investor bought a contract that was not an option, and not a put or a call, and that there was no time value or expiration; rather, "This is the cash or the spot currency market. This is not futures.  It's not options."  (DE # 132, Att. E (3/20/03 Tr.) at 5-6).  The ad also explained that Sterling charged a " $150 round turn commission" which means you only pay one way, and that Sterling didn't take any of the profit from the trades (DE # 132, Att. E (3/20/03 tr. at 8).  This ad also disclosed an "interest" charge of about $5 per night if there is a trade over 24 hours (DE # 132, Att. E (3/20/03 Tr.) at 9).

The ads claimed that the traders, customers and clients were very happy, but did

25

not disclose the significant losses that customers were suffering (*See* DE # 132, Att. F (3/31/03 Tr.) at 32, "Not only am I very happy with the success of Sterling Trading Group and our traders, but our investors and our clients are very happy with the return on their investments."). Later advertisements included the $150 commission that would be charged, and stated that it would be "per contract," "to buy and to sell," and that there was "nothing else" charged  (DE # 132, Att. F at 28).  Like the earlier ads, the March 31, 2003 ad emphasized that a $12,000.00 investment would buy six contracts, and that if there was a two penny move in the market, the investor would double his money, less the $150 per contract commission for each of the six contracts (DE # 132, Att. F (3/31/03 Tr.) at 38-39).

Each of the ads repeatedly advised the listener to call the toll-free number to speak to a Sterling representative and obtain an information package.

Arsenault's control over operations at Sterling included providing sales scripts for his salespersons to use, and using a "barge" system which allowed him to monitor the conversations between his salespersons and customers (DE # 128 at 9).

Sterling customers Phillip Matthews, Robert Firebaugh, Gregg McNelley, and Anthony Chentnik, as well as NFA employees Bridget Freas and Shamika Wade, provided sworn Declarations and testified regarding the information on foreign exchange currency trading that they received from representatives of Sterling.  The undersigned credits their testimony, and finds that Sterling representatives routinely touted the profitability of investments, while failing to disclose the losses being suffered by customers or the mark-ups that would be included in their transactions; that none of the customers intended to take delivery of the currency; and that all of the customers invested for the purpose of speculation.

Arsenault testified that Universal was the counterparty to the transactions of his customers; but also testified that Universal would not take the opposite side of Sterling's transactions unless Universal could hedge the trades overseas (DE # 111, Arsenault Test. at 199-200). Therefore, "if Universal sold a contract, then a Sterling customer would purchase that contract" (DE # 111, Arsenault Test. at 200). Arsenault testified that if his clients stayed in a position after 5:00 p.m., they would be charged interest, and that contracts were rolled over every 48 hours unless they were closed out (DE # 128, Arsenault Test. at 22). Arsenault was the person who made the decision whether to close out transactions (DE # 128, Arsenault Test. at 22).

Arsenault claimed that he could have placed trades through other affiliates of FCMs, such as Alaron or FXCM, but he chose to use Universal because Stern was the one who had brought this business to his attention (DE # 111, Arsenault Test. at 198).

With respect to the decision to disclose markups, Arsenault testified that, after the *Zelener* case was brought, it was his decision to change the account documents to more fully disclose the markups (DE # 111, Arsenault Test. at 206-07).

Arsenault testified that he decided to close Sterling because "after a year I realized there's no way anybody could make any money . . . in the spot[15] market" and so he sent the clients a letter stating that the market was too volatile, their money was being returned, and he was shutting down the business (DE # 111, Arsenault Test. at 207-08).[16]

---

[15]  The parties agreed that there was a typographical error in the transcript on page 208, and that although the transcript reflects the word "stock," Mr. Arsenault actually said "spot." (DE # 128 at 30-32).

[16]  A copy of this letter is contained in DE # 49, Ex. A).

**The Account Opening Documents**

Since the three versions of the account opening documents are, in large part, identical; and, since at least the majority of Sterling's customers signed the second version, except as otherwise specified, all references in this discussion are to the second version (DE # 4, Ex. 2, Koh Decl. at Att. B).   Each package contained a Risk Disclosure Statement that was taken verbatim from 17 C.F.R. § 1.55(c), Appendix A, which is a generic risk disclosure statement, which begins with the statement, "This brief statement does not disclose all of the risks and other significant aspects of trading in futures and options.  In light of the risks, you should undertake such transactions only if you understand the nature of the contracts (and contractual relationships) into which you are entering and the extent of your exposure to risk.  Trading in futures and options is not suitable for many members of the public."  It then contains specific sections under the headings, "Futures," "Options," and "Additional risks common to futures and options."  (*Id.*, at pp.  101 00058-59)

Following the Risk Disclosure Statement is a Customer Information form which seeks certain biographical, trading experience and financial information concerning the customer (*Id.* at p. 101 00060).

The next document in the package is entitled, "Notice to Traders." The first line of this Notice is centered, and states, "This Agreement Is a Legal Contract, Please Read It Carefully" (*Id.* at pp. 101 00061-62).  The contract is between Universal FX (referred to in the contract as "UFX") and the customer.  In pertinent part, this contract has the following provisions:

> In connection with opening an account to speculate and/or purchase
> and/or sell cash or spot foreign currency (hereinafter referred to as
> "Currency") through the OTC foreign exchange markets (hereinafter

referred to as "OTCFX") with UFX, Customer (hereinafter referred to as Trader) acknowledges that Trader has been advised and understands the following factors concerning trading in leveraged OTCFX, in addition to those contained in the Risk Disclosure Statement which has been provided to Trader.

1.  OTCFX is not traded on a regulated exchange.  There are no guarantees to the credit worthiness of the counter party of your Currency position.  Every attempt has been made to deal with reputable credit worthy banks/clearing houses.  Also, there may be certain cases in which trading liquidity decreases causing trading in a certain Currency to cease, thereby preventing the liquidation of an adverse position that may result in a substantial financial loss.

2.  Trading in OTCFX is suitable only for those sophisticated institutions or sophisticated participants financially able to withstand losses that may substantially exceed the value of margins or deposits....

3.  Trader acknowledges that the purchase or sale of a Currency always anticipates the accepting or making of delivery.

4.  UFX's margin policies and/or the policies of those banks/clearing houses through which trades are executed may require that additional funds be provided to properly margin Trader's account and that Trader is obligated to immediately meet such margin requirements.  Failure to meet margin calls may result in the liquidation of any open positions with a resultant loss.  UFX also reserves the right to refuse to accept any order.

5.  OTCFX business is not traded on a regulated market ....

6 ....

      b)     Market risks and on-line trading
Trading currencies involves substantial risk that is not suitable for everyone.  See Trader Agreement for more detailed description of risks....

7. In OTCFX, firms are not restricted to effect off-exchange transactions.  The firm with which you deal may be acting as your counter party to the transaction.  If may be difficult or impossible to liquidate an existing position, to assess the value, to determine a fair price or to assess the exposure to risk. .... Off-exchange transactions may be less regulated or subject to a separate regulatory regime....

8.  In the event that Trader grants trading authority or control over Trader's account to a third party (Trading Agent), whether on a discretionary or non-discretionary basis, UFX shall in no way be responsible for reviewing Trader's choice of such Trading Agent or for may any recommendations

with respect thereto. ....

The next document in the package is entitled, "Trader Agreement" (*Id.* at pp. 101

00063-68).  It provides, in pertinent part:

In consideration of UFX agreeing to carry one or more accounts of the undersigned ("Trader") and providing services to Trader in connection with the purchase and sale of cash currencies (including financial instruments) and any similar instruments (collectively referred to as "OTCFX"), which may be purchased or sold by or through UFX for Trader's accounts(s)[*sic*], Trader agrees as follows:

1.  AUTHORIZATION TO TRADE.  UFX is authorized to purchase and sell OTCFX for Trader's account(s) with a counter party bank or sophisticated institutions or participants in accordance with Trader's oral or written or computer instructions.  Unless instructed by Trader to the contrary in writing, UFX is authorized to execute all orders with such banking institutions, counter party, bank, or sophisticated institutional participants as UFX deems appropriate.

....

3.  MARGINS AND DEPOSIT REQUIREMENTS.  Trader shall provide to and maintain with UFX margin in such amounts and in such forms as UFX, in its sole discretion, may require.  Such margin requirements may be greater or less than margins required by a counter party bank.  UFX may change margin requirements at any time.  Trader agrees to deposit by immediate wire transfer such additional margin when and as required by UFX .... UFX may at any time proceed to liquidate Trader's account in accordance with paragraph 7 below and any failure by UFX to enforce its rights hereunder shall not be deemed a waiver by UFX to enforce its rights thereafter.... UFX retains the right to limit the amount and/or total number of open positions that Trader may acquire or maintain at UFX.  UFX will attempt to execute all orders, which it may, in its sole discretion, choose to accept in accordance with the oral or written, or computer instructions of Trader's.  UFX reserves the right to refuse to accept any order....

....

