UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  04-21346-CIV-LENARD/SIMONTON

COMMODITY FUTURES TRADING
COMMISSION,

　　　　Plaintiff,

v.

STERLING TRADING GROUP, INC.,
UNIVERSAL FX, INC., QIX, INC., STG
GLOBAL TRADING, INC., GRAYSTONE
BROWNE FINANCIAL, INC., JOSEPH
ARSENAULT, AND ANDREW STERN,

　　　　Defendants.
_____/

## REPORT AND RECOMMENDATION

Presently pending before the Court is Defendants' Joint Motion to Dismiss Amended Complaint (DE # 159).  This motion is referred to the undersigned Magistrate Judge to take all necessary and proper action as required by law (DE # 257).  The motion is fully briefed (DE ## 160, 165, 172).  For the reasons stated below, it is respectfully recommended that the Motion be Granted as to Counts I, III, and part of Count IV, and otherwise denied.

### I.  BACKGROUND

The Commodity Futures Trading Commission ("CFTC") has filed a five-count Amended Complaint alleging violations of the Commodities Exchange Act ("the Act"), as amended by the Commodities Futures Modernization Act of 2000 ("the Modernization Act"or "CFMA"), against Defendants Sterling Trading Group, Inc.  ("Sterling"), Universal FX, Inc.  ("UFX"), STG Global Trading, Inc.  ("STG"), QIX, Inc. ("QIX"), Graystone Browne Financial, Inc.  ("Graystone"), Joseph Arsenault and Andrew Stern (DE # 151).

More specifically, the Amended Complaint alleges in Count One that Defendants Sterling, Universal, Arsenault, and Stern committed fraud and deceit in the offer and sale of foreign exchange futures contracts, in violation of 7 U.S.C. § 6b(a)(i) and (iii)[1] and 17 C.F.R. § 1.1(b)(1) and (3) (Amended Complaint ¶¶ 114-21).  The Amended Complaint alleges that Defendant Arsenault directly or indirectly controlled Sterling, and is therefore liable as a controlling person pursuant to 7 U.S.C. § 13c(b) (Amended Complaint ¶¶ 66-69, 117).  The Complaint further alleges that Defendant Sterling liable as a principal, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, since the acts or omissions complained of were committed by Arsenault and other Sterling representatives within the scope of their employment with Sterling (Amended Complaint ¶ 118).  The liability of Defendant Stern is predicated upon the allegation that he is a controlling person with respect to Universal, pursuant to 7 U.S.C. § 13c(b) (Amended Complaint ¶¶ 61-65, 119).  The Amended Complaint alleges that Universal is liable as a principal, pursuant to 7 U.S.C. § 2(a)(1(B) and 17 C.F.R. § 1.2, for (1) the acts and omissions of its employees; and (2) the acts of Sterling as its agent (Amended Complaint ¶¶ 70-77, 120-21).

In Count Two, the Amended Complaint alleges that Defendants Graystone, STG, Arsenault and QIX committed fraud and deceit in the offer and sale of off-exchange foreign currency options, in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. §§ 1.1(b)(1,3) and 32.9(a, c) (Amended Complaint ¶¶ 122-27).  Similar to Count One, the Amended Complaint alleges control person liability with respect to Defendant Arsenault for the activities of Defendants Graystone and STG (Amended Complaint ¶¶ 99-101, 125).  The

---

[1]  Section 6 of Title 7 codifies Section 4 of the Commodity Exchange Act.  Although the Amended Complaint and the memoranda of the parties cite to both, this Report and Recommendation uses only the citation to the appropriate section of Title 7.

Amended Complaint further alleges that Defendants Graystone and STG are liable as principals, since the acts or omissions complained of were committed by Graystone and STG representatives within the scope of their respective employments (Amended Complaint ¶ 126). Finally, the Amended Complaint alleges that QIX is liable as a principal for the acts of Graystone and STG as its agent (Amended Complaint ¶¶ 102-08, 127). Defendant Stern is not charged with liability in Count Two.

In Count Three, the Amended Complaint alleges that Defendants Sterling, Universal, Arsenault and Stern violated 7 U.S.C. § 6(a) through the offer and sale of commodity futures contracts which were not conducted on a board of trade designated as a contract market (Amended Complaint ¶¶128-33). Like Count One, the Amended Complaint alleges principal/agent liability with respect to Defendants Sterling and Universal; and control person liability with respect to Defendants Arsenault and Stern.

In Count Four, the Amended Complaint alleges that Defendants Universal, QIX and Stern violated 7 U.S.C. § 6h by falsely representing that Universal and QIX were members of a registered entity and/or that Universal and QIX were registrants under the Act (Amended Complaint ¶¶ 134-36). The Amended Complaint alleges control person liability with respect to Defendant Stern (Amended Complaint ¶¶ 98, 136). Defendants Sterling, Graystone and STG are not charged with liability in Count Four.

In Count Five, the Amended Complaint alleges that Defendants STG, Graystone, QIX, Arsenault, and Stern violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.11(a) through the offer and sale of commodity options not conducted or executed on, or subject to the rules of a contract market or a foreign board of trade (Amended Complaint ¶¶ 137-41). The Amended Complaint alleges that Defendant Arsenault is liable for these violations as a control person with respect to Graystone and STG; and that Defendant Stern is liable

3

as a control person of QIX.

As relief, the Amended Complaint seeks the following (DE # 151 at 40-41):

a.      a permanent injunction prohibiting the defendants and any other person or entity associated with them, or any successor thereof, from engaging in conduct violative of the provisions of the Act as alleged in this Complaint, and from engaging in any activity relating to commodity interest trading, including but not limited to, soliciting, accepting or receiving funds, revenue or other property from any person, giving advice for compensation, or soliciting prospective customers, related to the purchase and sale of any commodity futures or options on commodity futures contracts;

b.      an order directing the defendants and any successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constituted violations of the Act, as described herein, and interest thereon from the date of such violations;

c.      an order directing the defendants to make full restitution to every customer whose funds were received by them as a result of acts and practices which constituted violations of the Act, as described herein, and interest thereon from the date of such violations;

d.      an order directing the defendants to pay a civil monetary penalty in the amount of not more than the higher of $120,000 or triple the monetary gain to each defendant for each violation of the Act or Regulations; and

e       such other and further remedial ancillary relief as the Court may deem appropriate.

The Amended Complaint concerns transactions that occurred during two different phases of operations involving overlapping defendants, and contains detailed allegations regarding the nature of the operations and the allegedly fraudulent activities which occurred.  The CFTC alleges that during Phase I of the operations, which occurred between July 2002 and August 2003, Sterling, controlled by Arsenault, used misleading radio advertisements; high-pressured, misleading telemarketing sales tactics; false and

misleading account-opening documents; and other deceptive practices to fraudulently solicit retail customers to engage in foreign currency futures transactions with Universal, which was controlled by Stern. The Amended Complaint also alleges that these transactions were illegal since Universal was not a proper counterparty to the transactions.  (Amended Complaint ¶¶ 20-77).

The Amended Complaint alleges that during Phase II of the operations, which occurred between August 2003 and June 7, 2004, Graystone and STG, under the control of Arsenault, solicited retail customers to enter into foreign currency options transactions with QIX, which was controlled by Stern.  The Amended Complaint alleges that Graystone and STG used false and misleading sales solicitation materials, high-pressure and deceptive sales tactics, and failed to provide access to account information regarding these transactions.  The Amended Complaint also alleges that these transactions were illegal since QIX was not a proper counterparty to the transactions (Amended Complaint ¶¶ 77-108).[2]

The Amended Complaint contains a detailed recitation of the specifically alleged fraudulent activities with respect to both phases.

II.  <u>THE POSITIONS OF THE PARTIES</u>

At the outset, the undersigned notes that, to the extent that the Motion to Dismiss is a factual challenge on the jurisdiction of the Court, both parties rely on the evidence

---

[2]  The Amended Complaint (DE # 151) differs from the initial Complaint filed in this case in that the CFTC added a fraud claim with respect to the Phase II transactions (between August 2003 and June 7, 2004) in which STG and Graystone acted as agents of and introducing entities for QIX.  This claim is contained in Count Two of the Amended Complaint, and the original Counts Two, Three and Four have been renumbered, respectively as Counts Three, Four and Five.  Although the Amended Complaint is not the basis for the request for preliminary injunctive relief, the undersigned notes that the same jurisdictional arguments apply to both the original Complaint and the Amended Complaint.

adduced at the evidentiary hearing held in connection with the CFTC's request for a preliminary injunction, and the voluminous documents filed in connection with those proceedings.

Defendants argue that the transactions which occurred during Phase I were "spot transactions" rather than futures contracts, and thus the CFTC does not have jurisdiction over those transactions. The parties agree that if the transactions at issue were spot transactions the CFTC does not have jurisdiction. Based upon this argument, Defendants contend that the CFTC lacks jurisdiction over Counts One, Three and that part of Count Four alleging transactions during Phase I.

In addition, relying on the CFMA, 7 U.S.C. § 2(c)(2)(B)(ii)(III), Defendants contend that Defendants Universal and QIX are affiliated persons of a Futures Commission Merchant ("FCM"); that Congress completely exempted such affiliated persons from the CFTC's jurisdiction; and, thus, the CFTC does not have jurisdiction over any of the claims asserted.

