UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  04-21346-CIV-LENARD/SIMONTON

COMMODITY FUTURES TRADING
COMMISSION,

      Plaintiff,

v.

STERLING TRADING GROUP, INC.,
UNIVERSAL FX, INC., QIX, INC., STG
GLOBAL TRADING, INC., GRAYSTONE
BROWNE FINANCIAL, INC., JOSEPH
ARSENAULT, AND ANDREW STERN,

      Defendants.
_____/

## REPORT AND RECOMMENDATION

Presently pending before the Court is Plaintiff's Motion for Summary Judgment (DE # 202).  This motion is referred to the undersigned Magistrate Judge to take all necessary and proper action as required by law (DE # 257).  The motion is fully briefed (DE ## 207 (replacing DE #203), 204, 218, 220, 236,[1] 238).[2]  The motion seeks summary judgment on liability and injunctive relief as to all counts, and seeks a hearing thereafter to determine amounts to be assessed for restitution and/or disgorgement, civil monetary penalties, and interest (DE # 202 at 1).  Since the undersigned has recommended dismissal of Counts One, Three, and that part of Count Four which relates to the operations of Defendants Sterling and Universal, this Report and Recommendation

---

[1] Pursuant to the Order of the Court (DE # 226), Defendants' Joint Statement of Material Facts in Dispute and Disputed Facts Not Included in Plaintiff's Statement (DE # 236) replaces the prior separate statements filed by the two groups of defendants (DE ## 216 and 217).

[2] In addition, voluminous evidentiary support has been filed.  All of these materials have been reviewed, and are referenced by docket entry number where appropriate.

addresses only the remaining counts–Count Two, Count Four (remaining parts), and Count Five.  For the reasons stated below, the undersigned recommends that summary judgment be granted as to liability on Count Five, and otherwise denied.

### I. BACKGROUND

The Commodity Futures Trading Commission ("CFTC") has filed an Amended Complaint alleging violations of the Commodities Exchange Act ("the Act"), as amended by the Commodities Futures Modernization Act of 2000 ("the Modernization Act"or "CFMA"), against Defendants STG Global Trading, Inc.  ("STG"), Graystone Browne Financial, Inc.  ("Graystone"), QIX, Inc. ("QIX"), Joseph Arsenault and Andrew Stern (DE # 151).

As stated above, the undersigned has recommended dismissal of Counts One, Three and Four (as it relates to Defendant Universal), and therefore those counts are not discussed herein.  In addition, the undersigned recommended denial of the Motion to Dismiss to the extent that it was based on arguments concerning the applicability of various statutes and regulations to the transactions involving QIX.  The legal reasoning stated in that report and recommendation is incorporated herein by reference.

In Count Two, the Amended Complaint alleges that Defendants Graystone, STG, Arsenault and QIX committed fraud and deceit in the offer and sale of off-exchange foreign currency options, in violation of 7 U.S.C. § 6c(b)[3] and 17 C.F.R. §§ 1.1(b)(1) and (b)(3) and 32.9(a) and (c) (Amended Complaint ¶¶ 122-27).  The Amended Complaint

---

[3] Section 6 of Title 7 codifies Section 4 of the Commodity Exchange Act.  Although the Amended Complaint and the memoranda of the parties cite to both, this Report and Recommendation uses only the citation to the appropriate section of Title 7.

alleges control person liability, pursuant to 7 U.S.C. § 13c(b),[4] with respect to Defendant Arsenault for the activities of Defendants Graystone and STG (Amended Complaint ¶¶ 99-101, 125).  The Amended Complaint further alleges that Defendants Graystone and STG are liable as  principals, pursuant to 7 U.S.C. § 2(a)(1)(B)[5] and 17 C.F.R. § 1.2, since the acts or omissions complained of were committed by Graystone and STG representatives within the scope of their respective employments (Amended Complaint ¶ 126).  Finally, the Amended Complaint alleges that QIX is liable as a principal, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, for the acts of Graystone and STG as its agent (Amended Complaint ¶¶ 102-08, 127).  Defendant Stern is not charged with liability in Count Two.

In Count Four, the Amended Complaint alleges that Defendants QIX and Stern violated 7 U.S.C. § 6h by falsely representing that QIX was a member of a registered entity and/or that QIX was a registrant under the Act (Amended Complaint ¶¶ 134-36). The Amended Complaint alleges that Stern is liable as a controlling person with respect to QIX, pursuant to 7 U.S.C. § 13c(b) (Amended Complaint ¶¶ 98, 136).  Defendants Graystone and STG are not charged with liability in Count Four.

In Count Five, the Amended Complaint alleges that Defendants STG, Graystone,

---

[4]  Section 13c(b) provides: "Any person who, directly or indirectly, controls any person who has violated any provision of this Act or any of the rules, regulations, or orders issued pursuant to this Act may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person.  In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation."

[5]  Section 2(a)(1)(B) provides: "The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation or trust, as well as of such official, agent, or other person." Regulation 1.2 contains identical language.

3

QIX, Arsenault, and Stern violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.11(a) through the offer and sale of commodity options not conducted or executed on, or subject to the rules of a contract market or a foreign board of trade (Amended Complaint ¶¶ 137-41). The Amended Complaint alleges that Defendant Arsenault is liable for these violations as a control person with respect to Graystone and STG; and that Defendant Stern is liable as a control person of QIX.

As relief, the Amended Complaint seeks the following (DE # 151 at 40-41):

a.      a permanent injunction prohibiting the defendants and any other person or entity associated with them, or any successor thereof, from engaging in conduct violative of the provisions of the Act as alleged in this Complaint, and from engaging in any activity relating to commodity interest trading, including but not limited to, soliciting, accepting or receiving funds, revenue or other property from any person, giving advice for compensation, or soliciting prospective customers, related to the purchase and sale of any commodity futures or options on commodity futures contracts;

b.      an order directing the defendants and any successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constituted violations of the Act, as described herein, and interest thereon from the date of such violations;

c.      an order directing the defendants to make full restitution to every customer whose funds were received by them as a result of acts and practices which constituted violations of the Act, as described herein, and interest thereon from the date of such violations;

d.      an order directing the defendants to pay a civil monetary penalty in the amount of not more than the higher of $120,000 or triple the monetary gain to each defendant for each violation of the Act or Regulations; and

e       such other and further remedial ancillary relief as the Court may deem appropriate.

The Amended Complaint concerns transactions that occurred during two different

4

phases of operations involving overlapping defendants, and contains detailed allegations regarding the nature of the operations and the allegedly fraudulent activities which occurred.  Based upon the recommendation of dismissal with respect to the Counts relating to Phase I of the operations, which occurred between July 2002 and August 2003, this Report is directed to the Counts which are based on Phase II only.

The Amended Complaint alleges that during Phase II of the operations, which occurred between August 2003 and June 7, 2004, Graystone and STG, under the control of Arsenault, solicited retail customers to enter into foreign currency options transactions with QIX, which was controlled by Stern.  The Amended Complaint alleges that Graystone and STG used false and misleading sales solicitation materials, high-pressure and deceptive sales tactics, and failed to provide access to account information regarding these transactions.  The Amended Complaint contains a detailed recitation of the specifically alleged fraudulent activities.  The Amended Complaint also alleges that these transactions were illegal, regardless of fraud, since QIX was not a proper counterparty to the transactions (Amended Complaint ¶¶ 77-108).

II. <u>THE POSITIONS OF THE PARTIES</u>

The CFTC contends that the undisputed material facts establish that Defendants are subject to the full panoply of statutes and regulations applicable to transactions involving options on commodities; *i.e.* that QIX is not a proper counterparty to foreign currency options transactions since it is not an "affiliate" of a registered FCM within the meaning of 7 U.S.C. § 2(c)(2)(B)(ii), and that QIX entered into these transactions with retail customers who were not "eligible contract participants" as defined by 7 U.S.C. § 1a(12)(A)(xi) (DE # 207 at 11-15).

With respect to Count Five, the CFTC contends that the undisputed material facts

5

establish that the transactions were not "conducted on or subject to the rules of a contract market or a foreign board of trade," and therefore these transactions are illegal since CFTC Regulation 32.11[6] prohibits the sale of commodity options unless the transactions occur thereon (DE # 207 at 15-17).

With respect to Count Four, the CFTC contends that the undisputed material facts establish that the account opening documents utilized by QIX demonstrate, as a matter of law, that QIX falsely represented itself as a registrant of the CFTC, and that Defendant Stern directly approved these false representations (DE # 207 at 22-23).

With respect to Count Two, the CFTC contends that the undisputed material facts establish that Graystone, STG, Arsenault and QIX committed fraud in connection with the solicitation of members of the public to engage in foreign exchange option transactions with QIX (DE # 207 at 21-22).  Specifically, the CFTC relies upon documents obtained from the offices of Graystone, STG, and QIX in June 2004, which included sales scripts, broker solicitation tapes, handwritten notes, customer account statements and internal financial reports.  The CFTC states that the sales scripts contained canned responses to potential customer concerns, that handwritten notes and broker solicitation tapes used high pressure sales tactics while touting large profit potentials and downplaying the risks, and that one "Graystone broker acknowledged that brokers at the firm had to read verbatim sales scripts provided by the company, and that he and other brokers could and did use profit illustrations in excess of 300%-600% while reading such scripts to prospective customers, without ever disclosing that most

---

[6] **17 C.F.R. § 32.11.   All relevant regulations promulgated by the CFTC are contained in Title 17 of the Code of Federal Regulations.  In this Report and Recommendation those regulations will be cited only by the applicable number, *e.g.*, references to 17 C.F.R. § 32.11 will be made to "Section 32.11" or "Regulation 32.11".**

Graystone customers were in fact losing money" (DE # 207 at 22).  The CFTC also contends that the undisputed facts establish that Defendant Arsenault was aware of the brokers' use of extravagant and misleading profit projections since he regularly discussed all aspects of the use of sales scripts during sales meetings, and is liable as a controlling person.  Finally, the CFTC states that brokers at STG also used similarly misleading sales scripts (*Id.*).

The CFTC contends that, based upon the undisputed facts concerning the relationship between QIX, Graystone and STG, QIX is liable as a principal of both Graystone and STG pursuant to 7 U.S.C. § 2(a)(1)(B) (DE # 207 at 23-24).  The CFTC relies, *inter alia*, upon the fact that Graystone and STG:  sent account opening documents provided by QIX to customers; instructed customers to send funds to QIX; and had contractual agreements which provided for an exclusive relationship with QIX (DE # 207 at 24).

The CFTC also contends that Arsenault is a controlling person of Graystone and STG, and that Stern is a controlling person of QIX (DE # 207 at 24-25, incorporating by reference its Memorandum in Support of its Motion for Preliminary Injunction (DE # 4, at 19-20).

In their Joint Response, Defendants initially contend that summary judgment is premature since the CFTC has indicated that it intends to engage in further discovery (DE # 218 at 2).[7]  On the merits, Defendants contend that:  summary judgment for a plaintiff in a fraud case is almost never appropriate; there are a myriad of disputed facts; and the CFTC cannot demonstrate reliance, scienter and materiality of the alleged

---

[7]  The undersigned notes that no further discovery materials were filed in support of the CFTC's motion, and thus this argument appears moot.

misrepresentations (DE # 218 at 2-5).  In addition, Defendants contend that the CFTC lacks jurisdiction to enforce the statutory and regulatory provisions on which its claims are based, and rely upon the arguments previously presented in their papers opposing the CFTC's Motion for Preliminary Injunction (DE ## 144, 145, 146) and in support of Defendants' Joint Motion to Dismiss (DE ## 159, 160, 172).  Other than by reference to these prior memoranda, the Joint Response does not directly address the arguments regarding summary judgment as to Counts Four and Five.  Various arguments are presented by Defendants, however, in the body of their Joint Statement of Material Facts in Dispute and Disputed Facts Not Included in Plaintiff's Statement (DE # 236).  Those arguments are addressed below.

