## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-21346-CIV-LENARD/TORRES

COMMODITY FUTURES TRADING
COMMISSION,

      Plaintiff,

vs.

STERLING TRADING GROUP, INC.,
UNIVERSAL FX, INC., STG GLOBAL
TRADING, INC., QIX, INC.,
GRAYSTONE BROWNE FINANCIAL,
INC., JOSEPH ARSENAULT, AND
ANDREW STERN

      Defendants.

_____/

## ORDER ADOPTING REPORTS OF MAGISTRATE JUDGE (dkt # 270, 271, 273); DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (dkt # 3); GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS (dkt # 159); GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (dkt # 202)

THIS CAUSE came before the Court on the Magistrate Judge's Report and

Recommendation on Plaintiff Commodity Futures Trading Commission's ("CFTC") Motion for

Preliminary Injunction (dkt # 270) filed on July 23, 2007; Report and Recommendation on

Defendants' Motion to Dismiss (dkt # 271) filed on July 24, 2007; and Report and

Recommendation on the CFTC's Motion for Summary Judgment (dkt # 273) filed on July 30,

2007. The CFTC filed its Objections to the Magistrate Judge's Reports (dkt # 279) on August

22, 2007 and the Defendants filed their Response to the CFTC's Objections (dkt # 284) on

September 25, 2007. The Defendants filed their Objections to the Magistrate Judge's Reports

(dkt # 278) on August 22, 2007, the CFTC filed its Response to the Defendants' Objections (dkt

# 283) on September 24, 2007, and Defendants filed a Reply (dkt # 285) on October 4, 2007.

UPON CONSIDERATION of Magistrate Judge Simonton's Reports and

Recommendations, after a de novo review of the record, and being otherwise fully advised in the

premises, the Court enters the following Order.

## I. BACKGROUND

A.    Factual Background

In the interests of brevity, the Court adopts by reference the factual background laid out

by the Magistrate Judge in her Report on the CFTC's Motion for Preliminary Injunction (dkt #

270 at 3-38) except as objected to by the Parties as noted herein.

B.    Procedural Background

On June 7, 2004, the CFTC filed a four-count Complaint alleging violations of the

Commodities Exchange Act ("CEA"), as amended by the Commodities Futures Modernization

Act of 2000 ("CFMA"), against Defendants Sterling Trading Group, Inc. ("Sterling"), Universal

FX, Inc. ("UFX"), STG Global Trading, Inc. ("STG"), QIX, Inc. ("QIX"), Graystone Browne

Financial, Inc. ("Graystone"),  Joseph Arsenault and Andrew Stern (collectively, "Defendants").

(dkt # 1.)  On the same day, the CFTC filed a Motion for Preliminary Injunction seeking

injunctive relief stemming from Defendants alleged violations of the CEA.  (dkt # 3.)  The

Motion for Preliminary Injunction was referred to Magistrate Judge Simonton.  (dkt # 14.)  The

Motion for Preliminary Injunction was fully briefed, an evidentiary hearing was held, and the

Magistrate Judge wrote a Report recommending that the Motion be denied.  (dkt # 270.)

On April 15, 2005 the CFTC filed a five-count Amended Complaint against Defendants.[1]

---

[1]    The Amended Complaint alleges in Count One that Defendants Sterling, UFX, Arsenault, and Stern committed fraud and deceit in the offer and sale of foreign exchange futures contracts, in violation of 7 U.S.C. § 6b(a)(i) and (iii) and 17 C.F.R. § 1.1(b)(1) and (3). (Id. at ¶¶ 114-21.) The Amended Complaint alleges that Defendant Arsenault directly or indirectly controlled Sterling, and is therefore liable as a controlling person pursuant to 7 U.S.C. § 13c(b). (Id. at ¶¶ 66-69, 117.) The Complaint further alleges that Defendant Sterling is liable as a principal, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, since the acts or omissions complained of were committed by Arsenault and other Sterling representatives within the scope of their employment with Sterling. (Id. at ¶ 118.) The liability of Defendant Stern is predicated upon the allegation that he is a controlling person with respect to UFX, pursuant to 7 U.S.C. § 13c(b). (Id. at ¶¶ 61-65, 119.) The Amended Complaint alleges that UFX is liable as a principal, pursuant to 7 U.S.C. § 2(a)(1(B) and 17 C.F.R. § 1.2, for (1) the acts and omissions of its employees; and (2) the acts of Sterling as its agent. (Id. at ¶¶ 70-77, 120-21.)

In Count Two, the Amended Complaint alleges that Defendants Graystone, STG, Arsenault and QIX committed fraud and deceit in the offer and sale of off-exchange foreign currency options, in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. §§ 1.1(b)(1, 3) and 32.9(a, c). (Id. at ¶¶ 122-27.) Similar to Count One, the Amended Complaint alleges control person liability with respect to Defendant Arsenault for the activities of Defendants Graystone and STG. (Id. at ¶¶ 99-101, 125.) The Amended Complaint further alleges that Defendants Graystone and STG are liable as principals, since the acts or omissions complained of were committed by Graystone and STG representatives within the scope of their respective employments. (Id. at ¶ 126.) Finally, the Amended Complaint alleges that QIX is liable as a principal for the acts of Graystone and STG as its agent. (Id. at ¶¶ 102-08, 127.) Defendant Stern is not charged with liability in Count Two.

In Count Three, the Amended Complaint alleges that Defendants Sterling, UFX, Arsenault and Stern violated 7 U.S.C. § 6(a) through the offer and sale of commodity futures contracts which were not conducted on a board of trade designated as a contract market. (Id. at ¶¶128-33.) Like Count One, the Amended Complaint alleges principal/agent liability with respect to Defendants Sterling and UFX; and control person liability with respect to Defendants Arsenault and Stern.

In Count Four, the Amended Complaint alleges that Defendants UFX, QIX and Stern violated 7 U.S.C. § 6h by falsely representing that UFX and QIX were members of a registered entity and/or that UFX and QIX were registrants under the CEA. (Id. at ¶¶ 134-36.) The Amended Complaint alleges control person liability with respect to Defendant Stern. (Id. at ¶¶ 98, 136.) Defendants Sterling, Graystone and STG are not charged with liability in Count Four.

In Count Five, the Amended Complaint alleges that Defendants STG, Graystone, QIX, Arsenault, and Stern violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.11(a) through the offer and sale of commodity options not conducted or executed on, or subject to the rules of a contract market or a foreign board of trade. (Id. at ¶¶ 137-41.) The Amended Complaint alleges that Defendant Arsenault is liable for these violations as a control person with respect to Graystone

(dkt # 151.) The Amended Complaint concerns allegedly fraudulent foreign currency ("forex")

transactions involving Defendants. The Amended Complaint divides the allegedly fraudulent

and illegal activity into two "phases," based on the time period of the forex transactions and the

Defendants involved. The CFTC alleges that during Phase I of the operations, which occurred

between July of 2002 and August of 2003, Sterling, controlled by Arsenault, used misleading

radio advertisements; high-pressure, misleading telemarketing sales tactics; false and misleading

account-opening documents; and other deceptive practices to fraudulently solicit retail customers

to engage in foreign currency futures transactions with UFX, which was controlled by Stern. The

Amended Complaint also alleges that these transactions were illegal since UFX was not a proper

counterparty to the transactions. (Amended Complaint ¶¶ 20-77.)

The Amended Complaint also alleges that during Phase II of the operations, which

occurred between August of 2003 and June 7, 2004, Graystone and STG, under the control of

Arsenault, solicited retail customers to enter into foreign currency options transactions with QIX,

which was controlled by Stern. The Amended Complaint alleges that Graystone and STG used

false and misleading sales solicitation materials, high-pressure and deceptive sales tactics, and

failed to provide access to account information regarding these transactions. The Amended

Complaint also alleges that these transactions were illegal since QIX was not a proper

counterparty to the transactions (Amended Complaint ¶¶ 77-108).

Defendants filed a joint Motion to Dismiss the Amended Complaint on May 13, 2005.