5.  SETTLEMENT DATE AND ROLLOVERS.  With respect to purchases or sales of Currencies through an OTCFX account, Trader agrees to instruct UFX as to the offset or rollover of a Currency position.  Except as provided herein, during the term of the Currency position, Trader shall give UFX instructions for rolling the Currency position no later than two hours prior to the settlement of trading in the Currency contract on the day Trader intends to rollover a Currency position.  In addition, Trader, by noon of the

business day before the settlement date of the contract of the Currency contract, shall instruct UFX whether to deliver, offset or rollover the Currency position.  In the absence of timely instructions from Trader, UFX is authorized, at UFX's absolute discretion, to deliver, rollover or offset all or any portion of the Currency position in the OTCFX account(s) for Trader's Account(s) and at Trader's risk.  Trader's account(s) shall be charged commissions, at broker's rates, upon the rollover or offset of a Currency position.

**6.  COLLATERAL AND LENDING AGREEMENT.**  All funds, securities, currencies, and other property of Trader which UFX or its affiliates may at any time be carrying for Trader ... are to be held by UFX as security and subject to a general lien and right to set-off for liabilities of Trader to UFX ....  UFX shall at no time be required to deliver to Trader the identical property delivered to or purchased by UFX for any account of Trader.  The rights of UFX are subject to the applicable requirements for the segregation of Trader funds and property under the Commodity Exchange Act, as amended (the "Act").  The purpose of the Lending Agreement is to allow UFX to use depository receipts (representing delivery) as collateral. Should Trader take delivery of Currencies through settlement of trades, UFX is obliged to make full payment for the delivery on 24 hours notice.  If the balance in the Trader's account is not adequate to pay for the delivery, the depository receipts become property carried on margin in the Trader's account, since they are not fully paid for by Trader.  The Lending Agreement allows UFX to use the depository receipt as collateral for a bank loan, the proceeds of which are used to pay for the depository receipts until rollover of the Currency and/or payment in full by Trader. Should Trader intend to take delivery of the Currency covered by any other obligation, UFX requires the Trader to sign the Lending Agreement so it may use the Currencies, property, depository receipts or evidence of ownership thereof, as collateral for a bank loan, the proceeds of which may be used to pay for the Currencies or evidence of ownership thereof, until payment in full, including interest, by the Trader....

**7.  LIQUIDATION OF ACCOUNTS AND PAYMENT OF DEFICIT BALANCES.** In the event of (a) the death or judicial declaration of incompetence of Trader; (b) the filing of a petition in bankruptcy ...; (c) the filing of an attachment against any of Trader's accounts ..., (d) insufficient margin, or UFX's determination that any collateral deposited to protect one or more accounts of Trader is inadequate ... or (f) any other circumstances or developments that UFX deems appropriate for its protection, and in UFX's sole discretion, it may take one or more, or any portion of, the following actions: ...(2) sell any or purchase any or all Currency contracts, securities held or carried for Trader; and (3) cancel any or all outstanding orders or contracts, or any other commitments made on behalf of Trader.  Any of the above actions may be taken without demand for margin or additional margin, without prior notice of sale or purchase or other notice to Trader,

31

Trader's personal representatives,....  In liquidation of Trader's long or short positions, UFX may, in its sole discretion, offset in the same settlement or it may initiate new long or short positions in order to establish a spread or straddle which in UFX's sole judgment may be advisable to protect or reduce existing positions in Trader's account.  Any sales or purchases hereunder may be made according to UFX's judgment and at its discretion with any interbank or other exchange market where such business is then usually transacted ....Trader shall at all times be liable for the payment of any deficit balance of Trader upon demand by UFX and in all cases, Trader shall be liable for any deficiency remaining in Trader's account(s) ....

8.  SETTLEMENT DATE OFFSET INSTRUCTIONS.  Offset instructions on Currency positions open prior to settlement arriving at settlement date must be given to UFX at least one (1) business day prior to the settlement or value day.  Alternatively, sufficient funds to take delivery or the necessary delivery documents must be in the possession of UFX within the same period described above.  If neither instructions, funds nor documents are received, UFX may without notice, either offset Trader's position or roll Trader's positions into the next settlement time period or make or receive delivery on behalf of Trader upon such terms and by such methods deemed reasonable by UFX in its sole discretion.

9.  CHARGES.  Trader shall pay such brokerage, commission and special service and all other charges (including, without limitation, markups and markdowns, statement charges, idle account charges, order cancellation charges, account transfer charges or other charges), fees .... UFX may change its commission, charges and/or fees without notice....  UFX confirms all prices quoted Trader are not inclusive of markups and markdowns.

....

13.  CURRENCY FLUCTUATION RISK.  If Trader directs UFX to enter into any currency transaction: (a) any profit or loss arising as a result of a fluctuation in the exchange rate affecting such currency will be entirely for Trader's account and risk; (b) all initial and subsequent deposits for margin purposes shall be made in U.S. dollars, in such amounts as UFX may in its sole discretion required; and (c) UFX is authorized to convert funds in Trader's account for margin into and from such foreign currency at a rate of exchange determined by UFX in its sole discretion on the basis of the then prevailing money market rates.

14.  RISK ACKNOWLEDGMENT.  Trader acknowledges that investments in leveraged and non-leveraged transactions are speculative, involves a high degree of risk, and is appropriate only for persons who can assume risk of loss in excess of their margin deposit.  Trader understands that because of

the low margin normally required in OTCFX trading, price changes in OTCFX may result in significant losses that may substantially exceed Trader's investment and margin deposit.... Trader recognizes that guarantees of profit or freedom from loss are impossible of performance in OTCFX trading.  Trader acknowledges that Trader has received no such guarantees from UFX or from any of its representatives or any introducing agent or other entity with whom Trader is conducting his/her UFX account .

The account opening documents also include an Arbitration Agreement which provides, "Any controversy between Trader and UFX, arising out of or relating to Trader's account shall be, except as provided below, resolved by arbitration in accordance with Part 180 of the Commodity Exchange Act as amended."  (*Id.* at 101 0069).

The account opening documents include a document labeled "EXHIBIT A Disclosure Statement and Commission Acknowledgment" which contains, *inter alia*, the following language:

> _____ ("INTRODUCER") AND UFX HAVE ENTERED INTO AN AGREEMENT PURSUANT TO WHICH INTRODUCER WILL SOLICIT AND INTRODUCE PROSPECTIVE COUNTER PARTIES SUCH AS YOURSELF TO UFX FOR THE PURPOSE OF ENTERING INTO OVER-THE-COUNTER FORWARD AND SPOT FOREIGN CURRENCY AND FOREIGN CURRENCY OPTIONS CONTRACTS ("FOREIGN EXCHANGE") WITH UFX.
> ....
>
> PURSUANT TO THE AGREEMENT, UFX WILL COLLECT AND REMIT TO INTRODUCER THE TRANSACTION-BASED COMMISSIONS CHARGED TO THE INTRODUCED COUNTER PARTY BY INTRODUCER.  SUCH TRANSACTION-BASED COMMISSIONS SHALL EQUAL THE AMOUNT INDICATED BELOW PER TRANSACTION.  UFX WILL NOT SHARE IN ANY TRANSACTION-BASED COMMISSIONS CHARGED BY INTRODUCER.
>
> UFX IS AN AFFILIATE OF A FUTURES COMMISSION MERCHANT WITH THE COMMODITY FUTURES TRADING COMMISSION ("CFTC") AND IS A MEMBER OF THE NATIONAL FUTURES ASSOCIATION ("NFA") PURSUANT TO THE PROVISIONS OF THE COMMODITY EXCHANGE ACT (THE "ACT"). HOWEVER, FOREIGN EXCHANGE CONTRACTS ENTERED INTO BETWEEN UFX AND YOU AS COUNTER PARTY ARE NOT TRADED ON OR SUBJECT TO THE RULES OF AN EXCHANGE REGULATED BY THE CFTC, NOR ARE SUCH FOREIGN EXCHANGE CONTRACTS CLEARED OR GUARANTEED BY ANY CLEARING ORGANIZATION, BUT RATHER SUCH CONTRACTS ARE BILATERAL AGREEMENTS BETWEEN UFX AND YOU.