In the alternative, Defendants contend that the CFTC's jurisdiction over foreign currency transactions is limited to specified subsections listed in 7 U.S.C. § 2(c)(2)(B)(ii)(III), which do not include the principal/agent claims made pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2; the control person claims made pursuant to 7 U.S.C. § 13c(b); the alleged violation of 7 U.S.C. § 6c(b) and 17 C.F.R. §§ 1.1(b)(1,3) and 32.9(a, c), regarding fraud and deceit in the sale of off-exchange foreign currency options, contained in Count Two; the alleged violation of 7 U.S.C. § 6(a), regarding the sale of off-exchange futures contracts, contained in Count Three; the alleged violation of 7 U.S.C. § 6h, regarding the false representation of registration status, contained in Count Four; or the alleged violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.11, regarding

6

the sale of off-exchange options contracts, contained in Count Five.

Finally, they claim that CFTC Regulations 32.9 (alleged in Count Two) and 32.11(a) (alleged in Count Five) should be dismissed as a matter of law because those regulations were not applicable to foreign currency transactions prior to the enactment of the CFMA, and Congress gave the CFTC no authority to use previously existing regulations "as part of its new, but limited, jurisdiction over foreign currency transactions" (DE # 160 at 14). Defendants contend that to apply those regulations to the transactions in the case at bar would violate 7 U.S.C. § Section 6c(b), which requires notice and a hearing prior to the promulgation of regulations.

With respect to the prayer for relief, Defendants contend that the Court should dismiss or strike the claim for restitution because the CEA provides no authority for the CFTC to seek restitution to a third party in a federal court proceeding.

Finally, Defendants contend that the Complaint contains commingled claims in violation of Fed. R. Civ. P. 10(b), and that the individual claims fail to allege "key elements" needed to support the alleged control person and principal/agent claims.

In response (DE # 165, which incorporates by reference DE # 43), the CFTC first claims that, pursuant to the rationale of *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990), this Court should not resolve disputed material issues of fact regarding the jurisdictional challenge to Phase I of the operations, since that challenge directly implicates the merits of the case. The CFTC claims next that the overwhelming evidence adduced at the evidentiary hearing supports their claim that the transactions in Phase I of the operations are futures transactions within the jurisdiction of the CFTC.

The CFTC also asserts that neither Universal nor QIX are proper counterparties exempt from regulation under the provisions of 7 U.S.C. § 2(c)(2)(B)(ii)(III), and therefore

7

they are subject to the jurisdictional grant to the CFTC over all covered commodity transactions.  In addition, the CFTC contends that the reservation of jurisdiction in 7 U.S.C. § 2(c)(2)(C) that exists with respect to certain regulations, applies to all registered FCMs and affiliates, and that it has jurisdiction under this provision to enforce its regulations under section 2(a)(1)(B) with respect to principal/agent liability, and under 13(b) with respect to control person liability.

The CFTC disagrees with Defendants' claim that only regulations which were expressly incorporated by the CFMA, or promulgated thereafter can be applied to foreign currency transactions.  The CFTC asserts the action of Congress in enacting the Commodity Futures Modernization Act to "clarify" the jurisdiction of the CFTC with respect to foreign currency transactions, made all then-existing regulations applicable to the transactions which fall within the clarified scope of the CFTC's jurisdiction.

With respect to the challenge to the sufficiency of the Complaint under Fed. R. Civ. P. 10(b), the CFTC asserts that it has not improperly commingled claims, and that setting forth separate counts for controlling person liability and principal/agent liability would not facilitate a clearer presentation of its claims.  In addition, a more definite statement should not be required under Fed. R. Civ. P. 12(e) since the Complaint provides detailed notice of the CFTC's claims against Defendants.

Finally, the CFTC argues that pursuant to 7 U.S.C. § 13a-1, this Court has the authority to grant complete equitable relief, including the authority to order restitution as part of its ancillary relief.[3]

---

[3]  The CFTC's claim that the Motion to Dismiss should be denied as untimely was resolved by the prior Order which granted Defendants' motion for extension of time to respond to the Amended Complaint (DE # 213).

II.   <u>STANDARDS OF REVIEW</u>

Defendants seek dismissal of the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) on the grounds that the Court lacks subject matter jurisdiction, and pursuant to Fed. R. Civ. P. 12(b)(6), on the grounds that the Complaint fails to state a claim upon which relief can be granted.

Under Fed.R.Civ.P. 12(b)(1), the plaintiff bears the burden of establishing that the court has jurisdiction. *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994).  Attacks on subject matter jurisdiction come in two forms–a facial attack based upon the allegations of the Complaint, and a factual attack which goes beyond the four corners of the Complaint.  Where, as here, the attack is factual, the trial court may proceed as it never could under 12(b)(6).  Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction--its very power to hear the case--there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. *See Goodman v. Sipos,* 259 F.3d 1327, 1331 n.6 (11th Cir. 2001) ("district court properly went beyond the pleadings in order to determine whether it lacked subject matter jurisdiction");  *McMaster v. United States*, 177 F.3d 936, 940 (11th Cir. 1999); *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990). In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of subject matter jurisdiction claims.

There is an exception to this general rule, however, where the factual attack on jurisdiction involves facts that are also intertwined with a determination on the merits of the case.  In that case, the Court must apply a Rule 56 summary judgment standard. *Lawrence v. Dunbar*, 919 F.2d at 1530.

9

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that dismissal of a claim is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Blackston v. Alabama*, 30 F.3d 117, 120 (11th Cir. 1994) (*quoting Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)). On a motion to dismiss, the Court must accept as true all facts alleged and draw all inferences therefrom in the light most favorable to the non-moving party. *See Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir. 1994). A very low sufficiency threshold is necessary for a complaint, or counterclaim, to survive a motion to dismiss. *See Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985) (citation omitted). Moreover, a complaint should not be dismissed for failure to state a claim upon which relief can be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *M/V Sea Lion v. v. Reyes*, 23 F.3d 345, 347 (11th Cir. 1994) (citation omitted).

Finally, under Fed. R. Civ. P. 12(e), a motion for more definite statement should be granted only where the pleading "is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading."  *See Betancourt v. Marine Cargo Mgmt., Inc.* 930 F. Supp 606, 608 (S.D. Fla. 1996); *Moore v. Fidelity Financial Services, Inc.*, 869 F. Supp. 557, 559-60 (N.D. Ill. 1994).  Motions under this rule are most commonly granted where a Complaint is defective under the provisions of Fed.  R. Civ. P. 10(b), which requires that, "[e]ach claim founded upon a separate transaction or occurrence ... shall be stated in a separate count ... whenever a separation facilitates the clear presentation of the matters set forth."

III.   **THE JURISDICTION OF THE CFTC OVER THE PHASE I TRANSACTIONS**

A.      **Introduction**

The parties have incorporated by reference the various memoranda filed in connection with the evidentiary hearing on this issue that was held in connection with the CFTC's Motion for Preliminary Injunction.  However, the CFTC makes the additional argument that the jurisdictional challenge directly implicates the merits of their claim, and therefore this Court must apply the summary judgment standard in evaluating its jurisdiction.  This argument was squarely rejected by the Court in *CFTC v. Madison Forex Int'l.,* 05-61672-CIV-ALTONAGA, DE # 80 at 4 n.1 (S.D. Fla. July 19, 2006) (DE # 250) ("The CFTC does not explain how the Defendants' jurisdictional challenge to the reach of the CEA implicates the merits of the CFTC's fraud allegations."); and, in *CFTC v. Next Fin. Serv., Unltd.*, 04-80562-CIV-RYSKAMP, DE # 85 at 9-10 (S.D. Fla. June 7, 2005) (DE # 171) ("CFTC fails to explain, and the Court cannot discern, how this action involves intermingling of jurisdictional and actual facts: at issue is whether the CEA allows regulation of Defendants, not whether Defendants engaged in fraud.")

In the case at bar, the parties do not dispute that the issue of whether the transactions alleged in Phase I of the Complaint are futures contracts is a matter of law to be determined by the Court.  As discussed in the Report and Recommendation regarding the Motion for Preliminary Injunction, the determination of this legal issue is not affected by whether or not Defendants committed the fraudulent practices alleged in the Complaint.

B.   **Facts Regarding Phase I Operations**

Detailed findings of fact entered with respect to the Motion for Preliminary Injunction (DE # 270) are adopted and incorporated by reference into this Report and

Recommendation.  Therefore, the undersigned sets forth below the facts in abbreviated form.

The CFTC is an independent federal regulatory agency that is charged with the responsibility for administering and enforcing the provisions of the Commodity Exchange Act (DE # 72, ¶ 64).