    III.    <u>STATEMENT OF FACTS</u>

        In determining whether summary judgment for Plaintiff is appropriate, the evidence and all inferences must be viewed in the light most favorable to Defendants. Using this guiding principle, the following facts are taken from Plaintiff's Statement of Undisputed Material Facts, as amended by Defendants' Joint Statement of Material Facts in Dispute and Disputed Facts Not Included in Plaintiff's Statement (DE # 236).[8]  Where Defendants have purported to dispute any fact contained herein, the undersigned explains why the uncontradicted evidence nevertheless establishes that fact.[9]

---

[8]  Facts which pertain only to Counts One, Three and that portion of Count Four which relates to Defendant Universal, as to which the undersigned has recommended dismissal, have not been included.  To facilitate review by the parties and the District Judge, the facts are stated in numbered paragraphs, in the same order in which they appear in the parties' statements of facts.

[9]  The Court ordered Defendants to file a Joint Response to Plaintiff's Statement of Material Facts which specifically identified each fact that is disputed, and cited evidence in the record to support the dispute, together with a statement of why the dispute is material (DE # 226).  This Order also stated that all facts which were not specifically

A.  **The Defendants**

1.  **Andrew Stern ("Stern") is president of QIX, Inc., Universal FX, and Universal Financial Holding Corporation, Inc.  He is a registered Associated Person with the NFA, and an approved NFA associated member and principal.  He was a respondent in three NFA regulatory and four NFA arbitration actions.**

2.  **Sterling Trading Group, Inc. was organized as a Florida corporation on May 9, 2002.  During the operation of Sterling, Joseph Arsenault was listed as its managing director and vice president.  From approximately August 2002 through July 2003, Sterling solicited retail customers to engage in foreign currency transactions with Universal FX, Inc.  Sterling ceased doing business in July 2003.**

3.  **Universal FX, Inc. ("Universal" or "UFX") was organized as a Florida corporation on February 22, 2002.  Andrew Stern is listed as its president.  From about February 2002 through December 2003, Universal entered into foreign currency transactions with retail customers.  Universal is not registered in any capacity with the Commission.  Since May 13, 2003, however, Universal has been listed in NFA records as a principal of UTS World, Incorporated, a registered FCM.**

4.  **STG Global Trading, Inc. ("STG") was organized as a California corporation on July 14, 2003.  STG is not registered with the CFTC in any capacity.  STG solicited retail customers to engage in foreign currency options transactions with QIX, Inc.  STG has no present place of business since it ceased business when this action was filed.**

5.  **Global Forex Trading, Inc. ("Global Forex" or "GFT") was organized as a**

_____

controverted, with supporting evidence in the record, will be deemed admitted (DE # 226).
Therefore, where Defendants have not controverted a statement of fact, it has been
deemed admitted for purposes of this Report and Recommendation.

9

Florida corporation on July 24, 2003.  Its president was Andre Stepsky.  In November

2003, Global Forex changed its name to Graystone Browne Financial, Inc. after receiving

a threatening letter from counsel representing a similarly named company.  Graystone

sent letter to customers advising them of this name change.

6.  Graystone Browne Financial, Inc. ("Graystone") was organized as a Florida

corporation on November 5, 2003.  Graystone ceased doing business when this case

was filed, and has no present place of business.  From August 2003 to the filing of this

action, Graystone (f/k/a as GFT) solicited retail customers to engage in foreign currency

options transactions with QIX, Inc.  Graystone is not registered with the Commission in

any capacity.

7.  QIX, Inc. ("QIX") was organized as a Florida corporation on October 17, 2002.

Andrew Stern is its president and sole shareholder.  QIX is currently not in business.

From at least August 2003 to the filing of this lawsuit, QIX entered into foreign currency

option transactions with retail customers.  QIX is not registered in any capacity with the

CFTC.  Since November 20, 2003, however, QIX has been listed in NFA records as a

principal of QIX Futures, Inc., a registered Futures Commission Merchant ("FCM").

8.  Joseph S. Arsenault ("Arsenault") resides at various times in California and

Florida.  He organized Sterling, Graystone, and STG.  Arsenault was responsible for their

overall management and the hiring and firing of employees.

B. <u>Other Relevant Entities</u>

9.  Universal Financial Holding Corporation, Inc. ("UFHC") is a Florida corporation

organized, owned and controlled by Stern, who is listed as its president.  UFHC is a

registered FCM.

10.  QIX Futures, Inc. ("QIX Futures") is an Illinois corporation organized by Stern.

QIX Futures has been a registered FCM since November 20, 2003.  QIX, Inc. is the sole owner of QIX Futures.

11.  UTS World, Inc. is a Florida corporation organized on March 1, 2003.  UTS World has been a registered FCM since May 13, 2003.

C.  <u>Phase II Operations</u>

<u>Facts Relied Upon to Support the Claim of Fraud</u>

a.  <u>Graystone</u>

12.  Various documents were seized from the offices of Graystone pursuant to this Court's statutory restraining order, including:

a.  sales scripts which include profit projections on individual trades of $65,000 (on ten options)(Koh Dec. 3, Att. A, bates number GB 130 00218, Att. D, bates number 130 00558; $45,000 (on ten options) (*Id.*, bates number GB 130 00222; $130,000 (on 20 options), (*Id.,* Att. C, bates number 130 00417); $78,000 (on ten options*), Id.*, Att. C, bates number GB 130 00555.

b.  sales "bullet points" that indicated Graystone brokers represented QIX, the clearing firm, as being "registered-NFA" or "regulated by NFA."  (*Id.*, Att. B, bates number GB 130 00237; GB 130 00250.

c.  a sales script that states, "I represent the FOREX or Interbank market.  We trade foreign currency, the most liquid and lucrative market in the world." (*Id.*, Att. B, bates number GB 130 00248.

d.  a sales script that states "we only make two or three verbal recommendations a year and we only do so when the information in front of us is so overwhelming that we can recommend it with such a high degree of confidence that the Euro will reach our target price within the specified time frame."  (*Id.*, Att. C, bates number GB 130 00407.

e.  audiocassette tapes seized from Graystone containing actual tape recorded sales solicitations.  On one tape, a Graystone broker states:

(i) "keep in mind the Euro has made six separate five penny movements and each penny is a 50% profit, and it's happened six separate times ...any one of those would have generated profits of 200%, 300% or even 400% if you had invested, but keep in mind that past performance is not a guarantee of future returns ...."  (DE # 97 (transcript of tape) at 1).

(ii) "I will show you a return in this market, not because I'm the best trader, but simply because the Euro is moving, it's been rising for four years straight, the volatility will slow down, and when it does so will your potential for profit."  (DE # 97 at 10).

(iii) "If you've heard of options, you know that the average strike price is 3 and a half, 4, even 5 cents out of the money, but I can get you 2 and a half cents out of the money, and the simple reason is, we buy in bulk, we only make recommendations four or five times a year, when we make those recommendations, we buy in bulk, because we know – not we think – that the market is going to make a movement where we want it to go."  (DE # 97 at 16).

(iv) "Our institutional clients, almost all of them, have earned as much as 250%–excuse me, 232%, since January; individual accounts for myself right now, are up about 110% in the past month and a half."  (DE # 97 at 19).

Defendants do not dispute that the above materials were seized from the offices of Graystone, but contend that they cannot be used as evidence in support of Plaintiff's

summary judgment motion since they are not admissible evidence.  Specifically,
Defendants assert that some, if not all, of the materials are broker's notes or personal
property of Graystone brokers.  Those materials therefore are not books and records of
Graystone kept in the normal course of business and therefore are not admissible as
business records.  Defendants also contend that the materials identified in the Koh
Declaration are an undifferentiated mass; that some are clearly personal notes or
training materials designated as such; and that the CFTC has not introduced any
evidence to establish the foundation as to how, if at all, Graystone used these materials
or whether Graystone authorized or tolerated these materials.  Defendants contend that
the CFTC has failed to connect any of these materials with Graystone other than to state
they were found on the premises.  In addition, Defendants assert that the CFTC has
failed to demonstrate that the mathematical leverage examples of market information
were inaccurate or incorrect, or that the material was otherwise false or misleading (DE
# 236 at 48).  Finally, Defendants assert that even if the documents are technically
admissible, they are not probative.

The CFTC responds, and the undersigned agrees, that the existence of these
records on the premises of Graystone in such a prevalent manner is at least
circumstantial evidence of fraud.

13.  According to internal financial reports obtained from QIX on June 9, 2004, for
the period from December 2003 through June 2004, 77 Graystone customers lost money,
while no customer made a profit.  One hundred percent of Graystone Browne customers
whose records were complete, lost a total of $1,287,599.30.[10]  On cross-examination by

---

[10]  The record does not reflect the number of Graystone customers who were
excluded from this computation due to incomplete records.

defense counsel at the preliminary hearing, CFTC Investigator Koh testified that 90% of commodity investors lose money, and the fact that losses occurred didn't mean that there was wrongdoing.

14.   Graystone account executives made trade recommendations to customers.

15.   Defendants dispute the fact that sales scripts were used by Graystone account executives to solicit customers, and rely upon the Declaration and testimony of Rose Mary Judy, who was responsible for accounts payable and receivable, payroll, customer service, and certain compliance functions at Graystone.  Ms. Judy avers that she did not observe phone sales scripts used for anything except for training, and that use of scripts in actual calls to customers would not have been tolerated (DE # 49, Judy Decl. ¶ 14).  She testified that there was a training script that was given to new brokers, but she had never reviewed it, and wasn't familiar with its contents and did not observe brokers with that script (DE # 214 at 63).  The typewritten scripts attached to CFTC Investigator Koh's Third Declaration all contain the words, "FOR TRAINING PURPOSES ONLY," at the bottom (DE # 59).  Other typewritten documents, as well as handwritten notes, which contain various paragraphs regarding sales, are not so labeled.  At least some support Defendants' claim that they were not generated or approved by Graystone since refer to the sale of shares of stock rather than commodities.[11]  Other documents,

---

[11]  For example, GB 130 00233 is entitled, "CLOSES," and includes the following and other similar paragraphs:

> _____, believe me I understand your concerns.  In fact, if someone were to ask me to invest $_____, whom I didn't know very well, I would be skeptical too.  So I absolutely understand.  I know that I'm asking you to stretch but I also know that nothing great was done without it.  Give me your trust and confidence this one time and I will never, never have to ask you for either again.  Let's go with the ___ shares.  It's

which are in various typefaces, and handwritten notes, refer to the foreign currency market.  Andre Stepsky, who worked as a sales person at all three companies, had never seen and/or never used certain of the typewritten, as well as handwritten, documents which were taken from Graystone's office in June 2004 (DE # 211, Stepsky Depo. at 88, 103-110, 120).[12]

Andre Stepsky testified that he read from a script when talking to customers at Sterling, Global Forex and Graystone, and that he was instructed to read from the script and interject his own personality into it, and scripts were present on all brokers' desks (DE # 211, Stepsky Depo. at 109, 130-32).  Elements of the scripts were discussed at training meetings, which occurred two or three times a week at Graystone (DE # 211 at 63-64, 78-79, 87).  Stepsky also testified that they were told to stay within realistic estimates when explaining leveraging, and that he gave estimates based upon the price

---

the right thing to do.

and

I have a philosophy of investing in the market, and that is to take a fundamentally sound company, whose value is not yet reflected in the price of the stock, and then tie in a near-term event, a catalyst if you will.   (name of company)   satisfies such criterion, and let me say this - whenever I've isolated a situation as unique as this I've made money for my clients hand over fist.  Do this pick up ___ shares, hold the stock 30 to 60 days, and I think the only problem you'll have is that you didn't buy more.