(dkt # 159.) The Motion to Dismiss was referred to Magistrate Judge Simonton. (dkt # 257.)

The Motion to Dismiss was fully briefed, and the Magistrate Judge wrote a Report

_____

and STG; and that Defendant Stern is liable as a control person of QIX.

recommending that the Motion be granted as to Counts I, III, and part of Count IV of the Amended Complaint, and otherwise denied. (dkt # 271.) The CFTC filed a Motion for Summary Judgment on January 3, 2006. (dkt # 202.) The Motion for Summary Judgment was referred to Magistrate Judge Simon. (dkt # 257.) The Motion for Summary Judgment was fully briefed, and the Magistrate Judge wrote a Report recommending that summary judgment be granted as to liability on Count V of the Amended Complaint, and otherwise denied. (dkt # 273.) Prior to writing her Reports, the Magistrate Judge held five days of evidentiary hearings.

      C.    <u>The Magistrate Judge's Reports and the Parties' Objections</u>

          1.    Report on the CFTC's Motion for Preliminary Injunction

In her Report on the CFTC's Motion for Preliminary Injunction, the Magistrate Judge began by discussing the CFTC's jurisdiction under the CEA. The Magistrate Judge found that UFX and QIX are not statutorily exempt as counterparties under the CEA. Accordingly, UFX and QIX are subject to the CFTC's jurisdiction with respect to all provisions of the CEA. The Magistrate Judge also found that the CFTC has the authority to enforce all regulations existing at the time of the CFMA's enactment, including regulations prohibiting off-exchange transactions and those governing principal/agent and control person liability.

The Magistrate Judge also found that the Seventh Circuit's opinion in <u>United States v. Zelener</u>, 373 F.3d 861 (7th Cir. 2004), provides the proper standard for determining whether the Phase I transactions were futures contracts (over which the CFTC has jurisdiction) or spot transactions (over which the CFTC does not have jurisdiction). The Magistrate Judge found that under <u>Zelener</u>, the key consideration in identifying a futures contract is its fungibility. The Magistrate Judge also noted that the <u>Zelener</u> Court had expressly rejected the CFTC's argument

that its interpretation of the term "futures contract" deserves deference under Chevron U.S.A., Inc. v Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Applying the Zelener standard to the Phase I transactions, the Magistrate Judge determined that the Phase I transactions were spot transactions not subject to the CFTC's jurisdiction. Accordingly, the Magistrate Judge held that Counts I and II of the Complaint, as well as that part of Count III which relates to UFX, cannot support injunctive relief.

Next, the Magistrate Judge rejected the CFTC's argument that QIX falsely represented that it was a registrant under the Act, and falsely represented, in connection with the handling of orders for foreign currency options, that the options would be executed by or through a member of a registered entity. The Magistrate Judge found that to the extent that QIX made initial misrepresentations, the misrepresentations were promptly corrected. In addition, QIX has ceased doing business, and there is no likelihood that it will resume business. Therefore, to the extent that the CFTC has not abandoned its argument by failing to present it in its post-hearing brief, the Magistrate Judge found injunctive relief is not necessary with respect to this alleged violation.

Finally, the Magistrate Judge found that, although 17 C.F.R. § 32.11, the regulation that prohibits off-exchange transactions, applies to QIX's transactions, the totality of the circumstances[2] demonstrated that preliminary injunctive relief was not warranted.

---

[2] The Magistrate Judge found the following circumstances persuasive: the frequency with which Defendant Stern consulted with the National Futures Association ("NFA"), the self-regulatory organization for the U.S. futures industry, and corrected concerns which were brought to his attention; the unsuccessful attempts of the NFA to obtain clarification from the CFTC regarding the "affiliate" exemption from coverage; and the voluntary cessation of business by QIX, Graystone and STG when this lawsuit was filed.

2.     Report on Defendants' Motion to Dismiss

In her Report on Defendants' Motion to Dismiss, the Magistrate Judge began by rejecting

the CFTC's argument that the Defendants' jurisdictional challenge directly implicates the merits

of their claim, and therefore the Court should apply the summary judgment standard in

evaluating its jurisdiction. Next, the Magistrate Judge repeated her finding from the Report on

the CFTC's Motion for Preliminary Injunction regarding use of the Zelener standard for

determining whether the Phase I transactions were futures contracts or spot transactions. As the

Magistrate Judge determined that the transactions in Phase I do not fall within the jurisdiction of

the CFTC, she recommended that Counts I and III of the Complaint, as well as that part of Count

IV which relates to UFX, be dismissed. This would result in the dismissal of Defendants Sterling

and UFX from this case, but Defendants Arsenault and Stern would remain subject to other

counts alleged in the Complaint.

Next, consistent with her finding in the Report on CFTC's Motion for Preliminary

Injunction, the Magistrate Judge found that UFX and QIX are not exempt counterparties under 7

U.S.C. § 2(c)(2)(B)(ii) and, as such, Defendants are subject to the provisions of the entire CEA

with respect to Phase II transactions. The Magistrate Judge also repeated her finding that the

CFTC has the authority to enforce all regulations existing at the time of the CFMA's enactment,

including regulations prohibiting off-exchange transactions and those governing principal/agent

and control person liability. Since QIX is not an entity exempted in any respect from the

jurisdictional reach of the CFTC, and since all existing statutes and regulations apply to the

activities of Defendants with respect to the transactions at issue in Phase II, the Magistrate Judge

recommended that the Motion to Dismiss Counts Two, Four and Five be denied.

7

The Magistrate Judge also rejected Defendants' argument that restitution is not an available avenue of relief in this case. The Magistrate concluded that the language, legislative history, and purpose of the CEA as well as the equitable powers of federal courts militate in favor of allowing the CFTC to seek restitution.

Finally, the Magistrate Judge recommended that Defendants' motion to dismiss or for a more definite statement with respect to the control person and principal/agent claims be denied. The Magistrate Judge found that the Amended Complaint contained sufficiently coherent and detailed factual allegations, concise statements of facts, and specific allegations against each Defendant.

3.    Report on the CFTC's Motion for Summary Judgment

In her Report on CFTC's Motion for Summary Judgment, the Magistrate Judge began her legal findings by repeating her recommendation that QIX was not an exempt counterparty under 7 U.S.C. § 2(c)(2)(B)(ii). The Magistrate Judge also repeated her finding that the CFTC has the authority to enforce all regulations existing at the time of the CFMA's enactment, including regulations prohibiting off-exchange transactions and those governing principal/agent and control person liability.

The Magistrate Judge went on to recommend that summary judgment should be denied as to Count Two. Count Two alleges that Defendants Graystone, STG, Arsenault, and QIX committed fraud and deceit in the offer and sale of off-exchange foreign currency options. Reviewing Eleventh Circuit cases on the CFTC's burden of establishing fraud as a matter of law, the Magistrate Judge concluded that the record was insufficient to conclude that the scripts and radio advertisements of Defendants were materially misleading as a matter of law.

8

Next, the Magistrate Judge recommended that summary judgment be granted as to liability on Count Five. Count Five alleges that Defendants STG, Graystone, QIX, Arsenault, and Stern violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.11(a) through the offer and sale of commodity options not conducted or executed on, or subject to the rules of a contract market or a foreign board of trade. The Magistrate Judge found that it was undisputed that STG, Graystone and QIX were soliciting, accepting funds for and offering to enter into foreign currency option transactions that were not traded on either a contract market or foreign board of trade. The Magistrate Judge further concluded that Defendants Arsenault and Stern were liable under the CEA's controlling person statute, 7 U.S.C. § 13(b), as they had the power and the ability to control the activities of their respective companies with respect to the decision to engage in off-exchange trading of foreign currency options.

Finally, the Magistrate Judge recommended that summary judgment be denied as to Count Four with respect to QIX and Stern. Count Four alleges that Defendants QIX and Stern violated 7 U.S.C. § 6h by falsely representing that QIX was a member of a registered entity and/or that QIX was a registrant under the Act. The Magistrate Judge found that there was considerable dispute regarding the inferences to be drawn from the representations in question.