**INTRODUCER IS NOT REGISTERED IN ANY CAPACITY WITH THE CFTC OR NFA.[17]**

**UFX DOES NOT SUPERVISE THE ACTIVITIES OF INTRODUCER AND ASSUMES NO LIABILITY FOR ANY REPRESENTATIONS MADE BY INTRODUCER.  UFX AND INTRODUCER ARE WHOLLY SEPARATE AND INDEPENDENT FROM ONE ANOTHER.  THE AGREEMENT BETWEEN UFX AND INTRODUCER DOES NOT ESTABLISH A JOINT VENTURE OR PARTNERSHIP AND INTRODUCER IS NOT AN AGENT OR EMPLOYEE OF UFX.**

The page following the above disclosure statement sets forth the commissions which will be charged.  This paragraph varied between the three versions.  The first version contained two forms of accounts which could be established–a six-month unlimited trading account which charged a fee of $1,500; and a UFX Account, which charged a $150 fee (DE # 4, Ex. 2, Koh Decl., Att. A at 101-00020).  The second version eliminated the six-month unlimited trading account (DE # 4, Ex. 2, Koh Decl., Att. B at 101 00075).  There is no evidence that any of the Sterling customers had a six-month unlimited trading account.  The second version provides, in pertinent part:

> UFX is hereby authorized to deduct from my account and pay
>
> **Commissions Per Round Turn Lot $**_____
>
> **Lots Size equivalent**
> **100k FXTS trading platform = 100,000 position**
>
> **Commission Payable to**
>
> **INTRODUCER** _____
>
> Because the risk factor is high in the foreign exchange market trading, only genuine "risk" funds should be used in such trading.  If Trader does not have the extra capital the Trader can afford to lose, Trader should not trade in the foreign exchange market.  No "safe" trading system has ever been devised, and no one can guarantee profits or freedom from

---

[17]  This line was not included in the first version of the account opening documents, which is at DE # 4, Exhibit 2, Koh Decl. Attachment A at 101 00019.

loss.  In fact no one can even guarantee to limit the extent of losses.

The third version of the account opening documents changed this page to include

a caption in larger, bold print, "COMMISSIONS AND MARK-UP DISCLOSURE," and to

include the following disclosures regarding mark-ups:

> Spread per currency pair _____ wide.
>
> Mark-up's per currency pair _____pips on the Open,
> and _____pips on the Close
>
> Total Mark-up's kept by introducer _____total Mark-
> up's credited to counterparty
>
> Commissions Per Round Turn Lot $ _____

> For example, if you trade the EUR/USD and your IB charges $150 in
> commissions with a 2 pip mark-up on the open, and a 2 pip mark-up on the
> close, you need a $190 move to overcome all commissions and fees before
> any profit is realized.  In the EUR-USD market, that would equate to a 19
> pip move in your favor.

(DE # 4, Ex. 2, Koh Decl., Att. C at 101 00031).

The account opening documents also included a Limited Power-of-Attorney which

authorized Sterling to act as Trading Agent for the Customer "to purchase and sell

currencies on the OTCFX market and/or options on OTCFX market contracts on margin

...." (DE # 4, Ex. 2, Koh Decl., Att. B at 101 00077).

C.  Phase II Operations

After Sterling closed, Arsenault opened two other firms, STG and Graystone

Browne f/k/a Global Forex Trading (DE # 128, Arsenault Test. at 13).  STG was located in

California, and Graystone Browne was located in Florida.  From approximately August

2003 through June 2004, these firms solicited customers to engage in foreign currency

35

options transactions with QIX.  Arsenault was responsible for operations at those firms,

but the clients were responsible for making their own trading decisions (DE # 128,

Arsenault Test. at 15).  STG and Graystone executed Introducing Agreements with QIX,

under which STG and Graystone agreed to serve exclusively as introducing brokers who

referred customers to QIX (DE # 61, Ex. A, Koh Decl. ¶ 3c, Att. A and B); and, pursuant to

these agreements, the customers of STG and Graystone Browne were introduced to QIX

(DE # 128, Arsenault Test. at 16).

       QIX prepared the account opening documents which were used by STG and

Graystone, and they are substantially similar to the account opening documents which

were used during Phase I of the operations.[18]  With respect to the present motion, the

CFTC specifically notes that they include a Regulation 1.55 Risk Disclosure, refer to

arbitration and CFTC reparations proceedings in the same manner as Universal's

documents, and that they falsely claim that QIX is a member of the NFA, and, thus, that

the options would be executed by or through a member of a registered entity (DE # 74 at

28-29). With respect to the assertion that QIX has falsely claimed membership in the

NFA, the undersigned notes that the original account opening documents used by QIX

contained the same language as the Universal documents in that it stated, "QIX, Inc. is

an affiliate of a Futures Commission Merchant with the Commodity Futures Trading

Commission ("CFTC"), and is a member of the NFA pursuant to the provisions of the

Commodity Exchange Act"  (DE # 62, Att. B. Pendleton Decl. ¶ 8).  On February 9, 2004,

the NFA wrote a letter to QIX Futures, Inc. advising that the language in the account

opening documents was "potentially misleading" and requesting that the language be

---

       [18]  A copy of the these account opening documents is attached to the Declaration of
Andrew Stern (DE # 49,Ex. A: Ex. C).  Hereafter, references to these documents will be
made by citing to "QIX Account Doc." followed by the page number.

clarified "to prevent any confusion."  The NFA suggested that the language be modified to state, "QIX, Inc. is an affiliate of a Futures Commission Merchant <u>which</u> is registered with the Commodity Futures Trading Commission and is a member of the NFA." (emphasis added to highlight the changed language) (*Id.* at Att. 2).  On March 11, 2004, Andrew Stern sent an e-mail to the NFA advising that the suggested modification had been made on the website and to the hard copies of the account documents.  The modified language states:

> QIX, INC. IS AN AFFILIATE OF A FUTURES COMMISSION MERCHANT WHICH IS REGISTERED WITH THE COMMODITY FUTURES TRADING COMMISSION ("CFTC") AND IS A MEMBER OF THE NATIONAL FUTURES ASSOCIATION ("NFA") PURSUANT TO THE PROVISIONS OF THE COMMODITY EXCHANGE ACT (THE "ACT").

(QIX Account Doc. at 17).

The Declaration of CFTC Investigator Koh provides a summary of the business conducted by STG and Graystone (DE # 61, Ex. A at ¶11).  According to internal financial reports obtained from QIX and examined by CFTC Investigator Koh, between December 2003 and June 2004, 35 STG customers lost money, while 1 customer made a profit. Approximately 975 of STG customers, whose records were complete, lost a total of $546,929.50.  During the same time period, 77 Graystone customers lost money, and no customers made a profit.  The Graystone customers, whose records were complete, lost a total of $1,287,599.30.

When the present lawsuit was initiated, QIX terminated its relationship with all its customers (DE # 49, Stern Decl. at ¶ 20).  Its customers were sent a letter which offered them the choice of liquidating their positions, moving to QIX Futures, which had served as QIX's FCM, or moving their open positions to any other FCM of their choice (DE # 49,

Stern Decl. ¶ 21 and Ex. E).  Customers were advised that if they did not make another choice, open positions would be transferred to QIX Futures.  Thus, all of QIX's Forex business was assigned to QIX Futures in July 2004 (*Id.*).

Since there is no dispute that the CFTC has jurisdiction over transactions involving foreign currency options, and since there is no claim in the present motion which seeks relief based on fraud as to the operations of STG, Graystone and QIX, a detailed recitation of the account opening documents and business operations of Phase II is not necessary.[19]

III.  **LEGAL ANALYSIS**

A.  **The Standard for Granting a Preliminary Injunction**

Title 7, United States Code, Section 13a-1 authorizes the CFTC to bring an action to enjoin or restrain violations of the Commodities Exchange Act.  Section (b) of that statute provides, "Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond."  Although there is no standard set forth in the statute, the Courts have held that the traditional standards applicable to private parties seeking injunctive relief do not apply.  In order to obtain a statutory preliminary injunction, the CFTC must demonstrate a prima facie case that a violation has occurred and that there is a reasonable likelihood of a future violation.  *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979).  Unlike the traditional standards for a preliminary injunction applicable to private parties, to obtain a statutory injunction, the CFTC need not prove irreparable harm or the inadequacy of other remedies.  *CFTC v. Muller*, 570 F.2d 1296,

---

[19]  To establish the likelihood of continuing fraud to support its request for injunctive relief as to The CFTC presented Declarations and testimony from investors Brad Campbell, who entered into transactions with Graystone/QIX; Vivian Barnhart, who entered into transactions with STG/QIX; and, Gary Hicks, who entered into transactions with Graystone (then known as Global Forex Trading,or "GFT")/QIX.

1300 (5th Cir. 1978).  Moreover, the Eleventh Circuit has held, "When a preliminary injunction is challenged on the basis of jurisdiction, a plaintiff need only establish 'a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits.'". *S.E.C. v. Unique Fin. Concepts, Inc.,* 196 F.3d 1195, 1198 (11th Cir. 1999) (citations omitted).[20]

The test for determining whether "a proper showing" has been made to support injunctive relief has been described as follows:

> Although the mere fact of a past violation does not ipso facto establish the SEC's right to injunctive relief, and thus is not alone tantamount to the "proper showing" of present or future violations, the Commission is entitled to prevail when the inferences flowing from the defendant's prior illegal conduct, viewed in light of present circumstances, betoken a "reasonable likelihood" of future transgressions. ...
>
> Relevant considerations in the "reasonable likelihood" analysis resolve into essentially three areas of inquiry: the nature of the past violation, the defendant's present attitude, and objective constraints on (or opportunities for) future violations .... Such factors include the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerit of the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

---

[20] Since the injunctive provisions of the Commodities Exchange Act are in all material respects similar to the injunctive provisions of the Securities Exchange Act of 1934, 15 U.S.C. s 78u(e), and the Securities Act of 1933, 15 U.S.C. s 77t(b), the case law developed under those sections of the securities laws is pertinent to cases under section 13a-1 of the Commodities Exchange Act. *CFTC v. British American Commodity Options*, 560 F.2d 135, 141 fn. 11 (2d Cir. 1977); *CFTC v. J. S. Love & Assoc. Options, Ltd.*, 422 F.Supp. 652, 661 (S.D.N.Y.1976).

*SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981) (citations omitted); *SEC v. The Globus Group, Inc.*, 117 F. Supp. 2d 1345 (S.D. Fla. 2000).

Where the relief sought is more than to preserve the status quo, for example where an asset freeze or other mandatory relief is sought, a more substantial showing may be required to support the relief sought. *See SEC v. Unifund SAL*, 910 F.2d 1028, 1039 (2d Cir. 1990) ("Like any litigant, the Commission should be obliged to make a more persuasive showing of its entitlement to a preliminary injunction the more onerous are the burdens of the injunction it seeks."). *Accord SEC v. Healthsouth Corp.*, 261 F. Supp. 2d 1298, 1317-19 (N.D. Ala. 2003).

> B.     The Law Governing the Transactions At Issue

As stated in the introductory portion of this Report, Defendants have mounted several challenges to the jurisdiction of the CFTC over their activities. The first section addresses the scope of regulatory jurisdiction under the CEA. The next section addresses whether the CFTC has proven that the transactions at issue in Phase I are futures transactions within the scope of any regulation, as opposed to excluded spot transactions.

> 1.     The CFTC's Jurisdiction Over the Regulatory Violations Alleged in the Complaint

It is useful to set forth the background of the regulation of commodities in order to put in perspective the issues presented in the case at bar. An excellent and detailed history is set forth in the opinions of Judge Ryskamp In *CFTC v. Next Fin. Serv. Unltd.*, Case No. 04-80562: DE # 85 (S.D. Fla. June 7, 2005) (DE # 171), and Judge Dimitrouleas in *CFTC v. G7 Advisory Serv., LLC*, 406 F. Supp. 2d 1289 (S.D. Fla. 2005) (DE # 198); therefore, only an abbreviated summary is presented here.

Initially, the only commodities regulated by Congress were certain grain futures transactions pursuant to the Grain Futures Act.  In 1936, Congress renamed the Act to be the Commodity Exchange Act ("CEA"), and expanded its coverage to include additional agricultural commodities.

Until 1974, foreign currency transactions were not included in the CEA.  In 1974, the CEA was greatly expanded to include, *inter alia*, trading in foreign currency.  In addition, Congress created the CFTC, and granted it the power, *inter alia*, to investigate complaints, hold administrative hearings, order reparations, and seek injunctive relief. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 357-58 (1982); *Next Fin. Serv.* at 11.  Based upon a concern expressed by the Treasury Department, however, coverage of foreign currency transactions was limited by a provision now known as "the Treasury Amendment."  This amendment exempted from CFTC jurisdiction "transactions in foreign currency ... unless such transactions involve the sale thereof for future delivery conducted on a board of trade."  *Next Fin. Serv.* at 12-13.

The CFTC took the position that the exemption should be narrowly construed and that it was not applicable to options contracts.  In *Dunn v. CFTC*, 519 U.S. 469 (1997), the United States Supreme Court squarely rejected this position, holding that the phrase "transactions in foreign currency" included transactions in options to buy or sell foreign currency.  The Court, however, did not address the meaning of the phrase "conducted on a board of trade," and the lower courts were split on the issue of whether this meant that only interbank transactions were exempt, or whether all off-exchange transactions were exempt.  *G7 Advisory Serv.*, 406 F. Supp.2d at 1294.  The confusion was caused in part by the definition of "board of trade" as "any exchange or association, whether incorporated or unincorporated, of persons who are engaged in the business of buying

41

or selling any commodity." *Id.*

In 2000, Congress enacted the Commodities Futures Modernization Act of 2000 ("CFMA") with the stated purpose of "clarifying the jurisdiction of the [CFTC] over certain retail foreign exchange transactions."   As explained by the Court in *G7 Advisory Serv.,* "The CFMA, as codified in Title 7, United States Code, § 2(c)(2)(B)[21] grants the

---

[21]   Title 7, United States Code, § 2(c)(2)(B) provides:

**(B) Agreements, contracts, and transactions in retail foreign currency**

This chapter applies to, and the Commission shall have jurisdiction over, an agreement, contract, or transaction in foreign currency that–

    **(i)** is a contract of sale of a commodity for future delivery (or an option on such a contract) or an option ...; and

    **(ii)** is offered to, or entered into with, a person that is not an eligible contract participant, unless the counterparty, or the person offering to be the counterparty, of the person is–

        **(I)** a financial institution;

        **(II)** a broker or dealer registered under ... the Securities Exchange Act ... or a futures commission merchant registered under this chapter;

        **(III)** an associated person of a broker or dealer registered under ... the Securities Exchange Act ... or an affiliated person of a futures commission merchant registered under this chapter, concerning the financial or securities activities of which the registered person makes and keeps records under ... the Securities Exchange Act ... or section 6f(c)(2)(B) of this title;

        **(IV)** an insurance company described in section 1a(12)(A)(ii) o this title, or a regulated subsidiary or affiliate of such an insurance company;

        **(V)** a financial holding company (as defined i section 1841) of Title 12); or

        **(VI)** an investment bank holding company ....

CFTC jurisdiction over all off-exchange foreign currency transactions involving non-eligible contract participants unless the counterparties to the transactions are an entity enumerated in 7 U.S.C. § 2(c)(2)(B)(ii).  The CFMA's listing of specified unregulated entities eliminated the need for judicial interpretation of the term "Board of Trade," which the CFMA redefined as 'any organized exchange or other trading facility.' 7 U.S.C. § 1a(2)." 406 F. Supp. 2d at 1295 (footnote added).

Thus, the first issue in the case at bar is whether the transactions alleged are exempt from regulation pursuant to section 2(c)(2)B)(ii).  It is undisputed that most, if not all, of the persons who engaged in transactions with Defendants were not eligible contract participants.[22]  Thus, to determine whether the transactions at issue are exempt from regulation pursuant to this provision, and therefore outside the jurisdiction of the CFTC, it is only necessary to examine whether Universal and QIX, as counterparties, were one of the entities enumerated in subparagraph (B)(ii).[23]  Subparagraph (B)(ii)(II)[24]

---

**(C)** Notwithstanding subclauses (II) and (III) of subparagraph (B)(ii), agreements, contracts, or transactions described in subparagraph (B) shall be subject to sections 6b, 6c(b), 15 and 13b (to the extent that sections 9, 15 and 13b of this title prohibit manipulation of the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any market), 13a-1, 13a-2 and 12(a) of this title if they are entered into by a futures commission merchant or an affiliate of a futures commission merchant that is not also an entity described in subparagraph (B)(ii) of this paragraph.

[22]  An "eligible contract participant" is defined as an individual who has total assets in excess of $10,000,000.00; or, has assets in excess of $5,000,000.00, and enters into the contract in order to manage the risk associated with an asset owned or a liability incurred by that person.  7 U.S.C. §1a(12)(A)(xi).  Based upon CFTC Investigator Koh's examination of the records, as well as the testimony of the individual investors at the evidentiary hearing, none of the customers met this definition (DE # 4, Ex. 2: Koh Decl. ¶ 19).

[23]  7 U.S.C. § 2(c)(2)(B)(ii).  Hereafter, for ease of reference, in the body of this discussion, the provisions of subsection 2(c)(2) will be referred to only by the letter designation and numbers which are within this subsection, and the full citation will be

provides exemption for a futures commission merchant registered under the Act, and

subsection (B)(ii)(III)[25] provides for exemption for "an affiliated person of a futures

commission merchant registered under this Act, concerning the financial or securities

activities of which the registered person makes and keeps records under ... section

6f(c)(2)(B)[26] of this Act."

Defendants Universal and QIX claim exemption as "affiliated persons" under this

provision.  An affiliated person is "any person directly or indirectly controlling,

controlled by, or under common control with a futures commission merchant."  7 U.S.C.

§ 6f(c)(1)(I).  During the relevant periods of time, it appears, and the undersigned

assumes for the purpose of this discussion, that Defendant Universal was affiliated with

UTS World or UFHC[27] and Defendant QIX was affiliated with QIX Futures.

The critical issue in this case is whether all affiliated persons are exempt as long

as the registered FCM keeps records, or whether the exemption applies only where the

registered FCM is required to keep records pursuant to § 6f(c)(2)(B).  The CFTC

contends that because the registered FCMs in the case at bar were not required to keep

---

footnoted to avoid potential confusion.  *I.e.*,  7 U.S.C. § 2(c)(2)(B) will be referred to as
subparagraph (B); 7 U.S.C. § 2(c)(2)(B)(ii) will be referred to as subparagraph (B)(ii); 7
U.S.C. § 2(c)(2)(B)(ii)(III) will be referred to as subparagraph (B)(ii)(III); 7 U.S.C. § 2(c)(2)(C)
will be referred to as subparagraph (C); etc.