Defendant Universal FX, Inc.  ("Universal" or "UFX")[4] was a trading firm that engaged in transactions in foreign currency (DE # 72, ¶ 4), and was formed with the intention of conducting retail foreign currency business (DE # 111, Stern Test. at 61). From approximately August 2002 until approximately December 2003, Universal acted as a counterparty to retail off-exchange transactions in foreign currency (DE # 72, ¶¶ 9, 14). In its role as counterparty, Universal executed customer trades, accepted customer money, and took the opposite side of customer trades (DE # 72, ¶ 10).  All of Universal's clients came from introducing brokers; except on rare occasions, the individual investors did not directly contact the trading desk (DE # 4, Ex.  2, Att.  F (Michael's Test. at 52-53, 60-61).[5]

Defendant Sterling Trading Group, Inc. ("Sterling") was among several other introducing entities that introduced customers to Universal (DE # 72, ¶¶ 27, 28).  Sterling was incorporated as a Florida corporation by Joseph Arsenault on or about May 9, 2002

---

[4]  In the parties' memoranda and this Report and Recommendation, Universal FX, Inc.  is referred to as "Universal."  However, in various underlying documents regarding the accounts at issue in the case at bar, Universal FX is referred to as "UFX."

[5]  The first Declaration of Investigator Koh sets forth an analysis of the activity of eleven introducing brokers during selected periods of time (DE # 4, Ex. 2 at ¶¶ 9 and 10). During the two-week period from May 1, 2003 through May 14, 2003, Sterling was responsible for $575,101.91, which is approximately 51% of the customer funds deposited at Universal, with the remainder divided among eight additional introducing brokers (*Id.* at ¶ 9).  During the month of January 2003, Sterling was responsible for $717,430.00, which is approximately 67% of the customer funds deposited at Universal (*Id.* at ¶ 10).

(DE # 72, ¶ 15).  Sterling has never been registered with the CFTC in any capacity (DE # 72, ¶ 16).  At the time of Sterling's incorporation, Arsenault was Sterling's chief executive officer and sole shareholder (DE # 72, ¶ 17).  At all times since Sterling's incorporation, Arsenault has owned either all shares of Sterling, or a controlling interest of the shares of Sterling (DE # 72, ¶ 19).

Sterling was active as a business from approximately August 2002 through July 2003, and solicited customers to engage in transactions in foreign currency with Universal as the counterparty (DE # 72, ¶ 25).  Sterling customers who opened an account with Universal did so by completing account opening documents provided by Universal, and transmitting funds to Universal (DE # 72, ¶¶ 29, 30).  All customer funds were made payable to Universal.  Universal would not accept money from Sterling or any other introducing entity, and would not accept checks made out to any introducing entity (DE # 72, ¶ 31).

Sterling used customer account documents that were provided by Universal.[6] The first document in the package is a Notice to Traders, which identifies the transactions at issue as involving "accounts to speculate and/or purchase and/or sell cash or spot foreign currency." Customers were advised that "there may be certain cases in which trading liquidity decreases causing trading in a certain Currency to cease, thereby preventing the liquidation of an adverse position that may result in a substantial financial loss" (¶ 1).  It further states that "trader acknowledges that the purchase or sale of currency always anticipates the accepting or making of delivery" (¶ 3), and that "UFX also reserves the right to refuse to accept any order" (¶ 4).  In

---

[6] The three versions of the account opening documents are contained in DE # 4, Ex. 2, Koh Decl. at Atts. A, B, and C.

paragraph 7, which advises the Trader of off-exchange transactions, it states, "It may be difficult or impossible to liquidate an existing position ...."

The next document, entitled, "Trader Agreement," provides that Universal agrees to provide services "in connection with the purchase and sale of cash currencies (including financial instruments) and any similar instruments (collectively referred to as 'OTCFX'). Paragraph 1 contains an authorization to trade, under which "UFX is authorized to purchase and sell OTCFX for Trader's account(s) ... in accordance with Trader's oral or written or computer instructions. Unless instructed by Trader to the contrary in writing, UFX is authorized to execute all orders with such banking institutions, counter party, bank, or sophisticated institutional participants as UFX deems appropriate" (¶ 1). In paragraph 3, entitled "Margins and Deposit Requirements," the Agreement states, "UFX will attempt to execute all orders, which it may, in its sole discretion, choose to accept in accordance with the oral or written, or computer instructions of Trader's. UFX reserves the right to refuse to accept any order." Paragraph 5 sets forth the mechanism under which a customer can request the settlement and rollovers "with respect to purchases or sales of Currencies." It states, "Except as provided herein, during the term of the Currency position, Trader shall give UFX instructions for rolling the Currency position no later than two hours prior to the settlement of trading in the Currency contract on the day Trader intends to rollover a Currency position. In addition, Trader, by noon of the business day before the settlement date of the contract of the Currency contract, shall instruct UFX whether to deliver, offset or rollover the Currency position. In the absence of timely instructions from Trader, UFX is authorized, at UFX's absolute discretion to deliver, rollover or offset all or any portion of the Currency positions ..."

The account opening documents do not set a specific time with respect to the length of time between the opening of the transaction and the settlement date, but Universal used the industry custom of 48 hours (DE # 111, Stern Test. at 93).

A disclosure statement sets forth the agreement between the introducing brokers, such as Sterling, and Defendant Universal, and provides the dollar amount of "commissions per round turn lot" which will be charged to the customer and payed to Sterling (DE # 4, Ex. 2, Koh Decl., Att. B at 101 00075).   A later version of this disclosure statement also contained information concerning mark-ups that would be charged, and provided the amounts charged for both the purchase (open) and sale (close) of currencies.  It also provided the following example to describe the effect of commissions and mark-ups on the profitability of speculating on foreign currencies:

> For example, if you trade the EUR/USD and your IB charges $150 in commissions with a 2 pip mark-up on the open, and a 2 pip mark-up on the close, you need a $190 move to overcome all commissions and fees before any profit is realized.  In the EUR-USD market, that would equate to a 19 pip move in your favor.

(DE # 4, Ex. 2, Koh Decl., Att. C at 101 00031).

The account opening documents also included a Limited Power-of-Attorney which authorized Sterling to act as Trading Agent for the Customer "to purchase and sell currencies on the OTCFX market and/or options on OTCFX market contracts on margin ...." (DE # 4, Ex. 2, Koh Decl., Att. B at 101 00077).

C.     Legal Analysis

The same framework for analysis set forth in the Report and Recommendation regarding the Motion for Preliminary Injunction applies to the present Motion to Dismiss. That analysis is set forth below.

The parties agree that the Commodity Exchange Act regulates only options

contracts and futures contracts, but does not regulate spot transactions.  Thus, if, as the defendants contend, the transactions at issue were spot transactions, the CFTC does not have jurisdiction to regulate those transactions.  On the other hand, if the transactions are futures transactions, the CFTC possesses regulatory jurisdiction and may pursue the present enforcement action.

Under the Commodities Exchange Act, the CFTC may exercise jurisdiction over "transactions involving contracts of sale of a commodity for future delivery."  7 U.S.C. § 2(a)(1)(A).   The scope of the term "future delivery" is clarified in 7 U.S.C. § 1a(19), which provides: "The term 'future delivery' does not include any sale of any cash commodity for deferred shipment or delivery."  The Eleventh Circuit has not addressed the appropriate methodology for determining jurisdiction under this statute, and the Courts of Appeals are divided.  The competing methodologies are illustrated by comparing the opinion in *CFTC v.  Co Petro Mktg.  Group, Inc.*, 680 F.2d 573, 577-81 ( 9th Cir.  1982)[7], with the opinions in *United States v.  Zelener*, 373 F.3d 861 (7th Cir.  2004); and *CFTC v. Madison Forex Int'l, LLC.*, Case No.  05-61672-CIV-Altonaga (DE # 80, filed 7/19/06)[8] .

In *Co Petro*, the Ninth Circuit examined contracts offered by Co Petro for the future purchase of petroleum products to determine whether the CFTC had regulatory jurisdiction over these sales.  The Court described these contracts, which were titled "Agency Agreement for Purchase and Sale of Motor Vehicle Fuel" as follows:

Under the Agency Agreement, the customer (1) appointed Co

[7]  *Accord CFTC v. Noble Wealth Data Info.  Serv.*, 90 F.  Supp.  2d 676, 688-89 (D. Md.  2000), which was adopted in *CFTC v.  Baragosh*, 278 F.3d 319, 329 n.3 (2002); *CFTC v. Nat'l Inv.  Consultants, Inc.*, 2005 WL 2072105 (N.  D. Cal.  Aug.  26, 2005); *CFTC v.  Calvary Currencies LLC*, 437 F.  Supp.  2d 453, 460-64 (D.  Md. 2006).

[8]  *Accord CFTC v.  Erskine*, Case No.  04-CV-0016 (N.D. Ohio April 19, 2006), *appeal docketed*, No. 06-3896 (6th Cir. Jun. 21, 2006).