[12]  In addition, the undersigned notes that victim Brad Campbell testified that he had been convinced by salesperson Lyle Wexler to lie about the source of the money he was investing and to lie to the compliance officer when confirming the trade, and thus avoid the customer protections that had been instituted by Graystone and QIX (DE # 101, Campbell Test. at 164-68,179, 205-06).  Campbell testified that he did so because "It was his rule.  If [Wexler] wanted to break his rule, that was fine with me."  (DE # 101, Campbell Test. at 205-06).

movement in currency that he observed (DE # 211, Stepsky Depo. at 134-35).[13]   Stepsky

testified:

> [W]e were trained to say the right thing, and we were never
> allowed to sell dirty, is what it was called.  You weren't allowed
> to ever use the word guarantee.  We were trained properly to
> say that if you invest $100,000, you could make as much as – if
> the market moves for you in the right direction.   We were
> always told to sell the risk as much as the rewards.

(DE # 211, Stpesky Depo. at 56).

The undersigned finds that the undisputed material facts establish that brokers

used scripts at Global Forex and Graystone.  Andre Stepsky's testimony on this point is

unequivocal, and not contradicted by the testimony of Rose Mary Judy.  Although Ms.

Judy stated in her Declaration that scripts were only used for training purposes, and that

the use of scripts in actual calls would not be tolerated, her deposition reflects that she

had no personal knowledge of this.  Specifically, she testified that she could hear

brokers talking, but she kept her door closed because she could not work with all that

noise.  She never heard the details of any individual conversation. She knew that there

was a training script that was given to new brokers, but she didn't know who provided

the script to brokers. She never observed brokers with that training script; she never

reviewed the contents of the script; and, she was not familiar with the contents (DE #

211, Judy Depo. at 61-63).[14]  Moreover, the Declaration of Financial Crimes Investigator

---

[13]   In his Declaration filed in opposition to the Motion for Preliminary Injunction,
Stepsky addressed only his involvement in the operations at Sterling, and Stepsky denied
making the misleading statements attributed to him by Sterling customers Firebaugh and
McNelley (DE # 49).

[14] The undersigned notes that Defendant Arsenault, who ran the day-to-day
operations and was integrally involved in training sessions and in monitoring brokers, did
not provide a declaration, affidavit, or testimony on this matter.

Michael Lipsitt, who participated in the seizure of documents from Graystone's premises establishes that, "There were numerous sales scripts ... on the sales desks and in desk drawers (DE # 61, Att. C ¶ 7). There was at least one sales script on Mr. Arsenault's desk (*Id.* at ¶ 8). However, it is also clear that the script does not reflect the totality of what was said to customers.

16. The CFTC alleges that sales scripts contain various misleading statements touting the high profit potential of investing in currency options, while down-playing the risks. Defendants dispute this characterization, and rely upon an audit report prepared at the direction of QIX which found that the training scripts were compliant. The CFTC objects to the use of an unsigned and unsworn audit report as evidence. The undersigned finds that the sales script speaks for itself, and the receipt of the audit report can be used for the purpose of establishing compliance efforts and good faith on the part of Defendants, although not for the truth of the findings contained therein. Since the CFTC places heavy reliance on the sales script in seeking summary judgment as to the fraud count, the four-page script identified by Stepsky, and taken from the office of Graystone, is set forth below:

1. HELLO _____.  MY NAME IS _____, AND I'M AN ACCOUNT EXECUTIVE WITH _____. HOW ARE YOU TODAY?  I'M CALLING BECAUSE A WHILE BACK I RECEIVED A REQUEST FOR SOME INFORMATION ABOUT HIGH PROFIT INVESTMENT OPPORTUNITIES; AND I'M GIVING YOU THE COURTESY OF A PHONE CALL TODAY TO LET YOU KNOW I'LL BE MAILING THAT INFORMATION, PLUS OUR LATEST CHARTS AND MARKET REPORT. (*VERIFYING MAILING ADDRESS*)

2. _____, HAVE YOU EVER INVESTED IN THE CURRENCY MARKET BEFORE? (*BUT/THEN*) I'M SURE YOU REALIZE THAT TIMING IS THE KEY TO MAKING MONEY IN ANY INVESTMENT, DON'T YOU?  GOOD, AND IT IS ESPECIALLY TRUE IN THE CURRENCY MARKETS.  IN FACT, OUR TRADERS ARE VERY EXCITED ABOUT WHAT THEY BELIEVE TO BE A TREMENDOUS OPPORTUNITY IN THE _____ CURRENCY RIGHT NOW!!

   **THE REASONS BEING**  **1.** _____

   (**Bullets**)    **2.** _____

           **3.** _____

**3.**  _____, **GRAB A PEN AND PAPER AND LET ME SHOW YOU IN BLACK AND WHITE WHAT THIS SITUATION COULD MEAN TO YOU FINANCIALLY.  I'LL HOLD ON!**

**4.  GIVE:**  **YOUR NAME AND COMPANY NAME & TOLL FREE NUMBER**
  **GET:**  **HIS FIRST NAME - OTHER PHONE #'S FROM HIM**
    (**CELL/WORK/ETC**)

**THE MARKET IS CALLED INTERBANK OR FOREX (**FOREIGN EXCHANGE**)**

  **1.  HIGH LIQUIDITY - 1.5 - 4 TRILLION $ DAILY WHICH TAKES THE ENTIRE STOCK MARKET 100 DAYS TO DO THAT VOLUME.**

  **WE ALSO TRADE 24 HOURS A DAY WORLD WIDE HOWEVER, THE OPTION MARKET IS OPEN FROM 8:30AM-6PM MONDAY - THURSDAY AND 8:30-4:00 PM FRIDAY.**

  **2.  YOU CAN MAKE $ IN EITHER DIRECTION IF WE ARE RIGHT (**CALLS & PUTS**).**

**5.  NOW** _____, **THERE ARE TWO MAJOR WAYS TO INVEST IN THE FOREX MARKET.  THE FIRST WAY IS CALLED SPOT TRADING. WRITE DOWN SPOT TRADING.**

**NOW WITH SPOT TRADING YOU HAVE <u>UNLIMITED PROFIT POTENTIAL</u>...BUT YOU ALSO HAVE UNLIMITED RISK.  THIS MEANS IF YOU INVEST $12,000 IN THE CASH MARKET, YOU CAN TURN IT INTO $50,000 OR MORE...BUT IT ALSO MEANS THAT YOU CAN LOSE THE $12,000 YOU STARTED WITH.  IN FACT, WITH SPOT TRADING, YOU CAN LOSE AN UNLIMITED AMOUNT MORE THAN YOU STARTED WITH (**MARGIN CALLS**).  FOR THIS SPECIFIC REASON, WE DO NOT RECOMMEND SPOT TRADING TO MOST OF OUR CLIENTS.**

**NOW THE SECOND WAY TO INVEST IN THE FOREX MARKET IS CALLED OPTIONS.  WRITE DOWN THE WORD O P T I O N S.  IT IS EXTREMELY IMPORTANT FOR YOU TO KNOW THAT WHEN <u>BUYING OPTIONS</u> YOU <u>STILL HAVE</u> UNLIMITED PROFIT POTENTIAL, JUST AS YOU DO WITH SPOT TRADING.... BUT, AS THE BUYER OF OPTIONS, YOU STRICTLY LIMIT YOUR RISK TO THE AMOUNT YOU INVEST.  THIS MEANS,**

_____ (*NAME*), IF YOU BUY $12,000 WORTH OF OPTIONS YOU CAN TURN IT INTO $50,000 OR MORE YOU CAN NEVER LOSE A PENNY MORE THAN WHAT YOU STARTED WITH; AND EVEN THAT'S UNDER A WORST CASE SCENARIO!

IN OTHER WORDS, _____, YOU'LL BE ABLE TO TAKE ADVANTAGE OF THIS TREMENDOUS OPPORTUNITY AND STILL BE ABLE TO SLEEP AT NIGHT!!  DO YOU FOLLOW ME??

6. _____, LET ME GIVE YOU A HYPOTHETICAL EXAMPLE.

| | | |
|---|---|---|
| 1 CONTRACT = _____ | EXPECTED PRICE $ _____ | |
| 1 PENNY = _____ | STRIKE PRICE/MNTH | $ _____ |
| | SUB-TOTAL | _____¢ |
| | | X     $1,500 |
| | INVESTMENT RETURN | $_____ |
| PURCHASE OPTION (Appro. $1,000) -1,000 | | $_____ |
| | | PROFIT |
| # OF CONTRACTS | x 12 ETC. | $_____ |
| | | PROFIT |

NOW TELL ME _____, IS THAT THE TYPE OF RETURN YOU'D LIKE ON YOUR INVESTMENT DOLLARS? (*PAUSE*) AND IF WE ARE ONLY HALF RIGHT, I DON'T THINK YOU WILL BE UNHAPPY; DO YOU AGREE?

7.  NOW _____, YOU <u>MUST</u> UNDERSTAND THAT IN ANY INVESTMENT THERE IS RISK.  IF WE'RE WRONG OFTEN ENOUGH, YOU COULD END UP LOSING SOME MONEY, WHICH I'M SURE YOU ALREADY REALIZE.  BUT REST ASSURED OUR TRADERS WILL WORK VERY HARD AND USE ALL THE "TRADING TOOLS" AVAILABLE, TO GET YOU THE BEST RESULTS.  BECAUSE REMEMBER _____, THE ONLY WAY YOU'LL REMAIN A CLIENT OF MINE; IS IF I MAKE YOU MONEY!  NOW _____ DOESN'T THAT MAKE SENSE TO YOU?  PAUSE (*WAIT FOR ANSWER*)

8.  GREAT NOW _____, LET ME ASK ...CAN YOU HANDLE AN OUTLAY OF <u>$12,000</u> RIGHT NOW?  (*IF YES*) WONDERFUL, SO WHAT YOU'RE TELLING ME IS THAT YOU COULD WRITE A CHECK OR WIRE ME <u>$12,000</u> WITHIN THE NEXT COUPLE OF DAYS IF YOU WANTED TO, IS THAT CORRECT (*WAIT FOR ANSWER*) GREAT!!

(**IF NO**) THAT'S A SHAME, BECAUSE I REALLY BELIEVE THAT A LOT OF MONEY COULD BE MADE IN THE _____ OVER THE NEXT COUPLE WEEKS.