       4.     Objections

Defendants present the following objections to the Magistrate Judge's Reports. First, Defendants argue that the Magistrate Judge erred in finding CFTC jurisdiction over QIX, Stern, and Arsenault. Defendants argue that QIX is exempt from the CFTC's forex jurisdiction as QIX falls within the "affiliated person" exemption of the CFMA. Defendants further argue that even if QIX were subject to the CFTC's forex jurisdiction, the CFTC's jurisdiction does not extend to

9

principal/agent and controlling person claims. Because QIX's only liability in Count II is premised on a principal/agent claim and Stern and Arsenault's liability is limited to controlling person claims in Counts IV and V, Defendants argue that these claims should be dismissed. Second, Defendants argue that the Magistrate Judge erred in finding a per se violation of 17 C.F.R. § 32.11(a) by QIX on the basis of QIX's supposed failure to qualify for the affiliated person exemption. Defendants argue that the CFMA does not grant the CFTC the authority to use regulations existing prior to the enactment of the CFMA - including § 32.11(a) - as part of its limited forex jurisdiction. Third, Defendants argue that the Magistrate Judge erred in granting summary judgment to the CFTC on its controlling person claims against Stern and Arsenault in Count V because the CFTC was required to show a "lack of good faith" to prove controlling person liability, and the Magistrate Judge acknowledged ample record evidence of Defendants' good faith. Finally, Defendants argue that the Magistrate Judge erred in finding that the CFTC has jurisdiction to recover restitution under 7 U.S.C. § 13a-1. Defendants argue that § 13a-1 does not mention restitution among the specific remedies it provides and the existence of the CEA's comprehensive enforcement scheme precludes the CFTC's authority to seek restitution under § 13a-1.

The CFTC presents a number of its own objections to the Magistrate Judge's Reports. First, the CFTC argues that the Magistrate Judge failed to accord proper <u>Chevron</u> deference to the CFTC's interpretation of the meaning of the term "futures contract" in the CEA. Second, the CFTC argues that the Magistrate Judge improperly relied on the Seventh Circuit's decision in <u>Zelener</u> in holding that the Phase I transactions were not futures contracts subject to the CFTC's jurisdiction. Third, the CFTC argues that, under either its preferred multi-factor approach or the

10

Zelener approach, the Phase I transactions were futures contracts covered by the CEA. Specifically, the CFTC argues that the transactions at issue were fungible and standardized, were not "spot sales for delivery within 48 hours," and provided for customer offset, contrary to the findings of the Magistrate Judge. Fourth, the CFTC urges the Court to adopt its multi-factor approach to defining a futures contract because it provides for more legal certainty regarding the CFTC's jurisdiction. Fifth, and finally, the CFTC argues that the Magistrate Judge erred in concluding that the jurisdictional question presented in Defendants' Motion to Dismiss is distinct from the Defendants' alleged fraud.

## II.    ANALYSIS

### A.    Regulatory Background

Initially, the only commodities regulated by Congress were certain grain futures transactions under the Grain Futures Act. In 1936, Congress renamed the Grain Futures Act the CEA, and expanded its coverage to include additional agricultural commodities.    Until 1974, forex transactions were not covered by the CEA. In 1974, the CEA was greatly expanded to cover, inter alia, trading in foreign currency. In addition, Congress created the CFTC, and granted it the power to investigate complaints, hold administrative hearings, order reparations, and seek injunctive relief.  See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 357-58 (1982); CFTC v. Next Fin. Serv. Unltd., Case No. 04-80562: (dkt # 85 at 11) (S.D. Fla. June 7, 2005). Based upon a concern expressed by the Treasury Department, however, coverage of foreign currency transactions was limited by a provision now known as "the Treasury Amendment." This amendment exempted from CFTC jurisdiction "transactions in foreign currency . . . unless such transactions involve the sale thereof for future delivery conducted on a

11

board of trade." <u>Next Fin. Serv.</u> at 8-9.

The CFTC took the position that the exemption should be narrowly construed and that it was not applicable to options contracts. In <u>Dunn v. CFTC</u>, 519 U.S. 469 (1997), the United States Supreme Court squarely rejected this position, holding that the phrase "transactions in foreign currency" included transactions in options to buy or sell foreign currency. The Court, however, did not address the meaning of the phrase "conducted on a board of trade," and the lower courts were split on the issue of whether this meant that only interbank transactions were exempt, or whether all off-exchange transactions were exempt. <u>CFTC v. G7 Advisory Serv., LLC</u>, 406 F. Supp. 2d 1289, 1294 (S.D. Fla. 2005) (Dimitrouleas, J.). The confusion was caused in part by the definition of "board of trade" as "any exchange or association, whether incorporated or unincorporated, of persons who are engaged in the business of buying or selling any commodity." <u>Id.</u>

In 2000, Congress enacted the CFMA with the stated purpose of "clarifying the jurisdiction of the [CFTC] over certain retail foreign exchange transactions." Judge Dimitrouleas explained the nature of this "clarified" jursidiction in <u>G7 Advisory Serv.</u>:

> The CFMA, as codified in Title 7, United States Code, § 2(c)(2)(B) grants the CFTC jurisdiction over all off-exchange foreign currency transactions involving noneligible contract participants unless the counterparties to the transactions are an entity enumerated in 7 U.S.C. § 2(c)(2)(B)(ii). The CFMA's listing of specified unregulated entities eliminated the need for judicial interpretation of the term "Board of Trade," which the CFMA redefined as "any organized exchange or other trading facility." 7 U.S.C. § 1a(2).

406 F. Supp. 2d at 1295

B.    Defendants' Objections

1.    Defendants object to the Magistrate Judge's finding that QIX does not qualify for the "affiliated person" exemption.

The CFMA grants the CFTC a limited grant of jurisdiction over foreign currency transactions: "[T]he Commission shall have jurisdiction over, an agreement, contract, or transaction in foreign currency that . . . is a contract of sale of a commodity for future delivery (or an option on such a contract) . . . and is offered to, or entered into with, a person that is not an eligible contract participant . . . ." 7 U.S.C. § 2(c)(2)(B).

There are several exemptions carved out of this limited grant of jurisdiction. The exemption relevant to this action concerns affiliated persons of registered futures commission merchants (FCMs). Under the terms of this exemption, the CFTC lacks jurisdiction over a transaction if "the counterparty, or the person offering to be the counterparty, of the person [offered to or entered into with] is . . . an affiliated person of a futures commission merchant registered under this Act, concerning the financial or securities activities of which the registered person makes and keeps records under . . . section 6f(c)(2)(B) of this Act." 7 U.S.C. § 2(c)(2)(B)(ii)(III).

Section 6f(c)(2)(B) provides:

The records required under subparagraph (A) shall describe, in the aggregate, each of the futures and other financial activities conducted by, and the customary sources of capital and funding of, those of its affiliated persons whose business activities are reasonably likely to have a material impact on the financial or operational condition of the futures commission merchant, including its adjusted net capital, its liquidity, or its ability to conduct or finance its operations.

7 U.S.C. § 6f(c)(2)(B). "Subparagraph (A)" (§ 6f(c)(2)(A)) provides in turn:

Each registered futures commission merchant shall obtain such information and

13

make and keep such records as the Commission, by rule or regulation, prescribes
concerning the registered futures commission merchant's policies, procedures, or
systems for monitoring and controlling financial and operational risks to it
resulting from the activities of any of its affiliated persons, other than a natural
person.

7 U.S.C. § 6f(c)(2)(A).

The Defendants argue that the analysis of the exemption ends with the language of §

6f(c)(2)(B).  That is, the making and keeping of records by a FCM on "the futures and other

financial activities conducted by, and the customary sources of capital and funding of" the

affiliated person perfects the exemption under § 2(c)(2)(B)(ii)(III).  As QIX Futures kept these

financial records on QIX's operations, under Defendants' reading of the exemption, QIX is

exempt from CFTC jurisdiction.