[24] 7 U.S.C. § 2(c)(2)(B)(ii)(II).

[25] 7 U.S.C. § 2(c)(2)(B)(ii)(III).

[26] 7 U.S.C. § 6f(c)(2)(B) (footnote added).

[27]  The CFTC points out that Universal began acting as a counterparty on or about
June 2002, but that UTS was not registered as an FCM until May 2003 (DE # 136 at ¶118).
However, Universal was also affiliated with UFHC, which was registered as an FCM during
the relevant time (DE # 111, Stern Test. at 121-22; DE # 65: NFA Detail Report and Annual
Report on UFHC)).

records, the exemption does not apply, and the fact that the registered FCMs, in fact, decided to keep records is irrelevant.  Defendants, on the other hand, contend that since the registered FCMs elected to keep records, they qualify as exempt affiliates.

Section 6f(c)(2)(A)-(B) (emphasis added) provides, in pertinent part:

> (A) Each registered futures commission merchant shall obtain such information and make and keep such records as the Commission, by rule or regulation, prescribes concerning the registered futures commission merchant's policies, procedures, or systems for monitoring and controlling financial and operational risks to it resulting from the activities of any of its affiliated persons, other than a natural person.

> (B) The records *required* under subparagraph (A) shall describe, in the aggregate, each of the futures and other financial activities conducted by, and the customary sources of capital and funding of, those of its affiliated persons whose business activities are reasonably likely to have a material impact on the financial or operational condition of the futures commission merchant, including its adjusted net capital, its liquidity, or its ability to conduct or finance its operations.

Pursuant to this authority, the CFTC has promulgated 17 C.F.R. §§ 1.14(d) and 1.15(c)(1).  Those regulations require FCMs to keep financial records regarding certain affiliated persons which are determined to be "Material Affiliated Persons."[28]  However, those record keeping requirements do not apply to certain smaller FCMs, and specifically exempt "any futures commission merchant which holds funds or property of or for futures customers of less than $6,250,000 and has less than $5,000,000 in adjusted net capital as of the futures commission merchant's fiscal year-end."  It is undisputed that, under these provisions, the relevant FCMs in the case at bar–UFHC, UTS World, and

---

[28] Section 1.14(a)(2) sets forth a five-factor test to be used to determine whether an affiliated person is a Material Affiliated Person, which "involves consideration of all aspects of the activities of, and the relationship between, both entities." 17 C.F.R. § 1.14(a)(2).

QIX Futures–are not required to keep records.[29]

The CFTC argues that Congress sought to limit the exemption for affiliates set forth in subparagraph (B)(ii)(III)[30] by including the proviso "concerning the financial ... activities of which the registered person makes and keeps records *under section 4f(c)(2)(B)*[31] *of the Act.* (Emphasis added).  When Congress referenced this subparagraph in the text of the CFMA, it chose the specific subpart of the CEA's statutory provision on Risk Assessment for Holding Company Systems that expressly referred to "records required" to be maintained pursuant to the CFTC's regulations.  At the time the CFMA was enacted, there was a regulatory scheme in place that specified which FCMs were required to keep records for such affiliates; these affiliate were referred to as "material affiliates" in that scheme.  Based upon this specific reference, the CFTC argues that the CFMA exemption applies *only* to those affiliates who are subject to the recordkeeping requirements of § 6f(c)(2)(B)–*i.e.*, affiliates that are classified as "Material Affiliated Persons" or "MAPs" of certain FCMs that meet the specified capital requirements.  Since neither Universal nor QIX fits into this category, the CFTC contends that the limited exemption specified in subparagraph (B)(ii)(III) does not apply to their activities.

Numerous cases in this District have considered this issue and adopted the position of the CFTC, and the undersigned Magistrate Judge concurs with this result.  Those courts have rejected "the Defendant's interpretation, as it would allow registered

---

[29]  Moreover, the CFTC points out that UFHC did not, in fact, "make and keep" any records for Universal (DE # 4, Ex. 2, Koh Decl. at ¶ 48; DE # 30, Stern Invest. Test. at 115-16).

[30]  7 U.S.C. § 2(c)(2)(B)(ii)(III).

[31]  Section 4f(c)(2)(B) of the CEA is codified at 7 U.S.C. § 6f(c)(2)(B).

FCMs to avoid CFTC regulation based on personal preference.  Any registered FCM could skirt CFTC regulation merely by electing to keep records, thereby confounding the CFMA's purpose of making clear which off-exchange foreign currency transactions are subject to CFTC regulation." *CFTC v. G7 Advisory Serv., LLC*, 406 F. Supp. 2d at 1296-97. *Accord CFTC v. Next Fin. Serv. Unltd.*, 04-80562-CIV-RYSKAMP (S.D. Fla. Jun. 7, 2005) (DE # 85)[32];   *CFTC v. E-Metals Merchants, Inc.*, 05-21571-CIV-LENARD (S.D. Fla. Jul. 26, 2005) (DE # 29 (R&R, adopted on other grounds in DE # 60),); *CFTC v. First Int'l Group*, 06-20972-CIV-JORDAN (S.D. Fla. Jan. 7, 2007) (DE # 34, relying on *G7 Advisory Serv.*). [33]

---

[32]  The undersigned notes that in *Next Fin. Serv.*, the Court specifically found that QIX was not a proper counterparty to the foreign currency transactions at issue in that case.  Although QIX was not a party to that action, which was brought only against certain introducing brokers who were similarly situated to Defendants STG and Graystone in the case at bar, the rationale supporting this determination is persuasive.

[33]  The CFTC contends, in the alternative, that even if Defendants were exempt affiliates, the statute contains an exclusion from this exemption which makes the transactions alleged in the case at bar subject to the jurisdiction of the CFTC with respect to the anti-fraud provisions of the CEA.  Subparagraph (2)(C) provides:

> Notwithstanding subclauses (II) and (III) of subparagraph (B)(ii), agreements, contracts, or transactions ... shall be subject to sections 6b, 6c(b), 15 and 13b (to the extent that sections 9, 15 and 13b prohibit manipulations of the market price of any commodity ...), 13a-1, 13a-2, and 12(a) of this title if they are entered into by a futures commission merchant or an affiliate of a futures commission merchant that is not also an entity described in subparagraph (B)(ii) of this paragraph.

7 U.S.C. § 2(c)(2)(C).  The CFTC contends that this provision reserves the CFTC's anti-fraud jurisdiction with regard to retail foreign currency transactions where one party is a retail customer and the counterparty is a registered FCM or an affiliate of an FCM.  The position of Defendants is that they fall within the exclusion from the anti-fraud provisions of subparagraph (2)(C) since they are "an entity described in subparagraph (B)(ii)."  Other courts in this District have adopted the argument of the CFTC in this regard, holding that the final provision of subparagraph (20(C) operates to provide an exemption from the CFTC's anti-fraud jurisdiction for only those registered FCMs or qualified affiliates that are also another type of entity described in subparagraph (2)(B)(ii), such as financial institutions, insurances companies, financial holding companies, investment bank holding companies, or fully registered broker-dealers.  *See  CFTC v. Madison Forex Int'l*, 05-61672-

Therefore, the undersigned concludes that Defendants Universal and QIX were not proper counterparties within the meaning of Section 2(c)(2)(B)(ii)(III), and therefore they do not qualify for the exemption from jurisdiction set forth in that provision. Therefore, they are subject to the provisions of the entire Commodities Exchange Act as specified in Section 2(c)(2)(B)(i)-(ii).

Finally, Defendants contend that the only regulations applicable to foreign currency transactions are those which were expressly incorporated by the CFMA. Thus, Defendants contend that the following regulations, which were promulgated prior to the CFMA and have not specifically been made applicable to foreign currency transactions, cannot be enforced by the CFTC in the case at bar: Section 4h of the CEA, 7 U.S.C. § 6h (which makes it unlawful to falsely represent registration status) (DE # 145 at 46); Section 32.11 of the Regulations (regarding the prohibition on off-exchange transactions) (DE # 145 at 51-54); Section 4(a) of the CEA, 7 U.S.C. § 6(a) (which makes it unlawful to trade off-exchange futures contracts) (DE # 145 at 50-51); CFTC Regulation 1.2, 17 C.F.R. § 1.2 and Sections 2(a)(1)(B) and 13(b) of the CEA,  7 U.S.C. §§ 2(a)(1)(B) and 13c(b) (respectively, principal/agent and control person liability) (DE # 145 at 51, 54). Defendants contend that the CFTC did not have jurisdiction to regulate off-exchange foreign currency transactions until the enactment of the CFMA. Therefore, none of the pre-existing regulations were applicable to the transactions at issue in the case at bar. Defendants further argue that since 7 U.S.C. §6c(b), specifically states that regulations

---

ALTONAGA (S.D. Fla. July 19, 2006) (DE # 80 at 6-7); *CFTC v. Gibralter Monetary Corp.*, 2006 WL 1789018 (S.D. Fla. May 30, 2006); *First Int'l Group* at 6-7.  This reading of the exemption makes sense because those entities are regulated by other agencies.  However, it is not necessary for the Court to reach that issue in the case at bar since the undersigned concludes that Defendants do not qualify as exempt affiliates.