> **Petro as his agent to purchase a specified quantity and type of fuel at a fixed price for delivery at an agreed future date, and (2) paid a deposit based upon a fixed percentage of the purchase price.  Co Petro, however, did not require its customer to take delivery of the fuel.   Instead, at a later specified date the customer could appoint Co Petro to sell the fuel on his behalf.  If the cash price had risen in the interim Co Petro was to (1) remit the difference between the original purchase price and the subsequent sale price, and (2) refund any remaining deposit.  If the cash price had decreased, Co Petro was to (1) deduct from the deposit the difference between the purchase price and the subsequent sale price, and (2) remit the balance of the deposit to the customer.  A liquidated damages clause provided that in no event would the customer lose more than 95% of his initial deposit.**

680 F.2d at 576.   The Court also examined the context in which the transactions occurred, noting that although the contracts were not as rigidly standardized as futures contracts traded on licensed markets, they were not individualized since there was uniformity in the units of volume offered for sale, the dates were uniform regarding notification of intent to resell a contract or take delivery, there was a right to offset the transaction, and the delivery date was set at ten months from the purchase date.

In determining that these transactions were futures contracts, the Court used a totality of the circumstances test:

> **In determining whether a particular contract is a contract of sale of a commodity for future delivery over which the Commission has regulatory jurisdiction by virtue of 7 U.S.C. § 2 (1976), no bright-line definition or list of characterizing elements is determinative.  The transaction must be viewed as a whole with a critical eye toward its underlying purpose.  The contracts here represent speculative ventures in commodity futures which were marketed to those for whom delivery was not an expectation.  Addressing these circumstances in the light of the legislative history of the Act, we conclude that Co Petro's contracts are "contracts of sale of a commodity for future delivery."**

680 F.2d at 581.

The Seventh Circuit took a different approach in *Zelener*.  There, the Seventh Circuit examined transactions which were very similar to the transactions at issue in the case at bar, and concluded that they were spot transactions over which the CFTC lacked enforcement jurisdiction.  The similarity to the transactions in the case at bar is not coincidental; the business which was the subject of the *Zelener* opinion was the model for the business operations in Phase I of the Complaint in the case at bar.  The focus of the Court in *Zelener* was whether the transactions at issue involved trading in "contracts" for the sale of a commodity, in which case they were futures transactions, or whether the transactions were for the purchase and sale of the underlying commodity, in which case they were not subject to the CFTC's jurisdiction.  The Court expressly held that the motive and intent of the purchaser, *i.e.* to ultimately take delivery or to engage in speculation and enter into an offsetting transaction, was not a relevant factor in the analysis.  In addition, the Court emphasized that the jurisdictional determination did not relieve the defendants of liability for fraud–it merely changed the avenue for pursuing such claims away from the CFTC to other avenues for relief.[9]

The transactions in *Zelener* were described by the Court as follows:

> AlaronFX deals in foreign currency.  Two corporations doing business as "British Capital Group" or BCG solicited customers' orders for foreign currency. . . . Each customer opened an account with BCG and another with AlaronFX; the documents made it clear that AlaronFX would be the source of

---

[9] The Court emphasized that the challenged conduct "could form the basis of a mail-fraud or wire-fraud prosecution, a civil or criminal action under RICO, or fraud litigation in state court.  Consumers or state attorneys general could invoke consumer-protection laws as well.  It is unnecessary to classify the transactions as futures contracts in order to provide remedies for deceit.  Why stretch the Commodity Futures Act–with resulting uncertainty, litigation costs, and potentially unhappy consequences for other economic arrangements that may be swept into a regulatory system not designed for them–when other remedies are ready to hand?"  373 F.3d at 867.

all currency bought or sold through BCG in this program, and that AlaronFX would act as a principal.  A customer could purchase (go long) or sell (short) any currency; for simplicity we limit our illustrations to long positions.  The customer specified the desired quantity, with a minimum order size of $5,000; the contract called for settlement within 48 hours.  It is agreed, however, that few of BCG's customers paid in full within that time, and that none took delivery.  AlaronFX could have reversed the transactions and charged (or credited) customers with the difference in price across those two days. Instead, however, AlaronFX rolled the transactions forward two days at a time–as the AlaronFX contract permits, and as BCG told the customers would occur.  Successive extensions meant that a customer had an open position in foreign currency.  If the dollar appreciated relative to that currency, the customer could close the position and reap the profit in one of two ways: take delivery of the currency (AlaronFX promised to make a wire transfer on demand), or sell an equal amount of currency back to Alaron FX.  If, however, the dollar fell relative to the other currency, then the client suffered a loss when the position was closed by selling currency back to AlaronFX.

373 F.3d at 863.

In *Zelener*, the CFTC focused on three principal factors to support its argument that the above transactions were futures contracts: "first, the positions were held open indefinitely, so that the customers' gains and losses depended on price movements in the future; second, the customers were amateurs who did not need foreign currency for business endeavors; third, none of the customers took delivery of any currency."  373 F.3d at 863.  The Court rejected this "totality of the circumstances" approach, holding that the determination must be based on an analysis of the contract, rather than the intention of the parties or whether the contracts ultimately led to delivery:

In organized futures markets, people buy and sell contracts, not commodities.  Terms are standardized, and each party's obligation runs to an intermediary, the clearing corporation.  Clearing houses eliminate counterparty credit risk.  Standard terms and an absence of counterparty-specific risk make the contracts fungible, which in turn makes it possible to close a position by buying an offsetting contract.

19

All contracts that expire in a given month are identical; each calls for delivery of the same commodity in the same place at the same time.  Forward and spot contracts, by contrast, call for sale of the commodity; no one deals "in the contract: it is not possible to close a position by buying a traded offset, because promises are not fungible; delivery is idiosyncratic rather than centralized.  *Co Petro*, the case that invented the multi-factor approach, dealt with a fungible contract, see 680 F.2d at 579-81, and trading did occur "in the contract."  That should have been enough to resolve the case.

It is essential to know beforehand whether a contract is a futures or a forward.  The answer determines who, if anyone, may enter into such a contract, and where trading may occur.  Contracts allocate price risk, and they fail in that office if it can't be known until years after the fact whether a given contract was lawful.  Nothing is worse than an approach that asks what the parties "intended" or that scrutinizes the percentage of contracts that led to delivery *ex post*. . . . But reading "contract of sale of a commodity for future delivery" with an emphasis on "contract," and sale of any cash commodity for deferred shipment or delivery" with an emphasis on "sale" nicely separates the domains of futures from other transactions.

373 F.3d at 866.

The Court expressly rejected the CFTC's contention that the rollovers turned these contracts into futures contracts, holding that the CFTC's position was not entitled to deference under *Chevron U.S.A., Inc.  v Natural Resources Defense Council, Inc.*  467 U.S. 837 (1984), since Congress had not delegated this determination to the CFTC.  373 F.3d at 867.  Thus, rather than turn to the totality of circumstances, the Court examined the contract to determine whether trading occurred in fungible contracts.  Since customers of AlaronFX did not purchase identical contracts since each was unique in the amount of currency and in timing, and did not have defined expiration or delivery dates, the Court concluded that the contracts were not fungible *unless* there was a promise to create an offset.  The Court recognized that "A promise to create offsets makes a given setup work *as if* fungible: although the customer can't go into a market to

20

buy an equal and opposite position, the dealer's promise to match the idiosyncratic terms in order to close the position without delivery means that the customer can disregard the absence of a formal exchange."  373 F.3d at 868.

Examining the account opening documents, the Court concluded that the following language, which is nearly identical to the language in the case at bar, did not give the customer an automatic right to offset, and that therefore the contracts were not fungible.[10]  In sum, the Court concluded: "These transactions were, in form, spot sales for delivery within 48 hours.  Rollover, and the magnification of gain or loss over a longer period, does not turn sales into futures contracts ...."  373 F.3d at 869.

In *CFTC v. Madison Forex Int'l, LLC.*, *supra*., this Court followed the *Zelener* approach, and determined that the transactions which occurred there, on the same on-line foreign exchange platform that was used in *Zelener* and this case, were not futures

---

[10]  The Court stated: "Paragraph 8 provides that if a customer's account contains "two or more open and opposite Contracts providing ... for the purchase and sale of the same Foreign Currency ... on the same Value Date, such Contracts shall automatically be canceled and replaced by an obligation to settle only the net difference. ... Paragraph 9, on which the Commission places its principal reliance, does not contain any promise.  What it says instead is that, if the client fails to give timely instructions about the disposition of the positions, then 'AlaronFX is authorized, in AlaronFX's sole discretion, to deliver, roll over or offset all or any portion of the Open Position in Customer's Account at Customer's risk.'  This paragraph does not give the client a right to purchase an offsetting position and thus close a transaction; that option belongs to AlaronFX rather than to the customer.  As for ¶ 5: subsection 5.3 says that 'AlaronFX will attempt to execute all Orders that it may, in its sole discretion, accept from Customer in accordance with Customer's instructions ....'  That's not a promise to close any given position by offset.  This subsection continues: 'AlaronFX or its affiliates may, at a future date, establish a trade matching system ....  In that event, AlaronFX ... shall have the right (but not the obligation) ... to act for its own account, and as a counter party or as a broker to AlaronFX customers, in the making of markets."  The Commission does not contend that such a 'trade matching system' was ever established.  Customers thus had no assurance that they could close their positions by offset.  The only *promise* was that, if AlaronFX did not buy back the currency (and thus create an offset under ¶ 8), it would deliver.  This looks more like the business of a wholesaler in commodities such as metals or rare coins than like a system of trading in fungible contracts that characterizes futures exchanges."  373 F.3d at 868.