## PERSONAL CONTACT

9.  WHAT DO YOU DO WITH YOURSELF, SUCH AS INTERESTS (*FISHING-BOATING-GOLF-KNITTING-HOBBIES*), (*INCOME $*) CURRENT INVESTMENTS?  STOCK MARKET?  MONEY MARKET - HOW MUCH?  CD'S/ ETC.?  AMOUNTS (*WHERE IS YOUR MONEY WORKING FOR YOU FOR THIS INVESTMENT?*), (*IF NOT OBVIOUS*)

10.  NOW _____, SO YOU KNOW, WE CHARGE A "ROUND TURN" COMMISSION OF $200, PLUS A $30.00 TRANSACTION FEE; A TOTAL OF $230 PER EACH CONTRACT TRADED.  "ROUND TURN" MEANS YOU DO NOT PAY ANOTHER COMMISSION WHEN WE SELL.  THE TOTAL OF COMMISSION FEES PLUS PREMIUM WILL ALLOW YOU TO LEVERAGE $150,000 PER EACH OPTION PURCHASED, WHICH IN MOST CASES GIVES YOU A LEVERAGE OF ABOUT 150 TO 1, THAT MEANS EACH DOLLAR WILL WORK LIKE $150!!! ISN'T THAT EXCITING?

11.  VERIFY ADDRESS AND HOME AND WORK PHONE NUMBERS.

***REMEMBER ANY ANSWER OTHER THAN A STRONG "YES" IS A "NO"***

12.  _____, ONCE YOU RECEIVE THE INFORMATION HOW LONG WILL YOU NEED TO GO OVER IT AND MAKE A DECISION?  (IF MORE THAN ONE WEEK RE-SELL) THAT'S FINE.

13.  NOW _____, AFTER GOING OVER THE MATERIAL, IF YOU AGREE THAT EVERYTHING I'VE TOLD YOU IS "RIGHT ON TARGET" DO I HAVE A CLIENT?  (WAIT FOR ANSWER)

(IF YES) GREAT
(IF NO) WHY NOT?
REMEMBER ANY ANSWER OTHER THAN A "YES" IS A "NO"!

14.  VERIFY ADDRESS & HOME & WORK PHONE #'S.

15.  _____, WHAT YOU MUST DO IS, AS SOON AS YOU RECEIVE MY PACKAGE, MAKE SURE YOU TAKE THE TIME; BETTER YET MAKE THE TIME TO GO OVER IT!  IT'S THAT IMPORTANT!  WRITE DOWN ANY QUESTION THAT YOU MAY STILL HAVE.   THEN CALL ME ON MY TOLL FREE #, AGAIN THAT # IS _____.

WE'LL GO OVER IT TOGETHER.  I'LL ANSWER ALL OF YOUR QUESTIONS AND CONCERNS, AND IF YOU LIKE WHAT YOU SEE, I'LL GET YOU INTO THE MARKET SO THAT YOU'LL HAVE THE OPPORTUNITY TO MAKE SOME

> **REAL MONEY!  BECAUSE LET'S FACE IT _____, WHEN ALL IS SAID AND DONE THAT'S REALLY WHAT IT'S ALL ABOUT, ISN'T IT?**
>
> **YOU HAVE A GREAT WEEK/WEEKEND, AND I'LL EXPECT TO HEAR FROM YOU BY _____DAY OR NOT LATER THAN _____DAY MORNING!**
>
> **OKAY.  BYE FOR NOW.**

**(DE # 211, Stepsky Depo. Ex. 14).  At the bottom of each page of the 4-page script are the words, "FOR TRAINING PURPOSES ONLY."**

**17.  Sales scripts were generally left on broker's desks for anyone to see, including Arsenault.[15]**

**18.  Graystone account executives were instructed to read from the script when the spoke to customers.[16]  Arsenault discussed at training meetings what brokers could say in response to customer questions or concerns about their investment.**

**19.  Arsenault, along with other Graystone employees, conducted training sessions, where Arsenault would instruct Graystone account executives on how to deal with customers on the phone.**

**20.  The CFTC contends that the statements in the sales scripts were misleading since a majority of the customers of Graystone lost money.  Defendants dispute this on the basis that the scripts were used only for training, and since they speak only of potentialities and contain no assurances or guarantees of profitability, nor do they have any statements of historical profits by Graystone customers (DE # 236 at 52).  The undersigned finds that the scripts speak for themselves; and whether the scripts and**

---

**[15]  This is disputed based on Ms. Judy's deposition; however, as discussed above, her deposition does not contradict the testimony of Stepsky in this regard.**

**[16]  This is disputed based on Ms. Judy's deposition; however, as discussed above, her deposition does not contradict the testimony of Stepsky in this regard.**

other circumstances establish fraud as a matter of law is a legal conclusion for the Court.

21.  Graystone account executives used sales scripts which gave examples of profit projections to customers.

22.  Andre Stepsky did not know how to access account information for his customers.  The CFTC did not cite to evidence in the record to establish that other account executives did not know how their customers were actually doing.

      b.  **STG**

23.  STG account executives used sales scripts to solicit customers.[17]

24.  The CFTC alleges that sales scripts contain various misleading statements touting the high profit potential of investing in currency options, while down-playing the risks.  As before, Defendants dispute this characterization, and rely upon an audit report prepared at the direction of QIX which found that the training scripts were compliant.  The CFTC objects to the use of an unsigned and unsworn audit report as evidence.  The undersigned finds that the sale script speaks for itself, and the receipt of the audit report can be used for the purpose of establishing compliance efforts and good faith on the part of Defendants, although not for the truth of the findings contained therein.  The sales scripts speak for themselves regarding what is contained therein, and script quoted above with respect to Graystone was also used at STG.  Ms. Babber also identified an option worksheet which was used at STG and posted on a broker's desk,

---

[17]  Defendants attempt to dispute this by relying on the aforementioned testimony of Rose Judy (DE # 236 at 54).  However, Ms. Judy worked at Graystone in Florida, and did not work in STG's office in California.  Heather Babber f/k/a Heather Moe worked in the California office, and testified unequivocally that she saw the sales scripts on broker's desks, saw them reading from them when they talked to customers, and overheard the brokers saying the same thing over and over again (DE # 211, Babber/Moe Depo. at 43-45).

and which showed calculations based on a seven cent move in the price of currency for 25 contracts, yielding a profit of $119,000 on a $25,000 investment, or a 378 ½% profit (DE # 211, Babber Depo. at 55 and Ex. 14).

25. According to internal financial reports obtained from QIX on June 9, 2004, for the period of December 2003 through June 2004, 35 STG customers lost money while 1 customer made a profit. Approximately 97% of STG customers whose records were complete lost a total of $546,929.50.[18]

26. STG account executives provided trade recommendations to customers.

27. STG account executives were provided with weekly trading information which showed how their customers were doing.

c. <u>Representations Regarding Registration Status</u>

28. Arsenault's new firms appear to have the same type of relationship with QIX as Sterling did with Universal: QIX provided STG Global and Graystone with its account opening documents, customer agreements, and risk disclosures to be provided to their customers.

29. QIX's account opening documents are nearly identical to those for Universal. In particular, QIX's account documents, like Universal's:

(a) contain a Regulation 1.55 Risk Disclosure designed for FCM's and IB's;

(b) refer to arbitration and CFTC reparations proceedings in a manner identical to Universal's

(c) the original account opening documents used by QIX stated, "QIX,

_____

[18] As with Graystone, the record does not reflect the number of STG customers who were excluded from this computation due to incomplete records.

23

Inc. is an affiliate of a Futures Commission Merchant with the

Commodity Futures Trading Commission ("CFTC"), and is a

member of the NFA pursuant to the provisions of the Commodity

Exchange Act"  (DE # 62, Att. B. Pendleton Decl. ¶ 8).

On February 9, 2004, the NFA wrote a letter to QIX Futures, Inc. advising that the

language in the account opening documents was "potentially misleading" and

requesting that the language be clarified "to prevent any confusion."  The NFA

suggested that the language be modified to state, "QIX, Inc. is an affiliate of a Futures

Commission Merchant <u>which</u> is registered with the Commodity Futures Trading

Commission and is a member of the NFA." (emphasis added to highlight the changed

language) (*Id.* at Att. 2).

On March 11, 2004, Andrew Stern sent an e-mail to the NFA advising that the

suggested modification had been made on the website and to the hard copies of the

account documents (DE # 62, Att. B: Pendleton Decl. ¶ 8 and Att. 3).  The modified

language states:

QIX, INC. IS AN AFFILIATE OF A FUTURES COMMISSION
MERCHANT WHICH IS REGISTERED WITH THE COMMODITY
FUTURES TRADING COMMISSION ("CFTC") AND IS A MEMBER
OF THE NATIONAL FUTURES ASSOCIATION ("NFA")
PURSUANT TO THE PROVISIONS OF THE COMMODITY
EXCHANGE ACT (THE "ACT").

(DE # 49, Ex. C: QIX Account Doc. at 17).

30.  The CFTC contends that, as a matter of law these statements were false and

misleading, because while Graystone customer accounts were traded, neither Graystone

nor QIX was registered with the CFTC is any capacity nor a member of the NFA.

Defendants dispute that the above statements were misleading.  Stern testified that he

included the risk disclosure because it is the generic risk disclosure form that all FCMs are required to give and he recognized the importance of such disclosure and he did not want to explain the omission (Stern Test. at 155-56).  CFTC Investigator Koh testified that the risk disclosure statement is not misleading as to the substance contained therein, and that it accurately discloses the risks involved, but was misleading because it gave the false impression that the trades were being conducted by an FCM (DE # 109, Koh Test. at 80-82).  There is no regulation which prevents an unregistered entity from giving the disclosure, and the CFTC has passed no regulation setting forth an appropriate risk disclosure for off-exchange Forex transactions (DE # 109, Koh Test. at 83; DE # 101, Pendleton Test. at 21-22).  With respect to the inclusion of the arbitration language, Stern testified he believed that arbitration and reparations proceedings would be available (De # 111, Stern Test. at 155-58), and CFTC Investigator Koh testified that he did not know whether those remedies were available (DE # 109, Koh Test. at 176-78).

### QIX Offered Option to Retail Customers

31.  From at least August 2003 through June 7, 2004, QIX entered into foreign currency option transactions with retail customers.

### The Jurisdiction of the Commission Over the Option Contracts

32.  QIX is a principal of QIX Futures, Inc., a registered futures commission merchant.

33.  QIX Futures has never held any customer segregated funds over $6.25 million, or adjusted net capital of over $5 million at the end of a fiscal year.

34.  QIX, STG and Graystone customers did not have the requisite total assets and did not enter into the transaction to manage risk associated with an asset they owned or a liability incurred; their purpose was purely speculation.

Defendants dispute this allegation on the grounds that the citation to CFTC Investigator's Koh's Declaration in the record (DE # 4, Ex. 2: Koh Decl. ¶ 49) refers only to a paragraph in which he states that none of Defendants has ever been designated a contract market for the sale of foreign currency futures or commodity options, and does not address the status of customers (DE # 236 at 57).  Defendants are correct regarding this citation to the record; and, in fact CFTC Investigator Koh never addresses the status of customers of QIX, Graystone and STG.  Defendants do not cite any contrary evidence in the record; they rely solely upon the CFTC's incorrect citation.

Inexplicably, the CFTC does not respond to this contention.  However, uncontradicted evidence in the record regarding the financial status of various customers and their purpose for investing, as well as all inferences which can be drawn by the sales and marketing techniques which permeate the record, supports this factual statement.