The Magistrate Judge interpreted the exemption differently. Under her reading of the

exemption, affiliated persons are only exempt if the FCM is required to keep records pursuant to

§ 6f(c)(2)(B).  The Magistrate Judge reasoned that when Congress referenced § 6f(c)(2)(B), it did

so for a reason, choosing the specific subpart of the CEA's statutory provision on Risk

Assessment for Holding Company Systems that expressly referred to "records required" to be

maintained pursuant to the CFTC's regulations.  Per the CFTC's regulations, only FCMs

possessing sufficient assets are required to keep records.  See 17 C.F.R. § 1.15(c)(1) ("any

futures commission merchant which holds funds or property of or for futures customers of less

than $6,250,000 and has less than $5,000,000 in adjusted net capital as of the futures commission

merchant's fiscal year-end" is not required to keep records).  Because it is undisputed that QIX

Futures does not meet the minimum capital requirements, it is not required to keep records

pursuant to 17 C.F.R. § 1.15(c)(1).  Accordingly, under the Magistrate Judge's interpretation,

14

QIX Future's affiliated person, QIX, is not subject to the exemption under § 2(c)(2)(B)(ii)(III). The Magistrate Judge found this interpretation of the exemption to be more in keeping with the spirit of the CFMA: "'Any registered FCM could skirt CFTC regulation merely by electing to keep records, thereby confounding the CFMA's purpose of making clear which off-exchange foreign currency transactions are subject to CFTC regulation.'" (dkt # 271 at 32 (quoting CFTC v. G7 Advisory Serv., LLC, 406 F. Supp. 2d 1289, 1297 (S.D. Fla. 2005)).)

The Court agrees with the Magistrate Judge's interpretation of the exemption under § 2(c)(2)(B)(ii)(III), and finds that QIX is not an "affiliated person" as set forth in that provision. The Court finds that Congress gave the CFTC the authority to limit the extent of the "affiliated person" exemption by explicitly tying it to a record-keeping requirement determined by the CFTC's own regulations.  Additionally, Defendants' interpretation would allow registered FCMs to avoid CFTC regulation at their discretion, "thereby confounding the CFMA's purpose of making clear which off-exchange foreign currency transactions are subject to CFTC regulation." G7 Advisory Serv., 406 F. Supp. 2d at 1297; accord CFTC v. First Int'l Group, Inc., 06-20979-CIV-JORDAN (S.D. Fla. Jan. 5, 2007) (dkt # 34 at 6); CFTC v. Next Fin. Serv. Unltd., 04-80562-CIV-RYSKAMP (S.D. Fla. June 7, 2005) (dkt # 85 at 15-16).

> 2.    Defendants object to the Magistrate Judge's finding that the CFTC has jurisdiction to assert principal/agent claims against QIX and control person claims against Stern and Arsenault and therefore object to the Magistrate's recommendation that Defendants' Motion to Dismiss as to Counts Two, parts of Count Four, and Count Five should be denied.

Section 2(c)(2)(C) of the CFMA provides:

Notwithstanding subclauses (II) and (III) of subparagraph (B)(ii), agreements, contracts, or transactions described in subparagraph (B) shall be subject to 7 USCS §§ 6b, 6c(b), 9, 15, and 13b (to the extent that sections 7 USCS §§ 9, 15,

> and 13b prohibit manipulation of the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any market), 7 USCS §§ 13a-1, 13a-2, 12(a) if they are entered into by a futures commission merchant or an affiliate of a futures commission merchant that is not also an entity described in subparagraph (B)(ii) of this paragraph.

7 U.S.C. § 2(c)(2)(C). Defendants argue that the CFTC's forex jurisdiction is limited to those sections of the CEA listed in § 2(c)(2)(C). More specifically, Defendants argue that Congress intentionally omitted the provisions the CFTC relies on to assert its principal/agent and control person claims - 7 U.S.C. §§ 2(a)(1)(B) and 13c(b) - from the list of provisions of the CEA expressly incorporated by § 2(c)(2)(C). Under Defendants' argument, because the CFMA did not expressly incorporate these sections, the CFTC lacks jurisdiction to pursue principal/agent and control person claims.

The Magistrate Judge rejected Defendants' arguments because "[i]t is manifestly clear that by enacting the CFMA, Congress intended the CFTC to assert the entirety of its jurisdiction, and all of its existing regulations, over foreign currency transactions, with respect to all entities except for those specifically excluded under 7 U.S.C. § 2(c)(2)(B)(ii)." (dkt # 271 at 35.)

This Court concurs with the Magistrate Judge. As an initial matter, the CFTC is not seeking to impose liability pursuant to § 2(c)(2)(C). Section 2(c)(2)(C) is invoked only if QIX qualifies as a proper counterparty, which it does not. Accordingly, the foreign currency options transactions entered into by QIX are subject to all provisions of the CEA. Accord CFTC v. Valko, 06-60001-CIV-DIMITROULEAS (S.D. Fla. Mar. 12, 2007), (dkt # 129 at 8-9). Further, Defendants' interpretation would render provisions of the CEA redundant or meaningless in contradiction of basic principles of statutory interpretation.   As expressed by Judge Dimitrouleas:

16

if § 2(c)(2)(C) is interpreted as restricting CFTC jurisdiction over off-exchange foreign currency transactions to only those provisions listed in § 2(c)(2)(C), that section would render superfluous § 2(c)(2)(B) which grants the CFTC jurisdiction to enforce the entire CEA in off-exchange foreign currency transactions unless the counterparty fits one of the enumerated exemptions. Thus, if Defendants' reading of the statute–as restricting CFTC jurisdiction to the specific sections listed in § 2(c)(2)(C)–were correct, it would leave § 2(c)(2)(B) meaningless. If, however, § 2(c)(2)(C) is interpreted as reserving CFTC jurisdiction over retail foreign currency transactions between a non-eligible contract participant and an FCM or affiliate of an FCM, both sections can be given their full effect.

CFTC v. Valko, at 9 (internal citations omitted). Accordingly, the Court finds that the CFTC has

jurisdiction to assert principal/agent and control person claims under 7 U.S.C. §§ 2(a)(1)(B) and

13c(b). Therefore, Defendants' Motion to Dismiss as to Counts Two, Four, and Five is denied.

> 3. Defendants object to the Magistrate Judge's finding that Summary Judgment should be granted as to Count Five.

Section 6c(b) of the CEA provides that "no person shall offer to enter into or confirm the

execution of, any transaction involving any commodity regulated under this Act which is of the

character of, or is commonly known to the trade as, an 'option,' contrary to any rule, regulation

or order of the Commission prohibiting any such transaction." 7 U.S.C. § 6c(b). CFTC

Regulation 32.11(a), 17 C.F.R. § 32.11(a), states that it is unlawful for any person to solicit or

accept orders for the purchase or sale of any commodity option, except for commodity option

transactions conducted or executed on or subject to the rules of a contract market.

Defendants argue that at the time of the enactment of § 32.11 through its most recent

amendment in 1988, the regulation never applied to forex transactions. Defendants further argue

that nothing in the CFMA gives the CFTC authority to use § 32.11 as part of its new, limited

forex jurisdiction. Thus, Defendants contend, there is no basis for the CFTC to enforce § 32.11

against Defendants. Defendants also argue that Congress could have explicitly made old

17

regulations applicable to the CFMA and enforceable under the § 4c(b) as it did in § 2(h).  Section

2(h) exempts certain transactions between eligible commercial entities from the CFMA, but

makes this exemption "subject to ...the regulations of the Commission pursuant to section 6c(b)

of this title proscribing fraud in connection with commodity option transactions to the extent the

agreement, contract, or transaction would otherwise be subject to such sections and regulations."

7 U.S.C. § 2(h)(4)(B).  Finally, Defendants, relying on the testimony of a former National

Futures Association employee, argue that § 32.11 has never applied to forex options transactions.