"may be made only after notice and opportunity for hearing," and since there was no regulation promulgated which specifically adopts the above regulations to the transactions, there has not been the required hearing and the regulations do not apply.

To support their argument, Defendants rely on *Krause v. Forex Exch. Mkt., Inc.*, 356 F. Supp. 2d 331 (S.D.N.Y. 2005).  In *Krause*, investors filed suit against a registered FCM (FXCM) and various other defendants.  The liability of FXCM was based upon control person liability pursuant to section 13(b) and principal/agent liability pursuant to section 2(a)(1).  The Court held that since registered FCMs are exempt from the CFMA's grant of  jurisdiction, except with respect to certain sections specifically enumerated in § 2(c)(2)(C), and since neither section 13(b) nor section 2(a)(1) were among those enumerated provisions, the CEA claims against FXCM must be dismissed.

The CFTC agrees that the regulations at issue were in existence at the time the CFMA was enacted.  However, the CFTC contends that when Congress enacted the CFMA to clarify its jurisdiction over certain retail foreign exchange transactions, Congress subjected the Defendants' conduct to the CEA in its entirety.  The CFTC emphasizes that Congress is presumed to know the existing law when it enacts legislation, and that a newly-enacted or revised statute is presumed to be harmonious with existing law and its judicial construction (DE # 134 at 24).

At the outset, the undersigned notes that Defendants' reliance on *Krause* is unavailing since Defendants in the case at bar, unlike FXCM in *Krause*, are not proper counterparties, and therefore the construction of the exemption granted to registered FCMs (and certain of their affiliates) does not apply.  At least three other cases in this District have adopted the arguments advanced by the CFTC.  *See CFTC v. G7 Advisory Serv., LLC*, 406 F. Supp. 2d 1289, 1297-98 (S.D. Fla. 2005) (holding that 17 C.F.R. § 32.9

applies to off-exchange currency transactions, since Congress took no affirmative act to deprive § 32.9 of effect with respect to Forex transactions, and to hold otherwise would by contrary to the CFMA's purpose of clarifying, not revoking the CFTC's authority to regulate off-exchange foreign currency transactions); *CFTC v. Next Fin. Serv. Unltd.*, 04-80562-CIV-KLR (S.D. Fla. June 7, 2005), DE # 85 at 20-23 (DE # 171) (same); *CFTC v. First Int'l Group*, 06-20972-CIV-AJ (S.D. Fla. DE # 34 Jan. 7, 2007), DE # 34 at 2n.3 (DE # 263) ("When Congress passed the CFMA it was simply *clarifying* the CFTC's jurisdiction. Given the presumption that Congress had knowledge of the law enacting the CFMA ... Regulation 32.9 applies to the transactions here."); *CFTC v. Valko*, 06-60001-CIV-WPD (S.D. Fla. Mar. 12, 2007), DE 129 at 7-12 (holding that both CFTC Regulations 32.9 and 32.11, which bar fraud in connection with commodity option transactions and suspend commodity option transactions not otherwise permitted under the regulations, are applicable to foreign currency transactions conducted by Defendants who are not proper counterparties, as are the sections of the CEA regarding control person liability, 7 U.S.C. §§ 13c(a) and 13c(b)).

The undersigned concurs with the opinions of the District Judges in the above cases.  It is manifestly clear that by enacting the CFMA, Congress intended the CFTC to assert the entirety of its jurisdiction, and all of its existing regulations, over foreign currency transactions, with respect to all entities except for those specifically excluded under 7 U.S.C. § 2(c)(2)(B)(ii).  Since, as previously discussed, neither of the two counterparties in the case at bar–Universal and QIX–qualify for this exclusion, the full regulatory scheme applies in the case at bar.

**2.      The Determination of Whether Transactions Involve Futures Contracts or Spot Transactions**

With respect to Phase I of the operations, the threshold issue is whether Sterling and Universal were engaged in spot transactions or futures transactions.  The parties agree that the Commodity Exchange Act regulates only options contracts and futures contracts, but does not regulate spot transactions.  Thus, if, as Defendants contend, the transactions at issue were spot transactions, the CFTC does not have jurisdiction to regulate those transactions.  On the other hand, if the transactions are futures transactions, the CFTC possesses regulatory jurisdiction and may pursue the present enforcement action.

Under the Commodities Exchange Act, the CFTC may exercise jurisdiction over "transactions involving contracts of sale of a commodity for future delivery."  7 U.S.C. § 2(a)(1)(A).   The scope of the term "future delivery" is clarified in 7 U.S.C. § 1a(19), which provides: "The term 'future delivery' does not include any sale of any cash commodity for deferred shipment or delivery."  The Eleventh Circuit has not addressed the appropriate methodology for determining jurisdiction under this statute, and the Courts of Appeals are divided.  The competing methodologies are illustrated by comparing the opinion in *CFTC v.  Co Petro Mktg.  Group, Inc.*, 680 F.2d 573, 577-81 ( 9th Cir.  1982)[34], with the opinions in *United States v.  Zelener*, 373 F.3d 861 (7th Cir.  2004); and *CFTC v. Madison Forex Int'l, LLC.*, Case No.  05-61672-CIV-Altonaga (DE # 80, filed 7/19/06).[35].

---

[34]  *Accord CFTC v. Noble Wealth Data Info.  Serv.*, 90 F.  Supp.  2d 676, 688-89 (D. Md.  2000), which was adopted in *CFTC v.  Baragosh*, 278 F.3d 319, 329 n.3 (2002); *CFTC v. Nat'l Inv.  Consultants, Inc.*, 2005 WL 2072105 (N.  D. Cal.  Aug.  26, 2005); *CFTC v.  Calvary Currencies LLC*, 437 F.  Supp.  2d 453, 460-64 (D.  Md. 2006).

[35]  *Accord CFTC v.  Erskine*, Case No.  04-CV-0016 (N.D. Ohio April 19, 2006), *appeal docketed*, No. 06-3896 (6th Cir. Jun. 21, 2006).

In *Co Petro*, the Ninth Circuit examined contracts offered by Co Petro for the future purchase of petroleum products to determine whether the CFTC had regulatory jurisdiction over these sales.  The Court described these contracts, which were titled "Agency Agreement for Purchase and Sale of Motor Vehicle Fuel" as follows:

> Under the Agency Agreement, the customer (1) appointed Co Petro as his agent to purchase a specified quantity and type of fuel at a fixed price for delivery at an agreed future date, and (2) paid a deposit based upon a fixed percentage of the purchase price.  Co Petro, however, did not require its customer to take delivery of the fuel.  Instead, at a later specified date the customer could appoint Co Petro to sell the fuel on his behalf.  If the cash price had risen in the interim Co Petro was to (1) remit the difference between the original purchase price and the subsequent sale price, and (2) refund any remaining deposit.  If the cash price had decreased, Co Petro was to (1) deduct from the deposit the difference between the purchase price and the subsequent sale price, and (2) remit the balance of the deposit to the customer.  A liquidated damages clause provided that in no event would the customer lose more than 95% of his initial deposit.

680 F.2d at 576.   The Court also examined the context in which the transactions occurred, noting that although the contracts were not as rigidly standardized as futures contracts traded on licensed markets, they were not individualized since there was uniformity in the units of volume offered for sale, the dates were uniform regarding notification of intent to resell a contract or take delivery, there was a right to offset the transaction, and the delivery date was set at ten months from the purchase date.

In determining that these transactions were futures contracts, the Court used a totality of the circumstances test:

> In determining whether a particular contract is a contract of sale of a commodity for future delivery over which the Commission has regulatory jurisdiction by virtue of 7 U.S.C. § 2 (1976), no bright-line definition or list of characterizing elements is determinative.  The transaction must be viewed as a whole with a critical eye toward its underlying purpose.  The contracts here represent speculative ventures in commodity futures which were marketed to those for whom delivery was not an expectation.  Addressing these circumstances in the

> light of the legislative history of the Act, we conclude that Co
> Petro's contracts are "contracts of sale of a commodity for
> future delivery."