21

contracts, but were spot transactions not subject to the regulatory jurisdiction of the CFTC.

The undersigned concludes that the approach taken by the Seventh Circuit in *Zelener* should be followed in the case at bar.  This approach leads to consistency in the application of the CFTC's regulatory jurisdiction, based upon the provisions of the contracts into which the parties enter, rather than the uncertainty created by a post-hoc determination, based upon the totality of the circumstances.  As recognized by the Seventh Circuit, there is a need for certainty regarding the legal duties of persons offering commodities for sale that is undermined by the examination of facts outside the contractual obligations.

An examination of the account documents in the case at bar reflects that, as in *Zelener* and *Madison Forex*, the customers were clearly advised that these were spot transactions and there was no absolute right to offset.  The undersigned recognizes that there are some differences upon which the CFTC has relied to distinguish this case.  However, those differences are not material.[11]  In fact, the problem with a post hoc determination of coverage is exemplified, in part, by the position of the CFTC in the case at bar.  On the one hand, the CFTC contends that it has jurisdiction over these transactions; on the other hand, it asserts that Defendants misled its customers into believing that the transactions were covered by the CFTC by including the risk disclosure statement mandated by 17 C.F.R. § 1.55(c), Appendix A, and an arbitration agreement that states any disputes shall be resolved by arbitration in accordance with

---

[11]  Perhaps the most significant difference is the disclosure of the commission rate in this case as "per round turn lot."  However, there is scant evidence in the record regarding what this meant; and, the fact that the commission would be charged only on the first transaction, and not for any subsequent disposition, is not sufficient to create a right on the part of the customer to offset the transaction.

Part 180 of the CEA.  The testimony of Andrew Stern that he included these provisions in an abundance of caution due to the lack of guidance from the CFTC regarding Forex transactions following the enactment of the CFMA, and the uncertainty of the CFTC's jurisdiction is credible.

The transactions at issue in Phase I were, in form, spot sales for delivery within 48 hours, as were the transactions in *Zelener*.  The Customer Agreement expressly states that "trader acknowledges that the purchase or sale of a Currency always anticipates the accepting or making of delivery."  The Agreement also provides that a customer could take actual delivery on the settlement date, and the evidence supports the fact that Universal had the ability to make delivery.

In addition, the account documents do not give the customer an absolute right to offset their transactions; although, at the discretion of Universal, offset was certainly contemplated:

> UFX also reserves the right to refuse to accept any order. (Agreement at Bates No. 101 00035)
>
> UFX retains the right to limit the amount and/or total number of open positions that Trader may acquire or maintain at UFX. UFX will attempt to execute all orders, which it may, *in its sole discretion*, choose to accept in accordance with the oral or written, or computer instructions of the Trader's.  UFX reserves the right to refuse to accept any order.  (Agreement at Bates No. 101 00037) (emphasis added).

In addition, as in *Zelener*, the contracts were unique in amount of currency and in timing; there were no defined expiration or delivery dates as is common with futures contracts.

The CFTC argues that the rollovers were, in fact, sham transactions that did not really occur.  If this is the case, it does not mean that the contract was a "futures"

contract within the jurisdiction of the CFTC, rather than a contract for the purchase and/or sale of a commodity.  What it means is that Defendants engaged in fraudulent conduct, and are subject to the traditional civil and/or criminal remedies for fraud.  The same remedies apply with respect to the radio advertisements used by Sterling to market these transactions.  Some of these ads appear to be marketing futures transactions, particularly the ad that states customers who invested $2,000.00 would control $100,000.00 of the currency, but wouldn't "physically own that"  (DE # 132, Att. D at 27).  On the other hand, other ads referred to the purchase and sale of "pure" currency (DE # 132, Att. F at 19).  The marketing pitch of introducing brokers such as Sterling, however, cannot logically control the jurisdiction of the CFTC to regulate the actual transactions conducted by Universal (or any other counterparty, for that matter).  If this were the case, Universal would be subject to the jurisdiction of the CFTC, and its panoply of regulations, with respect to transactions with customers of some introducing brokers, but not subject to those regulations with respect to identical transactions entered into with customers of other introducing brokers.  This result is not tenable, and illustrates the wisdom of the Court's approach in *Zelener*, which focuses on the account opening documents.

It bears repeating, however, that this decision does not excuse or relieve sellers of these commodities from the consequences of fraud; on the contrary, they remain subject to the traditional remedies for fraudulent transactions.[12]

---

[12]  The undersigned notes that if Congress disagrees with the *Zelener's* interpretation of the CFTC's jurisdiction, or determines that the CFTC should have a more expansive jurisdiction over foreign currency transactions, it can enact the legislation proposed by the CFTC on May 20, 2005, which "revises the Commission's existing jurisdiction over retail foreign exchange transactions to address ... the recent *Zelener* decision" (DE # 168).

Since the undersigned has determined that the transactions in Phase I do not fall within the jurisdiction of the CFTC, it is hereby recommended that Counts I and III of the Complaint, as well as that part of Count IV which relates to Universal, be dismissed. This will result in dismissal of Defendants Sterling and Universal from this case. Defendants Arsenault and Stern remain subject to other counts alleged in the Complaint.

IV.    REGULATORY JURISDICTION OVER THE PHASE II CLAIMS[13]

A.    Introduction

The Amended Complaint alleges Phase II-related violations in Counts Two, Four and Five.  Phase II of the operations involved  transactions in foreign currency options engaged in by Defendants Graystone Browne, STG Global, QIX, Arsenault and Stern.  It is undisputed that the CFTC has some jurisdiction to regulate transactions in foreign currency options, unlike the spot transactions discussed in the preceding section. However, as discussed below, this jurisdiction is not unlimited, and Defendants contend that the jurisdiction of the CFTC does not extend to the Phase II transactions.

The challenges raised in the motion to dismiss those Counts were also raised in connection with the Motion for Preliminary Injunction, and rejected.  The same analysis applies, and is set forth below.[14]

_____

[13]  These contentions are also raised with respect to the Phase I claims; but it is unnecessary to address them in that context based upon the conclusion that the CFTC does not have jurisdiction over any of the spot transactions that occurred in Phase I.  The same analysis would apply, however, and if the Phase I claims are not dismissed pursuant to the preceding analysis, those claims would survive the challenges addressed in this section.

[14]  These arguments can be characterized either as jurisdictional, in the sense that Defendants argue that the CFTC does not have jurisdiction to enforce certain regulations with respect to the transactions alleged in the Complaint; or, as failing to state a claim upon which relief can be granted, in the sense that Defendants argue that the regulations which the CFTC seeks to enforce do not apply to the entities and/or transactions alleged in the case at bar.  Regardless of form, however, the legal analysis is the same since the

B.    **The Regulatory Background**

It is useful to set forth the background of the regulation of commodities in order to put in perspective the issues presented in the case at bar.  An excellent and detailed history is set forth in the opinions of Judge Ryskamp In *CFTC v. Next Fin. Serv. Unltd.*, Case No. 04-80562: DE # 85 (S.D. Fla. June 7, 2005) (DE # 171), and Judge Dimitrouleas in *CFTC v. G7 Advisory Serv., LLC*, 406 F. Supp. 2d 1289 (S.D. Fla. 2005) (DE # 198); therefore, only an abbreviated summary is presented here.

Initially, the only commodities regulated by Congress were certain grain futures transactions pursuant to the Grain Futures Act.  In 1936, Congress renamed the Act to be the Commodity Exchange Act ("CEA"), and expanded its coverage to include additional agricultural commodities.

Until 1974, foreign currency transactions were not included in the CEA.  In 1974, the CEA was greatly expanded to include, *inter alia*, trading in foreign currency.  In addition, Congress created the CFTC, and granted it the power, *inter alia*,  to investigate complaints, hold administrative hearings, order reparations, and seek injunctive relief. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 357-58 (1982); *Next Fin. Serv.* at 11.  Based upon a concern expressed by the Treasury Department, however, coverage of foreign currency transactions was limited by a provision now known as "the Treasury Amendment."  This amendment exempted from CFTC jurisdiction "transactions in foreign currency ... unless such transactions involve the sale thereof for future delivery conducted on a board of trade."  *Next Fin. Serv.* at 12-13.

---

dispute concerns the legal interpretation of the statutes and regulations which govern the CFTC's regulation of transactions in foreign currency options.  *See CFTC v. First Int'l Group*, 06-20972-CIV-JORDAN, DE # 34 at 2 n.3 (S.D. Fla. Jan. 7, 2007) (DE # 263 (noting that a similar motion to dismiss for failure to state a claim was quasi-jurisdictional in nature).