At the outset, the undersigned notes that the CFTC is only seeking relief with respect to customers who were not "eligible contract participants."  Thus, the CFTC does not purport to exercise jurisdiction over any possible transactions that might have occurred with eligible contract participants. The term "eligible contract participant" is defined as "an individual who has total assets in excess of $10,000,000.00; or, has assets in excess of $5,000,000.00, and enters into the contract in order to manage the risk associated with an asset owned or a liability incurred by that person."  7 U.S.C. §1a(12)(A)(xi).  All of the evidence in the record regarding the financial status of customers and their purpose for investing supports the statement of the CFTC, and none of the evidence or any inferences which can be drawn from the sales and marketing techniques refutes it.  There is evidence in the record regarding Graystone/QIX customer

26

Gary Hicks, STG/QIX customer  Vivian Barnard.; STG/QIX customer Ralph Chilton; and

Graystone/QIX customer Brad Campbell.  The Declaration of Defendant Arsenault, with

the attached customer information of Brad Campbell (Ex. K), Vivian Barnhard (Ex. L), and

Ralph Chilton (Exhs. N and O), and the Declaration of sales representative Michael Mesa

with respect to Gary Hicks (DE # 49); establishes that their assets were below the above

threshold.  In addition, the testimony and Declarations of Hicks (DE # 4, Ex. 12; DE # 101,

Hicks Test. at 49-78); Campbell (DE #4, Ex. 11; DE # 101 at 154-213); Barnhard (DE # 49,

Ex. 10; DE #101 at 111-24); and Chilton (DE # 4, Ex. 9) confirms the financial status of

these customers and that their purpose for investing was to speculate in foreign

currency markets.  Exhibits to the deposition of Heather Babber/Moe include a similar

Customer Information form which show that the customer did not have the requisite

assets (DE # 211, Babber/Moe Depo. Ex. 15, GB 140-0000089 (Franklin Barrick)

    Thus, the undersigned finds that there is undisputed evidence in the record that

at least some QIX, STG and Graystone customers did not have the requisite total assets

and did not enter into the transaction to manage risk associated with an asset they

owned or a liability incurred; their purpose was purely speculation.

    **The Alleged Agency Relationship Between QIX and STG/Graystone**

    35.  QIX entered into identical introducing agreements with STG and Graystone

which contained several provisions outlining an exclusive business arrangement

between QIX and STG and Graystone, in which STG and Graystone agreed to introduce

customers exclusively to QIX.  Defendants don't dispute that this provision is in the

written agreement; but dispute that there was an exclusivity arrangement on the

grounds that Stern avers that QIX did not enforce that clause or interfere if an

introducing broker introduced customers to another FCM (DE # 49, Ex. A: Stern Decl. at

27

¶ 42).  However, the cited paragraph refers only to Universal, and there is no corresponding paragraph regarding the exclusivity arrangement with QIX.

36.  STG and Graystone introduced customers exclusively to QIX.

37.  In addition, QIX provided all account opening documents to STG and Graystone.  The QIX account opening documents provided instructions for STG and Graystone customers to send their funds directly to QIX.

38.  QIX was the counterparty to all of the trades entered into by STG and Graystone customers.

39.  Relying on the deposition of Heather Babber/Moe, the CFTC alleges that QIX retained portions of the commissions charged to STG customers.  Also relying on the same deposition, Defendants assert that STG received all the commissions in the approximate amount of $215 per round turn trade, and the QIX received a fee of $15 on each transaction.  The testimony of Babber/Moe states that out of the $231 that was charged in the first few months, QIX paid one dollar to Joe Prager, kept $15, and paid the rest to STG; thereafter the $1.00 payment to Prager was discontinued (DE # 211, Babber/Moe Depo. at 51-54).  The typed sales script advises customers that they will be charged a round turn commission of $200.00 plus a transaction fee of $30.00 (*See, e.g.* DE # 211, Babber/Moe Depo., Ex. 13 at 140-0005234).

**Defendant Arsenault's Control Over Defendants STG and Graystone**

In their response to the facts set forth by the CFTC in this section,[19] Defendants assert that these facts are disputed on the grounds that the CFTC "has not proven Mr.

---

[19]  Those facts are numbered 117 through 122 in the CFTC Statement of Undisputed Material Facts (DE # 204); and are numbered 40 through 45 in this Report and Recommendation.

Arsenault is liable as a controlling person for any antifraud violations by Sterling [sic].[20] Section 13(b) imposes on the CFTC the burden of proving the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting violations for such vicarious liability to attach." (DE # 236 at 58-63).  Thus, Defendants have presented only legal arguments regarding why the facts in this case do not support liability and have not challenged the underlying facts in paragraphs 40 through 45 st forth below.

    40.   Arsenault set up STG Global in California using his brother Christopher as its corporate agent.  Arsenault asked Heather Moe (n/k/a Babber) to run the operations of STG.  Arsenault used a former Sterling employee, Andre Stepsky, to incorporate Global Forex Trading in Florida.  Arsenault was the principal of STG and Graystone.

    41.   Arsenault controlled and was responsible for Graystone's overall operations. Arsenault ran and maintained the daily functions of Graystone.  Arsenault had the authority to hire and fire employees of Graystone and STG, and he did hire employees.

    42.  STG employees, including Heather Babber (Moe) and the account executives, reported to Arsenault.

    43.  Arsenault provided training on options to account executives at STG and Graystone.

    44.  Arsenault took responsibility for compliance at STG and Graystone.

    45.  Arsenault kept track of how STG and Graystone customers were doing.

---

[20]   The undersigned assumes the Defendants meant to allege STG and Graystone Browne, and neglected to replace the name when cutting and pasting this argument from their statement of disputed facts as to the Phase I transactions involving Sterling and Universal.  The facts asserted in the dispute with respect to these paragraphs to establish Arsenault's good faith, however, relate only to the operations of Sterling, and therefore are not included here.

46.  Arsenault made trade recommendations to account executives at Graystone and STG.  Account executives made their own recommendations to customers.[21]

**Defendant Stern's Control Over Defendant QIX**

47.  Stern was the president, director, and sole shareholder of QIX during the period of its operation.

48.  The CFTC contends that Stern was responsible for QIX's overall operations (¶ 125); Stern ran and maintained the daily functions of QIX, and hired and fired employees (¶ 126); that Stern had control over and approved the account opening documents and contracts that STG and Graystone sent out to retail customers (¶ 127); and that Stern controlled the bank accounts of QIX and signed checks for the company (¶ 128).

Defendants dispute these facts, correctly asserting that the Declaration of Defendant Stern establishes the following:  "Andrew Stern delegated responsibility to running QIX to Daniel Breen.  Mr. Breen hired and fired employees, wrote the vast majority of checks, and ran every aspect of QIX's foreign currency options business.  Mr. Stern briefly took control of QIX for a short period after Daniel Breen died, but only until a suitable replacement was found." (DE # 236 at 63-65, citing DE #48, Ex. A, Stern Decl. at ¶ 45).  The Declaration of Stern also establishes that he had access to bank accounts, but signed few checks, and rarely wired funds or transferred balances (Stern Decl. at ¶ 45).  He hired people to run the operations of Universal and QIX (Stern Decl. at ¶ 46).  He also averred that he "had nothing to do with account opening documents, except to

---

[21]  Defendants dispute the contention of the CFTC that the account executives were supposed to provide Arsenault's recommendations to customers; and rely upon Arsenault's testimony that the executives were free to, and did, disregard Arsenault's recommendations (DE # 236 at 63; DE # 128, Arsenault Test. at 20-21).  The undersigned agrees that this portion of the CFTC's statement is therefore disputed, and states this fact in the light most favorable to Defendants.

adopt the documents of a competitor" (Stern Decl. at ¶ 48).

Defendants assert that "there is no evidence that Andrew Stern, or by implication QIX, exerted any 'purported control' over" the account opening documents (DE # 236 at 64, ¶ 127).  Defendants contend that the CFTC's sole citation to the record is to paragraph 54 in Investigator Koh's Declaration, which does not mention either Graystone or STG (DE # 236 at 64, ¶ 127).[22]  There is ample uncontradicted evidence in the record, provided in the Declaration and in the testimony of Defendant Stern, which demonstrates that Stern had control over the creation and use of the QIX account opening documents.  In his testimony at the preliminary injunction hearing, Stern elaborated upon his involvement with the account opening documents of QIX.  He testified that Daniel Perini put them together, but that he, Stern, ultimately approved them (DE # 111 at 118).  The QIX documents are substantially identical to the ones used by Universal, and Stern provided extensive testimony on his involvement with the preparation of those documents, including how they had been adopted from documents

---

[22]  Paragraph 54 of Investigator Koh's Declaration states in conclusory terms, without further citation to evidence in the record:

> Based upon my review of corporate records, bank records, and the testimony of Stern, he is the president of both Universal and QIX.  In addition, he was responsible for the day-to-day operations of Universal and is currently responsible for the day-to-day operations of QIX.  Stern also approves the account opening documents and customer agreements sent to customers.  Stern was responsible for the hiring and firing of employees at Universal.  According to Stern's own testimony, he personally negotiated with the software companies that provided the trading platform for both Universal and QIX. Stern was also the signatory on the Universal bank accounts and personally signed all of the firm's checks.  Stern currently performs the same role at QIX.

(DE # 4, Ex. 2 (Koh Decl.) at ¶ 54).

used by FXCM and Alaron, and why he decided to include the risk disclosure and arbitration forms (DE # 111 at 64-67; 136; 155-58, 168-69).[23]

In addition, with respect to his involvement in the operations of QIX, Stern testified that <u>he</u> had compliance audits performed of introducing brokers at QIX since, "<u>I</u> thought it was most prudent, you know.  It was the only way <u>I</u> could think of that we could possibly get any insight into what the operations of the introducers were about." (DE # 111 at 170-71) (emphasis added).  When asked, with respect to the audit reports, "Are these documents that you read at the time and relied upon [in] your business decisions at QIX?" Stern responded, "Absolutely." (DE # 111, Stern Test. at 175-76).

### Defendants' Joint Statement of Additional Disputed Facts

Defendants have provided a statement of additional facts which they contend are material and were omitted from Plaintiff's Statement (DE # 236 at 65-76).  Many of these facts relate to the operations of Sterling and Universal, and are therefore are not relevant to the issues addressed in this Report and Recommendation.  Other statements are legal arguments rather than statements of fact.  The following facts, however, are based on evidence in the record, viewed in the light most favorable to Defendants, the non-moving parties.  The undersigned notes that in citing to various provisions in the account opening documents, Defendants cite only to Universal's documents; however, QIX used documents which are identical with respect to the cited provisions.

---

[23]  Defendants have not disputed the fact, contained in paragraph 86 of the CFTC's Statement of Facts, that "Stern had control over and approved the account opening documents and contracts that Sterling sent out to retail customers," although much of the remainder of paragraph 86 is disputed (DE # 236 at 44-46).