The Magistrate Judge found that § 32.11 applies to off-exchange foreign currency

transactions because Congress took no affirmative act to deprive § 32.11 of its effect with respect

to forex transactions.  The Magistrate Judge reasoned that holding that the CFTC lacks the

authority to enforce § 32.11 would be contrary to the CFMA's purpose of clarifying, not

revoking, the CFTC's authority to regulate off-exchange foreign currency transactions.  "It is

manifestly clear that by enacting the CFMA, Congress intended the CFTC to assert the entirety of

its jurisdiction, and all of its existing regulations, over foreign currency transactions, with respect

to all entities except for those specifically excluded under 7 U.S.C. § 2(c)(2)(B)(ii)."  (dkt # 270

at 50.)

The Court concurs with the finding of the Magistrate Judge.  The Defendants' argument

that § 32.11 never applied to forex transactions prior to the enactment of the CFMA is inaccurate.

Defendants overlook the Treasury Amendment's legislative history, as well as judicial

interpretations thereof, which indicate that Congress intended to regulate off-exchange foreign

currency transactions not involving banks or sophisticated individuals.  See CFTC v. Next Fin.

Serv. Unltd., 04-80562-CIV-RYSKAMP (S.D. Fla. June 7, 2005) (dkt # 85 at 17).

18

Defendants' argument regarding §§ 2(h) and 6c(b) is also flawed as it relies on a limited interpretation of § 6c(b) as an enabling statute allowing the CFTC to promulgate new regulations and ignores the language in the provision incorporating existing regulations: "No person shall offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this chapter . . . contrary to any rule, regulation or order of the Commission prohibiting any such transaction . . . ." 7 U.S.C. § 6c(b). Section 32.11 was in effect prior to the enactment of the CFMA, which left section § 32.11 unaltered. Whereas Congress took no affirmative act to deprive § 32.11 of effect insofar as it relates to off-exchange foreign currency transactions, § 32.11 governs Defendants' conduct. Accord Next Fin. Servs. at 18. Therefore, as it is undisputed that STG, Graystone, and QIX were soliciting, accepting funds for and offering to enter into foreign currency option transactions that were not traded on either a contract market or foreign board of trade, this Court finds that STG, Graystone, and QIX violated § 32.11.

Defendants further contest, however, that Defendants Arsenault and Stern were not controlling persons with respect to this violation. The control person liability statute of the CEA provides:

> Any person who, directly or indirectly, controls any person who has violated any provision of this Act or any of the rules, regulations, or orders issued pursuant to this Act may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.

7 U.S.C. § 13c(b). A controlling person is liable under 13c(b) if he had "'actual or constructive knowledge of the core activities that constitute the violations at issue and allowed them to

continue.'" Commodity Futures Trading Comm'n v. Commonwealth Fin. Group, 874 F. Supp.

1345, 1357 (S.D. Fla. 1994) (quoting In re Matter of Spiegel, [1987-1990 Transfer Binder]

Comm. Fut. L. Rep (CCH) P 24,103 at 34,767 (CFTC Jan. 12, 1988)).

Defendants argue that the Magistrate Judge improperly granted summary judgment

against Stern and Arsenault as to Count V, because a finding of good faith necessarily destroys a

controlling person claim. (dkt # 278 at 20-21.) Defendants' argument rests on a misreading of §

13c(b). The statute is disjunctive and clearly states that the CFTC satisfies its burden of poof by

demonstrating either that the controlling person did not act in good faith or that the controlling

person knowingly induced the acts constituting the violation. Defendants cite to Donohoe v.

Consolidated Operating & Production Corp., 30 F.3d 907, 912 (7th Cir. 1994) to support their

proposition that "good faith" is a long-recognized defense to controlling person liability. (dkt #

278 at 20). However, Donohoe is distinguishable as it concerns the application of the good faith

defense to the federal securities laws. Defendants do not cite any authority supporting the use of

a good faith defense to the CEA's controlling person provision.

Further, Defendants do not contest the Magistrate Judge's findings that Stern and

Arsenault knowingly induced the offer and sale of options in violation of § 4c(b) of the CEA and

CFTC Regulation 32.11(a), except to make the conclusory statement that "Andy Stern's good

faith, and total lack of knowledge of any purported violation (which Joe Arsenault is a

beneficiary of), is a matter of record." This argument is soundly contradicted by the evidence.

As stated by the Magistrate Judge:

> it is clear that both Arsenault and Stern had the power and the ability to control
> the activities of their respective companies with respect to the decision to engage
> in off-exchange trading of foreign currency options. Neither Arsenault nor Stern

appear to challenge their control in this respect. Arsenault has not disputed his extensive involvement and control over the operations of STG and Graystone, challenging only the fact that he was aware of any fraud or misrepresentations, and contending that he took extensive steps to eliminate such abuses. Stern disputes his control over the day-to-day operations, but does not appear to dispute his ultimate decision-making authority to control the type of business in which QIX engaged, or that he is the person who established QIX for the purpose of engaging in off-exchange foreign currency transactions.

(dkt # 273 at 52.)  Therefore, Arsenault and Stern were controlling persons, and violated §

13c(b).  Accordingly, CFTC's Motion for Summary Judgment as to liability on Count V is

granted.

> 4.    Defendants object to the Magistrate Judge's finding that the CFTC has jurisdiction to seek restitution under 7 U.S.C. § 13a-1.

Title 7, United States Code, Section 13a-1 governs the scope of relief that the CFTC may

seek in an action brought in federal court.  Section 13a-1 authorizes the CFTC to seek injunctive

relief, compliance orders, and civil penalties.  Defendants contend that this relief is not available

because the statute does not specifically authorize the CFTC to seek restitution.  Defendants

argue in support of their position by contrasting § 13a-1 with the statute governing available

remedies in administrative proceedings convened by the CFTC - 7 U.S.C. §§ 9 and 15 - which

expressly authorizes the CFTC to seek restitution.  Defendants further argue that the CEA

already gives customers comprehensive rights to recover their losses and specific procedures

governing those rights that are not found in § 13a-1.  Defendants argue that the lack of a statute

of limitations for seeking remedies under § 13a-1, as well as the absence of any regulations

prescribing standards of proof and procedures for collecting and distributing restitution to

customers, also counsels against reading the ability to seek restitution into § 13a-1.

In CFTC v. E-Metal Merchants, Inc., the Court rejected an analogous argument, holding

that restitution is an available remedy.

> [D]istrict courts are authorized to order restitution on the basis of the language, legislative history, and purpose of the [CEA] as well as pursuant to the equitable powers of federal courts. . . First, the language of the [CEA] does not expressly limit the equitable powers of district courts. See, e.g., 7 U.S.C. §13a-1. The U.S. Supreme Court has taught that "[u]nless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction. And [when] the public interest is involved in a proceeding of [an equitable] nature, those equitable powers assume an even broader and more flexible character." Porter v. Warner Holding Co., 328 U.S. 395, 398 (1946). . . . Next, the [CEA] expressly authorizes the issuance of restraining orders that prohibit the dissipation or disposal of assets, funds, or other property. See 7 U.S.C. § 13a-1. The legislative history of the [CEA] explains that it was the intent of Congress that restraining orders would enable the CFTC to seek restitution for customers. See H.R. Rep. 97-565, pt. 1, at 93, reprinted in 1982 U.S.C.C.A.N. 3871, 3942. Specifically, the House Report explains that Section 13a-1 empowers courts to issue ex parte restraining orders and "such power is provided . . . to prohibit movement or disposal of funds, assets, and other property which may be subject to lawful claims of customers." Id. (emphasis added). Last, the Court finds that Plaintiff is seeking restitution in equity, that is, it commenced this action in order to restore to [Defendants'] customers particular funds or property in the possession of the Defendants. See Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 213-18 (2002). Thus, its equitable powers having been invoked, the Court finds that it may exercise the full range of those powers. . . . Consequently, the Court concludes that the CEA authorizes the CFTC to seek and this Court to order both disgorgement and restitution.

No. 05-21571-CIV-LENARD (dkt # 60 at 17-18) (S.D. Fla. Jan. 6, 2006)(footnotes omitted).