680 F.2d at 581.

The Seventh Circuit took a different approach in *Zelener*. There, the Seventh Circuit examined transactions which were very similar to the transactions at issue in the case at bar, and concluded that they were spot transactions over which the CFTC lacked enforcement jurisdiction. The similarity to the transactions in the case at bar is not coincidental; as discussed in more detail below, the business which was the subject of the *Zelener* opinion was the model for the business operations in Phase I of the Complaint in the case at bar. The focus of the Court in *Zelener* was whether the transactions at issue involved trading in "contracts" for the sale of a commodity, in which case they were futures transactions, or whether the transactions were for the purchase and sale of the underlying commodity, in which case they were not subject to the CFTC's jurisdiction. The Court expressly held that the motive and intent of the purchaser, *i.e.* to ultimately take delivery or to engage in speculation and enter into an offsetting transaction, was not a relevant factor in the analysis. In addition, the Court emphasized that the jurisdictional determination did not relieve the defendants of liability for fraud–it merely changed the avenue for pursuing such claims away from the CFTC to other avenues for relief.[36]

---

[36] The Court emphasized that the challenged conduct "could form the basis of a mail-fraud or wire-fraud prosecution, a civil or criminal action under RICO, or fraud litigation in state court. Consumers or state attorneys general could invoke consumer-protection laws as well. It is unnecessary to classify the transactions as futures contracts in order to provide remedies for deceit. Why stretch the Commodity Futures Act–with resulting uncertainty, litigation costs, and potentially unhappy consequences for other economic arrangements that may be swept into a regulatory system not designed for them–when other remedies are ready to hand?" 373 F.3d at 867.

The transactions in *Zelener* were described by the Court as follows:

> AlaronFX deals in foreign currency. Two corporations doing business as "British Capital Group" or BCG solicited customers' orders for foreign currency. . . . Each customer opened an account with BCG and another with AlaronFX; the documents made it clear that AlaronFX would be the source of all currency bought or sold through BCG in this program, and that AlaronFX would act as a principal. A customer could purchase (go long) or sell (short) any currency; for simplicity we limit our illustrations to long positions. The customer specified the desired quantity, with a minimum order size of $5,000; the contract called for settlement within 48 hours. It is agreed, however, that few of BCG's customers paid in full within that time, and that none took delivery. AlaronFX could have reversed the transactions and charged (or credited) customers with the difference in price across those two days. Instead, however, AlaronFX rolled the transactions forward two days at a time–as the AlaronFX contract permits, and as BCG told the customers would occur. Successive extensions meant that a customer had an open position in foreign currency. If the dollar appreciated relative to that currency, the customer could close the position and reap the profit in one of two ways: take delivery of the currency (AlaronFX promised to make a wire transfer on demand), or sell an equal amount of currency back to Alaron FX. If, however, the dollar fell relative to the other currency, then the client suffered a loss when the position was closed by selling currency back to AlaronFX.

373 F.3d at 863.

In *Zelener*, the CFTC focused on three principal factors to support its argument that the above transactions were futures contracts: "first, the positions were held open indefinitely, so that the customers' gains and losses depended on price movements in the future; second, the customers were amateurs who did not need foreign currency for business endeavors; third, none of the customers took delivery of any currency." 373 F.3d at 863. The Court rejected this "totality of the circumstances" approach, holding that the determination must be based on an analysis of the contract, rather than the intention of the parties or whether the contracts ultimately led to delivery:

> In organized futures markets, people buy and sell contracts, not commodities. Terms are standardized, and each party's obligation runs to an

54

intermediary, the clearing corporation.   Clearing houses eliminate counterparty credit risk.  Standard terms and an absence of counterparty-specific risk make the contracts fungible, which in turn makes it possible to close a position by buying an offsetting contract.  All contracts that expire in a given month are identical; each calls for delivery of the same commodity in the same place at the same time.  Forward and spot contracts, by contrast, call for sale of the commodity; no one deals "in the contract: it is not possible to close a position by buying a traded offset, because promises are not fungible; delivery is idiosyncratic rather than centralized.  *Co Petro*, the case that invented the multi-factor approach, dealt with a fungible contract, see 680 F.2d at 579-81, and trading did occur "in the contract."  That should have been enough to resolve the case.

It is essential to know beforehand whether a contract is a futures or a forward.  The answer determines who, if anyone, may enter into such a contract, and where trading may occur.  Contracts allocate price risk, and they fail in that office if it can't be known until years after the fact whether a given contract was lawful.  Nothing is worse than an approach that asks what the parties "intended" or that scrutinizes the percentage of contracts that led to delivery *ex post*. . . . But reading "contract of sale of a commodity for future delivery" with an emphasis on "contract," and sale of any cash commodity for deferred shipment or delivery" with an emphasis on "sale" nicely separates the domains of futures from other transactions.

373 F.3d at 866.

The Court expressly rejected the CFTC's contention that the rollovers turned these contracts into futures contracts, holding that the CFTC's position was not entitled to deference under *Chevron U.S.A., Inc.  v Natural Resources Defense Council, Inc.*  467 U.S. 837 (1984), since Congress had not delegated this determination to the CFTC.  373 F.3d at 867.  Thus, rather than turn to the totality of circumstances, the Court examined the contract to determine whether trading occurred in fungible contracts.  Since customers of AlaronFX did not purchase identical contracts since each was unique in the amount of currency and in timing, and did not have defined expiration or delivery dates, the Court concluded that the contracts were not fungible *unless* there was a promise to create an offset.  The Court recognized that "A promise to create offsets makes a given setup work *as if* fungible: although the customer can't go into a market to

buy an equal and opposite position, the dealer's promise to match the idiosyncratic terms in order to close the position without delivery means that the customer can disregard the absence of a formal exchange."  373 F.3d at 868.

Examining the account opening documents, the Court concluded that the following language, which is nearly identical to the language in the case at bar, did not give the customer an automatic right to offset, and that therefore the contracts were not fungible.[37]  In sum, the Court concluded: "These transactions were, in form, spot sales for delivery within 48 hours.  Rollover, and the magnification of gain or loss over a longer period, does not turn sales into futures contracts ...."  373 F.3d at 869.

In *CFTC v. Madison Forex Int'l, LLC.*, *supra.*, this Court followed the *Zelener* approach, and determined that transactions which occurred on the same on-line foreign exchange platform that was used in *Zelener* and this case were not futures contracts,

---

[37]  The Court stated: "Paragraph 8 provides that if a customer's account contains "two or more open and opposite Contracts providing ... for the purchase and sale of the same Foreign Currency ... on the same Value Date, such Contracts shall automatically be canceled and replaced by an obligation to settle only the net difference. ... Paragraph 9, on which the Commission places its principal reliance, does not contain any promise.  What it says instead is that, if the client fails to give timely instructions about the disposition of the positions, then 'AlaronFX is authorized, in AlaronFX's sole discretion, to deliver, roll over or offset all or any portion of the Open Position in Customer's Account at Customer's risk.'  This paragraph does not give the client a right to purchase an offsetting position and thus close a transaction; that option belongs to AlaronFX rather than to the customer.  As for ¶ 5: subsection 5.3 says that 'AlaronFX will attempt to execute all Orders that it may, in its sole discretion, accept from Customer in accordance with Customer's instructions ....'  That's not a promise to close any given position by offset.  This subsection continues: 'AlaronFX or its affiliates may, at a future date, establish a trade matching system ....  In that event, AlaronFX ... shall have the right (but not the obligation) ... to act for its own account, and as a counter party or as a broker to AlaronFX customers, in the making of markets."  The Commission does not contend that such a 'trade matching system' was ever established.  Customers thus had no assurance that they could close their positions by offset.  The only *promise* was that, if AlaronFX did not buy back the currency (and thus create an offset under ¶ 8), it would deliver.  This looks more like the business of a wholesaler in commodities such as metals or rare coins than like a system of trading in fungible contracts that characterizes futures exchanges."  373 F.3d at 868.

but were spot transactions not subject to the regulatory jurisdiction of the CFTC.

The undersigned concludes that the approach taken by the Seventh Circuit in *Zelener* should be followed in the case at bar.  This approach leads to consistency in the application of the CFTC's regulatory jurisdiction, based upon the provisions of the contracts into which the parties enter, rather than the uncertainty created by a post-hoc determination, based upon the totality of the circumstances.  As recognized by the Seventh Circuit, there is a need for certainty regarding the legal duties of persons offering commodities for sale that is undermined by the examination of facts outside the contractual obligations.

An examination of the account documents in the case at bar reflects that, as in *Zelener* and *Madison Forex*, the customers were clearly advised that these were spot transactions and there was no absolute right to offset.  The undersigned recognizes that there are some differences upon which the CFTC has relied to distinguish this case.  However, those differences are not material.[38]  In fact, the problem with a post hoc determination of coverage is exemplified, in part, by the position of the CFTC in the case at bar.  On the one hand, the CFTC contends that it has jurisdiction over these transactions; on the other hand, it asserts that Defendants misled its customers into believing that the transactions were covered by the CFTC by including the risk disclosure statement mandated by 17 C.F.R. § 1.55(c), Appendix A, and an arbitration agreement that states any disputes shall be resolved by arbitration in accordance with

---

[38]  Perhaps the most significant difference is the disclosure of the commission rate in this case as "per round turn lot."  However, there is scant evidence in the record regarding what this meant; and, the fact that the commission would be charged only on the first transaction, and not for any subsequent disposition, is not sufficient to create a right on the part of the customer to offset the transaction.