The CFTC took the position that the exemption should be narrowly construed and that it was not applicable to options contracts.  In *Dunn v. CFTC*, 519 U.S. 469 (1997), the United States Supreme Court squarely rejected this position, holding that the phrase "transactions in foreign currency" included transactions in options to buy or sell foreign currency.   The Court, however, did not address the meaning of the phrase "conducted on a board of trade," and the lower courts were split on the issue of whether this meant that only interbank transactions were exempt, or whether all off-exchange transactions were exempt.  *G7 Advisory Serv.*, 406 F. Supp.2d at 1294.  The confusion was caused in part by the definition of "board of trade" as "any exchange or association, whether incorporated or unincorporated, of persons who are engaged in the business of buying or selling any commodity."  *Id.*

In 2000, Congress enacted the Commodities Futures Modernization Act of 2000 ("CFMA") with the stated purpose of "clarifying the jurisdiction of the [CFTC] over certain retail foreign exchange transactions."   As explained by the Court in *G7 Advisory Serv.,* "The CFMA, as codified in Title 7, United States Code, § 2(c)(2)(B)[15] grants the

---

[15]   Title 7, United States Code, § 2(c)(2)(B) provides:

**(B) Agreements, contracts, and transactions in retail foreign currency**

This chapter applies to, and the Commission shall have jurisdiction over, an agreement, contract, or transaction in foreign currency that–

    **(i)** is a contract of sale of a commodity for future delivery (or an option on such a contract) or an option ...; and

    **(ii)** is offered to, or entered into with, a person that is not an eligible contract participant, unless the counterparty, or the person offering to be the counterparty, of the person is–

        **(I)** a financial institution;

CFTC jurisdiction over all off-exchange foreign currency transactions involving non-eligible contract participants unless the counterparties to the transactions are an entity enumerated in 7 U.S.C. § 2(c)(2)(B)(ii).  The CFMA's listing of specified unregulated entities eliminated the need for judicial interpretation of the term "Board of Trade," which the CFMA redefined as 'any organized exchange or other trading facility.' 7 U.S.C. § 1a(2)." 406 F. Supp. 2d at 1295 (footnote added).

    C.  <u>The Applicability of the Statutes and Regulations to Phase II</u>

       The first issue in the case at bar is whether the transactions alleged are exempt

---

**(II)** a broker or dealer registered under ... the Securities Exchange Act ... or a futures commission merchant registered under this chapter;

**(III)** an associated person of a broker or dealer registered under ... the Securities Exchange Act ... or an affiliated person of a futures commission merchant registered under this chapter, concerning the financial or securities activities of which the registered person makes and keeps records under ... the Securities Exchange Act ... or section 6f(c)(2)(B) of this title;

**(IV)** an insurance company described in section 1a(12)(A)(ii) o this title, or a regulated subsidiary or affiliate of such an insurance company;

**(V)** a financial holding company (as defined i section 1841) of Title 12); or

**(VI)** an investment bank holding company ....

**(C)** Notwithstanding subclauses (II) and (III) of subparagraph (B)(ii), agreements, contracts, or transactions described in subparagraph (B) shall be subject to sections 6b, 6c(b), 15 and 13b (to the extent that sections 9, 15 and 13b of this title prohibit manipulation of the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any market), 13a-1, 13a-2 and 12(a) of this title if they are entered into by a futures commission merchant or an affiliate of a futures commission merchant that is not also an entity described in subparagraph (B)(ii) of this paragraph.

from the CFTC's regulatory jurisdiction pursuant to section 2(c)(2)B)(ii).  The Amended

Complaint alleges, and It is undisputed that most, if not all, of the persons who engaged

in transactions with Defendants were not eligible contract participants (Amended

Complaint ¶ 112).[16]  Thus, to determine whether the transactions at issue are exempt

from regulation pursuant to this provision, and therefore outside the jurisdiction of the

CFTC, it is only necessary to examine whether Universal and QIX, as counterparties,

were one of the entities enumerated in subparagraph (B)(ii).[17]   Subparagraph (B)(ii)(II)[18]

provides exemption for a futures commission merchant registered under the Act, and

subsection (B)(ii)(III)[19] provides for exemption for "an affiliated person of a futures

commission merchant registered under this Act, concerning the financial or securities

activities of which the registered person makes and keeps records under ... section

6f(c)(2)(B)[20] of this Act."

        The Amended Complaint alleges that QIX was not a proper counterparty under

---

[16]  An "eligible contract participant" is defined as an individual who has total assets in excess of $10,000,000.00; or, has assets in excess of $5,000,000.00, and enters into the contract in order to manage the risk associated with an asset owned or a liability incurred by that person.  7 U.S.C. §1a(12)(A)(xi).  Based upon CFTC Investigator Koh's examination of the records, as well as the testimony of the individual investors at the evidentiary hearing, none of the customers met this definition (DE # 4, Ex. 2: Koh Decl. ¶ 19).

[17] 7 U.S.C. § 2(c)(2)(B)(ii).  Hereafter, for ease of reference, in the body of this discussion, the provisions of subsection 2(c)(2) will be referred to only by the letter designation and numbers which are within this subsection, and the full citation will be footnoted to avoid potential confusion.  *I.e.*,  7 U.S.C. § 2(c)(2)(B) will be referred to as subparagraph (B); 7 U.S.C. § 2(c)(2)(B)(ii) will be referred to as subparagraph (B)(ii); 7 U.S.C. § 2(c)(2)(B)(ii)(III) will be referred to as subparagraph (B)(ii)(III); 7 U.S.C. § 2(c)(2)(C) will be referred to as subparagraph (C); etc.

[18] 7 U.S.C. § 2(c)(2)(B)(ii)(II).

[19] 7 U.S.C. § 2(c)(2)(B)(ii)(III).

[20] 7 U.S.C. § 6f(c)(2)(B) (footnote added).

this provision because it was neither an FCM nor an "affiliate" of an FCM within the

meaning of subsection (B)(ii)(III).  Defendants challenge this assertion, and claim that

QIX is exempt from the jurisdiction of the CFTC as an "affiliated person" under this

provision.  An affiliated person is "any person directly or indirectly controlling,

controlled by, or under common control with a futures commission merchant."  7 U.S.C.

§ 6f(c)(1)(I).

The critical issue in this respect is whether all affiliated persons are exempt as

long as the registered FCM keeps records, or whether the exemption applies only where

the registered FCM is required to keep records pursuant to § 6f(c)(2)(B).   The CFTC

contends that because the registered FCMs in the case at bar were not required to keep

records, the exemption does not apply, and the fact that the registered FCMs, in fact,

decided to keep records is irrelevant.  Defendants, on the other hand, contend that since

the registered FCMs elected to keep records, they qualify as exempt affiliates.

Section 6f(c)(2)(A)-(B) (emphasis added) provides, in pertinent part:

> (A) Each registered futures commission merchant shall obtain
> such information and make and keep such records as the
> Commission, by rule or regulation, prescribes concerning the
> registered futures commission merchant's policies,
> procedures, or systems for monitoring and controlling financial
> and operational risks to it resulting from the activities of any of
> its affiliated persons, other than a natural person.

> (B) The records *required* under subparagraph (A) shall
> describe, in the aggregate, each of the futures and other
> financial activities conducted by, and the customary sources of
> capital and funding of, those of its affiliated persons whose
> business activities are reasonably likely to have a material
> impact on the financial or operational condition of the futures
> commission merchant, including its adjusted net capital, its
> liquidity, or its ability to conduct or finance its operations.

Pursuant to this authority, the CFTC has promulgated 17 C.F.R. §§ 1.14(d) and

1.15(c)(1).  Those regulations require FCMs to keep financial records regarding certain affiliated persons which are determined to be "Material Affiliated Persons."[21]  However, those record keeping requirements do not apply to certain smaller FCMs, and specifically exempt "any futures commission merchant which holds funds or property of or for futures customers of less than $6,250,000 and has less than $5,000,000 in adjusted net capital as of the futures commission merchant's fiscal year-end."  It is undisputed that, under these provisions, QIX Futures was not required to keep records.

     The CFTC argues that Congress sought to limit the exemption for affiliates set forth in subparagraph (B)(ii)(III)[22] by including the proviso "concerning the financial ... activities of which the registered person makes and keeps records *under section 4f(c)(2)(B)*[23] *of the Act.* (Emphasis added).  When Congress referenced this subparagraph in the text of the CFMA, it chose the specific subpart of the CEA's statutory provision on Risk Assessment for Holding Company Systems that expressly referred to "records required" to be maintained pursuant to the CFTC's regulations.  At the time the CFMA was enacted, there was a regulatory scheme in place that specified which FCMs were required to keep records for such affiliates; these affiliate were referred to as "material affiliates" in that scheme.  Based upon this specific reference, the CFTC argues that the CFMA exemption applies *only* to those affiliates who are subject to the recordkeeping requirements of § 6f(c)(2)(B)–*i.e.*, affiliates that are classified as "Material Affiliated

---

     [21]  Section 1.14(a)(2) sets forth a five-factor test to be used to determine whether an affiliated person is a Material Affiliated Person, which "involves consideration of all aspects of the activities of, and the relationship between, both entities." 17 C.F.R. § 1.14(a)(2).

     [22]  7 U.S.C. § 2(c)(2)(B)(ii)(III).

     [23]  Section 4f(c)(2)(B) of the CEA is codified at 7 U.S.C. § 6f(c)(2)(B).

Persons" or "MAPs" of certain FCMs that meet the specified capital requirements.  Since

QIX does not fit into this category, the CFTC contends that the limited exemption

specified in subparagraph (B)(ii)(III) does not apply.