A.  **Fair Treatment of Customers**

(1)  **Risk Disclosure in Account Opening Documents**

49.  **According to the Declaration of Defendant Stern, the account opening documents were not designed to confuse or mislead, and carefully explained the nature, risks and mechanics of foreign currency transactions.**

50.  **The account opening documents state no less than six times that the transactions at issue were off-exchange, unregulated foreign currency transactions.**

51.  **With respect to risk disclosure statements, there are approximately 62 different disclosures relating to risks contained in the account opening documents.**

52.  **Every CFTC customer witness admitted reviewing, and signing, extensive account opening documentation including a variety of risk disclosure statements, prior to being permitted to open a trading account.**

(2) **Compliance Procedures**

53.  **Defendant Arsenault, according to his Declaration, considered compliance to be an important part of any investment-related operation, and did not want any person to become a client who did not understand the nature, mechanics and risks involved in foreign currency transactions.  Nor did he want persons investing who, if money was lost, would experience a diminution of their lifestyles.  From time to time, Arsenault prohibited persons from trading or refused to allow them to become customers based upon conversations with them, review of their application materials or other information. Stepsky testified that he would not send out an initial account information package unless the customer demonstrated in response to Mr. Stepsky's questions that he was "qualified" to receive the materials.  If a customer had never invested before, it "would send up a red flag" which Mr. Stepsky used from time to time to turn down prospective**

customers.

54. There was compliance taping at STG and Graystone. This is a process by which a salaried employee with no interest in the transaction asks the customer a series of questions prior to the customer entering the market to make certain that the customer understands the nature, mechanics and risks of the transaction involved, has not been guaranteed profits, and that no representations have been made by the broker contrary to those contained in the customer agreement and disclosure statement. These conversations were taped with the customer's consent. In addition, customer buy and sell orders were often taped.

55. The compliance taping calls were made by using a script which the compliance officers read to the customers.[24]  Arsenault and others monitored sales presentations by representatives, using including a phone system that allowed Arsenault to listen in without the salesperson being aware.

56. As part of overall compliance procedures, STG and Graystone tried to settle any claims from disgruntled customers of which they became aware. The number of customer complaints was small, and was never a significant or a material percentage of all customer accounts.

57. Certain evidence presented by the CFTC, including charts received by

---

[24]  Transcripts and tapes of compliance calls were filed by Defendants (DE # 147); and the script is also contained in the record (DE # 49, Judy Decl. at Ex. A).  The transcripts of the compliance tapes for customers Hicks and Campbell reflect that the script was followed.  The undersigned notes that when Mr. Hicks was asked to explain in his own words, what he perceived the risks to be with respect to option trading, he stated, "Well, I see a big gamble, but the profits, if they do show up, can be substantial" (DE # 147, Trans. at 3).  Customer Campbell responded, "Well, if the option expires before it is moved in the direction that we're wanting it to go, the option could become worthless and I make no money and lose the money I've invested" (DE # 147, Trans. at 9).

customers, showed that the Euro was generally moving up against the dollar during the time period in question.[25]

(3) <u>Compliance Audits</u>

58.  Investment Reference, Inc. ("IRI"), whose principal was Dennis Stahr, a highly experienced veteran of the commodities business, was engaged by QIX to perform two compliance audits of Graystone.

59.  IRI performed its first audit of Graystone on December 12, 2003, and provided a Forex Audit Report ("First Report") dated December 30, 2003.

60.  The cover of the First Report states:

**OPENING COMMENT**

> Although not currently required by any regulatory agency, QIX has taken it upon themselves to order this review of your current Forex operation.  With great foresight, the principals of QIX realize the need to operate within certain guidelines to protect the interest of customers of QIX while bringing a measure of consistency to the firms that clear the trades for these customers.  It is not only in the interest of the customers and of QIX, but also your own, that these reviews be completed. Based on these audits, recommendations can be made to enhance the opportunities this industry offers while at the same time forming a compliance guideline in a yet unregulated climate.

61.  Page two of the report notes that Arsenault and sales manager Stuart Brandon monitor the sales presentations by live observation and "silent" phone.  On the next page, the audit notes a single small deficiency with respect to customer files audited, and none as to order entry.

62.  Under the caption "COMPLAINT FILE," the report notes that Graystone had a

---

[25]  Defendants argue that this gave any opinions expressed about the possible profitability of that market a rational basis.

complaint file, and had resolved the one complaint received.  The Report found no deficiencies with respect to the advertising file or promotional materials.  The report noted that Graystone had a website that appeared compliant, and had a strong disclaimer.

63.  The Report also noted that there was a phone script "for training only" and that the script appeared compliant.

64.  With respect to telephone solicitations, the report notes: "Heard in conversation with customer and/or prospects were: Andre Stepsky, Mike Wexler and Roberta Couri.  All conversations appeared compliant and the demeanor of the reps was professional and courteous.  There was no sense of urgency conveyed and no pressure applied to open an account or to trade.  There was risk discussion included in the conversations."

65.  IRI performed a second audit on June 2, 2004, and produced a Forex Audit Report dated June 22, 2004.  This report contained the same description of activities as the first report, and found no deficiencies, including with respect to radio advertisements placed through March 2004.[26]  The Declaration of Arsenault confirms the accuracy of the conclusions and findings contained in the reports.

(4) No Obligation to Disclose Track Record

66.  Defendants concede that they did not disclose any track record or performance history to customers, and contend that they were not required to do so.  In addition, Defendants rely on the testimony of CFTC Investigator Koh that the fact that losses occurred does not mean anything was done wrong and that 90% of commodity

---

[26]  The record does not contain tapes or transcripts of these advertisements, unlike the advertisements of Sterling, which are included in the record.

investors lose money.

(5) Essential Good Faith

67.  According to the Declaration of Arsenault, Defendants made every effort to ensure that they treated all customers fairly and that the customers understood the nature, mechanics and risks of transactions in foreign currencies; the relatively few complaints received supported Arsenault's belief that customers were being treated fairly; and they had a reasonable basis for all statements made, including those related to the use of leverage and potential profitability in the foreign currencies market.

68.  Defendant Arsenault also averred in his Declaration that although STG and Graystone were not members of the NFA, and therefore not bound by NFA rules concerning balanced presentations, they made certain to emphasize the risks and customer understanding of the possibility of loss.  The Arsenault Defendants affirmed that customers fully understood the risks in the written disclosures and the compliance taping procedure.  Arsenault averred that he had no interest in having any person participate in the foreign currency markets who did not have the necessary understanding of them or the ability and right mental attitude to withstand the loss.

69.  Defendants contend that there is evidence to support a finding that customers knew what the risks were; that Arsenault focused on the customer understanding that the customer could lose his money; and that Stepsky testified that sales representatives "were always told to sell the risk as much as the rewards."

B.  Likelihood of Repetition

(1)  Cessation of Activities

70.  With the exception of this case, Arsenault has never been a defendant or respondent in any other action brought by a regulatory agency.

37

71.  Sterling voluntarily ceased business in or about July 2003 when Arsenault became convinced that nobody could make money in foreign currency spot trading.

72.  STG and Graystone ceased doing business with the filing of this action.

(2) Complexity of the Regulatory Scheme for Foreign Currency Transactions

73.  There are no specific regulations regarding retail foreign currency transactions.  Sharon Pendleton testified that she had been waiting almost four years for the CFTC to prepare a promised statement on the requirements for an "affiliate" of an FCM to be exempt from the regulations, and to date none had been issued.

IV.      THE STANDARD FOR GRANTING SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure authorizes entry of summary judgment where the pleadings and supporting materials show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001). Summary judgment is properly regarded not as a disfavored procedural shortcut but, rather, as an integral part of the federal rules as a whole, which are designed to secure a just, speedy, and inexpensive determination of every action. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). In assessing whether the movant has met its burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion and all reasonable doubts about the facts should be resolved in favor of the non-movant. *See Denney v. City of Albany*, 247 F.3d at 1181. Even where

38

the basic facts are undisputed, if reasonable minds could differ on the material inferences that should be drawn from these facts, summary judgment is not appropriate. *Herzog v. Castle Rock Entertainment*, 913 F.3d 1241, 1246 (11th Cir. 1999). Conclusory allegations will not suffice to create a genuine issue of material facts. *See Leigh v. Warner Bros.*, 212 F.3d 1210, 1217 (11th Cir. 2000). There must be more than a scintilla of evidence; there must be "substantial conflict in evidence to support a jury question." *Tidewell v. Carter Prods.*, 135 F.3d 1422, 1425 (11th Cir. 1998) *quoting Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Allen v. Tyson Foods*, 121 F.3d at 646.

V.   LEGAL ANALYSIS

A.   The Regulatory Framework as Applied to the Undisputed Facts

The same framework for analysis set forth in the Report and Recommendation regarding the Motion for Preliminary Injunction (DE # 270) and the Report and Recommendation regarding the Motion to Dismiss (DE # 271) applies to the present motion for summary judgment.   The CFMA, as codified in Title 7, United States Code, § 2(c)(2)(B)[27] grants the CFTC jurisdiction over all off-exchange foreign currency

---

[27]   Title 7, United States Code, § 2(c)(2)(B) provides:

**(B) Agreements, contracts, and transactions in retail foreign currency**

This chapter applies to, and the Commission shall have jurisdiction over, an agreement, contract, or transaction in foreign currency that–

**(i)** is a contract of sale of a commodity for future delivery (or an option on such a contract) or an option ...; and

**(ii)** is offered to, or entered into with, a person that is not an eligible contract participant, unless the counterparty, or the person offering to be

39

transactions involving non-eligible contract participants unless the counterparties to the transactions are an entity enumerated in 7 U.S.C. § 2(c)(2)(B)(ii).

Thus, to establish jurisdiction over the transactions at issue here, the undisputed material facts must establish that (1) the customers were not eligible contract participants, and (2) QIX is not a proper counterparty, *i.e.*, is not one of the entities enumerated as exempt from the CFTC's jurisdiction.

---

the counterparty, of the person is–

**(I)** a financial institution;

**(II)** a broker or dealer registered under ... the Securities Exchange Act ... or a futures commission merchant registered under this chapter;

**(III)** an associated person of a broker or dealer registered under ... the Securities Exchange Act ... or an affiliated person of a futures commission merchant registered under this chapter, concerning the financial or securities activities of which the registered person makes and keeps records under ... the Securities Exchange Act ... or section 6f(c)(2)(B) of this title;

**(IV)** an insurance company described in section 1a(12)(A)(ii) o this title, or a regulated subsidiary or affiliate of such an insurance company;

**(V)** a financial holding company (as defined i section 1841) of Title 12); or

**(VI)** an investment bank holding company ....

**(C)** Notwithstanding subclauses (II) and (III) of subparagraph (B)(ii), agreements, contracts, or transactions described in subparagraph (B) shall be subject to sections 6b, 6c(b), 15 and 13b (to the extent that sections 9, 15 and 13b of this title prohibit manipulation of the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any market), 13a-1, 13a-2 and 12(a) of this title if they are entered into by a futures commission merchant or an affiliate of a futures commission merchant that is not also an entity described in subparagraph (B)(ii) of this paragraph.

Defendants did not challenge the assertion that customers were not eligible contract participants in either their opposition to the Motion for Preliminary Injunction or in their Motion to Dismiss, and also do not mention this issue in their Joint Response in Opposition to Plaintiff's Motion for Summary Judgment.  However, in their Statement of Material Facts in Dispute, Defendants assert that the evidence cited by the CFTC fails to establish that customers were not eligible contract participants. The undersigned disagrees.  As the record evidence described above reflects, all of the customers whose records are in evidence provided financial information which demonstrates that they did not have the assets required to make them eligible contract participants.[28]

The second determination is whether the undisputed facts establish that QIX was not a proper counterparty.   Section 2(c)(2)(B)(ii) provides exemption for a futures commission merchant registered under the Act, and subsection 2(c)(2)(B)(ii)(III) provides for exemption for "an affiliated person of a futures commission merchant registered under this Act, concerning the financial or securities activities of which the registered person makes and keeps records under ... section 6f(c)(2)(B)[29] of this Act."