The Court's reasoning in E-Metal remains sound.  Accordingly, the Court finds that the CFTC has the authority to seek restitution under 7 U.S.C. § 13a-1.  However, restitution must be limited to the amount of Defendants' unjust enrichment, and therefore may not be measured by customer losses. Commodity Futures Trading Comm'n v. Wilshire Inv. Mgmt. Corp., 531 F.3d 1339, 1345 (11th Cir. 2008).

C.       Plaintiff's Objections

1.       Plaintiff objects to the Magistrate Judge's finding that the CFTC does not
         have jurisdiction over the Phase I transactions and that Defendants'
         Motion to Dismiss as to Counts I, II, and the part of Count IV pertaining
         to UFX should be granted.

        a.       Zelener is the appropriate standard for determining
                 whether a forex transaction is a "futures contract"

Under the CEA, the CFTC may exercise its jurisdiction over futures contracts, or

"transactions involving contracts of sale of a commodity for future delivery." 7 U.S.C. §

2(a)(1)(A). There are two competing methodologies for determining whether a forex transaction

is a "futures contract" such that the CFTC has jurisdiction over the transaction.  On the one hand

is the multi-factor, or "totality of the circumstances," approach set forth in CFTC v. Co Petro

Mktg. Group, Inc., 680 F.2d 573, 577-81 (9th Cir. 1982).  This is the approach advocated by the

CFTC.  A different approach is set forth in United States v. Zelener, 373 F.3d 861 (7th Cir.

2004).  Under Zelener, a forex transaction is a futures contract if it is a "fungible promise to buy

or sell a particular commodity at a fixed date in the future."  Id. at 864.  This is the approach

advocated by Defendants.

        In Co Petro, the Ninth Circuit determined whether contracts for the future purchase of

petroleum products offered by Co Petro were futures contracts subject to the CFTC's

jurisdiction. The court highlighted three principal features of the contracts in finding that they

were not futures contracts: (1) most of Co Petro's customers were "speculators from the general

public;" (2) the commodity underlying the transactions had no inherent value to most of Co

Petro's customers; and (3) Co Petro's customers "had neither the intention of taking delivery nor

the capacity to do so." 680 F.2d at 578.  The court in CFTC v. Midland Rare Coin Exchange,

Inc., 71 F. Supp. 2d 1257, 1262 (S.D. Fla. 1999) listed a similar set of factors as useful in

distinguishing futures contracts from other contracts (in this case cash forward transactions).

These factors include:

> (1) whether the seller of the contracts entered into these contracts only with
> producers and not with speculators from the general public; (2) whether the buyers
> and sellers had the ability to take or make delivery on the contracts; (3) whether
> the seller relied on actual delivery of the commodity to carry out its business; (4)
> whether the contracts were clearly tools to accomplish the actual delivery of the
> commodity in exchange for money; (5) whether delivery and payment routinely
> occurred between the parties in past dealings; and (6) whether the seller received
> cash payment on the contracts only upon delivery of the actual commodity.

As noted in CFTC v. Madison Forex Int'l, LLC, "at their core, these factors ultimately

focus on whether 'the parties contemplated physical delivery' of the commodity." 2006 U.S.

Dist. LEXIS 96294, *19 (S.D. Fla. July 20, 2006).

In Zelener, the Seventh Circuit advanced a different method for determining whether a

forex transaction is a futures contract. The transactions at issue in Zelener are very similar to the

transactions in the instant case:

> Two corporations doing business as "British Capital Group" or BCG solicited
> customers' orders for foreign currency. . . . Each customer opened an account
> with BCG and another with AlaronFX; the documents made it clear that
> AlaronFX would be the source of all currency bought or sold through BCG in this
> program, and that AlaronFX would act as a principal. A customer could purchase
> (go long) or sell (short) any currency; for simplicity we limit our illustrations to
> long positions. The customer specified the desired quantity, with a minimum
> order size of $5,000; the contract called for settlement within 48 hours. It is
> agreed, however, that few of BCG's customers paid in full within that time, and
> that none took delivery. AlaronFX could have reversed the transactions and
> charged (or credited) customers with the difference in price across those two days.
> Instead, however, AlaronFX rolled the transactions forward two days at a time-as
> the AlaronFX contract permits, and as BCG told the customers would occur.
> Successive extensions meant that a customer had an open position in foreign
> currency. If the dollar appreciated relative to that currency, the customer could
> close the position and reap the profit in one of two ways: take delivery of the

currency (AlaronFX promised to make a wire transfer on demand), or sell an equal amount of currency back to AlaronFX. If, however, the dollar fell relative to the other currency, then the client suffered a loss when the position was closed by selling currency back to AlaronFX.

373 F.3d at 863.

The district court dismissed the action for lack of CFTC subject matter jurisdiction, finding that BCG's customers were speculating in spot contracts by rolling over their positions and entering into offsetting trades. CFTC v. Zelener, 2003 U.S. Dist. LEXIS 17660 at *14 (N.D. Ill. Oct. 3, 2003). The CFTC appealed, arguing that, under the multi-factor "totality of the circumstances" analysis, the transactions were futures contracts as the currency was sold for speculative purposes to individuals for whom foreign currency had no inherent value and there was no contemplation of physical delivery of the foreign currency.

The Seventh Circuit affirmed the district court's dismissal and, in the process, rejected the "totality of the circumstances" test. The Court held that the determination must be based on an analysis of the contract, rather than the intention of the parties or whether the contracts ultimately led to delivery:

In organized futures markets, people buy and sell contracts, not commodities. Terms are standardized, and each party's obligation runs to an intermediary, the clearing corporation. Clearing houses eliminate counterparty credit risk. Standard terms and an absence of counterparty-specific risk make the contracts fungible, which in turn makes it possible to close a position by buying an offsetting contract. All contracts that expire in a given month are identical; each calls for delivery of the same commodity in the same place at the same time. Forward and spot contracts, by contrast, call for sale of the commodity; no one deals "in the contract: it is not possible to close a position by buying a traded offset, because promises are not fungible; delivery is idiosyncratic rather than centralized. Co Petro, the case that invented the multi-factor approach, dealt with a fungible contract, see 680 F.2d at 579-81, and trading did occur "in the contract." That should have been enough to resolve the case.

25

It is essential to know beforehand whether a contract is a futures or a forward. The answer determines who, if anyone, may enter into such a contract, and where trading may occur. Contracts allocate price risk, and they fail in that office if it can't be known until years after the fact whether a given contract was lawful. Nothing is worse than an approach that asks what the parties "intended" or that scrutinizes the percentage of contracts that led to delivery ex post. . . . But reading "contract of sale of a commodity for future delivery" with an emphasis on "contract," and "sale of any cash commodity for deferred shipment or delivery" with an emphasis on "sale" nicely separates the domains of futures from other transactions.

Id. at 866.  Thus, the Seventh Circuit concluded that the language of the account opening

documents[3] - nearly identical to the language in the documents for the transactions in the instant

_____

[3]        The Zelener Court described the account opening documents as follows:

Paragraph 8 provides that if a customer's account contains "two or more open and opposite Contracts providing . . . for the purchase and sale of the same Foreign Currency . . . on the same Value Date, such Contracts shall automatically be canceled and replaced by an obligation to settle only the net difference." So far, so good; offset is a standard feature of trading in the contract on a futures market. But the question we posed in Nagel is whether the dealer has promised to sell the offsetting position, and thus allow netting on demand. Such an obligation is harder to find in the AlaronFX contract.

Paragraph 9, on which the Commission places its principal reliance, does not contain any promise. What it says instead is that, if the client fails to give timely instructions about the disposition of the positions, then "AlaronFX is authorized, in AlaronFX's sole discretion, to deliver, roll over or offset all or any portion of the Open Position in Customer's Account at Customer's risk." This paragraph does not give the client a right to purchase an offsetting position and thus close a transaction; that option belongs to AlaronFX rather than to the customer. As for ¶ 5: subsection 5.3 says that "AlaronFX will attempt to execute all Orders that it may, in its sole discretion, accept from Customer in accordance with Customer's instructions . . . ." That's not a promise to close any given position by offset. This subsection continues: "AlaronFX or its affiliates may, at a future date, establish a trade matching system . . . . In that event, AlaronFX . . . shall have the right (but not the obligation) . . . to act for its own account, and as a counter party or as a broker to AlaronFX customers, in the making of markets." The Commission does not contend that such a "trade matching system" was ever established. Customers thus had no assurance that they could close their positions by offset. The only promise was that, if AlaronFX did not buy back the currency (and thus create an offset under ¶ 8), it would deliver. This looks more like

26

case - did not provide for the automatic right to offset and thus were non-fungible spot sales not subject to the jurisdiction of the CFTC. Id. at 869.