Part 180 of the CEA.  The testimony of Andrew Stern that he included these provisions in an abundance of caution due to the lack of guidance from the CFTC regarding Forex transactions following the enactment of the CFMA, and the uncertainty of the CFTC's jurisdiction is credible.

The transactions at issue in Phase I were, in form, spot sales for delivery within 48 hours, as were the transactions in *Zelener*.  The Customer Agreement expressly states that "trader acknowledges that the purchase or sale of a Currency always anticipates the accepting or making of delivery."  The Agreement also provides that a customer could take actual delivery on the settlement date, and the evidence supports that fact that Universal had the ability to make delivery.

In addition, the account documents do not give the customer an absolute right to offset their transactions; although, at the discretion of Universal, offset was certainly contemplated:

> UFX also reserves the right to refuse to accept any order. (Agreement at Bates No. 101 00035)

> UFX retains the right to limit the amount and/or total number of open positions that Trader may acquire or maintain at UFX. UFX will attempt to execute all orders, which it may, *in its sole discretion*, choose to accept in accordance with the oral or written, or computer instructions of the Trader's.  UFX reserves the right to refuse to accept any order.  (Agreement at Bates No. 101 00037) (emphasis added).

In addition, as in *Zelener*, the contracts were unique in amount of currency and in timing; there were no defined expiration or delivery dates as is common with futures contracts.

The CFTC argues that the rollovers were, in fact, sham transactions that did not really occur.  If this is the case, it does not mean that the contract was a "futures"

contract within the jurisdiction of the CFTC, rather than a contract for the purchase and/or sale of a commodity.[39]  What it means is that Defendants engaged in fraudulent conduct, and are subject to the traditional civil and/or criminal remedies for fraud.  The same remedies apply with respect to the radio advertisements used by Sterling to market these transactions.  Some of these ads appear to be marketing futures transactions, particularly the ad that states customers who invested $2,000.00 would control $100,000.00 of the currency, but wouldn't "physically own that"  (DE # 132, Att. D at 27).  On the other hand, other ads referred to the purchase and sale of "pure" currency (DE # 132, Att. F at 19).  The marketing pitch of introducing brokers such as Sterling, however, cannot logically control the jurisdiction of the CFTC to regulate the actual transactions conducted by Universal (or any other counterparty, for that matter).  If this were the case, Universal would be subject to the jurisdiction of the CFTC, and its panoply of regulations, with respect to transactions with customers of some introducing brokers, but not subject to those regulations with respect to identical transactions entered into with customers of other introducing brokers.  This result is not tenable, and illustrates the wisdom of the Court's approach in *Zelener*, which focuses on the account opening documents.

    It bears repeating, however, that this decision does not excuse or relieve sellers of these commodities from the consequences of fraud; on the contrary, they remain

---

[39]  The undersigned finds, however, that the CFTC did not prove at the hearing that the transactions were, in fact, sham transactions.  Based upon the evidence adduced at the hearing, including testimony that Universal purchased currency overseas to cover its domestic transactions with Sterling, the undersigned finds that the transactions were for the sale of currency with settlement dates that did not exceed 48 hours, and rollovers occurred in the manner described by Stern.  Although additional or more persuasive evidence of sham transactions may exist, the Court must rule on the record as it presently stands.

subject to the traditional remedies for fraudulent transactions.

Since the undersigned has determined that the transactions in Phase I do not fall within the jurisdiction of the CFTC, Counts I and II of the Complaint, as well as that part of Count III which relates to Universal, cannot support injunctive relief.[40]

3.     **Violations of 7 U.S.C. § 6h (Section of 4h of the CEA) False Representations Regarding Status as a Member of a Registered Entity or as Registrants Under the Act (Count 3)**

The CFTC contends that through its account opening documents, QIX falsely represented that it was a registrant under the Act, and falsely represented, in connection with handling of orders for foreign currency options, that the options would be executed by or through a member of a registered entity (DE # 136 at 36).  Title 7, United States Code, Section 6h provides that it is unlawful for any person to falsely represent themselves to be a member of a registered entity.

Assuming that the initial documents of QIX, which stated, QIX, Inc. is an affiliate of a Futures Commission Merchant with the Commodity Futures trading Commission (CFTC"), and is a member of the NFA pursuant to the provisions of the Commodity Exchange Act" were misleading, the undersigned notes that, long before this lawsuit was initiated, and as soon as the misleading nature of this statement was brought to the attention of Defendant Stern, he caused it to be corrected in accordance with language suggested by the NFA.  In March 2004, the language was changed to provide: "QIX, Inc. is an affiliate of a futures commission merchant which is registered with the Commodity

---

[40]  The undersigned notes that if Congress disagrees with the *Zelener's* interpretation of the CFTC's jurisdiction, or determines that the CFTC should have a more expansive jurisdiction over foreign currency transactions, it can enact the legislation proposed by the CFTC on May 20, 2005, which "revises the Commission's existing jurisdiction over retail foreign exchange transactions to address ... the recent *Zelener* decision" (DE # 168).

Futures Trading Commission ("CFTC") and is a member of the National Futures Association ("NFA") pursuant to the provisions of the Commodity Exchange Act" (QIX Account Doc. at 17).

In its initial Proposed Findings of Fact (DE # 74 at 28-29), as well as post-hearing brief (DE # 136 at 35-36), the CFTC includes statements that QIX falsely represented that it was a registrant; however, the CFTC does not even address this alleged violation by QIX in its supporting memoranda of law (DE ## 134, 155).

The undersigned finds that, to the extent that QIX made initial misrepresentations, they were promptly corrected. In addition, QIX has ceased doing business, and there is no likelihood that it will resume business. Therefore, to the extent that the CFTC has not abandoned its argument by failing to present it in its post-hearing brief, injunctive relief is not necessary with respect to this alleged violation.

4.   **Violations of 7 U.S.C. § 6c(b) (Section 4c(b) of the CEA) and 17 C.F.R. § 32.11(a) Through the Offer and Sale of Off-Exchange Commodity Options**

In Count 4 of the Complaint, the CFTC alleges that all of the transactions conducted by QIX were illegal under 17 C.F.R. § 32.11, which prohibits the purchase or sale of any commodity option (with certain exceptions not relevant to this case) except transactions "conducted on or subject to the rules of a contract market or a foreign board of trade in accordance with the provisions of section 4c of the Act."

As stated above, the undersigned concludes as a matter of law that this provision applies to the transactions of QIX, and therefore all of the foreign currency options transactions conducted in Phase II were illegal. However, as demonstrated by the uncontradicted testimony of Defendant Stern, as soon as he was made aware of the Commission's position in this regard, QIX terminated its relationship with its introducing

brokers and their customers.  QIX offered customers the choice of liquidating positions, moving positions to QIX Futures, or moving positions to another FCM.  All of QIX's capital was transferred to QIX Futures, and QIX has ceased conducting business.  The CFTC is kept apprised of the financial activities of QIX Futures, and made no showing of dissipation or hiding of assets.  The undersigned notes that fraud has not been alleged in the Complaint upon which the request for injunctive relief was predicated with respect to the transactions of QIX.

Based upon the totality of the circumstances, as set forth in *SEC v. Zale,* and *SEC v. The Globus Group, Inc.*, and especially considering the frequency with which Defendant Stern consulted with the NFA, and corrected concerns which were brought to his attention, and considering the unsuccessful attempts of the NFA to obtain clarity from the CFTC regarding the "affiliate" exemption from coverage, and the voluntary cessation of business by QIX, Graystone and STG when this lawsuit was filed, the undersigned finds that <u>preliminary</u> injunctive relief is not warranted.  In addition, the CFTC has not provided sufficient evidence to support the need for an asset freeze.

IV.    <u>CONCLUSION</u>

Based upon the foregoing analysis the undersigned concludes that:

1.  The CFTC does not have jurisdiction over the transactions alleged between Defendants Universal and Sterling.

2.  Defendant QIX is subject to the full panoply of regulations promulgated by the CFTC with respect to trading in foreign currency options.

3.  Regulation 32.11(a), 17 C.F.R. § 32.11(a), prohibits Defendant QIX from engaging in off-exchange foreign currency option transactions.

4.  Preliminary injunctive relief is not necessary to enforce compliance with the

CEA.

Therefore, it is hereby

**RECOMMENDED** That Plaintiff's Motion For Preliminary Injunction be **Denied**.

**DONE AND SUBMITTED** in Miami, Florida, this 23rd day of July, 2007.

The parties will have ten days from the date of service of this Order within which to file written objections, if any, for consideration by the United States District Judge to whom this case is assigned.  Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein.  *LoConte v. Dugger*, 847 F.2d 745 (11th Cir.), *cert. denied*, 488 U.S. 958 (1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).


_Andrea M. Simonton_____
**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

Copies furnished to:
The Honorable Joan A. Lenard
     United States District Judge
Counsel of Record