Numerous cases in this District have considered this issue and adopted the

position of the CFTC, and the undersigned Magistrate Judge concurs with this result.

Those courts have rejected "the Defendant's interpretation, as it would allow registered

FCMs to avoid CFTC regulation based on personal preference.  Any registered FCM

could skirt CFTC regulation merely by electing to keep records, thereby confounding the

CFMA's purpose of making clear which off-exchange foreign currency transactions are

subject to CFTC regulation." *CFTC v. G7 Advisory Serv., LLC*, 406 F. Supp. 2d at 1296-97.

*Accord CFTC v. Next Fin. Serv. Unltd.*, 04-80562-CIV-RYSKAMP (S.D. Fla. Jun. 7, 2005)

(DE # 85)[24];   *CFTC v. E-Metals Merchants, Inc.*, 05-21571-CIV-LENARD (S.D. Fla. Jul. 26,

2005) (DE # 29 (R&R, adopted on other grounds in DE # 60),); *CFTC v. First Int'l Group*,

06-20972-CIV-JORDAN (S.D. Fla. Jan. 7, 2007) (DE # 34, relying on *G7 Advisory Serv.*). [25]

---

[24]  The undersigned notes that in *Next Fin. Serv.*, the Court specifically found that QIX was not a proper counterparty to the foreign currency transactions at issue in that case.  Although QIX was not a party to that action, which was brought only against certain introducing brokers who were similarly situated to Defendants STG and Graystone in the case at bar, the rationale supporting this determination is persuasive.

[25]  The CFTC contends, in the alternative, that even if Defendants were exempt affiliates, the statute contains an exclusion from this exemption which makes the transactions alleged in the case at bar subject to the jurisdiction of the CFTC with respect to the anti-fraud provisions of the CEA.  Subparagraph (2)(C) provides:

> Notwithstanding subclauses (II) and (III) of subparagraph (B)(ii), agreements, contracts, or transactions ... shall be subject to sections 6b, 6c(b), 15 and 13b (to the extent that sections 9, 15 and 13b prohibit manipulations of the market price of any commodity ...), 13a-1, 13a-2, and 12(a) of this title if they are entered into by a futures commission merchant or an affiliate of a futures commission merchant that is not also an entity described in subparagraph (B)(ii) of this paragraph.

Therefore, the undersigned concludes that QIX was not a proper counterparty within the meaning of Section 2(c)(2)(B)(ii)(III), and therefore does not qualify for the exemption from jurisdiction set forth in that provision.  Therefore, as specified in Section 2(c)(2)(B)(i)-(ii), Defendants are subject to the provisions of the entire Commodities Exchange Act with respect to Phase II transactions.

Defendants also contend that the only regulations applicable to foreign currency transactions are those which were expressly incorporated by the CFMA.  Thus, Defendants contend that the following regulations, which were promulgated prior to the CFMA and have not specifically been made applicable to foreign currency transactions, cannot be enforced by the CFTC in the case at bar: 7 U.S.C. § 6h (which makes it unlawful to falsely represent registration status);  Section 32.11 of the Regulations (regarding the prohibition on off-exchange transactions); 7 U.S.C. § 6(a) (which makes it unlawful to trade off-exchange futures contracts); CFTC Regulation 1.2, 17 C.F.R. § 1.2 and 7 U.S.C. §§ 2(a)(1)(B) and 13c(b) (respectively, principal/agent and control person liability).  Defendants contend that the CFTC did not have jurisdiction to regulate off-

---

7 U.S.C. § 2(c)(2)(C).  The CFTC contends that this provision reserves the CFTC's anti-fraud jurisdiction with regard to retail foreign currency transactions where one party is a retail customer and the counterparty is a registered FCM or an affiliate of an FCM.  The position of Defendants is that they fall within the exclusion from the anti-fraud provisions of subparagraph (2)(C) since they are "an entity described in subparagraph (B)(ii)."  Other courts in this District have adopted the argument of the CFTC in this regard, holding that the final provision of subparagraph (20(C) operates to provide an exemption from the CFTC's anti-fraud jurisdiction for only those registered FCMs or qualified affiliates that are also another type of entity described in subparagraph (2)(B)(ii), such as financial institutions, insurances companies, financial holding companies, investment bank holding companies, or fully registered broker-dealers.  *See  CFTC v. Madison Forex Int'l*, 05-61672-ALTONAGA (S.D. Fla. July 19, 2006) (DE # 80 at 6-7); *CFTC v. Gibralter Monetary Corp.*, 2006 WL 1789018 (S.D. Fla. May 30, 2006); *First Int'l Group* at 6-7.  This reading of the exemption makes sense because those entities are regulated by other agencies.  However, it is not necessary for the Court to reach that issue in the case at bar since the undersigned concludes that Defendants do not qualify as exempt affiliates.

exchange foreign currency transactions until the enactment of the CFMA.  Therefore, none of the pre-existing regulations were applicable to the transactions at issue in the case at bar.  Defendants further argue that since 7 U.S.C. §6c(b), specifically states that regulations "may be made only after notice and opportunity for hearing," and since there was no regulation promulgated which specifically adopts the above regulations to the transactions, there has not been the required hearing and the regulations do not apply.

To support their argument, Defendants rely on *Krause v. Forex Exch. Mkt., Inc.*, 356 F. Supp. 2d 331 (S.D.N.Y. 2005).  In *Krause*, investors filed suit against a registered FCM (FXCM) and various other defendants.  The liability of FXCM was based upon control person liability pursuant to section 13(b) and principal/agent liability pursuant to section 2(a)(1).  The Court held that since registered FCMs are exempt from the CFMA's grant of  jurisdiction, except with respect to certain sections specifically enumerated in § 2(c)(2)(C), and since neither section 13(b) nor section 2(a)(1) were among those enumerated provisions, the CEA claims against FXCM must be dismissed.

The CFTC agrees that the regulations at issue were in existence at the time the CFMA was enacted.  However, the CFTC contends that when Congress enacted the CFMA to clarify its jurisdiction over certain retail foreign exchange transactions, Congress subjected the Defendants' conduct to the CEA in its entirety.  The CFTC emphasizes that Congress is presumed to know the existing law when it enacts legislation, and that a newly-enacted or revised statute is presumed to be harmonious with existing law and its judicial construction (DE # 134 at 24).

At the outset, the undersigned notes that Defendants' reliance on *Krause* is unavailing since QIX, unlike FXCM in *Krause*, is not a proper counterparty, and therefore the construction of the exemption granted to registered FCMs (and certain of their

34

affiliates) does not apply.  At least three other cases in this District have adopted the arguments advanced by the CFTC.  *See CFTC v. G7 Advisory Serv., LLC*, 406 F. Supp. 2d 1289, 1297-98 (S.D. Fla. 2005) (holding that 17 C.F.R. § 32.9 applies to off-exchange currency transactions, since Congress took no affirmative act to deprive § 32.9 of effect with respect to Forex transactions, and to hold otherwise would by contrary to the CFMA's purpose of clarifying, not revoking the CFTC's authority to regulate off-exchange foreign currency transactions); *CFTC v. Next Fin. Serv. Unltd.*, 04-80562-CIV-RYSKAMP (S.D. Fla. June 7, 2005), DE # 85 at 20-23 (DE # 171) (same); *CFTC v. First Int'l Group*, 06-20972-CIV-JORDAN (S.D. Fla. DE # 34 Jan. 7, 2007), DE # 34 at 2n.3 (DE # 263) ("When Congress passed the CFMA it was simply *clarifying* the CFTC's jurisdiction.  Given the presumption that Congress had knowledge of the law enacting the CFMA ... Regulation 32.9 applies to the transactions here."); *CFTC v. Valko*, 06-60001-CIV-DIMITROULEAS (S.D. Fla. Mar. 12, 2007), DE 129 at 7-12 (holding that both CFTC Regulations 32.9 and 32.11, which bar fraud in connection with commodity option transactions and suspend commodity option transactions not otherwise permitted under the regulations, are applicable to foreign currency transactions conducted by Defendants who are not proper counterparties, as are the sections of the CEA regarding control person liability, 7 U.S.C. §§ 13c(a) and 13c(b)).

        The undersigned concurs with the opinions of the District Judges in the above cases.  It is manifestly clear that by enacting the CFMA, Congress intended the CFTC to assert the entirety of its jurisdiction, and all of its existing regulations, over foreign currency transactions, with respect to all entities except for those specifically excluded under 7 U.S.C. § 2(c)(2)(B)(ii).  Since, as previously discussed, QIX does not qualify for this exclusion, the full regulatory scheme applies in the case at bar.

Therefore, since QIX is not an entity exempted in any respect from the jurisdictional reach of the CFTC, and since all existing statutes and regulations apply to the activities of Defendants with respect to the transactions at issue in Phase II, the undersigned recommends that the Motion to Dismiss Counts Two, Four and Five be denied as to those grounds.