The CFTC contends that QIX was not a proper counterparty under this provision because it was neither an FCM nor an "affiliate" of an FCM within the meaning of subsection (B)(ii)(III).  Defendants challenge this assertion, and claim that QIX is exempt from the jurisdiction of the CFTC as an "affiliated person" under this provision.  An

---

[28]   An "eligible contract participant" is defined as an individual who has total assets in excess of $10,000,000.00; or, has assets in excess of $5,000,000.00, and enters into the contract in order to manage the risk associated with an asset owned or a liability incurred by that person.  7 U.S.C. §1a(12)(A)(xi).  Based upon CFTC Investigator Koh's examination of the records, as well as the testimony of the individual investors at the evidentiary hearing, none of the customers met this definition (DE # 4, Ex. 2: Koh Decl. ¶ 19).

[29] 7 U.S.C. § 6f(c)(2)(B) (footnote added).

affiliated person is "any person directly or indirectly controlling, controlled by, or under common control with a futures commission merchant." 7 U.S.C. § 6f(c)(1)(I).

The critical issue in this respect is whether all affiliated persons are exempt as long as the registered FCM keeps records, or whether the exemption applies only where the registered FCM is required to keep records pursuant to § 6f(c)(2)(B). The CFTC contends that because the registered FCMs in the case at bar were not required to keep records, the exemption does not apply, and the fact that the registered FCMs, in fact, decided to keep records is irrelevant. Defendants, on the other hand, contend that since the registered FCMs elected to keep records, they qualify as exempt affiliates.

In the Reports and Recommendations issued with respect to the Motion for Preliminary Injunction and Motion to Dismiss, the undersigned adopted the position of the CFTC. For the reasons stated therein, which are incorporated by reference, the undersigned adheres to this position. Since the undisputed facts establish that QIX was not required to keep records under section 6f(c)(2)(B), the undersigned concludes as a matter of law that it was not a proper counterparty within the meaning of Section 2(c)(2)(B)(ii)(III). Thus, QIX does not qualify for the exemption from jurisdiction set forth in that provision, and, as specified in Section 2(c)(2)(B)(i)-(ii), Defendants are subject to the provisions of the entire Commodities Exchange Act with respect to Phase II transactions.

Defendants also contend that the only regulations applicable to foreign currency transactions are those which were expressly incorporated by the CFMA. Thus, Defendants contend that the following regulations, which were promulgated prior to the CFMA and have not specifically been made applicable to foreign currency transactions, cannot be enforced by the CFTC in the case at bar: 7 U.S.C. § 6h (which makes it

unlawful to falsely represent registration status); Section 32.9 of the Regulations (which prohibits fraudulent conduct in connection with transactions involving off-exchange options); Section 32.11 of the Regulations (regarding the prohibition on off-exchange transactions); 7 U.S.C. § 6(a) (which makes it unlawful to trade off-exchange futures contracts); CFTC Regulation 1.2, 17 C.F.R. § 1.2 and 7 U.S.C. §§ 2(a)(1)(B) and 13c(b) (respectively, principal/agent and control person liability).  Defendants contend that the CFTC did not have jurisdiction to regulate off-exchange foreign currency transactions until the enactment of the CFMA.  Therefore, none of the pre-existing regulations were applicable to the transactions at issue in the case at bar.  Defendants further argue that since 7 U.S.C. §6c(b), specifically states that regulations "may be made only after notice and opportunity for hearing," and since there was no regulation promulgated which specifically adopts the above regulations to the transactions, there has not been the required hearing and the regulations do not apply.

The CFTC agrees that the regulations at issue were in existence at the time the CFMA was enacted.  However, the CFTC contends that when Congress enacted the CFMA to clarify its jurisdiction over certain retail foreign exchange transactions, Congress subjected the Defendants' conduct to the CEA in its entirety.  The CFTC emphasizes that Congress is presumed to know the existing law when it enacts legislation, and that a newly-enacted or revised statute is presumed to be harmonious with existing law and its judicial construction (DE # 134 at 24).

Again, for the reasons stated in the Reports and Recommendations issued in connection with the Motion for Preliminary Injunction and Motion to Dismiss, the undersigned concludes that all existing regulations are applicable to the transactions in the case at bar.

Having determined that Defendants are subject to the statutes and regulations which form the basis for the present Complaint, it is now necessary to determine whether they violated those provisions.

### B. Summary Judgment Should Be Denied as to Count Two

In Count Two, the Amended Complaint alleges that Defendants Graystone, STG, Arsenault and QIX committed fraud and deceit in the offer and sale of off-exchange foreign currency options, in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. §§ 1.1(b)(1) and(3) and 32.9(a) and (c) (Amended Complaint ¶¶ 122-27).[30]

CFTC Regulations 32.9(a) and (c) make it "unlawful for any person directly or indirectly: (a) [t]o cheat or defraud or attempt to cheat or defraud any other person ... [or] (c) [t]o deceive or attempt to deceive any other person by any means whatsoever; in, or in connection with an offer to enter into, the entry into, or in the confirmation of the execution of, any commodity option transaction."  17 C.F.R. §§ 32.9(a) and (c).  It is well-settled that "to establish a claim for fraud, the CFTC has the burden of proving three elements: (1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality."  *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321,

---

[30] The Amended Complaint alleges control person liability, pursuant to 7 U.S.C. § 13c(b), with respect to Defendant Arsenault for the activities of Defendants Graystone and STG (Amended Complaint ¶¶ 99-101, 125).  The Amended Complaint further alleges that Defendants Graystone and STG are liable as principals, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, since the acts or omissions complained of were committed by Graystone and STG representatives within the scope of their respective employments (Amended Complaint ¶ 126).

Finally, the Amended Complaint alleges that QIX is liable as a principal, pursuant to 7 U.S.C. § 2(a)(1(B) and 17 C.F.R. § 1.2,  for the acts of Graystone and STG as its agent (Amended Complaint ¶¶ 102-08, 127).  Defendant Stern is not charged with liability in Count Two.  QIX denies the existence of a principal/agent relationship with STG and Graystone.  Based upon the finding of material disputed facts with respect to the issue of fraudulent misrepresentations by STG and Graystone, it is not necessary to reach that issue.

1328 (11th Cir. 2002).  Unlike a common law fraud claim, however, reliance is not a requisite element in an enforcement action.  *Id.* at 1328 n.6.

In *CFTC v. R.J. Fitzgerald & Co.*, the Eleventh Circuit established the parameters governing the determination of whether fraud has been established as a matter law.[31] There, in a two-to-one decision, the Eleventh Circuit reversed the finding of the District Court, following a bench trial, that the defendants were not involved in fraudulent solicitations and did not attempt to cheat, defraud, or deceive clients.  At the outset, the Court discussed each of the required elements of a claim:

> Whether a misrepresentation has been made depends on the "overall message" and "common understanding of the information conveyed."  For purposes of fraud or deceit in an enforcement action, scienter is established if Defendant intended to defraud, manipulate, or deceive, or if Defendant's conduct represents an extreme departure from the standards of ordinary care.  In the similar context of federal securities law, we have previously stated that scienter is met when Defendant's conduct involves "highly unreasonable omissions or misrepresentations ... that present a danger of misleading [customers] which is either known to the Defendant or so obvious that Defendant must have been aware of it."  A representation or omission is "material" if a reasonable investor would consider it important in deciding whether to make an investment.

310 F.3d at 1328-29 (internal citations omitted).

There were two primary solicitation devices at issue in *R. J. Fitzgerald*–a commercial advertisement that ran on CNBC and a seminar.  The words used in the commercial and in the script used to conduct the seminar were not in dispute.  The Court set forth the following recitation of the contents of the commercial:

> "[T]he El Nino [weather phenomenon] has struck where

---

[31]  Although *R. J. Fitzgerald & Co.* involved a violation of Regulation 33.10 rather than 33.9, the two regulations contain identical wording, and the same analysis applies.

expected, and if patterns continue, the effects could be devastating.  Droughts, floods, and other adverse conditions could drastically alter the supply and demand dynamics of the corn market.... With the giant developing nations, such as China and Russia badly in need of grains and world grain supplies put to the test, conditions may exist for profits as high as 200 to 300 percent."  This was accompanied by a graphic statement on the television screen that the percentages were a mathematical example of leverage.  The Commercial further asserted that "the potential of the corn market may never be greater.  Tight U.S. reserves coupled with domestic and worldwide demands could be the formula for a trade you won't want to miss.  Find out how as little as $5,000 could translate into profits as high as 200 to 300 percent.  Call R. J. Fitzgerald today ...."

310 F.3d at 1325.

The Court described the seminar script as follows:

The Seminar informed customers that weather patterns, political events, and historical trends can affect the prices of certain commodities.  The Seminar also told customers that technical analysis could assist them in the commodity options market, since "history often repeats itself" and "past price action can provide you with clues to future action."  Customers were told they could "take advantage" of "fundamental" market moves such as weather events and political events and "technical theory" such as past market movements through either futures or options investing.  The Seminar also drew a distinction between investment instruments based on the quantum of risk involved: Which one you choose depends on how aggressive or what degree of risk you wish to take on. If you are highly aggressive and looking for unlimited profit potential as well as unlimited risk than it would be the futures. But most would like something less aggressive, something offering unlimited profit potential but limited risk-option trade.

On the topic of risk, the Seminar additionally told potential customers: "options on futures allow investors and risk managers to define risk and limit it to the loss of a premium paid for the right to buy or sell a futures contract while still providing ... unlimited profit potential.

The ... employees who conducted the Seminar offered what the Seminar script deemed a "very exciting" illustration of how profits could be made on options.  Specifically, the Seminar focused on the commodity heating oil, explaining that

46

for the last eighteen years, there was an average increase in that commodity "of 22 cents from the low to the high in the price range" and that a $5,000 investment on a heating oil futures contract would result in $46,200 if there was a 22 cent move in the price.  Customers were told that if they wanted "limited risk," they could invest in an option contract, where they would receive "approximately 50% of that profit -46,200 divided by 2 equals $23,100."

310 F.3d at 126-27.

The Court concluded that read for its overall message, and how that message would be interpreted by an objectively reasonable television viewer, it overemphasized profit potential to such an extent that it was deceptive and misleading as a matter of law. The fact that boilerplate risk disclosure language was also included was unavailing.  The Court noted that numerous cases had held that a general risk disclosure statement does not preclude liability where the overall message is clearly and objectively misleading or deceptive.

In addition, the Court found as a matter of law that the element of scienter was established because Defendants acted recklessly with respect to the statements made in the commercial.  This conclusion was based upon the fact that the Court and the CFTC had previously condemned attempts to attract customers by "(1) linking profits expectations on commodities options to known and expected weather events, seasonal trends and historical highs; (2) suggesting that the commodities market can be correctly timed to generate large profits; and (3) substantially inflating option profit expectations while downplaying risk of loss."  310 F.3d at 1330.

Finally, the Court concluded that the misrepresentations were material because, "It is too obvious for debate that a reasonable listener's choice-making process would be substantially affected by the emphatic statements on profit potential ("200-300%) and

the suggestion that known and expected weather events are the vehicle for achieving those enormous profits."   310 F.3d at 1330.