The Magistrate Judge, following the reasoning and the holding of Zelener, concluded that the Phase I transactions at issue in this case were also non-fungible spot transactions not subject to the jurisdiction of the CFTC. This Court agrees. In its Objections, the CFTC argues that the Magistrate Judge incorrectly applied the Zelener approach "by both ignoring or failing to give appropriate weight to contract language, and additionally by relying extensively on the testimony from defendant Andrew Stern to support the Magistrate Court's conclusion that the UFX and Sterling transactions were not futures contracts." (dkt # 279 at 22.) The CFTC argues throughout its objections that Stern's testimony constitutes impermissible post hoc evidence under Zelener, as it is outside the terms of the contracts and account statements. The CFTC further objects to the Reports on the grounds that the Magistrate Judge improperly suggests that, under Zelener, both fungibility and contractual right to offset are necessary to find that a transaction constitutes a futures contract. The CFTC also objects to the Magistrate Judge's factual findings: specifically, that the contracts were unique in amount of currency and timing, that the transactions were spot sales for delivery within 48 hours, and that the terms and

the business of a wholesaler in commodities such as metals or rare coins than like the system of trading in fungible contracts that characterizes futures exchanges.

373 F.3d at 868.

27

conditions of the UFX's contracts did not provide the right for customer offset.[4]

This Court finds the CFTC's Objections to be without merit. There is no support for the CFTC's argument that the <u>Zelener</u> standard forbids an examination of facts outside of the contractual obligations. As the Defendants note in their Reply to the CFTC's Objections, the Seventh Circuit in <u>Zelener</u> explicitly relied on post hoc evidence beyond the face of the transaction documents in making its findings. <u>See Zelener</u> 373 F.3d at 864 (finding that few of BCG's customers paid in full during two-day period or took delivery and that AlaronFX rolled the transactions forward two days at a time). Additionally, there is no support for the CFTC's objection that the Magistrate Judge improperly suggested that a finding of fungibility and the contractual right to offset are both required in order for a transaction to be a futures contract. The CFTC does not cite to any portion of the Reports where the Magistrate suggested that both findings were necessary for a transaction to be a futures contract. Additionally, the Magistrate found that the transactions were both non-fungible and did not include a contractual right to offset. Thus, it is unclear on what grounds the CFTC is formulating its objection.

The CFTC's factual objections as to the Phase I transactions are also unpersuasive. The Magistrate Judge found that the Phase I transactions were spot transactions outside the jurisdiction of the CFTC. In support of this finding, the Magistrate Judge relied on the following facts: (1) the account documents, like those in <u>Zelener</u>, clearly advised the customers that the

---

[4]     The CFTC filed an attachment to its Objections consisting of nine pages of additional objections in bullet-point form. The objections contained in the attachment purport to relate to the "Magistrate Court's Findings of Fact." The majority of the objections contained in the attachment simply repeat objections the CFTC has already made. The other objections in the attachment contest various findings of fact by the Magistrate Judge as "irrelevant." This is not a valid basis for an objection and the CFTC does not cite any law in support of these objections. Accordingly, this Court need not consider the attachment in ruling on the CFTC's Objections.

transactions were spot transactions and there was no absolute right to offset; (2) like the

transactions in Zelener, the Phase I transactions were, in form, spot sales for delivery within 48

hours; and (3) the contracts were unique in the amount of currency and in timing.

The factual findings of the Magistrate Judge are well-supported by the Record. A plain

reading of the account documents indicates that the right to offset rested with UFX and not the

customer. The Phase I transaction account documents state that if the client fails to give timely

instructions about the disposition of the positions, then "UFX is authorized, at UFX's sole

discretion, to deliver, rollover or offset all or any portion of the Currency positions in the OTCFX

account(s) for Trader's Account(s) and at Trader's risk.: (See dkt # 271 at 14.) In Zelener, the

Seventh Circuit held that nearly identical contract language did not give the customer an absolute

right to offset. See 373 F.3d at 868. Additional language in the Phase I transaction documents

reinforces the Magistrate Judge's finding that the customer did not have an absolute right to

offset its transactions: "UFX will attempt to execute all orders, which it may, in its sole

discretion, choose to accept in accordance with the oral or written, or computer instructions of

Trader's. UFX reserves the right to refuse to accept any order." (Id.) The CFTC attempts to

argue that language in the account documents referencing "round turn lots" implies a promise by

UFX to offset transactions. However, the contract language recited above is clear - the right to

offset rests with UFX, not the customer. This Court will not read an ambiguity into the contract

language that does not exist. Similarly unavailing is the CFTC's argument regarding language in

the contract referring to the customer's right to "speculate and/or purchase and/or sell cash or

spot foreign currency." The CFTC claims that the only reasonable interpretation of this language

is that UFX is promising the customer a right to offset. Again, in light of the clear contract

29

language reserving the right to offset in UFX, the CFTC's attempt to read in an ambiguity is unreasonable.

The evidence also supports the Magistrate Judge's finding that the Phase I transactions were, in form, spot sales for delivery within 48 hours. Defendant Stern testified that UFX used the industry custom of 48 hours as the time between the opening of the transaction and the settlement date. The CFTC objects to the Magistrate Judge's finding by pointing to evidence that customer positions were often left open for several weeks. However, in <u>Zelener</u>, "the contract called for settlement within 48 hours" even though "few of BCG's customers paid in full within that time, and. . . none took delivery." 373 F.3d at 863. Moreover, the key consideration in determining whether the transactions were futures contracts is their fungibility. As the Seventh Circuit in <u>Zelener</u> held, "Rollover, and the magnification of gain or loss over a longer period, does not turn sales into futures contracts . . . ." <u>Id.</u> at 868.

Finally, this Court concurs with the Magistrate Judge's finding that the Phase I transations were unique in the amount of currency and in timing. Although UFX's trading platform only permitted foreign currency transactions in hundred thousand dollar increments, if orders were placed by telephone, the orders could be for any amount of currency. Additionally, although Sterling traded for its customers in hundred thousand dollar increments, other introducing brokers chose different amounts. The CFTC argues that the transactions introduced by Sterling were all for $100,000. However, other brokers besides Sterling introduced trades to UFX. Accordingly, the amount of currency traded was not standardized inasmuch as the tradable amount was not fixed, not governed by any binding rule of standardization, and ultimately a matter within UFX's discretion. However, even if trading increments were standardized, this

30

Court would still find that the trades at issue were not futures trades because of the other factors militating in favor of such a finding, primarily the absence of an obligation by UFX to accept an offsetting trade.

Regarding timing, because currency could be purchased 365 days a year and the settlement date was set for 48 hours after purchase, settlement dates varied from transaction to transaction depending on the day and hour of purchase. This differs from futures contracts where "[a]ll contracts that expire in a given month are identical; each calls for delivery of the same commodity in the same place at the same time." Id. at 866. Thus, both the amount of currency and the timing of the Phase I transactions were idiosyncratic - i.e., non-fungible - and therefore consistent with the nature of spot transactions.

All of these findings, individually and collectively, support the conclusion that the Phase I transactions were spot sales, not futures contracts. Accordingly, Counts I and III of the Complaint, as well as that part of Count IV which relates to UFX, are dismissed. This results in the dismissal of Defendants Sterling and UFX from this case.

> b.    The CFTC's interpretation of "futures contract" is not entitled to Chevron deference.