IV.     THE AUTHORITY TO SEEK RESTITUTION

Defendants request this Court to dismiss or strike the CFTC's claim for restitution on the grounds that Congress has not authorized the CFTC to seek such relief in federal court.  Defendants contend that 7 U.S.C. § 13a-1, which governs the scope of relief available to the CFTC in an action brought in federal court, specifically limits the relief to injunctive relief, compliance orders and civil penalties.  Since restitution is not specified, Defendants contend that this relief is not available.  To support their position, Defendants contrast this statute with the statute governing available remedies in administrative proceedings convened by the CFTC.  Pursuant to 7 U.S.C. §§ 9 and 15, the CFTC is expressly authorized to convene adjudicatory administrative hearings and, *inter alia*, to "required restitution to customers of damages proximately caused by violations." 7 U.S.C. § 9.

The CFTC counters, *quoting Porter v. Warner Holding Co.,* 328 U.S. 395, 397-98 (1946), that under well-established legal principles, "all inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction," and that this includes restitution.   The CFTC emphasizes that 7 U.S.C. § 13a-1 includes language which compels the conclusion that this Court has full equitable authority to implement ancillary relief, including restitution.  Specifically, it provides that a court may issues a restraining order "which prohibits any person from withdrawing, transferring,

removing, dissipating, or disposing of any funds, assets or other property," and also provides that the court may issue "writs of mandamus or orders affording like relief ... including the requirement that such person take such action as is necessary to remove the danger of violation of this Act."

The CFTC explains that the failure of Congress to expressly authorize restitution as an available remedy in its authorization with respect to litigation in federal courts, whereas restitution *is* expressly authorized in connection with administrative proceedings is explained by the fact that the inclusion of restitution as an administrative remedy was part of the Futures Trading Practice Act of 1992, P.L. 102-546 (102nd cong. 1st Sess. 1992), in which Congress sought to fill certain gaps in the relief provided in administrative proceedings.  Restitution was added as available relief in administrative proceedings based upon the representation by the CFTC to Congress that it already *had* this authority in injunctive proceedings in federal court, and sought to add it to administrative proceedings (DE # 165 at 12).

This Court, as well as other Courts in this District, has previously rejected the position of Defendants, and held that restitution is an available remedy.  The rationale is persuasive, and should be followed in the case at bar:

> [D]istrict courts are authorized to order restitution on the basis of the language, legislative history, and purpose of the Act as well as pursuant to the equitable powers of federal courts.... First, the language of the Act does not expressly limit the equitable powers of district courts.  *See, e.g.* 7 U.S.C. § 13a-1. The U.S. Supreme Court has taught that "[u]nless otherwise provided by statute, all the inherent equitable powers of the District court are available for the proper and complete exercise of that jurisdiction.  And [when] the public interest is involved in a proceeding of [an equitable] nature, those equitable powers assume an even broader and more flexible character."  *Porter v. Warner Holding Co.,* 328 U.S. 395, 398 (1946); *see also Federal Trade Commission v. Gem Merchandising Corp.,* 87

37

F.3d 466, 469 (11th Cir. 1996) (discussing a district court's equitable powers in the context of the Federal Trade commission Act); *Federal Trade Commission v. United States Oil & Gas Corp.*, 748 F.2d 1431, 1433-34 (11th Cir. 1984). Next, the Act expressly authorizes the issuance of restraining orders that prohibit the dissipation or disposal of assets, funds, or other property. *See* 7 U.S.C. § 13a-1. The legislative history of the Act explains that it was the intent of Congress that restraining orders would enable the CFTC to seek restitution for customers. *See* H.R. Rep. 97-565, pt. 1, at 93, *reprinted in* 1982 U.S.C.C.A.N. 3871, 3942. Specifically, the House Report explains that Section 13a-1 empowers courts to issue *ex parte* restraining orders and "such power is provided ...to prohibit movement or disposal of funds, assets, and other property *which may be subject to lawful claims of customers. Id.* (emphasis added). Last, the Court finds that Plaintiff is seeking restitution in equity, that is, it commenced this action in order to restore to [defendant's] customers particular funds or property in the possession of the Defendants. *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213-18 (2002). Thus, its equitable powers having been invoked, the Court finds that it may exercise the full range of those powers . . . . Consequently, the Court concludes that the CEA authorizes the CFTC to seek and this Court to order both disgorgement and restitution.

*CFTC v. E-Metal Merchants, Inc.*, No. 05-21571-CIV-LENARD, DE # 60 at 17-18 (S.D. Fla. Jan. 6, 2006)(footnotes omitted); *accord CFTC v. Next Fin. Serv. Unltd.*, No. 04-80562-CIV-RYSKAMP, DE # 155 (Order Denying Motion to Exclude or Strike Restitution Claim) (S.D. Fla. Mar. 13, 2006); *CFTC v. Madison Forex Int'l, LLC.*, No. 05-61672-CIV-ALTONAGA, DE # 80 at 20 n.15 (S.D. Fla. July 19, 2006) (DE # 250) (*citing* other cases in this District).

Therefore, the undersigned recommends that the motion to dismiss or strike the claim for restitution in the case at bar be denied.

V.    **THE SUFFICIENCY OF THE COMPLAINT**

Defendants also contend that the principal/agent and control person claims should be dismissed as improperly pled and for failure to state a claim, or in the

alternative, that a more definite statement should be required.  To support this contention, Defendants rely on Rule 10(b), which provides that "[e]ach claim founded upon a separate transaction or occurrence . . . [shall] be stated in a separate count . . . whenever a separation facilitates the clear presentation of the matters set forth."   The substance of Defendants' argument, which is set forth in two paragraphs, is contained in one conclusory sentence: "The CFTC's commingling of various counts is not only confusing and improper, but has allowed the CFTC to omit critical elements of the alleged claims that the CFTC cannot prove, such as factual allegations establishing any meaningful agency relationship between the parties."  (DE # 160 at 16-17).

The CFTC responds that the pleadings are neither vague nor ambiguous, contain extensive detail, and that Defendants have failed to specify what additional information is missing (DE # 165 at 12-13).

Based upon a review of the detailed allegations contained in the Amended Complaint, and the failure of Defendants to point to any omitted critical elements, the undersigned finds that the Amended Complaint is not confusing, and clearly alleges control person and principal/agent liability with respect to each of the Defendants to which it is applicable.   *See, e.g.* Amended Complaint ¶¶ 99-101, 125 (Arsenault is a controlling person with respect to Graystone and STG); ¶ 126 (Graystone and STG are principals with respect to actions committed by their employees); ¶¶ 102-08, 127 (QIX is a principal with respect to the acts of Graystone and STG); ¶¶ 98, 136 (Stern is a controlling person with respect to QIX).

Under Fed. R. Civ. P. 12(e), if a Complaint is "so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading," the Court may order Plaintiff to provide a more definite statement of the claim for relief.  However, motions

for a more definite statement are generally disfavored and are not a substitute for discovery.  "Courts should grant such motions only if the complaint is so unintelligible that the defendant cannot draft a responsive pleading."  *Moore v. Fidelity Financial Services, Inc.*, 869 F. Supp. 557, 559-60 (N.D. Ill. 1994).

The Amended Complaint contains a coherent, detailed statement of the factual allegations and a concise statement of the claims.  The Amended Complaint identifies each Defendant and provides specific allegations against each Defendant.  The Complaint also provides specific statutory references for each of the claims. No purpose would be served by requiring a more definite statement.

Therefore, the undersigned recommends that the motion to dismiss or for a more definite statement with respect to the control person and principal/agent claims be denied.

VI.   <u>CONCLUSION</u>

Based upon the foregoing analysis the undersigned concludes that:

1.  The CFTC does not have jurisdiction over the transactions alleged between Defendants Universal and Sterling, and therefore Counts One, Three, and those parts of Count Four that apply to Universal should be dismissed.

2.   With respect to transactions in foreign currency options, QIX is subject to the full panoply of statutes governing transactions in commodity options, as well as the regulations promulgated by the CFTC, including 7 U.S.C. § 6c(b) and 17 C.F.R. §§ 1.1(b)(1,3) and 32.9(a, c) as alleged in Count Two; 7 U.S.C. § 6h, as alleged in Count Four; and 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.11(a), as alleged in Count Five.

3.  The statutory and regulatory provisions regarding control person liability (pursuant to 7 U.S.C. § 13c(b)) and principal/agent liability (pursuant to 7 U.S.C. §

2(a)(1)(B) and 17 C.F.R. § 1.2) apply to transactions in foreign currency options.

4.   The CFTC is entitled to seek restitution for the alleged violations.

5.   The Complaint clearly alleges the basis for liability with respect to each Count and each Defendant, and is not vague, ambiguous, or confusing.

Therefore, it is hereby

**RECOMMENDED** that Defendants' Motion to Dismiss be Granted as to Counts One, Three, and those parts of Count Four that apply to Universal; and otherwise be **DENIED**.

**DONE AND SUBMITTED** in Miami, Florida, this 24th day of July, 2007.

The parties will have ten days from the date of service of this Order within which to file written objections, if any, for consideration by the United States District Judge to whom this case is assigned.  Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein.  *LoConte v. Dugger*, 847 F.2d 745 (11th Cir.), *cert. denied*, 488 U.S. 958 (1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).

ANDREA M. SIMONTON
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
The Honorable Joan A. Lenard, United States District Judge
Counsel of Record

41