The seminar was found to be similarly fraudulent and deceptive as a matter of law:

> Like the Commercial, the Seminar, when viewed in its entirety, suggests to a reasonable listener that [Defendant] has a reliable strategy in place for increasing profits and limiting losses. Like the Commercial, it presents a distinctly unbalanced picture between the potential for profit and the potential for loss in options, inflating one while downplaying the other.

310 F.3d at 1331.

However, although the CFTC presents a convincing argument for finding fraud as a matter of law; viewing the evidence and all inferences in the light most favorable to Defendants, the undersigned cannot conclude that the CFTC has met its burden.  Unlike the commercial set forth in *R. J. Fitzgerald*, and the radio advertisements of Sterling, the present record does not have a tape or transcript of the radio advertisements used by STG or Graystone.  The record is not clear with respect to what was said; and, the CFTC does not rely on those ads with respect to the liability of STG and Graystone.  Rather, the CFTC relies on the script, the training materials, the handwritten documents of brokers that were seized when this case was brought, and one tape recorded broker solicitation.  The undersigned cannot conclude that the script before the Court here, which is recited in its entirety in the Statement of Facts, and which contains blank spaces for the discussion of potential profits, is materially misleading as a matter of law. The script does not reflect the entirety of the conversation between the customer and the sales person.  As salesperson Andre Stepsky testified, they were told to adapt the script to their personality, were never allowed to "sell dirty" and were always told to sell the

risk as much as the reward" (DE # 211 at 56).

In addition, the undersigned is not free to weigh the credibility of Arsenault and Stern with respect to efforts to ensure that fraudulent and misleading statements did not occur. Defendant Arsenault, according to his Declaration, considered compliance to be an important part of any investment-related operation, and did not want any person to become a client who did not understand the nature, mechanics and risks involved in foreign currency transactions. Nor did he want persons investing who, if money was lost, would experience a diminution of their lifestyles. From time to time, Arsenault prohibited persons from trading or refused to allow them to become customers based upon conversations with them, review of their application materials or other information. In addition, there were taped compliance calls to make certain that the customer understood the nature, mechanics and risks of the transaction involved, had not been guaranteed profits, and that no representations had been made by the broker contrary to those contained in the customer agreement and disclosure statement. Stern testified that, on behalf of QIX he ordered audits to ensure the propriety of operations by Graystone.

To be sure, the materials seized demonstrate fraudulent practices, assuming they were used in connection with the solicitation of customers with either the knowledge or reckless disregard on the part of Defendants. However, the record is not sufficiently complete or undisputed to determine the liability of Defendants as a matter of law.

Therefore, the undersigned recommends that summary judgment be denied as to Count Two.

### C. Summary Judgment Should Be Granted as to Count Five

In Count Five, the Amended Complaint alleges that Defendants STG, Graystone,

QIX, Arsenault, and Stern violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.11(a) through the offer and sale of commodity options not conducted or executed on, or subject to the rules of a contract market or a foreign board of trade (Amended Complaint ¶¶ 137-41). The Amended Complaint alleges that Defendant Arsenault is liable for these violations as a control person with respect to Graystone and STG; and that Defendant Stern is liable as a control person of QIX.

Title 7, United States Code, Section 6c(b) provides that "no person shall offer to enter into or confirm the execution of, any transaction involving any commodity regulated under this Act which is of the character of, or is commonly known to the trade as, an "option," contrary to any rule, regulation or order of the Commission prohibition any such transaction."  CFTC Regulation 32.11(a), 17 C.F.R. § 32.11(a), states that it is unlawful for any person to solicit or accept orders for the purchase or sale of any commodity option, except for commodity option transactions conducted or executed on or subject to the rules of a contract market.

In the case at bar, it is undisputed that STG, Graystone and QIX were soliciting, accepting funds for and offering to enter into foreign currency option transactions that were not traded on either a contract market or foreign board of trade.  The essence of Defendants' contrary argument is that they were not subject to Rule 32.11(a) since they were eligible counterparties exempt from this regulation, and that the regulation is inapplicable because it was not adopted after Forex became subject to regulation.  As stated above, both of these legal arguments are rejected.[32]

---

[32]  In view of the determination that QIX is not an eligible counterparty, it is unnecessary to determine whether Regulation 32.11 is among those regulations as to which Congress reserved the enforcement jurisdiction of the CFTC pursuant to 7 U.S.C. § 2(c)(2)(C).

Therefore, the undersigned concludes that STG, Graystone and QIX violated the provisions of the CEA and Regulation 32.11(a) in connection with the transactions at issue in the case at bar, which involved parties who were not eligible contract participants.

In addition, it is clear that Defendants Arsenault and Stern were controlling persons with respect to this violation. Title 7, United States Code, Section 13c(b) provides:

> Any person who, directly or indirectly, controls any person who has violated any provision of this Act or any of the rules, regulations, or orders issued pursuant to this Act may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person.  In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.

The scope of this provision was explained by the Court in *CFTC v. Gibralter Monetary Corp.*, No. 04-80132-CIV-DIMITROULEAS, 206 WL 1789018 (May 30, 2006):

> A fundamental purpose of this Section, "is to allow the [CFTC] to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the [CEA] directly on such individuals as well as on the corporation itself." *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1567 (11th Cir. 1995). . . .
>
> The CFTC bears the burden of demonstrating "controlling person" liability. *CFTC v. Midland Rare Coin Exch., Inc.* 71 F. Supp. 2d 1257, 1265-66 (S.D. Fla. 1999).  To prove "controlling person" liability the CFTC must demonstrate that the (1) corporation violated the CEA; (2) defendants "directly or indirectly" controlled the corporation; and (3) defendants failed to act with good faith, or knowingly induced the acts that constitute the violations. *CFTC v. Baragosh*, 278 F.3d 319, 330 (4th Cir. 2002).  This "controlling person" standard is satisfied when an individual has actual or constructive knowledge of the activities that constitute the violation and allows them to continue.  *Commonwealth Fin. Group, Inc.*, 874 F. Supp. at

> **1357.  For "controlling person" liability the focus is upon the power to control not whether that power is actually exercised.**

*Id.* at *18.  *Accord CFTC v. Next Fin. Serv. Unltd., Inc.*, No. 04-80562-CIV-RYSKAMP, 2006 WL 889421 (Mar. 30, 2006).

In the case at bar, it is clear that both Arsenault and Stern had the power and the ability to control the activities of their respective companies with respect to the decision to engage in off-exchange trading of foreign currency options.  Neither Arsenault nor Stern appear to challenge their control in this respect.  Arsenault has not disputed his extensive involvement and control over the operations of STG and Graystone, challenging only the fact that he was aware of any fraud or misrepresentations, and contending that he took extensive steps to eliminate such abuses.  Stern disputes his control over the day-to-day operations, but does not appear to dispute his ultimate decision-making authority to control the type of business in which QIX engaged, or that he is the person who established QIX for the purpose of engaging in off-exchange foreign currency transactions.

The CFTC notes that Defendants argue that the regulatory scheme is "incomprehensible" and imply that they should not be held liable because they acted without scienter.   However, Defendants have not claimed that scienter is an element of a violation of Regulation 32.11(a), and the CFTC correctly notes that it is not.  This Regulation is an absolute prohibition against off-exchange trading of commodity options, regardless of intent, and Defendants have not argued otherwise.[33]  *See generally CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 773 (9th Cir. 1995) (holding that 7

---

[33]  With the caveat that Defendants have argued that this provision does not apply to their transactions at all.  That is to say, Defendants have not disputed that Regulation 32.11(a) was violated *if* it applies to them and to foreign currency transactions.

52

U.S.C. § 6(a) does not have a scienter element); *Lawrence v. CFTC*, 759 F.2d 767, 773 (9th

Cir. 1985) (finding willfulness established under the CEA "[if a person 1) intentionally

does an act which is prohibited, irrespective of evil motive or reliance on erroneous

advice, or 2) acts with careless disregard of statutory requirements").

However, the issue of intent is relevant to the issue of whether injunctive relief is

required.  The undersigned notes that, in its Motion for Summary Judgment, the CFTC

has requested a hearing to determine amounts to be assessed for restitution and/or

disgorgement, civil monetary penalties, and interest (DE # 202 at 1).  In view of the

contested facts concerning whether there was a good faith attempts by Arsenault and

Stern to determine whether they were required to comply with this regulation, the

undersigned has determined that the hearing should also encompass the need for the

requested injunctive relief, and the scope of that relief.

### D.  Summary Judgment Should Be Denied as to Count Four

In Count Four, the Amended Complaint alleges that Defendants QIX and Stern

violated 7 U.S.C. § 6h by falsely representing that QIX was a member of a registered

entity and/or that QIX was a registrant under the Act (Amended Complaint ¶¶ 134-36).

The Amended Complaint alleges that Stern is liable as a controlling person with respect

to QIX, pursuant to 7 U.S.C. § 13c(b) (Amended Complaint ¶¶ 98, 136).  Defendants

Graystone and STG are not charged with liability in Count Four.

Although the underlying facts concerning these written representations are

undisputed, there is considerable dispute about the inferences to be drawn from those

facts.  In general, summary judgment is not appropriate even where the underlying facts

are undisputed if the inferences which may be drawn from those facts remain in dispute.

Defendants contend that the representations were not misleading, and that to the

extent that the initial statement in the account opening documents was viewed by the NFA as "potentially misleading," it was corrected.  The CFTC asserts that inclusion of the risk disclosure statement is misleading because, even though it accurately discloses the risks applicable to the transactions at issue, the statement is required only for registered FCMs, which QIX is not (DE # 220, Att. A at 9).  The CFTC contends that by including a risk disclosure document that was promulgated for registered entities, the customers were misled into believing that QIX was registered.  In addition, the CFTC claims that by including in the account documents an arbitration clause pursuant to the Commission Regulations, despite Defendants' claim that they are not subject to the jurisdiction of the Commission, QIX further misled the customers into believing that QIX was a Commission registrant.  CFTC Investigator Koh testified, however, that he was not sure of the availability of arbitration by agreement with respect to off-exchange foreign currency transactions; and Defendant Stern testified that he believed that such proceedings occurred and that QIX intended to be bound by those provisions.  Moreover, it is now established that the transactions at issue are subject to the jurisdiction of the CFTC.  In any event, it appears that the relief sought here is moot based upon the determination that the transactions were illegal *vel non.*  Therefore, the undersigned recommends that summary judgment be denied as to Count Four.  The evidence concerning these alleged misleading statements, of course, remains admissible in connection with the claim of fraud asserted in Count Two.

VI.   <u>CONCLUSION</u>

Based upon the foregoing analysis, it is hereby

**RECOMMENDED** that the CFTC's Motion for Summary Judgment be **GRANTED**

as to liability on Count Five, and otherwise **DENIED**.

       **DONE AND SUBMITTED** in chambers, in Miami, Florida, on July 30, 2007.

       The parties will have ten days from the date of service of this Order within which to file written objections, if any, for consideration by the United States District Judge to whom this case is assigned.  Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein.  *LoConte v. Dugger*, 847 F.2d 745 (11th Cir.), *cert. denied*, 488 U.S. 958 (1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).


                        _Andrea M. Simonton_____
                        ANDREA M. SIMONTON
                        UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
The Honorable Joan A. Lenard,
   United States District Judge
All Counsel of Record