The CFTC also objects to the Magistrate Judge's Reports because the Magistrate Judge failed to accord its interpretation of the term "futures contract" proper deference as required by Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837 (1984). Under the CFTC's interpretation, a "totality of the circumstances" standard - and not the Zelener "fungibility" standard - is the proper method for determining whether a transaction is a futures contract.

"When an agency interprets a statute that the agency is responsible for administering,

courts must give the agency's interpretation due deference if (1) Congress has delegated interpretive authority to the agency, (2) the statute is silent or ambiguous with respect to the issue at hand, and (3) the agency's interpretation of the statute is reasonable." Sierra Club, Inc. v. Leavitt, 488 F.3d 904, 911-12 (11th Cir. 2007) (citing Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837 (1984) and United States v. Mead Corp., 533 U.S. 218 (2001)).  Further, "Chevron deference is confined to those instances in which the agency renders its interpretation in the course of a rulemaking proceeding or adjudication." TVA v. Whitman, 336 F.3d 1236, 1250 (11th Cir. 2003).  However, even if an agency's interpretation of its own statute is advanced in the course of litigation rather than through a rulemaking or agency adjudication, courts will still pay some deference to the agency's interpretation. Id.

The Magistrate Judge did not expressly hold that the CFTC's interpretation of "futures contract" was not entitled to Chevron deference.[5]  However, in accepting the Seventh Circuit's approach to defining futures contracts in United States v. Zelener, 373 F.3d 861 (7th Cir. 2004), the Magistrate Judge noted that the Zelener court found "that the CFTC's position was not entitled to deference under Chevron . . . since Congress had not delegated this determination to the CFTC." (dkt # 270 at 55.)

This Court finds that, consistent with the Magistrate Judge's Reports, the CFTC's interpretation is not entitled to Chevron deference.  The Court agrees with the Seventh Circuit that Congress has not delegated the CFTC the authority to define "futures contract." See Zelener,

---

[5]       The dearth of Chevron analysis in the Reports is likely attributable to the failure of the CFTC to raise the argument until its Objections except for a brief footnote in its Motion for Preliminary Injunction and a Notice of Filing of Supplemental Authority (dkt # 235) filed two years after its first principal brief.

373 F.3d at 867; see also CFTC v. Erskine, 512 F.3d 309, 314 (6th Cir. 2008). Additionally, this Court agrees with the Sixth Circuit in Erskine that, because the CFTC has never defined "futures contract" in a rule-making or adjudication, its interpretation lacks the "administrative formality" entitled to Chevron deference. Id.

In Zelener, Judge Easterbrook found that Congress had not delegated authority to the CFTC to define a "futures contract":

> [T]he central point is that deference depends on delegation. See United States v. Mead Corp., 533 U.S. 218, 150 L. Ed. 2d 292, 121 S. Ct. 2164 (2001). When Congress has told an agency to resolve a problem, then courts must accept the answer. When, however, the problem is to be resolved by the courts in litigation - which is how this comes before us - the agency does not receive deference. Adams Fruit Co. v. Barrett, 494 U.S. 638, 649-50, 108 L. Ed. 2d 585, 110 S. Ct. 1384 (1990). Courts must heed the agency's reasoning and give it the benefit of the doubt. But the CFTC has avoided rather than addressed the central issue: is trading "in the contract" a defining characteristic? The agency has assumed a negative answer without explanation. In Nagel, Chicago Mercantile Exchange, and other decisions, this circuit addressed the subject without extending Chevron deference to the Commission; we adhere to that position today.

373 F.3d at 867. This Court agrees with Judge Easterbrook that Congress has not delegated authority to the CFTC to interpret the term "futures contract." The Supreme Court has instructed that delegation requires "specific interpretive authority," which may be express or implied, "to implement a particular provision or fill a particular gap." Mead, 533 U.S. at 229. The CFTC points to no "particular provision" under the Modernization Act or any other delegated authority to define "futures contracts" with respect to forex.

Moreover, even if the CFTC has such authority, this Court also finds that the CFTC's interpretation is not entitled to Chevron deference. The CFTC has not exercised such authority in the course of a rulemaking proceeding or adjudication in a manner that supports Chevron

deference as to the use of a multi-factor "totality of the circumstances" test under the circumstances at issue. <u>Accord</u> <u>Erskine</u>, 512 F.3d at 314 (the CFTC "has merely asserted its preferred definition during the course of litigation (and in a proposal to Congress for new legislation). This approach does not result in a definition entitled to <u>Chevron</u> deference."). The CFTC argues that for twenty-five years, it has exercised its APA rule-making authority to develop its interpretation of futures contracts. The Court disagrees. The "hybrid" and "swap" rules the CFTC purports to rely on predate the CFMA by over a decade and have nothing to do with forex or the CFMA, and establish no formal methodology for defining futures. The ALJ appeals cited by the CFTC are also not entitled to <u>Chevron</u> deference. As stated by Defendants in their Reply to the CFTC's Objections, "[t]hese appeals, dating from the 1970's and 1980's, precede by decades the Modernization Act and the <u>Zelener</u> Court's analysis. Far from articulating the formal adoption of an approach to determining futures contracts in the context at issue, these ALJ opinions are fact-specific reviews relating, like <u>Mead</u>, to 'transactions of the moment.'" (dkt # 284 at 13.) Therefore, this Court finds that the CFTC has not defined "futures contract" in a rule-making or adjudication context sufficiently specific to entitle the CFTC to <u>Chevron</u> deference as to the multi-factor "totality of the circumstances" test that the CFTC advocates under the present circumstances.

2.   Plaintiff objects to the Magistrate Judge's finding that Defendants' challenge to the CFTC's jurisdiction over the Phase I transactions does not directly implicate the merits of their claim.

In her Report on Defendants' Motion to Dismiss, the Magistrate Judge rejected the CFTC's argument that the jurisdictional challenge directly implicates the merits of their claim, and therefore this Court must apply the summary judgment standard in evaluating its jurisdiction.

34

(dkt # 271 at 11.)  The CFTC argues that the jurisdictional issue in this case and the issue of whether the Defendants engaged in fraud are inextricably intertwined; i.e., "both the Commission's jurisdiction, and the merits of the claims in the Amended Complaint, necessarily involve the question of the proper definitional standard to determine whether the Universal FX transactions are futures contracts."  (dkt # 279 at 1.)

This Court agrees with the finding of the Magistrate Judge.  As noted by the Magistrate Judge, whether the CFTC has jurisdiction over the Phase I transactions is not at all affected by whether Defendants committed the fraudulent practices alleged in the Amended Complaint.  A number of courts in this district have made the same finding.  See CFTC v. Madison Forex Int'l., 2006 U.S. Dist. LEXIS 96294, *6 n.1 (S.D. Fla. July 19, 2006); CFTC v. Next Fin. Serv., Unltd., 04-80562-CIV-RYSKAMP, (dkt # 85 at 9-10) (S.D. Fla. June 7, 2005).

## III.   CONCLUSION

Accordingly, it is hereby

ORDERED AND ADJUDGED that Plaintiff's Motion for Preliminary Injunction (dkt # 3) is DENIED.  It is further

ORDERED AND ADJUDGED that Defendants' Motion to Dismiss (dkt # 159) is GRANTED IN PART AND DENIED IN PART.  The Motion is GRANTED with respect to Counts I, III, and the portion of Count IV involving UFX, and DENIED in all other respects.  It is further

ORDERED AND ADJUDGED that Plaintiff's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.  The Motion is GRANTED as to Count V, and DENIED as to Count  II and the portion of Count IV involving QIX and Stern.  It is further

35

ORDERED AND ADJUDGED that the Report and Recommendation on Plaintiff's Motion for Preliminary Injunction (dkt # 270), the Report and Recommendation on Defendants' Motion to Dismiss (dkt # 271), and the Report and Recommendation on Plaintiff's Motion for Summary Judgment (dkt # 273) are ADOPTED consistent with the terms of this Order.

DONE AND ORDERED in Chambers at Miami, Florida, this 20th day of March, 2009.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:    All counsel of record